## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRICO MARINE SERVICES, INC., *et al.*,[1] | ) | Case No. 10-_____ |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |

## DECLARATION OF JOHN R. CASTELLANO IN SUPPORT
## OF FIRST DAY PLEADINGS AND PAPERS

I, John R. Castellano, hereby declare under the penalty of perjury:

1.    I am the Chief Restructuring Officer ("CRO") for Trico Marine Services, Inc. ("TMS" or "Trico"), the parent company of Trico Marine Assets, Inc. ("TMA"), Trico Marine Operators, Inc. ("TMO"), Trico Marine International, Inc. ("TMI"), Trico Holdco, LLC ("Holdco"), and Trico Marine Cayman, L.P. ("Cayman"), the above-captioned debtors in possession (collectively, the "Debtors"). I have been working with the Debtors since June of 2010. In this capacity, I have been actively engaged in the management of the Debtors' business operations, the preparation of the Debtors' petition for relief under chapter 11 of the bankruptcy code, and other aspects of the Debtors' restructuring efforts. I have reviewed the Debtors' business plans, projections, and attempts to obtain financing. I am familiar with the Debtors' day-to-day operations, businesses, financial affairs and books and records. I am duly authorized to make this declaration and the statements set forth herein on behalf of the Debtors. I have personal knowledge of the facts set forth herein.

---

[1] The Debtors are the following entities (followed by their tax identification numbers): Trico Marine Services, Inc. (XX-XXX2405); Trico Marine Assets, Inc. (XX-XXX2404); Trico Marine Operators, Inc. (XX-XXX6124); Trico Marine International, Inc. (XX-XXX3132); Trico Holdco, LLC (XX-XXX3870); Trico Marine Cayman, L.P. (XX-XXX5842). The mailing address for all of the Debtors for the purpose of these Cases is 10001 Woodloch Forest Drive, Suite 610, The Woodlands, TX 77380.

2.    On August 25, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") which commenced their bankruptcy cases (the "Cases").

3.    Since the Petition Date, the Debtors have continued to operate and manage their business as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

## OVERVIEW OF THE DEBTORS

### Business Overview

4.    The Debtors are headquartered in The Woodlands, Texas and through debtor and nondebtor subsidiaries, provide subsea services, subsea trenching and protection services, and towing and supply services and vessels, primarily to oil and natural gas exploration and production companies that operate in major offshore oil and gas producing regions around the world, including the North Sea, West Africa, Mexico, Brazil, and the Asia Pacific Region. Trico Marine Services, Inc. ("TMS"), the lead Debtor in the Cases, is the ultimate parent of 43 entities.

5.    The Debtors began as a towing and supply services company, but in 2007 and 2008, acquisitions expanded the services of the Debtors beyond towing and supply to also include subsea services and subsea trenching and protection. The principal subsidiaries providing subsea services and subsea trenching and protection services, DeepOcean AS ("DeepOcean") and CTC Marine Projects, Ltd. ("CTC Marine"), are nondebtors in these Cases.

6.    DeepOcean, through its subsidiaries, provides subsea services management covering the full life cycle of a well. DeepOcean's fleet of state-of-the-art vessels, engineering solutions, and equipment support the exploration, construction, production, and finally the decommissioning phases of a well. These services include the initial survey of the seabed floor to develop a topographical map of the area in preparation of for the installation of a subsea

offshore field. DeepOcean also provides inspection, maintenance and repair services necessary to maintain a subsea infrastructure once it is in place. After an offshore well is depleted, DeepOcean would be responsible for disassembling the subsea infrastructure and returning the seabed to its original condition.

7. CTC Marine manages the Debtors' subsea trenching and protection services. CTC Marine's customers are comprised of offshore oil and gas exploration and production companies, large power and telecommunications companies, and engineering, procurement, installation and construction contractors companies. CTC Marine offers a fleet of modern subsea capable equipment and vessels. Utilizing state-of-the-art subsea trenching assets and engineering solutions, CTC Marine provides burial services for subsea transmission systems, including pipelines, flowlines, cables and other subsea infrastructure products through use of a fleet of modern subsea capable equipment and vessels.

8. The Debtors, through their subsidiaries and affiliates, also provide marine support services to the oil and gas industry through the use of a diversified fleet of vessels. These services include the transportation of drilling materials, supplies and crews to drilling rigs and other offshore facilities, towing support for drilling rigs and equipment, and support for the construction, installation, repair, and maintenance of offshore facilities.

## TMS Common Stock

9. TMS Common Stock is publicly traded on the NASDAQ National Market under the ticker symbol TRMA. As of August 16, 2010, TMS had 20,286,308 shares of common stock outstanding, with par value of $0.01.

## Debt Structure

### U.S. Credit Facility and DIP Facility

10.     In January of 2008, TMS entered into a Credit Agreement (as amended, the "U.S. Credit Facility") with Nordea Bank Finland PLC ("Nordea"), and Unicredit Bank AG (f/k/a Bayerische Hypo — Und Vereinsbank) ("Unicredit"), as lenders.  Needing additional capital, and not having any availability under the U.S. Credit Facility, the U.S. Credit Agreement was amended and restated on June 11, 2010 by and among TMS, as borrower; Debtors Trico Marine Assets, Inc. ("TMA"), Trico Marine Operators, Inc. ("TMO"), Trico Marine International, Inc. ("TMI"), Trico Marine Cayman, LP ("Trico Cayman"), and Trico Holdco, LLC ("Holdco"), and certain non-debtor affiliates,[2] as guarantors; Obsidian Agency Services, Inc. ("Obsidian"), as collateral agent and administrative agent; and affiliates of Tennenbaum Capital Partners, LLC ("Tennenbaum Capital"), as lenders (replacing Nordea and Unicredit).[3]  As amended, the U.S. Credit Facility is a $25 million term loan that matures on December 31, 2011.  As of August 25, 2010, the full principal amount was outstanding.  Interest on the U.S. Credit Facility accrues at an annual rate equal to LIBOR plus 15.5%.[4]

11.     The U.S. Credit Facility[5] is secured by mortgages (and related assignments of earnings and assignment of insurances) for 11 ships; pledges of all deposit accounts of TMS,

---

[2] The non-debtor guarantors of the U.S. Credit Facility are Coastal Inland Marine Services Ltd., Trico Marine Services (Hong Kong) Limited, Servicios de Apoyo Maritimo de Mexico, S. de R.L. de C.V., Trico Servicos Maritimos Ltda., Trico International Holdings B.V., and Trico Marine International Holdings B.V.

[3] Subsequent to the June 11, 2010 amendment, several further amendments were made to the U.S. Credit Facility: (A) on June 25, 2010 to (i) permit the creation of certain liens, (ii) exempt the bankruptcy filing by certain subsidiaries of TMS from the events of default, and (iii) suspend the effectiveness of the guarantee of the U.S. Credit Facility by TMI until such time as TMS files for bankruptcy protection; (B) on July 23, 2010 to permit restrictive provisions entered into in connection with the First Supplemental Indenture and the Trico Shipping W/C Facility (defined below); (C) on August 10, 2010 to increase the interest rate to 15.5%; (D) on August 16, 2010 to remove the cross-default provision to the 3% Notes (defined below) and extend the date by which a bankruptcy must be filed to August 23 if no forbearance is received from the holders of the Secured Notes (defined below) and the 3% Notes; and (E) on August 23, 2010 to extend the date by which a bankruptcy must be filed to August 27 if no forbearance is received from the holders of the Secured Notes and the 3% Notes.

[4] Upon approval of the Final DIP Order, a portion of the interest is refundable to the Debtors.

[5] On June 11, 2010 TMS entered into (i) a Reimbursement Agreement ("Reimbursement Agreement") by and among TMS, TMA, TMO and Nordea and (ii) a L/C Cash Collateral Agreement (together with the Reimbursement Agreement, the "Letter of Credit Agreements") pursuant to which six letters of credit (as amended, the "Continuing Letters of Credit") with an aggregate stated amount of $3,490,546.24 originally issued pursuant to the U.S. Credit

TMA and TMO; 100% of the equity interests of TMA and TMO; 65% of the equity interests of Trico Cayman; and a pledge of a subordinated intercompany note from Trico Supply AS ("Trico Supply") payable to TMO with an initial principal amount of $194 million (the "$194 million Intercompany Note").

12.     Contemporaneously with the June 11, 2010 amendment to the U.S. Credit Facility, TMS entered into an Existing Credit Commitment Purchase and Debtor-in-Possession Facility Commitment (the "Original DIP Facility Commitment"), among TMS and Tennenbaum DIP Opportunity Fund, LLC ("Tennenbaum"). The proceeds of the Original DIP Facility Commitment, if utilized, would be used in part to fully refinance the obligations under the existing U.S. Credit Facility and will accrue at an interest rate equal to the LIBOR Rate (as defined in the DIP Facility plus 9.5% per annum (the" Original DIP Facility"). The Original DIP Facility contemplated the funding of a $50 million debtor-in-possession facility, $25 million of which would have refinanced or "rolled up" the Debtors' obligations under the U.S. Credit Facility, and the $25 million balance in "new money" loans to the Debtors' estates.

13.     However, after negotiating the terms of the amendments to the U.S. Credit Facility, and in the weeks leading up to the Petition Date, it became apparent that the assumptions regarding the financial status of the Debtors and the Debtors' non-debtor affiliates upon which the Original DIP Facility was structured were no longer valid. Accordingly, on August 24, 2010, and with little alternative financing options available to the Debtors, the Debtors amended the Original DIP Facility Commitment to instead provide for a $35 million debtor-in-possession credit facility, $25 million of which will refinance or "roll up" the Debtors'

---

Facility were (x) kept outstanding after the termination of the letter of credit facility under the U.S. Credit Facility and (y) cash collateralized in an amount equal to 105% of the stated amount of such letters of credit. Nordea has no obligation to issue new letters of credit pursuant to the Letter of Credit Agreements. Letters of credit in a stated amount of $277,000.00 expired on July 6, 2010 and the corresponding cash collateral was returned to TMO.

obligations under the U.S. Credit Facility, and the $10 million balance in "new money" loans to the Debtors' estates (the "Amended DIP Facility" and "Amended DIP Facility Commitment"). The interest rate under the Amended DIP Facility increased to LIBOR plus 11.5%. The Amended DIP Facility will provide much needed liquidity to the Debtors' estates and will allow the Debtors to operate in chapter 11, but is not expected to provide the liquidity necessary to accomplish a complete restructuring of the estates through confirmation of a Plan. Accordingly, the Debtors continue to evaluate alternative transactions to bring additional working capital into the estates, to include the use of asset sales and possible "take out" debtor-in-possession financing.

## 8.125% Secured Notes

14. TMS, TMA, and TMO also owe approximately $202.8 million under certain 8.125% secured convertible debentures due in 2013 (the "Secured Notes") secured by, *inter alia,* a second lien on the 11 vessels pledged to the U.S. Credit Facility, the $194 million Intercompany Note, and 100% of the equity interests of TMA and TMO.[6] U.S. Bank, N.A. ("U.S. Bank") serves as the indenture trustee for the Secured Notes. Under the indenture governing the Secured Notes, interest payments are to be made on May 15 and November 15 of each year, each with a subsequent 30-day grace period. The interest payment due May 15, 2010 remains unpaid. Principal payments are also due quarterly, beginning on August 1, 2010. The August 1 payment also remains unpaid

## 3% Senior Convertible Notes

15. On February 7, 2007, TMS issued $150 million of 3% senior convertible debentures due 2027 (the "3% Notes") with Wells Fargo Bank, N.A. ("Wells Fargo") as

---

[6] TMA and TMO have issued non-recourse guaranties of the Secured Notes.

indenture trustee. The indenture governing the 3% Notes specifies that interest is due on January 15 and July 15 of each year. The payment due July 15, 2010 remains unpaid. The 3% Notes are unsecured and are not guaranteed by any affiliates of TMS.

16. In the aggregate, the obligations under the U.S. Credit Facility, the Secured Notes, and the 3% Notes totals approximately $378 million (collectively, the "Parent Debt") and comprise the main credit obligations of TMS. The obligations under the Parent Debt are all *pari passu* in right of payment. The U.S. Credit Facility, however, has a senior lien on shared collateral with the Secured Notes, while the 3% Notes are wholly unsecured.

### Other Significant Affiliate Obligations

**The High Yield Notes**

17. Trico Shipping AS, a Norway entity ("Trico Shipping") and non-debtor affiliate of TMS, is the primary obligor on two separate financial debt obligations: a series of secured notes and a working capital credit facility. On October 30, 2009, Trico Shipping issued $400 million of 11.875% senior secured notes due 2014 (the "High Yield Notes"). Under the indenture governing the High Yield Notes, interest payments are due on May 1 and November 1 of each year, with the debt obligations fully maturing on November 1, 2014. TMS, Holdco, Trico Cayman, and a substantial number of the non-debtor subsidiaries of TMS are guarantors of the High Yield Notes (collectively, the "High Yield Notes Guarantors").[7]

18. Together with Trico Shipping, the High Yield Notes Guarantors have pledged a first-priority lien in substantially all of their assets to secure the debentures. The collateral

---

[7] The High Yield Notes Guarantors are: TMS; Trico Cayman; Holdco; Trico Supply; Trico Subsea Holding AS; Trico Subsea AS; DeepOcean Shipping III AS; Deep Ocean Shipping II AS; DeepOcean Shipping AS; DeepOcean; Trico Supply Limited; Albyn Marine Limited; CTC Marine Projects Limited; DeepOcean Brasil Servicos Ltda.; DeepOcean Maritime AS; DeepOcean Management AS; Deep Ocean de Mexico S. de R.L. de C.V.; CTC Marine Norway AS; CTC Marine Projects (Guernsey) Limited; DeepOcean Subsea Services Limited; DeepOcean BV; DeepOcean UK Ltd.; Servicios Profesionales de Apoyo Especializado, S. de R.L. de C.V.; and Servicios de Soporte Profesional Administrativo, S. de R.L. de C.V.

includes 13 vessels and related assets, certain refund guarantees, factoring agreements, intercompany notes, including a subordinated loan agreement from Trico Shipping payable to TMS in an initial principal amount of $395 million (the "$395 Million Intercompany Note") and a subordinated loan agreement from Trico Supply payable to Trico Cayman in an initial principal amount of $33 million (the "$33 Million Intercompany Note"), TMS's equity interest in Holdco, and additional pledges of collateral by a substantial number of TMS's subsidiaries.

19.      All of TMS's High Yield Notes Guarantors have also pledged their owned equity interests of affiliated subsidiaries to secure the High Yield Notes.[8]  Additionally, nine of the non-debtor subsidiaries have pledged cash accounts.[9]  The vessels and related assets, refund guarantees, factoring agreements, equity pledges, and cash account pledges (collectively, the "Trico Shipping Debt Collateral") constitute the bulk of the collateral pledged under the High Yield Notes. TMS's guaranty of the High Yield Notes is junior in right of payment to the U.S. Credit Facility.

20.      On June 25, 2010, Trico Shipping and the High Yield Notes Guarantors entered into the first supplemental indenture to the High Yield Notes with Deutsche Bank as trustee (the "First Supplemental Indenture").  The First Supplemental Indenture primarily implements a forbearance period designed to waive any defaults which would occur under the High Yield Notes and related indenture resulting from the Debtors' chapter 11 filings.  The forbearance is effective on June 17, 2010 and expires on the earlier of (a) June 17, 2011 and (b) the effective

---

[8] The Guarantors Pledging Equity Interests include: Holdco; Trico Supply; Trico Shipping; Trico Subsea Holding AS; Trico Subsea AS; DeepOcean Shipping III AS; Deep Ocean Shipping II AS; DeepOcean Shipping AS; DeepOcean; Trico Supply Limited; Albyn Marine Limited; CTC Marine Projects Limited; DeepOcean Brasil Servicos Ltda.; DeepOcean Maritime AS; DeepOcean Management AS; Deep Ocean de Mexico S. de R.L. de C.V.; CTC Marine Norway AS; CTC Marine Projects (Guernsey) Limited; DeepOcean Subsea Services Limited; DeepOcean BV; DeepOcean UK Ltd.; Servicios Profesionales de Apoyo Especializado, S. de R.L. de C.V.; and Servicios de Soporte Profesional Administrativo, S. de R.L. de C.V.

[9] Guarantors Pledging Accounts include Trico Shipping, Trico Supply, DeepOcean Shipping III AS, DeepOcean Shipping II AS, Trico Subsea AS, Trico Subsea Holding AS, DeepOcean AS, DeepOcean Management AS, and DeepOcean Maritime AS.

date of a plan of reorganization in the Cases. The First Supplemental Indenture, among other things, (i) waives certain events of default related to the Debtors' commencement of the Cases, (ii) waives certain events of default related to indebtedness issued by TMS, including acceleration of this indebtedness and nonpayment of interest and/or principal during the forbearance period, (iii) adds certain financial covenants at Trico Supply and its subsidiaries during the forbearance period, and (iv) increases the amount of indebtedness that can be issued and secured by the Trico Shipping Debt Collateral of the High Yield Notes from $450 million to $465 million.

**Trico Shipping Working Capital Facility**

21.     In addition to the High Yield Notes, Trico Shipping is party to a working capital facility (the "Trico Shipping W/C Facility") originally with Nordea and Unicredit as lenders, and as more fully described herein, with the addition of Tennenbaum Capital as lender.[10] The revolving loan portion of the Trico Shipping W/C Facility (provided by Nordea and Unicredit) expires on December 31, 2011 with quarterly amortization payments of approximately $2.18 million. Interest accrues at LIBOR plus 7% plus a utilization fee of 3% per annum.[11] A $10 million letter of credit subfacility remains outstanding as of August 1, 2010. As of August 1, 2010, the total commitment of approximately $15 million remains outstanding and is fully drawn (including issued letters of credit).

22.     Originally, Trico Supply and its subsidiaries had contemplated adding an additional $50 million in needed liquidity through an addition of $50 million in High Yield Notes, as authorized by the First Supplemental Indenture (commonly referred to as the "tack on

---

[10] On June 21, 2010, the Trico Shipping W/C Facility was amended to (i) increase the interest rate by 2% during a forbearance period, (ii) permit the incurrence of additional indebtedness by Trico Shipping, (iii) revise the manner in which certain prepayments are applied to scheduled commitment reductions, and (iv) add financial covenants relating to minimum cash and minimum EBITDA.

[11] During the forbearance period.

bonds"). However, during this process, Trico Supply was approached by Tennenbaum Capital to provide the $50 million under a working capital facility structure, with superior terms to those proposed under the "tack on bond" structure.

23. Accordingly, on June 29, 2010, Trico Shipping entered into the Third Amendment to Credit Agreement and Forbearance Agreement. The June 29, 2010 amendment provided for the addition of a term loan facility (the "Term Loan Facility") to be provided by affiliates of Tennenbaum Capital, including up to $50 million in Tranche A Term Loans and up to $15 million in Tranche B Term Loans (collectively, the "Term Loans"). The Term Loans mature on January 31, 2014 and will bear interest at the initial rate of 13.5% per annum until June 30, 2013 and 14.5% per annum thereafter. Undrawn amounts under the Term Loan Facility are subject to a fee equal to 1.5% per annum until December 31, 2010 and 2.5% per annum thereafter.

24. At closing of the Term Loan Facility, Trico Shipping borrowed approximately $28 million under the Tranche A Term Loans. While $22 million remains available under the Term Loan Facility, Trico Shipping agreed not to draw on this availability prior to December 31, 2010, due to changes in financial conditions of the Debtors and their non-debtor affiliates. Trico Shipping is likely unable to ultimately access the $22 million in availability.

25. The Trico Shipping W/C Facility and the Term Loan Facility are secured by the same Trico Shipping Debt Collateral and are *pari passu* in payment and lien priority with the High Yield Notes. Similar to the High Yield Notes, TMS's guarantee of the Trico Shipping W/C Facility and the Term Loan Facility is junior in right of payment to the U.S. Credit Facility.

**Other Significant Debt**

26. In 1999, Debtor TMI issued $18.9 million of notes due in 2014 (the "MARAD Notes") to finance construction of two supply vessels, of which approximately $5 million

remains outstanding as of August 1, 2010. The notes are guaranteed by TMS and the U.S. Maritime Administration and are secured by first priority preferred mortgages on the two vessels. The interest rate under the MARAD Notes is 6.11%.

## Events Leading to Chapter 11

27.    The demand for providers of subsea and marine support vessels and services is dependent upon the needs for such providers by offshore natural gas exploration and production companies. During 2009 and into 2010 there has been a significant reduction in the level of operating and capital expenditures in the offshore oil and gas industries, as well as other industries that would require offshore services such as those provided by the Debtors. This reduction in demand was driven principally by the global economic slowdown that occurred during 2009. The Debtors provide services that relate to projects with a significant investment requirement as well as a significant lead time in developing and executing. As a result, the Debtors, and the companies to which the Debtors provide services, are susceptible to wide variations in supply and demand, commodity and currency fluctuations, changing regulatory regimes, political instability, and security concerns. Additionally, as the prices of oil and natural gas decline or are depressed, drilling and construction activities in the regions in which the Debtors operate decline or remain stagnant. As the Debtors serve industries where there is a long lead time for investment, perceptions regarding global economic growth as well as perceptions regarding commodity prices impact investment decisions, and, thus, impact demand for the Debtors' services. In addition, the business of the Debtors is seasonal and depends in part on weather conditions. Thus, the financial results of certain quarters are impacted by changing weather conditions, particularly the winter months in the North Sea.

28. As a result of the decline in oil and gas prices, a decline in utilization and day rates in the towing and supply businesses driven by reduced exploration and production spending and an increase in the supply of vessels, the Debtors were faced with insufficient liquidity to service the above-described debts and obligations.

**The Debtors' Efforts to Negotiate a Consensual Restructuring - Prepetition**

29. On or about June 17, 2010, the Debtors' grace period to make the interest payment on the Secured Notes expired. On June 29, 2010, the Debtors entered into a forbearance agreement with a majority of the holders of the Secured Notes (the "Secured Notes Forbearance Agreement"). The purpose of the Secured Notes Forbearance Agreement was to negotiate a consensual restructuring of the Debtors' assets and debts, not only with the holders of the Secured Notes, but also with the holders of the 3% Notes, and if necessary, with the holders of the High Yield Notes, in light of TMS's guaranty and placement of the $194 Million Intercompany Note, the $395 Million Intercompany Note, and the $33 Million Intercompany Note in Trico Shipping's and Trico Supply's capital structures. Tennenbaum agreed to a September 8, 2010 deadline to commence chapter 11 proceedings (or otherwise forfeit the Original DIP Commitment). Additionally, to assist in this process, the Debtors retained Evercore Group L.L.C. and AP Services, LLC ("APS") to provide financial advisory and restructuring advisory services.

30. From June 27, 2010 through the Petition Date, the Debtors aggressively pursued negotiations over a consensual restructuring. Due to the many and varied interests of the various creditor groups, no consensual restructuring plan was achieved.

31. The Secured Notes Forbearance Agreement expired August 15, 2010. On August 16, 2010, a new forbearance agreement was executed with the majority holders of the Secured

Notes, and, with no agreement being reached, the new forbearance agreement with the Secured Notes expired on August 24, 2010.

32.    Additionally, the grace period for the payment of interest due July 17, 2010 on the 3% Notes expired on August 15, 2010.  Though discussions with the significant holders of 3% Notes was undertaken, no forbearance agreement was ever reached.

33.    In the meantime, a reassessment of the business plan and downturn in the business impacted the availability of liquidity through the Term Loan Facility.  It soon became apparent that a strategy of reorganizing the Debtors without involving holders of significant debt at the non-debtor affiliate level was no longer feasible.

34.    Between August 15, 2010 and the Petition Date, the Debtors and non-debtor affiliates engaged in an intense effort to reach a consensus with any of their significant creditors that would inject liquidity into the Debtors sufficient to allow the Debtors to continue to operate outside of chapter 11 while a consensual restructuring was negotiated.  These discussions included each of the Debtors' and non-debtors' major constituencies:  Tennenbaum and Tennenbaum Capital, the 3% Notes, Secured Notes, and High Yield Notes.  The Debtors proposed the framework of a consensual plan to all parties and, although parties initially indicated willingness to work within the framework, no consensual plan or feasible structure for short-term financing for the Debtors could ultimately be obtained.  Needing to avail themselves of the Amended DIP Facility, the Debtors commenced chapter 11 on the Petition Date.

35.    The Debtors commenced these Cases to maximize the value of the Debtors' assets for the benefit of their stakeholders, recapitalize their capital structure, and to enable the Debtors to take strategic action to address short and long-term liquidity constraints.

# FIRST DAY MOTIONS

36.     I have reviewed the various pleadings filed contemporaneously herewith and discussed herein (the "First Day Motions").[12] The allegations contained in each of the First Day Motions are true and correct to the best of my knowledge, information, and belief.

## Debtors' Motion to (A) Approve Maintenance of Certain Pre-Petition Bank Accounts and Cash Management System; (B) Continue Use of Existing Checks and Business Forms; and (C) Continue Current Investment Policies

37.     Prior to commencing these Cases, the Debtors managed their cash, receivables, and payables through a cash management system (the "Cash Management System") maintained with Nordea and Union Bank. The Cash Management System is designed to efficiently collect, transfer, and disburse funds for each of the Debtors.

38.     A listing of the Debtors' bank accounts is attached to the motion as **Exhibit A**, and a diagram of the Cash Management System is attached to the motion as **Exhibit B**. The principal components of the Cash Management System are described below, and all of the Debtors' accounts are maintained in the United States.

39.     TMS maintains with Nordea account no. XXXXXX3001 (the "TMS Account") and maintains with Union Bank, N.A. account no. XXXXXX4997 (the "Blocked Account"). TMO maintains five bank accounts with Nordea: account no. XXXXXX3001 (the "General Operating Account"), account no. XXXXXX3002 (the "Disbursement Account"), account no. XXXXXX3003 (the "Lockbox Account"), account no. XXXXXX3005 (the "Reserve CC Account"), account no. XXXXXX2002 (the "Investment Account"). TMA maintains one account with Nordea, designated as account no. XXXXX63001 (the "TMA Account"). Finally, Cayman maintains one account with Nordea, designated as account no. XXXXX03001 (the

---

[12] Capitalized terms not defined herein shall have the meaning given to them in their respective First Day Motions.

"Cayman Account"). As of August 24, 2010, the Debtors' Bank Accounts had a combined bank cash balance of $669,470 of which $817 was held in the Blocked Account.

40.     The Blocked Account was funded by the refinance of the U.S. Credit Facility and contains the proceeds of the amendment and restatement of the U.S. Credit Facility in connection with the Amended DIP Facility Commitment. Funds from the Blocked Account are transferred to and from the General Operating Account in accordance with the terms of the U.S. Credit Facility.

41.     During the day, the General Operating Account operates as a holding account for any upstreamed revenues from certain subsidiaries. Additionally, the Disbursement Account, Lockbox Account, Reserve CC Account, TMA Account, and TMS Account are swept to the General Operating Account, resulting in zero balances for those accounts at the end of the day. Each night, the balance of the General Operating Account is swept to the Investment Account; then, each morning, the balance in the Investment Account is swept back into the General Operating Account. Funds in the Investment Account generate interest if the balance in the Investment Account is over a pre-determined level, however, the balance of the Investment Account generally does not meet the minimum level for interest. Funds from the General Operating Account may also be transferred, as necessary, to the Disbursement Account. Moreover, all wire transfers are processed from the General Operating Account.

42.     The Disbursement Account is used by the Debtors for all payments made by check. The Lockbox Account is used for miscellaneous check receipts, such as COBRA payments from former employees, refunds of suppliers for overpayments and taxes, and employee payments and reimbursements to the Debtors.

43.    The TMS Account, Reserve CC Account, General Operating Account, Disbursement Account, Lockbox Account, and Investment Account are pledged to secure the U.S. Credit Facility. The Blocked Account is subject to a control agreement in favor of Tennenbaum in accordance with the U.S. Credit Facility.

44.    Occasionally, TMO receives excess cash and/or revenues from the following non-Debtor affiliated entities: Trico Servicos Maritimos Ltda. ("Brazil"), Coastal Inland Marine Services Ltd. ("West Africa"), and Naviera Mexicana de Servicios, S. de R.L. de C.V. ("Mexico"). In practice, Brazil, Mexico, and West Africa wire funds from the applicable non-Debtor entity's account into the General Operating Account. Additionally, a significant portion of the revenues from West Africa and Brazil is transferred directly from customers to the General Operating Account by wire transfer and/or electronic funds transfer: approximately 80% of West Africa's revenue and approximately 50% of Brazil's revenue.[13] The Debtors, however, do not anticipate that the non-Debtor entities will have excess cash during the Cases.

45.    For example, Brazilian revenue received in the General Operating Account related to a vessel owned by non-Debtor Trico Shipping is paid by wire transfer to Trico Shipping from the General Operating Account for expenses related to the vessel.

46.    The Debtors also pay certain other expenses to or on behalf of West Africa, Mexico, and Brazil. The Debtors estimate that approximately $640,000 will be paid out of the General Operating Account to or on behalf of Mexico through October 31, 2010. The Debtors estimate that approximately $800,000 per month will be paid out of the General Operating Account to or on behalf of Brazil during the Cases. Additionally, the Debtors expect to pay out approximately $2,450,000 from the General Operating Account to or on behalf of West Africa

---

[13] The approximate average forecast for receipts from Brazil and West Africa over the next 26 weeks is $550,000 per month and $1,400,000 per month, respectively.

through September 30, 2010, a portion of which relates to local West African taxes. Following September, the Debtors expect to transfer approximately $700,000 per month from the General Operating Account to or on behalf of West Africa during the Cases. The usage of funds for these purposes is provided for in the budget to the Debtors' proposed DIP Facility. The Debtors will maintain intercompany records of their activity with Mexico, Brazil, and West Africa so that transfers to and from the Debtors can be tracked.

47.     The Debtors maintain a coordinated and integrated accounting, cash management, and treasury system to manage their extensive business operations, and the Debtors believe that the transition to chapter 11 will be more orderly and will minimize the disruption to their operations if they are authorized to continue their pre-petition practices by using their Cash Management System and the bank accounts associated therewith.

48.     The Debtors' Cash Management System constitutes an ordinary course and essential business practice and provides significant benefits to the Debtors and their estates including, among other things, the ability to control corporate funds, ensure the maximum availability of funds when necessary, and reduce borrowing costs and administrative expenses by facilitating the movement of funds and by providing more timely and accurate account balance information.

49.     Having to replace the current Cash Management System would be costly and disruptive of the orderly collection of revenues by the Debtors, resulting in a significant adverse affect on the Debtors' reorganization efforts.

50.     Maintenance of the existing Cash Management System is in the best interests of the Debtors and their estates. The maintenance of the Cash Management System, as modified (together with the reporting discussed in the Motion), will accomplish the dual goals of

minimizing the disruption to the Debtors' operations and satisfying the United States Trustee's operating guidelines. The recording of transactions would afford a complete accounting of the Debtors' funds and would provide the Trustee comfort that the spirit of the operating guidelines would be observed.

51.     The Debtors respectfully request that, pursuant to Bankruptcy Code § 503(b)(1), all intercompany claims against a Debtor by another Debtor arising after the Petition Date as a result of intercompany transactions, if any, through the Cash Management System be accorded administrative expense priority status.

52.     Additionally, the Debtors are seeking this Court's waiver of the requirement to order new checks and business forms that include the term "debtor in possession." The Debtors have an inventory of check stock and business forms that would go to waste if new checks were to be ordered and used. Moreover, requiring the Debtors to obtain new checks, which bear the designation "debtor in possession," would cause the Debtors to incur undue expense.

53.     The Debtors are also seeking an interim waiver of compliance with 11 U.S.C. § 345. The Debtors submit that cause exists to authorize the Debtors to continue to deposit and invest cash in substantially the same manner as the Debtors have invested such funds prior to the Petition Date.

54.     Cause exists to grant a waiver of the requirements of Bankruptcy Code § 345 for 45 days for several reasons. The Debtors operate a large and sophisticated business, and the Cases are complex. Further, each of the Debtors' banks are sound financial institutions that have experience working with the Debtors.

55.     If the Debtors determine that they are unable to comply with the requirements of §

345, in consultation with the United States Trustee within the 45-day period, the Debtors will file

a permanent motion seeking waiver of these requirements.

56.     No prior request for the relief sought in this Motion has been made to the Court in

these Cases.

### Debtors' Motion to (I) Authorize Debtors to (A) Pay Pre-petition Wages and Salaries to Employees and (B) Pay Pre-petition Benefits and to Continue Benefit Programs in the Ordinary Course and (II) Direct Banks to Honor Pre-petition Checks for Payment of Pre-petition Employee Obligations

57.     TMO is the only Debtor entity with employees. As of the Petition Date, TMO

employed 67 individuals, of whom 36 work on an annual salary basis, and 31 are paid a daily

rate for days worked (the "Employees").

58.     TMO pays 64 of its employees on a semi-monthly basis and three of its

employees on a monthly basis. Office employees are paid on a current basis and shipping crew

employees are five days in arrears. The aggregate semi-monthly payroll for employees is

approximately $434,835. TMO uses Automatic Data Processing, Inc. ("ADP") to process its

payroll obligations. Each pay period, TMO transfers the appropriate amount to ADP in advance

of the employees' scheduled pay date, and ADP remits payment to the employees.[14] TMO

funded its payroll on or about August 5, 2010, which paid non crew employees through August

15, 2010 and crew employees through August 13, 2010. The employees' next pay date will be

on or around August 31, 2010. As of the Petition date, the Debtors estimate that approximately

$261,600 in pre-petition wages is due to employees. With the exception of Richard Bachmann,

TMS's CEO, who is owed approximately $16,153.85 in pre-petition wages, and Tomas Salazar,

---

[14] Approximately four employees of TMO are not U.S. citizens. ADP does not process those employees' paychecks; instead, TMO directly wires the funds to these employees each pay period.

TMS's Vice President – Americas and West Africa, who is owed approximately $14,715.91 in pre-petition wages and allowances, the Debtors do not believe that any other single employee is owed pre-petition amounts in excess of the $11,725 statutory cap imposed by 11 U.S.C. § 507(a).

59.     Five of TMO's employees are U.S. citizens living abroad and two of TMO's employees are non-U.S. citizens living outside their home countries (the "International Employees"). The International Employees receive a cost of living allowance based on statistical costs of living, family size, and location. Three of the International Employees receives a foreign service premium equal to 15% of their base salary and one International Employee receives a foreign service premium equal to 22% of his base salary. TMO pays the housing expenses of the International Employees and also pays for one home visit per year (airfare and other expenses) for the International Employees and their families.

60.     In the ordinary course of its business, TMO also provides its employees with certain benefits, including medical, dental and vision insurance, flexible spending accounts, basic and voluntary life and accidental death and dismemberment insurance, short- and long-term disability benefits, a 401(k) retirement savings plan, a business travel medical plan, and paid leave benefits. TMO also sponsors several special programs for its employees, including an employee counseling and assistance program, a direct deposit program, and a transportation allowance. TMO also reimburses its employees for business expenses.

61.     The Debtors provide a business travel medical plan through HTH Worldwide to cover unforeseen employee medical expenses while traveling on business. As of the Petition Date, the Debtors believe less than $15,000 is due to HTH Worldwide. To the extent that any of the Debtors owe any additional amount under these obligations pre-petition, the Debtors submit that these amounts are *de minimis*.

62.    TMO offers vacation to its annual salary employees that is based upon the length of service to TMO and/or the Employee's prior relevant job-related experience and provides employees with a minimum of 11 holidays per year. Vacation ranges from two to five weeks and must be taken in the calendar year it was earned. Unused vacation cannot be carried over to the following year. TMO does not allow employees to "cash out" their unused vacation time at the end of the calendar year; however, in the ordinary course of business, TMO pays employees for their unused accrued vacation upon cessation of employment.

63.    In order to avoid the undue hardship that would undoubtedly befall the employees if they went unpaid, the Debtors request that the Court enter an order under Bankruptcy Code §§ 105(a), 363, 507(a)(4), 541, 1107, and 1108 granting the Debtors the authority, in their discretion and in the exercise of their business judgment, (a) to pay all obligations of the Debtors owing to or on behalf of employees (the "Employee Claims"),[15] including pre-petition claims, whether accrued or currently due and payable, of all of TMO's employees; (b) to pay all pre-petition benefits, whether accrued or currently due and payable, and to continue TMO's various employee benefit plans and programs in the ordinary course (the "Employee Benefits"), including payment of all applicable plan administrators; and (c) directing all financial institutions to honor pre-petition checks for payment of Employee Claims and Employee Benefits (collectively, the "Employee Obligations") and prohibiting such financial institutions from placing any holds on, or attempting to reverse, any automatic transfers made to satisfy Employee Obligations. Any payment made on behalf of the Employee Obligations will not exceed, in the

---

[15] Including, but not limited to, compensation, expense reimbursements, vacation and sick pay, and benefits. The Debtors also seek authority to pay all federal, state, local, and foreign income withholding, payroll, employment, unemployment, social security, and similar taxes, whether withheld from Employees' wages or paid directly by the Debtors payment processor to governmental authorities, as well as other Employee withholdings, including, but not limited to, charitable contributions and garnishment contributions, if any. The defined term "Employee Claims" is meant to include all such payments.

aggregate, $400,000. Assuming the Debtors are granted authority to borrow under the proposed DIP Facility and to use cash collateral as the Debtors have separately requested, the Debtors have sufficient funds available to pay all requested amounts as and when due, and all payments made on account of Employee Obligations will be made in accordance with any budgeted use of DIP Financing and cash collateral approved by the Court.

64.     Payment of the Employee Claims and continuation of the Employee Benefits is necessary for the Debtors' effective reorganization. The Debtors believe that it is critical for employee productivity and stability that all Employee Benefits and payments remain current and are continued postpetition. If the Employees' wages, reimbursements, and benefits are not received in the ordinary course of business, or if the Employee Benefits are discontinued, employee morale will deteriorate, which, in turn, will substantially and adversely impact the Debtors' ability to complete a successful reorganization.

65.     Further, if the Employee Obligations are not paid in the ordinary course of business, the Employees would suffer personal hardship, would not receive needed medical services, and in some cases, would be unable to pay basic living expenses. This will hurt the Employees, destabilize the Debtors, and harm the Debtors' businesses and reorganization efforts. Any loss of Employees would disrupt the Debtors' businesses and would deplete the value of the estates. The competition in the offshore and subsea services industry, particularly for skilled employees, makes TMO's Employees particularly mobile.

66.     The Debtors' maintenance of their positive relationships with the Employees is critical to the continued reliability and efficiency of their ongoing operations during the restructuring process. The Debtors' ability to maintain continued and uninterrupted operations during this crucial time will in turn serve to maximize value of their estates for the benefit of

their estates and creditors. Accordingly, the Debtors' ability to pay certain pre-petition claims of the Employees will assist in the Debtors' efforts to restructure during these Cases.

67. As set forth above, the Debtors believe $261,600 in pre-petition wages is due to Employees. The Debtors thus seek authority to pay pre-petition wages to Employees. The Debtors do not believe the total amount will exceed $280,000. As of the Petition Date, only two Employees, as stated above, have accrued pre-petition wages, salaries, and other amounts that are due and owing as of the Petition Date in excess of $11,725.

68. The cost of air travel is generally paid directly with a company credit card. Other travel expenses are reimbursed by TMO. TMO has instituted certain written polices and procedures under which it reimburses its Employees for business related expenses. The expenses are ordinary course business expenses that TMO's Employees incur in performing their job functions and conducting the Debtors' businesses. It is essential for the continued operation of the Debtors' businesses that TMO be permitted to continue reimbursing Employees for such business expenses.

69. Although the Debtors believe that they are substantially current in the payment of all pre-petition expense reimbursements, given the global nature of the Debtors business, employees may be traveling and incurring pre-petition expenses. The Debtors believe that any such pre-petition expense amounts are *de minimis*. Should any amounts be owed on account of pre-petition expense reimbursements, the Debtors request authority to honor those obligations. The Debtors estimate that any such amounts will fall well under the statutory cap.

70. TMO employs four individuals that are working (or have worked in recent years) in foreign countries (the "Expats") In order to protect these Expats from the financial impact of working in countries with different tax rates than those of the Expats' home country, the Debtors

make the change in country "tax-neutral." At the time of the Petition Date there are outstanding amounts owed to taxing authorities on behalf of at least one of the Expats for taxes due in an amount of approximately $15,000. As calculation of taxes for 2009 and 2010 have not been completed, there may be amounts owing to taxing authorities for taxes due in 2009 and year to date in 2010 related to the four Expats. While it is not possible at this time to determine the exact amounts of these obligations, the Debtors seek authorization to pay any outstanding pre-petition amounts that become due related to these obligations.

71.     As stated previously, TMO uses ADP to process its payroll obligations, and fully funds all taxes one day prior to each pay date. To the extent that any taxes attributable to pre-petition wages are being held by the Debtors or any tax equalization or reconciliation is required in the ordinary course of the Debtors' business, the Debtors seek to collect and pay such taxes in the ordinary course of business.

72.     TMO has several insurance and benefits plans providing various benefits including, medical, dental and vision insurance, flexible spending accounts, life insurance, accidental death and dismemberment insurance, short- and long-term disability benefits, workers' compensation, a 401(k) retirement savings plan, and paid leave benefits (collectively the "Benefit Plans"). TMO, in the ordinary course of its business has also instituted several special programs for its employees, listed below (collectively the "Employee Programs"). The following table summarizes TMO's Benefit Plans and Employee Programs and lists the applicable plan provides:[16]

| BENEFIT PLAN | PROVIDERS | OUTSTANDING |
| --- | --- | --- |

---

[16] Because most plan administrators are paid in advance, the Debtors estimate that they have no significant pre-petition liabilities on account of unpaid premiums associated with the benefits and programs not already set forth on the table below. However, to the extent additional pre-petition liabilities exist, the Debtors are seeking approval to pay those amounts through this Motion.

| BENEFIT PLAN | PROVIDERS | OUTSTANDING |
|---|---|---|
| MEDICAL AND RX INSURANCE | BLUE CROSS BLUE SHIELD OF TEXAS | $16,394 |
| STOP-LOSS INSURANCE | HIGHMARK | $0 |
| DENTAL INSURANCE | METROPOLITAN LIFE INSURANCE COMPANY OF NEW YORK | $0 |
| MEDICAL AND DENTAL INSURANCE FOR THIRD COUNTRY NATIONALS | HTH WORLDWIDE | $0 |
| BUSINESS TRAVEL MEDICAL PLAN | HTH WORLDWIDE | $11,342 |
| VISION INSURANCE | DAVIS VISION | $0 |
| FLEXIBLE SPENDING ACCOUNT | DISCOVERY BENEFITS INC. | $90 |
| LIFE INSURANCE | RELIANCE STANDARD | $0 |
| ACCIDENT DEATH AND DISMEMBERMENT INSURANCE | RELIANCE STANDARD | $0 |
| SHORT TERM AND LONG TERM DISABILITY | RELIANCE STANDARD | $0 |
| 401(K) RETIREMENT SAVINGS | JOHN HANCOCK | $23,200 |
| WORKERS COMPENSATION | SIGNAL MUTUAL | $0 |

73.    TMO offers medical and prescription drug insurance (the "Health Insurance Plan") to its employees through Blue Cross Blue Shield of Texas ("BCBSTX"). HTH Worldwide is the provider of medical and dental insurance for third country nationals employed by TMO.[17]

74.    The Health Insurance Plan is self insured by TMO, but is administered by BCBSTX. TMO also has a stop-loss policy with Highmark, Inc. to cover the cost of any

---

[17] A third country national is a non-U.S. citizen working for a U.S. company in a foreign jurisdiction.