# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TRICO MARINE SERVICES, INC., *et al.*,[1] | ) Case No. 10-_____ |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) AND 507(a), FED. R. BANKR. P. 2002, 4001 AND 9014 AND DEL. BANKR. L.R. 4001-2 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), in the above-captioned chapter 11 cases (the "Cases")[2] by and through their undersigned attorneys, file this *Motion For Entry of Interim and Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a), Fed. R. Bankr. P. 2002, 4001, and 9014 and Del. Bankr. L.R. 4001-2 (I) Authorizing Debtors (A) To Obtain*

---

[1] The Debtors are the following entities (followed by their tax identification numbers): Trico Marine Services, Inc. (XX-XXX2405); Trico Marine Assets, Inc. (XX-XXX2404); Trico Marine Operators, Inc. (XX-XXX6124); Trico Marine International, Inc. (XX-XXX3132); Trico Holdco, LLC (XX-XXX3870); Trico Marine Cayman, L.P. (XX-XXX5842). The mailing address for all of the Debtors for the purpose of these Cases is 10001 Woodloch Forest Drive, Suite 610, The Woodlands, TX 77380.

[2] Capitalized terms used but not otherwise defined in the Motion shall have the respective meanings ascribed thereto in the DIP Financing Agreement (as defined herein).

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 1 of 53

*Postpetition Secured DIP Financing (B) To Refinance Certain Prepetition Secured Indebtedness and (C) To Use Cash Collateral; (II) Granting Liens and Providing For Superpriority Administrative Expense Status; (III) Granting Adequate Protection to Prepetition Secured Parties; (IV) Modifying Automatic Stay; and (V) Granting Related Relief* (the "Motion") and respectfully request that this court (the "Bankruptcy Court" or "Court") enter an interim order on an expedited basis, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and ultimately, at a final hearing to be set by the Court, (the "Final Hearing"), enter a final order substantially in the form of the Interim Order and with certain additional terms as set forth herein (the "Final Order"). Furthermore, the Debtors request that the Court prescribe the form and manner of notice and set the time for the final hearing on the Motion, and such other and further relief as the Court deems just and proper. In support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND PROCEDURAL BACKGROUND

1. The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief sought herein are sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) of the Bankruptcy Code, rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 2 of 53

4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

3.      On August 25, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the Cases.

4.      Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

5.      As of the date hereof, an official committee of unsecured creditors has not been appointed in the Cases.

6.      Contemporaneously with the filing of this Motion, the Debtors filed their Motion for Joint Administration of Cases and Declaration in Support of First Day Pleadings.

## FACTUAL BACKGROUND

### Business Overview

7.      The Debtors are headquartered in The Woodlands, Texas and through debtor and nondebtor subsidiaries, provide subsea services, subsea trenching and protection services, and towing and supply services and vessels, primarily to oil and natural gas exploration and production companies that operate in major offshore oil and gas producing regions around the world, including the North Sea, West Africa, Mexico, Brazil, and the Asia Pacific Region.  Trico Marine Services, Inc. ("TMS"), the lead Debtor in the Cases, is the ultimate parent of 43 entities.

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 3 of 53

8.     The Debtors began as a towing and supply services company, but in 2007 and 2008, acquisitions expanded the services of the Debtors beyond towing and supply to also include subsea services and subsea trenching and protection.    The principal subsidiaries providing subsea services and subsea trenching and protection services, DeepOcean AS ("DeepOcean") and CTC Marine Projects, Ltd. ("CTC Marine"), are nondebtors in these Cases.

9.     DeepOcean, through its subsidiaries, provides subsea services management covering the full life cycle of a well.  DeepOcean's fleet of state-of-the-art vessels, engineering solutions, and equipment support the exploration, construction, production, and finally the decommissioning phases of a well.  These services include the initial survey of the seabed floor to develop a topographical map of the area in preparation for the installation of a subsea offshore field.   DeepOcean also provides inspection, maintenance and repair services necessary to maintain a subsea infrastructure once it is in place.   After an offshore well is depleted, DeepOcean would be responsible for disassembling the subsea infrastructure and returning the seabed to its original condition.

10.     CTC Marine manages the Debtors' subsea trenching and protection services. CTC Marine's customers are comprised of offshore oil and gas exploration and production companies, large power and telecommunications companies, and engineering, procurement, installation and construction contractor companies. CTC Marine offers a fleet of modern subsea capable equipment and vessels. Utilizing state-of-the-art subsea trenching assets and engineering solutions, CTC Marine provides burial services for subsea transmission systems, including

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 4 of 53

pipelines, flowlines, cables and other subsea infrastructure products through use of a fleet of modern subsea capable equipment and vessels.

11.     The Debtors, through their subsidiaries and affiliates, also provide marine support services to the oil and gas industry through the use of a diversified fleet of vessels. These services include the transportation of drilling materials, supplies and crews to drilling rigs and other offshore facilities, towing support for drilling rigs and equipment, and support for the construction, installation, repair, and maintenance of offshore facilities.

## TMS Common Stock

12.     TMS Common Stock is publicly traded on the NASDAQ National Market under the ticker symbol TRMA. As of August 16, 2010, TMS had 20,286,308 shares of common stock outstanding, with par value of $0.01.

## Debt Structure

### U.S. Credit Facility and DIP Facility

13.     In January of 2008, TMS entered into a Credit Agreement (as amended, the "U.S. Credit Facility") with Nordea Bank Finland PLC ("Nordea"), and Unicredit Bank AG (f/k/a Bayerische Hypo — Und Vereinsbank) ("Unicredit"), as lenders. Needing additional capital, and not having any availability under the U.S. Credit Facility, the U.S. Credit Agreement was amended and restated on June 11, 2010 by and among TMS, as borrower; Debtors Trico Marine Assets, Inc. ("TMA"), Trico Marine Operators, Inc. ("TMO"), Trico Marine International, Inc. ("TMI"), Trico Marine Cayman, LP ("Trico Cayman"), and Trico Holdco, LLC ("Holdco"), and

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 5 of 53

certain non-debtor affiliates,[3] as guarantors; Obsidian Agency Services, Inc. ("Obsidian"), as collateral agent and administrative agent; and affiliates of Tennenbaum Capital Partners, LLC ("Tennenbaum Capital"), as lenders (replacing Nordea and Unicredit).[4] As amended, the U.S. Credit Facility is a $25 million term loan that matures on December 31, 2011. As of August 25, 2010, the full principal amount was outstanding. Interest on the U.S. Credit Facility accrues at an annual rate equal to LIBOR plus 15.5%.[5]

14.    The U.S. Credit Facility[6] is secured by mortgages (and related assignments of earnings and assignment of insurances) for 11 ships; pledges of all deposit accounts of TMS, TMA and TMO; 100% of the equity interests of TMA and TMO; 65% of the equity interests of

---

[3] The non-debtor guarantors of the U.S. Credit Facility are Coastal Inland Marine Services Ltd., Trico Marine Services (Hong Kong) Limited, Servicios de Apoyo Maritimo de Mexico, S. de R.L. de C.V., Trico Servicos Maritimos Ltda., Trico International Holdings B.V., and Trico Marine International Holdings B.V.

[4] Subsequent to the June 11, 2010 amendment, several further amendments were made to the U.S. Credit Facility: (A) on June 25, 2010 to (i) permit the creation of certain liens, (ii) exempt the bankruptcy filing by certain subsidiaries of TMS from the events of default, and (iii) suspend the effectiveness of the guarantee of the U.S. Credit Facility by TMI until such time as TMS files for bankruptcy protection; (B) on July 23, 2010 to permit restrictive provisions entered into in connection with the First Supplemental Indenture and the Trico Shipping W/C Facility (defined below); (C) on August 10, 2010 to increase the interest rate to 15.5%; (D) on August 16, 2010 to remove the cross-default provision to the 3% Notes (defined below) and extend the date by which a bankruptcy must be filed to August 23 if no forbearance is received from the holders of the Secured Notes (defined below) and the 3% Notes; and (E) on August 23, 2010 to extend the date by which a bankruptcy must be filed to August 27 if no forbearance is received from the holders of the Secured Notes and the 3% Notes.

[5] Upon approval of the Final DIP Order, a portion of the interest is refundable to the Debtors.

[6] On June 11, 2010 TMS entered into (i) a Reimbursement Agreement ("Reimbursement Agreement") by and among TMS, TMA, TMO and Nordea and (ii) a L/C Cash Collateral Agreement (together with the Reimbursement Agreement, the "Letter of Credit Agreements") pursuant to which six letters of credit (as amended, the "Continuing Letters of Credit") with an aggregate stated amount of $3,490,546.24 originally issued pursuant to the U.S. Credit Facility were (x) kept outstanding after the termination of the letter of credit facility under the U.S. Credit Facility and (y) cash collateralized in an amount equal to 105% of the stated amount of such letters of credit. Nordea has no obligation to issue new letters of credit pursuant to the Letter of Credit Agreements. Letters of credit in a stated amount of $277,000.00 expired on July 6, 2010 and the corresponding cash collateral was returned to TMO.

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 6 of 53

Trico Cayman; and a pledge of a subordinated intercompany note from Trico Supply AS ("Trico Supply") payable to TMO with an initial principal amount of $194 million (the "$194 million Intercompany Note").

15.     Contemporaneously with the June 11, 2010 amendment to the U.S. Credit Facility, TMS entered into an Existing Credit Commitment Purchase and Debtor-in-Possession Facility Commitment (the "Original DIP Facility Commitment"), among TMS and Tennenbaum DIP Opportunity Fund, LLC ("Tennenbaum").   The proceeds of the Original DIP Facility Commitment, if utilized, would be used in part to fully refinance the obligations under the existing U.S. Credit Facility and will accrue at an interest rate equal to the LIBOR Rate (as defined in the DIP Facility plus 9.5% per annum) (the" Original DIP Facility").   The Original DIP Facility contemplated the funding of a $50 million debtor-in-possession facility, $25 million of which would have refinanced or "rolled up" the Debtors' obligations under the U.S. Credit Facility, and the $25 million balance in "new money" loans to the Debtors' estates.

16.     However, after negotiating the terms of the amendments to the U.S. Credit Facility, and in the weeks leading up to the Petition Date, it became apparent that the assumptions regarding the financial status of the Debtors and the Debtors' non-debtor affiliates upon which the Original DIP Facility was structured were no longer valid.   Accordingly, on August 24, 2010, and with little alternative financing options available to the Debtors, the Debtors amended the Original DIP Facility Commitment to instead provide for a $35 million debtor-in-possession credit facility, $25 million of which will refinance or "roll up" the Debtors'

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 7 of 53

obligations under the U.S. Credit Facility, and the $10 million balance in "new money" loans to the Debtors' estates (the "Amended DIP Facility" and "Amended DIP Facility Commitment"). The interest rate under the Amended DIP Facility increased to LIBOR plus 11.5%. The Amended DIP Facility will provide much needed liquidity to the Debtors' estates and will allow the Debtors to operate in chapter 11, but is not expected to provide the liquidity necessary to accomplish a complete restructuring of the estates through confirmation of a Plan. Accordingly, the Debtors continue to evaluate alternative transactions to bring additional working capital into the estates, to include the use of asset sales and possible "take out" debtor-in-possession financing.

**8.125% Secured Notes**

17. TMS, TMA, and TMO also owe approximately $202.8 million under certain 8.125% secured convertible debentures due in 2013 (the "Secured Notes") secured by, *inter alia,* a second lien on the 11 vessels pledged to the U.S. Credit Facility, the $194 million Intercompany Note, and 100% of the equity interests of TMA and TMO.[7] U.S. Bank, N.A. ("U.S. Bank") serves as the indenture trustee for the Secured Notes. Under the indenture governing the Secured Notes, interest payments are to be made on May 15 and November 15 of each year, each with a subsequent 30-day grace period. The interest payment due May 15, 2010 remains unpaid. Principal payments are also due quarterly, beginning on August 1, 2010. The August 1 payment also remains unpaid.

---

[7] TMA and TMO have issued non-recourse guaranties of the Secured Notes.

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

**3% Senior Convertible Notes**

18.     On February 7, 2007, TMS issued $150 million of 3% senior convertible debentures due 2027 (the "3% Notes") with Wells Fargo Bank, N.A. ("Wells Fargo") as indenture trustee. The indenture governing the 3% Notes specifies that interest is due on January 15 and July 15 of each year. The payment due July 15, 2010 remains unpaid. The 3% Notes are unsecured and are not guaranteed by any affiliates of TMS.

19.     In the aggregate, the obligations under the U.S. Credit Facility, the Secured Notes, and the 3% Notes totals approximately $378 million (collectively, the "Parent Debt") and comprise the main credit obligations of TMS. The obligations under the Parent Debt are all *pari passu* in right of payment. The U.S. Credit Facility, however, has a senior lien on shared collateral with the Secured Notes, while the 3% Notes are wholly unsecured.

## Other Significant Affiliate Obligations

**The High Yield Notes**

20.     Trico Shipping AS, a Norway entity ("Trico Shipping") and non-debtor affiliate of TMS, is the primary obligor on two separate financial debt obligations: a series of secured notes and a working capital credit facility. On October 30, 2009, Trico Shipping issued $400 million of 11.875% senior secured notes due 2014 (the "High Yield Notes"). Under the indenture governing the High Yield Notes, interest payments are due on May 1 and November 1 of each year, with the debt obligations fully maturing on November 1, 2014. TMS, Holdco,

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 9 of 53

Trico Cayman, and a substantial number of the non-debtor subsidiaries of TMS are guarantors of the High Yield Notes (collectively, the "High Yield Notes Guarantors").[8]

21.     Together with Trico Shipping, the High Yield Notes Guarantors have pledged a first-priority lien in substantially all of their assets to secure the debentures. The collateral includes 13 vessels and related assets, certain refund guarantees, factoring arrangements, intercompany notes, including a subordinated loan agreement from Trico Shipping payable to TMS in an initial principal amount of $395 million (the "$395 Million Intercompany Note") and a subordinated loan agreement from Trico Supply payable to Trico Cayman in an initial principal amount of $33 million (the "$33 Million Intercompany Note"), TMS's equity interest in Holdco, and additional pledges of collateral by a substantial number of TMS's subsidiaries.

22.     All of TMS's High Yield Notes Guarantors have also pledged their owned equity interests of affiliated subsidiaries to secure the High Yield Notes.[9]  Additionally, nine of the non-

---

[8] The High Yield Notes Guarantors are: TMS; Trico Cayman; Holdco; Trico Supply; Trico Subsea Holding AS; Trico Subsea AS; DeepOcean Shipping III AS; Deep Ocean Shipping II AS; DeepOcean Shipping AS; DeepOcean; Trico Supply Limited; Albyn Marine Limited; CTC Marine Projects Limited; DeepOcean Brasil Servicos Ltda.; DeepOcean Maritime AS; DeepOcean Management AS; Deep Ocean de Mexico S. de R.L. de C.V.; CTC Marine Norway AS; CTC Marine Projects (Guernsey) Limited; DeepOcean Subsea Services Limited; DeepOcean BV; DeepOcean UK Ltd.; Servicios Profesionales de Apoyo Especializado, S. de R.L. de C.V.; and Servicios de Soporte Profesional Administrativo, S. de R.L. de C.V.

[9] The Guarantors Pledging Equity Interests include: Holdco; Trico Supply; Trico Shipping; Trico Subsea Holding AS; Trico Subsea AS; DeepOcean Shipping III AS; Deep Ocean Shipping II AS; DeepOcean Shipping AS; DeepOcean; Trico Supply Limited; Albyn Marine Limited; CTC Marine Projects Limited; DeepOcean Brasil Servicos Ltda.; DeepOcean Maritime AS; DeepOcean Management AS; Deep Ocean de Mexico S. de R.L. de C.V.; CTC Marine Norway AS; CTC Marine Projects (Guernsey) Limited; DeepOcean Subsea Services Limited; DeepOcean BV; DeepOcean UK Ltd.; Servicios Profesionales de Apoyo Especializado, S. de R.L. de C.V.; and Servicios de Soporte Profesional Administrativo, S. de R.L. de C.V.

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 10 of 53

debtor subsidiaries have pledged cash accounts.[10]   The vessels and related assets, refund

guarantees, factoring agreements, equity pledges, and cash account pledges (collectively, the

"Trico Shipping Debt Collateral") constitute the bulk of the collateral pledged under the High

Yield Notes.  TMS's guaranty of the High Yield Notes is junior in right of payment to the U.S.

Credit Facility.

23.    On June 25, 2010, Trico Shipping and the High Yield Notes Guarantors entered

into the first supplemental indenture to the High Yield Notes with Deutsche Bank as trustee (the

"First Supplemental Indenture").   The First Supplemental Indenture primarily implements a

forbearance period designed to waive any defaults which would occur under the High Yield

Notes and related indenture resulting from the Debtors' chapter 11 filings.  The forbearance is

effective on June 17, 2010 and expires on the earlier of (a) June 17, 2011 or (b) the effective date

of a plan of reorganization in the Cases.  The First Supplemental Indenture, among other things,

(i) waives certain events of default related to the Debtors' commencement of the Cases, (ii)

waives certain events of default related to indebtedness issued by TMS, including acceleration of

this indebtedness and nonpayment of interest and/or principal during the forbearance period, (iii)

adds certain financial covenants at Trico Supply and its subsidiaries during the forbearance

period, and (iv) increases the amount of indebtedness that can be issued and secured by the Trico

Shipping Debt Collateral of the High Yield Notes from $450 million to $465 million.

---

[10] Guarantors Pledging Accounts include Trico Shipping, Trico Supply, DeepOcean Shipping III AS, DeepOcean Shipping II AS, Trico Subsea AS, Trico Subsea Holding AS, DeepOcean AS, DeepOcean Management AS, and DeepOcean Maritime AS.

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

**Trico Shipping Working Capital Facility**

24.     In addition to the High Yield Notes, Trico Shipping is party to a working capital facility (the "Trico Shipping W/C Facility") originally with Nordea and Unicredit as lenders, and as more fully described herein, with the addition of Tennenbaum Capital as lender.[11]   The revolving loan portion of the Trico Shipping W/C Facility (provided by Nordea and Unicredit) expires on December 31, 2011 with quarterly amortization payments of approximately $2.18 million.   Interest accrues at LIBOR plus 7% plus a utilization fee of 3% per annum.[12]   A $10 million letter of credit subfacility remains outstanding as of August 1, 2010.   As of August 1, 2010, the total commitment of approximately $15 million remains outstanding and is fully drawn (including issued letters of credit).

25.     Originally, Trico Supply and its subsidiaries had contemplated adding an additional $50 million in needed liquidity through an addition of $50 million in High Yield Notes, as authorized by the First Supplemental Indenture (commonly referred to as the "tack on bonds").   However, during this process, Trico Supply was approached by Tennenbaum Capital to provide the $50 million under a working capital facility structure, with superior terms to those proposed under the "tack on bond" structure.

---

[11] On June 21, 2010, the Trico Shipping W/C Facility was amended to (i) increase the interest rate by 2% during a forbearance period, (ii) permit the incurrence of additional indebtedness by Trico Shipping, (iii) revise the manner in which certain prepayments are applied to scheduled commitment reductions, and (iv) add financial covenants relating to minimum cash and minimum EBITDA.

[12] During the forbearance period.

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

26.     Accordingly, on June 29, 2010, Trico Shipping entered into the Third Amendment to Credit Agreement and Forbearance Agreement. The June 29, 2010 amendment provided for the addition of a term loan facility (the "Term Loan Facility") to be provided by affiliates of Tennenbaum Capital, including up to $50 million in Tranche A Term Loans and up to $15 million in Tranche B Term Loans (collectively, the "Term Loans"). The Term Loans mature on January 31, 2014 and will bear interest at the initial rate of 13.5% per annum until June 30, 2013 and 14.5% per annum thereafter. Undrawn amounts under the Term Loan Facility are subject to a fee equal to 1.5% per annum until December 31, 2010 and 2.5% per annum thereafter.

27.     At closing of the Term Loan Facility, Trico Shipping borrowed approximately $28 million under the Tranche A Term Loans. While $22 million remains available under the Term Loan Facility, Trico Shipping agreed not to draw on this availability prior to December 31, 2010, due to changes in financial conditions of the Debtors and their non-debtor affiliates. Trico Shipping is likely unable to ultimately access the $22 million in availability.

28.     The Trico Shipping W/C Facility and the Term Loan Facility are secured by the same Trico Shipping Debt Collateral and are *pari passu* in payment and lien priority with the High Yield Notes. Similar to the High Yield Notes, TMS's guarantee of the Trico Shipping W/C Facility and the Term Loan Facility is junior in right of payment to the U.S. Credit Facility.

**Other Significant Debt**

29.     In 1999, Debtor TMI issued $18.9 million of notes due in 2014 (the "MARAD Notes") to finance construction of two supply vessels, of which approximately $5 million

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 13 of 53

remains outstanding as of August 1, 2010. The notes are guaranteed by TMS and the U.S. Maritime Administration and are secured by first priority preferred mortgages on the two vessels. The interest rate under the MARAD Notes is 6.11%.

## Events Leading to Chapter 11

30.     The demand for providers of subsea and marine support vessels and services is dependent upon the needs for such providers by offshore natural gas exploration and production companies. During 2009 and into 2010 there has been a significant reduction in the level of operating and capital expenditures in the offshore oil and gas industries, as well as other industries that would require offshore services such as those provided by the Debtors. This reduction in demand was driven principally by the global economic slowdown that occurred during 2009. The Debtors provide services that relate to projects with a significant investment requirement as well as a significant lead time in developing and executing. As a result, the Debtors, and the companies to which the Debtors provide services, are susceptible to wide variations in supply and demand, commodity and currency fluctuations, changing regulatory regimes, political instability, and security concerns. Additionally, as the prices of oil and natural gas decline or are depressed, drilling and construction activities in the regions in which the Debtors operate decline or remain stagnant. As the Debtors serve industries where there is a long lead time for investment, perceptions regarding global economic growth as well as perceptions regarding commodity prices impact investment decisions, and, thus, impact demand for the Debtors' services. In addition, the business of the Debtors is seasonal and depends in part

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 14 of 53

on weather conditions. Thus, the financial results of certain quarters are impacted by changing weather conditions, particularly the winter months in the North Sea.

31.     As a result of the decline in oil and gas prices, a decline in utilization and day rates in the towing and supply businesses driven by reduced exploration and production spending and an increase in the supply of vessels, the Debtors were faced with insufficient liquidity to service the above-described debts and obligations.

**The Debtors' Efforts to Negotiate a Consensual Restructuring - Prepetition**

32.     On or about June 17, 2010, the Debtors' grace period to make the interest payment on the Secured Notes expired.    On June 29, 2010, the Debtors entered into a forbearance agreement with a majority of the holders of the Secured Notes (the "Secured Notes Forbearance Agreement").    The purpose of the Secured Notes Forbearance Agreement was to negotiate a consensual restructuring of the Debtors' assets and debts, not only with the holders of the Secured Notes, but also with the holders of the 3% Notes, and if necessary, with the holders of the High Yield Notes, in light of TMS's guaranty and placement of the $194 Million Intercompany Note, the $395 Million Intercompany Note, and the $33 Million Intercompany Note in Trico Shipping's and Trico Supply's capital structures.    Tennenbaum agreed to a September 8, 2010 deadline to commence chapter 11 proceedings (or otherwise forfeit the Original DIP Commitment).    Additionally, to assist in this process, the Debtors retained Evercore Group L.L.C. and AP Services, LLC ("APS") to provide financial advisory and restructuring advisory services.

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 15 of 53

33.     From June 27, 2010 through the Petition Date, the Debtors aggressively pursued negotiations over a consensual restructuring. Due to the many and varied interests of the various creditor groups, no consensual restructuring plan was achieved.

34.     The Secured Notes Forbearance Agreement expired August 15, 2010. On August 16, 2010, a new forbearance agreement was executed with the majority holders of the Secured Notes, and, with no agreement being reached, the new forbearance agreement with the Secured Notes expired on August 24, 2010.

35.     Additionally, the grace period for the payment of interest due July 17, 2010 on the 3% Notes expired on August 15, 2010. Though discussions with the significant holders of 3% Notes was undertaken, no forbearance agreement was ever reached.

36.     In the meantime, a reassessment of the business plan and downturn in the business impacted the availability of liquidity through the Term Loan Facility. It soon became apparent that a strategy of reorganizing the Debtors without involving holders of significant debt at the non-debtor affiliate level was no longer feasible.

37.     Between August 15, 2010 and the Petition Date, the Debtors and non-debtor affiliates engaged in an intense effort to reach a consensus with any of their significant creditors that would inject liquidity into the Debtors sufficient to allow the Debtors to continue to operate outside of chapter 11 while a consensual restructuring was negotiated. These discussions included each of the Debtors' and non-debtors' major constituencies: Tennenbaum and Tennenbaum Capital, the 3% Notes, Secured Notes, and High Yield Notes. The Debtors

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 16 of 53

proposed the framework of a consensual plan to all parties and, although parties initially indicated willingness to work within the framework, no consensual plan or feasible structure for short-term financing for the Debtors could ultimately be obtained. Needing to avail themselves of the Amended DIP Facility, the Debtors commenced these Cases on the Petition Date.

38.     The Debtors commenced these Cases to maximize the value of the Debtors' assets for the benefit of their stakeholders, recapitalize their capital structure, and to enable the Debtors to take strategic action to address short and long-term liquidity constraints.

**Entry into the DIP Financing Agreement**

39.     TMS, in its capacity as borrower (the "Borrower") and certain other affiliates of the Debtors, in their capacities as guarantors (collectively, the "Guarantors") under the Amended U.S. Credit Facility, have negotiated an agreement to receive debtor-in-possession financing, the terms of which are memorialized in that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement dated as of August 24, 2010 attached hereto as **Exhibit B** (as amended, restated, or otherwise modified from time to time in accordance with the terms thereof and in the Interim Order and the Final Order, the "DIP Financing Agreement"), with Obsidian Agency Services, Inc. ("Obsidian") as agent (in such capacity, the "DIP Agent") and Tennenbaum DIP Opportunity Fund, LLC, Tennenbaum Opportunities Partners V, LP, and Special Value Continuation Partners, LP (such entities, together with their successors and assigns, the "DIP Lenders"), to obtain postpetition term loans in an aggregate principal amount not to exceed $35,000,000 (collectively, the "DIP Loan") which shall consist of (i) new money

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 17 of 53

loans in the principal amount of $10,000,000 (the "DIP Financing New Money Loans"), (ii) a loan to refinance the Amended U.S. Credit Facility in the principal amount of $25,000,000 (the "Refinancing Loan"), and (iii) any interest, fees, expenses and other obligations owed by any Debtor to the DIP Agent or the DIP Lenders in connection with the DIP Loan, the DIP Financing Agreement, or use of Cash Collateral (as defined below).

**Summary of the DIP Financing Agreement**

40.     As required by Bankruptcy Rule 4001(c) and Local Rule 4001-2(a)(ii), the following is a summary of the significant terms of the DIP Financing Agreement and Interim Order.[13]

(a)     DIP Borrower: TMS (the "Borrower").  (*See* § 1 of the DIP Financing Agreement).

(b)     Guarantors: All direct and indirect subsidiaries of TMS, excluding Trico Supply AS and its subsidiaries (the Guarantors, together with the Borrower, comprise the "Loan Parties").  (*See* § 1 of the DIP Financing Agreement).

(c)     DIP Administrative and Collateral Agent: Obsidian Agency Services, Inc. an affiliate of Tennenbaum Capital Partners, LLC or a third party bank or trust company selected by Tennenbaum.  (*See* § 1 of the DIP Financing Agreement).

---

[13] This statement is a summary of certain terms and conditions set forth in the DIP Financing Agreement and Interim Order.  Reference is made to the DIP Financing Agreement for a full and complete description of the DIP Facility. To the extent this statement is inconsistent with the DIP Financing Agreement, the DIP Financing Agreement shall control.  To the extent this statement is inconsistent with the Interim Order, the Interim Order shall control.  To the extent the Interim Order and DIP Financing Agreement conflict, the Interim Order shall control.  Unless otherwise indicated, the terms summarized herein will become effective upon entry of the Interim Order and will remain in effect in the event final relief is denied as provided under Rule 4001(c)(2).

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

(d) Lenders: Tennenbaum Opportunities Partners V, LP, Special Value Continuation Partners, LP, and Tennenbaum DIP Opportunity Fund, LLC. (*See* § 1 of the DIP Financing Agreement).

(e) DIP Credit Facility: a secured superpriority priming senior credit facility (the "DIP Facility") in the amount of up to $35,000,000 (the "Total DIP Commitment") consisting of (i) the DIP Financing New Money Loans and, upon entry of the Final Order, (ii) the Refinancing Loan to refinance the Amended U.S. Credit Facility Debt (collectively, the "DIP Loans"). The DIP Facility also includes any interest, fees, expenses and other obligations owed to the DIP Agent or DIP Lenders in connection with the DIP Facility or the orders relating to the use of cash collateral. Amounts paid or prepaid under the DIP Facility may not be reborrowed. (*See* § 2.01 of the DIP Financing Agreement).

(f) Use of Proceeds: To fund operating expenses and other working capital needs of the Debtors in accordance with an agreed upon budget, pay transaction fees and expenses, refinance the Prepetition First-Lien Debt using the Refinancing Loans (subject to entry of the Final Order), and pay fees, expenses and interest to the DIP Agent and DIP Lenders under the DIP Financing Agreement and certain notes, security documents, and subordination agreements related thereto (*See* ¶¶ 2, 4, and 6 of the Interim Order and § 8.08 of the DIP Financing Agreement).

(g) Mandatory Prepayment: TMS shall immediately deposit or cause to be deposited and applied to the repayment of amounts owning under to the DIP Agent and the DIP Lenders pursuant to the DIP Financing Agreement and the related loan documents (the "DIP Obligations") all Net Cash Proceeds from Asset Sales (with the exceptions of certain Asset Sales relating to Trico Supply AS and its subsidiaries, subsidiary leases or licenses of real or personal property in the ordinary course of business, sale of certain accounts receivable, sale of part of the business that maintain the security interests of the DIP Agent, charter or lease of vessels in the ordinary course of business, and the sale of certain used equipment), all distributions made by Eastern Marine Services Limited or Naviera Mexicana de Servicios, S. de R.L. de C.V. (the "Mexican JV") to any Credit Party, and all proceeds of EMSL Loans (as defined in the DIP Financing Agreement); provided that if such Net Cash Proceeds, distributions and/or payments result from the disposition of Vessels that are

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 19 of 53

owned by Eastern Marine Services Limited or TMI or if such proceeds are proceeds of the EMSL Loans (all such Net Cash Proceeds, distributions, payments or loan proceeds referred to in this proviso, collectively, the "Specified Proceeds"), then, so long as no Event of Default shall have occurred and be continuing, all Specified Proceeds received from and after the Effective Date (measured on an aggregate basis) shall be applied in the following order:

(i)      the first $15,000,000 of Specified Proceeds (or portion thereof) shall remain in the Advance Account and shall be available to be used by TMS for working capital needs in accordance with the Approved Budget (as defined below) and the DIP Financing Agreement;

(ii)     the next $1,250,000 (or portion thereof) of Specified Proceeds shall be applied to the repayment of the DIP Obligations (unless the Required Lenders otherwise consent in writing to permit such amounts to remain in the Advance Account to be used by TMS for working capital needs in accordance with the Approved Budget and the DIP Financing Agreement);

(iii)    the next $3,750,000 (or portion thereof) of Specified Proceeds shall remain in the Advance Account and shall be available to be used by TMS for working capital needs in accordance with the Approved Budget and the DIP Financing Agreement;

(iv)     the next $5,000,000 (or portion thereof) of Specified Proceeds shall be applied as follows: 50% of such Specified Proceeds shall be applied to the repayment of the DIP Obligations (unless the Required Lenders otherwise consent in writing to permit such amounts to remain in the Advance Account to be used by TMS for working capital needs in accordance with the Approved Budget and the DIP Financing Agreement) and 50% of such Specified Proceeds shall remain in the Advance Account and shall be available to be used by TMS for working capital needs in accordance with the Approved Budget and the DIP Financing Agreement; and

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 20 of 53

(v)    thereafter, all Specified Proceeds shall be applied to the repayment of the Obligations.

Mandatory prepayments shall be applied first to the payment of all fees and expenses of the DIP Agent and the DIP Lenders (excluding the Exit Fee required pursuant to Section 5.05 of the DIP Financing Agreement), then to all accrued and unpaid interest on the DIP Loans that are prepaid, and then to outstanding principal and the related Exit Fee required pursuant to Section 5.05 of the DIP Financing Agreement (*See* § 5.02 of the DIP Financing Agreement).

(h)    <u>Voluntary Prepayments</u>: TMS may prepay the DIP Loans at any time without premium or penalty, other than payments of the Exit Fee as required pursuant to Section 5.05 of the DIP Financing Agreement, in $1,000,000 increments upon giving three business days' notice to the DIP Lenders. Voluntary prepayments shall be applied first to the payment of all fees and expenses of the DIP Agent and the DIP Lenders (other than the Exit Fee as required pursuant to Section 5.05 of the DIP Financing Agreement), then to unpaid interest on the DIP Loans that are prepaid, and then to outstanding principal and the related Exit Fee as required pursuant to Section 5.05 of the DIP Financing Agreement (*See* § 5.01 of the DIP Financing Agreement).

(i)    <u>Collateral Dispositions</u>: any sale, transfer or other disposition of any material assets of any Debtor or of any subsidiary of any Debtor (other than Trico Shipping AS and its subsidiaries), without consent of the DIP Agent and DIP Lenders, shall constitute an Event of Default under the DIP Financing Agreement (*See* § 11.28 of the DIP Financing Agreement).

(j)    <u>Maturity</u>: Earliest of: (i) March 11, 2011, (ii) the effective date of any plan of reorganization with respect to any Debtor, (iii) the closing date of a sale pursuant to Bankruptcy Code § 363 or otherwise of all or substantially all of the assets of any of the Debtors, Trico Supply AS or Trico Shipping AS; (iv) the date of conversion of any Case to a case under chapter 7 of the Bankruptcy Code, (v) the dismissal of any Case, and (vi) the acceleration of the DIP Loans following an Event of Default (*See* ¶ 3 of the Interim Order and § 1 of the DIP Financing Agreement).

(k)    <u>Security</u>: The liens granted pursuant to the DIP Financing Agreement and to Bankruptcy Code §§ 364(c)(2), 364(c)(3) and 364(d) (collectively, the

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 21 of 53

"DIP Liens") on collateral securing the DIP Financing Agreement (the "DIP Collateral") will be, with the exception of the Carve-Out (as defined below), valid, fully perfected, first priority and superior to any other security, mortgage, or collateral interest, lien, or claim to the DIP Collateral. The Loan Parties will grant the following liens and security interests on all assets and on all causes of action excluding as to Debtors only Avoidance Actions (defined below), whether now owned or hereafter acquired, subject to the Carve-Out (as defined below):

(i)   Liens on Unencumbered Property. Pursuant to Bankruptcy Code § 364(c)(2), first priority liens upon all unencumbered prepetition collateral of the Debtors (*See* ¶ 11 of the Interim Order and § 2.15(b)(i) of the DIP Financing Agreement);

(ii)  Priming Liens. Pursuant to Bankruptcy Code § 364(d), priming liens upon all prepetition collateral that is encumbered by liens securing the Prepetition First Lien Debt, the 8.125% Secured Second-Lien Notes including Liens on all intercompany notes securing such Indebtedness (such Collateral, the "Intercreditor Encumbered Collateral) (*See* ¶ 11 of the Interim Order and § 2.15(b)(ii) of the DIP Financing Agreement);

(iii) Liens on Property Subject to Prior Liens. Pursuant to Bankruptcy Code § 364(c)(3), junior liens upon all collateral subject to security interests acceptable to the DIP Agent, including certain intercompany indebtedness (*See* ¶ 11 of the Interim Order and § 2.15(b)(iii) of the DIP Financing Agreement);

(iv)  Avoidance Actions. The DIP Collateral shall exclude actions for preferences, fraudulent conveyances, and other avoidance power claims under Bankruptcy Code §§ 544, 545, 547, 548, 550 and 553 (the "Avoidance Actions"); provided, however, that following entry of a final order the proceeds of Avoidance Actions shall be available to pay any administrative claim held by the DIP Agent and the DIP Lenders (*See* ¶¶ 10 and 11 of the Interim Order and § 1 of the DIP Financing Agreement).

(l)   Superpriority: Pursuant to Bankruptcy Code § 364(c)(1), all DIP Obligations shall constitute an allowed super-priority administrative expense claim (the "Superpriority Claim") having priority over any and all

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 22 of 53

other administrative claims against the Debtors, subject to the Carve-Out. (*See* ¶ 10 of the Interim Order and § 2.15(a) of the DIP Financing Agreement).

(m) <u>Stipulation as to Validity of Liens</u>: The Debtors stipulate and seek a finding as to the validity of the Prepetition Lenders' liens (*See* Finding (F) of the Interim Order).

(n) <u>Challenge Period</u>: The Unsecured Creditors' Committee (the "<u>Creditors' Committee</u>") shall have 60 days from the date of the Creditors' Committee's formation to investigate and file any and all claims, causes of action, defenses, counterclaims, or litigation against the Prepetition Agent, any Prepetition Lenders, or challenge as to the enforceability of the Prepetition Liens (parties in interest other than the Creditors' Committee shall have 75 days from the Petition Date) (*See* ¶ 14 of the Interim Order).

(o) <u>Interest Rate</u>: Borrower agrees to pay interest on unpaid principal under the DIP Loans at a rate of 11.5% per annum plus the greater of (i) the LIBOR rate or (ii) 2.5% (*See* § 2.07(a) of the DIP Financing Agreement).

(p) <u>Conditions Precedent to the Effective Date</u>: The DIP Lenders' obligation to advance funds under the DIP Financing Agreement is conditioned on a number of factors, including, without limitation, (i) entry of the Interim Order by the Bankruptcy Court; (ii) no Material Adverse Effect reasonably expected to have an adverse effect upon the business, operations, or financial condition of the Loan Parties (or discovery of new and inconsistent information pertaining to such an effect); (iii) no default or event of default; (iv) notes, security documents, and executed DIP Financing Agreement delivered to the DIP Agent; (v) payment of all costs, fees, expenses, and recording taxes paid to the DIP Agent and DIP Lenders to the extent then due (*See* § 6.01 of the DIP Financing Agreement).

(q) <u>Fees and Expenses</u>: (i) Exit Fee of 1% of amount prepaid or repaid or required to be prepaid or repaid payable upon the date of each repayment or prepayment of any DIP Loans or the amount of commitments terminated without being funded and (ii) Reasonable and documented costs and expenses of the DIP Agent and DIP Lenders incurred in connection with the execution, administration, amendment and enforcement of the Interim Order and the DIP Financing Agreement and all related documents (the

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 23 of 53

"DIP Expenses") (*See* ¶ 6 of the Interim Order and § 5.05 of the DIP Financing Agreement).

(r)    Refund Upon Refinancing of Prepetition First Lien Debt: If the full amount of the Prepetition First Lien Debt shall be refinanced in full and in cash with proceeds of the DIP Loan, then the Prepetition Lenders shall refund to the Debtors the sum of (a) $250,000 and (b) an amount equal to 2% per annum on the average daily outstanding principal amount of the loans under the Prepetition First Lien Debt for the period of the closing of the Prepetition First Lien Debt through (but not including) August 1, 2010, and (c) an amount equal to 4% per annum on the average daily outstanding principal amount of the loans under the Prepetition First Lien Debt for the period August 1, 2010, though (but not including) the date of such refinancing (*See* ¶ 7 of the Interim Order).

(s)    Default Rate: 2% over and above the non-default rate (*See* § 2.07(b) of the DIP Financing Agreement).

(t)    Financial Covenants: Financial covenants for liquidity at end of month, limitations on maintenance capital expenditures, cumulative EBITDA, monthly cash flow, and cumulative cash flow (*See* §§ 10.07, 10.08, 10.09, and 10.10 of the DIP Financing Agreement).

(u)    Indemnification: TMS agrees to indemnify the DIP Agent and each DIP Lender, and each of their respective officers, directors, employees, representatives, agents, affiliates, trustees and investment advisors from and hold each of them harmless against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements arising out of or related to (a) any investigation, litigation, or proceeding related to the entering into and/or performance of the Interim Order, the Final Order, the DIP Financing Agreement, or any other Credit Document, or (b) the Release of Hazardous Materials by TMS or any TMS subsidiary (*See* § 14.01(d)(iii) of the DIP Financing Agreement); such indemnification shall be included as an expense under the DIP Loan (*See* ¶ 6(b) of the Interim Order and § 14.01(d) of the DIP Financing Agreement).

(v)    Release: TMS and each of the Credit Parties waives, releases and discharges to the fullest extent permitted by law known and unknown claims against the DIP Agent and the DIP Lenders and their respective

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 24 of 53

affiliates, shareholders and "controlling persons" (within the meaning of the federal securities laws), and their respective successors and assigns and each and all of the officers, directors, employees, consultants, agents, attorneys and other representatives (*See* § 14.19 of the DIP Financing Agreement) (*See* ¶ 15 of the Interim Order and § 14.19 of the DIP Financing Agreement).

(w)     Carve-Out: The Interim Order provides that the DIP Facility is subject to a carve-out, which shall be comprised of and subject to the following:

(i)     The Borrower shall make deposits into the Professional Fee Reserve (as defined in the DIP Financing Agreement) on or prior to the fifth day and on the twentieth day of every month from which withdrawals shall be taken for the payment of professional fees in accordance with the DIP Financing Agreement.  From and after the date of the Termination Notice (as defined below), amounts withdrawn from the Professional Fee Reserve may only be applied to pay fees covered by the Carve-Out (as defined below).  Upon the occurrence and during the continuation of an Event of Default, payment of any amounts on account of the Postpetition Liens and the Superpriority Claim shall be subject and subordinate only to payment of: (A) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and to the Clerk of the Bankruptcy Court and (B) allowed (whether allowed prior to or after the date of notice (such notice, the "Termination Notice") from the DIP Agent that an Event of Default has occurred and the cash collateral and the balance in the Advance Account are no longer available to the Borrower) and unpaid fees and expenses of the attorneys, accountants and other professionals retained in the Chapter 11 Cases by the Debtors or any Creditors' Committee pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363, 503 or 1103 and owed pursuant to the terms of such professionals' respective engagement letters or other agreements of engagement (other than any success fee, transaction fee, or other similar fee set forth in such professionals' respective engagement letters or other agreements) incurred from the Petition Date to the date of the Termination Notice, plus the following "Priority Professional Expenses" incurred after the date of the Termination Notice:  up to $500,000 for the fees and expenses of Vinson & Elkins LLP,

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 25 of 53

Cahill Gordon & Reindel LLP and Morris, Nichols, Arsht & Tunnell LLP, up to $500,000 for the fees and expenses of other professionals retained by the Debtors, and up to $150,000 for the fees and expenses of the Creditors' Committee professionals, in each case minus any retainers held by the applicable professionals as of the date of the Termination Notice (the "Professional Expense Cap");

(ii)     Following the occurrence and during the continuance of an Event of Default and following the delivery of a Termination Notice (the "Post-Termination Notice Period"), any payments or actually made to any of the professionals described in paragraph 29(t)(i) during such Post-Termination Notice Period pursuant to paragraph 29(t)(i)(B) under Bankruptcy Code sections 327, 328, 330, 331, 503 or 1103 or otherwise shall (A) reduce the Priority Professional Expenses on a dollar-for-dollar basis to the extent such payments relate to allowed fees and expenses during the Post-Termination Notice Period and (B) shall not be paid from the proceeds of any DIP Loan or Collateral (including Cash Collateral) until such time as all retainers, if any, held by such professionals have been reduced to zero by application of such retainers to the Priority Professional Expenses (the immediately preceding clauses (i) and (ii), collectively, the "Carve-Out");

(iii)     No liens, claims, interests or priority status, other than the Carve-Out and the Permitted Priority Liens, having a lien or administrative priority superior to or *pari passu* with that of the Postpetition Liens, the Superpriority Claim or the First Lien Agent Adequate Protection Liens granted by the Interim Order, shall be granted while any portion of the DIP Loan or the Prepetition First Lien Debt remains outstanding, or any loan commitment under the DIP Financing Agreement or Prepetition Loan Documents remains in effect, without the prior written consent of the DIP Agent and the Prepetition First Lien Agent;

(iv)     Except for the Committee Challenge Fees (as defined in the Interim Order), no portion of the Carve-Out may be used by any person in connection with any Challenge Action (as defined in the Interim Order);

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 26 of 53

(v) Any professional seeking access to the Carve-Out for payment of fees and expenses incurred in any month must have previously provided written monthly fee statements (identifying monthly fees and expenses only) to the Debtors and the DIP Agent so they are received no later than the twentieth day of the next succeeding month ending after the Petition Date (e.g., for illustration only, the Debtor's professionals must submit a fee statement for August 2010 no later than September, 20, 2010). This requirement is in addition to any requirements for filing monthly and quarterly interim fee applications and for final fee applications. For purposes of the financial covenants set forth in the DIP Financing Agreement and compliance with the Approved Budget, the fees and expenses set forth in such statements shall be deemed to be paid in cash when any such statements are received, whether or not they are actually so paid. Any professional that fails to timely provide the foregoing written monthly fee statements shall be prohibited from seeking payment from the Carve-Out for any fees and expenses for the applicable month (e.g., for illustration only, if a professional fails to submit a fee statement for fees and expenses incurred in September 2010 before October 20, 2010, that professional may not seek payment of any fees and expenses from the Carve-Out for the month of September 2010);

(vi) From and after the date of the Termination Notice, amounts withdrawn from the Professional Fee Reserve may only be applied to pay fees covered by the Carve-Out and any remainder shall be used to repay the DIP Loan.

Except for the amount of $25,000 of the proceeds of the DIP Facility or the cash collateral (but not both) that will be available to pay fees and expenses of the Committee in investigating, taking discovery with respect to, filing and prosecuting any and all claims, offsets, setoffs, contested matters, causes of action, defenses, counterclaims, litigation against the DIP Agent or any of the DIP Lenders, no portion of the Carve-Out may be used by any person to investigate or pursue any investigation or pursue any claims, offsets, setoffs, contested matters, causes of action, defenses, counterclaims, litigation or discovery against the DIP Agent or any of the DIP Lenders (or their respective agents, professionals, employees, officers, subsidiaries,

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 27 of 53

affiliates etc.) (*See* ¶ 13 of the Interim Order and § 1 of the DIP Financing Agreement).

(x)    Events of Default: (i) failure to make payment when due of any principal of any DIP Loan; (ii) failure to make any interest payment or other amount owed pursuant to any DIP Loan within three business days of when due; (iii) any representation, warranty, or statement made by any of the Loan Parties proven to be untrue in any material respect at the time when deemed made; (iv) default in the due performance of any affirmative term, covenant, or agreement described in the DIP Financing Agreement; (v) default by the Borrower or the Borrower's subsidiaries in the payment of any indebtedness in excess of $1,000,000 beyond the grace period (if any); (vi) the commencement of a voluntary case under Title 11 of the Bankruptcy Code outside the District of Delaware by any of the Loan Parties or commencement of an uncontroverted involuntary case in any jurisdiction under that same title; (vii) failure to make a contribution to a pension plan as required under ERISA; (viii) any of the security documents cease to be in full force and effect; (ix) any guarantee ceases to be in full force and effect; (x) entry of a final judgment or decree against the Borrower or any of its subsidiaries in excess of $1,000,000; (xi) a Change in Control; (xii) the commencement of any enforcement action by any creditor of any Person in the Trico Supply Group undismissed or unstayed for 30 days where such creditor holds greater than $1,000,000 in indebtedness; (xiii) any distribution in excess of $100 is made by the Mexican JV to any Person other than Trico Operators or holders of equity on a per day per vessel basis; (xiv) any of the DIP Obligations cease to be "Senior Permitted Indebtedness" (as defined in the Prepetition Second Lien Notes Indenture); (xv) failure to enter the Final Order on terms and conditions satisfactory to the DIP Agent within 30 days of the Petition Date; (xvi) dismissal of any of the Cases or conversion of any of the Cases to a chapter 7 case; (xvi) appointment of a chapter 11 trustee or examiner with expanded powers with respect to any of the Debtors; (xvii) entry of an order granting relief from the automatic stay to permit foreclosure on any asset of any of the Debtors which individually or in the aggregate have value in excess of $1,000,000; (xviii) entry of an order granting any other superpriority claim or lien equal to or superior in priority to that granted to the DIP Agent or the DIP Lenders (or unopposed motion for such an order filed by any Committee); (xix) modification, reversal, amendment, vacation, or stay of the effectiveness of the Interim Order or the Final Order

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 28 of 53

(xx) commencement of any subsidiary enforcement action by any material creditor of any direct or indirect subsidiary of TMS; (xxi) proposal by the Debtors of any plan of reorganization or liquidation (on the failure of the Debtors to diligently oppose such a plan proposed by any other person) for any of the Debtors that does not provide for the indefeasible payment in full in cash of the Loans and all other DIP Obligations on the effective date of such plan; (xxii) commencement of any action, litigation, or adversary proceeding or assertion of any setoff or offset by any of the Loan Parties against any of the DIP Agent or the DIP Lenders; (xxiii) any material violation of the Interim Order or the Final Order; (xiv) entry of order or judgment in any of the Cases modifying, limiting, subordinating, recharacterizing or avoiding the priority, validity or amount of any indebtedness owed to the DIP Lenders or the perfection, priority or validity of the liens of the Prepetition Lenders or imposing, surcharging or assessing against the Prepetition First Lien Lenders, the DIP Lenders or their respective claims or any Collateral any costs or expenses; (xv) payment of any prepetition indebtedness of any Debtor other than (a) payments approved by bankruptcy court pursuant to Debtors' first day motions and provided for in the Approved Budget or (b) payments to the Prepetition Lenders; (xxvi) the sale, disposition, or transfer of material assets of any Debtor without the prior written consent of the Required Lenders; or (xxvii) any motion for subsequent debtor-in-possession financing without support of Required Lenders that does not provide for the full repayment of the DIP Loan (*See* § 11 of the DIP Financing Agreement).

(y) <u>Remedies</u>: Upon the occurrence of an Event of Default, the DIP Lenders shall have customary remedies, including, without limitation, the right (exercisable upon five (5) business days' prior written notice to the Borrower) to realize on any or all DIP Collateral without the necessity of obtaining any further relief or order from the Bankruptcy Court. The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the DIP Facility, the Interim Order and the Final Order and with respect to the DIP Collateral. The only issue as to which the Borrowers may seek Bankruptcy Court intervention at any hearing seeking to delay or prevent the DIP Agent or the DIP Lenders from exercising remedies shall be whether an Event of Default has in fact, occurred and is continuing. Subsequent to the occurrence of an Event of Default, the DIP Lenders shall have no obligation to fund and no proceeds of loans under the DIP Facility or cash collateral of

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 29 of 53

the DIP Lenders will be available to fund any administrative expenses in excess of the Carve-Out.

The Final Order shall provide that any foreclosure sale can be conducted on not less than ten days notice, which shall be deemed commercially reasonable, and that the DIP Lenders collectively shall be entitled to credit bid the full face amount of the DIP Facility, including unaccreted OID at any such foreclosure sale.

In the sole discretion of the DIP Lenders, after the occurrence and during the continuance of an Event of Default, upon direction by the DIP Agent or the DIP Lenders, the Loan Parties shall engage in a sale of any or all of the DIP Collateral designated by the DIP Lenders under Section 363 of the Bankruptcy Code (each, a "363 Sale"), in a sale that will be conducted on a time schedule selected by the DIP Lenders (subject to availability of the Bankruptcy Court's calendar), and at which the DIP Lenders shall be permitted to credit bid all or any portion of the DIP Facility including unaccreted OID. In the event the Debtors do not timely file a 363 Sale motion, the DIP Lenders may file such a motion on the Debtors' behalf, and if the DIP Lenders file such a motion on the Debtor's behalf, the Debtors shall reasonably cooperate in all aspects of the sale, including providing witnesses at hearings and depositions without need for a subpoena as well as marshalling assets at the direction of the DIP Lenders. The rights of the DIP Lenders to direct the Debtors to conduct one or more 363 Sales on shortened notice and to file a motion for approval of a 363 Sale on the Debtors' behalf if the Debtors fail to timely file such motion are material remedies without which the DIP Lenders would not provide the DIP Facility (*See* ¶¶ 21 and 22 of the Interim Order and § 11.32 of the DIP Financing Agreement).

## **RELIEF REQUESTED**

41.     The Debtors request that the Interim Order and the Final Order include, without limitation, the following relief:

(a)     Authorize the Loan Parties to enter into the DIP Financing Agreement;

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 30 of 53

(b) Upon entry of the Final Order, authorize the immediate application of a portion of the proceeds of the DIP Financing Agreement to satisfy in full the Debtors' prepetition obligations under the Amended U.S. Credit Facility;

(c) Grant superpriority administrative expense claim status under Bankruptcy Code § 364(c)(1) to the DIP Lenders for claims made pursuant to the DIP Loan, subject to the Carve-Out;

(d) Deem the DIP Loan immediately secured under Bankruptcy Code §§ 364(c)(2), 364(c)(3), and 364(d)(1) by valid, binding, continuing, enforceable, non-avoidable and fully perfected, first priority priming liens on and senior security interests in all of the DIP Collateral, subject to the Carve-Out;

(e) Authorize the Debtors' use of Cash Collateral pursuant to §§ 361 and 363(c) and (e) of the Bankruptcy Code and the provision of adequate protection to the Prepetition Lenders and Prepetition Second-Lien Lenders as described herein;

(f) Modify the automatic stay as to the DIP Agent (on behalf of the DIP Lenders) to allow implementation of the provisions of the DIP Financing Agreement, the Interim Order, and the Final Order (as defined below) without further notice or order of the Court;

(g) Waive notice requirements provided for by Bankruptcy Rule 6004(a), the twenty one-day stay provided for by Bankruptcy Rule 6003(b), and the fourteen-day stay provided for by Bankruptcy Rule 6004(h);

(h) Schedule an interim hearing (the "Interim Hearing") pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2 to consider the immediate entry of the Interim Order which, among other things, (i) approves, on an interim basis, the DIP Financing Agreement, (ii) authorizes the Debtors to obtain the DIP Loans on an interim basis in an aggregate principal amount of up to $10,000,000, (iii) authorizes the Debtors to use the Cash Collateral on an interim basis and (iv) grants adequate protection to the DIP Agent, DIP Lenders, Prepetition Indenture Trustee, and the Prepetition Second-Lien Lenders, as provided in the Interim Order;

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 31 of 53

(i)      Schedule a final hearing (the "Final Hearing") to consider entry of a final order as defined in the DIP Financing Agreement (the "Final Order") authorizing (among other things) on a final basis the use of the Cash Collateral, the DIP Financing Agreement, the DIP Loan, refinancing of the of the Prepetition First-Lien Debt, and granting adequate protection to the DIP Agent, DIP Lenders, Prepetition Indenture Trustee, and the Prepetition Second-Lien Lenders; and

(j)      Find that notice of the Interim Hearing is sufficient and adequate with respect to the Notice Parties (as defined in the Interim Order) pursuant to Bankruptcy Rules 2002 and 4001 and the Local Rules of this Court, and that no other or further notice is required.

## BASIS FOR RELIEF REQUESTED

### Need for the DIP Financing Agreement, "Roll-Up" of Prepetition Debt, and Usage of Cash Collateral

42.      The Debtors do not have sufficient available sources of working capital or cash to continue the operation of their businesses without accessing the DIP Facility and using Cash Collateral.  The ability to obtain sufficient working capital and liquidity through the DIP Facility is vital to the preservation and maximization of the value of the Debtors' estates.  As a result of, among other things, the Debtors' financial condition and prepetition capital structure, the Debtors have been unable to obtain alternative sources of cash or credit in the form of unsecured credit allowable under Bankruptcy Code § 503(b)(1).

43.      Specifically, the proposed DIP Facility and usage of Cash Collateral relating to the Amended U.S. Credit Facility and Secured Second-Lien Notes will fund the Debtors' operating expenses, marketing expenses, professional fees, fees due under 28 U.S.C. § 1930, insurance, taxes, and other miscellaneous costs.  The DIP Credit Facility provides the Debtors'

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 32 of 53

estate with an additional $10,000,000 of availability over and above that provided under the Amended U.S. Credit Facility, and it should be emphasized that $10,207,815 of the total amounts advanced under the Amended U.S. Credit Facility (all of which would be repaid through the Refinancing Loan) was advanced by the Prepetition Lenders less than ten weeks before the Petition Date as an accommodation to the Debtors in order to address the Debtors' immediate liquidity needs and to provide an opportunity to explore and fund restructuring discussions with the Debtors' constituencies. Thus, the Debtors submit that only a portion of the Amended U.S. Credit Facility (about $14,792,185) represents "vintage" pre-petition loans which are being rolled up. The repayment of the Amended U.S. Credit Facility through the Refinancing Loan enhances the Debtors' economic position by retiring outstanding prepetition obligations under that facility and permitting the availability of the remainder of the DIP Facility. In addition, eliminating the Amended U.S. Credit Facility through the Refinancing Loan will dramatically simplify and expedite the Debtor's restructuring, avoiding an unnecessary priming fight and eliminating the expense and need for separate counsel to prepetition and postpetition lenders.

44.     As described below, prior to the Petition Date, the Debtors and the Debtors' Financial Adviser, Evercore Partners, engaged in an intensive search for financing alternatives in which multiple bids and proposals were considered. Financing on a post-petition basis is not otherwise available in the absence of the Debtors' granting, pursuant to Bankruptcy Code §

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 33 of 53

364(c)(1), claims having priority over any and all other administrative expenses and liens having the priority provided herein.

### Entry Into the DIP Financing Agreement Should be Authorized

45.    Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the debtor's estate. *See In re Myrtle Beach Holdings, LLC*, 2008 Bankr. LEXIS 2835 (Bankr. D. Del. Sept. 29, 2008) (approving post-petition super-priority debtor-in-possession financing, senior-priority liens, authorizing the use of cash collateral, and providing related adequate protection where the court found debtor was unable to obtain financing on terms more favorable than those offered in the debtor's DIP Credit Agreement).

46.    Bankruptcy Code § 364(c) provides, in pertinent part, that:

> (c)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> (2)    secured by a lien on property of the estates that is not otherwise subject to a lien; or
> (3)    secured by a junior lien on property of the estates that is subject to a lien.

11 U.S.C. 364(c).

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 34 of 53

47.     The Debtors satisfy the requirements of Bankruptcy Code § 364(c) because the

Debtors are unable to obtain credit otherwise (as described below), relevant secured creditors are

adequately protected, and the proposed financing is in the best interests of the estates.   In

satisfying Bankruptcy Code § 364(c), a debtor need not seek credit from every available source,

but should make a reasonable effort to seek other sources of credit available of the type set forth

in Bankruptcy Code § 364(a) and (b).   *See Bray v. Shenandoah Federal Sav. & Loan Ass'n (In re*

*Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986) (in context of obtaining credit secured by

equal or senior lien, debtor in possession demonstrated inability to obtain credit by contacting

financial institutions in immediate geographical area; debtor in possession is under no obligation

to seek credit from every possible lender). In *In re Sky Valley, Inc.*, 100 B.R. 107, 112-13

(Bankr. N.D.Ga. 1988), the court stated that "it would be unrealistic and unnecessary to require

Debtors to conduct such an exhaustive search for financing" where the business suffered from

financial stress, had little or no unencumbered property, and the primary property was subject to

numerous liens.  As a result, the Debtors' approach of four other potential lenders was sufficient

under such circumstances.

48.     It should be noted that debtors in prior Delaware bankruptcy cases have obtained

approval of "roll-up" and partial "roll-up" DIP financing motions as early as the first day of the

case. *See, e.g., In re The Fairchild Corp.*, No. 09-10899 (Bankr. D. Del. 2009); *In re Dan River*

*Holdings LLC,* 08-10726 (Bankr. D. Del. 2008); *In re Hancock Fabrics, Inc.*, No. 07-10353

(Bankr. D. Del. 2007).  In this case, the Debtors are only seeking the consummation of the "roll-

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c),
364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014
(I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE
CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING
LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY;
AND (V) GRANTING RELATED RELIEF**

Page 35 of 53

up", through the Refinancing Loan, upon entry of the Final Order. "Roll-up" postpetition financing (such as that described in the Motion) has also been approved where, as here, the debtor sought an interim order approving use of certain DIP financing funds but postponed its request for court approval of a "roll-up" of prepetition and postpetition debt until a final hearing on the issue. *See, e.g., In re Pacific Energy Resources, LTD.,* No. 09-10785, Docket No. 415, (Bankr. D. Del. 2009) (approving in the final order payment of a "Refunding Amount" related to a "partial roll-up" of outstanding prepetition senior secured obligations into postpetition DIP Term Facilities). Also, as noted below, the debtors submit that the fact that the major portion of the "rolled up" prepetition debt represents loans that were made shortly before the Petition Date and for the purpose of facilitating a restructuring should mitigate some of the typical concerns with the "roll-up" loans.

**Priming Liens under DIP Facility**

49.     Bankruptcy Code § 364(d) allows a creditor's claim to be secured by a lien that is equal or senior to an existing lien if:

> (a) the trustee is unable to obtain such credit otherwise, and
>
> (b) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d). The DIP Financing Agreement provides that the DIP Lenders will receive priming liens upon all collateral that is encumbered by liens securing the 8.125% Secured Second-Lien Notes.

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 36 of 53

50.     Prior to the Petition Date, the Debtors and their financial advisor, Evercore Partners, contacted 23 lending institutions (including certain current debt holders) and received eight initial proposals to provide debtor-in-possession financing.  After determining that five of those initial proposals were not fit for further consideration, the Debtors actively encouraged the remaining parties to conduct due diligence in order to facilitate their providing DIP financing commitments.  Of the proposals made to the Debtors, the DIP Financing Agreement offered by Tennenbaum offers the Debtors the least onerous terms, conditions, and milestones and therefore the greatest degree of flexibility to pursue restructuring alternatives.   The Debtors have determined in the exercise of their business judgment that the DIP Facilities are the Debtors' best option under the circumstances and provide the most favorable terms to the Debtors' estates. The Debtors further submit that the terms and conditions of the DIP Facility were negotiated in good faith at arm's length with all parties represented by experienced counsel.

51.     The Prepetition Second-Lien Lenders are adequately protected even though their liens are primed by the DIP Facility, as the Prepetition Second-Lien Lenders have knowingly consented to the priming aspect of the DIP Facility through their execution of the Intercreditor Agreement.  In connection with a bankruptcy proceeding, the Intercreditor Agreement contains the advance consent of the collateral agent for the Secured Second-Lien Notes to priming DIP financing in the principal amount of up to $10,000,000, which, together with the Cap Amount in relation to the refinancing of the Amended U.S. Credit Facility, equals $35,000,000: the maximum amount that is subject to priming under the DIP Facility.   Furthermore, paragraph

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 37 of 53

12(e) of the Interim Order grants to the holders of the Secured Second-Lien Notes junior liens of the same type that constitute the adequate protection liens given to the DIP Lenders under the DIP Financing Agreement.

52.     The DIP Facility will minimize disruption of the businesses and operations of the Debtors and permit the Debtors to meet payroll and other operating expenses, obtain needed supplies, and maintain the going concern value of their businesses by demonstrating an ability to maintain normal operations.  The terms of the DIP Facility and adequate protection arrangements are fair and reasonable under the circumstances, reflect the exercise of prudent business judgment by the Debtors consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The Debtors' entry into the DIP Financing Agreement should be approved under Bankruptcy Code § 364 because "the credit acquired is of significant benefit to the Debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the Debtor to obtain comparable credit elsewhere." *See In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).  The Debtors submit that the requirements under Bankruptcy Code § 364 to obtain postpetition financing have been met and that the Motion should therefore be granted.

## Use of Cash Collateral

53.     The Debtors believe that cash on hand on the Petition Date constituting collateral of the Amended U.S. Credit Facility and cash generated through usage of other collateral (the "Cash Collateral") securing the Amended U.S. Credit Facility and Secured Second-Lien Notes

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 38 of 53

constitute "cash collateral" within the meaning of § 363 of the Bankruptcy Code. The Debtors do not have sufficient available sources of working capital or cash to continue the operation of their businesses without accessing the Cash Collateral. The ability to obtain sufficient working capital and liquidity through the DIP Facility and use of the Cash Collateral is vital to the preservation and maximization of the value of the Debtors' estates. As a result of, among other things, the Debtors' financial condition and prepetition capital structure, the Debtors have been unable to obtain alternative sources of cash or credit in the form of unsecured credit allowable under Bankruptcy Code § 503(b)(1). Specifically, the proposed usage of the Cash Collateral requested in this Motion will fund the Debtors' operating expenses, marketing expenses, professional fees, fees due under 28 U.S.C. § 1930, insurance, taxes, and other miscellaneous costs. The Debtors' failure to timely pay such items will result in immediate and irreparable harm to their assets.

54. Each of the Prepetition Lenders and the Secured Second-Lien Notes has or may have an interest in the Cash Collateral. The Debtors' use of property of the estate, including the Cash Collateral, is governed by Bankruptcy Code § 363, which provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under section…1108…of this title and unless the court orders otherwise, the trustee [or debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or hearing, and may use property of the estate in the ordinary course of business without notice or hearing.

11 U.S.C. 363(c)(1).

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 39 of 53

55.     A modified rule applies, however, with respect to cash collateral, defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estates and an entity other than the estates have an interest…" 11 U.S.C. 363(a).  Bankruptcy Code § 363(c)(2) permits the debtor in possession to use, sell, or lease cash collateral only if either of two alternative circumstances exist:

(a)     Each entity that has an interest in such cash collateral consents; or

(b)     The court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. 363(c)(2).  Through the execution of the DIP Financing Agreement by affiliates of the Prepetition Lenders and the agreement of the Prepetition Second-Lien Lenders and the Prepetition Agent embodied in the Intercreditor Agreement, the Prepetition Lenders and the Prepetition Second-Lien Lenders have respectively consented to the Debtors' use of the Cash Collateral.[14]

56.     Bankruptcy Code § 363(e) requires that the debtor-in-possession's use of collateral (such as cash collateral) during the bankruptcy case must be conditioned on "adequate protection" of other interests in the property.  What constitutes adequate protection is decided on

---

[14] *See* DIP Financing Agreement § 9.22 (conditioning usage of Cash Collateral upon adherence to the Approved Budget) and Intercreditor Agreement § 6.1(a) (providing that the Prepetition Second-Lien Lenders will not oppose or raise any objection to or contest to the Debtors' use of Cash Collateral so long as the aggregate principal amount of post-petition financing does not exceed, at a minimum, $10,000,000.  Furthermore, § 6.3 of the Intercreditor Agreement provides that the collateral agent for the Secured Second-Lien Notes will refrain from objecting to requests for adequate protection related to the Prepetition First-Lien Debt, while also providing that if additional collateral is granted to the Prepetition Lenders as adequate protection, a junior lien on such collateral may be sought on behalf of the Prepetition Second-Lien Lenders).

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 40 of 53

a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). By "adequate protection," the Bankruptcy Code seeks to shield a secured creditor from diminution of the value of its security interest during the period of the bankruptcy case. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996). Adequate protection can come in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens and/or administrative claims.

57.     Pursuant to the attached Interim Order, the Prepetition Lenders' interest in the Cash Collateral is adequately protected:

(a)     First, Under the terms of the DIP Financing Agreement, cash collateral may only be used in accordance with the budget agreed upon by the DIP Lenders pursuant to the DIP Financing Agreement (the "Approved Budget"). The DIP Financing Agreement requires the Debtors to make variance reports to the DIP Agent in order to keep the DIP Agent apprised of any deviations from the Approved Budget. The expenses listed on the Approved Budget are reasonable and necessary business expenses that must be paid in order to continue the Debtors' businesses;

(b)     Second, As adequate protection for any actual diminution in value of the Prepetition Collateral from the use of Cash Collateral, the Debtors propose to grant to the DIP Lenders first priority security interests and replacement liens in all of the Debtors' assets and causes of action excluding only Avoidance Actions, whether now owned or hereafter acquired, subject only to the liens granted to secure the DIP Loans and any permitted liens allowed pursuant to the DIP Financing Agreement and Carve-Out.

(c)     Third, the Debtors will pay the reasonable fees and expenses incurred by Latham & Watkins LLP and Young, Conaway, Stargatt & Taylor LLP in

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 41 of 53

their respective capacity as counsel to the Prepetition Lenders, and such other legal or financial professionals retained by the Prepetition Lenders.

(d)     Fourth, the Debtors shall accrue and pay interest on Prepetition First-Lien Debt at the contractual rate until such time as the Prepetition First-Lien Debt is paid or refinanced in full in cash. Upon any Event of Default under the DIP Financing Commitment, the Debtors shall accrue and pay interest on the Prepetition First-Lien Debt at the default contractual rate until such time as the Prepetition First-Lien Debt is paid or refinanced in full in cash.

(e)     Fifth, claims arising from or in connection with the Prepetition First-Lien Debt are deemed "allowed claims" within the meaning of § 502 of the Bankruptcy Code.

(f)     Sixth, the Debtors propose that the DIP Agent shall have the right to "credit bid" the amount of the Prepetition First-Lien Debt during any sale of the DIP Collateral, including sales occurring pursuant to § 363 of the Bankruptcy Code or included as part of any plan subject to confirmation.

(g)     Seventh, the Debtors propose to modify the automatic stay to the extent necessary to effectuate all of the terms and provisions of the Interim Order.

(h)     Eighth, the Debtors grant the Prepetition Lenders a continuation of their liens under the Amended U.S. Credit Facility until the Prepetition First-Lien Debt has been satisfied to the DIP Agent's satisfaction.

58.     The Prepetition Second-Lien Lenders' interest in the Cash Collateral (to the extent there is such an interest) is also adequately protected through the granting of additional subordinated liens on all the DIP Collateral in accordance with the Intercreditor Agreement.[15] The Debtors submit that the adequate protection proposed above for the DIP Lenders, the DIP Agent, and the Prepetition Second-Lien Lenders is necessary and appropriate to ensure that the Debtors can continue to use the Cash Collateral.

---

[15] See FN8 and ¶ 12(e) of the Interim Order.

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

59.     The Debtors submit that the adequate protection proposed herein more than justifies the continued use of the Cash Collateral and is fair, reasonable and sufficient to satisfy the requirements of §§ 362(c)(2) and (e) of the Bankruptcy Code. Moreover, Courts in this district have granted similar relief in other recent chapter 11 cases. *See, e.g., In re Hawaiian Telcom Commc'ns., Inc.*, No. 08-13086 (PJW) (Bankr. D. Del. Dec 3, 2008) (interim order); *In re Intermet Corp.*, No. 08-11859 (KG) (Bankr. D. Del. Sept. 19, 2008) (amended Nov. 14, 2008); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008).

## Request for Modification of the Automatic Stay

60.     Paragraph 21 of the Interim Order provides for the modification of the automatic stay provisions of section 362 of the Bankruptcy Code in order to effectuate the terms and provisions of the Interim Order, including, without limitation, to permit the Debtors to grant and perfect the DIP Liens and adequate protection liens described herein, to incur all liabilities and obligations under the DIP Financing Agreement, and to authorize the Debtors to repay the DIP Loan. Specifically, the Interim Order modifies the automatic stay to:

(a)     Require all of the cash, checks, or other collections or proceeds from Collateral received by the Debtors to be deposited in accordance with the requirements of the DIP Financing Agreement;

(b)     Upon an Event of Default, allow the DIP Lenders to exercise all rights under and remedies provided for in the DIP Financing Agreement (including the right to setoff funds in accounts maintained by the Debtors with any of the DIP Lenders) upon the expiration of a five business day waiting period (the "Waiting Period") without requiring authorization from the Court;

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 43 of 53

<table>
<tr><td>(c)</td><td>Prohibit the use of Cash Collateral or DIP Loan Proceeds except those provided for in the Approved Budget during the Waiting Period;</td></tr>
<tr><td>(d)</td><td>Determine that the only issue as to which the Debtors and any party in interest (including any Creditors' Committee) may seek Bankruptcy Court intervention seeking to delay or prevent the DIP Agent or the DIP Lenders from exercising its remedies shall be whether an Event of Default has, in fact, occurred and is occurring.</td></tr>
</table>

61.     Stay modifications of this type are customary features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances.    Accordingly, the Court should modify the automatic stay to the extent contemplated by the Interim Order.

## Request To Waive Bankruptcy Rules 6003(b), 6004(a), and 6004(h)

62.     In order to successfully implement the foregoing, the Debtors respectfully request that the Court waive the notice requirements provided for by Bankruptcy Rule 6004(a), the 21-day stay provided for in Bankruptcy Rule 6003, and the 14-day stay provided for by Bankruptcy Rule 6004(h).    Pursuant to Bankruptcy Rule 6003, the Court may grant the relief requested in the Motion within 21 days after the bankruptcy petition date if the relief is necessary to avoid immediate and irreparable harm.    The Debtors have an urgent and immediate need for cash to continue to operate.    Without access to the Cash Collateral and the DIP Facility, the Debtors will jeopardize their ability to fulfill obligations and commitments to trade creditors, employees, lenders, and other stakeholders upon whose trust and confidence the future viability of the business depends. The Debtors thus seek immediate authority to use the Cash Collateral

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 44 of 53

and enter into the DIP Financing Agreement as set forth in the Motion and in the Interim Order to prevent immediate and irreparable harm to the Debtors, pending a final hearing pursuant to Bankruptcy Rule 4001(c).

<u>**Compliance With Local Rule 4001-2(a)(i)**</u>

63.     Rule 4001-2(a)(ii) of the Local Rules requires any motion seeking approval of a cash collateral or financing request to highlight certain provisions, to the extent they are included in such financing arrangement. The Interim Order contains the following provisions that must be identified and explained pursuant to this rule:

(a)     ***<u>Local Rules 4001-2(a)(i)(A) and 4001-2(a)(i)(E), Provisions Granting Cross-Collateralization Protections (other than replacement liens) and Deeming Prepetition Secured Debt to be Postpetition Debt</u>***: *See* Interim Order at ¶ 10 and ¶ 12(c)(i). The effect of the roll-up (which will only occur upon entry of a Final Order) will be to (a) convert $25,000,000 of prepetition secured debt into postpetition secured debt, and (b) cross-collateralize the Prepetition First-Lien Debt currently secured by mortgages on eleven TMS ships; pledges of certain Concentration Accounts of TMA and TMO; 100% of the equity interests of TMA and TMO; 65% of the equity interests of Trico Marine Cayman, L.P.; and a pledge of a subordinated intercompany note from Trico Supply AS to TMO with first priority liens upon all unencumbered collateral and Intercompany Note Collateral. The Debtors submit that the roll-up contemplated in the Interim Order and the DIP Financing Agreement is appropriate under the circumstances and will not prejudice the Debtors or their estates, because payment of such amounts is subject to the rights of parties in interest to challenge the validity or priority of the DIP Lenders' liens and claims.

(b)     ***<u>Local Rule 4001-2(a)(i)(C), Provisions That Seek To Waive, Without Notice, Whatever Rights the Estate May Have Under 11 U.S.C. §506(c)</u>***: *See* Interim Order at ¶ 16. The Debtors will seek at the Final Hearing a waiver of the provisions of Bankruptcy Code § 506(c) or other provisions that would allow the Prepetition Collateral to be subject to surcharge by the

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 45 of 53

Debtors or any other party-in-interest.  Here, the Prepetition Lenders have consented to the Debtors' use of the Prepetition Collateral in order to provide the Debtors with sufficient funds with which to operate their business.

(c)   ***Local Rule 4001-2(a)(i)(F), Provisions That Provide Disparate Treatment For the Professionals Retained By the Debtor With Respect to A Professional Fee Carve-Out***.  *See* Interim Order at ¶ 13.  The Interim Order and DIP Financing Agreement provide a "carve-out" in amounts of $500,000 for the fees and expenses of attorneys retained by the Debtors, up to $500,000 for the fees and expenses of other professionals retained by the Debtors, and up to $150,000 for the fees and expenses incurred by professionals retained by the Creditors' Committee payable following delivery of a termination notice in accordance with the terms of the DIP Financing Agreement.  The fees paid to professionals retained by the Debtors in the Carve-Out are competitive within the market of services offered by other professionals performing work of similar complexity and sophistication.

64.     The provisions described above are typically found in financing and consensual cash collateral agreements of this nature, and the Prepetition Lenders would not have agreed to provide financing and allow the Debtors to use the Cash Collateral absent such provisions.

## **Request for Final Hearing**

65.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that a Final Hearing on the use of the Cash Collateral should be held no later than September 24, 2010, and that the court fix the time and date prior to the final hearing on the Motion for parties to file objections to the Motion.

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Page 46 of 53

## NOTICE

66.     Notice of this Motion has been provided by e-mail, facsimile, or overnight delivery to: (a) the Office of the United States Trustee for the District of Delaware; (b) Tennenbaum, as lender for the U.S. Credit Facility; (c) Obsidian, as administrative agent and collateral agent for the U.S. Credit Facility; (d) Nordea, as lender for the Trico Shipping W/C Facility and as administrative agent and collateral agent for the U.S. Credit Facility; (e) U.S. Bank, as Trustee and collateral agent for the Secured Notes; (f) Wells Fargo Bank, as Trustee for the 3% Notes; (g) Unicredit, as lender for the Trico Shipping W/C Facility; (h) Deutsche Bank National Trust Company, as Trustee for the High Yield Notes; (i) Wilmington Trust FSB, as collateral agent to the intercreditor agreement between the Trico Shipping W/C Facility and the High Yield Notes; (j) the Debtors' 40 largest unsecured creditors (on a consolidated basis); (k) those persons who have formally appeared in these Cases and requested service pursuant to Bankruptcy Rule 2002; and (l) all applicable government agencies to the extent required by the Bankruptcy Rules and the Local Rules. As this Motion is seeking first-day relief, notice hereof and of any order entered hereon will be served in accordance with Local Rule 9013-1(m).

## PRAYER

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein; (ii) schedule the Final Hearing, (iii) after the Final Hearing, enter a Final Order substantially in the form of the

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Page 47 of 53

Interim Order and as filed with the Court prior to the Final Hearing; and (iv) grant such other and

further relief as is just and proper.

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c),
364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014
(I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE
CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING
LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY;
AND (V) GRANTING RELATED RELIEF

Page 48 of 53

August 25, 2010
Wilmington, Delaware

Respectfully submitted,

*/s/ Robert J. Dehney*
Robert J. Dehney (No. 3578)
Gregory T. Donilon (No. 4244)
Andrew R. Remming (No. 5120)
L. John Bird (No. 5310)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Tel: 302.658.9200
Fax: 302.658.3989

-and-

Steven M. Abramowitz (*pro hac vice* pending)
VINSON & ELKINS LLP
666 Fifth Avenue, 26th Floor
New York, NY 10103
Tel: 212.237.0137
Fax: 917.849.5381
sabramowitz@velaw.com

-and-

Harry A. Perrin (*pro hac vice* pending)
VINSON & ELKINS LLP
First City Tower
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760
Tel: 713.758.2222
Fax: 713.758.2346
hperrin@velaw.com

-and-

John E. Mitchell (*pro hac vice* pending)
Angela B. Degeyter (*pro hac vice* pending)

DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c),
364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014
(I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE
CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING
LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY;
AND (V) GRANTING RELATED RELIEF
Page 49 of 53

John Paul K. Napier (*pro hac vice* pending)
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Tel: 214.220.7700
Fax: 214.999.7787
jmitchell@velaw.com
adegeyter@velaw.com
jnapier@velaw.com

*Proposed Attorneys for the Debtors and
Debtors-in-Possession*

**DEBTORS' MOTION FOR ENTRY OF INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(I), 364(c)(2), 364(c)(3), 364(d)(I), 364(e), 503(b) and 507(a) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**