# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TRICO MARINE SERVICES, INC., *et al.*,[1] | ) Case No. 10-_____ |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

## DECLARATION OF STEPHEN SIEH IN SUPPORT
## OF DIP FINANCING MOTION

Stephen Sieh makes this Declaration pursuant to 28 U.S.C. 1746 and states:

1. I am a managing director of Evercore Partners Inc. ("Evercore") and financial advisor for Trico Marine Services, Inc. ("TMS" or "Trico"), the parent company of Trico Marine Assets, Inc. ("TMA"), Trico Marine Operators, Inc. ("TMO"), Trico Marine International, Inc. ("TMI"), Trico Holdco, LLC ("Holdco"), and Trico Marine Cayman, L.P. ("Cayman"), the above-captioned debtors in possession (collectively, the "Debtors"). I have 12 years experience of having participated in a wide range of corporate finance activities, including mergers and acquisitions, corporate lending, and Chapter 11 restructurings. I am duly authorized to make this declaration and the statements set forth herein on behalf of the Debtors. I have personal knowledge of the facts set forth herein.

2. Evercore was retained by the Debtors on April 19, 2010. Since that time until the Petition Date, and as described herein, Evercore and I worked closely with the Debtors' management, financial staff and other professionals in the Debtors' restructuring efforts;

---

[1] The Debtors are the following entities (followed by their tax identification numbers): Trico Marine Services, Inc. (72-1252405); Trico Marine Assets, Inc. (72-125404); Trico Marine Operators, Inc. (72-1096124); Trico Marine International, Inc. (72-1403132); Trico Holdco, LLC (20-5743870); Trico Marine Cayman, L.P. (98-0515842). The mailing address for all of the Debtors for the purpose of these chapter 11 cases is 10001 Woodloch Forest Drive, Suite 610, The Woodlands, TX 77380.

DECLARATION OF STEPHEN SIEH IN SUPPORT
OF DIP FINANCING MOTION

acquainted ourselves with the Debtors' businesses, operations, properties and finances; analyzed the Debtors' liquidity and projected cash flows; advised the Debtors in their evaluations of financing alternatives; assisted the Debtors in obtaining $25.0 million of prepetition financing; and assisted the Debtors in connection with preparations for commencement of these cases, including assistance in the Debtors' efforts to procure debtor-in-possession financing ("DIP Financing").

3. On August 25, 2010 (the "Petition Date"), the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") which commenced their bankruptcy cases (the "Cases").

4. I have reviewed the Debtors' Motion For Entry of Interim and Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a), Fed. R. Bankr. P. 2002, 4001, and 9014 and Del. Bankr. L.R. 4001-2 (I) Authorizing Debtors (A) To Obtain Postpetition Secured DIP Financing (B) To Refinance Certain Prepetition Secured Indebtedness and (C) To Use Cash Collateral; (II) Granting Liens and Providing For Superpriority Administrative Expense Status; (III) Granting Adequate Protection to Prepetition Secured Parties; (IV) Modifying Automatic Stay; and (V) Granting Related Relief (the "DIP Financing Motion").[2] The representations contained in the DIP Financing Motion are true and correct to the best of my knowledge, information, and belief.

5. As described in the DIP Financing Motion, the Debtors' secured debt obligations arise from borrowings under the $25 million Amended U.S. Credit Facility and $202.8 million in 8.125% Secured Second-Lien Notes. The Debtors' unsecured debt obligations arise from the issuance of $150 million of the 3% Notes. In the aggregate, the Prepetition First-Lien Debt, the

---

[2] Capitalized terms not defined herein shall have the meaning given to them in the DIP Financing Motion.

**DECLARATION OF STEPHEN SIEH IN SUPPORT
OF DIP FINANCING MOTION**

Secured Second-Lien Notes, and the 3.0% Notes (collectively, the "Parent Debt") total approximately $377 million and comprise the main credit obligations of TMS. The obligations under the Parent Debt are all *pari passu* in right of payment, with the Amended U.S. Credit Facility having a senior lien on shared collateral.

6. In addition to the Parent Debt, in 1999 Trico Marine International, Ltd. issued $18.9 million of notes due in 2014 (the "MARAD Notes") to finance construction of two supply vessels, of which $5.1 million remains outstanding as of May 19, 2010. The notes are guaranteed by TMS and the U.S. Maritime Administration and are secured by first priority preferred mortgages on two vessels. The interest rate under the MARAD Notes is 6.11%.

**Summary of Events Leading to Execution of DIP Financing Agreement**

7. On May 17, 2010, liquidity constraints prevented Trico from making an $8.2 million interest payment on the Secured Second-Lien Notes, triggering a 30-day grace period during which the Debtors began planning these Cases. In connection with such planning, the Debtors' Board of Directors (the "Board") and Evercore determined that the Debtors would require debtor-in-possession financing to meet their ongoing liquidity needs. Accordingly, the Board authorized Evercore to solicit proposals to provide postpetition debtor-in-possession financing from various lending institutions (including the agents for the Debtors' prepetition creditors). Evercore contacted 26 financial institutions, including traditional asset-based lenders, commercial banks, specialty lenders to the global maritime industry, credit-focused hedge funds and historically active providers of post-petition financing. Several of the institutions contacted were familiar with the Debtors' business and held material ownership in the Debtors' pre-petition obligations. From those institutions, the Debtors received eight initial proposals. The

Debtors and its advisors reviewed the proposals, and entered into discussions with the different institutions on the terms and conditions of their respective proposals.

8. As of June 10, 2010, the Debtors' forecasted cash and available credit capacity were insufficient to fund the missed interest payment on Senior Secured Second-Lien Notes prior to the end of the grace period, forcing the company to face the possibility that all of the Debtors' outstanding indebtedness would become callable by its creditors before an out-of-court or prenegotiated restructuring plan could be agreed upon. Additionally, the Debtors' failure to make the missed payment would have triggered an event of default under that certain Trico Shipping Working Capital Facility dated 30 October 2009 (the "OPCO Facility"), thus risking acceleration of outstanding debt obligations throughout Trico's business enterprise and negatively impacting the operations of Trico's non-debtor foreign subsidiaries.

9. After careful consideration of the various alternatives generated by the Debtors' efforts to obtain financing, and extensive discussion of those alternatives with Evercore and the Debtors' legal advisors, the Board determined that the proposal (the "Initial DIP Proposal," as further described herein) made by Tennenbaum DIP Opportunity Fund, LLC ("Tennenbaum") to (i) immediately fund prepetition an additional $10,207,815 of undrawn commitments while purchasing $14,792,185 of drawn and preexisting commitments under the Original U.S. Credit Facility and (ii) provide debtor-in-possession financing was, in the Board's business judgment, the option most likely to provide the Debtor the opportunity to negotiate a potential restructuring with the Debtors' creditor constituencies prior to filing and thus maximize the Debtors' value as a going concern.

10. Ultimately, the Initial DIP Proposal, as outlined in the Commitment Letter (each as defined below), submitted by Tennenbaum offered the Debtors the most favorable structure,

**DECLARATION OF STEPHEN SIEH IN SUPPORT
OF DIP FINANCING MOTION**

Page 4 of 9

terms and conditions, and the greatest degree of flexibility to pursue restructuring alternatives. As a result, the Debtors and Tennenbaum executed a commitment letter dated as of June 7, 2010 (the "Commitment Letter") to provide additional liquidity under an amended U.S. Credit Facility (the "Amended U.S. Credit Facility") and memorialize the essential terms upon which Tennenbaum would provide debtor-in-possession financing during these Cases. The Initial DIP Proposal originally contemplated the funding of a $50 million DIP facility consisting of (i) a $35 million "Tranche A" loan, $25 million of which would have refinanced or "rolled-up" the Debtors' obligations under the Amended U.S. Credit Facility and $10 million of which would have constituted an additional "new money" loan, and (ii) an additional "Tranche B" $15 million "new money" loan.

11. In order to provide sufficient time to allow the Debtors to negotiate a potential restructuring with their creditor constituencies, the Debtors and the lenders under the OPCO Facility entered into a forbearance agreement pursuant to which the lenders agreed to refrain from accelerating outstanding indebtedness under that facility so long as the Secured Second-Lien Notes had not been accelerated. The Debtors and the Prepetition Second-Lien Lenders also entered into a forbearance agreement dated as of June 22, 2010 (the "Second-Lien Forbearance Agreement"), pursuant to which Prepetition Second-Lien Lenders agreed not to accelerate the outstanding indebtedness under the Secured Second-Lien Notes or pursue any remedy against the Debtors. Additionally, the Debtors entered into a support agreement with holders of 11.875% senior secured notes due 2014 (the "OPCO High-Yield Notes") owed by Trico's non-debtor foreign subsidiary, Trico Shipping AS ("Trico Shipping") under which those holders also agreed to refrain from pursuing rights or remedies against Trico Shipping (other than to enforce the support agreement).

12. In the weeks leading up to the petition date, the Debtors revised certain assumptions relating to its financial projections of the Debtors and of Trico's non-debtor affiliates upon which the Initial DIP Proposal had been based. The Debtors again weighed a variety options to obtain financing on terms that accounted for the changing financial posture of the Debtors' and of Trico's non-debtor foreign affiliates, to include financing provided by existing prepetition creditors or creditor constituencies, but were unable to secure a viable alternative to the DIP Proposal. As a result, after further discussion with Tennenbaum and consultation with the Debtors' legal and financial advisors regarding the Debtors' limited range of financing options and immediate liquidity needs, the Board determined that the value of the Debtor's assets would be maximized through entry into a revised DIP agreement comprising of a $35 million DIP facility provided by Tennenbaum (the "Revised DIP Financing Agreement") rather than the $50 million facility provided for in the Commitment Letter. The interest rate under the Revised DIP Financing Agreement increased the rate originally provided in the Initial DIP Proposal by two percentage points to LIBOR plus 11.5%.

13. Under the terms of the Revised DIP Financing Agreement, Tennenbaum will immediately advance a $10,000,000 "new money" DIP loan upon the Court's entry of the Interim Order attached as Exhibit A to the DIP Motion (the "Interim Order DIP Loan"). The Revised DIP Financing Agreement also provides that, upon entry of the Final Order, Tennenbaum will advance a $25,000,000 Refinancing Loan that will allow the debtor to retire its prepetition obligations under the Amended U.S. Credit Facility and will, in combination with the Interim Order DIP Loan, provide the basis for a single super-priority administrative expense claim. If approved, the Interim Order DIP Loan requested by the DIP Financing Motion will provide the immediate liquidity required to fund the Debtors' ongoing business operations

through the initial phase of these Cases (though likely not through confirmation of a plan of reorganization). Accordingly, the Debtors continue to evaluate alternative transactions to bring additional working capital into the estates, to include the use of asset sales and possible "take out" debtor-in-possession financing.

**Approval of the DIP Financing Motion is Necessary to Avoid Immediate and Irreparable Harm**

14. As a result of, among other things, the Debtors' financial condition and prepetition capital structure, the Debtors have been unable to obtain alternative sources of cash or credit in the form of unsecured credit allowable under Bankruptcy Code § 503(b)(1). The ability to obtain sufficient working capital and liquidity through the DIP Facility is therefore vital to the preservation and maximization of the value of the Debtors' estates. The Revised DIP Financing Agreement provides the Debtors' estate with an additional $10,000,000 of availability over and above that provided under the Amended U.S. Credit Facility, and it should be emphasized that $10,207,815 of the total amounts advanced under the Amended U.S. Credit Facility (all of which would be repaid through the Refinancing Loan) was advanced by the DIP Lender less than twelve weeks before the Petition Date as an accommodation to the Debtors in order to address immediate liquidity needs of the Debtors and in contemplation of these Cases.

15. Prior to the Board's selection of the Initial DIP Proposal as the Debtors' best financing alternative, and throughout the process that resulted in the negotiation of the Amended U.S. Credit Facility and the Revised DIP Financing Agreement, the Debtors and their advisors had substantial discussions with numerous potential sources of DIP financing, including certain current debt holders, and devoted substantial efforts to assist parties with diligence requests, discuss possible structures of DIP financing, and obtain as many proposals as possible for further consideration and application of efforts by the Debtors and their advisors. These efforts were

made simultaneously with efforts to obtain forbearance agreements with the Prepetition Second-Lien Lenders and the holders of the OPCO High-Yield Notes in the context of liquidity needs.

16. Financing on a post-petition basis is not otherwise available in the absence of the Debtors' granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all other administrative expenses. No third-party lender was willing to extend post-petition financing without receiving senior and priming liens on and security interests in substantially all the Debtors' prepetition assets. The terms and conditions of the Revised DIP Financing Agreement are the best possible under the circumstances of these Cases, and were negotiated in good faith at arm's length with all parties represented by experienced counsel. It is my understanding that the Debtors have satisfied the legal prerequisites to borrow under the Revised DIP Financing Agreement.

17. In my opinion, the terms of the DIP Financing Agreement are fair and reasonable under the entirety of the circumstances leading to the commencement of the Debtors' Cases, reflect the exercise of prudent business judgment by the Debtors, and are supported by reasonably equivalent value and fair consideration. The DIP Facility provided under the Revised DIP Financing Agreement will minimize disruption of the businesses and operations of the Debtors and permit the Debtors to meet payroll and other operating expenses, obtain needed supplies, and maintain the going concern value of their businesses by demonstrating an ability to maintain normal operations. In order to avoid the immediate and irreparable harm that would result from a disruption in the debtor's ability to carry on its operations, it is essential that the DIP Motion be approved so that the Debtors may stabilize their operations and resume paying for ordinary, postpetition operating expenses.

## CONCLUSION

18. Approval of the DIP Financing Motion is in the best interest of the Debtors' estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day of 24 August, 2010.

_____
Stephen Sieh