# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TRICO MARINE SERVICES, INC., *et al.*,[1] | ) Case No. 10-_____ |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

## DECLARATION OF JOHN R. CASTELLANO IN SUPPORT
## OF DIP FINANCING MOTION

John R. Castellano makes this Declaration pursuant to 28 U.S.C. 1746 and states:

1. I am the Chief Restructuring Officer ("CRO") for Trico Marine Services, Inc. ("TMS" or "Trico"), the parent company of Trico Marine Assets, Inc. ("TMA"), Trico Marine Operators, Inc. ("TMO"), Trico Marine International, Inc. ("TMI"), Trico Holdco, LLC ("Holdco"), and Trico Marine Cayman, L.P. ("Cayman"), the above-captioned debtors in possession (collectively, the "Debtors"). I have been working with the Debtors since June of 2010. In this capacity, I have been actively engaged in the management of the Debtors' business operations, the preparation of the Debtors' petition for relief under chapter 11 of the bankruptcy code, and other aspects of the Debtors' restructuring efforts. I have reviewed the Debtors' business plans, projections, and attempts to obtain financing. I am familiar with the Debtors' day-to-day operations, businesses, financial affairs and books and records. I am duly authorized to make this declaration and the statements set forth herein on behalf of the Debtors. I have personal knowledge of the facts set forth herein.

---

[1] The Debtors are the following entities (followed by their tax identification numbers): Trico Marine Services, Inc. (72-1252405); Trico Marine Assets, Inc. (72-125404); Trico Marine Operators, Inc. (72-1096124); Trico Marine International, Inc. (72-1403132); Trico Holdco, LLC (20-5743870); Trico Marine Cayman, L.P. (98-0515842). The mailing address for all of the Debtors for the purpose of these chapter 11 cases is 10001 Woodloch Forest Drive, Suite 610, The Woodlands, TX 77380.
**DECLARATION OF JOHN R. CASTELLANO IN SUPPORT
OF DIP FINANCING MOTION**

2. On August 25, 2010 (the "Petition Date"), the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") which commenced their bankruptcy cases (the "Cases").

3. Since the Petition Date, the Debtors have continued to operate and manage their business as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

4. I have reviewed the Debtors' Motion For Entry of Interim and Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a), Fed. R. Bankr. P. 2002, 4001, and 9014 and Del. Bankr. L.R. 4001-2 (I) Authorizing Debtors (A) To Obtain Postpetition Secured DIP Financing (B) To Refinance Certain Prepetition Secured Indebtedness and (C) To Use Cash Collateral; (II) Granting Liens and Providing For Superpriority Administrative Expense Status; (III) Granting Adequate Protection to Prepetition Secured Parties; (IV) Modifying Automatic Stay; and (V) Granting Related Relief (the "DIP Financing Motion").[2] The representations contained in the DIP Financing Motion are true and correct to the best of my knowledge, information, and belief.

5. As described in the DIP Financing Motion, the Debtors' secured debt obligations arise from borrowings under the $25 million Amended U.S. Credit Facility and $202.8 million in 8.125% Secured Second-Lien Notes. The Debtors' unsecured debt obligations arise primarily from the issuance of $150 million of 3% Notes. In the aggregate, the Prepetition First-Lien Debt, the Secured Second-Lien Notes, and the 3.0% Notes (collectively, the "Parent Debt") total approximately $377 million and comprise the main credit obligations of TMS. The obligations under the Parent Debt are all *pari passu* in right of payment, with the Amended U.S. Credit Facility having a senior lien on shared collateral.

---

[2] Capitalized terms not defined herein shall have the meaning given to them in the DIP Financing Motion.

**DECLARATION OF JOHN R. CASTELLANO IN SUPPORT
OF DIP FINANCING MOTION**

6. In addition to the Parent Debt, in 1999 Trico Marine International, Ltd. issued $18.9 million of notes due in 2014 (the "MARAD Notes") to finance construction of two supply vessels, of which $5.0 million remains outstanding as of June 30, 2010. The notes are guaranteed by TMS and the U.S. Maritime Administration and are secured by first priority preferred mortgages on two vessels. The interest rate under the MARAD Notes is 6.11%.

## Summary of Events Leading to Execution of DIP Financing Agreement

7. Through working with the Debtors' financial advisor, Evercore Partners ("Evercore"), I have come to know that in the week prior to the June 7, 2010 execution of the Commitment Letter (as defined below), the Debtors' Board of Directors (the "Board"), the Debtors' management team, and the Debtors' financial advisor, Evercore Partners ("Evercore"), determined that the Debtors would require debtor-in-possession financing to meet their ongoing liquidity needs. After careful consideration of the various alternatives generated by the Debtors' efforts to obtain financing, and extensive discussion of those alternatives with Evercore and the Debtors' legal advisors, the Board determined that a proposal (the "DIP Proposal") made by Tennenbaum DIP Opportunity Fund, LLC ("Tennenbaum") to (i) fund prepetition an additional $10,207,815 of undrawn commitments while purchasing $14,792,185 of drawn and preexisting commitments under the Original U.S. Credit Facility and (ii) provide debtor-in-possession financing was, in the Board's business judgment, the best option and alternative most likely to maximize the Debtors' value as a going concern. As a result, the Debtors and Tennenbaum executed a commitment letter (the "Commitment Letter") creating the Amended U.S. Credit Facility and memorializing the essential terms upon which Tennenbaum would provide debtor-in-possession financing during these Cases.

8. However, after negotiating the terms of the amendments to the U.S. Credit Facility, and in the weeks leading up to the Petition Date, it became apparent that the assumptions regarding the financial status of the Debtors and the Debtors' non-debtor affiliates upon which the Original DIP Facility was structured were no longer valid. The Debtors attempted to locate feasible alternative financing, to include financing provided by existing prepetition creditors or creditor constituencies, but were unable to secure a viable alternative. Accordingly, the Debtors have amended the Original DIP Facility Commitment to instead provide for a $35 million debtor-in-possession credit facility (the "Amended DIP Facility" and "DIP Financing Agreement"), $25 million of which will refinance or "roll up" the Debtors' obligations under the Original U.S. Credit Facility (the "Refinancing Loan"), and $10 million of which will consist of "new money" loans to the Debtors' estates upon the Court's entry of the Interim Order attached as **Exhibit A** to the DIP Motion (the "Interim Order DIP Loan"). The interest rate under the Amended DIP Facility increases the rate originally provided in the DIP Proposal by two percentage points to LIBOR plus 11.5%. Under the terms of the DIP Financing Agreement, the Refinancing Loan and Interim Order DIP Loan combine to provide the basis for a single super-priority administrative expense claim.

9. If approved, the Interim Order DIP Loan requested by the DIP Financing Motion will provide the immediate liquidity necessary to fund the Debtors' ongoing business operations, but is not expected to provide the liquidity necessary to accomplish a complete restructuring of the Debtors' estates through confirmation of a Plan. Accordingly, the Debtors continue to evaluate alternative transactions to bring additional working capital into the estates, to include the use of asset sales and possible "take out" debtor-in-possession financing.

## Approval of the DIP Financing Motion is Necessary to Avoid Immediate and Irreparable Harm to the Debtors' Estates

10. As a result of, among other things, the Debtors' financial condition and prepetition capital structure, the Debtors have been unable to obtain alternative sources of cash or credit in the form of unsecured credit allowable under Bankruptcy Code § 503(b)(1). The ability to obtain sufficient working capital and liquidity through the DIP Facility is therefore vital to the preservation and maximization of the value of the Debtors' estates. Prior to finalizing the DIP Financing Agreement, the Debtors and their advisors engaged Tennenbaum in detailed and robust negotiations and devoted substantial efforts toward obtaining financing on terms as favorable as possible to the Debtors' estates. The DIP Financing Agreement provides the Debtors' estates with an additional $10,000,000 of availability over and above that provided under the Amended U.S. Credit Facility, and it should be emphasized that $10,207,815 of the total amounts advanced under the Amended U.S. Credit Facility (all of which would be repaid through the Refinancing Loan) was advanced by the DIP Lender less than twelve weeks before the Petition Date as an accommodation to the Debtors in order to address immediate liquidity needs of the Debtors and in contemplation of these Cases.

11. As of the Petition Date, the Debtors have only $160,000 in cash on hand, but are incurring an average negative cash flow of over $4 million per month. As demonstrated in the budget attached to the DIP Financing Motion as **Exhibit C** (as superseded and replaced by the Debtors in accordance with the DIP Financing Agreement, the "Budget"), the Debtors' bi-weekly payroll expenses are over $450,000 or approximately $900,000 per month. Without approval of the DIP Motion and entry of the Interim Order, the Interim Order DIP Loan will be unavailable, and the Debtors will be unable to satisfy their payroll obligations and other critical operating expenses, all of which are identified in the Budget. In the absence of immediate access

to cash and credit, the Debtors' suppliers will refuse to sell critical supplies and services to the Debtors, and the Debtors will therefore be unable to operate their business. The DIP Financing Agreement requires that the Debtors obtain an order approving the DIP Facility on a final basis within 30 days of the Petition Date. Accordingly, the Debtors request that they be authorized to spend Budgeted cash collateral and proceeds of the Interim Order DIP Loan from the Petition Date through the final hearing on the DIP Facility. Borrowing $10,000,000 under the Interim Order DIP Loan and spending the amounts identified in the Budget until a final hearing can be conducted is necessary to prevent immediate and irreparable harm to the Debtors' estates.

12. As I understand is typical of most debtor-in-possession financing agreements, the DIP Loan Agreement contains a "carve-out" for the payment of certain professional fees. Furthermore, the Debtors' ability to access the DIP Facility is subject entirely to the Budget. The Budget represents the Debtors' best good faith estimates of the amounts and timing of anticipated receipts and disbursements during the Budget period. Financing on a post-petition basis is not otherwise available in the absence of the Debtors' granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all other administrative expenses. It is my understanding that the Debtors have satisfied the legal prerequisites to borrow under the DIP Financing Agreement.

13. The interests of pre-petition creditors in cash collateral are adequately protected. The Debtors will use cash collateral in accordance with the Budget, itemizing the sources and requirements of cash and providing a weekly projection of cash receipts and expenditures. The expenses listed on the Budget are reasonable and necessary business expenses that must be paid in order to continue the Debtors' businesses. The Debtors are not aware of any substantial funds that are not claimed as Cash Collateral. The Debtors require use of such funds to meet their

post-petition obligations and to pay their general and administrative operating expenses, including post-petition insurance and taxes. The Debtors' failure to timely pay such items will result in immediate and irreparable harm to their assets. The Debtors seek only the use of that amount of Cash Collateral as is necessary to avoid immediate and irreparable harm to their assets pending a final hearing.

14. In my opinion, the terms of the DIP Financing Agreement and adequate protection arrangements contained therein are fair and reasonable under the circumstances of these Debtors and their operations, and the events leading up to the Chapter 11 filings, and reflect the exercise of prudent business judgment by the Debtors consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The DIP Facility provided under the DIP Financing Agreement will minimize disruption of the businesses and operations of the Debtors and permit the Debtors to meet payroll and other operating expenses, obtain needed supplies, and maintain the going concern value of their businesses by demonstrating an ability to maintain normal operations. In order to avoid the immediate and irreplaceable harm that would result from a disruption in the Debtor's ability to carry on their operations, it is essential that the DIP Motion be approved so that the Debtors may stabilize their operations and resume paying for ordinary, post-petition operating expenses.

## CONCLUSION

15. Approval of the DIP Financing Motion on an interim basis is in the best interest of the Debtors' estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day of 25 August, 2010.

_____
John R. Castellano