# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRICO MARINE SERVICES, INC., et al.,[1] | Case No. 10-12653 (BLS) |
| Debtors. | Joint Administration Requested |
| | **Related Docket Nos. 13, 14 and 15** |

**Hearing Date: August 27, 2010 at 10:30 a.m. (prevailing Eastern time)**

## PRELIMINARY LIMITED OBJECTION OF CERTAIN HOLDERS OF 3.00% SENIOR CONVERTIBLE DEBENTURES DUE 2027 TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORITY DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO REFINANCE CERTAIN PREPETITION SECURED INDEBTEDNESS AND (C) TO USE CASH COLLATERAL (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES (IV) MODIFYING AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Certain beneficial holders (collectively, the "3% Debenture Holders")[2] of 3.00% Senior Convertible Debentures due 2027 (the "3% Debentures") issued by Trico Marine Services, Inc. ("Parent", together with all its direct and indirect subsidiaries, the "Company"), a debtor and debtor-in-possession in the above-captioned chapter 11 cases (and, collectively with the other debtors and debtors-in-possession in the above-captioned chapter 11 cases, the "Debtors"), hereby file this Preliminary Objection to the *Debtors' Motion For Entry of Interim and Final*

---

[1] The Debtors are the following entities (followed by the last four digits of their tax identification numbers): Trico Marine Services, Inc. ("TMS") (2405); Trico Marine Assets, Inc. ("TMA") (5404); Trico Marine Operators, Inc. ("TMO") (6124); Trico Marine International, Inc. ("TMI") (3132); Trico Holdco, LLC ("Holdco") (3870); Trico Marine Cayman, L.P. ("Cayman") (5842). The mailing address for all of the Debtors for the purpose of these Cases is 10001 Woodloch Forest Drive, Suite 610, The Woodlands, TX 77380.

[2] The 3% Debenture Holders include Arrowgrass Capital Partners LLP, Bay Harbour (BHR Capital), Cumberland Associates LLC, H Partners Management LLC, Marathon Asset Management, Tenor Capital Management, and Source Capital Group, Inc., each of which is, or acts as investment manager or advisor for, a beneficial holder of 3% Debentures.

*Orders (I) Authorizing Debtors (A) To Obtain Postpetition Secured DIP Financing (B) To Refinance Certain Prepetition Secured Indebtedness And (C) To Use Cash Collateral (II) Granting Liens And Providing For Superpriority Administrative Expense Status; (III) Granting Adequate Protection To Prepetition Secured Parties (IV) Modifying Automatic Stay; And (V) Granting Related Relief* [Docket No. 13] (the "DIP Motion"), respectfully stating as follows:

## PRELIMINARY STATEMENT

This case is a liquidation in substance if not form. The Debtors have no hope to reorganize, nor do they suggest this in the DIP Motion and other first-day pleadings. Indeed, just weeks ago, the Debtors indicated that they would be liquidating the Parent and folding it into their operating subsidiaries. They have inexplicably abandoned this initiative in favor of these Chapter 11 cases, which exclude the Debtors' operating subsidiaries.

The Debtors have been subsidizing their operating subsidiaries without any meaningful return, and the Debtors clearly expect that this practice will continue in Chapter 11. To the contrary, the Bankruptcy Code requires that it stop. The Debtors should only be permitted to spend the absolute minimum amount under the DIP that is necessary to keep the Debtors' business running until the final DIP financing hearing, and all substantive issues with respect to the DIP (including the exorbitant exit fee and roll-up) also should be reserved until then.

The Debtors do not provide any meaningful disclosure of what they hope to accomplish in Chapter 11. Yet the Debtors' proposed **13-week** DIP budget indicates that the Debtors will bleed nearly $6.5 million, primarily on professional fees of $5.6 million. The bleeding would be even worse but for proposed asset sales that purportedly will generate $10 million.

This case should not remain in Chapter 11 if the Debtors cannot reduce or eliminate their cash flow deficits, ensure the integrity of intercompany transfers and eliminate conflicts of

interest suffusing management's oversight of the Debtors on the one hand, and their operating subsidiaries on the other.

## RELEVANT FACTUAL BACKGROUND

### Business, Acquisitions, and Debt

1. Historically, the Company successfully operated an international towing and supply business that serviced the off-shore drilling platforms used by oil and gas exploration and production companies.[3] The Debtors generally make up the towing and supply side of the Company's business. The boards of directors (or similar governing authorities) of the Company's various entities overlap significantly within the corporate group. For the Court's reference, the following is a substantially simplified corporate structure chart:



2. In February 2007, Parent issued the 3.00% Debentures in an original principal amount of $150 million. The 3.00% Debentures are unsecured. Upon information and belief, through subsequent gross mismanagement, ill-conceived acquisitions, and increasingly

---

[3] Trico Marine Services, Inc., Annual Report (Form 10-K), at 1 (March 2, 2007).

burdensome and restrictive financings, the Debtors' leadership drove what had been a very healthy company into the depths of insolvency.

3. The Company's management increased the Company's leverage in May 2008 by issuing $300 million in unsecured 6.50% Senior Convertible Debentures due 2028 (the "6.50% Debentures").[4] The Company used the proceeds of the 6.50% Debentures to finance, in part, an expansion by the Company into new business lines. With the purchase of DeepOcean ASA ("DeepOcean") and CTC Marine Projects LTD ("CTC Marine"),[5] management committed the Company to a venture well beyond their core towing and supply business into a range of subsea services, including undersea maintenance, light construction and trenching, and sea-floor cable laying, while simultaneously boosting the Company's debt load.

4. In order to acquire DeepOcean, Trico Shipping borrowed vast sums from Parent pursuant to an intercompany loan agreement (the "Shipping Intercompany Loan") in the original principal amount of $395 million. Prior to October 2009, the Shipping Intercompany Loan was subordinated to approximately $172 million of debt under a then-existing Trico Shipping credit facility.

5. In October 2009, Trico Shipping, a non-Debtor subsidiary of the Company issued the 11.875% Notes and paid off then-existing indebtedness of foreign subsidiaries.[6] Among other things, the October 2009 Transactions:

---

[4] In May 2009, the Company exchanged the 6.50% Notes for, among other things, approximately $202 million in original principal amount 8.125% Secured Convertible Debentures due 2013 (the "8.125% Debentures").

[5] References to entities acquired by the Company refer to such entities and their subsidiaries and/or affiliates also acquired in such transaction.

[6] Concurrently therewith, Trico Shipping entered into a working capital facility, under which approximately $28 million is outstanding.

- More than doubled the amount of debt senior to the Shipping Intercompany Loan, from approximately $172 million to well over $400 million.[7]

- Required that the Debtors subsidize the non-Debtors' overhead expenses.

- Prohibited foreign subsidiaries from making, and Parent from permitting, dividends or any other payments from foreign subsidiaries to Parent in excess of $5 million per year (such amount being grossly insufficient to cover the amount of overhead expenses attributable to foreign subsidiaries shouldered by Parent).

6. The 11.875% Notes' collateral package consists of most of the assets of the foreign subsidiaries and is supported by guarantees by virtually all of the Debtors. Recently, the Debtors have sold vessels and used the sale proceeds to continue to fund the non-Debtors' overhead expenses -- effectively liquidating the Debtors' estates for the benefit of non-Debtor creditors.

### The Company's Failed Negotiations With Creditors

7. The Debtors' fixed, non-contingent debts consist of (a) $25,000,000 outstanding under a senior secured credit facility (the "Prepetition Credit Facility"), (b) $202,800,000 outstanding 8.125% Debentures, and (c) $150,000,000 outstanding 3% Debentures. The 11.875% Notes assert certain contingent, unliquidated claims against the Parent on account of its guaranty of those notes. The non-Debtors' debts include the 11.875% Notes, and a working capital facility and term loans provided by entities affiliated with Tennenbaum Capital Partners LLC (the "Tennenbaum Entities").

8. As discussed in the various first-day pleadings filed by the Debtors, prior to the Petition Date, the Debtors attempted to negotiate a restructuring with their key constituents. What the Debtors do not disclose is that the Debtors' representatives made clear their intention

---

[7] Trico Marine Services, Inc., Current Report (Form 8-K), at 3, 29 (Oct. 9, 2009).

<u>**to liquidate the Parent**</u> and fold its assets into the Company's operating subsidiaries (the "OpCos"). Now, the Company has decided to shift gears via these Chapter 11 cases, and it appears singularly focused on transferring value away from the Parent's creditors to the OpCos.

## The DIP Motion

9. On the Petition Date, the Debtors filed the DIP Motion asking the Court to approve $35,000,000 in debtor-in-possession financing (the "<u>DIP Financing</u>") to be provided by Tennenbaum Entities and used to payoff the $25,000,000 Prepetition Credit Facility, with $10,000,000 allocated for the Debtors' ongoing operations and professionals.

## LIMITED OBJECTION

10. The 3% Debenture Holders have several material concerns with the DIP Financing and the DIP Motion, including, without limitation, the following:[8]

- **Intercompany Issues**. Due to the nature of the Debtors' corporate structure, intercompany issues are of prime importance. For the 3% Debenture Holders, the Parent must preserve its own value and not transfer assets or incur obligations that would benefit non-Debtor (and non-obligor) subsidiaries. Of course, the Parent, as debtor-in-possession, owes fiduciary duties to its own creditors. Accordingly, in connection with the Final DIP Hearing, the Debtors must demonstrate (a) that the DIP Facility is in the best interest of the Parent's creditors (as opposed to the "whole enterprise") and (b) that each disbursement in its 13-week budget shall pay the Parent's obligations and provide a benefit only to the Parent and **not** its subsidiary's obligations. As an example, the debtors' bloated payroll apparently includes individuals who are performing substantial services for non-Debtor affiliates.

- **The Debtors' Willingness And Ability To Reorganize**. As noted, the Debtors have indicated (at least pre-petition) that they would liquidate the Parent. The Debtors make no statements in their papers showing that they intend or have the ability to reorganize. Indeed, the DIP Motion makes clear that although

---

[8] Inasmuch as the hearing scheduled for August 27, 2010 is interim in nature and the Debtors have limited the relief sought, several of the most critical issues are not necessarily to be addressed at the interim hearing, but rather at the final hearing on the DIP Motion or another hearing. Nonetheless, the 3% Debenture Holders wanted to apprise the Court of these essential issues to preview the likely disputes that shall arise in these cases.

$10,000,000 of the DIP Facility is necessary to sustain operations on a temporary basis, it "is not expected to provide the liquidity necessary to accomplish a complete restructuring of the estates through confirmation of a Plan." (Declaration of John R. Castellano in Support of First Day Pleadings and Papers [Docket No. 3], ¶ 13). Another critical fact is that the Debtors' 13-week projections (filed with the Court) show $10,500,000 of the Parent's $18,310,000 in projected receipts coming from asset sales; meaning, the Parent already expects to generate at least 57% of its receipts from liquidating assets.[9] Nevertheless, despite the expected liquidations, the budget shows negative cash flow during that period of more than $6.5 million.

- **The Debtors Have Failed To Show The Benefit Of The DIP Financing.** In connection with the Final DIP Hearing -- and before the Debtors are permitted to repay the Prepetition Credit Facility and grant the Tennenbaum Entities substantial protections and concessions -- the Debtors must demonstrate that the DIP Facility will enable reorganization. Otherwise, borrowing money plainly is not in the estate's best interests. The Debtors have failed to make this showing now.

- **Second Lien Notes / Adequate Protection**. The DIP Motion proposes various forms of adequate protection to the 8.125% Debentures. In connection with the Final DIP Hearing, the Debtors must show that giving such protection is necessary. First, the Debtors fail to address whether the 8.125% Debentures waived or limited their rights to seek adequate protection in the governing transaction documents including the intercreditor agreement. Second, the Debtors have failed to demonstrate that the 8.125% Debentures are (even partially) secured, keeping in mind that the collateral package securing the 8.125% Debentures is materially more limited that the collateral securing the Prepetition Credit Facility and that, among other things, the 8.125% Debentures have no liens on the Shipping Intercompany Note. Third, the interim order on the DIP Motion must make clear that any adequate protection granted to the 8.125% Debentures is limited to the extent of diminution in value of **their** collateral, not diminution of any other collateral.

- **The DIP Should Not Be Approved With Its Significant Onerous Terms**. The DIP Facility contemplates highly prejudicial terms. Among them, the terms contemplated in the DIP Facility would roll-up the $25,000,000 Prepetition Credit Facility into post-petition obligations and require the Debtors to pay a 1% exit fee for the repayment of the rolled-up portion of the DIP Facility. These onerous terms should not be approved.

---

[9] That the Debtors have been quickly bleeding cash is shown by the Debtors' disclosure that they borrowed $10,207,815 "less than ten weeks before the Petition Date," (DIP Motion, ¶ 43), yet "[a]s of the Petition Date, the Debtors have only $160,000 in cash on hand, but are incurring an average negative cash flow of over $4 million per month," (Declaration of John R. Castellano in Support of DIP Financing Motion [Docket No. 15], ¶ 11).

- **The Debtors Must Show The DIP Facility Is The Best Available Alternative.** At or prior to the Final DIP Hearing, the Debtors must demonstrate that the DIP Facility is the best alternative available. While the DIP Motion and accompanying declarations reference the Debtors' prepetition process of soliciting financing proposals, further evidence is required regarding the terms solicited, in particular whether the Debtors solicited proposals for "stand-alone" debtor-in-possession financing or, rather, exclusively solicited proposals that would refinance the Prepetition Credit Facility.

- **Clarification Of Respective Priorities And Rights.** In connection with the DIP Motion, the Debtors need to clarify specific interests and liens encumbering their assets. In particular, the DIP Motion and related papers seem to say that the 11.875% notes hold a first priority lien on the Shipping Intercompany Note. The 3% Debenture Holders are unaware of such a lien and, upon information and belief, no public filings have disclosed its existence.

## RESERVATION OF RIGHTS

This Preliminary Objection is without prejudice to the right of the 3% Debenture Holders to object to the DIP Motion and any related relief on any other or further bases, and without prejudice to the right of the 3% Debenture Holders to make other or further arguments at the August 27, 2010 first day hearing. All such rights are fully reserved and preserved.

Dated: August 26, 2010

PACHULSKI STANG ZIEHL & JONES LLP

_/s/_

Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

and

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David S. Rosner, Esquire
Andrew K. Glenn, Esquire
David J. Mark, Esquire
Daniel A. Fliman, Esquire
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

Co-Counsel to the Certain Holders of 3.00% Senior Convertible Debentures Due 2027