## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 10-12653 (BLS)** |
| | § | |
| **TRICO MARINE SERVICES, INC.,** *et al.* | § | **(Chapter 11)** |
| | § | |
| **DEBTORS.** | § | **(Joint Administration Requested)** |
| | § | |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a), FED. R. BANKR. P. 2002, 4001 AND 9014 AND DEL. BANKR. L.R. 4001-2 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED DIP FINANCING (B) TO USE CASH COLLATERAL (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

Trico Marine Services, Inc. ("Trico Marine")[1] and certain of its affiliates (collectively, the "Debtors")[2], having moved on August 25, 2010 (the "Motion") for interim and final orders authorizing them to, among other things, (i) incur post-petition secured indebtedness, (ii) pay the Prepetition First Lien Debt (defined below in paragraph E), (iii) grant security interests and superpriority claims, and (iv) grant adequate protection, pursuant to sections 105(a), 362, 363(c), 364(c), (d), and (e), 503(b) and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Delaware Bankruptcy Local Rules (the "Local Rules") and having sought the following relief:

a)        This Court's authorization for Trico Marine, in its capacity as borrower (the "Borrower"), and certain other affiliates of the Debtors, in their capacities as guarantors

---

[1]        Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion and if not defined in the Motion, in the DIP Financing Agreement which is attached to the Motion as Exhibit B.

[2]        The Debtors are the following entities (followed by their tax identification numbers):  Trico Marine Services, Inc. (72-1252405); Trico Marine Assets, Inc. (72-125404); Trico Marine Operators, Inc. (72-1096124); Trico Marine International, Inc. (72-1403132); Trico Holdco, LLC (20-5743870); Trico Marine Cayman, L.P. (98-0515842).  The mailing address for all of the Debtors for the purpose of these Cases is 10001 Woodloch Forest Drive, Suite 610, The Woodlands, TX 77380.

(collectively, the "Guarantors"), to enter into debtor in possession financing on the terms set forth herein and in that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement dated as of August 24, 2010 (as amended, restated or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Financing Agreement"), with Obsidian Agency Services, Inc. ("Obsidian") as agent (in such capacity, the "DIP Agent"), and Tennenbaum DIP Opportunity Fund, LLC, Tennenbaum Opportunities Partners V, LP, and Special Value Continuation Partners, LP (the "DIP Lenders"), to obtain postpetition term loans in an aggregate principal amount not to exceed $35,000,000 (collectively, the "DIP Loan") which shall consist of (i) new money loans in the principal amount of $10,000,000 (the "DIP Financing New Money Loan") and (ii) upon entry of a Final Order, a loan to refinance the Prepetition First Lien Debt in the principal amount of $25,000,000. The term "DIP Loan" shall also include any interest, fees, expenses and other obligations owed by any Debtor to the Agent or the Lenders described herein in connection with the DIP Loan, the DIP Financing Agreement or use of Cash Collateral.

b)     This Court's ordering that the DIP Loan is, as more specifically set forth in this Interim Order:

i.     granted superpriority administrative claim status under Bankruptcy Code section 364(c)(1), having priority over any and all administrative expenses of any kind or nature, including, without limitation, the kinds specified in or arising or ordered under Bankruptcy Code sections 105(a), 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507, 546(c) (subject to entry of a Final Order), 726, 1113, and 1114, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in these Chapter 11 Cases (as defined in paragraph A below) or any successor case, which allowed superpriority claims of the DIP Agent and DIP Lenders shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors as provided herein, subject and subordinate only to, upon the occurrence and during the

continuance of an Event of Default, the payment of the Carve-Out (as defined below in paragraph 13) on the terms and conditions set forth herein;

    ii. be deemed immediately secured under Bankruptcy Code sections 364(c)(2), 364(c)(3), and 364(d)(1) by valid, binding, continuing, enforceable, non-avoidable and fully perfected, first priority priming liens on and senior security interests in all of the Collateral (as defined in paragraph 12, below) subject and subordinate only to: (A) all non-avoidable, valid, enforceable and perfected liens and security interests in the Debtors' assets that existed as of the Petition Date in favor of such third parties holding liens or security interests that are superior in priority, after giving effect to any existing subordination arrangements (including, without limitation, the Prepetition Intercreditor Agreement, as defined below), to the Prepetition First Lien Agent's pre-petition security interests in and liens on the Debtors' assets (the "Permitted Priority Liens") and (ii) solely upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out on the terms and conditions set forth herein;

  c) This Court's authorization pursuant to sections 361 and 363(c) and (e) of the Bankruptcy Code for the Debtors to use Cash Collateral and provide Adequate Protection (as that term is defined in paragraph 12 below) (i) to the Prepetition First Lien Agent (as defined below) and the Prepetition First Lien Lenders with respect to any diminution in the value of the Prepetition First Lien Agent's and the Prepetition First Lien Lenders' interests in the Prepetition Collateral (as defined in paragraph F, below), and (ii) as required by the Prepetition Intercreditor Agreement, to the Prepetition Second Lien Lenders (as defined below) with respect to any diminution in the value of the Prepetition Second Lien Lenders' interest in the Prepetition Collateral, in each case, whether from the use of the Cash Collateral or the use, sale, lease, depreciation or other diminution in value of the Prepetition Collateral, or as a result of the imposition of the automatic stay under section 362(a) of the Bankruptcy Code;

  d) This Court's modification of the automatic stay as to the DIP Agent (on behalf of the DIP Lenders) to allow implementation of the provisions of the DIP Financing Agreement,

this Interim Order, and the Final Order (as defined below) without further notice or order of the court;

e)     This Court's scheduling an interim hearing (the "Interim Hearing"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, to consider the entry of an interim order in the form hereof (this "Interim Order") which, among other things, (i) approves, on an interim basis, the DIP Financing Agreement, (ii) authorizes the Debtors to obtain the DIP Loan on an interim basis in accordance with the DIP Financing Agreement and this Interim Order in the aggregate principal amount of up to $10,000,000 (the "Maximum Interim Borrowing") which will be funded on the initial funding date and the Debtors will be permitted to use such proceeds during any time period in accordance with the budget attached hereto as Exhibit A (as such budget may be amended with the consent of the DIP Lenders, the "Approved Budget"), and (iii) authorizes the Debtors to use the Cash Collateral on an interim basis and grants Adequate Protection to the Prepetition First Lien Agent and Prepetition First Lien Lenders and the Prepetition Indenture Trustee (as defined below) and the Prepetition Second Lien Lenders, as provided in this Interim Order;

f)     This Court's scheduling, pursuant to Bankruptcy Rule 4001(c)(2), a hearing (the "Final Hearing") to consider entry of a final order as defined in the DIP Financing Agreement (the "Final Order") which, among other things, (i) authorizes on a final basis the Debtors' use of the Cash Collateral, (ii) approves, on a final basis, the DIP Financing Agreement, (iii) authorizes, on a final basis, the DIP Loan, (iv) authorizes the Debtors to refinance in full the Prepetition First Lien Debt and (v) grants, on a final basis, Adequate Protection to the Prepetition First Lien Agent and Prepetition First Lien Lenders and the Prepetition Indenture Trustee and the Prepetition Second Lien Lenders, as provided in the Final Order; and

g)     This Court's finding, pursuant to Bankruptcy Rules 2002 and 4001, and the Local Rules of this Court that notice of the Interim Hearing is sufficient under the circumstances and has been given to (i) the United States Trustee (the "U.S. Trustee"), (ii) counsel to the DIP Agent, (iii) counsel to any known secured creditors of record, (iv) counsel to the Prepetition First

Lien Agent and Prepetition First Lien Lenders, (v) counsel to the Ad Hoc Committee of Prepetition Second Lien Lenders, (vi) counsel to the Ad Hoc Committee of the holders of unsecured convertible debentures of Trico Marine, (vii) the Debtors' lessors and licensors, (viii) the forty (40) largest unsecured creditors of the Debtors, (ix) any party asserting a Lien against any of the Debtors' assets, and (x) the Internal Revenue Service (collectively, the "Notice Parties");

h)      Waive notice requirements provided for by Bankruptcy Rule 6004(a); the twenty one day stay provided for by Bankruptcy Rule 6003(b), and the fourteen day stay provided for by Bankruptcy Rule 6004(h);

i)      The Interim Hearing having been held on August 27, 2010; and based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing and the entire record herein; and the Court having heard and resolved or overruled all objections to the interim relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors; and after due deliberation and consideration, sufficient cause appearing therefore, **IT IS HEREBY FOUND:**[3]

A.      Petition Date.  On August 25, 2010 (the "Petition Date"), the Debtors commenced their chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee, examiner or committee has been appointed in any of the Chapter 11 Cases.

B.      Jurisdiction; Venue.  This Court has core jurisdiction over the Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. §§ §157(b)(2)(D) and 1334. Venue for the Chapter 11 Cases is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

---

[3]      Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

C.     <u>Notice</u>. Proper notice under the circumstances has been given by the Debtors of the Motion and the Interim Hearing pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2.

D.     <u>Prepetition Loan Documents</u>. Trico Marine is the borrower under (a) that certain Second Amended and Restated Credit Agreement dated as of June 11, 2010, by and among Trico Marine, as borrower, the guarantors thereto, the lenders party thereto (the "<u>Prepetition First Lien Lenders</u>"), and Obsidian as Administrative and Collateral Agent ("<u>Prepetition First Lien Agent</u>"), as such agreement may have been amended from time to time through the date hereof, including pursuant to that certain Amendment No. 1 to Credit Agreement dated as of June 25, 2010, that certain Amendment No. 2 to Credit Agreement dated as of July 23, 2010, that certain Amendment No. 3 to Credit Agreement dated as of August 10, 2010 and that certain Amendment No. 4 to Credit Agreement dated as of August 16, 2010 and that certain Amendment No. 5 to Credit Agreement dated as of August 23, 2010 (collectively, the "<u>Prepetition First Lien Loan Agreement</u>") and (b) that certain Indenture (as amended, restated or otherwise modified from time to time, the "<u>Prepetition Second Lien Indenture</u>"), dated as of May 14, 2009, between the Borrower and Wells Fargo Bank, National Association, as Indenture Trustee (the "<u>Prepetition Indenture Trustee</u>"). The term "<u>Prepetition Loan Documents</u>" means, collectively, the Prepetition First Lien Loan Agreements, the Prepetition Second Lien Indenture, and all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments, amendments, and any other agreements executed and/or delivered pursuant thereto or in connection therewith.

E.     <u>Prepetition Indebtedness</u>. For purposes of this Interim Order, the term (a) "<u>Prepetition First Lien Debt</u>" shall mean all "<u>Obligations</u>" as defined in the Prepetition First Lien Loan Agreement, and other amounts owed, as of the Petition Date, to the Prepetition First Lien Agent and Prepetition First Lien Lenders under the Prepetition First Lien Loan Agreement and the other Prepetition Loan Documents related thereto and (b) "<u>Prepetition Second Lien Debt</u>" shall mean all Obligations as defined in the Prepetition Second Lien Indenture and other amounts

owed, as of the Petition Date, to the Prepetition Indenture Trustee and the holders of bonds issues pursuant to the Prepetition Second Lien Indenture (the "Prepetition Second Lien Lenders") and the other Prepetition Loan Documents related thereto.

        F.     Prepetition Liens. To secure the Prepetition First Lien Debt under the Prepetition First Lien Loan Agreement, Trico Marine and certain of its affiliates and subsidiaries (including all of the Debtors) granted (i) the Prepetition First Lien Agent, for the benefit of the Prepetition First Lien Agent and the Prepetition First Lien Lenders, valid first priority liens and security interests upon and in a substantial part of the property and assets of Trico Marine and such affiliates and subsidiaries, including, without limitation, real property, equipment, inventory, tax refunds, insurance proceeds, accounts receivable, instruments, chattel paper, general intangibles, contracts, documents of title, intellectual property, and certain other tangible and intangible personal property and the proceeds and products thereof (the "Prepetition Collateral"), and (ii) the Prepetition Indenture Trustee, for the benefit of the Prepetition Second Lien Lenders, valid second priority liens and security interests upon and in a substantial portion of, but not all of, the Prepetition Collateral (such portion, the "Prepetition Second Lien Collateral"). Specifically, the Prepetition Second Lien Collateral does not include the "Excluded Second-Lien Collateral" (as defined in the Prepetition Intercreditor Agreement), including any deposit accounts of the Debtors. Pursuant to that certain Prepetition Intercreditor Agreement, dated as of May 14, 2009 (as amended, restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition Intercreditor Agreement"), the prepetition liens and security interests which secure Prepetition Second Lien Debt (the "Prepetition Second Liens") are subject and subordinate in priority to the prepetition liens which secure the Prepetition First Lien Debt (the "Prepetition First Liens," together with the Prepetition Second Liens, the "Prepetition Lender Liens"). Pursuant to the terms of the Prepetition Intercreditor Agreement, the Prepetition Second Lien Lenders consented to and subordinated their Prepetition Second Liens to the DIP Financing New Money Loan and the Prepetition First Lien Debt (and any refinancing thereof).

G. **Debtors' Stipulations.** In entering into the DIP Financing Agreement and as consideration therefor, the Debtors acknowledge, represent, stipulate, and agree that:

(i)        until such time as the DIP Loan is paid in full in cash and the commitments related thereto are terminated in accordance with the terms of the Interim Order and the DIP Financing Agreement, the Debtors shall not in any way grant, seek to grant, or cause to be granted any lien and/or claim that is senior to or *pari passu* with any of the liens, security interests and claims provided under this Interim Order to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders, including, without limitation, by offering a subsequent lender or any other party a superior or *pari passu* lien or claim pursuant to Bankruptcy Code section 364(d) or otherwise (including any lien, pledge, transfer, hypothecation or claim with respect to the Intercompany Notes (as defined below)), except with respect to Permitted Priority Liens and the Carve-Out;

(ii)        subject to the provisions of Paragraph 14, below, as of the Petition Date, (A) the aggregate principal amount of the Prepetition First Lien Debt outstanding was $25,000,000, plus (x) accrued and unpaid interest thereon and (y) fees, costs, and expenses incurred in connection therewith, in each case as provided under the Prepetition First Lien Loan Agreement and the other Prepetition Loan Documents related thereto; (B) the aggregate principal amount of the Prepetition Second Lien Debt outstanding was $203,812,000, plus (x) accrued and unpaid interest thereon and (y) fees, costs, and expenses incurred in connection therewith, in each case as provided under the Prepetition Second Lien Indenture and the other Prepetition Loan Documents related thereto; (C) all of the Prepetition First Lien Debt is unconditionally due and owing by the Debtors to the respective Prepetition First Lien Lenders; and (D) all claims in respect of the Prepetition First Lien Debt are not, and shall not be, subject to any avoidance, reductions, set off, offset, disallowance, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation by any person or entity.

(iii)     subject to the provisions of Paragraph 14, below, the Prepetition First Liens and Prepetition Second Liens (A) constitute valid, binding, continuing, enforceable, and properly perfected liens on the Prepetition Collateral that, prior to the entry of this Interim Order, were subject only to Permitted Priority Liens and, in the case of the Prepetition Second Liens, also the Prepetition First Liens; and (B) shall not be subject to avoidance, reductions, set-off, offset, disallowance, recharacterization, subordination (whether equitable, contractual or otherwise; provided, however that the Prepetition Second Liens are and shall be subordinate to the Prepetition First Liens), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation by any person or entity;

(iv)     subject to the provisions of Paragraph 14, below, neither the Prepetition First Lien Agent nor the Prepetition First Lien Lenders are or shall be deemed to be (a) responsible for any liability of any of the Debtors, (b) control persons (subject to entry of the Final Order) or (c) insiders of the Debtors by virtue of any of the actions taken by such parties in respect of or in connection with the Prepetition Obligations;

(v)     neither the DIP Agent nor the DIP Lenders are or shall be deemed to be control persons or insiders of the Debtors by virtue of any of the actions taken by such parties in respect of or in connection with the DIP Obligations (as defined below);

(vi)     subject to the provisions of Paragraph 14, below, as of the Petition Date, no claims of any Debtor exist against any of the Prepetition First Lien Agent or the Prepetition First Lien Lenders;

(vii)     subject to the provisions of Paragraph 14, below, the Debtors have waived, discharged and released any right they may have to challenge any of the Prepetition First Lien Debt and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses in action against the Prepetition First Lien Agent, the Prepetition First Lien Lenders and/or any of their respective affiliates, parents, subsidiaries, agents, attorneys, advisors, professionals, officers, directors and employees (in their respective capacities as such); and

(viii)   as of the Petition Date, there were no other perfected liens on or security interests in the Prepetition Collateral except for the Prepetition Lender Liens and the Permitted Priority Liens.

H.   Purpose and Necessity of Financing.  The Debtors require the financing described in the Motion to fund, among other things, ongoing working capital requirements of the Debtors, the refinancing of the Prepetition First Lien Debt (upon entry of the Final Order), and the payment of fees, expenses, and interest and for other purposes permitted by this Interim Order.  If the Debtors do not obtain authorization to borrow and the DIP Financing Agreement is not approved, the Debtors will suffer immediate and irreparable harm.  The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under Bankruptcy Code section 503, or other financing under Bankruptcy Code sections 364(c) or (d), on equal or more favorable terms than those set forth in the DIP Financing Agreement based on the totality of the circumstances.  Moreover, a loan facility in the amount provided by DIP Financing Agreement is not available to the Debtors without granting the DIP Agent, for the benefit of the respective DIP Lenders, superpriority claims and priming liens and security interests, pursuant to Bankruptcy Code sections 364(c)(1), (2), (3), and 364(d), as provided in this Interim Order and the DIP Financing Agreement.  If the Debtors were unable to obtain other financing (secured or otherwise) in connection with these Chapter 11 Cases and without obtaining the DIP Loan contemplated hereby, the Debtors would face substantial risks to their ongoing business operations.  After considering all alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that the DIP Financing Agreement represents the best financing package available to them at this time and is in the best interests of the estates and their creditors.

I.   Use of Cash Collateral.  The Debtors also require the use of Cash Collateral to operate their businesses.  Without the use of Cash Collateral, the Debtors will not be able to meet their cash requirements for working capital needs.  The Prepetition First Lien Agent, the Prepetition Indenture Trustee and the DIP Agent do not consent to the use of Cash Collateral except on the terms and conditions, and for the purposes, specified herein.  The adequate

protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to obtain such consent or non-objection of such parties and to adequately protect the non-consenting parties' interests in the Prepetition Collateral.

J.  Good Cause.  The ability of the Debtors to obtain sufficient working capital and liquidity and use of Cash Collateral under this Interim Order is vital to the Debtors' estates and creditors, and in particular, to the ability of the Debtors to preserve their businesses and restructure their indebtedness under the Bankruptcy Code.  The liquidity to be provided under the DIP Financing Agreement and through the use of Cash Collateral will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of the Debtors' businesses.  The Debtors' estates will be immediately and irreparably harmed if this Interim Order is not entered.  Good cause has, therefore, been shown for the relief sought in the Motion.

K.  Good Faith.  The DIP Financing Agreement has been negotiated in good faith and at arm's-length by and among the Debtors, the DIP Agent and the DIP Lenders.  Any DIP Loan and/or other financial accommodations made to the Debtors by the DIP Agent and the DIP Lenders pursuant to this Interim Order and/or the DIP Financing Agreement shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith, as that term is used in Bankruptcy Code section 364(e), and the DIP Agent and the DIP Lenders shall be entitled to all protections afforded thereunder, including, without limitation, the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision thereof is vacated, reversed or modified, on appeal or otherwise.  The terms of the DIP Financing Agreement are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

L.  Consideration.  The Debtors will receive and have received fair and reasonable consideration in exchange for access to the DIP Loan, the use of Cash Collateral, and

all other financial accommodations provided under the DIP Financing Agreement and this Interim Order.

      M.      <u>Immediate Entry of Interim Order</u>. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2). The Motion and this Interim Order comply with Local Bankruptcy Rule 4001-2. The permission granted herein to enter into the DIP Financing Agreement and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that immediate entry of this Interim Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow for access to the financing necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing business and further enhance the Debtors' prospects for a successful restructuring. Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED:**

      1.      <u>Disposition</u>. The Motion is granted on an interim basis, subject to the terms set forth herein. Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on their merits. This Interim Order shall be valid and binding on all parties-in-interest, and effective immediately upon entry notwithstanding the possible application of Bankruptcy Rules 6003(b), 6004(a), 6004(h), 7062, and 9014.

      2.      <u>Authorization</u>. Upon entry of this Interim Order, the DIP Financing Agreement shall constitute legal, valid, and binding obligations of the Debtors, enforceable against the Debtors in accordance with their terms. The Debtors are hereby authorized to obtain immediately the DIP Loan, pursuant to the terms of this Interim Order and subject to the terms of the DIP Financing Agreement, in the aggregate principal amount of up to the Maximum Interim Borrowing. Promptly upon entry of this Interim Order and provided that the Debtors are not in default under the terms of this Interim Order, the Debtors are authorized to borrow the DIP Loan

12

and fund, in accordance with the DIP Financing Agreement, interest, fees, expenses and any other amounts required or allowed to be paid in accordance with this Interim Order and the DIP Financing Agreement. In addition, upon entry of the Interim Order, to the extent that Debtors have cash on hand as of the Petition Date (the "Petition Date Cash"), the Debtors are immediately authorized pursuant to sections 105, 361, 363, 541 and 553 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, to use Cash Collateral up to the amount of the Petition Date Cash for the operation of their businesses in accordance with the DIP Budget. The Debtors shall use proceeds of Cash Collateral before using proceeds of the DIP Loan.

3.      Termination of Postpetition Credit and Cash Collateral Usage. Notwithstanding anything in this Interim Order to the contrary, the DIP Lenders' obligation to make the DIP Loan in accordance with the DIP Financing Agreement and the Prepetition First Lien Agent's and DIP Agent's consent to the use of Cash Collateral shall automatically terminate without any further action by this Court, the DIP Agent, the Prepetition First Lien Agent or the Prepetition First Lien Lenders, upon the earliest to occur of (the "Termination Date"): (i) the date of final payment and satisfaction in full in cash of the DIP Loan and the termination of the loan commitments under the DIP Financing Agreement; (ii) the effective date of any Plan of Reorganization or Liquidation in any of the Chapter 11 Cases, (iii) March 11, 2011; and (iv) the consummation of the sale or other disposition of all or substantially all of the assets of the Debtors; (v) five days following the delivery of a Termination Notice, as provided in paragraph 13.

4.      Refinancing of Prepetition First Lien Debt. Upon entry of the Final Order, the Debtors are authorized and directed to borrow $25 million principal amount of the DIP Loan and use the proceeds thereof, together with Cash Collateral, to refinance in full the Prepetition First Lien Debt. The refinancing of the Prepetition First Lien Debt as provided herein, and the DIP Loan made to fund such payment, shall constitute part of the DIP Loan. It shall be an Event of Default if such refinancing is not approved and authorized by the Final Order or if the Final Order is not entered within thirty (30) days of the Petition Date.

5.     MARAD Notes. If the Debtors elect to make repayment of the MARAD Notes, such repayment shall be implemented, if at all, in a manner that ensures that any collateral that secured the MARAD Notes as of the date of such repayment shall immediately following repayment be subject to the first priority liens of the DIP Agent and DIP Lenders pursuant to Sections 364(c)(2) and 364(d), as applicable.

6.     Fees and Expenses.

(a)     Within ten business days of receipt of a written invoice (with summary form and redacted to preserve privilege), with a copy provided to the U.S. Trustee, counsel to the Debtors and counsel to the Committee, the Borrower shall pay all reasonable costs and expenses of the DIP Agent and the DIP Lenders incurred in connection with the consideration, investigation, negotiation, documentation, consummation, administration, amendment and enforcement of the DIP Loan or any Cash Collateral Order and participation in the Cases (in their capacities as DIP Agent and DIP Lenders), including without limitation, legal, accounting, appraisal, investigation, audit, inspection, insurance, title insurance, and other similar fees and costs, regardless of whether or not the DIP Loan or any other financing is consummated (the "DIP Expenses"), provided there has been no written objection by the U.S. Trustee, the Debtors or the Committee received by the DIP Agent within ten business days after their receipt of the foregoing invoice (an "Objection"). Any written Objection to such fees or expenses must contain a specific basis for the Objection. None of such costs, fees, charges, and expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided, that to the extent the Debtors fail to reimburse the DIP Agent and/or the DIP Lenders for any such fees and expenses that are not subject to objection as provided herein, the applicable professionals shall be permitted to apply any amounts held in escrow or retainer (whether obtained prior to, on, or after, the Petition Date) against such unpaid fees and expenses without the need to file any application with the Court; provided, further, that the Court shall have jurisdiction to determine any dispute

14

concerning such invoices; provided, however, if an objection to a professional's invoice is timely received, the Debtors shall only be required to timely pay the undisputed amount of the invoice and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

(b)     The DIP Expenses shall include any fees, payments and expenses related to or described in the Indemnity (the "Indemnity"), as defined in Sections 14.01(d) and 14.19 of the DIP Financing Agreement; provided that payment of the Indemnity shall be governed by the DIP Financing Agreement and shall not be subject to any Objection or the procedures related to the Objection described in paragraph 6(a), above.

(c)     Subject to entry of a Final Order, the DIP Expenses shall also include an exit fee (the "Exit Fee") payable (i) on each date on which any prepayment or repayment of the DIP Loans is made or required to be made (including, for the avoidance of doubt, the Maturity Date) in an amount equal to 1.0% times the principal amount of such DIP Lender's loans prepaid or repaid or required to be prepaid or repaid on such date and (ii) upon any termination of any unfunded commitment (for any reason, including without limitation as a result of the occurrence of an Event of Default), in an amount equal to 1.0% times the principal amount of such DIP Lender's unfunded commitments so terminated. Such Exit Fee shall be fully earned and non-refundable on each date that it is payable and such Exit Fee shall not be subject to any Objection or the procedures related to the Objection described in paragraph 6(a), above. Notwithstanding the foregoing, failure to approve the Exit Fee under the Final Order shall be an Event of Default.

7.      Refund Upon Refinancing of Prepetition First Lien Debt. Upon the funding of the DIP Loan, if the full amount of the Prepetition First Lien Debt shall be refinanced in full and in cash with proceeds of the DIP Loan (the "Prepetition First Lien Debt Refinancing"), then the Prepetition First Lien Lenders shall refund to the Debtors the sum of (a) $250,000 and (b) an amount equal to 2.00% per annum on the average daily outstanding principal amount of the loans under the Prepetition First Lien Debt for the period from the closing of the Prepetition First Lien Debt through (but not including) August 1, 2010, and (c) an amount equal to 4.00% per annum

on the average daily outstanding principal amount of the loans under the Prepetition First Lien Debt for the period August 1, 2010, through (but not including) the date of such refinancing of the Prepetition First Lien Debt, in each case, calculated for the actual number of days in such period and a 365 day year (collectively, the "Refund Amount"). If following the Prepetition First Lien Debt Refinancing, a Challenge Action results in a Rescinded Roll Up Loan (as defined in paragraph 14 (c)), the Debtors shall promptly repay the Refund Amount as further described in paragraph 14(c).

      8.    Authority to Execute and Deliver Necessary Documents.

      (a)    The Debtors are authorized and directed to enter into, execute and deliver to the DIP Agent the DIP Financing Agreement and any and all other documents, agreements and instruments delivered pursuant to any of the foregoing or executed or filed in connection with any of the foregoing, each as may be amended hereafter from time to time in accordance with the terms of this Interim Order or otherwise requested by the DIP Agent (the documents, instruments and agreements referenced in this clause (a), collectively, shall be included in the definition of the "DIP Financing Agreement"). The Debtors are further authorized and directed to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, and mortgages or deeds of trust encumbering all of the Collateral (defined below in paragraph 11) and securing all of the Debtors' obligations under the DIP Financing Agreement, including payment of the DIP Loan in cash, that are reasonably requested by the DIP Agent.

      (b)    The Debtors are hereby further authorized and directed to (i) perform all of their obligations under the DIP Financing Agreement, and such other agreements as may be required by the DIP Financing Agreement to give effect to the terms of the financing provided for under the DIP Financing Agreement, and (ii) perform all acts required under the DIP Financing Agreement, including, without limitation, the payment of fees, and the reimbursement of present and future costs and expenses (including without limitation, the DIP Agent's and DIP Lenders' attorneys' and other advisors' fees and expenses), paid or incurred by the DIP Agent's or DIP Lenders as provided for in the DIP Financing Agreement. All such unpaid fees,

commissions, costs, and other expenses shall be included and constitute part of the principal amount of the DIP Loan and be secured by the Postpetition Liens.

(c) Except as provided in Paragraph 14 for any DIP Loan used to refinance the Prepetition First Lien Debt, all obligations under the DIP Financing Agreement shall constitute valid and binding obligations of each of the Debtors, enforceable against them and their successors and assigns (including, without limitation, any successor trustee or other estate representative in any Chapter 11 Case or subsequent or superseding chapter 7 or chapter 11 case (each, a "Successor Case"), in accordance with their terms and the terms of the DIP Financing Agreement, and no obligation, payment, transfer or grant of a security under the DIP Financing Agreement or this Interim Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under Bankruptcy Code section 502(d)) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

9. <u>Amendments, Consents, Waivers, and Modifications</u>. The Debtors may enter into any non-material amendments, consents, waivers or modifications to the DIP Financing Agreement with the prior written consent of the DIP Agent, which consent shall be granted or withheld in the DIP Agent's sole discretion, <u>provided</u>, <u>however</u>, that the Debtors shall provide the Creditors' Committee (as defined below in Paragraph 14), if any, counsel to the holders of High Yield Notes (to the extent affecting collateral securing the High Yield Notes) and the U.S. Trustee with notice of any material modification to any DIP Loan or the Approved Budget. The Debtors may not amend paragraph 28 of this order (or any other provision specifically affecting and referencing the Nordea Rights and the Nordea Interests) without the consent of Nordea (as defined below).

10. <u>DIP Lenders' Superpriority Claims</u>. The DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted allowed superpriority administrative expense claims (the

"Superpriority Claims") pursuant to Bankruptcy Code section 364(c)(1) for the DIP Loan, having priority over any and all other administrative claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under Bankruptcy Code sections 105(a), 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507, 546(c) (subject to entry of a Final Order), 726, 1113, and 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof including, without limitation, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "Avoidance Actions") (subject to entry of a Final Order); provided, that the DIP Financing Superpriority Claim shall be subject and subordinate only to the payment of the Carve-Out solely upon the occurrence and during the continuance of an Event of Default in accordance with the terms and conditions set forth herein and to the Nordea Rights and Nordea Interests (as defined below and set forth in paragraph 28).

11.    DIP Lenders' Lien Priority.

(a)    To secure the DIP Obligations, the DIP Agent is hereby granted, for the benefit of itself and the DIP Lenders, valid, enforceable, non-avoidable and fully perfected, first priority priming liens on and security interests in (collectively, the "Postpetition Liens") all Prepetition Collateral, all of the other property, assets and interests in property and assets of the Debtors (or any successor trustee or other estate representative in any Chapter 11 Case or Successor Case) and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors (or any successor trustee or other estate representative in any Chapter 11 Case or Successor Case), of any kind or nature whatsoever, real or personal, tangible or intangible or mixed now existing or hereafter acquired or created, including, without limitation, all accounts, inventory, goods, contracts, contract rights, investment property, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, general

intangibles, payment intangibles, rights, interests, intercompany notes and obligations, tax or other refunds, insurance proceeds, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property (including all facilities), fixtures, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)), and all of the issued and outstanding capital stock not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) of each subsidiary of each Debtor, all of the capital stock of all other Persons that are not Subsidiaries directly owned by each Debtor, money, investment property, deposit accounts, all commercial tort claims and other causes of action (other than avoidance actions of the Debtors), Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above (collectively, the "Collateral"), subject and subordinate only to (i) the Permitted Priority Liens (ii) solely upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out in accordance with the terms and conditions set forth herein, and (iii) the Nordea Rights and Nordea Interests as set forth in paragraph 28. The Postpetition Liens shall also include, pursuant to section 364(c)(3) of the Bankruptcy Code, a lien, subject and subordinate to valid, enforceable and perfected first priority liens of holders of the High Yield Notes and the Trico Supply Working Capital Creditors (as defined below), upon all rights and interests (including rights to the proceeds (as defined in Article 9 of the Uniform Commercial Code) of and in the intercompany notes reflecting (a) that certain intercompany indebtedness between the Borrower as lender and Trico Shipping AS as borrower in the original principal amount of $395,000,000 and (b) that certain intercompany note reflecting certain intercompany indebtedness between Trico Cayman as lender and Trico Marine Supply AS as borrower in the original principal amount of $33,486,076.35 (collectively, the "Intercompany Notes"). In addition, the Debtors shall not pledge, transfer, hypothecate or permit any liens to attach to the Intercompany Notes. Nothing herein affects any rights of (i) the holders of the High Yield Notes (as defined in the Motion) as may exist in the indenture dated as of October 30, 2009 between Trico Shipping, the High Yield Note Guarantors, and Wells Fargo

Bank N.A. (as amended or supplemented, the "High Yield Indenture"), the First Supplemental Indenture to the High Yield Notes dated as of June 25, 2010 (the "First Supplemental High Yield Indenture"), or the Collateral Agency and Intercreditor Agreement to the High Yield Notes dated as of October 30, 2009 (the "High Yield Intercreditor Agreement") or (ii) the Trico Supply Working Capital Creditors as may exist in the Amended Credit Agreement, originally dated as of October 30, 2009, as amended by that certain First Amendment and Waiver to Credit Agreement, dated as of March 15, 2010, that certain Second Amendment to Credit Agreement and Forbearance Agreement, dated as of June 17, 2010, and that certain Third Amendment to Credit Agreement and Forbearance Agreement, dated as of June 29, 2010 (as further amended, modified and supplemented from time to time, the "Trico Supply Credit Agreement"), among Trico Cayman, Trico Holdco LLC, a Delaware limited liability company and the general partner of Trico Cayman ("Trico Holdco"), Trico Supply, the Subsidiary Guarantors listed on Schedule IX thereto, Trico Shipping, the Lenders party hereto from time to time, and Nordea (Finland), as administrative agent or the High Yield Intercreditor Agreement. The "Trico Supply Working Capital Creditors" shall mean the lenders and the agents under the Trico Supply Credit Agreement.

(b)     The Postpetition Liens shall not at any time be (i) made subject or subordinate to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under Bankruptcy Code sections 363 or 364(d) or otherwise other than the Permitted Priority Liens and, solely upon the occurrence and during the continuance of an Event of Default, the Carve-Out in accordance with the terms and conditions set forth herein, or (ii) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(c)     The Postpetition Liens shall be and hereby are deemed fully perfected liens and security interests, effective, binding and perfected upon the date of this Interim Order without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements and other agreements or instruments,

such that no additional steps need be taken by the DIP Agent or the DIP Lenders to perfect such interests.

(d)    The Postpetition Liens, Superpriority Claims, and other rights and remedies granted under this Interim Order to the DIP Agent, for the benefit of the DIP Lenders, shall continue in the Chapter 11 Cases and in any Successor Case, and such liens and security interests shall maintain their respective priorities as provided in this Interim Order until all the DIP Loan has been paid in full in cash and completely satisfied and the DIP Lenders' commitments have been terminated in accordance with the DIP Financing Agreement.

(e)    The Debtors (and/or their legal or financial advisors) shall deliver to the DIP Agent and DIP Lenders (and their respective legal and financial advisors), all financial reports, budgets, forecasts, and all other legal or financial documentation, pleadings, and/or filings (together, the "Documentation") that are required to be provided to the DIP Agent, the DIP Lenders, and/or the DIP Agent's legal and financial advisors pursuant to the DIP Financing Agreement or are reasonably requested by any of them.

(f)    The Debtors (and/or their legal and financial advisors) will (i) maintain books, records and accounts to the extent and as required by the DIP Financing Agreement, (ii) cooperate, confer with, and provide to the DIP Agent and Prepetition First Lien Agent all such information as required or allowed under the DIP Financing Agreement or the provisions of this Interim Order, (iii) permit representatives of the DIP Agent such rights, upon reasonable notice and at reasonable times, to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as and to the extent required by the DIP Financing Agreement, and (iv) permit representatives of the DIP Agent to confer with the

Debtors' management and advisors on matters concerning the general status of the Debtors' businesses, financial condition and operations.

12. **Adequate Protection for Prepetition First Lien Agent and Prepetition First Lien Lenders and Prepetition Second Lien Lenders**. The Debtors acknowledge and stipulate that the Prepetition First Lien Lenders are entitled, pursuant to Bankruptcy Code sections 361, 363(e), and 364(d)(1), to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in exchange for the Debtors' use of such Prepetition Collateral, to the extent of the aggregate diminution in value, if any, of the Prepetition First Lien Lenders' Collateral, including, without limitation, any such diminution resulting from or attributable to, any or all of the Carve-Out, imposition of the automatic stay, the use of Cash Collateral, any sale, lease or use by the Debtors, physical deterioration, or other decline in value of any other Prepetition Collateral, and the priming of the Prepetition First Lien Debt by the Postpetition Liens. As adequate protection, the Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, are hereby granted the following (clauses (a) through (f) below shall be referred to collectively as the "Adequate Protection"):

(a) **Adequate Protection Liens and Superpriority Claim**. As adequate protection for the use of the Prepetition Collateral (including the Cash Collateral) by the Debtors, and in accordance with Bankruptcy Code sections 361, 363(c) and (e), 364(c)(1) and 364(d), the Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, is hereby granted (y) valid, enforceable, binding, non-avoidable and fully perfected, first priority postpetition security interests in and liens (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) (the "First Lien Agent Adequate Protection Liens") on all of the Collateral and (z) first priority superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code (the "First Lien Adequate Protection Priority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code,

including, without limitation, sections 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims arise in these Chapter 11 Cases or in any subsequent chapter 7 case into which these Cases may be converted. The First Lien Adequate Protection Liens and First Lien Adequate Protection Priority Claims shall at all times be senior to, among other things, (i) the rights of the Debtors in the Chapter 11 Cases and any successor trustee or other estate representative in an Chapter 11 Case or Successor Case, (ii) the liens and security interests of any party holding prepetition liens or security interests junior or subordinate to the Prepetition First Lien Agent's liens on the Prepetition Collateral, (iii) liens and security interests of the Prepetition First Lien Agent, (iv) any intercompany claim of or against any Debtor, and (v) any prepetition lien that is determined to be avoidable pursuant to sections 544, 545, 547, 548, 551 and/or 553 of the Bankruptcy Code or otherwise; provided, however, the First Lien Agent Adequate Protection Liens and First Lien Adequate Protection Priority Claims shall be subject and subordinate to the Permitted Priority Liens, the Postpetition Liens, the DIP Financing Superpriority Claim, the Nordea Rights and Nordea Interests (as set forth in paragraph 28), and, solely upon the occurrence and during the continuance of an Event of Default, payment of the Carve-Out in accordance with the terms and conditions set forth herein;

(b) Without limiting the foregoing, the Prepetition First Lien Agent and Prepetition First Lien Lenders shall have all of the rights accorded them pursuant to sections 503 and 507(b) of the Bankruptcy Code in respect of the adequate protection provided herein.

(c) As further adequate protection for the use of the Prepetition Collateral (including Cash Collateral) by the Debtors, and in accordance with Bankruptcy Code sections 361, 363(e), and 364(d), the Prepetition First Lien Agent and Prepetition First Lien Lenders shall receive, as applicable, from the Debtors payment of:

i. Refinancing of Prepetition First Lien Debt. Upon entry of the Final Order, the Debtors shall use the DIP Loan and Cash Collateral to refinance in cash any

remaining outstanding Prepetition First Lien Debt.

        ii.      <u>Fees and Expenses</u>. The Debtors are authorized and directed to pay, pursuant to the procedures outlined in paragraph 6, the reasonable fees and expenses incurred by Latham & Watkins LLP, Blank Rome LLP and Young, Conaway, Stargatt & Taylor LLP in their respective capacity as counsel to the Prepetition First Lien Agent, and such other legal or financial professionals or consultants as are retained by the Prepetition First Lien Agent and/or the Prepetition First Lien Lenders.

        iii.     <u>Accrual and Payment of Interest</u>. The Debtors shall accrue and pay interest on the Prepetition First Lien Debt at the contractual rate until such time as the Prepetition First Lien Debt is paid or refinanced in full in cash. Upon any Event of Default, the Debtors shall accrue and pay interest on the Prepetition First Lien Debt at the default contractual rate until such time as the Prepetition First Lien Debt is paid or refinanced in full in cash. All of the foregoing payments shall be made in accordance with the terms of the Prepetition First Lien Loan Agreement and on the dates provided therein.

        iv.     <u>Allowance of Claims</u>. Subject to the provisions of paragraph 14, the claims arising from or in connection with the Prepetition First Lien Debt are hereby deemed "allowed claims" within the meaning of section 502 of the Bankruptcy Code.

        v.     <u>Right to Credit Bid</u>. The Prepetition First Lien Agent (on behalf of the Prepetition Lenders) and the DIP Agent (on behalf of the DIP Lenders) shall have the right to "credit bid" the allowed amount of the Prepetition First Lien Debt and/or the DIP Loan, as applicable, during any sale of any of the Debtors' assets pledged as Prepetition Collateral or Collateral, as applicable, including without limitation, in connection with sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

        vi.     <u>Automatic Stay</u>. The automatic stay is modified as to the Prepetition First Lien Agent (on behalf of the Prepetition First Lien Lenders) and the DIP Agent

(on behalf of the DIP Lenders) to allow implementation of the provisions of this paragraph 12 without further notice or order of the Court.

vii.     Continuation of Liens. The Prepetition First Lien Agent and the Prepetition Indenture Trustee, as applicable, shall retain continuing liens on all of the Prepetition Collateral until payment in full in cash of the Prepetition First Lien Debt and the Prepetition Second Lien Debt, as applicable or, as the case may be, such other satisfaction of the Prepetition First Lien Debt that is acceptable to the Prepetition First Lien Agent in its sole discretion, or the Prepetition Second Lien Debt that is acceptable to the Prepetition Indenture Trustee in its sole discretion.

(d)     Consent to Priming and Adequate Protection: Prepetition First Lien Lenders. The Prepetition First Lien Agent and the Prepetition First Lien Lenders consent to the adequate protection and the priming provided for herein; provided, however, that the consent of the Prepetition First Lien Agent and the Prepetition First Lien Lenders to the priming, the use of Cash Collateral, and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Interim Order (in form and substance satisfactory to the Prepetition First Lien Agent) and such consent shall not be deemed to extend to any other replacement financing or debtor in possession financing other than the DIP Loan provided pursuant to this Interim Order; and provided, further, that such consent shall be of no force and effect in the event (i) this Interim Order is not entered and the DIP Loan and DIP Financing Agreement as set forth herein are not approved, (ii) the Final Order is not entered by September 24, 2010, (iii) the refinancing of the Prepetition First Lien Debt is not approved and authorized by the Final Order or such refinancing does not occur by September 24, 2010; and provided, further, that in the event of the occurrence of the Termination Date, nothing herein shall alter the burden of proof set forth in the applicable provisions of the Bankruptcy Code at any hearing concerning the continued use of Prepetition Collateral (including Cash Collateral) by the Debtors.

(e)     Consent to Priming and Adequate Protection: Prepetition Second Lien Lenders.  As adequate protection for the use of the Prepetition Second Lien Collateral (including any Prepetition Second Lien Collateral consisting of Cash Collateral) by the Debtors, and in accordance with Bankruptcy Code sections 361, 363(c) and (e), 364(c)(1) and 364(d), the Prepetition Indenture Trustee, for the benefit of itself and the Prepetition Second Lien Lenders, is hereby granted the same types of liens that constitute the First Lien Agent Adequate Protection Liens and superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code, in each case subordinated to (a) any liens and claims granted to the DIP Agent and the DIP Lenders as described herein, (b) the First Lien Agent Adequate Protection Liens and the First Lien Adequate Protection Priority Claims as described herein and in the Prepetition Intercreditor Agreement, (c) the Nordea Rights and Nordea Interests (as set forth in paragraph 28), and (d) the Carve-Out, in each case in an amount equal to the aggregate diminution in the value or amount of the respective interests of the Prepetition Indenture Trustee in the Prepetition Second Lien Collateral.

(f)     Further Adequate Protection.  Subject to the terms of the Prepetition Intercreditor Agreement, nothing in this Interim Order waives any rights of the Prepetition First Lien Agent and Prepetition Indenture Trustee to request at any time that the Court provide additional or further protection of its interests in the Prepetition Collateral (including the Cash Collateral), or to seek further or additional adequate protection in the event the adequate protection provided herein proves to be inadequate.

13.     Carve-Out.

(a)     The Borrower shall make deposits into the Professional Fee Reserve (as defined in the DIP Financing Agreement) on or prior to the fifth day and on the twentieth day of every month from which withdrawals shall be taken for the payment of professional fees in accordance with the DIP Financing Agreement.  From and after the date of the Termination Notice (as defined below), amounts withdrawn from the Professional Fee Reserve may only be applied to pay fees covered by the Carve-Out (as defined below).  Upon the occurrence and

during the continuation of an Event of Default, payment of any amounts on account of the Postpetition Liens and the Superpriority Claims shall be subject and subordinate only to payment of: (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and to the Clerk of the Bankruptcy Court and (ii) allowed and unpaid fees and expenses owed to the attorneys, accountants and other professionals retained in the Chapter 11 Cases by the Debtors or any Creditors' Committee pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363, 503 or 1103, that are incurred from the Petition Date to the date of the Termination Notice as defined below and owed pursuant to the terms of such professionals' respective engagement letters or other agreements of engagement (but not including any success fee, transaction fee, or other similar fee set forth in such professionals' respective engagement letters or other agreements) (all such fees and expenses, whether allowed before or after the date of the Termination Notice, being the "Pre-Termination Notice Date Allowed Fees and Expenses"), plus the following "Priority Professional Expenses" incurred after the date of the Termination Notice: up to $500,000 for the allowed fees and expenses of Vinson & Elkins LLP, Cahill Gordon and Reindal LLP and Morris, Nichols, Arsht & Tunnell LLP, up to $500,000 for the allowed fees and expenses of other professionals retained by the Debtors, and up to $150,000 for the allowed fees and expenses of the professionals retained by the Creditors' Committee, in each case minus any retainers held by the applicable professionals as of the date of the Termination Notice (the "Professional Fee Cap"); provided however that following the occurrence and during the continuance of an Event of Default and following the delivery of a notice from the DIP Agent that an Event of Default has occurred and that the cash collateral and balance in the Advance Account (as defined in Section 1 of the DIP Financing Agreement) are no longer available to the Borrower (such notice being a "Termination Notice" and such period being the "Post-Termination Notice Period"), any payments actually made to any of the foregoing professionals incurred during such Post-Termination Notice Period pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503 or 1103 or otherwise, shall (A) reduce (1) the Priority Professional Expenses on a dollar-for-dollar basis to the extent such payments relate to allowed fees and expenses incurred during the Post-

Termination Notice Period and (2) the Pre-Termination Date Allowed Fees and Expenses to the extent such payments relate to allowed fees and expenses incurred prior to the Post-Termination Date Notice Period and (B) not be paid from the proceeds of any Loans or Collateral (including Cash Collateral) until such time as all retainers, if any, held by such professionals have been reduced to zero by application of such retainer to Priority Professional Expenses (the immediately preceding clauses (i) and (ii), collectively, the "Carve-Out");

(b) Following the occurrence and during the continuance of an Event of Default and following the delivery of a Termination Notice (the "Post-Termination Notice Period"), any payments or portions of payments actually made to any of the professionals described in paragraph 13(a) during such Post-Termination Notice Period pursuant to paragraph 13(a)(ii) under Bankruptcy Code sections 327, 328, 330, 331, 503 or 1103 or otherwise (i) shall not be included within the Professional Expense Cap for those portions of such fees and expenses that are on account of work performed prior to the start of the Post-Termination Notice Period, (ii) shall reduce the Professional Expense Cap on a dollar for dollar basis to the extent any portion of such fees and expenses are on account of work performed on or after the start of the Post-Termination Notice Period, and (iii) shall not be paid from the proceeds of any DIP Loan or Collateral (including Cash Collateral) until such time as all retainers, if any, held by such professionals have been reduced to zero by application of such retainers to the Priority Professional Expenses.

(c) No liens, claims, interests or priority status (other than the Carve-Out, the Permitted Priority Liens, and the Nordea Rights and Nordea Interests as set forth in paragraph 28), having a lien or administrative priority superior to or *pari passu* with that of the Postpetition Liens, the Superpriority Claims or the First Lien Agent Adequate Protection Liens granted by this Interim Order, shall be granted while any portion of the DIP Loan or the Prepetition First Lien Debt remains outstanding, or any loan commitment under the DIP Financing Agreement or Prepetition Loan Documents remains in effect, without the prior written consent of the DIP Agent and the Prepetition First Lien Agent.

(e) Except for the Committee Challenge Fees (defined below in paragraph 14), no portion of the Carve-Out may be used by any person in connection with any Challenge Action (defined below in paragraph 14).

(f) Subject to entry of a Final Order (except with respect to the Debtors' professionals), any professional seeking access to the Carve-Out for payment of fees and expenses incurred in any month must have previously provided written monthly fee statements (identifying monthly fees and expenses only) to the Debtors and the DIP Agent so they are received no later than the twentieth day of the next succeeding month ending after the Petition Date (e.g., for illustration only, the Debtor's professionals must submit a fee statement for August 2010 no later than September, 20, 2010). This requirement is in addition to any requirements for filing monthly and quarterly interim fee applications and for final fee applications. For purposes of the financial covenants set forth in the DIP Financing Agreement and compliance with the Approved Budget, the fees and expenses set forth in such statements shall be deemed to be paid in cash when any such statements are received, whether or not they are actually so paid. Any professional that fails to timely provide the foregoing written monthly fee statements shall be prohibited from seeking payment from the Carve-Out for any fees and expenses for the applicable month (e.g., for illustration only, if a professional fails to submit a fee statement for fees and expenses incurred in September 2010 before October 20, 2010, that professional may not seek payment of any fees and expenses from the Carve-Out for the month of September 2010). Failure to approve this provision under the Final Order shall be an Event of Default.

14. <u>Investigation Period</u>. (a) The Superpriority Claims, the Postpetition Liens, the First Lien Agent Adequate Protection Liens, the Prepetition First Liens and the Nordea Rights and Nordea Interests (as set forth in paragraph 28) shall be senior to, and no proceeds of the DIP Loan nor any Collateral or Prepetition Collateral, or Nordea Collateral (defined below), may be used to pay, any claims for services rendered by any of the professionals retained by the Debtors,

(or any successor trustee or other estate representative in any Chapter 11 Case or any Successor Case), any creditor or party in interest, any committee or any other party in connection with the investigation of, assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter or discovery against any DIP Agent, DIP Lenders, Prepetition First Lien Agent or Prepetition First Lien Lenders, or Nordea, in connection with any affirmative cause of action or contested matter to or the challenge of any claims or liens arising under, related to, or with respect to the DIP Loan and/or the Prepetition First Lien Debt. Notwithstanding anything herein to the contrary, until the later of (a) for parties-in-interest, seventy-five (75) days following entry of this Order and (b) sixty (60) days following the formation of any official committee of unsecured creditors (a "Creditors' Committee") appointed pursuant to Bankruptcy Code section 1102 (the "Investigation Termination Date") the Creditors' Committee, or, if no Creditors' Committee has been formed, any party-in-interest, shall be entitled to (i) investigate or conduct discovery with respect to the validity, amount, perfection, priority, and enforceability of the Prepetition First Lien Debt and Prepetition First Liens, and the Nordea Rights and Nordea Interests, and any potential claims, counterclaims, offsets, setoffs, defenses, contested matters or causes of action of the Debtors or their respective estates against or with respect to the Prepetition First Lien Agent or Prepetition First Lien Lenders, and (ii) commence the prosecution, litigation and/or assertion of any of the foregoing potential claims, counterclaims, offsets, defenses, contested matters or causes of action (the preceding (i) and (ii) collectively the "Challenge Actions"). Any Challenge Actions, including any challenge to the Prepetition First Lien Debt or Prepetition First Liens, or to the Nordea Rights or Nordea Interests, or the assertion of any other claims, defenses, contested matters or causes of action of the Debtors or their estates against any of the Prepetition First Lien

Agent and/or Prepetition First Lien Lenders, or against Nordea, must be made and filed, as applicable, by the Creditors' Committee, or if no Creditors' Committee has been formed, by a party in interest with standing properly commencing an adversary proceeding, on or before the Investigation Termination Date. If no such action is filed on or before the Investigation Termination Date, all holders of claims and interests as well as other parties in interest shall be forever barred from bringing or taking any such action on behalf of themselves, the Debtors or these estates, and the Debtors' stipulations made in paragraph H, above (or in paragraph 28 with respect to Nordea), and the release (as set forth below in paragraph 15) shall be binding on all parties in interest. If such an action is timely and properly brought, any claim or action that is not brought shall be forever barred. In the event of a timely and successful challenge by plaintiff in such an action, this Court shall fashion the appropriate remedy with respect to the Prepetition First Lien Agent and Prepetition First Lien Lenders, and Nordea, as applicable, after hearing from all parties. Notwithstanding the foregoing, no more than $25,000 of the proceeds of the DIP Loan or the cash collateral (but not both and not the Nordea Collateral) may be applied to pay fees and expenses of the Creditor's Committee (but not the Debtors or any of their subsidiaries) in investigating, taking discovery with respect to, filing and prosecuting the Challenge Actions (the "Committee Challenge Fees").

(b) If a trustee is appointed pursuant to Bankruptcy Code section 702 or 1104 prior to the Investigation Termination Date, the Investigation Termination Date for such trustee shall be 60 days from the date of such appointment to make and file a Challenge Action (the "Trustee Investigation Termination Date"). The Trustee Investigation Termination Date shall not extend the Investigation Termination Date for any othe party.

(c) If a Challenge Action brought by any party proves that (i) the aggregate value of the valid, perfected and non-avoidable liens securing the Prepetition First Lien Debt on the Petition Date was less than the amount of the Prepetition First Lien Debt on the Petition Date, or (ii) the principal amount of the Prepetition First Lien Debt that was valid and enforceable on the Petition Date was less than the principal amount that was refinanced with proceeds of the DIP Loan, then the refinancing of such portion of the Prepetition First Lien Debt that has been successfully shown to be undersecured or unenforceable shall be rescinded (such portion being the "Rescinded Roll Up Loan") . Concurrently with such rescission and as a condition to such recission, (i) the lenders under the Prepetition First Lien Loan Agreement shall return to the DIP Lenders the principal amount of the DIP Loan that was used to refinance the Rescinded Roll Up Loan, (ii) the Rescinded Roll Up Loan shall be reinstated as Prepetition First Lien Debt with the same rights as if the refinancing had never occurred, including without limitation, with respect to interest, (iii) the Debtors promptly shall pay to the Prepetition First Lien Lenders in cash (x) $250,000 payment described in paragraph 7(a) and (y) the portion of the Refund Amount described in paragraphs 7(a) and 7(b) allocable to such Rescinded Roll Up Loan and (iv) an Event of Default shall occur under Section 11.31 of the DIP Financing Agreement.

(d) For good cause shown, the Investigation Termination Date may be extended by the Court upon notice and a showing of good cause, or by stipulation by the DIP Agent and the Prepetition First Lien Agent in their respective sole discretion.

15. <u>Releases</u>.

(a)     Upon entry of this Interim Order and subject to the rights set forth in paragraph 14 above, the Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in any Chapter 11 Case or Successor Case), forever and irrevocably (i) release, discharge, and acquit each DIP Agent, each of the DIP

Lenders, in their capacity as DIP Lenders, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating to the negotiation and execution of the DIP Financing, this Interim Order and the negotiation of the terms thereof and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and nonavoidability of the Postpetition Liens and Superpriority Claims.

(b)    Subject to entry of the Final Order and the rights set forth in paragraph 14 above, the Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in any Chapter 11 Case or Successor Case), forever and irrevocably (i) release, discharge, and acquit the Prepetition First Lien Agent and Prepetition First Lien Lenders, and Nordea, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating, as applicable, to the Prepetition First Lien Debt, the Prepetition First Liens, the Prepetition Loan Documents, the Nordea Rights, or the Nordea Interests, the Debtors' attempts to restructure the Prepetition First Lien Debt, any and all claims and causes of action arising under title 11 of the United States Code, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the Prepetition First Lien Agent and Prepetition First Lien Lenders, and Nordea; and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection,

priority, enforceability and nonavoidability of the Prepetition First Lien Debt, the Prepetition Lender Liens, and the Nordea Rights and Nordea Interests, as applicable.

16.  **Limitation on Additional Surcharges.**  No action, inaction or acquiescence by any of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent or the Prepetition First Lien Lenders, including funding the Debtors' ongoing operations under this Interim Order, shall be deemed to be or shall be considered as evidence of any alleged consent by any of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent or the Prepetition First Lien Lenders, to a charge against the Collateral or the Prepetition Collateral pursuant to Bankruptcy Code sections 506(c) (subject to entry of a Final Order), 552(b) (subject to entry of a Final Order) or 105(a) (subject to the Final Order), and no such costs, fees or expenses shall be so charged against the Collateral or Prepetition Collateral without the prior written consent of each DIP Agent, the DIP Lenders, each Prepetition First Lien Agent and the Prepetition First Lien Lenders to the extent of their respective interests in such Collateral or Prepetition Collateral (such consent to be granted or withheld in the respective party's sole and absolute discretion).  The DIP Agent, the DIP Lenders, the Prepetition First Lien Agent or the Prepetition First Lien Lenders, shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or the Prepetition Collateral.

17.  **Additional Perfection Measures.**  The Postpetition Liens and the First Lien Agent Adequate Protection Liens shall be perfected by operation of law immediately upon entry of this Interim Order without further action by the Debtors, the Prepetition First Lien Agent, the DIP Agent, the Prepetition First Lien Lenders, or the DIP Lenders.  None of the Debtors, the DIP Agent or the Prepetition First Lien Agent shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments (including, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property, or filings with any other federal

agencies/authorities) in any jurisdiction to the fullest extent allowed by law, or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the Postpetition Liens or the First Lien Agent Adequate Protection Liens.

      (a)    The DIP Agent or the Prepetition First Lien Agent may, but shall not be obligated to, obtain consents from any landlord, licensor or other party in interest, file mortgages, financing statements, notices of lien or similar instruments, or otherwise record or perfect such security interests and liens, in which case:

      i.    all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order provided, however, that any documents evidencing the Postpetition Liens and the First Lien Agent Adequate Protection Liens shall be deemed to have been recorded and filed immediately prior to the documents evidencing any adequate protection liens granted to the Prepetition Second Lien Lenders; and

      ii.    no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

      (b)    In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Agent or the Prepetition First Lien Agent may but shall not be obligated to, file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of Collateral or Prepetition Collateral, as applicable, and such filings by the DIP Agent and the Prepetition First Lien Agent shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

    18.    Application of Collateral Proceeds.

      (a)    To the extent required by this Interim Order and the DIP Financing Agreement and subject in all cases and in all respects to the Prepetition Intercreditor Agreement, after the occurrence of an Event of Default and until such time as the DIP Loan and the Prepetition First Lien Debt have been repaid in full in cash, the Debtors are hereby authorized

and directed to remit to the DIP Agent, for the benefit of the DIP Lenders, one-hundred percent (100%) of all collections on, and proceeds of, the Prepetition Collateral and Collateral, including, but not limited to, all accounts receivable collections, proceeds of sales of inventory, fixed assets, and any other assets, including sales in and outside the ordinary course of business, and all other cash or cash equivalents which shall at any time on or after the Petition Date come into the possession or control of the Debtors (whether from sales, licenses, condemnation and casualty events or other transfers of assets), or to which the Debtors shall become entitled at any time, and the automatic stay provisions of Bankruptcy Code section 362 are hereby modified to permit the DIP Agent and the DIP Lenders (subject to the terms of the Prepetition Intercreditor Agreement and this Interim Order) to retain and apply all collections, remittances, and proceeds of the Collateral in accordance with this Interim Order and the DIP Financing Agreement to the DIP Obligations, first to fees, costs and expenses owed under the DIP Financing Agreement (including the Carve-Out), then to interest, and then to principal.

       (b)     Pursuant to the DIP Financing Agreement, net cash proceeds from asset sales by the Debtors and the other credit parties, all distributions made by Eastern Marine Services Limited or the Mexican JV to any Credit Party, and all proceeds of EMSL Loans, shall be deposited into the Advance Account and applied to the repayment of the DIP Loan, provided that if such net cash proceeds are from the disposition of vessels owned by Eastern Marine Services Limited or Trico Marine International, or if such proceeds are proceeds of the EMSL Loans (all such Asset Sales, net cash proceeds, payments, distributions and/or loan proceeds referred to in this proviso, collectively, the "Specified Net Cash Proceeds"), then, so long as no Event of Default shall have occurred and be continuing, all Specified Net Cash Proceeds received from and after the Effective Date (measured on an aggregate basis) shall be applied in the following order:

           i.     the first $15,000,000 of Specified Net Cash Proceeds (or portion thereof) shall remain in the Advance Account and shall be available to be used by

the Debtors for working capital needs in accordance with the Approved Budget and the DIP Financing Agreement;

ii.     the next $1,250,000 (or portion thereof) of Specified Net Cash Proceeds shall be applied to the repayment of the Obligations (unless the DIP Lenders otherwise consent in writing to permit such amounts to remain in the Advance Account to be used by the Debtors for working capital needs in accordance with the Approved Budget and this DIP Financing Agreement);

iii.     the next $3,750,000 (or portion thereof) of Specified Net Cash Proceeds shall remain in the Advance Account and shall be available to be used by the Debtors for working capital needs in accordance with the Approved Budget and this DIP Financing Agreement;

iv.     the next $5,000,000 (or portion thereof) of Specified Net Cash Proceeds shall be applied as follows: 50% of such Specified Net Cash Proceeds shall be applied to the repayment of the Obligations (unless the DIP Lenders otherwise consent in writing to permit such amounts to remain in the Advance Account to be used by the Debtors for working capital needs in accordance with the Approved Budget and this Agreement) and 50% of such Specified Net Cash Proceeds shall remain in the Advance Account and shall be available to be used by the Debtors for working capital needs in accordance with the Approved Budget and this DIP Financing Agreement; and

v.     thereafter, all Specified Net Cash Proceeds shall be applied to the repayment of the Obligations.

19.     Access to Collateral.

(a)     Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agent or the DIP Lenders contained in this Interim Order or the DIP Financing Agreement, or otherwise available at law or in equity, upon five (5) business days' written notice to the Debtors, the U.S. Trustee, counsel to the Official

Committee of Unsecured Creditors, and any landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default or a default by the Debtors of any of its obligations under this Interim Order has occurred and is continuing, the DIP Agent may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor, and the DIP Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in its businesses without interference from lienholders or licensors thereunder, subject to such lienholders or licensors rights under applicable law. Nothing herein shall require the Debtors, the DIP Agent or the DI P Lenders to assume any lease or license under Bankruptcy Code Section 365 as a condition to the rights afforded to the DIP Agent and the DIP Lenders in this paragraph.

(b)   Upon an Event of Default and subject to the Waiting Period (as defined below), at the request of the DIP Agent (which may be given without first seeking relief from the automatic stay or other order of this Court) the Debtors and their subsidiaries (excluding Trico Supply AS and any of its direct or indirect subsidiaries) shall dock all of their vessels at one or more ports reasonably selected by the DIP Agent.

20.   Cash Management Systems. The Debtors are authorized and directed to maintain their cash management system in a manner consistent with the DIP Financing Agreement, this Interim Order, and the order of this Court approving the maintenance of the Debtors' cash management system, provided, however, that such order is on terms and conditions acceptable to the DIP Agent, the Prepetition First Lien Agent, and the holders of High Yield Notes (to the extent applicable to the Trico Supply AS and any of its direct or indirect subsidiaries) and such

order is not inconsistent with the terms specified herein, the DIP Financing Agreement and/or the Prepetition First Lien Agreement.

21. Automatic Stay Modified.

(a)     Subject to the provisions of subparagraphs (b) and (c) hereof, the automatic stay provisions of Bankruptcy Code section 362 hereby are, to the extent applicable, vacated, and modified to the extent necessary to allow the DIP Agent and DIP Lenders:

i.     whether or not a Default or an Event of Default or a default by the Debtors of any of their respective obligations under this Interim Order has occurred, to require all cash, checks or other collections or proceeds from Collateral received by the Debtors to be deposited in accordance with the requirements of the DIP Financing Agreement, and to apply any amounts so deposited and other amounts paid to or received by any DIP Agent or the DIP Lenders, under the DIP Financing Agreement in accordance with any requirements of the DIP Financing Agreement;

ii.     upon the occurrence of an Event of Default or a default by any of the Debtors of any of its obligations under this Interim Order, and subject to five (5) business days prior written notice (the "Waiting Period") to the Debtors and their counsel, counsel to any Creditors' Committee, counsel to each of the Prepetition First Lien Agent and the U.S. Trustee of the DIP Lenders' decision to exercise all rights and remedies provided for in the DIP Financing Agreement, this Interim Order or under other applicable bankruptcy and nonbankruptcy law to the extent permitted under the DIP Financing Agreement and this Interim Order (including the right to setoff funds in accounts maintained by the Debtors with any of the DIP Lenders or the DIP Agent to repay the DIP Loan) without requiring prior authorization of this Court in order to exercise such rights and remedies following the Waiting Period; and

iii.     immediately upon the occurrence of an Event of Default, without providing any prior notice thereof (A) the DIP Agent, for the benefit of the DIP Lenders, may charge interest at the default rates pursuant to the respective DIP Financing Agreements, (B) neither the DIP Agent nor any of the DIP Lenders shall have any further obligation to provide

financing under the DIP Financing Agreement, this Interim Order or otherwise, or to permit release to the Debtors of proceeds of loans that were previously funded, and may, in their sole discretion, terminate all commitments with respect to the DIP Loan, and (C) after the expiration of the Waiting Period and subject to the provision of paragraph 21(b) hereof, any authorization to use Cash Collateral shall terminate.

(b)     During the Waiting Period, the Debtors shall not use any Cash Collateral or any DIP Loan proceeds to pay any expenses except those provided for in the Approved Budget.

(c)     This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of Bankruptcy Code section 362(a), use of Cash Collateral, or other injunctive relief requested.

(d)     The only issue as to which the Debtors and any party in interest (including any Creditors' Committee) may seek Bankruptcy Court intervention at any hearing seeking to delay or prevent the DIP Agent or the DIP Lenders from exercising remedies shall be whether an Event of Default or default under this Interim Order has in fact, occurred and is continuing. 363 Sale.

22.     After the occurrence and during the continuation of an Event of Default, unless otherwise directed by the DIP Agent and without limiting the rights and remedies of the DIP Agent and DIP Lenders under the DIP Financing Agreement: (i) the Debtors shall, not more than 10 days after the Termination Notice, file a motion (the "Sale Motion") to approve bid procedures and a sale (the "Sale") of substantially all of the assets of the Debtors; (ii) not more than 15 days after the filing of the Sale Motion, a hearing shall be held to consider approval of the bid procedures set forth and requested by the Sale Motion; (iii) not more than 40 days after the filing of the Sale Motion, a hearing shall be held to consider approval of the Sale; and (iv) not more than 55 days after the filing of the Sale Motion, the sale shall be consummated. The

Debtors and the DIP Agent shall cooperate in good faith regarding the terms of the Sale and Sale Motion.

23.     Successors and Assigns.  The DIP Financing Agreement and the provisions of this Interim Order shall be binding upon the Debtors, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders and each of their respective successors and assigns, and shall inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders, and each of their respective successors and assigns including, without limitation, any trustee, responsible officer, estate administrator or representative, or similar person appointed in a case for any of the Debtors under any chapter of the Bankruptcy Code.  The provisions of this Interim Order shall also be binding on all of the Debtors' creditors, equity holders, and all other parties in interest.  Without limiting the foregoing and for the avoidance of doubt, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders shall have no obligation to permit the use of Cash Collateral or other proceeds of Collateral or extend any financing to any chapter 7 trustee or any other estate representative or representative appointed for any of the Debtors' estates.

24.     Binding Nature of Agreement.  This Interim Order and the DIP Financing Agreements to which any of the Debtors are or will become a party shall constitute legal, valid, and binding obligations of the Debtors party thereto, enforceable against the Debtors in accordance with their terms.  The rights, remedies, powers, privileges, liens, and priorities of the DIP Agent and the DIP Lenders provided for in this Interim Order and in the DIP Financing Agreement shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order), by any plan of reorganization or liquidation in the Chapter 11 Cases, by the dismissal or conversion of the Chapter 11 Cases or in any Successor Case under the Bankruptcy Code unless and until the DIP Loan has first been paid in full in cash and completely satisfied and the commitments terminated in accordance with the Interim Order and the DIP Financing Agreement.  The rights, remedies, powers, privileges, liens, and priorities of

the Prepetition First Lien Agent and Prepetition First Lien Lenders shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order), by any plan of reorganization or liquidation in the Chapter 11 Cases, by the dismissal or conversion of the Chapter 11 Cases or in any Successor Case unless and until the Prepetition First Lien Debt has first been paid in full in cash and completely satisfied in accordance with the Prepetition Loan Documents or refinanced by the DIP Loan as provided herein.

25. <u>Subsequent Reversal or Modification</u>. This Interim Order is entered pursuant to Bankruptcy Code section 364 and Bankruptcy Rules 4001(b) and (c), granting the DIP Agent, DIP Lenders, Prepetition First Lien Agent and Prepetition First Lien Lenders all protections afforded by Bankruptcy Code section 364(e). If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by the Debtors to the DIP Agent, the DIP Lenders and the Prepetition First Lien Agent and/or the Prepetition First Lien Lenders as applicable, prior to the date of receipt by the DIP Agent, the DIP Lenders, Prepetition First Lien Agent and the Prepetition First Lien Lenders of written notice of the effective date of such action or (ii) the validity and enforceability of any lien, claim or priority authorized or created under this Interim Order or pursuant to the DIP Financing Agreement. Notwithstanding any such reversal, stay, modification or vacatur, any postpetition indebtedness, obligation or liability incurred by the Debtors to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders prior to written notice to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders of the effective date of such action, shall be governed in all respects by the original provisions of this Interim Order and the DIP Financing Agreement, as applicable, and the DIP Agent, the DIP Lenders, Prepetition First Lien Agent and the Prepetition First Lien Lenders shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Financing Agreement with respect to all such indebtedness, obligations or liability.

26. <u>Restriction on Use of Lender's Funds</u>. Notwithstanding anything herein to the contrary, and subject to the proviso at the end of this paragraph, no proceeds from the DIP Loan, Collateral or proceeds thereof, Cash Collateral (including any prepetition retainer funded by the Prepetition First Lien Lenders), Prepetition Collateral or proceeds thereof, or any portion of the Carve-Out may be used by any of the Debtors, any Committee, and any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, or any other person, party or entity to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than from the DIP Lenders, except for the purpose of repayment the DIP Loan in full and in cash; (b) investigate any Challenge Actions (as outlined in paragraph 14 above); provided, however, up to $25,000 of proceeds of DIP Loan and Cash Collateral in the aggregate may be used by a Creditors' Committee to investigate the Prepetition First Lien Debt and Prepetition Lender Liens (all as described further in paragraph 14, above).

27. <u>Collateral Rights</u>. In the event that any party who has both received notice of the Interim Hearing and holds a lien or security interest in Collateral or Prepetition Collateral that is junior and/or subordinate to any of the Postpetition Liens, the First Lien Agent Adequate Protection Liens or the Prepetition First Liens in such Collateral or Prepetition Collateral receives or is paid the proceeds of such Collateral or Prepetition Collateral, or receives any other payment with respect thereto from any other source, prior to payment in full in cash and the complete satisfaction of (i) the DIP Loan under the DIP Financing Agreement and termination of the loan commitments thereunder in accordance with the DIP Financing Agreement and (ii) subject to the Final Order, the Prepetition First Lien Debt under the Prepetition Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such Prepetition Collateral or other Collateral in trust for the DIP Agent, DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders (subject to the terms of the Prepetition Intercreditor Agreement), and shall immediately turnover such proceeds for application, in the following order, to (a) to the DIP Agent for application to the DIP Loan

under the DIP Financing Agreement until paid in full in cash, (b) to the Prepetition First Lien Agent for application to the Prepetition First Lien Debt under the Prepetition First Lien Loan Documents until paid in full in cash, and (c) to the extent such payment consists of Prepetition Second Lien Collateral, to the Prepetition Indenture Trustee for application to the Prepetition Second Lien Debt under the Prepetition Second Lien Indenture until paid in full in cash.

28.   . Trico Marine, Trico Marine Assets, Inc. and Trico Marine Operators, Inc., as applicants (the "Applicants"), on the one hand, and Nordea Bank Finland PLC, New York Branch ("Nordea (Finland)"), on the other hand, are parties to that certain Reimbursement Agreement dated as of June 11, 2010 (as amended, supplemented or otherwise modified from time to time, the "Nordea L/C Reimbursement Agreement"), pursuant to which, among other things, and as more particularly set forth in the Nordea L/C Reimbursement Agreement, the applicants agreed to reimburse Nordea Finland for the amount of each payment which Nordea Finland makes against a presentation (a "Presentation") under any of six letters of credit (the Nordea L/C's") issued by Nordea Finland, having an aggregate face amount of $3,490,546.24 and which are more specifically described on Annex A of the Reimbursement Agreement. The Applicants, as assignors, Nordea Bank Norge ASA, Cayman Islands Branch ("Nordea Cayman," and together with Nordea Finland, "Nordea"), as assignee, and Nordea Finland, are parties to that certain L/C Cash Collateral Agreement dated as of June 11, 2010 (as amended, supplement or otherwise modified from time to time, the "Nordea L/C Cash Collateral Agreement"), pursuant to which, among other things, as more particularly set forth in the Nordea L/C Cash Collateral Agreement, the Applicants transferred $3,665,073.55 (the "Nordea L/C Cash"), to account no. 6623792001 (the "Nordea L/C Cash Account"), maintained at Nordea Cayman, and assigned, and pledged to Nordea as collateral securing the Obligations (as defined in the Nordea L/C Cash Collateral Agreement, and hereafter referred to as the "Nordea Obligations"), the Nordea L/C Cash, the Nordea L/C Cash Account, and all other Collateral (as defined in the Nordea L/C Cash Collateral Agreement, and hereafter referred to as the "Nordea Collateral"). Notwithstanding anything to the contrary contained in this Interim Order, the DIP

Financing Agreement, or any other document, agreement or instrument executed or delivered in connection therewith, and for avoidance of doubt, (i) the Nordea Collateral is not Prepetition Collateral, and is not Cash Collateral of the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Prepetition Second Lien Agent or the Prepetition Second Lien Lenders or any other party other than Nordea, (ii) the Debtors are not authorized to use the Nordea Collateral, except as expressly set forth in the Nordea L/C Reimbursement Agreement and the Nordea L/C Cash Collateral Agreement, (iii) the Postpetition Liens, the Superpriority Claims, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Priority Claims, all other Adequate Protection, the Carve-out, and all other liens or claims granted or arising under this Interim Order or under any other order of this Court entered in these Chapter 11 Cases, shall be junior and subject in all respects to Nordea's interests in and liens on the Nordea Collateral (the "Nordea Interests"), and to Nordea's rights under the Nordea L/C Reimbursement Agreement, the Nordea L/C Cash Collateral Agreement, all other documents, agreement or instruments executed in connection therewith or related thereto (the "Nordea L/C Documents"), and applicable law, including any common law right of set off (collectively, the "Nordea Rights"), and (iv) any enforcement or other rights granted in respect of the Nordea Collateral under this Interim Order or any other Order of this Court entered in the Chapter 11 Cases shall be subject to the Nordea Rights and to payment and satisfaction in full and in cash of the Nordea Obligations. Subject to the provisions of paragraph 14, (i) the Nordea Rights and Nordea Interests are (A) valid, binding, continuing, enforceable, and properly perfected liens on and interests in the Nordea Collateral, and (B) not subject to avoidance, reduction, set-off, offset, disallowance, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or other applicable law by any person or entity, (ii) Subject to a Final Order, Nordea is not and shall not be deemed a control person or insider of the Debtors by virtue of any of the actions taken by it in respect of or in connection with the Nordea Rights, (iii) no claims of the Debtors exist against Nordea, and (iv) the Debtors have waived, discharged and released any right they may have to challenge the

Nordea Rights or Nordea Interests and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses in action against Nordea and/or any of their respective affiliates, parents, subsidiaries, agents, attorneys, advisors, professionals, officers, directors and employees (in their capacities as such). In the event of any Presentation, Nordea is authorized, without further order of the Court, to apply the Nordia L/C Cash in payment and satisfaction of the Nordia Obligations arising in respect thereof in accordance with the the terms of the Nordea L/C Documents, and the automatic stay of Section 362(a) of the Bankruptcy Code is hereby modified and vacated solely to the extent necessary to allow Nordea to take such action. The Debtors are authorized and directed to pay, pursuant to the procedures outlined in paragraph 6, the reasonable fees and expenses incurred by White & Case LLP and for Fox Rothschild LLP as Nordea's counsel. To the extent a letter of credit is terminated, a cash deposit held by Nordea that is refunded to the Debtors shall be deemed Cash Collateral under the terms of this order for all purposes.

29.     Plan of Reorganization or Liquidation. No plan of reorganization or liquidation may be confirmed in any of these Chapter 11 Cases unless, in connection and concurrently with the effective date of such plan, the plan provides for the payment in full, in cash, and in complete satisfaction of the DIP Loan, the Prepetition First Lien Debt, and Adequate Protection owed to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders, and the loan commitments under the DIP Financing Agreement and this Interim Order are terminated in accordance therewith on the effective date of such plan.

30.     Sale/Conversion/Dismissal.

(a) Unless otherwise agreed by the DIP Agent, DIP Lenders, Prepetition First Lien Agent and the Prepetition First Lien Lenders, neither the Debtors nor any trustee will file a motion seeking a sale of all or substantially all of the assets of the Debtors under Bankruptcy Code section 363 (a "363 Substantial Asset Sale") unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to pay in full and completely satisfy in cash the DIP Loan, the Prepetition First Lien Debt, and Adequate Protection owed to

the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders (collectively, the "DIP Financing Obligations"), and the loan commitments under the DIP Financing Agreement and this Interim Order are terminated in accordance therewith on the closing date of such sale.

(b) It shall be an Event of Default under the DIP Financing Agreement if any order is entered dismissing or converting the Chapter 11 Cases under Bankruptcy Code sections 305 or 1112, or appointing a chapter 11 trustee or an examiner with expanded powers for any such relief unless and until (i) the DIP Loan is paid in full in cash and is completely satisfied and the loan commitments under the DIP Financing Agreement are terminated in accordance therewith or (ii) the DIP Agent expressly consents in writing, such consent to be granted or withheld in the DIP Agent's sole discretion. If an order dismissing or converting the Chapter 11 Cases under Bankruptcy Code sections 305 or 1112 or otherwise is at any time entered, such order shall provide that (A) the Postpetition Liens, Superpriority Claims, Adequate Protection Liens and Adequate Protection Priority Claims granted hereunder and in the DIP Financing Agreement shall continue in full force and effect, remain binding on all parties-in-interest including any successor trustee or other estate representative in any Successor Case, and maintain their priorities as provided in this Interim Order and the DIP Financing Agreement until the DIP Loan and Prepetition First Lien Debt, as applicable, are paid in full in cash and are completely satisfied and the loan commitments under the DIP Financing Agreement and this Interim Order are terminated in accordance with the DIP Financing Agreement and this Interim Order, and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing all such liens and claims.

31.     Notwithstanding anything to the contrary in this Interim Order or the DIP Financing Agreement, (i) Trico Supply AS and its direct and indirect subsidiaries (the "Trico Supply Group") and its assets (the "Trico Supply Assets") shall not be subject to any liens granted hereunder and nothing in this Interim Order grants such a lien, and the Debtors shall not obtain credit or incur debt secured by a lien on the Trico Supply Assets, (ii) none of the Trico

Supply Assets shall be collateral securing the DIP Loan and shall not be included in the term "Collateral" as defined in connection with the DIP Loan, and (iii) the Trico Supply Group shall be deemed to be expressly excluded from the defined term "Debtors" hereunder, including under Section 28 of this Interim Order and shall not be a guarantor of the DIP Obligations. The Debtors are authorized to enter into such amendments to the DIP Loan documents as requested by the DIP Lenders to incorporate and implement this paragraph 32.

32.     No Waiver. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that any of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent or the Prepetition First Lien Lenders may have to bring or be heard on any matter brought before this Court.

33.     Setoff and Recoupment. Notwithstanding anything to the contrary contained herein (but subject to the terms of the Prepetition Intercreditor Agreement), nothing in this Interim Order shall limit or impair the nature, extent, validity and/or priority of the rights against the Debtors, if any, of any party-in-interest in the Chapter 11 Cases under Bankruptcy Code sections 546(c), 545 and 553 and/or the equitable doctrine of recoupment.

34.     Priority of Terms. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Financing Agreement, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the Motion or the DIP Financing Agreement, the terms and provisions of this Interim Order shall govern.

35.     Indefeasible payment. Subject to the investigatory period provisions of paragraph 14, for purposes of the Interim Order, when payment in cash is received by the Prepetition First Lien Agent or the DIP Agent, that payment shall be considered indefeasibly made.

36.     No Third Party Beneficiary. Except as explicitly set forth herein with respect to the Carve-Out, no rights are created hereunder for the benefit of any third party, any creditor, any party in a Successor Case or any direct, indirect or incidental beneficiary.

37.     Final Hearing Date.  The Final Hearing to consider the entry of the Final Order approving the relief sought in the Motion shall be held on [_____], 2010 at [ ]:00 [ ].m. prevailing Eastern time (as the same may be adjourned or continued by this Court) before the Honorable [_____], at the United States Bankruptcy Court for the District of Delaware.

38.     Adequate Notice.  Adequate notice under the circumstances has been given to (i) the U.S. Trustee, (ii) counsel to the DIP Agent, (iii) counsel to any known secured creditors of record, (iv) counsel to the Prepetition First Lien Agent and Prepetition First Lien Lenders, (v) counsel to the Prepetition Indenture Trustee, (vi) the Debtors' lessors and licensors, (vii) the forty (40) largest unsecured creditors of the Debtors, (viii) any party asserting a Lien against any of the Debtors' assets, and (ix) the Internal Revenue Service.  Pursuant to Bankruptcy Rule 4001, no further notice of the request for the relief granted at the Interim Hearing is required.  The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to the Notice Parties, any known party affected by the terms of the Final Order, and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be actually received no later than 4:00 p.m. prevailing Eastern time on [      ], 2010.

39.     Entry of Interim Order; Effect.  This Interim Order shall take effect immediately upon execution hereof, notwithstanding the possible application of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter this Interim Order on the Court's docket in the Chapter 11 Cases.

40.     Retention of Jurisdiction.  This Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Interim Order and/or the DIP Financing Agreement.

41.     Binding Effect of Interim Order.  The terms of this Interim Order shall be binding on any trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code or other fiduciary or other estate representative hereafter appointed as a legal representative of the Debtors or with

respect to the property of the estates of the Debtors; provided that, except to the extent expressly set forth in this Interim Order, the DIP Agent, the Prepetition First Lien Agent, the DIP Lenders and the Prepetition First Lien Lenders shall have no obligation to permit the use of Cash Collateral or other proceeds of Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors. Except as otherwise explicitly set forth in this Interim Order, no third parties are intended to be or shall be deemed third party beneficiaries of this Interim Order.

42. Waiver of Requirement to File Proof of Claim. Neither the Prepetition First Lien Agent nor any of the Prepetition First Lien Lenders shall be required to file a proof of claim with respect to any of the Prepetition First Lien Debt.

Dated: August 27, 2010

_____
[                    ]
United States Bankruptcy Judge