IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRICO MARINE SERVICES, INC., *et al.*,[1] | ) | Case No. 10-12653 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**EMERGENCY MOTION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 105(A), 361, 363, 507(B), 1107, AND 1108 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 4001, 9006(B) AND 9014 FOR AN ORDER (A) AUTHORIZING THE USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS AND (C) SCHEDULING A FINAL HEARING**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), in the above-captioned chapter 11 cases (the "Cases") by and through their undersigned attorneys, hereby file this emergency motion (the "Motion")[2] pursuant to §§ 105(a), 361, 363, 507(b), 1107 and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code"), Rules 4001, 9006(b) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-2 of the Local Rules of Bankruptcy

---

[1] The Debtors are the following entities (followed by the last four digits of their tax identification numbers): Trico Marine Services, Inc. (2405); Trico Marine Assets, Inc. (2404); Trico Marine Operators, Inc. (6124); Trico Marine International, Inc. (3132); Trico Holdco, LLC (3870); Trico Marine Cayman, L.P. (5842). The mailing address for all of the Debtors for the purpose of these Cases is 10001 Woodloch Forest Drive, Suite 610, The Woodlands, TX 77380.

[2] Capitalized terms used herein but not otherwise defined shall be ascribed the meanings given to such terms in *Debtors' Motion For Entry Of Interim And Final Orders Pursuant To 11 U.S.C. Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) And 507(a), Fed. R. Bankr. P. 2002, 4001 And 9014 And Del. Bankr. L.R. 4001-2 (I) Authorizing Debtors (A) To Obtain Postpetition Secured DIP Financing (B) To Refinance Certain Prepetition Secured Indebtedness And (C) To Use Cash Collateral (II) Granting Liens And Providing For Superpriority Administrative Expense Status; (III) Granting Adequate Protection To Prepetition Secured Parties (IV) Modifying Automatic Stay; And (V) Granting Related Relief* [Docket No. 13] (the "DIP Motion").

MOTION OF THE DEBTORS FOR
EMERGENCY USE OF CASH COLLATERAL

Page 1 of 20

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), for entry of an order substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"):

    a.    authorizing the Debtors to use cash collateral, as such term is defined in § 363 of the Bankruptcy Code (the "Cash Collateral"),[3] on an interim basis in the manner prescribed herein and in accordance with the budget attached hereto as **Exhibit B** (the "Budget") from the date of an order approving this Motion through the date of the Final Hearing (as defined herein) (the "Interim Period") pursuant to §§ 363(c)(2) and 552(b) of the Bankruptcy Code;

    b.    approving, pursuant to § 363(e) of the Bankruptcy Code, the proposed adequate protection for the prepetition lenders of the Debtors identified herein; and

    c.    establishing November 29, 2010 as the hearing date for final approval of the Debtors' use of Cash Collateral in the manner prescribed herein (the "Final Hearing").

In support thereof, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

As this Court is aware, the Debtors have spent the last two months of these Cases attempting to negotiate a consensual final order approving debtor-in-possession financing ("Final DIP Order") with the lenders, Tennenbaum DIP Opportunity Fund, LLC, Tennenbaum Opportunities Partners V, LP, and Special Value Continuation Partners, LP (collectively, "Tennenbaum") and certain other creditor constituencies. Unfortunately, the Debtors have been in default of the DIP Facility since September 24, as subsequently extended to October 21, due to

---

[3] Use of the term "Cash Collateral" is coextensive with the definition contained in § 363 of the Bankruptcy Code. It is used in this Motion for convenience and reference only and is not an acknowledgment by the Debtors that any cash or other property now in the Debtors' possession or that will be received by them in the future constitutes Cash Collateral of any entity. The Debtors reserve all rights regarding whether or not the specific cash generated by the business following the Petition Date in fact constitutes Cash Collateral within the meaning of § 363(a) of the Bankruptcy Code due to, among other things, the limitations set forth in § 552 of the Code.

the inability to obtain an order from this Court approving a "roll-up" of Tennenbaum's prepetition secured indebtedness in the principal amount of $25 million. As a result, since that time, the Debtors have not had access to the DIP facility beyond the currently outstanding principal amount of $3,500,000.[4] For the last several weeks, the Debtors have worked tirelessly and in good faith to agree to the terms of a Final DIP Order that would protect Tennenbaum's interest as a DIP lender as well as provide reasonable protections to Tennenbaum in their capacity as a prepetition secured lender, while ensuring fair treatment for the Debtors' other constituencies.

Although the Debtors have been proceeding to sell most of their assets as quickly as possible (including pending motions that would provide sufficient funds to pay off all of Tennebaum's debt, both prepetition and postpetition), and the Debtors have given up many of the economic benefits that they would have been entitled to had the roll-up been approved, such as the refund of fees and accrual of interest at the non-default rate, the parties have now reached an impasse. Among other things, Tennenbaum has now required that in connection with the Final DIP Order, the Debtors sell all of their assets (including non-operating assets and assets not encumbered by Tennenbaum's prepetition liens) on a highly expedited schedule, with Tennenbaum having the right to credit bid on an undetermined and unconstrained basis. Unfortunately, the Debtors simply do not believe that agreeing to Tennenbaum's requirements is in the best interest of these estates.

As a consequence, Tennenbaum delivered a notice of termination of the DIP Facility yesterday, on November 8, 2010. Accordingly, the Debtors were given no choice but to file the

---

[4] References to outstanding amounts due under the DIP Facility contained throughout this Motion represent principal amounts only and do not include appropriate fees, costs and other amounts that may have accrued under the DIP Financing Agreement.

instant Motion to use Cash Collateral to preserve the remaining value in the estates by continuing, on an orderly basis, the sale of their assets and wind-down of their businesses, which the Debtors believe will ultimately enable them to pay off Tennenbaum in full, and provide meaningful proceeds for the benefit of other constituents. As a fiduciary to these estates, the Debtors could not in the exercise of their business judgment permit Tennenbaum to force a fire sale of the remaining assets of the estates to the detriment of all of the Debtors' other creditors. Moreover, the Debtors believe that Tennenbaum, by its own admission a vastly oversecured creditor in these Cases,[5] is more than adequately protected through, among other things, additional and replacement liens on the Debtors' assets, *including substantial unencumbered assets*, and the demonstrable proof that its collateral *currently under contract for sale* exceeds the value of its claims.

## JURISDICTION AND PROCEDURAL BACKGROUND

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. Furthermore, this Court has jurisdiction pursuant to the Interim DIP Order (as defined herein). *See* Interim DIP Order, ¶ 21(c) ("This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of Bankruptcy Code section 362(a), use of Cash Collateral, or other injunctive relief requested.") This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[5] *See* September 22, 2010 Hrg, Tr. at 65: 20-22 (MR. KLYMAN: "And the over secured creditor, in this case [Tennenbaum], has a valid property interest in that security cushion, has a right to adequate protection of the interest.")

3. On August 25, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy cases (the "Cases").

4. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108

## TRICO'S CAPITAL STRUCTURE (SECURED DEBT)

5. The Debtors have two primary secured prepetition obligations: the First Lien Credit Facility and the Second Lien Notes (each as defined herein).

    a. *The First Lien Credit Facility*. The Trico Marine Services, Inc. ("TMS"), the lead Debtor in the Cases, is a party to the Amended Credit Agreement dated as of June 11, 2010 among TMS, Obsidian Agency Services, Inc. as Administrative Agent (the "Agent"), and certain affiliates of Tennenbaum (the "First Lien Credit Facility"). The guarantors of TMS's obligations under the Prepetition Credit Facility are Trico Marine Assets, Inc. ("TMA"), Trico Marine Operators, Inc. ("TMO") and all other wholly-owned subsidiaries of TMS other than Trico Supply AS and its subsidiaries. As of the date hereof, the outstanding principal amount under the First Lien Credit Facility is $25 million. The First Lien Credit Facility is secured by mortgages (and related assignments of earnings and assignment of insurances) for eleven ships; pledges of all deposit accounts of TMS, TMA and TMO; 100% of the equity interests of TMA and TMO; 65% of the equity interests of Trico Marine Cayman, L.P.; and a pledge of a subordinated intercompany note from Trico Supply AS ("Trico Supply") to TMO with an initial principal amount of $194 million (the "$194 million Intercompany Note").

    b. *The Second Lien Notes*. TMS also owes approximately $202.8 million under 8.125% secured convertible debentures due in 2013 (the "Second Lien Notes") secured by a second lien on the eleven vessels pledged to secure the First Lien Credit Facility, the $194 million Intercompany Note, and 100% of the equity interests of TMA and TMO. U.S. Bank, N.A. ("U.S. Bank") serves as the indenture trustee for the Second Lien Notes. Under the indenture governing the Second Lien Notes, interest payments are to be made on May 15 and November 15 of each year, each with a subsequent thirty-day grace period.

**EVENTS LEADING UP TO THE FILING OF THIS MOTION**

6. Prior to the Petition Date, the Debtors solicited bids for the provision of debtor-in-possession financing to finance the business and operations of the Debtors during the pendency of the Cases. Shortly thereafter, in June 2010, the Debtors entered into an *Existing Credit Commitment Purchase and Debtor-in-Possession Facility Commitment* (collectively, the "DIP Facility Commitment") with Tennenbaum (in its capacity as lender under the DIP Facility Commitment, the "DIP Lender") to provide up to $10 million in debtor-in-possession financing and an additional $25 million to refinance the outstanding amounts under the First Lien Credit Facility (i.e., a "roll-up").

7. On the Petition Date, the Debtors filed a motion for authority to, among other things, consummate the DIP Facility Commitment through entry into the *Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement* dated as of August 24, 2010 (as amended, restated or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Financing Agreement"). On August 27, 2010, the Court entered an interim order approving the DIP Financing Agreement (as amended on September 7, 2010, the "Interim DIP Order"), a copy of which is attached as **Exhibit C** hereto [Docket No. 95]. After objections to approval of the DIP Financing Agreement on a final basis were lodged, the Court stated at the originally scheduled final hearing that it had concerns about the "roll-up" component of the DIP Financing Agreement and sent the Debtors, Tennenbaum and the other pertinent parties back to the negotiating table. Under the terms of the DIP Financing Agreement and the Interim DIP Order, an "event of default" occurred when the Debtors did not secure a Final DIP Order approving the DIP Financing Agreement, including the "roll-up", on or prior to September 24,

2010. Tennenbaum granted the Debtors an extension of that deadline through and including October 21, 2010.

8. As previously stated, the Debtors and Tennenbaum have been engaged in vigorous negotiations for more than two months in an effort to achieve a consensual Final DIP Order, which process has included multiple exchanges of proposed draft final orders. This process culminated with around-the-clock negotiations the weekend of November 6, 2010 triggered by Tennenbaum's delivery during the afternoon of November 6 of a revised form of Final DIP Order containing, among other material changes from the Interim DIP Order and prior drafts, a requirement to hold a hearing on the sale of all of the Debtors' operating and non-operating assets, including, importantly, the Debtors' interest in three Intercompany Notes from the Debtors' non-debtor "Opco" subsidiaries, Trico Supply AS and Trico Shipping AS, and the Debtors' interest in its Eastern Marine Services Limited ("EMSL") joint venture, by December 14, 2010.[6] Later on November 6, counsel to the Debtors was informed that unless the Debtors agreed to a form of Final DIP Order by Monday, November 8 at 8 a.m. ET and filed it with the Bankruptcy Court before that time, Tennenbaum would provide the Debtors with a notice of termination of the DIP Financing Agreement. After all of the Debtors' professionals and management conferred over the next 24 hours, the Debtors provided Tennenbaum's counsel during the evening of Sunday, November 7 with their conceptual comments and objections to the proposed form of order and noted that, in the Debtors' judgment, the latest proposed form of

---

[6] It should be noted that Tennenbaum has provided a secured loan in the amount of approximately $29 million to Trico Shipping AS ("Trico Shipping"), a non-debtor affiliate of TMS. Trico Shipping is currently engaged in the negotiation of an out-of-court restructuring with an Ad Hoc Committee of secured noteholders. Among other things, the Debtors are concerned, in an abundance of caution, that Tennenbaum's insistence on including the intercompany notes in the required global expedited sale of the Debtors' assets may be related to Tennenbaum's position and strategy in relation to Trico Shipping's restructuring process.

Final DIP Order was materially worse for the estates than previous drafts and, consistent with the Debtors' fiduciary duties, was not acceptable in numerous respects.

9. In response to the Debtors' communication, Tennenbaum provided a notice of termination of the DIP Financing Agreement during the evening of November 8, 2010 (the "Termination Notice"), a copy of which is attached here to **Exhibit D**. In the Termination Notice, Tennenbaum contends that under the terms of the Interim DIP Order (citing paragraph 3 thereof), the Debtors' ability to use Cash Collateral would terminate in five calendar days after termination of the DIP Financing Agreement, or on November 13, 2010.[7] The Debtors assert that under the terms of the Interim DIP Order and Bankruptcy Rule 9006(b), the date that access to Cash Collateral will end is not November 13, but November 15, 2010.[8] As of the date hereof, the principal amount drawn under the DIP Facility, after giving effect to funds in the advance account which are unavailable to the Debtors, is $3.5 million.

## STATUS OF THE CASES AND NEED FOR THE USE OF CASH COLLATERAL

10. During the period before and since the Interim DIP Order was entered, the Debtors have conducted an analysis of their businesses and operations. After comprehensive review, the Debtors have concluded that their businesses (towing and supply) do not have long term viability. Thus, the Debtors have embarked on a diligent and methodical, but accelerated process to sell their operating assets for the highest and best price as quickly as possible. Although this process is well underway (as demonstrated by the chart of pending transactions

---

[7] The Debtors believe that under the Interim DIP Order the relevant period is five Business Days. *See* Interim DIP Order, ¶ 21(b).

[8] In any event, pursuant to Bankruptcy Rule 9006, the five day period began on Tuesday, November 9, the day after the triggering event. Because the fifth day (assuming calendar days) falls on a Saturday, Bankruptcy Rule 9006 states that the period will continue to run until the end of the next day that is not a Saturday, Sunday or legal holiday. *See* FED. R. BANKR. P. 9006(a).

below), the Debtors do not have sufficient available sources of working capital or cash to fund their remaining operations, pay the fees of their chapter 11 professionals or conclude the orderly sale of their assets without accessing Cash Collateral. The following sales (relating to ten ships) or other monetization transactions (relating to Comar) are currently in process:

| Asset | Status | Gross Sale Price | Estimated Closing Date |
|---|---|---|---|
| Trinity River | Motion filed; Docket No. 387 | $1,000,000 | (unknown) (subject to engine repair) |
| Suwanee River | Motion filed; Docket No. 387 | $950,000 | Before December 15, 2010 |
| Roe River | Motion filed; Docket No. 387 | $1,200,000 | Before December 15, 2010 |
| Oak River | Motion filed; Docket No. 387 | $950,000 | Before December 15, 2010 |
| Elm River | Motion filed; Docket No. 387 | $1,700,000 | Before December 15, 2010 |
| Carson River, East River, Powder River | Motion filed; Docket No. 389 (deposit received) | $1,500,000 (total price for three ships) | As soon as November 10, 2010 |
| Trico Mystic and Trico Moon | Motions filed; Dockets No. 253, 376 and 391 | $26,000,000 (total price for two ships; $13 million each) | November 29 – December 15 for Moon: December 31, 2010 for Mystic |
| Comar charter assignments | Motion filed; Docket 375 | $3,179,000 | November 24, 2010 |

11. Of the ten ships mentioned above, all but the East River and the Carson River constitute collateral for the First Lien Credit Facility.

12. In addition to the above pending sales, the Debtors have previously obtained approval on October 6, 2010 to sell two ships (the Spirit River and the Truckee River), the more valuable of which (Spirit River) is not encumbered by the First Lien Credit Facility [Docket Nos. 159 and 260] for total net proceeds of over $5 million (the "September Sale Motion").

Unfortunately, the purchaser of those two vessels based in West Africa was unable to close, but the Debtors continue to actively market those ships.

13. In sum, the Debtors are working with all deliberate speed to sell the remainder of their operating assets. These include eight of the eleven ships securing the First Lien Credit Facility and the two ships subject to the September Sale Motion, but does not include the two principal non-operating assets which are not causing losses to the debtors, but because of their nature, need to be sold in a more deliberate manner (*i.e.*, the non-debtor EMSL (Hong Kong) joint venture interest, the NAMESE joint venture interest and the three intercompany notes with Trico Supply AS and Trico Shipping AS).

14. If the Debtors are not granted authority to use Cash Collateral, at a minimum, they will be forced to conduct a fire sale of their remaining assets at Tennenbaum's behest, to the detriment of every single creditor of the Debtors other than Tennenbaum. Moreover, by this Motion, the Debtors merely seek the use of Cash Collateral over a short term period – until November 29 on an interim basis and December 31 on a final basis – in order to continue the orderly sale process they have already begun in earnest and are moving as quickly as possible, with a view toward paying off the outstanding amounts owing under the DIP Facility by the end of November (potentially prior to the end of the Interim Period), and making substantial payoffs of outstanding amounts under the First Lien Credit Facility by the end of the first week in December. The amount of Cash Collateral the Debtors seek to use during the Interim Period is approximately $3 million – and represents a very small amount in contrast to Tennenbaum's sizable equity cushion.

15. In the Debtors' business judgment, they believe that, in the present circumstances, completing their ongoing sale process will maximize the value of these estates. Tennenbaum's impatience is simply not a justifiable basis for the forced sales it seeks, particularly where the outstanding amounts of postpetition financing only $3.5 million *and* where the currently pending sales, plus other proceeds, should be more than sufficient to pay off the entirety of its prepetition and postpetition loans in the near term. Tennenbaum was *not* granted a "roll-up" and should not be treated as if a "roll-up" was granted.

16. In addition, it should be noted that the Debtors have engaged in extensive negotiations with a group of holders of Second Lien Notes regarding a replacement debtor-in-possession facility that would take out Tennenbaum completely and provide additional liquidity to the Debtors. Although there can be no assurance that the Debtors and such holders will reach agreement on the terms of a replacement facility, the Debtors intend to continue that path during the Interim Period.

## BASIS FOR RELIEF REQUESTED

17. Cash Collateral is defined in § 363(a) of the Bankruptcy Code as "[C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property ... <u>subject to a security interest as provided in § 552(b) of this title</u>, whether existing before or after the commencement of a case under this title." (emphasis added). The Debtors' use of property of the estate, including Cash Collateral, is generally governed by Bankruptcy Code § 363, which provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under section...1108...of this title and unless the court orders otherwise, the trustee [or debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or hearing, and may use property of the estate in the ordinary course of business without notice or hearing.

11 U.S.C. 363(c)(1).

18. A modified rule applies, however, with respect to Cash Collateral; Bankruptcy Code § 363(c)(2) permits the debtor in possession to use, sell, or lease Cash Collateral only if either of two alternative circumstances exist:

> (A) each entity that has an interest in such cash collateral consents;
> or  (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

U.S.C. 363(c)(2).

19. Bankruptcy Code § 363(e), in turn, requires that the debtor-in-possession's use of collateral (including Cash Collateral) during the bankruptcy case must be conditioned on "adequate protection" of other interests in the property. What constitutes adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). By "adequate protection," the Bankruptcy Code seeks to shield a secured creditor from diminution of the value of its security interest during the period of the bankruptcy case. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

20. <u>First</u>, it cannot be determined at this time the extent to which either Tennenbaum, in its capacity as a DIP Lender and as prepetition lender under the First Lien Credit Facility, or

the holders of the Second Lien Notes (the "Second Lien Creditors"), have an interest in the Debtors' Cash Collateral. While the definition of Cash Collateral explicitly includes postpetition earnings under § 552(b)(1), such earnings are included "except as provided in § 363, 506(c) ... or to any extent that the court ...based on the equities of the case, orders otherwise." 11 U.S.C. § 552(b)(1). Section 506(c), in turn, provides that "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property." 11 U.S.C. § 506(c).

21. Where, as here, the Debtors are currently operating the estates principally to preserve and liquidate the collateral of Tennenbaum and the Second Lien Creditors (as well as to protect whatever unencumbered assets may exist), the Debtors believe that the liens of such creditors may not extend to postpetition earnings pursuant to § 552(b)(2). Moreover, the "equities of the case" exception may further be applicable where estate collateral is being generated on a postpetition basis solely for the benefit of the secured creditor but with the use of postpetition resources and labor, in which the prepetition lenders do not have a lien.

22. However, to the extent that Tennenbaum does have an interest in Cash Collateral, such interest in Cash Collateral is more than adequately protected. First, the Debtors are actively and expeditiously selling or auctioning Tennenbaum's collateral and other assets, and have shown demonstrable progress by filing motions to sell ten separate ships and assign the Comar charter in transactions that are expected to generate total proceeds of no less than $36 million. All of these sales are anticipated to close before year end, or shortly thereafter, and some (Comar transaction, Trico Moon, Carson River, East River, Powder River) with estimated aggregate

proceeds of at least $17.5 million, should close within thirty days.[9] The prices from these actual sales *under contract* will more than cover Tennenbaum's claims under the DIP Facility (equal to $3.5 million), which the Debtors intend to satisfy immediately upon their realization of sufficient proceeds to do so. With respect to Tennenbaum's interest in Cash Collateral as a prepetition lender, Tennenbaum itself has admitted[10] – and no party disputes – that its claims under the First Lien Credit Facility of approximately $25 million are oversecured by its collateral, which the Debtors estimate to be valued at no less than $32.3 million, and possibly more.[11] Moreover, the slated sales contemplated by the motions would also provide sufficient proceeds to satisfy Tennenbaum's claims under the First Lien Credit Facility. Thus, the risk that Tennenbaum will suffer any meaningful diminution in the value of its collateral is negligible, and is more than offset by the liens and claims contemplated below.

23. Second, as adequate protection for any diminution in the value of Tennenbaum's collateral through the use of Cash Collateral, the Debtors propose to grant Tennenbaum additional and replacement security interests and liens (the "Adequate Protection Liens") in and upon all of the Debtors' assets and causes of action excluding only avoidance actions, including the Debtors' considerable assets that are not encumbered by the Prepetition First Lien Debt or

---

[9] In fact, the sale of Carson River, East River and Powder River, for gross proceeds of $1.5 million, may close imminently, upon obtaining an order of the Court.

[10] *See supra* footnote 5.

[11] The eleven ships owned by the Debtors, which constitute collateral for both the DIP Facility and the First Lien Credit Facility have an estimated value (based on appraisals conducted by Merrill Marine Services Inc. as of June 4, 2010) ranging between $41.4 and $54.8 million. Appraisals by Fearnley Offshore Supply as of December 31, 2009 provide estimated values in higher ranges. The eleven ships consist of Elm River (Dominica); Trico Mystic (U.S.); Trico Moon (U.S.); Buffalo River (Dominica/Mexico); Oak River (Dominica); Palma River (Vanuatu/Mexico); Powder River (Dominica/Mexico); Roe River (Dominica); Suwannee River (Dominica); Trinity River (Dominica) and Truckee River (Dominica). The total sale price of ten ships subject to pending sale motions is $32,300,000. Eight of those ships constitute collateral for the First Lien Credit Facility.

the Second Lien Notes, which the Debtors estimate to be valued at no less than $37 million. The Adequate Protection Liens will be subordinate only to the liens granted under the DIP Facility and a carve-out for (a) all professional fees and (b) certain administrative expenses of the estates as set forth in the Budget (the "Carve-Out").

24. The Adequate Protection Liens would include, among other things, (i) a pledge of 100% of the equity in Trico Marine Services (Hong Kong) Limited (Hong Kong) which is the owner of a 49% JV interest (the "EMSL Interest") in Eastern Marine Services Limited (Hong Kong) ("EMSL") which operates ships in the Western Pacific, (ii) a pledge of 100% of TMO's 49% stake (the "NAMESE Interest") in Naviera Mexicana de Servicios ("NAMESE") — an entity that operates certain maritime assets in Mexican waters; and (iii) the following ships: the Hondo River, the Spirit River and the Walker I. Currently, those items of collateral only secure the DIP Facility (and thus are otherwise unencumbered) and, in the case of the Hondo River and the Spirit River, liens in favor of the U.S. Maritime Administration ("MARAD"). The Debtors believe that these Adequate Protection Liens have considerable value. Based on appraisals conducted prior to the Petition Date, the two MARAD encumbered ships, the Spirit River and the Hondo River have an estimated value of between $11.1 and $14.9 million. After deducting the prior lien in favor of the MARAD in the amount of approximately $5 million, the Debtors believe that these ships have a value to the estates between $6.1 and $9.9 million.[12] The Debtors estimate that the pledge of 100% of Trico Marine Services (Hong Kong) Limited is worth $26.3 million because that entity owns a 49% JV interest in EMSL which has assets that are appraised

---

[12] Although the transaction contemplated by the September Sale Motion did not close, that motion included an allocation of $7.55 million in purchase price to the Spirit River. The value of the Walker I, a thirty year old ship, which is not encumbered, is estimated to be no more than $300,000.

MOTION OF THE DEBTORS FOR
EMERGENCY USE OF CASH COLLATERAL

at $53.6 million. Further, the Debtors estimate that the pledge of 100% of TMO's 49% stake in NAMESE has an estimated value of approximately $5.0 million.

25. For ease of reference, attached as **Exhibit E** hereto is a chart which compares the collateral for the First Lien Credit Facility and the DIP Facility, with the additional collateral currently securing the DIP Facility being available as Adequate Protection Liens.

26. Third, the Debtors intend to grant Tennenbaum a superpriority claim against each of the Debtors as provided in § 507(b) of the Bankruptcy Code (the "Superpriority Claim") to the extent of any diminution in the value of Tennenbaum's interest in its collateral, subject only to the Carve-Out.

27. Fourth, the Debtors intend to utilize Cash Collateral during the Interim Period only in accordance with the Budget, which is based on the Debtors' business judgment and contains only those reasonable and necessary expenses required to fund the remaining orderly sale and wind-down of the estates.[13] The total amount of disbursements contemplated by the Budget for the Interim Period is approximately $3 million.

28. Fifth, to the extent that adequate funds are available, the Debtors will pay the reasonable postpetition fees and expenses incurred by Latham & Watkins LLP and Young, Conaway, Stargatt & Taylor LLP in their respective capacity as counsel to the Agent, and such other legal or financial professionals appropriately retained by Tennenbaum and the Agent.

29. With respect to the Second Lien Creditors, the Debtors propose to grant them additional and replacement security interests and liens (the "Second Lien Adequate Protection Liens") in and upon all of the Debtors' assets and causes of action, excluding only avoidance

---

[13] The Debtors note that the disbursement items contained in the Budget attached hereto were provided to Tennenbaum prior to the filing of this Motion and Tennenbaum did not object to the proposed disbursements.

actions, which liens shall be junior and subordinate only to the liens securing the DIP Facility, the Adequate Protection Liens granted to Tennenbaum and the Carve-Out.

30. The Debtors submit that the adequate protection proposed above for Tennenbaum and the Second Lien Creditors is necessary and appropriate to ensure that the Debtors can continue to use their secured lenders' Cash Collateral and adequately protects their interest in their collateral. Among other things, because the significant value of the assets currently proposed to be sold, as well as the unencumbered assets upon which both secured creditors are receiving replacement liens, it is clear that both Tennenbaum and the Second Lien Creditors are adequately protected by the adequate protection package proposed herein.

31. Accordingly, the Debtors believe that the adequate protection proposed by the Debtors more than justifies the continued use of Cash Collateral under the facts and circumstances of this matter, and is fair, reasonable and sufficient to satisfy the requirements of § 362(c)(2) and (e) of the Bankruptcy Code. Moreover, Courts in this district have granted similar relief in other recent chapter 11 cases. *See, e.g., In re Hawaiian Telcom Commc'ns., Inc.*, No. 08-13086 (PJW) (Bankr. D. Del. Nov 26, 2008) (interim order); *In re Internet Corp.*, No. 08-11859 (KG) (Bankr. D. Del. Sept. 19, 2008) (amended Nov. 14, 2008); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008).

32. In addition, Bankruptcy Rule 9006(b) vests the Court with authority to enlarge any specified period prescribed by a court order for an act to be permitted for cause shown with or without motion or notice if the request is made prior to the expiration of the period. *See* FED. R. BANKR. P. 9006(b). Under the Interim DIP Order, the Debtors are permitted to use Cash Collateral for five days (Interim DIP Order, ¶ 3) or five Business Days (Interim DIP Order, ¶ 21)

after termination of the DIP Facility. The Debtors respectfully assert that the facts and circumstances here constitute "cause" justifying the extension of the Debtors' ability to use Cash Collateral beyond the limited period prescribed by the Interim DIP Order.

33. Finally, the Debtors request in connection with the relief requested herein, and pursuant the Court's express jurisdiction set forth in Section 21(c) of the Interim DIP Order, that Tennenbaum and the Second Lien Creditors be enjoined from exercising any and all rights and remedies they may have under the DIP Financing Agreement, the First Lien Credit Facility, the Interim DIP Order and the indenture governing the Second Lien Notes from the date hereof through the date of the Final Hearing.

### Compliance With Local Rule 4001-2

34. Local Bankruptcy Court Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") requires any motion seeking approval of a cash collateral order to highlight certain provisions. The Interim Order contains the following provisions that must be identified and explained pursuant to this rule: A carve-out with respect to fees for professionals retained by the Debtors and the creditors committee and the other typical statutory fees. The fees paid to professionals retained by the Debtors and the Creditors' Committee in the Carve-Out are competitive within the market of services offered by other professionals performing work of similar complexity and sophistication.

### Request for Final Hearing

35. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that a Final Hearing on the use of the Cash Collateral should be held no later than November 29,

2010, subject to the Court's schedule, and that the court fix the time and date prior to the final hearing on the Motion for parties to file objections to the Motion.

## NOTICE

36. Notice of this Motion has been provided by e-mail, facsimile, or overnight delivery to: (a) the Office of the United States Trustee for the District of Delaware; (b) Tennenbaum, as lender for the U.S. Credit Facility; (c) Obsidian, as administrative agent and collateral agent for the U.S. Credit Facility; (d) Nordea, as lender for the Trico Shipping W/C Facility and as administrative agent and collateral agent for the U.S. Credit Facility; (e) U.S. Bank, as Trustee and collateral agent for the Secured Notes; (f) Wells Fargo Bank, as Trustee for the 3% Notes; (g) Unicredit, as lender for the Trico Shipping W/C Facility; (h) Deutsche Bank National Trust Company, as Trustee for the High Yield Notes; (i) Wilmington Trust FSB, as collateral agent to the intercreditor agreement between the Trico Shipping W/C Facility and the High Yield Notes; (j) those persons who have formally appeared in these Cases and requested service pursuant to Bankruptcy Rule 2002; (k) counsel to the Official Committee of Unsecured Creditors; and (l) all applicable government agencies to the extent required by the Bankruptcy Rules and the Local Rules.

## PRAYER

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as the Court deems just and proper.

November 10, 2010
Wilmington, Delaware

Respectfully submitted,

_____
Robert J. Dehney (No. 3578)
Gregory T. Donilon (No. 4244)
Andrew R. Remming (No. 5120)
L. John Bird (No. 5310)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Tel: 302.658.9200
Fax: 302.658.3989

-and-

John E. Mitchell
Steven M. Abramowitz
Alexandra S. Kelly
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Tel: 214.220.7700
Fax: 214.999.7787
jmitchell@velaw.com
sabramowitz@velaw.com
akelly@velaw.com

*Attorneys for the Debtors and Debtors-in-Possession*