# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**TRICO MARINE SERVICES, INC.,** *et al.,*<br><br>**Debtors** | Chapter 11<br><br>Case No. 10-12653 (BLS)<br><br>Jointly Administered |
| **TRICO MARINE SERVICES, INC., TRICO MARINE ASSETS, INC., TRICO MARINE OPERATORS, INC., TRICO MARINE INTERNATIONAL, INC., TRICO HOLDCO, LLC, AND TRICO MARINE CAYMAN, L.P.**<br><br>**Plaintiffs**<br><br>v.<br><br>**OBSIDIAN AGENCY SERVICES, INC, AS AGENT, AND TENNENBAUM DIP OPPORTUNITY FUND, LLC, TENNENBAUM OPPORTUNITIES PARTNERS V, LP, AND SPECIAL VALUE CONTINUATION PARTNERS, LP, AS LENDERS.**<br>   **Defendants** | Adversary No. _____ |

## DEBTORS' VERIFIED COMPLAINT FOR IMMEDIATE INJUNCTIVE RELIEF

Debtors Trico Marine Services, Inc. ("TMS"), Trico Marine Assets, Inc. ("TMA"), Trico Marine Operators, Inc. ("TMO"), Trico Marine International, Inc. ("TMI"), Trico Holdco, LLC ("Holdco"), and Trico Marine Cayman, L.P. ("Cayman") (collectively, the "Debtors") file this Verified Complaint for Immediate Injunctive Relief and allege as follows:

## I. PRELIMINARY STATEMENT

1. Debtors are part of an interconnected and interrelated family of entities known as the Trico Marine Group. On August 25, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), thereby initiating the bankruptcy cases pending in this Court. The Debtors are operating and managing their businesses and assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. On August 24, 2010, TMS, as borrower, along with certain of its affiliates as guarantors, entered into a Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (the "DIP Financing Agreement") with Obsidian Agency Services, Inc., as agent ("Agent"), and Tennenbaum DIP Opportunity Fund, LLC, Tennenbaum Opportunities Partners V, LP, and Special Value Continuation Partners, LP (collectively, "Tennenbaum" or the "DIP Lenders") as lenders, pursuant to which certain financing (the "DIP Loan") was made available to the Debtors in accordance with this Court's Amended Interim Order dated September 7, 2010 [Dkt. No. 95] (the "Interim DIP Order").

3. On November 8, 2010, Agent faxed the Debtors a letter claiming that Events of Default (as defined in the DIP Financing Agreement) had occurred under the DIP Financing Agreement (the "Termination Notice"). The Termination Notice is attached hereto as Exhibit A.

4. The Termination Notice states Agent's intent to, among other things, terminate Debtors' access to Cash Collateral (as defined in the DIP Financing Agreement), terminate any outstanding Commitments (as defined in the DIP Financing Agreement), and pursue remedies under the DIP Financing Agreement after the termination of the "Waiting Period" described in Section 11.32 of the DIP Financing Agreement and paragraph 21(a)(ii) of the Interim DIP Order.

Such Waiting Period is "five (5) business days" and terminates on the close of business on November 16, 2010.[1]

5. Debtors are actively engaged in the process of selling sufficient assets to repay in full the amounts owing under the DIP Financing Agreement (the "Sales Processes"). These Sales Processes are expected to be completed within the next forty-five days. The exercise of remedies as threatened by the DIP Lenders would compromise the Sales Processes and prevent the Debtors from successfully maximizing the value of their assets.

6. Debtors file this Complaint seeking immediate injunctive relief to prevent immediate and irreparable harm to their efforts to maximize value for the benefit of the estates and their creditors. Debtors ask this Court to preserve the *status quo* with respect to the DIP Financing Agreement while the Sales Processes are completed in the next forty-five days. Allowing the Sales Processes to be completed will allow the DIP Loan to be paid in full. Without this relief, Debtors will suffer immediate and irreparable harm because their ability to operate in chapter 11 and maximize value for all of their creditors will be jeopardized. Tennenbaum will not suffer any adverse effects if the relief requested by this Complaint is granted because it is adequately protected and will collect all amounts owed to it, with interest, no later than forty-five days from now. Therefore, Debtors seek immediate injunctive relief to ensure that no rights or remedies will be pursued by Defendants until the Sales Processes conclude, thus protecting Debtors and their creditors from imminent, irreparable harm.

## II. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over these bankruptcy cases (the "Cases") pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference entered by

---

[1] Upon information and belief, Agent and Tennenbaum contend that the Waiting Period terminates on November 13, 2010; however, this contention is contradicted by paragraph 21(a)(ii) of the Interim DIP Order.

3

the U.S. District Court for the District of Delaware on or about September 3, 2001. Furthermore, the Court has exclusive jurisdiction pursuant to the Interim DIP Order. *See* Interim DIP Order, ¶21(c) ("This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of Bankruptcy Code section 362(a), use of Cash Collateral, or other injunctive relief requested.").

8. This adversary proceeding is initiated under Rule 7001(8) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the relief requested herein may be ordered pursuant to Rule 65 of the Federal Rules of Civil Procedure, made applicable hereto by Bankruptcy Rule 7065, and Bankruptcy Code § 105(a).

9. This proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Should the Court determine that any aspect of this proceeding is non-core in nature, however, then pursuant to 28 U.S.C. § 157(c)(2), the Debtors hereby consent to the Court's hearing and determination of such non-core matters and to the entry of final judgment thereon.

10. Venue is proper in this Court under 28 U.S.C. § 1409(a).

### III. FACTS

11. Plaintiffs-Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code to reorganize or restructure their debts and business operations. Debtor TMS is the parent company of 43 direct and indirect subsidiaries that operate as one closely interrelated and interdependent family of enterprises (collectively, the "Trico Marine Group"). Each enterprise builds on and supports the overall operations of the collective Trico Marine Group. The Trico Marine Group specializes in offshore towing and supply services, subsea trenching and protection, and inspection, maintenance, repair, and survey of underwater cables

and pipelines. The Trico Marine Group serves clients around the world, including in the North Sea, West Africa, Mexico, Brazil, and the Asia Pacific Region.

12. The Trico Marine Group has been serving oil and gas companies since the early 1990s. Through its subsidiaries, it has acquired a fleet of state-of-the-art vessels and subsea equipment and established a design and engineering solutions team that enables the exploration, construction, inspection, maintenance, repair, production, and decommissioning of offshore wells. The Trico Marine Group also owns a fleet of vessels and equipment for subsea trenching and protection services.

A. **Need for Restructuring.**

13. During 2009 and into 2010 there was a significant reduction in the level of operating and capital expenditures in the offshore oil and gas industries, as well as other industries that would require offshore services such as those provided by the Debtors. This reduction in demand was driven principally by the global economic slowdown that occurred during 2009. The Debtors provide services that relate to projects with a significant investment requirement as well as a significant lead time in developing and executing. As a result, the Debtors, and the companies to which the Debtors provide services, are susceptible to wide variations in supply and demand, commodity and currency fluctuations, changing regulatory regimes, political instability, and security concerns. Additionally, as the prices of oil and natural gas decline or are depressed, drilling and construction activities in the regions in which the Debtors operate decline or remain stagnant. As the Debtors serve industries where there is a long lead time for investment, perceptions regarding global economic growth as well as perceptions regarding commodity prices impact investment decisions, and, thus, impact demand for the Debtors' services. In addition, the business of the Debtors is seasonal and depends in part

on weather conditions. Thus, the financial results of certain quarters are impacted by changing weather conditions, particularly the winter months in the North Sea.

14. As a result of the decline in oil and gas prices, a decline in utilization and day rates in the towing and supply businesses driven by reduced exploration and production spending and an increase in the supply of vessels, the Debtors were faced with insufficient liquidity to service their debts and obligations. From June 27, 2010, through the Petition Date, the Debtors aggressively pursued negotiations over a consensual restructuring. Due to the many interests of the various creditor groups, however, no consensual restructuring plan was achieved.

15. Debtors explored alternative proposals with financial institutions for meeting their obligations but these efforts proved unsuccessful. As a result, Debtors filed for bankruptcy protection to reorganize their businesses and preserve value for the benefit of creditors and other stakeholders and to take strategic action to overcome their liquidity constraints.

**B.     The DIP Loan and the DIP Agreement.**

16. On August 24, 2010, TMS, as borrower, along with certain of its affiliates as guarantors, entered into the DIP Financing Agreement with Agent and Tennenbaum, pursuant to which up to $10 million in debtor-in-possession financing was to be made available to the Debtors. The DIP Financing Agreement was to provide for a $35 million debtor-in-possession credit facility, $25 million of which was to refinance or "roll up" the Debtors' obligations under a pre-petition loan facility (the "First Lien Credit Facility"), and $10 million of which was to be "new money" loans to the Debtors' estates upon the Court's entry of an interim order. To date, however, after giving effect to funds in the advance account which are unavailable to the Debtors, Tennenbaum has advanced the principal amount of only approximately $3,500,000 as "new money" under the DIP Loan since these cases were filed.

17. Certain Events of Default have allegedly occurred under the DIP Financing Agreement, and the Agent has threatened to exercise remedies under the DIP Financing Agreement, the Interim Order (as defined in the DIP Financing Agreement) and the First Lien Credit Facility. Specifically, on November 8, 2010, the Agent sent the Termination Notice to TMS, a document in which Agent threatens to, among other things, terminate Debtor's access to Cash Collateral,[2] terminate any outstanding Commitments, and pursue remedies under the DIP Financing Agreement after the termination of the Waiting Period described in Section 11.32 of the DIP Financing Agreement and paragraph 21(a)(ii) of the Interim DIP Order.[3] The Termination Notice further directs TMS to proceed with a sale of all assets of the Debtors as purportedly required by Section 22 of the Interim DIP Order.

C. **The Sales Processes.**

18. Debtors are in the process of conducting asset sales that will produce sufficient cash to repay in full the pre-petition and post-petition amounts owing to Defendants under the DIP Financing Agreement.

19. Specifically, Debtors have agreed to the following vessel sales:

| Asset | Status | Gross Sale Price | Estimated Closing Date |
| --- | --- | --- | --- |
| Trinity River | Motion filed; Docket No. 387 | $1,000,000 | (unknown) (subject to engine repair) |
| Suwanee River | Motion filed; Docket No. 387 | $950,000 | Before December 15, 2010 |
| Roe River | Motion filed; Docket No. 387 | $1,200,000 | Before December 15, 2010 |

---

[2] Capitalized terms not defined herein have the meanings given in the DIP Financing Agreement and Interim DIP Order.
[3] Pursuant to the Interim DIP Order, "[t]his Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of Bankruptcy Code section 362(a), use of Cash Collateral, or other injunctive relief requested."

| Oak River | Motion filed; Docket No. 387 | $950,000 | Before December 15, 2010 |
| --- | --- | --- | --- |
| Elm River | Motion filed; Docket No. 387 | $1,700,000 | Before December 15, 2010 |
| Carson River, East River, Powder River | Motion filed; Docket No. 389 (deposit received) | $1,500,000 (total price for three ships) | As soon as November 10, 2010 |
| Trico Mystic and Trico Moon | Motions filed; Dockets No. 253, 376 and 391 | $26,000,000 (total price for two ships; $13 million each) | November 29 – December 15 for Moon: December 31, 2010 for Mystic |

20. The approximately $33,000,000 that will be generated by the Sales Processes will be used to pay off the approximately $3,500,000 of post-petition debt owing under the DIP Loan, as well as all other amounts (including pre-petition amounts) owed to the DIP Lenders. Thus, upon completion of the Sales Processes, the Debtors will repay, in full, the amounts owing under the DIP Financing Agreement, together with any interest owing thereunder.

21. In addition to the amounts generated by the Sales Processes, the Debtors expect to receive approximately $3,179,192 by November 27, 2010, as a result of (a) the return of a security deposit from General Electric in the amount of $1,697,512, and (b) the return of Cash Collateral relating to letters of credit of $1,806,680, less a $325,000 holdback. Additionally, the Debtors expect to receive approximately $750,000 per month in reimbursement for shared expenses from certain non-debtor subsidiaries.[4]

### D. The Sales Processes were Contemplated when the DIP Loan was Put in Place.

22. The parties, including the DIP Lenders, knew that the DIP Loan would not provide the liquidity needed by the Debtors' estates through confirmation of a Plan. *See, e.g.*, Declaration of John R. Castellano in Support of DIP Financing Motion at ¶ 9 [Dkt. No. 15.] Indeed, Debtors had been evaluating and contemplating asset sales in accordance with a long-

---

[4] *See Revised Order Granting Debtors' Motion to Execute Amended Credit Documents* [Dkt. No. 278].

term business strategy to bring additional working capital into the estates even before seeking bankruptcy protection. *Id.*

23. Furthermore, the Debtors have been actively engaged with other potential DIP lenders to repay the amounts owed to Tennenbaum and to obtain financing necessary to operate during this Chapter 11 process.

E. **Remedies upon Event of Default.**

24. Section 21(a) of the Interim DIP Order provides that if an Event of Default occurs under the DIP Financing Agreement, DIP Lenders may exercise "all rights and remedies" provided in the DIP Financing Agreement or the Interim DIP Order. *See* Interim DIP Order ¶ 21(a)(ii). The remedies that the DIP Lenders may try to pursue include terminating Debtors' use of Cash Collateral, ending Debtors' access to the funds in the Advance Account, terminating outstanding Commitments under the DIP Financing Agreement, requiring the sale of all of the Debtors' assets, and undertaking other actions inconsistent with Debtors' efforts and operations in these Cases. *See* Ex. A [Termination Letter].

F. **The DIP Lenders Exercising their Remedies Would Have a Devastating Impact on the Debtors' Ability to Operate in Chapter 11 Through Plan Confirmation.**

25. If the DIP Lenders were to exercise remedies prior to the Sales Processes being completed, the Debtors would face immediate, irreparable harm that would severely threaten their ability to continue operating in chapter 11 through the date of confirmation of a liquidating chapter 11 plan.

26. Allowing the Defendants to exercise remedies serves neither the intent of chapter 11 nor the Defendants' own interest. Even if no remedies are exercised right now, the DIP Lenders will be repaid in full with interest. If, however, the DIP Lenders are allowed to pursue

remedies against the Debtors now, it will significantly impair the Debtors' ability to maximize the value of their assets.

27. In order to maximize the value of the Debtors' estates, Debtors must have the ability to complete the Sales Processes in an orderly manner. If the DIP Lenders prevent the Debtors from using Cash Collateral, Debtors will be irreparably harmed because the use of Cash Collateral is necessary to meet payroll and other operating expenses, obtain needed supplies, protect the Debtors' assets by maintaining necessary insurance, meet other operating expenses necessary to maintain the Debtors' value in these Cases, and continue the orderly liquidation process.

### G. Attempt to Avoid Court Intervention.

28. To prevent any such interference with the chapter 11 process, Debtors have sought in good faith to negotiate a form of final financing order with the DIP Lenders that would allow the Debtors to operate pending the outcome of the Sales Processes. The DIP Lenders have refused to reach a reasonable agreement with the Debtors and insist on exercising remedies under the DIP Financing Agreement. The Debtors also have engaged in extensive negotiations with a group of holders of Second Lien Notes regarding a replacement debtor-in-possession facility that would take out Tennenbaum completely and provide additional liquidity to the Debtors. Although there can be no assurance that the Debtors and such holders will reach agreement on the terms of a replacement facility, the Debtors intend to continue down that path during the requested period of additional cash collateral usage.

## IV. CLAIMS

### A. Count One - Entry of an Emergency Section 105 Injunction to Protect the Debtors' Reorganization Efforts.

29. The Debtors hereby re-allege and incorporate paragraphs 1-28 above.

30. Debtors are diligently and in good faith pursuing all appropriate steps to file a chapter 11 plan as soon as possible.

31. Furthermore, the Sales Processes are under way and will be consummated unless the Defendants are allowed to exercise remedies under the DIP Financing Agreement or the Interim DIP Order. If the Sales Processes are allowed to proceed, the Defendants will be repaid in full.

32. The likelihood of irreparable harm to the Debtors in the absence of injunctive relief far outweighs any harm to the DIP Lenders. Failure to enjoin the Defendants from acting against the Debtors and their assets would lead to immediate and irreparable harm to Debtors' efforts to maximize value in these chapter 11 proceedings, while issuing an injunction would not harm the DIP Lenders because an injunction is sought for the limited purpose of allowing the Debtors to complete the Sales Processes, allowing the DIP Lenders to be paid in full.

33. Without immediate entry of a § 105 injunction, there is a clear and present danger of immediate and irreparable interference with the Debtors' ability to maximize value through the chapter 11 process. If Defendants take the actions that Debtors hereby seek to enjoin, Debtors could immediately be forced into a chapter 7 liquidation, harming the Debtors and their creditor constituencies.

34. By reason of the foregoing, Debtors are entitled to the issuance of an emergency temporary injunction under § 105(a) of the Bankruptcy Code against Defendants and their officers, agents, servants, employees, attorneys, and persons who are in active concert with them to prevent immediate, irreparable harm to Debtors, allow the Sales Processes to run their course, allow for the collection of proceeds from the Sales Processes, repay the DIP Lenders, and maximize the value of the Debtors' estates.

B.  **Count II - Entry of Temporary Restraining Order To Protect Debtors' Chapter 11 Plan Efforts.**

35. The Debtors hereby re-allege and incorporate paragraphs 1-34 above.

36. A temporary restraining order is needed to prevent immediate, irreparable harm to Debtors, for which no adequate remedy at law exists to redress.

37. By contrast, the Defendants suffer no harm by the entry of a temporary restraining order. The Debtors only seek a brief injunction to allow the Sales Processes to occur. Defendants will in no way be prejudiced by such an injunction. To the contrary, the issuance of a temporary restraining order will allow the Debtors to pay the Defendants in full with interest.

38. To prevent the foregoing harmful effects upon the Debtors' chapter 11 plan efforts, a temporary restraining order should issue prohibiting and enjoining Defendants and their officers, agents, servants, employees, attorneys, and persons who are in active concert with them from filing or continuing to prosecute any action against the Debtors or their assets until this Court has issued a ruling on the Debtors' request for preliminary injunctive relief.

C.  **Debtors Are Entitled to Reinstatement of the Automatic Stay Under 11 U.S.C. § 362.**

39. The Debtors hereby re-allege and incorporate paragraphs 1-38 above.

40. Unless the automatic stay is reinstated, Defendants threaten to take rushed actions to force a hasty sale of the Debtors' assets that will result in diminished value received for those assets, thus substantially threatening the rights and interests of other creditors, especially unsecured creditors.

41. Defendants' rush to force a self-serving sale jeopardize the completion of the orderly sales process currently underway, one that will maximize value for all creditors – both secured and unsecured alike – while paying in full all debts owed to the admittedly overly-secured Defendants.

42. As a result, the automatic stay should be reinstated to permit the Sales Processes to conclude for the benefit of secured and unsecured creditors alike.

## V. PRAYER FOR RELIEF

For all the reasons discussed above, Debtors TMS, TMA, TMO, TMI, Holdco, and Cayman respectfully request that the Court enter an emergency temporary restraining order, reinstate the automatic stay, and, after notice and hearing, enter a temporary and preliminary injunction staying, restraining, and enjoining Defendants and their officers, agents, servants, employees, attorneys, and persons who are in active concert with them from:

a. Interfering with the availability of the balance in the Advance Account to the Debtors;

b. Interfering with or terminating the Debtors' use of any Cash Collateral;

c. Terminating any outstanding Commitments;

d. Requiring or seeking to require the sale of all or substantially all assets of the Debtors;

e. Seizing, liquidating, or taking any action against any collateral pledged as security under the DIP Loan;

f. Exercising any rights of control over or otherwise taking action against accounts of the Debtors;

g. Exercising any other remedies under the DIP Financing Agreement without prior approval of this Court; and

h. Otherwise taking any action that may interfere with Debtors' ability to operate in chapter 11 without first obtaining approval of this Court, including, without limitation, state law foreclosure actions.

i. Such other and further relief as the Court deems appropriate.

November 10, 2010
Wilmington, Delaware

Respectfully submitted,

/s/ *Robert J. Dehney*

Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
L. John Bird (No. 5310)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Tel: 302.658.9200
Fax: 302.658.3989

-and-

John E. Mitchell
Angela B. Degeyter
John Paul K. Napier
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
jmitchell@velaw.com
adegeyter@velaw.com
jnapier@velaw.com

*Attorneys for the Debtors and Debtors-in-Possession*

3894473