| | |
|---|---|
| In re:<br><br>TRICO MARINE SERVICES, INC., *ET AL.*<br><br>Debtors | Chapter 11<br><br>Case No. 10-12653 (BLS)<br><br>Hearing Date: December 14, 2010<br>Hearing Time: 1:30 PM<br><br>Objection Deadline: December 7, 2010 at 4:00PM |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING AND AUTHORITY TO PROSECUTE CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby moves (the "Motion") for entry of an order authorizing the Committee to prosecute certain claims and causes of action on behalf of the Debtors' estates including, among others, claims (i) to avoid and recover fraudulent conveyances and (ii) to recovery intercompany claims against the Debtors' non-debtor affiliates. In support of the Motion, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT[1]

1.      In 2007 and 2008, the Debtors and their non-debtor affiliates embarked on a speculative and ultimately disastrous acquisition campaign. Sensing that the Debtors' business prospects were fading with the age of its fleet and fueled by the quest to profit from unsustainably high oil prices, the Debtors acquired Active Subsea in November 2007 for $247

---

[1]      Capitalized terms used but not defined in this Preliminary Statement shall have the meanings assigned to them in the body of this Motion.

million and then proceeded to acquire Deep Ocean in May and June 2008 for an additional $800 million, including $280 million in assumed debt that Deep Ocean accumulated as a result of its recent purchase of CTC Marine. This acquisition campaign depleted the Debtors' existing cash resources and required the Debtors to borrow massive amounts to finance the acquisitions. Trico Supply and Trico Shipping, two non-debtor subsidiaries based in Norway, were the acquisition vehicles. The Debtors provided a large portion of the necessary funding through the following intercompany loans:

- A $194 Million Note issued by Trico Supply in favor of Trico Marine Operators in November 2007;

- A $33 Million Loan by Trico Marine Cayman to Trico Supply in November 2007; and

- A $395 Million Intercompany Loan from Trico Marine to Trico Shipping in May 2008.

2.      Following the acquisitions, oil prices plummeted, and the financial condition of the Debtors, their subsidiaries and the newly acquired businesses -- each now burdened by an unsustainably high debt load -- further eroded. Rather than restructuring their debts through bankruptcy or consent, the Debtors compounded the harm caused by the acquisition by choosing instead to have Trico Shipping issue $400 million in High Yield Notes in October 2009. The High Yield Notes Transaction further weakened the Debtors' tenuous financial condition by subordinating payment of the intercompany loans to the High Yield Notes, which became worthless as a result.

3.      The Committee has satisfied all of the requirements for derivative standing articulated in *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) and its progeny. Where, as here, a debtor's

2161169v1
11/24/2010 8:07 PM

board and management have not prosecuted – and, indeed, cannot prosecute because of obvious conflicts of interest – colorable and potentially valuable claims owned by a bankruptcy estate, the official committee of unsecured creditors should be granted derivative standing to prosecute such claims.

4.    The Committee's proposed claims are clearly colorable and valuable. The claims largely hinge on the insolvency of the Debtors and their subsidiaries. Here, there is no doubt that the Debtors and their subsidiaries were rendered deeply insolvent by the High Yield Notes Transaction, and, as explained below, the Debtors received less than reasonably equivalent value for the subordination of the intercompany loans to the High Yield Notes. Nor is there any doubt that, if successful, the claims would substantially benefit the estate: the claims that the Committee seeks to assert would redress the significant harm to the Debtors and their creditors primarily through the High Yield Notes Transaction by avoiding over $400 million of debt and recovering on intercompany loans worth hundreds of millions of dollars.

5.    Accordingly, for all of the reasons set forth herein, the Court should grant the Committee standing to prosecute claims and causes of action relating to the High Yield Notes' issuance and for the recovery of all intercompany loans against the Debtors' non-debtor subsidiaries.

## JURISDICTION

6.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief requested herein are sections 105(a), 1103(c)(5), 1107(a) and 1109(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

2161169v1
11/24/2010 8:07 PM

## PROCEDURAL BACKGROUND

7.      On August 25, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy cases (the "Chapter 11 Cases").[2]

8.      Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

9.      On September 7, 2010, the United States Trustee for the District of Delaware (the "U.S. Trustee") held a meeting to form a committee to represent the interests of all unsecured creditors in the Chapter 11 Cases.

10.     On September 8, 2010, the U.S. Trustee filed a notice of appointment of the Committee, the members of which are: (i) Wells Fargo Bank, N.A., as Indenture Trustee; (ii) Frank E. Williams, Junior; (iii) Joseph S. Compofelice; (iv) Astoundry, Inc.; and (v) Discovery Group, Inc. [Docket No. 97].

## FACTUAL BACKGROUND

### A.      EVENTS LEADING UP TO THE ISSUANCE OF THE 11⅞ NOTES.

11.     Trico Marine, through Debtor and non-debtor subsidiaries, provides subsea services, subsea trenching and protection services and towing and supply services and vessels, primarily to oil and natural gas exploration and production companies that operate in major

---

[2]      The Debtors are the following entities (followed by the last four digits of their tax identification numbers): Trico Marine Services, Inc. ("Trico Marine") (2405); Trico Marine Assets, Inc. ("Trico Marine Assets") (5404); Trico Marine Operators, Inc. ("Trico Marine Operators") (6124); Trico Marine International, Inc. ("Trico Marine International") (3132); Trico Holdco, LLC ("Trico Holdco") (3870); Trico Marine Cayman, L.P. ("Trico Marine Cayman") (5842). The mailing address for all of the Debtors for the purpose of these Cases is 10001 Woodloch Forest Drive, Suite 610, The Woodlands, TX 77380.

offshore oil and gas producing regions around the world. Typically the Debtors' business generates higher profits and revenues as the price of oil increases.

12. Below is a simplified organizational chart of the Debtors and the Non-Debtor OpCos:



13. In November 2007, Trico Supply acquired Active Subsea ASA ("Active Subsea") for $247 million. The primary source of the funds for this acquisition was $150 million 3% Senior Convertible Notes due 2027 ("3% Notes") issued by Trico Marine in March 2007. In addition, Trico Supply issued a Promissory Note dated November 8, 2007 to Trico Marine Operators, a Debtor and direct subsidiary of Trico Marine in the approximate amount of $194 million (the "$194 Million Note"). Trico Supply also entered into a Loan Agreement with Trico Marine Cayman pursuant to which Trico Supply borrowed approximately $33 million (the "33 Million Loan"). The principal assets of Active Subsea were eight ships under construction.

14. In May and June 2008, Trico Shipping acquired Deep Ocean ASA ("Deep Ocean") for approximately $800 million, which included the assumption of $280 million in existing debt that Deep Ocean had incurred largely as a result of its acquisition of CTC Marine

Projects, Ltd. ("CTC Marine"). Trico Marine financed the acquisition with a number of borrowings including the following:

    a.      Trico Marine sold $300 million of 6.50% convertible debentures in May 2008 (the "6.50% Debentures");

    b.      Trico Marine loaned $395 million to Trico Shipping pursuant to a Subordinated Loan Agreement dated May 15, 2008 (the "$395 Million Intercompany Loan");

    c.      Trico Shipping entered into a $200 million revolving credit facility with various lenders and Nordea Bank Finland PLC, New York Branch ("Nordea") as administrative agent (the "$200 Million Credit Facility"); and

    d.      Trico Subsea AS ("Trico Subsea"), a subsidiary of Trico Shipping, entered into a $100 million revolving credit facility with various lenders and Nordea as administrative agent (the "$100 Million Credit Facility"). Trico Shipping subsequently guaranteed the $100 Million Credit Facility.

    15.    In connection with the $395 Million Intercompany Loan, Trico Shipping and Trico Marine agreed to subordinate Trico Shipping's obligations under the $395 Million Intercompany Loan to Trico Shipping's obligations under the $200 Million Credit Facility. On information and belief, the $395 Million Intercompany Loan was not subordinate to any other debt of Trico Shipping.

    16.    Trico Shipping acquired Deep Ocean subject to approximately $280 million owed by Deep Ocean and Deep Ocean's subsidiaries under various debt facilities (the "Deep Ocean Assumed Facilities").[3]

---

[3]     The Deep Ocean Assumed Facilities included the following:

    a.      Norwegian Kroner ("NOK") 350 million Revolving Credit Facility provided by Sparebank secured by a vessel owned by a subsidiary of Deep Ocean;

    b.      NOK 230 million Revolving Credit Facility provided by Sparebank and secured by inventory and other assets of Deep Ocean and its subsidiaries including stock pledges;

    c.      NOK 150 million Term Loan provided by Sparebank and secured by inventory and other assets of Deep Ocean and its subsidiaries including stock pledges;

    d.      NOK 200 million Overdraft Facility provided by Sparebank and secured by inventory and other assets of Deep Ocean and its subsidiaries including stock pledges;

    e.      €23.3 million Revolving Credit Facility provided by Nordea Bank Norge ASA and secured by a vessel owned by a subsidiary of Deep Ocean;

17.     Following Trico Shipping's acquisition of Deep Ocean, in a series of steps completed in December of 2008 and January of 2009, Deep Ocean transferred to Trico Supply its ownership of certain Deep Ocean and certain of its subsidiaries. According to Trico Marine's financial statements, these steps were taken to satisfy Norwegian tax law.

18.     As a result of the acquisitions of Active Subsea and Deep Ocean, Trico Marine abruptly changed from being a cash rich, low debt enterprise to one that was highly leveraged. The credit crunch that occurred in 2008 and the sharp decline in oil prices in the second half of 2008 caused a severe deterioration in revenue and significantly exacerbated Trico Marine's heavy debt load resulting from the acquisitions. Trico Marine conceded the significant deterioration in its Annual Report on Form 10-K filed with the Securities Exchange Commission in March 2009 ("2009 10-K"):

    a.    "We are highly leveraged. As of December 31, 2008, our total indebtedness was $805.9 million, which represents approximately 84.9% of our capitalization. Our interest expense in 2008 was $31.9 million. Our substantial level of indebtedness may adversely affect our flexibility in responding to adverse changes in economic, business or market conditions, which could have a material adverse effect on our results of operations." 2009 10-K at 21.

    b.    "Due to the goodwill and intangible impairment taken at December 31, 2008, the Company received waivers and amendments related to its minimum net worth requirement as of December 31, 2008 and amended certain credit facilities on a go forward basis to exclude the effect of this impairment. . . . Continued compliance with our debt covenants are dependent upon us obtaining a minimum level of EBITDA and liquidity in 2009. Our forecasted EBITDA contains certain estimates and assumptions regarding new vessel deliveries, fleet utilization, average day rates, and operating and general and administrative expenses, which could prove to be inaccurate. A material deviation from one or more of these

---

    f.    $18 million Revolving Credit Facility provided by Nordea Bank Norge ASA and secured by a vessel owned by Deep Ocean;

    g.    £8 million Overdraft Facility provided by Barclays Bank PLC and secured by assets of subsidiaries of Deep Ocean;

    h.    £24.2 million Sterling Asset Financing Credit Facility provided by Barclays Bank PLC and secured by assets of subsidiaries of Deep Ocean; and

    i.    Various finance lease obligations of Deep Ocean and its subsidiaries.

estimates or assumptions could result in a violation of one or more of our covenants. If a violation were to occur, there are no assurances that we could obtain waivers or amendments to these covenants. Failure to obtain the necessary waivers or amendments would result in all or a portion of our debt becoming immediately due and payable." *Id.*

c.  "Global financial markets and economic conditions have been, and continue to be, disrupted and volatile. The debt and equity capital markets have been exceedingly distressed. . . . If our business does not generate sufficient cash flow from operations to enable us to pay our indebtedness or to fund our other liquidity needs, then, as a consequence of these changes in the credit markets, we cannot assure you that future borrowings will be available to us under our credit facilities in sufficient amounts. . . . Moreover, even if lenders and institutional investors are willing and able to provide adequate funding, interest rates may rise in the future and therefore increase the cost of borrowing we incur on any of our floating rate debt. Finally, we may need to refinance all or a portion of our indebtedness on or before maturity, sell assets, reduce or delay capital expenditures, seek additional equity financing or seek third-party financing to satisfy such obligations. We cannot assure you that we will be able to refinance any of our indebtedness on commercially reasonable terms or at all." *Id.* at 20-21.

19.  Because of Trico Marine's weakened financial condition and resulting covenant defaults, Trico Marine was forced to agree to refinance Deep Ocean's long-term debt ahead of schedule. Thus, Sparebank, the principal lender to Deep Ocean, forced Trico Marine to shorten the maturity date for all of its facilities to January 1, 2010 (the "Sparebank Facilities").

20.  Similarly, in May 2009, Trico Marine entered into exchange agreements with the holders of the 6.50% Debentures. Pursuant to the exchange agreements, Trico Marine exchanged the $253.5 million of 6.50% Debentures then outstanding for a combination of cash, common stock, warrants and $202.8 million of new 8.125% Debentures (the "8.125% Debentures"). The 8.125% Debentures were secured by a second lien on assets that secured Trico Marine's senior credit facility. This transaction furthered reduced Trico Marine's financial flexibility.

21.  Trico Marine's 2009 Annual Report included an opinion letter of PriceWaterhouseCoopers LLP ("PWC"), dated March 11, 2009, which did not contain a going

concern qualification. Indeed, the footnotes to the financial statements, while noting various factors that created "uncertainty," contained the statement that "we currently believe our liquidity and projected cash flows from operations will be sufficient to meet our cash requirements for the next twelve months and foreseeable future."

22.     However, on October 9, 2009, in connection with Trico Shipping's Offering Memorandum (the "11⅞ Offering Memorandum") concerning the sale of the High Yield Notes (discussed in Section B, *infra*), PWC modified its opinion to add a going concern qualification. PWC's modified opinion letter referred to revised footnotes in Trico Marine's financial statements stating that "the Company believes that its forecasted and available credit capacity *are not sufficient to meet its commitments as they come due over the next twelve months*." (emphasis added). The notes referenced the efforts to refinance the outstanding indebtedness of Trico Shipping and its subsidiaries and observed that

> [e]ven if the Company [i.e. Trico Marine] is able to refinance the debt of the Trico Supply Group [i.e. Trico Supply and its subsidiaries, including Trico Shipping, Deep Ocean and CTC Marine] and obtains waivers for any future covenant violations, its obligations and the obligations of the Trico Supply Group *will still impose significant restrictions on the Company and the Trico Supply Group which . . . could severely limit its ability to implement plans which would negatively impact future operations*.

11⅞ Offering Memorandum at F-9 (emphasis added).

**B.     THE HIGH YIELD NOTES AND ASSOCIATED REFINANCINGS.**

23.     Through the first nine months of 2009, Trico Marine engaged in extensive efforts to refinance Deep Ocean's debt that was maturing in early 2010. In addition to approximately $100 million due on the Sparebank Facilities, there was also approximately $20 million due in March 2010 on the €23.3 million Revolving Credit Facility.

9

24. Trico Marine could not refinance Deep Ocean's debt on commercially reasonable terms. However, rather than restructuring its debt under the Bankruptcy Code, on October 30, 2009, Trico Shipping issued $400 million of High Yield Notes (together with all the associated transactions and transfers, the "High Yield Notes Transaction") on terms that not only did not make any economic sense, but significantly weakened Trico Marine's, Trico Supply's and Trico Shipping's already tenuous financial condition.

25. Trico Shipping used the proceeds of the High Yield Notes to repay its remaining obligations under the $200 Million Credit Facility and the $100 Million Credit Facility totaling approximately $172 million. In addition, Trico Shipping used High Yield Notes proceeds to repay the obligations of Deep Ocean and its subsidiaries under the Deep Ocean Assumed Facilities. As a result of the issuance of the High Yield Notes, Trico Shipping's total debt increased from approximately $172 million to $400 million.

26. As part of the High Yield Notes Transaction, Trico Shipping, Trico Supply and each of their subsidiaries granted liens on virtually all of their assets to secure the High Yield Notes obligations. Trico Marine, Trico Marine Cayman and Trico Holdco – each a Debtor – guaranteed the High Yield Notes' repayment (the "HoldCo Guarantees"). Trico Marine's guaranty was secured by a lien on the $395 Million Intercompany Note and Trico Marine Cayman's guaranty was secured by a lien on the $33 Million Loan.

27. Also as part of the High Yield Notes Transaction, Trico Marine entered into an "Intercompany Subordination Agreement" (the "Intercompany Loan Transfer") dated as of October 30, 2009 (the "October 2009 Intercompany Subordination Agreement"), in which, among other things, Trico Marine agreed to subordinate all "Intercompany Debt" that it held against Trico Shipping, including the $395 Million Intercompany Loan, to the payment in full of

10

the High Yield Notes. Trico Marine agreed that no payment of any kind or character would be made on Intercompany Debt so long as the High Yield Notes remained outstanding other than payments specifically permitted by the Indenture. Section 4.08 of the High Yield Notes indenture limited payments on Intercompany Debt to Trico Marine to $5 million a year unless an event of default occurred in which case no payments were permitted.

28.     Thus, by executing the October 2009 Intercompany Subordination Agreement, Trico Marine subordinated payments under the $395 Million Intercompany Note to $400 million in debt as to both principal and interest payments, whereas before the High Yield Notes Transaction, the $395 Million Intercompany Note was subordinated to only $136 million of secured indebtedness.

29.     On March 16, 2010, Trico Marine issued its Annual Report for 2009. Despite the issuance of the High Yield Notes – or more, accurately because of the issuance of the High Yield Notes -- PWC again issued a qualified audit opinion. PWC observed that "the risk the Company may not successfully obtain amendments or waivers to financial covenants and/or the risk the Company may not have adequate liquidity to fund its operations or service its debt **raise substantial doubt about the Company's ability to continue as a going concern.**" 2009 10K at 70 (emphasis added).

30.     The negative impact of the High Yield Notes Transaction on Trico Shipping is further demonstrated by comparing the consolidating balance sheet of Trico Shipping as of September 30, 2009, contained in Trico Shipping's 10-Q for the period ending September 30, 2009, with the comparable consolidating balance sheet for Trico Shipping in Trico Marine's audited financial statements for the period ending December 31, 2009. According to the September 30, 2009 balance sheet, Trico Shipping's total equity was a negative $202,480,000.

2161169v1
11/24/2010 8:07 PM

This amount included long term debt of approximately $136 million and intercompany payables of approximately $432 million. As of December 31, 2009, the negative equity had jumped, as a direct consequence of the High Yield Notes Transaction, to a negative $312,485,000. This amount included long term debt of approximately $385 million and net intercompany debt of $138 million.

## C. THE DEBTORS' IMMEDIATE NEED TO RESTRUCTURE AFTER THE HIGH YIELD NOTE CLOSING.

31.     The High Yield Notes Transaction did nothing to improve Trico Marine's financial condition, but instead worsened it.

32.     Indeed, shortly thereafter, Trico Marine announced in May 2010 that it would be unable to make the approximately $8 million interest payment due on the 8.125% Debentures due on May 15, 2010 and that it had engaged a financial advisor to assist in a restructuring. In June 2010, Trico Marine entered into an amended and restated credit agreement whereby Tenennbaum Capital Partners, LLC replaced Nordea as Trico Marine's primary lender and committed to providing financing in the anticipation of the Debtors' likely chapter 11 filing. From June 2010 up to the Petition Date, the Debtors unsuccessfully attempted to negotiate a consensual restructuring of the Debtors and the Trico Supply Group.

## D. THE COMMITTEE'S INVESTIGATION AND THE SUBJECT CLAIMS.

33.     The Committee has commenced an investigation of various pre-petition acts and occurrences including the October 2009 High Yield Notes Transaction. Although the Committee has only received very limited Bankruptcy Rule 2004 document discovery, it has conducted extensive factual and legal research to determine whether any viable claims exist. Based on only the limited information the Committee currently has, the Committee has concluded that substantial claims exist including, but not limited to:

(i)     claims to avoid, as constructively fraudulent transfers, pursuant to section 548(a)(1)(B) and applicable non-bankruptcy law, (a) the Intercompany Loan Transfer, whereby Trico Marine subordinated its right to payment under the $395 Million Intercompany Loan, and (b) the HoldCo Guarantees, whereby Debtors Trico Marine, Trico HoldCo and Trico Marine Cayman guaranteed the High Yield Note obligations;

(ii)    claims to avoid, as constructively fraudulent transfers, pursuant to applicable non-bankruptcy law, (a) Trico Shipping's obligations incurred and transfers made in connection with the High Yield Notes Transaction, and (b) Trico Supply's obligations incurred and transfers made in connection with same;

(iii)   a right to demand, pursuant to section 541(a) of the Bankruptcy Code, payments due by Trico Shipping to Trico Marine under the $395 Million Intercompany Loan;

(iv)    a right to demand, pursuant to section 541(a) of the Bankruptcy Code, payments due by Trico Shipping to Trico Marine Operators under the $194 Million Note and to Trico Marine Cayman under the $33 Million Note; and

(v)     a right to institute any other proceedings necessary and appropriate for the collection of the $395 Million Intercompany Loan, the $194 Million Note and the $33 Million Note, including, but not limited to, the commencement involuntary Norwegian bankruptcy proceeding against Trico Shipping on behalf of Trico Marine, and against Trico Supply on behalf of Trico Marine Operators and Trico Marine Cayman (collectively, the "Subject Claims").

34.     As described herein and in the proposed form of Complaint attached hereto as Exhibit A (the "Proposed Complaint"), the Committee has already identified the Subject Claims, even without having the benefit of full document discovery and depositions of the relevant parties.  Although the Committee would have preferred to have filed this Motion with the benefit of full discovery, it is constrained to file this Motion at this time in light of the Debtors' public announcement that they intend to conclude a restructuring of the Trico Supply Group that the Committee understands will incorporate a settlement of the claims that the Committee is seeking to assert without the Committee's consent and on terms that are completely unacceptable to the Debtors' creditor body.

13

35. The Committee's investigation is continuing and it believes that there are additional claims that it will seek to assert in the future. Most prominent among such claims, are claims against the Debtors directors and officers for authorizing the transactions that are the subject of the claims asserted herein including claims for breach of fiduciary duty and breach of the duties of loyalty and due care. There is also a substantial need to investigate the acquisitions of Active Subsea and Deep Ocean under circumstances which suggest that the Debtors considerably overpaid for those entities.

36. In particular, the boards of directors and officers of Trico Marine, Trico Operators, Trico Holdco, Trico Marine Cayman, Trico Supply and Trico Shipping who approved the High Yield Notes Transaction and the related transfers and transactions that are described herein consist largely of the same individuals. Accordingly, such board members and officers had inherent conflicts of interest and each such member and officer failed to exercise independent business judgment on behalf of the each of the entities that each such member and officer purportedly represented. Moreover, because the boards of directors and officers of the entities, referred to above, believed that Trico Marine and the other Debtors were liquidating their business, they preferred what they believed to be the interests of the Trico Supply Group above the interests of the Debtors.

37. For similar reasons, the Debtors are hopelessly conflicted to prosecute or settle claims against the Non-Debtor OpCos. First, there is nearly identical management between the Debtors and the Non-Debtor OpCos. No party disputes that the Debtors will be liquidating, and the Non-Debtor OpCos will continue as going concerns. Thus, management has every incentive to favor the Non-Debtor OpCos to satisfy their future employers. Second, there is substantial overlap between the boards of directors of the Debtors and the Non-Debtor OpCos. On the

14

Company website, Richard Bachmann, Kenneth Burke, Edward Hutcheson, Jr., Myles (Bill) Scoggins and Per Staehr (the "Overlapping Board Members") are listed as directors of the "Trico Marine Group," which is comprised of Deep Ocean, CTC Marine and Trico Offshore.[4] Trico Offshore includes Trico Supply and Trico Subsea AS, TMA, and TMO as well as a joint venture with China Oilfield Services Limited.[5] Trico Marine's most recent form 10-K also lists the aforementioned individuals as directors of Trico Marine. Because it would require the Overlapping Board Members to, in effect, second guess their own actions with respect to the October 2009 transactions, the Debtors cannot prosecute the Subject Claims themselves. Third, the same outside professional advisors represent both the Debtors and the Trico Supply Group. *See Official Committee of Unsecured Creditors' Statement and Omnibus Reservation of Rights Regarding the Debtors' Applications to Retain Vinson & Elkins LLP; Morris, Nichols, Arsht & Tunnell LLP; Cahill Gordon & Reindel LLP; Evercore Group, LLC and AP Services, LLC* [Docket No. 230]. There are therefore no disinterested directors and advisors capable of exercising independent business judgment on behalf of the Debtors and their creditors.

38. Further, and as more fully set forth below, as directors of the Non-Debtor OpCos, the Overlapping Board Members owe fiduciary duties to the shareholders of the Non-Debtor OpCos and, because the Non-Debtor OpCos are insolvent, to the creditors of the Non-Debtor OpCos. However, these Overlapping Board Members, as directors of the Debtors, also owe fiduciary duties to the Debtors' creditors. Thus, the decision makers for the Debtors and the Non-Debtor OpCos have irreconcilable conflicts of interest.

---

[4] *See* http://www.tricomarine.com/directors-management.php

[5] *See* http://www.to.tricomarine.com/company-history.php

2161169v1
11/24/2010 8:07 PM

## RELIEF REQUESTED

39.     Pursuant to sections 105(a), 1103(c)(5) and 1109(b) of the Bankruptcy Code, the

Committee respectfully requests entry of an order authorizing the Committee to bring the Subject

Claims and file the Proposed Complaint.

## BASIS FOR RELIEF

40.     Section 1107 of the Bankruptcy Code provides that a debtor in possession shall

perform all of the functions and duties of a trustee serving in a chapter 11 reorganization and

that, among these duties, are the duties to collect property of its estate. *See* 11 U.S.C. § 1107(a).

Property of the estate includes "all legal or equitable interests of the debtor," and these interests

include all causes of action belonging to the debtor at the time the case is commenced. *See* 11

U.S.C. § 541(a)(1); *see also Integrated Solutions v. Serv. Support Specialties*, 124 F.3d 487, 490

(3d Cir. 1997) ("The Bankruptcy Code defines a bankrupt's estate broadly to encompass all

kinds of property, including intangibles and causes of action."); *Cain v. Hyatt*, 101 B.R. 440,

441-42 (E.D. Pa. 1989) ("Courts have uniformly held that the broad scope of § 541 encompasses

causes of action existing at the time of the commencement of the bankruptcy action.") (citations

omitted).

41.     A debtor is obligated to maximize the value of its estate for the benefit of its

creditors and all parties in interest. *See, e.g., Commodity Futures Trading Comm'n v. Weintraub*,

471 U.S. 343, 352 (1985) ("The trustee is 'accountable for all property received,'… and has the

duty to maximize the value of the estate") (internal quotations omitted).  Accordingly, a debtor is

duty bound to pursue claims and defenses that could increase the value of its estate. *See, e.g.,

Commodore Int'l v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 99 (2d Cir. 2001) ("The

[debtor in possession] has an obligation to pursue all actions that are in the best interests of

creditors and the estate.") (quoting *Liberty Mut. Ins. Co. v. Official Unsecured Creditors' Comm.*

16

*of Spaulding Composites Co. (In re Spaulding Composites Co.)*, 207 B.R. 899, 904 (B.A.P. 9th

Cir. 1997)); *La. World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 249 (5th Cir. 1988) ("If a

valid -- and potentially profitable -- cause of action exists . . . which the debtor-in-possession

may assert on behalf of the corporation, *all* creditors are harmed when the debtor-in-possession

refuses to pursue it.  The value of the estate is not maximized and the ultimate recovery of all

creditors is diminished").

      42.     A creditors committee represents the interests of all general unsecured creditors.

*See Walsh v. Westmoreland Human Opportunities, Inc. (In re Life Serv. Sys.)*, 279 B.R. 504, 510

(Bankr. W.D. Pa. 2002) (citing *In re Nationwide Sports Distrib.*, 227 B.R. 455, 463 (Bankr. E.D.

Pa. 1998)).  Section 1103(c)(5) of the Bankruptcy Code provides as follows:

> (c)     A committee appointed under section 1102 of this title may –
>
> > (2)     investigate the acts, conduct, assets, liabilities, and
> > financial condition of the debtor, the operation of the debtor's
> > business and the desirability of the continuance of such business,
> > and any other matter relevant to the case or to the formulation of a
> > plan;
> >
> > (3)     participate in the formulation of a plan, advise those
> > represented by such committee of such committee's determinations
> > as to any plan formulated . . .
>
> * * *
>
> > (5)     perform such other services as are in the interest of those
> > represented.

11 U.S.C. § 1103(c)(2)-(3), (5); *see also Advisory Comm. of Major Funding Corp. v. Sommers

(In re Advisory Comm. of Major Funding Corp.)*, 109 F.3d 219, 224 (5th Cir. 1997) ("Section

1103 provides the tools with which . . . creditors' committee[s] work").  Additionally, section

1109(b) of the Bankruptcy Code provides that "[a] party in interest, including the debtor, the

trustee, *a creditors' committee* . . . may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b) (emphasis added).

43.     The Third Circuit has held that the Bankruptcy Code provides a qualified right for a creditors' committee to commence actions in the name of the estate with approval of the bankruptcy court. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) (en banc) ("*Cybergenics II*") (holding that it is "unmistakably clear that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate. Avoiding fraudulent transfers through § 544(b) is a perfect application of that function"). The Third Circuit in *Cybergenics II* held that sections 503(b)(3)(B), 1103(c)(5), and 1109(b) of the Bankruptcy Code, together with the bankruptcy court's equitable powers granted under section 105(a), reflect Congress's intent to allow a committee to pursue an avoidance action for the estate's direct benefit. *See id.* at 569, 572.

44.     Courts in the Third Circuit have taken a permissive approach in approving a committee's standing to pursue actions on behalf of the estate and its creditors. *See, e.g., id.* at 553 ("'Nearly all courts considering the issue [of authorizing a creditor's committee to act on behalf of the debtor] have permitted creditors' committees to bring actions in the name of the debtor in possession if the committee is able to establish' that a debtor is neglecting its fiduciary duty.") (quoting 7 COLLIER ON BANKRUPTCY ¶ 1103.05[6][a] (15th rev. ed. 2002)); *In re Nicolet, Inc.*, 80 B.R. 733, 737-39 (Bankr. E.D. Pa. 1987) (referring to the "liberal approach" employed by the Third Circuit, and observing that the vast majority of bankruptcy court decisions have authorized creditors' committees to take such actions) (citing *In re McKeesport Steel Castings Co.*, 799 F.2d 91 (3d Cir. 1986)) (additional internal citations omitted); *In re Monsour Med. Ctr.*,

5 B.R. 715, 718 (Bankr. W.D. Pa. 1980) (holding that a creditors' committee's implied authority to sue to avoid a preference or fraudulent transfer continues under the Bankruptcy Code).

45.    "Although *Cybergenics* did not specifically lay out the procedures that should be followed in allowing creditors derivative standing, the Third Circuit expressed its agreement with the approaches taken by the Second and Seventh Circuits . . . . Under these guidelines generally, derivative standing requires: (1) a colorable claim, (2) that the trustee unjustifiably refused to pursue the claim, and (3) the permission of the bankruptcy court to initiate the action." *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004) (citing *G-I Holdings, Inc. v. Those Parties Listed On Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 628 & n.16 (Bankr. D.N.J. 2004), *rev'd in part and remanded, Official Comm. of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*, No. 04-3423 (WGB), 2006 U.S. Dist. LEXIS 45510 (D.N.J. June 21, 2006); *Commodore*, 262 F.3d at 100; *Fogel v. Zell*, 221 F.3d 955, 966 (7th Cir. 2000); *Official Comm. of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley Media, Inc.)*, No. 01-11353(PJW), Adv. Proc. No. 02-04553, 2003 Bankr. LEXIS 940, at *2 (Bankr. D. Del. Aug. 14, 2003)).  Here, the Committee submits this Motion for the Court's approval, and respectfully submits that it easily satisfies all prongs set forth by this test.

A.    **The Subject Claims Would Benefit the Estates.**

46.    When determining whether the potential cost and benefit renders it worth a committee pursuing litigation, courts within the Third Circuit will examine: "Whether the action is likely to benefit the reorganization estate; The probabilities of legal success in the event the action is pursued; Financial recovery in the event of success; Whether appointment of a trustee or another party to bring the action would be preferable; and The cost to the estate in proceeding with the action and the terms relative to any attorneys fees." *G-I Holdings*, 2006 U.S. Dist. LEXIS 45510, at *40.

19

47. This standard is easily satisfied here. Given the large amounts at stake, even a relatively small chance of success weighs strongly in favor of the Committee's pursuit of the Subject Claims; here, the Committee believes that its chances of prevailing are highly probable because of the reasons set forth and the legal authorities cited herein. Moreover, the discovery it expects to receive in the upcoming months can serve only to reinforce this likelihood of success. Successful prosecution of the Subject Claims could reasonably yield in excess of $200 million for distribution to unsecured creditors. Even if the Committee were to only avoid half of the fraudulent conveyance, it would free up over $100 million for distribution to all unsecured creditors. Moreover, a financial recovery from the pursuit of intercompany claims will likely be the only significant source of recovery available to the Debtors' general unsecured creditors given the extensive liens on nearly all of the Debtors' assets and the likelihood that the bulk of any remaining funds will be used to pay administrative claims. The benefits of bringing the Subject Claims far outweigh the costs and are the Debtors' general unsecured creditors only chance for a meaningful recovery.

48. By contrast, because these are liquidating chapter 11 cases, the downside of pursuing the Subject Claims would be minimal since it will not negatively effect the reorganization of the Debtors' business, and will not be detrimental to the Debtors' employees. None of the time pressures associated with the need to reorganize expeditiously are present here. The only cost would be professional fees, which would be paid out of estate funds that would otherwise be available for distribution to unsecured creditors. Further, because the Debtors are liquidating, there is no particular need for the Debtors to remain in control of the Subject Claims. *See Nat'l Forge*, 304 B.R. at 218, 223 (finding in case with liquidating plan that there was "no risk that the Creditors' Committee is usurping the Debtor's role in bringing the Complaint . . . .

Any funds that the Creditors' Committee expends in pursuit of the Complaint are funds that would otherwise be available for distribution to its constituents").

49.     Finally, the Committee is the only independent estate fiduciary that did not participate in the subject transactions and is not conflicted; it is the only party that can fairly and impartially investigate and pursue the Subject Claims. As discussed above, undeniable conflicts exist that prevent the Debtors from prosecuting the Subject Claims. The only other plausible alternative to having the Committee prosecute the Subject Claims would be to appoint a chapter 11 trustee or to convert these cases to chapter 7. These alternatives would be wasteful because the Committee has invested significant time and expense in investigating the Subject Claims, has already drafted the Proposed Complaint, and is ready to begin prosecuting the Subject Claims immediately. Because the appointment of a trustee or conversion of these cases would only increase the administrative burden on the Debtors' estates to the detriment of all stakeholders, it is most economical for the Committee to be granted standing to bring the Subject Claims. Accordingly, the substantial benefits to the Debtors' estates more than merit the time and expense of prosecuting the Subject Claims.

**B.     The Subject Claims Are Colorable.**

50.     The Subject Claims are "colorable" within the meaning of the standard relevant to this Motion; indeed, the Committee strongly believes it will be successful in prosecuting and realizing on the Subject Claims.

### a.     Applicable Standard

51.     To establish a "colorable" claim, the "derivative standing test requires the Court to decide whether the Committee has asserted 'claims for relief that *on appropriate proof* would support a recovery.'" *G-I Holdings*, 313 B.R. at 631 (quoting *STN*, 779 F.2d at 905) (emphasis added). "'Because the creditors' committee is *not required to present its proof,* the first inquiry

21

is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim.'" *G-I Holdings*, 313 B.R. at 631 (quoting *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003), quoting *Official Comm. of Unsecured Creditors of America's Hobby Ctr. v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998); *Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999)) (emphasis added). "When considering a motion to dismiss, a court must accept as true the allegations and facts pleaded in the complaint and any and all reasonable inferences derived from those facts." *G-I Holdings*, 313 B.R. at 631 (citations omitted). "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim which would entitle him or her to relief." *Id.* (citations, quotations, and marks omitted). *See also STN*, 779 F.2d at 905-06 (the bankruptcy court need not conduct a "mini-trial" to determine whether a "colorable" claim exists).

52.     As this Court explained post-*Twombly* and *Iqbal*, "to survive a motion to dismiss, [] constructive fraudulent transfer claims predicated on section 548 or 544 must allege sufficient facts that ***plausibly show***: (i) a transfer within the applicable time period; (iii) [transferor's] insolvency; and (iii) a lack of reasonably equivalent value (or fair consideration)." *Charys Liquidating Trust et al. v. McMahon Securities Co., L.P.* ("*Charys*"), 2010 Bankr. LEXIS 2636 at *20 (Bankr. D. Del. Aug. 27, 2010) (emphasis added); *see also Aphton*, 423 B.R. 76, 90 (Bankr. D. Del 2010) ("there are two elements that must be deemed facially plausible in order to survive a motion to dismiss a claim for constructive fraudulent transfer: (i) the debtor's insolvency; and (ii) whether the debtor received reasonably equivalent value for the transfer.").

22

53.     In *Aphton*, the defendants sought dismissal of a fraudulent conveyance claim,

arguing that the transfer of money and stock to former noteholders was used to retire antecedent

debt and therefore could not form the basis for a constructive fraudulent conveyance claim. *Id.*

at 92-93. Judge Sontchi held, however, that because the complaint alleged that the debtor was

insolvent at the time of the conveyance, it was *facially plausible* that there was not reasonably

equivalent value in the exchange. *Id.* at 93. Similarly, in *Charys*, this Court denied dismissal of

a fraudulent conveyance claim where the complaint alleged insolvency and where "[b]ased on

the totality of the circumstances as alleged in the Complaint, the Court could infer that Charys

did not receive services commensurate with the $11,391,635.42 in Transfers." 2010 Bankr.

LEXIS 2636 at *26. Courts in the Third Circuit and throughout the country have made similar

findings in the post-*Twombly*, post-*Iqbal* landscape.[6]

54.     If the Court accepts all of the Committee's factual allegations as true – which it

must at this stage of the proceedings – the Proposed Complaint would plainly survive a motion to

dismiss; thus, the Subject Claims are "colorable" as a matter of law.[7]

---

[6]     *See, e.g., In re Le-Nature's Inc.*, No. 08-1518, 2009 U.S. Dist. LEXIS 85073, at *70-71 (W.D. Pa. Sept. 16, 2009) (finding that whether reasonably equivalent value was provided by payments on outstanding loans, fees and expenses was a question of fact); *In re Saba Enters.*, 421 B.R. 626, 646 (Bankr. S.D.N.Y. 2009) ("Even under the more stringent 'flexible plausibility' standard recently established in *Twombly*, courts have found in the constructive fraudulent transfer context that the plaintiff does not need to plead specific facts to support the relevant allegations").

[7]     Indeed, the Committee is not even *required* to provide a draft complaint with this Motion. As the court in *G-I Holdings* explained, "[a]lthough the Committee did not file a proposed complaint in conjunction with its motion for leave to prosecute the . . . Claims, it did file a summary of claims to be asserted by the Committee. The motion was sufficiently detailed to provide the Bankruptcy Court with enough information to determine standing." 2006 U.S. Dist. LEXIS 45510, at *45-46. The Committee is not required to present proof of the Claims for the Court to grant the Motion. Although, as this Court explained in a motion to dismiss an adversary proceeding, Supreme Court decisions have recently called upon plaintiffs to "'plead more than the possibility of relief to survive a motion to dismiss,'" *Aphton*, 423 B.R. at 86 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)), *Twombly* and *Iqbal*'s pleading mandates do not change the test for a committee seeking derivative standing to litigate claims on an estate's behalf. A creditors' committee is not required to submit its proof with a motion seeking derivative standing. *See In re MIG, Inc.*, No. 09-12118(KG), 2009 Bankr. LEXIS 4313, at *4 (Bankr. D. Del. Dec. 18, 2009) (citing *STN*, 779 F.2d at 905-06) (court examines whether "committee presents . . . claims for relief that *on appropriate proof* would support a recovery") (emphasis added).

## b. **Constructive Fraudulent Conveyance**

55. The Proposed Complaint seeks to avoid, as constructively fraudulent, pursuant to section 548(a)(1)(B) and applicable non-bankruptcy law, (a) the Intercompany Loan Transfer, whereby Trico Marine transferred rights to payment under the $395 Million Intercompany Loan by subordination, and (b) the HoldCo Guarantees, whereby Debtors Trico Marine, Trico HoldCo and Trico Marine Cayman guaranteed the High Yield Note obligations (the "Debtors' Fraudulent Conveyances"). The Committee seeks standing to avoid the Debtors' Fraudulent Conveyances pursuant to the Bankruptcy Code's strong-arm powers on behalf of the bankruptcy estates of Debtors Trico Marine, Trico HoldCo and Trico Marine Cayman.

56. The Proposed Complaint also seeks to avoid, as constructively fraudulent, pursuant to applicable non-bankruptcy law, (a) Trico Shipping's obligations incurred and transfers made in connection with the High Yield Notes Transaction, and (b) Trico Supply's obligations incurred and transfers made in connection with same (the "Non-Debtors' Fraudulent Conveyances" and with the Debtors' Fraudulent Conveyances, the "Fraudulent Conveyances"). Debtor Trico Marine, as a creditor of Trico Shipping, and Debtors Trico Marine Operators and Trico Marine Cayman, as creditors of Trico Supply, have standing to seek to avoid the Non-Debtors' Fraudulent Conveyances under applicable non-bankruptcy law. Those claims and causes of action constitute property of those Debtors' bankruptcy estates under Section 541(a). The Committee seeks standing to prosecute such claims on behalf of the Debtors' estates.

57. Fraudulent conveyance claims generally require that the plaintiff show that the transferor was insolvent (or rendered insolvent) and received less than fair consideration (or reasonably equivalent value) in exchange for the obligations or transfers at issue. [8]

---

[8] For purposes of this Motion, the Court need not determine which law applies to the fraudulent transfer claims since the Proposed Complaint provides sufficient notice to the potential defendants. *See Charys,* 2010 Bankr.

58. **Insolvency.** Even the preliminary evidence firmly establishes (a) that Trico Marine was insolvent (or rendered insolvent) when it made the Intercompany Loan Transfer, (b) that Trico Marine, Trico HoldCo and Trico Marine Cayman were insolvent (or rendered insolvent) when they guaranteed the High Yield Note obligations, and that (c) Trico Shipping and Trico Supply were insolvent (or rendered insolvent) at the time of the High Yield Notes Transaction.

59. On October 9, 2009, in connection with the Offering Memorandum issued by Trico Shipping with respect to the sale of the High Yield Notes, PWC modified its earlier opinion to add a going concern qualification. PWC's modified opinion letter referred to revised footnotes to Trico Marine's financial statements which stated that "the Company believes that its forecasted and available credit capacity are **not sufficient to meet its commitments as they come due over the next twelve months**."

60. **Reasonably Equivalent Value / Fair Consideration.** As this Court explained in *Charys*, "[t]he term 'reasonably equivalent value' is not defined in the Bankruptcy Code, however, the Third Circuit has noted that 'a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'" 2010 Bankr. LEXIS 2636 at *22-23 *quoting*

---

LEXIS 2636 at *18 ("Section 544, in turn, authorizes avoidance of transfers of an interest of the debtor in property that are voidable by an unsecured creditor under applicable state law. Here, Plaintiffs have alleged that the Transfers are avoidable under 'applicable state law, including, but not limited to, the Georgia Uniform Fraudulent Transfer Act, Ga. Code § 18-[2]-[7]0 et seq., the Delaware Fraudulent Transfer Act, 6 Del. C. § 1301 et seq., [and] the New York Fraudulent Conveyance Act, N.Y. Debt. and Cred. Law. Art. 10 (§ 270 et seq.) . . . .' Plaintiffs have properly pled various state laws in the alternative and put Defendant on adequate notice of what claims Plaintiffs are asserting") (internal citations omitted).

Moreover, the law of each of the jurisdictions that is likely to apply is substantially similar. *See In re W.R. Grace & Co.*, 281 B.R. 852, 854 (Bankr. D. Del. 2002). Trico Marine is a Delaware corporation with a principal place of business in Texas. The High Yield Notes were issued in the United States pursuant to an Indenture governed by New York law. Furthermore the transactions at issue were apparently negotiated in the United States between Trico Marine and the underwriter, Barclays, who worked out of its New York and Houston offices. Accordingly, the principal choices of law are Delaware, New York and Texas. Furthermore, although Trico Shipping and Trico Supply are each Norwegian corporations, state of incorporation is not the principal consideration for choice of law issues for fraudulent transfer. *See id.* at 855.

*VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007). "To determine reasonably equivalent value, the Third Circuit requires a 'totality of the circumstances' analysis, taking into account 'the good faith of the parties, the difference between the amount paid and the market value, and whether the transaction was at arms length.'" *Id. quoting Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002). "[R]easonably equivalent value is a fact intensive determination that typically requires testing through the discovery process." 2010 Bankr. LEXIS 2636 at *25.

61.     The Third Circuit has held that "whether the debtor *received* reasonable value must be determined from the standpoint of the creditors." *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L.)*, 92 F.3d 139, 150 (3d Cir. 1996) (original emphasis) (internal quotation and marks omitted). Just because a lender may have parted with quantifiable value does not necessarily confer equal, reasonably equivalent value on the debtor. *Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 286 (Bankr. E.D. Pa. 2006).

62.     The following evidence confirms, even at this preliminary phase, that the relevant transferors made the Fraudulent Conveyances for no fair consideration:

- Trico Marine's Intercompany Loan Transfer. Trico Marine effectively eliminated its right to repayment of the $395 Million Intercompany Loan after satisfaction of $170 million of senior debt by subordinating its right of repayment behind $400 million of senior debt. Thus, Trico Marine transferred to Trico Shipping at least $230 million of consideration. It received nothing in exchange. *See Holber v. Jacobs (In re Jacobs)*, 401 B.R. 161 (Bankr. E.D. Pa. 2008) (holding that the debtor's subordination of indebtedness against third party constituted a transfer subject to avoidance).

- The Debtor Guarantees. Trico Marine, Trico Holdco and Trico Marine Cayman transferred value to Trico Shipping by guaranteeing the High Yield Note obligations, exceeding $400 million. They, however, received nothing in exchange.

- The High Yield Note Transfers And Obligations. Trico Shipping transferred value (a) to the High Yield Notes by incurring the High Yield Note obligations, exceeding $400 million and (b) to the High Yield Notes by granting liens on its

2161169v1
11/24/2010 8:07 PM

assets. Trico Supply transferred value (a) to the High Yield Notes by guaranteeing the High Yield Note obligations, exceeding $400 million and (b) to the High Yield Notes by granting liens on its assets. The net proceeds of the High Yield Notes after original issue discount and fees were approximately $370 million. Of this amount, approximately $172 million was used to refinance debt of Trico Shipping. The remaining $200 million was used to refinance the debt of Deep Ocean and its subsidiaries. Due to a prior reorganization completed in January 2009, Deep Ocean CTC Marine and many of their subsidiaries were no longer subsidiaries of Trico Shipping but were, instead, subsidiaries of Trico Supply, Trico Shipping's parent. Thus, Trico Shipping effectively upstreamed over $100 million of net proceeds to Trico Supply in exchange for no benefit or other consideration. Moreover, Trico Shipping did not receive any benefit from funds that were downstreamed to its subsidiaries, since on information and belief, many of these subsidiaries were insolvent.

### c.    Payment of Outstanding Intercompany Claims

63.    The Committee also seeks standing to demand payments due to Trico Marine by Trico Shipping under the $395 Million Intercompany Loan. As discussed above, the $395 Million Intercompany Loan is due on demand, which has not and cannot be given if Trico Shipping cannot repay it. The Committee requests authority to demand such payment from Trico Shipping on behalf of Trico Marine upon avoidance of the High Yield Notes Transaction obligations.

64.    The Committee also seeks standing to demand payments due to Trico Marine Operators by Trico Supply under the $194 Million Note and to Trico Marine Cayman under the $33 Million Note. The right to collect on those claims constitutes property of the Debtors' estates under section 541(a). The Committee requests authority to collect payment on behalf of the estates.

### C.    The Debtors' Conflicts Preclude Them From Prosecuting The Subject Claims.

65.    Where, as here, the debtor has "a conflict of interest in pursuing an estate claim so that it is effectively disqualified from pursuing an action which is otherwise a colorable claim, the debtor (or a trustee) can be viewed as delinquent and the creditors committee should be

27

authorized to pursue the cause of action." *Valley Media*, 2003 Bankr. LEXIS 940, at *6-7. As the Third Circuit in *Cybergenics II* explained, a debtor-in-possession serving as trustee in a chapter 11 case "gives rise to the proverbial problem of the fox guarding the henhouse. If no trustee is appointed, the debtor -- really, the debtor's management - bears a fiduciary duty to avoid fraudulent transfers that *it itself made*," and is sure to jump at "any opportunity to avoid bringing a claim that would amount to reputational self-immolation." 330 F.3d at 573 (emphasis added). *See also G-I Holdings*, 313 B.R. at 643 (assuming that even the mere "influence of conflicts of interest" must have affected debtor's decision not to bring avoidance actions). Thus, it is often not "realistic" to "order[] the debtor itself to pursue" an avoidance claim "given management's . . . conflicts of interest." *Cybergenics II*, 330 F.3d at 575, 578. "These conflicts of interest can arise even in situations where there is no concern that a debtor's management is trying to save its own skin." *Id.* at 573. Accordingly, "[t]he possibility of a derivative suit by a creditors' committee provides a critical safeguard against lax pursuit of avoidance actions" due to the influence of conflicts of interest. *Id. See also Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 545, 549 (W.D. Pa. 2005) (affirming bankruptcy court's authorization of committee to bring derivative action where debtor's management had conflict of interest); *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.)*, 285 B.R. 848, 855 (Bankr. S.D.N.Y. 2002) ("[I]t is permissible, not uncommon, and often desirable for official committees to seek and obtain the right to assert the claim on behalf of the estate -- either when there is doubt as to the debtor's ability or inclination to prosecute the claim vigorously, or where the debtor consensually cedes control of the litigation over to the committee") (citations omitted).

66. Indeed, conflicts are such strong evidence of a debtor's inability to fairly prosecute avoidance actions that in some cases the existence of conflicts alone, without any formal request or demand on the part of the creditors' committee, will satisfy the unjustifiable refusal component of the derivative standing test. In *G-I Holdings*, for example, the court found as much against a backdrop of conflicts strikingly similar to those in the instant cases. 313 B.R. at 629-30. There, the creditors committee never formally requested that the debtor initiate the avoidance action, but (as is also true in the instant cases) the transactions at issue were implemented by executives who still remained in charge, and both the debtor and transferee had taken positions adverse to the proposed attacks in the past. *Id.* at 630. The court explained that "a debtor's refusal to pursue an avoidance action can be implied even where no formal demand has been made by a creditors committee," and that the conflicts in the case before it presented "ample evidence" of the debtor's sure refusal. *Id.* Accordingly, the court found that the conflicts rendered demand made and declined within the meaning of the test. *Id. See also Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214, 222 (Bankr. W.D. Pa. 2004) ("it cannot be said that a formal request, in order to obtain a formal refusal, a request which would surely be refused, should be required").

67. When determining whether the refusal to bring a particular action (or to consent to a committee's prosecution) is an abuse of discretion (*i.e.*, unjustified), courts consider the following: (1) whether conflicts of interest exist between the debtor and the parties against whom the creditors' committee's derivative action will be brought; (2) whether the creditors' interests are protected despite the debtor's refusal; (3) whether allowing the committee to pursue the action on the debtor's behalf will benefit the estate; and (4) whether appointing a trustee and allowing the trustee, as opposed to the committee, to pursue the action or converting the Chapter

11 case to a Chapter 7 case, would be more beneficial to the estate. *See In re G-I Holdings, Inc.*, 313 B.R. at 643.

68. The inherent conflicts here, like those in *G-I Holdings*, are in and of themselves enough to disqualify the Debtors from prosecuting the valuable Subject Claims for the benefit of all unsecured creditors in these cases.

69. <u>First,</u> that the Debtors will refuse to bring the Subject Claims if demand is made is evident from the well-publicized settlement the Non-Debtor OpCos and a steering committee of High Yield Note are currently negotiating. A Trico press release dated October 29, 2010 announced that the Debtors and the Non-Debtor OpCos "reached an agreement in principle with the steering committee . . . of holders of approximately 83% of its 11 7/8% Senior Secured Notes to implement a comprehensive financial restructuring of Trico Supply" and that in "November, the parties expect to complete th[e] process, approve the final terms and request necessary court approvals ." What is not disclosed in the press release (or the corresponding 8-K statement) is that this deal would "settle around" the Subject Claims by releasing all Intercompany Claims. On November 5, 2010, the Committee informed the Debtors' directors, managers, and officers of the Committee's strong opposition to that potential settlement and of the immense, irreparable harm the deal would inflict upon general unsecured creditors. Upon the Committee's information and belief, negotiations continue between the Debtors/Non-Debtor OpCos and the High Yield Notes and the Debtors remain ready and willing to walk away from the valuable Subject Claims. This, of course, shows that making demand upon the Debtors would be wholly futile.

70. <u>Second,</u> as discussed above, the Debtors' conflicts include the following:

2161169v1
11/24/2010 8:07 PM

- The Debtors and Non-Debtor OpCos have diverging interests with respect to the October 2009 transactions, and the Overlapping Board Members owe fiduciary duties to both the Non-Debtor OpCos' and the Debtors' creditors.

- The Debtors and the Non-Debtor OpCos are represented by the same professionals (e.g. Vinson & Elkins LLP, Evercore Group, L.L.C., AP Services LLC). These professionals will not be able to advise the Debtors and the Non-Debtor OpCos with both parties' best interests in mind because the parties have diverging interests with respect to the High Yield Notes transaction.

71. Finally, because the Debtors are conflicted from bringing the Subject Claims, the only other alternative to prosecute the Subject Claims would be to appoint a trustee to do so. This would be wasteful. The Committee has invested significant time and expense in investigating the Subject Claims. The Committee has already drafted the Proposed Complaint and is ready to begin prosecuting the Subject Claims immediately. The appointment of a trustee or conversion of this case would only increase the administrative burden on the Debtor's estate to the detriment of all. Judicial economy mandates that the Committee be granted standing to bring these claims.

72. Based on all of the foregoing, the Committee has satisfied the requirements to obtain authority to prosecute, address, litigate, and, if appropriate, settle the Subject Claims and to pursue all other actions, objections and rights with respect to same.

## NOTICE

73. Notice of this Motion has been provided by e-mail, facsimile, or overnight delivery to: (a) the Office of the United States Trustee for the District of Delaware; (b) Tennenbaum, as lender for the U.S. Credit Facility; (c) counsel to the Debtors; (d) Obsidian, as administrative agent and collateral agent for the U.S. Credit Facility; (e) Nordea, as lender for the Trico Shipping W/C Facility and as administrative agent and collateral agent for the U.S. Credit Facility; (f) U.S. Bank, as Trustee and collateral agent for the Secured Notes; (g) Wells Fargo Bank, as Trustee for the 3% Notes; (h) Unicredit, as lender for the Trico Shipping W/C Facility;

(i) Deutsche Bank National Trust Company, as Trustee for the High Yield Notes; (j) Wilmington Trust FSB, as collateral agent to the intercreditor agreement between the Trico Shipping W/C Facility and the High Yield Notes; (k) those persons who have formally appeared in these Cases and requested service pursuant to Bankruptcy Rule 2002; and (l) all applicable government agencies to the extent required by the Bankruptcy Rules and the Local Rules.

## CONCLUSION

74.     WHEREFORE, the Committee respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: November 24, 2010
        Wilmington, Delaware

                                        PACHULSKI STANG ZIEHL & JONES LLP

                                        Laura Davis Jones (Bar No. 2436)
                                        Timothy P. Cairns (Bar No. 4228)
                                        919 North Market Street, 17th Floor
                                        P.O. Box 8705
                                        Wilmington, DE  19899-8705 (Courier 19801)
                                        Telephone:  (302) 652-4100
                                        Facsimile:  (302) 652-4400

                                        and

                                        KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
                                        David S. Rosner, Esquire
                                        Andrew K. Glenn, Esquire
                                        David J. Mark, Esquire
                                        Daniel A. Fliman, Esquire
                                        1633 Broadway
                                        New York, New York 10019
                                        Telephone: (212) 506-1700
                                        Facsimile: (212) 506-1800

                                        Co-Counsel to the Official Committee of Unsecured Creditors

32