# IN THE UNITED STATE BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Trico Marine Services, Inc., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 10-12653 (BLS)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 293, 376, 391, 447, 462, and 553** |

## ODYSSEA VESSELS, INC.'S LIMITED OBJECTION TO DEBTORS' NOTICE OF SELECTION OF SUCCESSFUL BIDDER; AND OVERBID ON THE TRICO MOON

Odyssea Vessels, Inc. ("Odyssea") hereby submits this limited objection to the "Debtors' Notice of Selection of Successful Bidder" (the "Bid Selection Notice") [Docket No. 533] filed in connection with the Auction[1] of the Trico Moon and Trico Mystic (the "Vessels"), and hereby overbids in the amount of $15.700 million for the Trico Moon.

### Background

The Trico Moon and Trico Mystic are "sister" ships. They were both delivered in 2008, and are of substantially identical design and construction. The Debtors originally proposed to sell the Trico Moon and Trico Mystic to Tidewater by motion dated October 13, 2010. *See* Docket No. 293 (the "Sale Motion"). The Sale Motion did not request approval of any breakup fee in the event that a party appeared at a hearing regarding the Sale Motion and overbid for the Vessels. After the Debtors filed the Sale Motion, other parties expressed interest in buying the Trico Moon and Trico Mystic, which prompted the Debtors to file their "Motion for an Order (A) Approving Sale Procedures in Connection with the Sale of Trico Mystic and Trico Moon Vessels; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale; and (C) Granting Related Relief " (the "Sale Procedures Motion") [Docket No. 376]. *See* Sale

---

[1] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Bid Selection Notice or the Sales Procedure Order.

Procedures Motion at ¶ 27 ("In fact, after the filing of the Sale Motion, the Debtors have received further interest in the Vessels which has prompted this Motion.").

Pursuant to the order granting the Sale Procedures Motion (the "Sale Procedures Order," which approved the "Sale Procedures") [Docket No. 447], the Debtors held the Auction on November 24, 2010. Odyssea was determined by the Debtors and the Committee to be a "Qualified Bidder," and Odyssea participated in the Auction.

Exercising their discretion under section F.5.b of the Sale Procedures, the Debtors conducted the Auction in three parts. First, the Debtors auctioned the Vessels *en bloc*. The highest bid in the *en bloc* auction was submitted by PACC in the amount of $30.750 million. The next highest bid was Tidewater's in the amount of $30.500 million. The Debtors next auctioned the Trico Moon. PACC submitted the highest bid for the Trico Moon in the amount of $15.300 million. Tidewater submitted the next highest bid in the amount of $15.175 million. Finally, the Debtors auctioned the Trico Mystic, for which PACC submitted the highest bid in the amount of $15.325 million, and Tidewater submitted the next highest bid in the amount of $15.200 million.

At the conclusion of the Auction, the Qualified Bidders adjourned to separate rooms while the Debtors and the Committee deliberated to select the highest and best bid(s). While the Debtors were deliberating, Odyssea told the Debtors that it would be willing and able to close a sale of the Trico Moon immediately upon the Court's approval on November 29, and sought to increase its bid on the Trico Moon to $15.600 million under section G.1 of the Sale Procedures, which provides that "[n]either the Debtors' announcement at the Auction of the Successful Bid nor the Debtors' presentation of the Successful Bid to the Bankruptcy Court for approval shall constitute the Debtors' acceptance of the Successful Bid. The Debtors shall be deemed to have accepted the Successful Bid only when the Successful Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of the Successful Bid." The Debtors indicated that they would not accept further bids, including Odyssea's overbid on the Trico Moon.

1905394.1

The Debtors and Qualified Bidders then reconvened, and the Debtors announced that they had selected Tidewater's *en bloc* bid for $30.500 million as the Successful Bid, based the price offered and the certainty that Tidewater would close on both Vessels, which consideration included (i) Tidewater's agreement to close on the Moon immediately after Court approval; and (ii) Tidewater's alleged ability to obtain consent for the assignment of the Petrobras contracts associated with the Mystic.

Odyssea stated on the record at the Auction that it had attempted to submit to the Debtors an overbid on the Trico Moon, that such bid was rejected by the Debtors, and that Odyssea would appear at the November 29 hearing and would submit its overbid on the Trico Moon. Odyssea has subsequently determined to submit, and hereby submits, its overbid in the amount of **$15.700 million** for the Trico Moon.

### Limited Objection

The Debtors' selection of Tidewater's bid for both Vessels in the amount of $30.500 million was not a sound exercise of business judgment in light of Odyssea's overbid on the Trico Moon. Tidewater's *en bloc* bid provides the same consideration as PACC's high bid of $15.300 million on the Trico Moon plus Tidewater's $15.200 million separate bid on the Trico Mystic. Any overbid on the Trico Moon would have thus increased the total consideration received for both Vessels above the amount provided by Tidewater's *en bloc* bid.

Odyssea acknowledges that the sale of the Trico Mystic presents complications that require the Debtors' exercise of discretion in determining what is the highest and best bid. Specifically, there may be a basis for the Debtors to determine that Tidewater's $15.200 million lower bid is a better offer than PACC's $15.325 million higher bid for the Trico Mystic because the sale of the Trico Mystic involves a consensual assignment of contract rights and obligations owed to and from certain non-debtor third parties.

The sale of the Trico Moon, however, does not present any of these complications, and bids should be measured solely on the basis of price offered and willingness to close promptly. Thus, the Debtors should have accepted Odyssea's overbid for the Trico Moon, since the Debtors

could still have sold the Trico Mystic to Tidewater for $15.200 million, and received greater aggregate consideration by selling the Trico Moon for any amount in excess of $15.300 million.

The Debtors' interpretation of the Sale Procedures as mandating that the sale was final at the conclusion of the bidding process at the Auction was incorrect. The Sale Procedures expressly provide that no sale was final until approved by the Court. *See* Sale Procedures at G.1. Moreover, substantial authority provides that, even where a debtor is contractually obligated to present a transaction to a bankruptcy court for approval, the debtor must apprise the court of any better offer that it receives, and the court should approve the better transaction.

For example, in *Goodwin v. Mickey Thompson Entm't Group, Inc. (In re Mickey Thompson Entm't Group, Inc.)*, 292 B.R. 415 (B.A.P. 9th Cir. 2003), the trustee had negotiated a settlement of the claim against a third party defendant for a $40,000 payment. In response to the motion to approve the compromise, another party offered to buy the estate's claims against the defendant for $45,000. The trustee initially indicated that he would conduct an auction of the claims against the defendant, but at the time of the hearing on the motion to approve the compromise, the trustee reconsidered this decision and asked the bankruptcy court to approve the original $40,000 compromise. The bankruptcy court approved the compromise. The Bankruptcy Appellate Panel for the Ninth Circuit reversed, reasoning that the compromise of claims held by the estate in exchange for a cash payment was the equivalent of a sale and that it was inappropriate for the bankruptcy court to authorize the trustee to proceed with a sale for $40,000 when the trustee had received an offer to purchase the same claims for $45,000 (plus 15% of any net recovery):

> [A] trustee's fiduciary duty to maximize the assets of the estate trumps any contractual obligation that a trustee arguably may incur in the course of making an agreement that is not enforceable unless it is approved by the court. Everyone who deals with a bankruptcy trustee in a transaction that is not in the ordinary course of business is charged with knowledge that the law may require court approval and that a trustee has an obligation to present all relevant facts to the court including whether there is a more attractive solution than that which the trustee has negotiated.

*Id*. at 421 (citing *Morane v. Martin (In re Martin)*, 91 F.3d 389, 395 (3rd Cir. 1996)).

1905394.1

In *Morane v. Martin (In re Martin)*, 91 F.3d 389 (3rd Cir. 1996), the chapter 7 trustee had negotiated a compromise of litigation with a third-party defendant. Between the time the trustee negotiated the settlement agreement and hearing on the motion to approve the compromise, the chapter 7 debtor successfully prosecuted the causes of action that were the subject of a settlement agreement in a state court trial and obtained a judgment for $150,500. The other party to the compromise agreement contended that the bankruptcy court was required to ignore the state court judgment and that the trustee had a duty to proceed with the motion to approve the compromise and not to allow the chapter 7 debtor to try the matter in the state court. The trustee did not withdraw the motion to approve the compromise, but submitted to the bankruptcy court the information regarding the state court judgment, which demonstrated that the compromise was no longer in the best interest of the estate. The bankruptcy court denied the motion to approve the compromise, but the district court reversed this decision on appeal. The district court held that the trustee owed the other party to the settlement a duty to seek bankruptcy court approval and should not have allowed the debtor to proceed in the state court. The Third Circuit reversed, reinstating the bankruptcy court's decision, reasoning as follows:

> We have no quarrel with the district court's statement that the trustee was required to deal with the Myers with "honesty in fact in the conduct or transaction concerned . . . and [to] refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract."
>
> . . .
>
> However, a trustee has a fiduciary relationship with <u>all</u> creditors of the estate. . . . She has the duty to maximize the value of the estate and in so doing is "bound to be vigilant and attentive in advancing [the estate's interest]." In sum, "it is the trustee's duty to both the debtor and the creditor to realize from the estate all that is possible for distribution among creditors." Thus, this trustee was faced with a conflict between her fiduciary duty to the creditor body as a whole and the alleged duty to go forward with a settlement agreement favoring one creditor but otherwise detrimental to the estate.
>
> We cannot require a trustee to choose between these conflicting legal obligations. Rather, Rule 9019(a) demonstrates the Legislature's intent to place this responsibility with the bankruptcy court. In order to make such a determination, the bankruptcy court must be apprised of all relevant information that

> will enable it to determine what course of action will be in the best interest of the estate. Accordingly, the trustee should inform the court and the parties of any changed circumstances since the entry into the stipulation of settlement. The trustee may even opt not to argue in favor of the stipulation as was done here, if she no longer believes the settlement to be in the best interest of the estate.

*Id.* at 393-94 (citations omitted).

These principals apply with greater force to the present case. The Debtors were not contractually bound to request approval of the Tidewater transaction. Instead, the Debtors were bound by their fiduciary obligation to all creditors to maximize the value of the estate. The Debtors were permitted under the Sale Procedures, and required under *In re Martin*, to consider higher and better offers received at the Auction, even following the close of bidding.

Accordingly, the Debtors and this Court should consider Odyssea's $15.700 million bid for the Trico Moon. Assuming that Tidewater's $15.200 million bid for the Trico Mystic is the highest and best bid, Odyssea's $15.700 million bid for the Trico Moon increases the total consideration received for both Vessels to $30.900 million, which exceeds Tidewater's *en bloc* bid by $400,000.

The Debtors might contend that Odyssea's bid should not be considered because Tidewater has requested a $780,000 breakup fee. This argument should be rejected by this Court.

First, this Court has not yet approved any breakup fee, and should not approve such a fee if Tidewater is deemed the Successful Bidder for <u>either</u> of the Vessels. Tidewater expressly bargained for a breakup fee only in the event that "a sale of the Vessels to a party other than Jackson Marine, L.L.C. is consummated . . . ." *See* Sale Procedures Motion, Exhibit "A" (Heads of Agreement, § 10). If Odyssea is the successful bidder for one of the Vessels, the breakup fee provision will be not triggered under its express terms, because "a sale of the *Vessels*" to another party will not have occurred. Tidewater cannot complain about this result, since it agreed to the wording of the breakup fee provision, and it participated in the separate bidding for both the Trico Moon and the Trico Mystic.

Second, Tidewater should not in any event be permitted a breakup fee. The Sale Motion did not disclose or request approval of a breakup fee, and, before the Auction was even contemplated, the Debtors received expressions of interest from additional parties. Indeed, the Debtors conceded in the Sale Procedures Motion that they received such inquiries as soon as they filed the Sale Motion. *See* Sale Procedures Motion at ¶ 27. The only purpose to be served by awarding a breakup fee to Tidewater is to accord it a blocking position against other potential buyers who emerged before Tidewater even requested that the Debtors seek approval of a breakup fee.

In the Third Circuit, "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999). Where a bidder would have participated without a breakup fee, the award of such a fee "cannot be characterized as necessary to preserve the value of the estate." *Id.* The facts here are analogous to those in *In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010), where the Third Circuit held that the a stalking horse bidder who requested only that the debtor seek approval of a breakup fee cannot possibly argue that the breakup fee was "necessary" to induce the potential purchaser's bid. *Id.* at 207 ("[T]he mere possibility of the payment of a break-up fee was sufficient for that purpose."). Here, the Tidewater was prepared to purchase under the terms set forth in the Sale Motion without any provision at all for a breakup fee.

Tidewater also did not need a breakup fee to be approved to induce it to bid and follow through on its proposed transaction. It participated in the *en bloc* auction and the separate auctions of each Vessel without any assurance that this Court would approve a breakup fee. Further, at the hearing on the Sale Procedures Motion, the Committee contended that another bidder was already putting together an overbid, and a total of three other bidders appeared at the

-7-

auction having tendered overbids. Thus, even if Tidewater would have withdrawn its offer if this Court definitively stated that no breakup fee would be awarded, which is unlikely, three bidders would have participated at the Auction. On these facts, a breakup fee cannot have been necessary to benefit the estates. *See id.* at 208 (holding that bankruptcy court's determination that no breakup fee was necessary "was justified by (1) [successful bidder's] assertion that it planned to continue bidding, (2) the binding language of the APA, and (3) the logical belief that [the stalking horse bidder] would not abandon a fully negotiated agreement if no other bidder materialized.").

Third, because the Trico Moon and the Trico Mystic are sister ships, Tidewater could not have incurred substantial costs in conducting due diligence for both Vessels as compared to the costs of due diligence for one of the Vessels. Each is substantially the same ship, and any due diligence conducted with respect to one substantially reduced the due diligence that had to be performed with respect to the other. There is therefore no basis to award Tidewater a breakup fee if it succeeds in acquiring one of the Vessels.

Fourth, section C.2 of the Sale Procedures provides that Tidewater "shall not be entitled to a credit equal to its [breakup fee] when bidding at the Auction." To the extent that the Debtors rejected Odyssea's overbid based on the potential impact of any breakup fee to which Tidewater might be entitled, such consideration constitutes an end-run, for Tidewater's benefit, of the Sale Procedures. Giving Tidewater credit for its disputed breakup fee cannot therefore have been a part of a sound exercise of business judgment.

Finally, even if Tidewater is awarded half of its breakup fee if it is not the Successful Bidder for the Trico Moon ($390,000), Odyssea's bid of $15.700 million for the Trico Moon still provides greater consideration to the estate, net of such breakup fee, than the sale *en bloc* for $30.500 million. The net consideration to the estate would be $30.510 million.

-8-
1905394.1

**Conclusion**

WHEREFORE, Odyssea respectfully requests that this Court consider Odyssea's $15.700 million bid for the Trico Moon, find that such bid is the highest and best bid for the Trico Moon, and approve the sale of the Trico Moon to Odyssea.

Dated: Wilmington, Delaware
November 27, 2010

Respectfully submitted,

POLSINELLI SHUGHART PC

  /s/  *Shanti M. Katona*
Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Fax: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com

-and-

Robert A. Greenfield, Esq. (admission *pro hac vice* pending)
H. Alexander Fisch, Esq.
STUTMAN TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars
12th Floor
Los Angeles, California 90067
Tel: 310-228-5600
Fax: 310-228-5788
rgreenfield@stutman.com
afisch@stutman.com

*Attorneys for the Odyssea Vessels, Inc.*

1905394.1