**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRICO MARINE SERVICES, INC., *et al.*,[1] | ) | Case No. 10-12653 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date: TBD** |
| | ) | **Objections Due: TBD** |
| | ) | |
| | ) | |

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363
AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS
TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY
INTERESTS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this *Motion Pursuant to Bankruptcy Code Sections 105 and 363 and Bankruptcy Rule 9019 for*

*an Order Authorizing the Debtors to Compromise Certain Intercompany Claims and Equity*

*Interests* (the "Motion") and respectfully submit the following:

## PRELIMINARY STATEMENT[2]

1.      On or around November 4, 2010, the Debtors and certain of their nondebtor

operating subsidiaries (the "Opco Subsidiaries")[3] agreed to pursue a restructuring and related

---

[1] The Debtors are the following entities (followed by the last four digits of their tax identification numbers): Trico Marine Services, Inc. (2405); Trico Marine Assets, Inc. (2404); Trico Marine Operators, Inc. (6124); Trico Marine International, Inc. (3132); Trico Holdco, LLC (3870); Trico Marine Cayman, L.P. (5842). The mailing address for all of the Debtors for the purpose of these Cases is 10001 Woodloch Forest Drive, Suite 610, The Woodlands, TX 77380.

[2] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them in the body of the Motion or the Term Sheet. To the extent any summaries and/or descriptions of the relationships of the parties and the terms of the Settlement contained in the Motion differ in any way from those contained in the Term Sheet, the Term Sheet shall govern.

[3] The Opco Subsidiaries include Trico Supply AS ("Trico Supply"), Trico Shipping AS ("Trico Shipping") and their subsidiaries: DeepOcean AS, Trico Supply (UK) Limited, Albyn Marine Limited, Trico Subsea Holding AS, Trico Subsea AS, DeepOcean Shipping AS, DeepOcean Shipping II AS, DeepOcean Shipping III AS, DeepOcean Brasil

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363
AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS
TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                              **Page 1 of 28**

US 626006v.8

compromise and settlement of claims pursuant to the terms and conditions of a term sheet (the "Term Sheet")[4] with a steering committee (the "Steering Committee") of holders of 83% in the aggregate of the Trico Shipping High Yield Notes to effect a proposed global restructuring of the Opco Subsidiaries, including a settlement of certain of the Debtors' claims and interests against one or more the Opco Subsidiaries (the "Restructuring").

2.     Then, on or about November 19, 2010, TMS, the Opco Subsidiaries, and the Steering Committee entered into a Restructuring Support Agreement (the "RSA"), incorporating the Term Sheet and providing for a formal agreed-upon process to implement the Restructuring.[5] Generally, pursuant to the Term Sheet and the RSA (and subject to this Court's approval of the Motion), all of the outstanding, funded secured debt of Trico Supply, Trico Shipping, and the other Opco Subsidiaries (including the principal amounts outstanding under the High Yield Notes), would be converted into 100% of new common stock of a reorganized and de-levered Trico Supply.  The new common stock to be issued in exchange for the secured debt will be issued pursuant to an out-of-court exchange or, if the requisite levels of consents to the out-of-court exchange are not achieved, pursuant to a prepackaged chapter 11 plan filed in this Court by the Opco Subsidiaries in subsequently-filed bankruptcy cases (the "Prepackaged Plan"), provided the requisite acceptances for the Prepackaged Plan are obtained prior to filing.

3.     The Term Sheet and the RSA also provide, as part of the Restructuring, for a compromise and settlement of: (1) intercompany claims held by the Debtors against the Opco

---

Servicos Ltda., DeepOcean Maritime AS, DeepOcean Subsea Services Limited (UK), DeepOcean B.V., DeepOcean UK Ltd., Deep Ocean Management AS, DeepOcean de Mexico, S. de R.L. de C.V., Servicios Profesionales de Apoyo Especializado, S. de R.L. de C.V., Servicios de Soporte Profesional Administrativo, S. de R.L. de C.V., CTC Marine Projects Limited (UK), CTC Marine Norway AS, and CTC Marine Projects (Guernsey) Limited.
[4] A true and correct copy of the Term Sheet is attached hereto as **Exhibit A.**
[5] A true and correct copy of the RSA is attached hereto as **Exhibit B.**

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363
AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS
TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                    **Page 2 of 28**

US 626006v.8

Subsidiaries (i) arising under three outstanding subordinated intercompany notes (the "Intercompany Claims")[6] and (ii) related to transition and corporate services rendered by the Debtors to Opco (the "Transition Services Claims"); and (2) the Debtors' existing equity interests in the Opco Subsidiaries (the "Existing Equity").[7] Pursuant to the settlement, Intercompany Claims, the Transition Services Claims, and the Existing Equity will be released, waived, and cancelled in exchange for five-year warrants to purchase 5% of the New Common Stock of the Reorganized Trico Supply (the "Settlement").

4. The Term Sheet and the RSA also provide value to the estate through the release of TMS's guarantee of the Senior Debt of the Opco Subsidiaries. Absent the Settlement, depending on the value of the Opco Subsidiaries, the Existing Debtholders would otherwise assert unsecured guarantee claims against the Debtors' estates relating to the Senior Debt in an amount up to $100 million, which would dilute the recovery available to unsecured creditors of these estates. Finally, the Term Sheet and the RSA provide for the entry into a Transition Services Agreement by and between the Debtors and the Opco Subsidiaries to govern corporate and management transition services to be provided by the Debtors to Opco in exchange for reimbursement of related costs incurred.

5. The Term Sheet and the RSA do not seek to compromise the fraudulent conveyance claims alleged in the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Prosecute Causes of Action on*

---

[6] The $194 Million Intercompany Note, the $395 Million Intercompany Note, and the $33 Million Intercompany Note described below.
[7] Debtor Trico Cayman holds 100% of the equity interests in the nondebtor Trico Supply.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**

*Behalf of the Debtors' Estates* filed on November 24, 2010 (the "Committee's Motion") [Dkt. No. 534], which purported claims will remain property of the Debtors' estates.

6.      In the event the Settlement is not approved, the Restructuring contemplates an alternative path under the Prepackaged Plan, which would involve a sale of the Opco Subsidiaries and/or their assets.  It is the Debtors' belief that the enterprise value of the Opco Subsidiaries will not exceed the aggregate secured debt and, therefore, it is unlikely that, under this alternative, the Debtors will receive any recovery on account of the Intercompany Notes, the Transition Services Claims, or the Existing Equity.  Thus, the Debtors believe that the proposed Settlement will result in the Debtors receiving more on account of their claims and interests in the Opco Subsidiaries than they would receive if the Settlement is not approved, and, therefore, that the proposed Settlement is in the best interests of the Debtors and their creditors.

7.      The proposed Settlement will also avoid potential litigation over intercompany claims.  While these Cases have stabilized and achieved a measure of administrative solvency, protracted litigation over intercompany claims could jeopardize the ability of the Debtors to liquidate their estates in a manner which would yield the best recovery to their creditors.  Thus, the Debtors believe that the proposed Settlement will result in the Debtors receiving more on account of their claims and interests in the Opco Subsidiaries than they would receive if the Settlement is not approved, in addition to receiving a release of potentially significant guarantee claims, and, therefore, that the proposed Settlement is in the best interests of the Debtors and their creditors.

8.      Accordingly, through this Motion, the Debtors seek this Court's approval to (i) enter into the Term Sheet and the RSA, thereby compromising and settling the Intercompany

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                    **Page 4 of 28**

US 626006v.8

Claims, the Transition Services Claims, and Existing Equity on the terms set forth in the Term Sheet and the RSA, while preserving certain purported claims, and (ii) enter into a Transition Services Agreement, all as more fully set forth in the Term Sheet and the RSA. As detailed below, the Debtors submit that entry into the Term Sheet and the RSA is justified as a sound and prudent exercise of the Debtors' business judgment, and that the Settlement of the Intercompany Claims, Transition Services Claims, and Existing Equity is a valid exercise of the Debtors' business judgment and certainly above the lowest point of reasonableness, considering the facts and circumstances of these Cases.

## JURISDICTION AND PROCEDURAL BACKGROUND

9.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

10.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11.       On August 25, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy cases (the "Cases").

12.       Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

13.       An official committee of unsecured creditors (the "Committee") was appointed in these Cases on September 8, 2010.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                                    **Page 5 of 28**

US 626006v.8

## STATEMENT OF FACTS

### Business Overview

14.     The Debtors are headquartered in The Woodlands, Texas and through debtor and nondebtor subsidiaries, provide subsea services, subsea trenching and protection services, towing and supply services, and vessels, primarily to oil and natural gas exploration and production companies that operate in major offshore oil and gas producing regions around the world, including the North Sea, West Africa, Mexico, Brazil, and the Asia Pacific Region.  Trico Marine Services, Inc. ("TMS"), the lead Debtor in the Cases, is the ultimate parent of 43 entities (collectively, the "Trico Marine Group").

15.     Debtors Trico Marine Assets, Inc. ("TMA"), Trico Marine Operators, Inc. ("TMO"), and Trico Marine International, Inc. ("TMI"), along with nondebtor subsidiaries Trico Servicos Maritimos Ltda. ("Brazil"), Coastal Inland Marine Services Ltd. ("West Africa"), Trico Marine Services (Hong Kong) Ltd. ("Hong Kong"), Eastern Marine Services Ltd. ("EMSL") and Naviera Mexicana de Servicios, S. de R.L. de C.V. ("Mexico"), provide towing and supply services.  This segment of the Trico Marine Group, along with certain related subsidiaries, is commonly referred to as "Holdco."

16.     The principal entities providing subsea services and subsea trenching and protection services are DeepOcean AS ("DeepOcean") and CTC Marine Projects, Ltd. ("CTC Marine"), subsidiaries of Trico Supply.  Trico Shipping, also a subsidiary of Trico Supply, owns the Trico Marine Group's vessels.  Trico Supply, Trico Shipping, DeepOcean, CTC Marine, and their subsidiaries, which are not Debtors in these Cases, are commonly referred to as "Opco."

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                           **Page 6 of 28**

US 626006v.8

## Debt Structure

U.S. Credit Facility and DIP Facility

17.     TMS is the borrower, and Debtors TMA, TMO, TMI, Trico Marine Cayman, LP ("Trico Cayman"), and Trico Holdco, LLC, and certain non-debtor affiliates,[8] are guarantors, under the Amended and Restated U.S. Credit Agreement, dated June 11, 2010 (the "U.S. Credit Facility").   Obsidian Agency Services, Inc. ("Obsidian") serves as collateral agent and administrative agent, and affiliates of Tennenbaum Capital Partners, LLC ("Tennenbaum Capital"), are the lenders under the U.S. Credit Facility.  As amended, the U.S. Credit Facility is a $25 million term loan that matures on December 31, 2011.

18.     The U.S. Credit Facility is secured by mortgages (and related assignments of earnings and assignment of insurances) on 11 ships; pledges of all deposit accounts of TMS, TMA and TMO; 100% of the equity interests of TMA and TMO; 65% of the equity interests of Trico Cayman; and a pledge of a subordinated intercompany note, dated November 8, 2007, from Trico Supply payable to TMO with an initial principal amount of $194 million (the "$194 Million Intercompany Note").

19.     On August 24, 2010, the Debtors entered into an amended DIP facility commitment with Tennenbaum DIP Opportunity Fund, LLC and Obsidian as agent (collectively, the "DIP Lenders") to provide for a $35 million debtor-in-possession credit facility, $10 million of which would consist of "new money" loans to the Debtors' estates (the "Amended DIP Facility").  In addition to the collateral securing the U.S. Credit Facility, the Amended DIP

---

[8] The non-debtor guarantors of the U.S. Credit Facility are West Africa, Hong Kong, Servicios de Apoyo Maritimo de Mexico, S. de R.L. de C.V., Brazil, Trico International Holdings B.V., and Trico Marine International Holdings B.V.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                    **Page 7 of 28**

US 626006v.8

Facility is secured by, among other things, a junior lien on two intercompany notes:[9] (i) a subordinated loan agreement dated, May 15, 2008, from Trico Shipping payable to TMS in an initial principal amount of $395 million (the "$395 Million Intercompany Note") and (ii) a subordinated loan agreement dated, November 8, 2007, from Trico Supply payable to Trico Cayman in an initial principal amount of $33 million (the "$33 Million Intercompany Note" and, (collectively with the $194 Million Intercompany Note and the $395 Million Intercompany Note, the "Intercompany Notes").

20.    On August 27, 2010, the Court entered an Interim Order approving the Debtors' entry into the Amended DIP Facility [Dkt. No. 58].  The DIP Lenders funded the full available $10 million under the Amended DIP Facility pursuant to the Interim Order; however, the Debtors only drew $3.5 million of this available amount.  On November 8, 2010, Obsidian terminated the Amended DIP Facility and authority for the Debtors to use cash collateral as the Court had not granted approval of the Amended DIP Facility on a final basis.  On November 10, 2010, the Debtors filed their *Emergency Motion of the Debtors Pursuant to 11 U.S.C. Sections 105(A), 361, 363, 507(B), 1107, and 1108 and Federal Rules of Bankruptcy Procedure 4001, 9006(b) and 9014 for an Order (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection to Prepetition Lenders and (C) Scheduling a Final Hearing* (the "Cash Collateral Motion") [Dkt. No. 416] to, among other things, authorize the use of cash collateral. The Court entered an interim order that same day approving the Debtors' limited use of cash collateral, as requested by the Debtors [Dkt. No. 422] and scheduling a final hearing thereon.

---

[9] This junior lien under the Amended DIP Facility is subject to a first priority lien securing the High Yield Notes and the Trico Shipping W/C Facility (both defined below).

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363
AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS
TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**

US 626006v.8

21.     On November 29, 2010, the Debtors and the DIP Lenders reached an agreement regarding access to cash collateral under the Amended DIP Facility.  In exchange for the DIP Lenders' consent to use cash collateral, the Debtors agreed to (i) comply with the budget filed with the Bankruptcy Court on November 29, 2010 [Dkt. No. 547], and (ii) use a portion of proceeds from the sale of certain vessels, as disclosed in the budget, to reduce the Debtors' obligations under the DIP Facility and the U.S. Credit Facility to $4 million by January 14, 2011.

8.125% Secured Notes

22.     TMS, as borrower, and TMA and TMO, as non-recourse guarantors, also owe approximately $202.8 million under certain 8.125% secured convertible debentures due in 2013 (the "8.125% Notes") secured by, *inter alia,* a junior lien on (i) the vessels pledged under the U.S. Credit Facility, (ii) the $194 million Intercompany Note, and (iii) 100% of the equity interests of TMA and TMO.  U.S. Bank, N.A. ("U.S. Bank") serves as the indenture trustee for the 8.125% Notes.

3% Senior Convertible Notes

23.     On February 7, 2007, TMS issued $150 million of 3% senior convertible debentures due 2027 (the "3% Notes") with Wells Fargo Bank, N.A. ("Wells Fargo") as indenture trustee.  The 3% Notes are unsecured and are not guaranteed by any affiliates of TMS.

24.     In the aggregate, the principal amount of obligations under the U.S. Credit Facility, the 8.125% Notes, and the 3% Notes totals approximately $378 million (collectively, the "Parent Debt") and comprise the main credit obligations of TMS.  The obligations under the Parent Debt are all *pari passu* in right of payment.  The U.S. Credit Facility, however, has a senior lien on shared collateral with the 8.125% Notes, while the 3% Notes are unsecured.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**

US 626006v.6                                                                                          Page 9 of 28

US 626006v.8

25.     In 1999, Debtor TMI issued $18.9 million of notes due in 2014 (the "MARAD Notes") to finance construction of two supply vessels, of which approximately $5 million remains outstanding.  The notes are guaranteed by TMS and the U.S. Maritime Administration and are secured by first priority preferred mortgages on the two vessels.  The interest rate under the MARAD Notes is 6.11%.

## Other Significant Affiliate Obligations

26.     Trico Shipping is the primary obligor on three separate financial debt obligations at Opco: a series of secured notes, a working capital credit facility, and a priority credit facility.

The High Yield Notes

27.     On October 30, 2009, Trico Shipping issued $400 million of 11.875% senior secured notes due 2014 (the "High Yield Notes").  TMS, Trico Holdco, LLC, Trico Cayman, and a substantial number of the non-debtor subsidiaries of TMS (all of which are part of Opco) are guarantors of the High Yield Notes (collectively, the "High Yield Notes Guarantors").[10]

28.     Trico Shipping and the High Yield Notes Guarantors pledged a first-priority lien in substantially all of their assets to secure the High Yield Notes.  The collateral includes 13 vessels and related assets, certain refund guarantees, factoring agreements, the $395 Million Intercompany Note, the $33 Million Intercompany Note, TMS's equity interest in Trico Holdco, LLC, and additional pledges of collateral by a substantial number of TMS's subsidiaries.

---

[10] The High Yield Notes Guarantors are: TMS; Trico Cayman; Holdco; Trico Supply; Trico Subsea Holding AS; Trico Subsea AS; DeepOcean Shipping III AS; Deep Ocean Shipping II AS; DeepOcean Shipping AS; DeepOcean; Trico Supply Limited; Albyn Marine Limited; CTC Marine Projects Limited; DeepOcean Brasil Servicos Ltda.; DeepOcean Maritime AS; DeepOcean Management AS; Deep Ocean de Mexico S. de R.L. de C.V.; CTC Marine Norway AS; CTC Marine Projects (Guernsey) Limited; DeepOcean Subsea Services Limited; DeepOcean BV; DeepOcean UK Ltd.; Servicios Profesionales de Apoyo Especializado, S. de R.L. de C.V.; and Servicios de Soporte Profesional Administrativo, S. de R.L. de C.V.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                          **Page 10 of 28**

US 626006v.8

29.     All of TMS's High Yield Notes Guarantors have also pledged their owned equity interests of certain affiliated subsidiaries to secure the High Yield Notes.[11]  Additionally, nine of the non-debtor subsidiaries have pledged cash accounts.[12]  The vessels and related assets, refund guarantees, factoring agreements, equity pledges, and cash account pledges (collectively, the "Trico Shipping Debt Collateral") constitute the bulk of the collateral pledged under the High Yield Notes.  TMS's guarantee of the High Yield Notes is junior in right of payment to the U.S. Credit Facility.

30.     On June 25, 2010, Trico Shipping and the High Yield Notes Guarantors entered into the first supplemental indenture to the High Yield Notes with Deutsche Bank as trustee (the "First Supplemental Indenture").  The First Supplemental Indenture, among other things, waived certain events of default and increased the amount of indebtedness that can be issued and secured by the Trico Shipping Debt Collateral of the High Yield Notes from $450 million to $465 million.

Trico Shipping Working Capital Facility

31.     In addition to the High Yield Notes, Trico Shipping is party to a working capital facility (the "Trico Shipping W/C Facility") originally with Nordea and Unicredit as lenders, and

---

[11] The Guarantors pledging equity interests include: Holdco; Trico Supply; Trico Shipping; Trico Subsea Holding AS; Trico Subsea AS; DeepOcean Shipping III AS; Deep Ocean Shipping II AS; DeepOcean Shipping AS; DeepOcean; Trico Supply Limited; Albyn Marine Limited; CTC Marine Projects Limited; DeepOcean Brasil Servicos Ltda.; DeepOcean Maritime AS; DeepOcean Management AS; Deep Ocean de Mexico S. de R.L. de C.V.; CTC Marine Norway AS; CTC Marine Projects (Guernsey) Limited; DeepOcean Subsea Services Limited; DeepOcean BV; DeepOcean UK Ltd.; Servicios Profesionales de Apoyo Especializado, S. de R.L. de C.V.; and Servicios de Soporte Profesional Administrativo, S. de R.L. de C.V.
[12] Guarantors pledging cash accounts include Trico Shipping, Trico Supply, DeepOcean Shipping III AS, DeepOcean Shipping II AS, Trico Subsea AS, Trico Subsea Holding AS, DeepOcean AS, DeepOcean Management AS, and DeepOcean Maritime AS.

US 626006v.8

as more fully described herein, with the addition of Tennenbaum Capital as lender.[13]  The

revolving loan portion of the Trico Shipping W/C Facility (provided by Nordea and Unicredit)

expires on December 31, 2011 with quarterly amortization payments of approximately $2.18

million.  Of the total commitment of approximately $15 million, plus a $10 million letter of

credit subfacility, Trico Shipping currently has $6.1 million drawn on the revolving loan portion

of the credit facility, and $5.36 million in issued letters of credit.

32.     Originally, Trico Shipping and its subsidiaries had contemplated adding an

additional $50 million in needed liquidity through an addition of $50 million in High Yield

Notes, as authorized by the First Supplemental Indenture (commonly referred to as the "tack on

bonds").  However, during this process, Trico Shipping was approached by Tennenbaum Capital

to provide the $65 million under a working capital facility, with superior terms to those proposed

under the "tack on bond" structure.

33.     Accordingly, on June 29, 2010, Trico Shipping entered into the Third Amendment

to Credit Agreement and Forbearance Agreement.  This amendment provided for the addition of

a term loan facility (the "Term Loan Facility") to be provided by affiliates of Tennenbaum

Capital, including up to $50 million in Tranche A Term Loans and up to $15 million in Tranche

B Term Loans (collectively, the "Term Loans").

34.     At closing of the Term Loan Facility, Trico Shipping borrowed approximately

$28 million under the Tranche A Term Loans.  All further Term Loan commitments were later

cancelled as set forth below.

---

[13] On June 21, 2010, the Trico Shipping W/C Facility was amended to (i) increase the interest rate by 2% during a
forbearance period, (ii) permit the incurrence of additional indebtedness by Trico Shipping, (iii) revise the manner in
which certain prepayments are applied to scheduled commitment reductions, and (iv) add financial covenants
relating to minimum cash and minimum EBITDA.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363
AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS
TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**

35.     The Trico Shipping W/C Facility, including the Term Loan Facility, is secured by the same Trico Shipping Debt Collateral and are *pari passu* in payment and lien priority with the High Yield Notes.  Similar to the High Yield Notes, TMS's guarantee of the Trico Shipping W/C Facility and the Term Loan Facility is junior in right of payment to the U.S. Credit Facility.

<u>The Priority Credit Agreement</u>

36.     To infuse the necessary liquidity into Opco that was originally contemplated to be provided by the Term Loan Facility, Trico Shipping entered into a $22,000,000 Secured Credit Facility (the "<u>Priority Credit Agreement</u>") with certain holders of the High Yield Notes and Tennenbaum as lenders (collectively, the "<u>Lenders</u>") on September 21, 2010.[14]  Each of Trico Shipping's subsidiaries provided upstream guarantees of the Priority Credit Agreement.  None of the Debtors is a guarantor under the Priority Credit Agreement.

37.     The Priority Credit Agreement consists of (i) a term loan facility in an aggregate principal amount of $15 million, which was fully drawn following the closing of September 21, 2010 ("<u>New Term Loan Facility</u>") and (ii) an additional senior secured term loan facility in an aggregate principal amount of up to $7 million (the "<u>Delayed-Draw Term Loan Facility</u>").  The additional $7 million available under the Delayed-Draw Term Loan Facility was completely funded as of December 6, 2010.  The Priority Credit Facility is secured by a first-priority interest in the Trico Shipping Debt Collateral.  The maturity date for the Priority Credit Facility is the earlier of September 21, 2011 and acceleration following an event of default.

38.     By order dated September 17, 2010, and Amended Order dated October 8, 2010, this Court granted the Debtors authority to execute the necessary credit documents to facilitate

---

[14] Pursuant to the $22,000,000 Priority Credit Agreement, all unused commitments under the Term Loan Facility will be terminated.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363
AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS
TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                 **Page 13 of 28**

US 626006v.8

Trico Shipping's entry into the Priority Credit Facility in the amount of $22 million, with an option to increase those borrowings to $50 million on the same terms. Among the documents executed by the Debtors and the Opco entities was a second supplemental indenture to the High Yield Notes, dated September 21, 2010, (the "Second Supplemental Indenture"), as more fully described in the *Debtors' Motion to Execute Amended Credit Documents* and later-filed supplement thereto [Dkt. Nos. 101, 146].

### The Committee's Investigation of Purported Claims Against Holdco and Opco

39.     Since its appointment, the Committee and its counsel (in an official role, and prior to the Petition Date, certain members of the Committee and the same counsel, in an unofficial role) have investigated purported claims against the Debtors, Opco, and related entities and persons concerning various of the Debtors' and Opco's financing decisions and other alleged actions prior to the Petition Date.

40.     In connection therewith, the Debtors, Opco, and the Committee have engaged in extensive document discovery. In the Committee's Motion, as described above, and the draft complaint attached as an exhibit thereto, the Committee alleges constructive fraud avoidance and other breach of contract claims.

### RELIEF REQUESTED

41.     By this Motion, the Debtors seek an order, pursuant to Bankruptcy Rule 9019(a) and Bankruptcy Code §§ 105(a) and 363(b), approving the Debtors' entry into the Term Sheet and the RSA, including the Settlement of the Intercompany Claims, the Transition Services Claims, and the Existing Equity and the entry into the Transition Services Agreement. Certain material terms of the Term Sheet and the RSA are as follows:

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                          Page 14 of 28

US 626006v.8

a.     **The Restructuring:**     The outstanding indebtedness of, and Existing Equity in, Trico Shipping, Trico Supply, and their respective subsidiaries (collectively referred to in the Term Sheet and the RSA as the "Company" and also referred to herein as the Opco Subsidiaries) shall be restructured through an out-of-court exchange offer (the "Exchange Offer") or, if the requisite levels of consent are not obtained, through an in-Court chapter 11 case (the "Opco Chapter 11 Case") involving the Prepackaged Plan.

b.     **Treatment of Priority Credit Agreement:**     Upon the effectiveness of the Restructuring, the Priority Credit Agreement will be rolled into or repaid in full with the proceeds of a new first priority senior credit facility (the "Exit Credit Facility") secured by substantially all of the assets of the Reorganized Company.[15]

c.     **Treatment of Trico Shipping W/C Facility and High Yield Notes:** Upon the effectiveness of the Restructuring, all claims and rights of holders of the debt arising under the Trico Shipping W/C Facility and the High Yield Notes shall automatically be waived and released in exchange for their *pro rata* share of 100% of the post-restructuring common equity of Reorganized Trico Supply (the "New Common Stock"), subject to dilution due to any issuances made under the Management Incentive Plan (defined below) and the Equity Warrants (defined below) issued under the Settlement.

d.     **Treatment of Holders of Trade Payables:**     Trade payables of the Opco Subsidiaries will remain outstanding and satisfied in the ordinary course of business.

e.     **The Settlement:**     The Existing Equity will be cancelled and the Intercompany Claims and the Transition Services Claims will be waived and released in exchange for 5-year warrants (the "Equity Warrants") to purchase 5% of the New Common Stock (subject to dilution from shares issued in connection with the Management Incentive Plan (defined below)) at an exercise price equal to the implied total enterprise value at which the secured claims under the High Yield Notes, the Priority Credit Agreement, and the Trico Shipping W/C Facility (collectively, the "Existing Debtholders") will have received a full recovery (the "Secured Claim Amount") on allowed claims (including accrued principal, accrued and unpaid interest, and related fees, charges and expenses) under the Exchange Offer.

The Settlement contemplates a distribution of the proceeds thereof under a liquidating chapter 11 plan for the Debtors, providing for a liquidation trust (or other customary liquidation vehicle or mechanism), orderly sales of assets, and customary releases by the Debtors' estates of the Holdco directors, officers, and management.

---

[15] In the event that it becomes necessary to file the Opco Chapter 11 Case, the Company and the Steering Committee shall negotiate use of cash collateral and, if necessary, a DIP financing facility adequate to fund expenses of the Opco Chapter 11 Case and other obligations.  If the DIP financing facility is required, it will be rolled into and repaid in full with the Exit Credit Facility along with the Priority Credit Agreement.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                            **Page 15 of 28**

US 626006v.8

f.    **The Exchange Offer:**  At least 20 business days prior to the effective date of the Restructuring (the "Launch Date"), the Company shall commence the Exchange Offer.  The Exchange Offer contemplates an exchange of the Company's outstanding senior secured debt for 100% of the New Common Stock, subject to dilution due to any issuances made under the Management Incentive Plan (defined below) and the Equity Warrants issued under the Settlement.[16]  The Exchange Offer will be premised and is conditioned on (a) obtaining applicable consents of holders under (i) the Trico Shipping W/C Facility and (ii) 99% of the High Yield Notes and (b) Court approval of the Settlement.  The Exchange Offer will be coupled with a consent solicitation to the holders of the High Yield Notes which will remove the negative covenants and events of default from the Indenture governing the High Yield Notes, and potentially modify the transfer provisions of the Indenture.

g.    **The Prepackaged Chapter 11 Plan:** On the Launch Date, the Company will solicit acceptances of the Prepackaged Plan.  If the Exchange Offer cannot be accomplished due to failure to (i) achieve the requisite exchange threshold and applicable consents or (ii) obtain Bankruptcy Court approval of this Motion, but the Company has obtained the statutorily-required acceptances of the Prepackaged Plan from holders of the secured claims, the Restructuring will be implemented via such Prepackaged Plan.

h.    **The Stalking Horse Bid Under Prepackaged Chapter 11 Plan:**  If the Court does not approve the Settlement, the Opco Subsidiaries will pursue a sale of substantially all of their assets, in whole or in parts) (the "Acquired Assets"), or a sale of the Trico Supply equity interests, pursuant to the Prepackaged Plan, with the Existing Debtholders as the stalking horse bidder (the "Sale Transaction").  The Opco Subsidiaries will negotiate the Sale Transaction with the Existing Debtholders, subject to higher and better bids resulting from an auction process to occur after the Chapter 11 Case is filed. The bid (the "Stalking Horse Bid") of the Existing Debtholders will be a credit bid in an amount equal to the Secured Claim Amount, or such other amount as may be determined by the Steering Committee.

The proposed terms of the Prepackaged Plan only apply to the extent the Stalking Horse Bid is successful.  In the event the Stalking Horse Bid does not prevail, all claims of the Existing Debtholders will be paid in full (or in such lesser amount as the Steering Committee may agree) in cash with the net proceeds of any overbid and the successful overbidder will replace the Stalking Horse Bid under the Prepackaged Plan.

i.    **Alternative Prepackaged Chapter 11 Plan:**  To the extent that the Exchange Offer cannot be accomplished due to failure to achieve the requisite exchange threshold and applicable consents, but this Court approves the Settlement and the Company has obtained statutorily-required acceptances under the Bankruptcy Code of the

---

[16] The holders of the High Yield Notes will exchange their Notes and the holders of the claims under the Trico Shipping W/C Facility will release their claims in exchange for their pro rata shares of the New Common Stock.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363**
**AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS**
**TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                          **Page 16 of 28**

US 626006v.8

Alternative Chapter 11 Plan (as defined below), the Restructuring will be implemented through the Prepackaged Plan.  Under this scenario, the Prepackaged Plan will implement the Settlement only, and not the Sale Transaction.

j.  **Short Term Employee Incentive Plan:**  Prior to the Launch Date, the Opco Subsidiaries, the Debtors, and the Steering Committee will negotiate the terms of a cash-based short term employee incentive plan to cover key employees at both Holdco and the Opco Subsidiaries, provided that no Bankruptcy Court approval will be required prior to the Launch Date.

k.  **Long Term Management Incentive Plan:**  Prior to the Restructuring, the Steering Committee will outline and negotiate a proposed long term Management Incentive Plan (the "Management Incentive Plan") for the Company, which will provide for grants of warrants or options in the equity of the reorganized Trico Supply.

l.  **Transition Services Agreement:**  As part of the Restructuring, the Opco Subsidiaries and the Debtors will enter into a Transition Services Agreement, whereby the Opco Subsidiaries will agree to pay $750,000 (which is net of charter costs for an Opco-owned vessel), each month to the Debtors.  The Debtors, in turn, will agree to provide to the Opco Subsidiaries corporate and support services consistent with those provided by the Debtors during the last 12 months.  The Transition Services Agreement will run for a period of 12 months; however, it will be cancellable at any time after January 31, 2011 by the Opco Subsidiaries upon notice to the Debtors.

m.  **"Fiduciary Out" Provision:**  Among other termination provisions, the RSA contains a "fiduciary out" clause allowing either the Holdco Debtors or the Opco Subsidiaries to terminate their respective obligations under the RSA and the Term Sheet if they determine that a better offer or proposal exists that they would be compelled to consider and accept in a proper exercise of their fiduciary duties.  This fiduciary out provision, which is set forth in Section 2 of the RSA, states as follows:

> Notwithstanding anything to the contrary contained in this RSA, each of the Company or the Holdco Debtors, as applicable, may terminate their respective obligations pursuant to the foregoing provisions and those set forth in Section 4 hereunder by five (5) Business Days' prior written notice to counsel for the Consenting Holders if the Company or the Holdco Debtors has received a proposal for any sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Company either under Chapter 7 or Chapter 11 of the Bankruptcy Code, that the Company's Board of Directors or the  Holdco Debtors' Board of Directors, as applicable, reasonably determines (upon consultation with legal counsel and financial advisors), in the good faith exercise of such Board of Directors' respective business judgment and duties, is higher and better than the proposal of the Consenting

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                    **Page 17 of 28**

US 626006v.8

Noteholders set forth in the Restructuring Term Sheet and that continued support of the Restructuring in accordance with the Restructuring Term Sheet would be inconsistent with their respective fiduciary obligations.

## BASIS FOR RELIEF

42.     As set forth in detail below, the Debtors submit that entry into the Settlement and related agreements is a sound and prudent exercise of their business judgment authorized under Bankruptcy Code § 363(b) and that the terms of the Settlement represent a sound business purpose and fall above the required level of reasonableness for a compromise to be authorized pursuant to Bankruptcy Rule 9019.

**A.     The Settlement is a Proper Exercise of the Debtors' Right to Compromise Claims and Controversies Contemplated by Bankruptcy Rule 9019.**

43.     Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  Compromises and settlements are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).  The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Banta D. Del. 2006); *see also In re Penn Central Transportation Co.*, 596 F.2d 1102 (3d Cir. 1979).[17]

---

[17] Here, litigation is not being settled.  However, the Intercompany Claims that would otherwise be pursued under the Intercompany Notes, as well as any Transition Services Claims to be brought against the Opco Subsidiaries, are claims that the Debtors are seeking to settle hereby.  In addition, this Settlement avoids potentially costly litigation over the value of the Trico Supply equity interests.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                    Page 18 of 28

US 626006v.8

44. The decision to approve a settlement "is within the discretion of the bankruptcy court." *In re World Health Alternatives, Inc.*, 344 B.R. at 296; *see also In re Neshaminy Office Building Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986), cited with approval in *Meyers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996). Yet, the bankruptcy court should not substitute its judgment for that of the debtor. *See In re Neshaminy Office Building Associates*, 62 B.R. at 803. The court is not to decide the numerous questions of law or fact raised by an alleged claim that may morph into litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness. *See In re W.T. Grant and Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *see also In re World Health Alternatives, Inc.*, 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible compromise." Rather, the court must decide that the settlement is within a range of reasonableness.).

45. The Third Circuit Court of Appeals has enumerated four factors that should be considered in determining whether a settlement should be approved: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of the creditors. *In re Martin*, 91 F.3d at 393; *accord Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that the *Martin* factors are useful when analyzing settlements of both claims belonging to the debtor and claims against the debtor).

46. While the first three factors suggest a standard more suited to evaluating a settlement of litigation, they are easily applicable to the proposed Settlement set forth herein.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363**
**AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS**
**TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                    **Page 19 of 28**

US 626006v.8

Factors (1), (2), and (3) are applicable here, as this Court needs to evaluate the complexities of bringing and pursuing the Intercompany Claims and tge Transition Services Claims, as well as the likelihood of success in pursuing such claims. "Success" necessarily would entail a difficult, time consuming, and costly evaluation of whether the Intercompany Claims, the Transition Services Claims, and the Existing Equity have any value at all, based upon the value of the Opco Subsidiaries, and whether the Debtors would be successful in collecting on the Intercompany Notes. The fourth factor, the paramount interest of creditors, is also applicable here and is likely the single most important factor this Court should consider.

47. As set forth below, the Debtors' entry into the Term Sheet for the Settlement of the Intercompany Claims, the Transition Services Claims, and the Existing Equity is in the best interests of the Debtors' estates and creditors in these Cases.

**The Settlement is Superior to Complex, Expensive Litigation with a Marginal Chance of Success**

48. It goes without saying that, if this Court does not approve the Settlement, the Debtors' alternative will be to enforce collection remedies under the Intercompany Notes, which they do not believe can be effectively enforced due to the senior debt held by the Opco Subsidiaries' Existing Debtholders (the "Senior Debt") to which the Intercompany Notes are subordinated. What makes this more difficult is that the terms of the Intercompany Notes forbid even the making of a demand for payment.

49. Even if the Debtors could attempt to enforce remedies, the enforcement of such remedies would appear to be a moot exercise. It is the Debtors' belief that the enterprise value of Opco is less than the amount of the Senior Debt. The Debtors have been testing this belief by

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                    **Page 20 of 28**

US 626006v.8

pursuing a marketing and sales process of Opco's assets and businesses and will continue to do so through at least the date of the hearing on this Motion. The Debtors submit that they will provide evidence of this at the hearing on the Motion.

50. There are additional reasons why this is the only path to any recovery on the Intercompany Notes. As outlined in the Term Sheet and the RSA, the Steering Committee has, in conjunction with the Debtors and the Opco Subsidiaries, determined that the Opco Subsidiaries cannot sustain the level of debt currently in place (*i.e.*, the Senior Debt). The Steering Committee has offered to fully equitize the Senior Debt through the Exchange Offer or, alternatively, through the Opco Chapter 11 Case. If the Court does not approve the Settlement, the equitization will be accomplished through the Prepackaged Plan, leading to additional delay and cost, to the detriment of all parties. Under such circumstances, it is unlikely that there would be any recovery on the Intercompany Notes.

51. At that point, any pursuit of the Intercompany Claims, the Transition Services Claims, and the Existing Equity will necessarily entail expensive and protracted litigation over confirmation of the Prepackaged Plan and valuation of the Opco Subsidiaries. If the sales process does not yield a recovery in excess of the Opco secured debt, it is unclear how a recovery will be obtained on the Intercompany Notes, the Transition Services Claims, or the Existing Equity. Protracted valuation litigation would be expensive, distracting, and time consuming and, at the conclusion of such litigation, given that Opco is substantially overleveraged, the Debtors' subordinated Intercompany Notes, the Transition Services Claims, and the Existing Equity are very likely to be found to have little or no value.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**

US 626006v.6                                                                    Page 21 of 28

US 626006v.8

52.     The sizeable litigation expenses that the Debtors would incur in a tenuous valuation battle involving Norwegian and UK companies would completely consume these estates and could render them administratively insolvent.  The Debtors are in the process of selling their primary assets (the towing and supply vessels), and expect to file a liquidating chapter 11 plan in the near future.  The Debtors simply do not have the liquidity to fund expensive litigation with little hope of return for the benefit of their estates.  Furthermore, drawn-out litigation may concern individual creditors and customers of the Opco Subsidiaries regarding Opco's future viability, possibly causing such parties to cancel contracts and relationships or bring separate proceedings in foreign jurisdictions, adding additional burdens to the Opco Subsidiaries and further impacting any value to Holdco.

53.     Simply put, the failure to achieve approval of the Settlement or other consensual resolution of the Intercompany Claims, the Transition Services Claims, and the Existing Equity threatens to add a substantial level of inconvenience, expense, and uncertainty to these Cases, the effects of which would ultimately be borne by the Debtors' estates and creditors.  Conversely, the Debtors' entry into the Term Sheet and the RSA would provide immediate value to the estates in the form of the Equity Warrants described above.  The Debtors would seek to have the Equity Warrants distributed to their creditors as efficiently as possible pursuant to a liquidating plan that could preserve certain causes of action, such as those alleged in the Committee's Motion.  Thus, the Term Sheet and the RSA provide tangible value to the estates in the form of the Equity Warrants, which value the Debtors do not believe they would realize if the estates were forced to engage in litigation on the Intercompany Claims, the Transition Services Claims, and the Existing Equity.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                      **Page 22 of 28**

US 626006v.8

54.     The Term Sheet and the RSA also provide value to the Debtors in the form of a Transition Services Agreement between the Debtors and Opco, which will provide the Debtors with approximately $750,000 each month in exchange for the Debtors' providing corporate support services to the Opco Subsidiaries.  Additionally and significantly, TMS's guarantee of the Senior Debt is being released pursuant to the Term Sheet and the RSA.  Depending on the value of the Opco Subsidiaries, the Existing Debtholders could otherwise assert unsecured guarantee claims against the Debtors' estates relating to the Senior Debt on account of their deficiency claims for either the amount of the deficiency or, possible, up to the face amount of the guaranteed debt.  Currently that guaranteed senior debt is at least $434.1 million, and although the Debtors could seek to limit the allowed amount of the guaranty claim to the amount of any deficiency, such claim would in any case be very significant and would constitute one of the largest claims in these Cases.   Absent the Settlement, the assertion of such guarantee claims significantly delay the distributions of recoveries to the Debtors' direct creditors and would further dilute the recovery available to the unsecured creditors of the Debtors' estates.

55.     Therefore, because the Debtors do not believe, in a good faith exercise of their business judgment, that the Debtors would be successful in any attempt to collect on the Intercompany Claims or the Transition Services Claims, or realize any value from the Existing Equity, and that any attempt to do so would be extremely complex and expensive at levels these estates cannot afford, the Settlement is manifestly fair and reasonable and in the best interests of their estates.

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363
AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS
TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                              **Page 23 of 28**

US 626006v.8

**The Settlement Serves the Paramount Interests of the Debtors' Creditors**

56.     The Settlement also serves the paramount interests of the Debtors' creditors. Although the settlement reached with the DIP Lenders in connection with the Cash Collateral Motion provides the funding for the Debtors to operate the Cases, the Debtors' continued financial soundness is uncertain.  As explained above, if the Court does not approve this Motion and the Debtors are forced to enter into protracted and speculative valuation or other litigation, the estates would incur substantial litigation fees and costs—fees and costs that could consume and delay any recoveries for unsecured creditors in these Cases, in terms of both a significant reduction in assets available for distribution and a delay in receiving that distribution.  Indeed, these costs alone may once again jeopardize the administrative solvency of these estates.

57.     Additionally, by settling the Intercompany Claims, the Transition Services Claims, and the Existing Equity with a warrant "package," the Debtors' estates have negotiated a settlement that hedges against any risk or allegations that the Debtors' valuation of the Opco Subsidiaries is incorrectly low.   The Debtors believe they will establish that the Opco Subsidiaries' value is below $485 million; however, if the implied equity value of the Opco Subsidiaries greatly exceeds $485 million, the Equity Warrants (by that time to likely have been distributed to the Debtors' creditors) will have value.  Accordingly, the Equity Warrants serve the paramount interests of the Debtors' creditors by preserving long term enterprise value in Opco for their benefit, even though the Intercompany Notes and the Existing Equity may *currently* be without tangible or realizable projected value.

58.     The Settlement also protects the creditors' interests by preserving *all* claims the Debtors may have against the Opco Subsidiaries, other than the claims based on the

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363
AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS
TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                            **Page 24 of 28**

US 626006v.8

Intercompany Notes and the Transition Services Claims. The Committee has repeatedly alleged, including in their recently-filed motion, that the Debtors' estates have claims against the Opco Subsidiaries, claims based upon fraudulent transfer and other such causes of action. While the Debtors do not believe that any such claims exist and will, at the appropriate time, respond to the allegations set forth in the Committee's Motion, the Settlement nevertheless preserves those claims that the Debtors' estates may have against the Opco Subsidiaries based upon the theories outlined by the Committee. Therefore, the Settlement protects the alleged litigation claims the Committee purportedly values, which are not being released in the Settlement.

**B.      The Debtors' Entry into the Term Sheet and the RSA is Proper under Bankruptcy Code §§ 363 and 105**

59.      Section 363(b) provides that, after notice and a hearing, a debtor may engage in activities outside the ordinary course of business, with "courts require the debtor to show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *see In re Lionel Corp.*, 722 F. 2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a 363(b) application expressly find from the evidence presented before him a good business reason to grant the application."); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

60.      Additionally, Section 105(a) of the Bankruptcy Code empowers a court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, and courts have held that the purpose of Section 105(a) is to ensure a court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction." 2 *Collier on Bankruptcy*, ¶ 105.01 (15th rev. ed. 1997); *see also In re Joint E. & S.*

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**

US 626006v.6                                                                                                          **Page 25 of 28**

US 626006v.8

*Dist. Asbestos Litig.*, 129 B.R. 710, 843 (S.D.N.Y. 1991); *see also Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

61.     Any actions required to effectuate the terms of the Term Sheet, the RSA, and the Settlement, including entry into such and related agreements, should be authorized and approved pursuant to Bankruptcy Code §§ 363(b) and 105(a) for the reasons set forth above.  Such actions are certainly within the Debtors' sound business judgment, as approved by the Debtors' board of directors, and necessary to effectuate and finalize a global restructuring of the entirety of the Trico Marine Group.  Indeed, authorizing the Debtors to enter into the RSA and effectuate the terms of the Settlement is also well within the equitable powers of this Court, as the Debtors have demonstrated herein that entry into the Settlement will benefit all of the Debtors' constituents.

## CONCLUSION

62.     By deciding to settle all issues surrounding the value of the Intercompany Claims, the Transition Services Claims, and the Existing Equity at Opco, the Debtors weighed the relative risks and expenses of litigation and the benefits of settling, including, but not limited to, their ability to emerge from chapter 11 quickly and the advantages to their chapter 11 estates. The Debtors, with the assistance of their counsel and financial advisors, have carefully evaluated

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                                              **Page 26 of 28**

US 626006v.8

all aspects of the Term Sheet, the RSA, and the Settlement, including exploration of alternatives to the Settlement, and have determined that the Settlement is fair and reasonable and that it is in the Debtors' best interests to execute the Term Sheet and the RSA. Accordingly, because the Settlement: (i) is fair and equitable, (ii) represents a settlement that is well within the range of reasonableness, and (iii) obviates the expense, delay, inconvenience, and uncertainty that would attend any litigation of the value of the Intercompany Claims, the Transition Services Claims, and the Existing Equity, the Court should approve the Settlement.

## NO PRIOR REQUEST

63.     No prior request for the relief sought in this Motion has been made to this Court in these Cases.

## NOTICE

64.     Notice of this Motion has been provided by e-mail, facsimile, or overnight delivery to: (a) the Office of the United States Trustee for the District of Delaware; (b) Tennenbaum, as lender for the U.S. Credit Facility; (c) Obsidian, as administrative agent and collateral agent for the U.S. Credit Facility; (d) Nordea, as lender for the Trico Shipping W/C Facility and as administrative agent and collateral agent for the U.S. Credit Facility; (e) U.S. Bank, as Trustee and collateral agent for the Secured Notes; (f) Wells Fargo Bank, as Trustee for the 3% Notes; (g) Unicredit, as lender for the Trico Shipping W/C Facility; (h) Deutsche Bank National Trust Company, as Trustee for the High Yield Notes; (i) Wilmington Trust FSB, as collateral agent to the intercreditor agreement between the Trico Shipping W/C Facility and the High Yield Notes; (j) those persons who have formally appeared in these Cases and requested service pursuant to Bankruptcy Rule 2002; (k) counsel to the Official Committee of Unsecured

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**

US 626006v.6                                                                 **Page 27 of 28**

US 626006v.8

Creditors; and (l) all applicable government agencies to the extent required by the Bankruptcy Rules and the Local Rules.

## PRAYER

WHEREFORE, the Debtors respectfully request that the Court (i) grant this Motion, (ii) authorize the Debtors to execute the Term Sheet and the RSA and enter into the Settlement contained therein, and (iii) grant such other and further relief as is just and proper.

Respectfully submitted,

December 6, 2010
Wilmington, Delaware

*/s/ Andrew R. Remming*
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
L. John Bird (No. 5310)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Tel: 302.658.9200
Fax: 302.658.3989

-and-

John E. Mitchell
Angela B. Degeyter
John Paul K. Napier
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Tel: 214.220.7700
Fax: 214.999.7787
jmitchell@velaw.com
adegeyter@velaw.com
jnapier@velaw.com

*Attorneys for the Debtors and*
*Debtors-in-Possession*

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 9019 FOR AN ORDER AUTHORIZING THE DEBTORS TO COMPROMISE CERTAIN INTERCOMPANY CLAIMS AND EQUITY INTERESTS**
US 626006v.6                                                                 **Page 28 of 28**

US 626006v.8