# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRICO MARINE SERVICES, INC., *et al.*,[1] | ) | Case No. 10-12653 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **RE: D.I. 741** |

## DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), file this *Objection to Emergency Motion of PACC Offshore Services Holding Pte Ltd For (A) Immediate Telephonic Hearing On Dispute Over Memorandum of Agreement and (B) Order Enforcing the Sale Order and Prohibiting Debtors From Withdrawing or Distributing Escrowed Funds Pending Further Order of the Court and/or Directing the Parties to Arbitration* (the "Objection") and respectfully submit the following:

## INITIAL STATEMENT[2]

The Debtors are ready, willing and able to close on the Mystic and have been since December 17, 2010. As this Court is aware, on November 29, 2010, PACC sought to reopen the

---

[1] The Debtors are the following entities (followed by the last four digits of their tax identification numbers): Trico Marine Services, Inc. (2405); Trico Marine Assets, Inc. (2404); Trico Marine Operators, Inc. (6124); Trico Marine International, Inc. (3132); Trico Holdco, LLC (3870); Trico Marine Cayman, L.P. (5842). The mailing address for all of the Debtors for the purpose of these Cases is 10001 Woodloch Forest Drive, Suite 610, The Woodlands, TX 77380.

[2] Captalized terms not defined in this Initial Statement shall have the meanings ascribed to them in the body of this Objection.

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION** Page 1 of 19

US 718926v.4

auction for the Mystic and the Moon on the basis that it would provide a prompt and certain close and, thus, liquidity to the estates. However, instead of a prompt close and additional needed liquidity, PACC has refused to close, issued a "cancelling letter" and objected to the Debtors' ability to withdraw the Sale Proceeds in contravention of PACC's previous agreement and the Sale Order.[3]

PACC's failure to close creates extreme harm and prejudice to the Debtors, without even factoring in the cost in terms of professional fees and company time and effort addressing the failure to close. To extent PACC does not close on the Sale, the Debtors are faced with the need to seek an extension from Tidewater of its back-up bid. Even worse, PACC's failure to close has placed the Debtors in a catch-22 situation with Tidewater's back-up bid. Specifically, Petrobras has indicated it will only consider an assignment of the Debtors' agreement to Tidewater if the Debtors indicate that Tidewater, and not PACC, may purchase the Mystic. This means the Debtors must forego any opportunity to close with PACC. And on top of all of this, the DIP Lenders have informed the Debtors that due to PACC's failure to close, the Debtors are in default of the cash collateral budget and the DIP Lenders have threatened to cut off the

---

[3] At this point, the Debtors can only surmise why PACC is refusing the close. PACC may have had a change of heart about dealing with Petrobras and buying a ship subject to a Petrobras charter. Indeed, PACC first met with Petrobras "face to face" on or about December 16, 2010, only to refuse to close two weeks later (notwithstanding PACC's repeated assertions to the Court that it would close regardless of the assignment of the Petrobras charter). Another reason could have been the repairs then being made to the vessel. However, when PACC issued its cancelling notice, the Mystic had been repaired and was fully operational and back in service with Petrobras. The current state of the vessel could not support the issuing of the notice, the Mystic was operating. Perhaps it was the fact that this vessel had a history of electrical repairs. But that reason cannot support a cancellation, either, as the mechanical history of the vessel was available to PACC in the ship's logs when PACC conducted its due diligence. PACC knew of the repair history and chose to bid on the vessel anyway. Now, not only has PACC refused to close, upon belief, PACC is actively trying to sell the Moon (the Mystic's sister ship and of same design) to the Moon's back up bidder.

Debtors' continued use of cash collateral. Accordingly, PACC's failure to close threatens the Debtors' use of cash collateral and, ultimately, the viability of these Debtors.

## JURISDICTION AND PROCEDURAL BACKGROUND

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. On August 25, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy cases (the "Cases").

4. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

5. An official committee of unsecured creditors (the "Committee") was appointed in these Cases on September 8, 2010.

## STATEMENT OF FACTS

### Background

6. On November 12, 2010, the Bankruptcy Court entered an order (the "Sale Procedures Order") [Dkt. No. 447] providing for, among other things, approval of sale procedures related to the Trico Mystic (the "Mystic") and Trico Moon (the "Moon" and together with the Mystic, the "Vessels"), (b) the date for the Auction (defined below), and (c) the date for the Sale Hearing (defined below).

7. Pursuant to the Sale Procedures Order, the Debtors held an auction (the "Auction") on November 24, 2010 for the Vessels. Participating in the Auction were

representatives from qualified bidders Tidewater Inc. ("Tidewater"), Odyssea Vessels, Inc. ("Odyssea"), PACC Offshore Services Holdings Pte Lte ("PACC"), and Seacor Marine LLC ("Seacor"). All bidders were required to use the form of sale agreement attached to the Sale Procedures, which agreement was originally negotiated between the Debtors and Tidewater.

8. Also, pursuant to the Sale Procedures, bids could not have any inspection contingencies. PACC complied with this requirement by submitting a letter dated November 23, 2010, giving notice that PACC had inspected the Vessels and accepting their condition.[4]

9. At the conclusion of the bidding on November 24, 2010, the Debtors, after consultation with the Committee, selected Tidewater's *en bloc* bid of $30,500,000 as the highest and best bid for the Vessels. The Debtors chose Tidewater's bid notwithstanding the fact that PACC's *en bloc* offer was for $30,750,000 ($250,000 higher than Tidewater) because the Debtors believed that, with regard to the Mystic, a closing with Tidewater provided most certainty to the Debtors' estates.[5] Particularly, the Debtors believed that Tidewater, given its business operations and history, had the greatest likelihood of being able to assume the Petrobras Contracts.

## PACC's Objection to the Sale to Tidewater

10. On November 29, 2010, the Court held a hearing to approve the sale of the Vessels to Tidewater. PACC and Odyssea objected to the sale to Tidewater. Specifically, PACC

---

[4] A copy of such waiver letter is attached hereto as **Exhibit A**.

[5] The Mystic operates under that certain charter contract (the "Charter Contract") between Petroleo Brasileiro S/A ("Petrobras") and debtor Trico Marine Operators, Inc. ("TMO") and that certain service contract (the "Service Contract" and together with the Charter Contract, the "Petrobras Contracts") between non-debtor Trico Servicos Maritimos, Ltd. ("Trico Servicos") and Petrobras in Brazil. TMO, through the Charter Contract, provides support to Petrobras with regards to production and drilling units in Brazil and Trico Servicos, through the Service Contract, is responsible for supplying the Mystic with all operations necessary to perform the Charter Contract.

stated that it was "willing to close immediately, on both vessels, without the assignment of the [Petrobras Contracts]" and argued its bid would bring more money to the Debtors' estates. Transcript of November 29, 2010 Hearing at 62:21-24 and at 66:15-22 (when asked if PACC would close on the Mystic without assignment of the Petrobras Contracts, PACC replied, "[t]hat's correct").[6]

11. After PACC's declaration that its bid would offer more to the Debtors' estates, the Debtors' DIP Lenders stated that because PACC "was prepared to close immediately on both ships without contingency . . . we would support the gavel coming down in favor of [PACC] without a break-up fee, so the money can come into this estate right away." Transcript of November 29, 2010 Hearing at 64:17-22.

### The Continued Auction and Selection of PACC as the Successful Bidder

12. Based on the above-described statements at the sale hearing, the Court ordered the Auction to continue on November 30, 2010 subject to the following terms:

    a. the total purchase price for the Vessels must be escrowed within two business days after order of the Court approving the sale;

    b. the Vessels would remain U.S. flagged;

    c. entry of a final order on the sale must be waived;

    d. the Successful Bidder must enter into a back-to-back agreement (the "Back-to-Back Agreements") with the Debtors, providing for continued performance under the Petrobras Contracts, and standard indemnities for such an arrangement; and

    e. closing to occur as soon as the Debtors were in a position to close (collectively, the "Bid Terms").

---

[6] A copy of the November 29, 2010 hearing transcript is attached hereto as **Exhibit B**.

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION**     **Page 5 of 19**
US 718926v.4

Transcript of November 29, 2010 Hearing at 72:25-73-6; 73:23-74:4. These Bid Terms were confirmed by PACC at the November 29, 2010 hearing. *Id.* at 74:9.

13. On November 30, 2010, the Debtors continued the Auction. Prior to accepting bids, the Debtors re-stated the terms of the Auction, including the requirement that "[c]losing must occur on each vessel separately as soon as the Debtors are in a position to close." Transcript of November 30, 2010 Auction at 9:10-12.[7]

14. At the conclusion of the Auction on November 30, 2010, the Debtors, in consultation with the Committee and the DIP Lenders, selected PACC's bid as the Successful Bid for the Vessels. In addition to the Bid Terms, PACC was to pay $15,640,000.50 for the Moon and $15,640,000.50 for the Mystic. Five percent of the purchase price, $1,564,000.05 (the "Escrow"), was to be escrowed as a holdback under the Agreement with the remaining 95%, $29,716,000.95 (the "Sale Proceeds"), to be deposited into a segregated DIP account.

15. The Debtors selected Odyssea as the back-up bidder for the Moon, with a purchase price of $15,700,000, and Tidewater as the back-up bidder for the Mystic, with a purchase price of $15,250,000 (together, the "Back-Up Bidders").[8]

16. Accordingly, Trico Marine Assets, Inc. ("TMA" or "Seller") and PACC edited the Tidewater form of Heads of Agreement (the "Agreement") and the Memorandums of Agreement for the Moon and the Mystic (individually, the "Moon MOA" and "Mystic MOA" respectively, and together, the "MOAs").[9]

---

[7] A copy of the November 30, 2010 auction transcript is attached hereto as **Exhibit C**.

[8] Tidewater's back-up bid contained different terms and required the assignment of the Petrobras Contracts contemporaneously with closing.

[9] Copies of the Agreement and the MOAs are attached hereto as **Exhibit D**.

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION** Page 6 of 19
US 718926v.4

17. The Agreement specifically states that the venue for handling any disputes arising out of the Agreement was to be the Bankruptcy Court; provided however, that if the Court declines to take jurisdiction over the dispute, such dispute shall be referred to arbitration. Agreement at § 8. Moreover, in the case of any inconsistency with the Agreement and the MOAs, the Agreement controls. Agreement at § 7.

18. On the afternoon of November 30, 2010, the Court held a hearing to approve the sale of the Vessels. At the hearing, the sale terms were again announced on the record. Transcript of November 30, 2010 Hearing at 17:10-18:21.[10] Specifically, the Debtors stated their selection of PACC as the Successful Bidder on the "the same terms as described [at the November 29, 2010 hearing] on the record." *Id.* at 12:21-22. The terms of the Successful Bid were confirmed by PACC. *Id.* 22:21-22.

19. On December 1, 2010, the Court entered its *Order Granting Motion to Approve the Sale of Assets Free and Clear of Liens, Claims, and Encumbrances to Buyer* (the "Sale Order") [Dkt. No. 561] approving the sale of the Vessels as described in the Agreement, the Sale Order and on the record at the hearings before the Bankruptcy Court on November 29 and November 30, 2010 (collectively, the "Sale Hearings").

20. Under paragraph 5 the Sale Order, the Sale Proceeds may be withdrawn on the earlier of (a) one business day after delivery of written notice by the Debtors that they have satisfied all performance conditions set forth in the Agreement, (b) waiver by PACC of any unperformed conditions by the debtors as set forth in the Agreement, (c) upon agreement of PACC and the Debtors, and (d) further order of this court (the "Withdrawal Events").

---

[10] A copy of the November 30, 2010 hearing transcript is attached hereto as **Exhibit E**.

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION** **Page 7 of 19**
US 718926v.4

## The Debtors' Efforts to Close the Sale of the Vessels

21. Beginning immediately after entry of the Sale Order, on December 1, 2010, the Debtors and PACC began discussing a prompt closing of the Moon and Mystic and drafting the Back-to-Back Agreements.

22. The Debtors and PACC closed on the sale of the Moon on December 10, 2010 and $14,858,000.48 of the Sale Proceeds was withdrawn and distributed per the Budget[11].

23. The Debtors and PACC agreed on a December 17, 2010 closing date for the Mystic and negotiated the Back-to-Back Agreements in anticipation of such closing. As part of the closing, the Debtors paid for portions of the Petrobras Contracts to be translated from Portuguese into English and such translations were completed and submitted to PACC on December 16, 2010. Upon information and belief, prior to December 16, 2010, PACC did not have an English version of the Petrobras Contracts.

24. Notwithstanding the anticipated entry into the Back-to-Back Agreements, the parties also began work on the Petrobras Contracts assignment process. Accordingly, on December 16, 2010, representatives of the Debtors, PACC, and Petrobras met face-to-face in Brazil to begin assignment of the Petrobras Contracts.

25. The following day, on December 17, 2010, the Debtors and PACC met at the Debtors' offices to close under the Sale Order. During the closing process, PACC's counsel informed the Debtors that PACC had been notified that the Mystic had an electric issue that needed repair. The electrical issue was that one of three delta modules used for the power

---

[11] Consistent with the Debtors' usual practices, unless requested by a buyer, a formal written Notice of Readiness was not given. PACC did not request such notice for the Moon and the parties simply scheduled a closing date and closed the sale of the Moon. The same procedure was used for the Mystic.

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION** Page 8 of 19
US 718926v.4

management system burned out. This problem had happened in the past and had previously caused significant downtime. The logs on the Mystic showed that the vessel had been off-hire for approximately 2,384 hours (99 days) since October 29, 2009 (although as of the filing of this Objection, it is believed that not all of the down-time was due to electrical issues). PACC inspected the Mystic on November 17, 2010 and accepted its present condition.[12] *See* Mystic MOA at clause 4(a) and Exhibit A. All relevant vessel logs were available for PACC's review at the time of inspection, and such logs disclosed the amount of downtime for the Mystic.

26. The burnt module did not result in the Mystic being inoperable and ultimately was an $85,000 repair that did not effect class status. Although the vessel could not contractually perform under the Petrobras Contracts until repaired she was otherwise mobile and could operate and get to port on her own.

27. The Debtors began immediately working on repairing the Mystic, and in good faith agreed to absorb all costs of repair, including all costs associated with any down-time. The Debtors and PACC discussed closing prior to the repairs being finalized, and numerous drafts of the Back-to-Back Agreements were exchanged *reflecting a closing with repairs ongoing*. At no time prior to December 30, 2010 did PACC state that it would not close without the repairs being completed.

28. Repairs to the Trico Mystic depended upon the efforts of Coverteam, Inc. ("Converteam"), a vendor of the Debtors. Converteam began repairing the Mystic on December 18, 2010, but was initially unsuccessful. Subsequently, on December 23, 2010, Converteam told

---

[12] After inspecting the Mystic, PACC never communicated to the Debtors any issues with the Mystic's condition, nor did PACC seek any contingencies related to the Mystic's condition.

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION** Page 9 of 19
US 718926v.4

the Debtors that the repairs would not continue unless and until its pre-petition claim was paid.[13] The Debtors attempted to contact Converteam over the Christmas holiday to complete repairs on the Mystic, but received no response from Converteam until December 27, 2010. The Debtors diligently worked with Converteam to settle the dispute over the pre-petition invoices, and upon resolution of the issues with Converteam, the repairs to the Mystic were completed and the vessel was back on hire with Petrobras on January 2, 2011.

29. PACC was informed in real time of the Debtors' repair efforts and knew the Debtors were negotiating the payment of a pre-petition claim of Converteam. At no time, did PACC state that the repairs needed to be completed by a date certain or that PACC would not close if the repairs weren't completed by a date certain.

30. During the Converteam delay, the Debtors and PACC discussed closing on the Mystic prior to the repairs being finalized. During this time the parties continued to negotiate the Back-to-Back Agreements to reflect a closing prior to the repairs being completed.

31. On December 27, 2010, the Debtors reiterated its readiness to close prior to the repairs being finalized, and counsel for PACC sent a few minor comments to the Back-to-Back Agreements and stated that counsel was waiting on approval from PACC to close on the Mystic. Subsequently, on December 28, 2010 and December 29, 2010, counsel for PACC notified counsel for the Debtors he was still awaiting *final sign off* on the Back-to-Back Agreements from PACC.

32. Just one day later, and without any explanation, PACC's counsel for the first time mentioned the December 30, 2010 cancelling date and stated that PACC intended to cancel the

---

[13] The Debtors books and records show Converteam was owed $380,000 pre-petition. On the other hand, Converteam originally sought in excess of $1 million from the Debtors on account of disputed invoices.

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION** **Page 10 of 19**
US 718926v.4

Mystic MOA. PACC's message that it intended to cancel the contract gave the Debtors very little time, less than one day, to react and determine how to respond. PACC's notice (yet to be delivered) was a complete change of position in how it had been dealing with the Debtors with respect to the repairs. Indeed, PACC's counsel's last statement to the Debtors was that he was awaiting "final sign off" on the documents for closing. Then, in what appears to be an attempt to run out the clock on the Debtors, PACC notified the Debtors of its intent to cancel, for the stated reason of the boat not being repaired.

33. Unsure of PACC's motives, the Debtors presumed that PACC did not want to let the cancelling date run without the vessel being repaired. Accordingly, the Debtors determined that they should send notice to PACC to extend the cancelling date for 15 days to January 15, 2011. By chance, also on December 30, the Debtors were meeting with Converteam regarding a critical vendor payment (ultimately $300,000) to gain Converteam's agreement to repair the vessel on an expedited basis over the New Year's weekend.

34. The Debtors' contacted PACC's counsel, and let him know the extension letter was forthcoming. The Debtors also informed PACC that an agreement had been reached with Converteam with respect to the critical vendor payment and that work would start immediately. Counsel for PACC responded that he appreciated the extension, that he would inform his clients, and that the Debtors should keep PACC apprised of the repairs over the weekend.

35. By Sunday morning, January 2, 2011, the repairs were completed and the Mystic was back on-hire under the Petrobras Contracts. PACC was immediately informed of this fact.

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION** **Page 11 of 19**
US 718926v.4

36. Nevertheless, late in the afternoon on January 3, 2011, PACC sent notice to the Debtors of its intention to cancel the MOA pursuant to clauses 5(c) and 14 of the Mystic MOA.[14] PACC also requested immediate release of the Sale Proceeds with respect to the Mystic.

37. Upon receipt of this notice, the Debtors contacted PACC in an attempt consensually resolve any issues that may have led to PACC's decision to seek cancellation of the Mystic MOA. PACC, however, rebuffed these attempts by the Debtors. On January 6, 2011, the Debtors reiterated to PACC their readiness to close on the Mystic immediately, and notified PACC that they had satisfied all performance conditions set forth in the Agreement.

38. On January 10, 2011, the Debtors sent a letter (the "Notification of Withdrawal Event")[15] notifying PACC that a Withdrawal Event had occurred, and that the Debtors would distribute the Mystic Distribution (as defined in the Sale Order) of $14,858,000.47 the following business day in accordance with the Sale Order.

39. On January 11, 2011, PACC filed a motion (the "Emergency Motion") [Dkt. No. 741] seeking, *inter alia*, an immediate telephonic hearing on the dispute over the Mystic MOA, and entry of an order enforcing the Sale Order and prohibiting the Debtors from withdrawing or distributing the Sale Proceeds pending further order of the Court, and/or directing the Debtors and PACC to arbitration.

40. On January 11, 2011, the Debtors agreed not to withdraw the Sale Proceeds absent further order of this Court.

---

[14] A copy of this PACC letter is attached hereto as **Exhibit F**.

[15] A copy of the Notification of Withdrawal Event is attached hereto as **Exhibit G**.

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION** Page 12 of 19
US 718926v.4

## OBJECTION

41. As this Court is well aware, on November 8, 2010, the Debtors' DIP Lenders terminated the existing DIP Facility and the Debtors' authority to use cash collateral. On November 29, 2010, concurrently with the scheduled hearing to approve the sale of the Mystic and Moon to Tidewater, this Court was to conduct a hearing on the Debtors' emergency motion to authorize the use of cash collateral [Dkt. No. 416].

42. A contested cash collateral hearing became unnecessary because of PACC's agreement to promptly close on the Vessels. Tidewater was the Debtors' chosen purchaser, both as a stalking horse bidder and as the highest and best bid at the conclusion of the Auction. The Debtors' always believed that Tidewater was highest and best due to the certainty of closing on the sale, notwithstanding the delay of an expected 30–60 days to obtain assignment of the Petrobras Contracts.

43. PACC, however, chose to seek to reopen the Auction, over the objection of the Debtors, for the sole purpose of submitting an additional bid. PACC reassured this Court, as well as the estates' creditors, that it would close immediately, assignment of the Petrobras contract notwithstanding.

44. In light of PACC's statements to this Court, the DIP Lenders threw their support behind PACC, and, importantly, the Debtors and the DIP Lenders relied on PACC's assurances that closing would occur to structure an agreement regarding use of cash collateral under which the Debtors agreed to (i) comply with a revised budget filed with the Court [Dkt. No. 547] and (ii) reduce the obligations under the DIP Facility and the pre-petition credit facility to $4 million by January 14, 2011. Obtaining the proceeds from the sale of the Mystic is crucial to the

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION** **Page 13 of 19**
US 718926v.4

Debtors' ability to comply with the agreement with the DIP Lenders regarding access to cash collateral.

45. Now, PACC has refused to close, and its decision has ramifications reaching far beyond the sale of a single vessel. The DIP Lenders (now pre-petition secured lenders) have asserted that the Debtors are in breach of the cash collateral order. The DIP Lenders are likely to seek expedited relief from this Court with respect to the Debtors' remaining assets, thereby putting the viability of the Debtors in jeopardy. A crucial hearing in the Debtors' Cases is currently set for January 31, 2011. Settlement discussions are progressing among the parties. Had Tidewater been chosen as the highest and best bidder as originally contemplated, Tidewater would have been 40 days into an expected 30-60 day process. Now, if the Debtors do not receive the relief they are requesting, that process must begin anew, and whether the Debtors' lenders will allow the Debtors to continue to use cash collateral in the interim to see the assignment process through to the end is uncertain.

46. All parties in interest relied on PACC's assurances and representations to the Court. It should not now be allowed to jeopardize these estates' restructurings.

## Time Was Not of the Essence

47. "Ordinarily, time is not of the essence" in a contract under Texas law.[16] *Kennedy*

---

[16] A contract for the sale of a vessel is not a maritime contract, and is therefore determined under the applicable state law. *See, e.g.*, *Gulf Coast Shell & Aggregate LP v. Newlin*, 623 F.3d 235, 240 (5th Cir. 2010) ("contracts for the construction or sale of a vessel are not maritime contracts"); *see also Chase Manhattan Financial Services, Inc. v. McMillian*, 896 F.2d 452, 460 (10th Cir. 1990) ("contracts for the sale of a ship are not 'maritime' and thus admiralty jurisdiction does not apply"); *Hatteras of Lauderdale, Inc. v. Gemini Lady*, 853 F.2d 848, 850 (11th Cir. 1988) (neither contracts for construction nor for sale of a vessel are maritime in nature); *Privilege Yachting v. Teed*, 849 F. Supp. 298, 301 (D. Del. 1994) (contracts for the sale of a vessel are not maritime); *Rowan Cos. v. Wilmington Trust Co.*, 305 S.W.3d 698, 706 (Tex. App. – Houston [14th Dist.] 2009) (same). Section 8 of the Agreement provides that it shall be "governed by and construed in accordance with Title 9 of the United States Code, the General Maritime Law of the U.S.A. and the Law of the State of Texas to the extent not provided for by the General

*Ship & Repair, L.P. v. Pham*, 210 S.W.3d 11, 19 (Tex. App. – Houston [14th Dist.] 2006). Merely because a date is stated for performance does not render time of the essence. *Id.*; *see also Municipal Adm. Servs., Inc. v. City of Beaumont*, 969 S.W.2d 31 (Tex. App. – Texarkana 1998) ("The fact that a contract specifies a date for performance does not, of itself, mean that time is of the essence."); *Atkin v. Cobb*, 663 S.W.2d 48, 52 (Tex. App. – San Antonio 1983) ("In a suit for specific performance of a contract to convey land, performance on the date specified is not ordinarily considered of the essence unless the contract so provides or the attendant circumstances are such as to imply that time is of the essence."). Only if a contract expressly makes time of the essence or there is something in the nature or purpose of the contract and the circumstances surrounding it makes it apparent that time was to be of the essence. *Id.*; *see also Atkin*, 663 S.W.2d at 52 ("Any intention to make time of the essence in the performance of a contract must be clearly manifested . . ."). If a contract does not make time of the essence, whether time was of the essence is a question of fact. *Id.*

48. Furthermore, even if a contract contains a provision stating that time is of the essence, such provision may be waived. *Id.* at 20. "A waiver of time of performance of a contract will result from ***any act*** that induces the opposite party to believe that exact performance within the time designated in the contract will not be insisted upon." *Id.* (emphasis added). Thus, parol evidence and ***course of dealing*** may be used to determine whether there has been a waiver. *See Smith v. Hues*, 540 S.W.2d 485, 488 (Tex. App. – Houston [14th Dist.] 1976).

49. The Mystic MOA did not expressly state or imply that time was of the essence.

---

Maritime Law of the U.S.A." Because the general maritime law is not applicable to contracts for the sale of a vessel, the Agreement is, therefore, governed by Texas law.

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION** Page 15 of 19
US 718926v.4

Moreover, neither the Sale Order, nor the record at the Sale Hearings reflects that a closing on or prior to December 30, 2010 was a material term of the sale of the Mystic.[17] Furthermore, and importantly, at (i) the November 29, 2010 hearing, (ii) the continued Auction on November, 30, 2010, and (iii) the November 30, 2010 hearing, PACC agreed that it would close *whenever the Debtors were ready to close*. Transcript of November 29, 2010 Hearing at 74:9; Transcript of November 30, 2010 Auction at 9:10-12; Transcript of November 30, 2010 Hearing at 22:21-22. At no time, prior to, during or after the hearings, did PACC's counsel ever mention or discuss the December 30, 2010 date. In fact, the first time PACC's counsel mentioned such date was on December 30, 2010 itself. Therefore, notwithstanding the fact that the Mystic MOA included a December 30, 2010 "cancellation date," such date was never a material part of the overall transaction and such date should have no force or effect.

50. Additionally, assuming a*rguendo* that the presence of the cancellation date in the Mystic MOA made time of the essence, the facts and circumstances of the transaction show that PACC clearly waived such provision by its acts and conduct. First, as previously noted, PACC agreed that closing was to occur whenever the Debtors were ready to close.[18] *See* Transcript of November 29, 2010 Hearing at 74:9. Second, PACC's counsel continued discussions with the Debtors about closing and status of the Back-to-Back Agreements until December 29, 2010. As late as December 27, 2010, PACC forwarded additional minor comments to the Back-to Back

---

[17] The December 30, 2010 date was a carryover from Tidewater's original stalking horse bid which document was executed on October 29, 2010.

[18] Neither the Agreement, nor the Mystic MOA contained an integration clause and paragraph 1 of the Sale Order specifically stated that "the Motion, the Agreement and the transactions contemplated thereby shall be, and hereby are, granted and approved in all respects, all as described herein and on the record at the Hearings." The Sale Order, at paragraphs 1 and 25 also provide that if there is an inconsistency between the provisions of the Sale Order and the Agreement, the Sale Order shall control.

Agreements and suggested a December 28, 2010 closing date, subject to final sign-off from PACC. Third, PACC never mentioned the December 30, 2010 date until the morning of December 30, 2010 in response to Debtors' counsel's request for an update on the status of closing. At all times prior to December 30, 2010, the Debtors believed that PACC was going to close as soon as the Back-to-Back Agreements were finalized.

51. The Mystic MOA did not make time of the essence. Alternatively, *assuming arguendo*, that time was of the essence, PACC waived the cancellation date through its actions. Thus, PACC cannot utilize clause 14 of the Mystic MOA to cancel the Mystic MOA, and the Mystic MOA remains in force and effect.

### **The Debtors Are Entitled to Withdraw the Sale Proceeds Under the Sale Order**

52. Under the Sale Order, a Withdrawal Event has occurred entitling the Debtors to withdraw the Sale Proceeds applicable to the Trico Mystic. Specifically, the Sale Order states that "the Sale Proceeds may be withdrawn . . . one business day after delivery of written notice by the Debtors that they have satisfied all performance conditions set forth in the Agreement . . . ." Sale Order at ¶ 5.

53. Under the Mystic MOA, when the Mystic was physically ready for delivery, the Debtors were to notify PACC of its readiness, whereupon the Mystic was to be delivered as the vessel was at the time of inspection, "fair wear and tear excepted." Mystic MOA at clause 11. The Mystic was also to be delivered "with her class maintained without condition/recommendation, free of average damage affecting the Vessel's class . . ." and certain closing documents (including the Back-to-Back Agreements) were to be executed. *Id.* No other conditions precedent were specified in the Sale Order, the Agreement, or the Mystic MOA, and

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION** **Page 17 of 19**
US 718926v.4

the Seller is prepared to immediately close. Thus, pursuant to the Sale Order, a Withdrawal Event has occurred, and the Debtors should be permitted to withdraw the Sale Proceeds attributable to the Mystic.

## The Sale Order Should Be Enforced

54. The Debtors and PACC both agree that the Sale Order should be enforced.[19] As such, the Debtors should be permitted to immediately withdraw the Sale Proceeds attributable to the Mystic. The Debtors otherwise reserve all rights and remedies.

## PRAYER

Therefore, the Debtors request that the Court deny the Emergency Motion and permit the Debtors to exercise their right to immediately withdraw the Sale Proceeds attributable to the Mystic. The Debtors also request the Court grant such other and further relief as is just and proper.

---

[19] The Court retains jurisdiction over any dispute under the Agreement or the Sale Order. The Agreement specifically states that the venue for handling any disputes arising out of the Agreement was to be the Bankruptcy Court; provided however, that if the Court declines to take jurisdiction over the dispute, such dispute shall be referred to arbitration. Agreement at § 8. Accordingly, the Court should deny PACC's alternative request to refer this dispute to arbitration.

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF PACC OFFSHORE SERVICES HOLDING PTE LTD FOR (A) IMMEDIATE TELEPHONIC HEARING ON DISPUTE OVER MEMORANDUM OF AGREEMENT AND (B) ORDER ENFORCING THE SALE ORDER AND PROHIBITING DEBTORS FROM WITHDRAWING OR DISTRIBUTING ESCROWED FUNDS PENDING FURTHER ORDER OF THE COURT AND/OR DIRECTING THE PARTIES TO ARBITRATION**
US 718926v.4

January 12, 2011
Wilmington, Delaware

Respectfully submitted,

*/s/ Andrew R. Remming*
Robert J. Dehney (No. 3578)
Eric Schwartz (No. 3134)
Andrew R. Remming (No. 5120)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Tel: 302.658.9200
Fax: 302.658.3989

-and-

John E. Mitchell
Tonya M. Ramsey
Angela B. Degeyter
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Tel: 214.220.7700
Fax: 214.999.7787
jmitchell@velaw.com
tramsey@velaw.com
adegeyter@velaw.com

*Attorneys for the Debtors and Debtors-in-Possession*