**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>TRICO MARINE SERVICES, INC., *et al.*<br><br>Debtors. | Chapter 11<br><br>Case No. 10-12653 (BLS)<br><br>Jointly Administered<br><br>Hearing Date: January 31, 2011 at 9:00 a.m. (ET) (requested)<br>Objection Deadline: At the hearing (requested) |

**EMERGENCY MOTION OF OBSIDIAN AGENCY SERVICES, INC., TENNENBAUM DIP OPPORTUNITY FUND, LLC, TENNENBAUM OPPORTUNITIES PARTNERS V, LP, AND SPECIAL VALUE CONTINUATION PARTNERS, LP FOR AN ORDER (A) TERMINATING OR MODIFYING THE DEBTORS' USE OF CASH COLLATERAL, (B) SCHEDULING GLOBAL AUCTION FOR REMAINING UNSOLD ASSETS, (C) LIFTING AGREED INJUNCTION AGAINST EXERCISING REMEDIES AGAINST NON-DEBTORS AND (D) GRANTING RELATED RELIEF**

Obsidian Agency Services, Inc. ("Obsidian") as (a) agent (in such capacity, the "DIP Agent"), and Tennenbaum DIP Opportunity Fund, LLC, Tennenbaum Opportunities Partners V, LP, and Special Value Continuation Partners, LP (the "DIP Lenders") and (b) as Administrative and Collateral Agent (in such capacity, the "Prepetition First Lien Agent") under that certain Second Amended and Restated Credit Agreement dated as of June 11, 2010, by and among Trico Marine, as borrower, the guarantors thereto, the lenders party thereto (the "Prepetition First Lien Lenders" and, with the DIP Lenders, the "Secured Lenders"), as such agreement may have been amended from time to time through the date hereof, respectfully submit the following Emergency Motion for an Order (A) Terminating and/or Modifying the Debtors use of Cash Collateral, (B) Scheduling Global Auction for Remaining Unsold Assets, (C) Lifting Agreed Injunction Against Exercising Remedies Against Non-Debtors and (D)

Granting Related Relief (the "Motion"). In support of the Motion, Obsidian respectfully represents as follows:

I.

## ARGUMENT

The Debtors represented to this Court in connection with hearings on use of Cash Collateral in November 2010 that they would pay the Secured Lenders in full by January 14, 2011. They have not done so. Despite the Debtors' representations concerning use of cash collateral and the payoff of amounts owing the Secured Lenders, the Secured Lenders are still owed approximately $7.7 million of principal, interest and fees, plus in excess of $2.4 million in attorneys' fees.[1] The Debtors bear a heavy burden to show that their continued use of Cash Collateral affords the Secured Lenders adequate protection from diminution in the value of their liens. The Debtors cannot meet this burden because the undisputed facts show that:

(i) Prior to and during the hearing on contested use of Cash Collateral on November 29, 2010, the Debtors represented that they would close certain asset sales by dates certain and pay off the Secured Lenders in full on or before January 14, 2011. To ensure that there was no uncertainty about the timing and source of these repayments, the Debtors prepared and filed with this Court a budget showing the asset sales and debt repayments. See Revised Budget [D.I. 547], attached hereto as Exhibit 1; see also, e.g., Emergency Motion of the Debtors For An Order Authorizing Use of Cash Collateral [D.I. 416] at 4 and 13 (stating that the Secured Lenders are "more than adequately protected though . . . the demonstrable proof that its collateral *currently under contract for sale*

[1] In contrast, for example, the Debtors have paid the professionals for the Debtors and the Creditors Committee more than $4.3 million and reserved another approximately $2.7 million for additional payment.

exceeds the value of its claims" and . . . "All of these sales are anticipated to close before year end, or shortly thereafter") (emphasis included in original). This Court has expressly recognized that the Secured Lenders and this Court relied on the Debtors' representations of value and marketability of sale:

> "[T]he debtor made a series of commitments and said we think there's value and that the market will respond, and I looked at Mr. Mitchell and said you better be right, and if he's not right he has a problem. And I said that three weeks ago, and he knows it now."

Transcript of November 29, 2010 Hearing (the "November 29 Hearing Transcript") at 87, lines 18-23, attached hereto as Exhibit 2. In addition, the Secured Lenders' counsel expressly stated that the Secured Lenders' consent to use of cash collateral at the November 29, 2010 hearing was subject to the Debtors' compliance with the Revised Budget:

> "MR. HELLER: . . . .The adequate protection is driven by the budget, with which we expect compliance.
>
> THE COURT: Sure."

November 29 Hearing Transcript at 96, lines 7-9.

The Debtors have again failed to make good on their commitments, including that by January 14, 2011 they would fully pay off the Secured Lenders' pre- and post-petition obligations. See Revised Budget. Instead, the Debtors currently owe the Secured Lenders' in excess of approximately $10 million.

(ii) In reliance on those now discredited representations, the Secured Lenders consented to the Debtors' continued use of cash collateral from and after November 29,

2010. That consent may have materially prejudiced the Secured Lenders' recovery. The Debtors sold their newest, most valuable, and most marketable assets they have (the Mystic and the Moon), which secured the entirely Pre-Petition First Lien Debt. The Moon was sold on December 10, 2010, and generated approximately $14.8 million in net proceeds. The Mystic was sold in January 2011, and generated the same amount of proceeds. All such proceeds constitute cash collateral for the Prepetition First Lien Debt. If the Debtors had applied such proceeds to payment of the Prepetition First Lien Debt as the Secured Lenders had originally demanded (against accusations they were being unduly aggressive), it would have been entirely repaid. However, the Debtors retained millions of dollars of such proceeds and used them in part to fund operating losses and pay professional fees (while the Secured Lenders' professionals agreed to wait) since November 29, 2010, all of which has, as the Secured Lenders feared and warned, diminished the value of the Secured Lenders' collateral.

(iii) After actively marketing their fleet for sale since approximately June 2010, the Debtors have sold all of their saleable vessels. The sale of five vessels are scheduled for Court approval on January 31, 2011 (including the Hondo, Spirit, James, Pearl and Buffalo). Even assuming each of these sales close – a major assumption in light of the Debtors' past performance – and that the Secured Lenders receives 100% of the net proceeds of sale, the Debtors will still owe the Secured Lenders millions of dollars with no ready source of repayment.

(iv) The market has spoken with respect to the value of the Debtors' remaining vessels. The Debtors testified they have been actively marketing their vessels for sale since approximately June 2010. Certain of the vessels serving as the Secured Lenders'

collateral that the Debtors previously claimed would generate nearly $6 million in proceeds – the so-called West Africa Vessels – have been in and out of signed agreements multiple times since the Petition Date. The current proposed buyer has also failed to close the sale. Accordingly, the Debtors cannot be relied on to make any credible statements as to if and when any of their remaining vessels – which have not been sold after nearly seven months of marketing – will be sold or at what value. For purposes of providing adequate protection, they should be considered at only scrap value;

(v) The Revised Budget called for the use of the net proceeds of the Hondo and Spirit as the final source to fully pay off the Secured Lenders' claims. See Revised Budget, Week 21. In clear contravention of the Revised Budget, the Debtors have refused to agree to entry of a sale order that provides for payment of the net proceeds of the Hondo and the Spirit to pay the Secured Lenders' claims. Through this intentional violation of the Revised Budget, the Debtors notified the Secured Lenders that they have unilaterally delayed the closing of these vessels -- potentially imperiling recoveries for these estates.

(vi) Absent further use and depletion of the Secured Creditors' cash collateral, the Debtors are out of cash. The Revised Budget demonstrates that without use of the Cash Collateral, the Debtors are cash flow negative.

Respectfully, as the Court knows, the Debtors received the full benefit of the Interim Amended DIP Financing Order and this Court's November 29 Cash Collateral Order. The Secured Lenders have not. Even though the Debtors have serially defaulted under those orders, the Secured Lenders have been prevented from exercising their Court-granted remedies. This delay has unfairly prejudiced the Secured Lenders since they declared an event of default on

November 8, 2010 (after negotiating and forbearing with respect to several other material defaults by the Debtors since the petition date), and has given the Debtors and other constituents comfort that no action need be taken to refinance the Secured Lenders, protect the value of their collateral or honor their contractual commitments to them.

At this point, with the Debtors' operating assets sold or unwanted by other buyers, it is abundantly clear that the Debtors were not right about the timing and success of asset sales. As a result, the Debtors have been allowed to fail to provide the Secured Lenders with the benefit of their bargain, namely protections that were approved by this Court and endorsed by the Debtors' boards of directors. Those protections expressly require that:

- The proceeds of asset sales would be used to pay Pre-Petition Debt and the DIP financing;
- Asset sales would occur upon a specified timeline set forth in the Approved Budget;
- Upon an event of default, the Debtors were obligated to sell substantially all of their assets in a global Section 363 sale on an expedited timeline (the "Global Asset Sale"); and
- The Secured Lenders could credit bid on any or all of their collateral at that global asset sale, without compulsion to marshal assets.

These and other protections contained in the Interim DIP Financing Order and the November 29 Cash Collateral Order are for the benefit of both the Prepetition First Lien Debt and the DIP Loan. The Court should not accept the Debtors' invitation to re-write that bargain after the fact.

Therefore, the Secured Lenders respectfully request that this Court provide them the negotiated benefit of their bargain, and in any event, the adequate protection to which they are otherwise entitled, as follows:

1. The net proceeds of sale of any remaining vessels, including, without limitation, the Hondo and the Spirit, should be wired through closing to Obsidian to satisfy the Debtors' obligations under the DIP Loan and the Prepetition First Lien Loans;
2. The Debtors should only have use of cash collateral for the next two weeks to effectuate a Global Asset Sale of all of the Debtors' remaining assets including, without limitation, the intercompany notes and the Debtors' interest in EMSL.[2] Although the proposed timeline is more truncated than set forth in the Interim DIP Financing Order, the fact that the Secured Lenders have been stymied in pursuing remedies provided by the Interim DIP Financing Order, coupled with the Debtors' dire cash situation, compels such a result. The use of cash collateral pending the Global Asset Sale should be restricted to the operating disbursement line items in the Revised Budget;
3. The remaining assets of the Debtors should be auctioned in the Global Asset Sale in two weeks, with a hearing to approve the results of that auction to follow promptly thereafter. Tennenbaum should have the right to credit bid en bloc or for parts of these remaining assets.
4. The exit fee that the Debtors agreed to pay on the DIP Loan should be paid.
5. The previously agreed upon injunction against the Secured Lenders with respect to pursuing collection and enforcement remedies against non-debtor parties should be terminated.

[2] The Creditors Committee has admitted that the "Debtors' principal assets are [their] intercompany notes and [their] equity in [their] non-debtors subsidiaries." Committee Objection to Debtors' Motion to Execute Amended Credit Documents [D.I. 619] at paragraph 20. Thus, these assets would fall within the definition of "substantially all" of the Debtors' assets that this Court previously ordered for sale pursuant to the Global Asset Sale.

6. One of the major benefits the estates' professionals received was a carve-out from the Secured Lenders' recoveries for payment of certain fees and expenses (which total approximately $7.1 million). The Secured Lenders have been trying for weeks to obtain a stipulation from those professionals requiring the Debtors to set aside those funds in a segregated account that can only be used to pay the carve out. The Secured Lenders request that this Court enter an order authorizing the terms of the stipulation attached hereto as Exhibit 3.

7. In addition, the Carve Out does not cover – and the Secured Lenders' DIP Loan and cash collateral cannot be used to pay – any claims for services rendered by any professional retained by the Debtors or the Creditors' Committee for, among other things, any assertion of any "motion, objection defense or other contested matter or discovery against any DIP Agent, DIP Lenders, Prepetition First Lien Agent or Prepetition First Lien Lenders . . . in connection with any contested matter . . . with respect to the DIP Loan and/or the Prepetition First Lien Debt." Interim DIP Financing Order at Paragraph 14. It appears from a review of the fee applications filed in these Cases that the professionals retained by the Debtors and the Creditors' Committee incurred more than $700,000 in fees in connection with the filing and prosecution of contested matters related to the use of cash collateral and termination of the DIP Loan. Accordingly, if the Secured Lenders are not paid in full from the Global Asset Sale, the Secured Lenders request that this Court enter an order (a) directing those professionals to provide an accounting of and then disgorge any fees and expenses paid by the Debtors from proceeds of the DIP Loan or cash collateral that were paid in connection with any challenge to the scope of the Secured Lenders' rights and remedies under the Interim DIP Financing Order or with

respect to use of cash collateral (including without limitation any motion to compel use of cash collateral), (b) to the extent such fees and expenses have not yet been paid, directing that they are ineligible for payment out of the Carve Out and (c) directing that any of the proceeds of the DIP Loan or cash collateral disgorged by the professionals as described in subparagraph 7(a) or otherwise described in subparagraph 7(b) be immediately paid to the Secured Lenders to pay down the obligations under the DIP Loan and Prepetition First Lien Debt.

8. The Debtors' current cash-on-hand represents cash collateral of the Secured Lenders. As such, the Secured Lenders request that the Debtors be ordered to immediately turnover to the Secured Lenders all such cash in excess of $1,000,000 for application to the obligations under the DIP Loan and Prepetition First Lien Debt, with an ongoing weekly sweep and comparable application of all cash on hand in excess of $1,000,000, subject to the Debtors' obligation to demonstrate that it can adequately protect the Secured Lenders with respect to any remaining cash collateral that remains with the Debtors.

II.

CONCLUSION

For the reasons stated in this Motion, the Secured Lenders respectfully requests that this Court enter the order attached hereto as Exhibit 4 which (a) grants the Motion in its entirety; (b) schedules a global auction for all of the Debtors' remaining unsold assets for the week of February 14, 2011, (c) terminates the agreed injunction against the Secured Lenders exercising remedies against non-debtors and (d) provides the Secured Lenders with such other and further relief as is just and proper.

Dated: Wilmington, Delaware
January 27, 2011

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Donald J. Bowman, Jr.*

Michael R. Nestor (No. 3526)
Donald J. Bowman, Jr. (No. 4383)
Morgan L. Seward (No. 5388)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

LATHAM & WATKINS LLP
Robert A. Klyman (admitted *pro hac vice*)
Peter W. Devereaux (admitted *pro hac vice*)
Amy C. Quartarolo (admitted *pro hac vice*)
355 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 891-7584
Facsimile: (213) 891-8763

ATTORNEYS FOR OBSIDIAN AGENCY SERVICES, INC., TENNENBAUM DIP OPPORTUNITY FUND, LLC, TENNENBAUM OPPORTUNITIES PARTNERS V, LP, AND SPECIAL VALUE CONTINUATION PARTNERS, LP