# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| _____ | § | Chapter 11 |
| In re: | § | |
| | § | Case No. 10-12653 |
| TRICO MARINE SERVICES, INC., et al., | § | |
| | § | |
| Debtors | § | (Jointly Administered) |
| _____ | § | |

---

## [PROPOSED] DISCLOSURE STATEMENT FOR THE
## DEBTORS' JOINT PLAN OF LIQUIDATION
### Dated: February 25, 2011

---

## IMPORTANT DATES

- Date by which Ballots must be received: _____, **2011**

- Deadline by which objections to Confirmation of the Plan must be filed and served:_____, **2011**

- Hearing on Confirmation of the Plan: __:00 _.m., Eastern Time, _____, **2011**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

**VINSON & ELKINS L.L.P.**
John E. Mitchell
Tonya M. Ramsey
Angela B. Degeyter
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Phone: (214) 220-7700
Facsimile: (214) 220-7716

John E. West
Courtney S. Lauer
Ginny A. Maslin
1001 Fannin Street, Suite 2500
Houston, Texas 77002-6760
Telephone: (713) 758-2222
Facsimile: (713) 758-2346

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Phone: (302) 658-9200
Facsimile: (302) 658-3989

**ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN DESCRIBED HEREIN IS _____, 2011, UNLESS THE DEBTORS EXTEND THIS DATE PRIOR TO THE PLAN VOTING DEADLINE.  TO BE COUNTED, THE SOLICITATION AGENT MUST RECEIVE YOUR BALLOT ON OR BEFORE THE PLAN VOTING DEADLINE.

<u>PLEASE READ THIS IMPORTANT INFORMATION</u>

THE BANKRUPTCY CODE REQUIRES THAT THE PARTY PROPOSING A CHAPTER 11 PLAN PREPARE AND FILE A DOCUMENT WITH THE BANKRUPTCY COURT CALLED A "DISCLOSURE STATEMENT."  THIS DOCUMENT IS THE DISCLOSURE STATEMENT FOR THE PLAN DESCRIBED HEREIN.  THE DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

[THE BANKRUPTCY COURT HAS REVIEWED THIS DISCLOSURE STATEMENT, AND HAS DETERMINED THAT IT CONTAINS ADEQUATE INFORMATION AND MAY BE SENT TO YOU TO SOLICIT YOUR VOTE TO ACCEPT THE PLAN.]

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS <u>ENTIRE</u> DISCLOSURE STATEMENT AND THE PLAN ATTACHED HERETO BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF.  HOLDERS OF CLAIMS AND INTERESTS MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THE LIQUIDATING DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE.  THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN.  MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OR THE LIQUIDATING DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY OTHER INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF THE PLAN.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION.  THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER

DOCUMENTS OR FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN, OR SUCH OTHER DOCUMENTS, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

\* \* \* \* \*

THE BANKRUPTCY COURT HAS SCHEDULED THE HEARING ON CONFIRMATION OF THE PLAN FOR _____, 2011, AT __:__ _.M. PREVAILING EASTERN TIME BEFORE THE HONORABLE BRENDAN L. SHANNON, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 6TH FLOOR, COURTROOM #1, WILMINGTON, DELAWARE 19801. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT OF THE CONFIRMATION HEARING.

TO ENSURE THAT YOUR BALLOT IS COUNTED, YOU MUST DELIVER THE BALLOT] INDICATING ACCEPTANCE OR REJECTION OF THE PLAN SO AS TO BE RECEIVED NO LATER THAN _____, 2011.

OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE _____, 2011. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**TABLE OF EXHIBITS**

| Exhibit | Name |
|---|---|
| A | Debtors' Joint Plan of Liquidation |
| B | [Order Approving Disclosure Statement and Approving Voting Procedures] |
| C | Corporate Organizational Chart |
| D | Holdco/Opco Settlement Order |
| E | Schedule of Payments Made within 90 Days of Petition Date |
| F | Schedule of Payments Made to Insiders within One Year of Petition Date |

**THE FOLLOWING STATEMENTS ARE QUALIFIED IN THEIR ENTIRETY BY THE MORE DETAILED INFORMATION AND FINANCIAL STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN.**

Trico Marine Services, Inc. ("TMS"), a Delaware corporation, and certain of its subsidiaries (the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on August 25, 2010.[1]

Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession in the Chapter 11 Cases.

On _____, 2011, the Debtors filed the proposed joint plan of liquidation attached hereto as Exhibit A (as amended, modified or supplemented from time to time, the "Plan") and this Disclosure Statement with the Bankruptcy Court. On [_____], 2011, the Bankruptcy Court approved the adequacy of the Disclosure Statement, which allowed the Debtors to commence soliciting votes from creditors entitled to accept or reject the Plan. The [Order Approving Disclosure Statement and Voting Procedures] is attached hereto as Exhibit B.

This Disclosure Statement describes certain aspects of the Plan, the Debtors' operations, assets, and related matters, including the treatment of claims against, and equity interests in, the Debtors. The Disclosure Statement also describes certain potential federal income tax consequences to such holders, voting procedures, and the confirmation process.

The Debtors are furnishing this Disclosure Statement as the proponents of the Plan pursuant to Bankruptcy Code § 1125 and in connection with the solicitation of votes (the "Solicitation") to accept or reject the Plan, as it may be amended or supplemented from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

The Debtors submit that the Plan maximizes the Debtors' value, is in the best interests of their creditors, and that any alternative to confirmation of the Plan would result in significant delays and additional costs to the Debtors and their estates. If the Plan were not to be confirmed, the Debtors believe that they could be forced to prepare a separate plan less beneficial to creditors, or liquidate under chapter 7 of the Bankruptcy Code, or that another party could propose a competing plan.

The Plan contemplates the consolidation of the Debtors for voting and distribution purposes but does not contemplate the merger or consolidation of the Debtors as legal entities.

### Solicitation Package

Article IX of the Disclosure Statement specifies the deadlines, procedures and instructions for voting to accept or reject the Plan and the applicable standards for tabulating Ballots. An appropriate return envelope will be included with each Ballot.

The Debtors have engaged, and the Bankruptcy Court has authorized the employment of, Epiq Bankruptcy Solutions, LLC as the Solicitation Agent to assist in the voting process. The

---

[1] The Debtors are: (1) Trico Marine Assets, Inc. ("TMA"), (2) Trico Marine Operators, Inc. ("TMO"), (3) Trico Holdco, LLC ("Trico Holdco"), (4) Trico Marine Cayman, LP ("TMC"), (5) Trico Marine International, Inc. ("TMI"), and (6) TMS.

Solicitation Agent will answer questions, provide additional copies of materials, and process and tabulate Ballots but cannot provide legal advice. The addresses of the Solicitation Agent are:

**If by U.S. Mail:**

Trico Marine Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014

**If by Courier/Hand Delivery:**

Trico Marine Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, Third Floor
New York, NY 10017

The solicitation package ("Solicitation Package") shall include, among other things, the Plan and this Disclosure Statement and, where appropriate, Ballots.

The Solicitation Package, except for Ballots, may also be obtained at no cost by accessing the website at http://dm.epiq11.com/TMG, by requesting a copy from the Solicitation Agent by writing to one of the addresses above, or by calling 1-888-369-8929.

**FOR YOUR VOTE TO BE COUNTED, THE SOLICITATION AGENT MUST RECEIVE YOUR BALLOT OR A MASTER BALLOT CONTAINING YOUR VOTE ON THE PLAN, IN ACCORDANCE WITH THE PROCEDURES AND REQUIREMENTS SET FORTH HEREIN, PRIOR TO 4:00 P.M., EASTERN TIME, ON _____, 2011.**

**HOLDERS MUST CAST THEIR BALLOTS IN ACCORDANCE WITH THE SOLICITATION PROCEDURES SET FORTH IN ARTICLE IX OF THIS DISCLOSURE STATEMENT. EXCEPT AS MAY BE PERMITTED IN ACCORDANCE WITH THE SOLICITATION PROCEDURES SET FORTH HEREIN AND AS MAY BE APPROVED BY THE COURT, ANY BALLOT RECEIVED AFTER THE PLAN VOTING DEADLINE WILL NOT BE COUNTED.**

### The Confirmation Hearing

Bankruptcy Code § 1128(a) requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing. Bankruptcy Code § 1128(b) provides that any party-in-interest may object to confirmation of the Plan. The Bankruptcy Court has scheduled the Confirmation Hearing to commence on _____, 2011, at __:__ _.m. prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Courtroom #1, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to confirmation of the Plan must be filed and served on the Debtors, and certain other parties, on or before _____, 2011, at 4:00 p.m., prevailing Eastern Time, in accordance with the order approving this Disclosure Statement, attached hereto as Exhibit B.

**THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN THAT HAVE NOT BEEN TIMELY SERVED AND**

**FILED IN COMPLIANCE WITH THE TERMS OF THE ORDER APPROVING THE DISCLOSURE STATEMENT.**

### Recommendation

The Board of Directors of TMS, on its behalf and the behalf of the other Debtors, has approved the Disclosure Statement, the Plan, and the transactions contemplated thereby and, along with management of the Debtors, recommends that all creditors submit Ballots to accept the Plan.

**TABLE OF CONTENTS**

**ARTICLE I DEFINED TERMS**..............................................................................................1

**ARTICLE II BACKGROUND**............................................................................................1
    Section 2.01   Debtors' Corporate Structure .......................................................1
    Section 2.02   Sources of Information..................................................................1
    Section 2.03   Description of the Debtors' Businesses and Assets.....................2
    Section 2.04   Debtors' Pre-Petition Indebtedness .............................................2
    Section 2.05   Events Leading to Chapter 11 .....................................................5
    Section 2.06   Debtors' Management..................................................................7
    Section 2.07   Overview of Chapter 11 ............................................................10
    Section 2.08   Events During the Bankruptcy Cases .........................................11

**ARTICLE III SUMMARY OF PLAN** ..............................................................................21

**ARTICLE IV CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS OF
THE PLAN**..............................................................................................24
    Section 4.01   U.S. Federal Income Tax Consequences to U.S. Holders of
Claims .......................................................................................26
    Section 4.02   U.S. Federal Income Tax Consequences to Non-U.S.
Holders of Claims .....................................................................28
    Section 4.03   Information Reporting and Backup Withholding ........................29

**ARTICLE V BEST INTERESTS OF CREDITORS LIQUIDATION** ................................30
    Section 5.01   Best Interests Test......................................................................30
    Section 5.02   Liquidation Analysis .................................................................30

**ARTICLE VI ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
OF THE PLAN**..........................................................................................31

**ARTICLE VII RISK FACTORS**......................................................................................31
    Section 7.01   Risks Related to Projections and Estimates ...............................32
    Section 7.02   Objections to Classifications.....................................................32
    Section 7.03   Nonoccurrence of the "Effective Date" as pursuant to and
as defined in the Opco Restructuring Term Sheet ......................32
    Section 7.04   Nonoccurrence of Effective Date of Plan ..................................33

**ARTICLE VIII PREFERENCES**.......................................................................................33

**ARTICLE IX SOLICITATION AND VOTING PROCEDURES**......................................34
    Section 9.01   Introduction ..............................................................................34
    Section 9.02   Voting........................................................................................35
    Section 9.03   Fiduciaries and Other Representatives.......................................36
    Section 9.04   Change of Vote .........................................................................36
    Section 9.05   Waiver of Defects, Irregularities ...............................................36
    Section 9.06   Reservation of Rights Regarding Solicitation .............................36

**ARTICLE X CONFIRMATION PROCEDURES** ............................................................**37**

    Section 10.01  The Confirmation Hearing ........................................................37

    Section 10.02  Statutory Requirements for Confirmation of the Plan .................37

    Section 10.03  Amendments, Modification, or Withdrawal of Plan....................37

    Section 10.04  Identity of Persons to Contact for More Information ..................37

**ARTICLE XI CONCLUSION AND RECOMMENDATION** .............................................**38**

**ALL HOLDERS OF CLAIMS OR INTERESTS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN CAREFULLY AND IN THEIR ENTIRETY. TO THE EXTENT OF ANY DISCREPANCIES BETWEEN THE PROVISIONS OF THE DISCLOSURE STATEMENT AND THE PROVISIONS OF THE PLAN, THE PROVISIONS OF THE PLAN SHALL CONTROL.**

# ARTICLE I

## DEFINED TERMS

Except as expressly defined elsewhere in this Disclosure Statement or unless the context otherwise requires, all capitalized terms used but not defined herein shall have the meanings ascribed to them in Article I of the Plan. Any term used but not defined herein or in the Plan that is defined in the Bankruptcy Code or the Bankruptcy Rules, as the case may be, shall have the meaning ascribed in the Bankruptcy Code or the Bankruptcy Rules. Whenever the context requires, such terms shall include the plural as well as the singular. The masculine gender shall include the feminine, and the feminine gender shall include the masculine.

# ARTICLE II

## BACKGROUND

### Section 2.01  Debtors' Corporate Structure

Debtor TMS is a publicly-traded corporation incorporated under the laws of Delaware. TMS owns 100% of the equity interests in TMA, TMO, and Trico Holdco, and 99% of the equity interests in debtor TMC. Trico Holdco owns 1% of the equity interests in TMC, and TMA owns 100% of the equity interests in debtor TMI. TMC owns 100% of the equity interests in the non-debtor subsidiary, Trico Supply AS ("Trico Supply"), which, together with its direct and indirect subsidiaries, are referred to as the "Entities." TMS, TMA, and TMO also own all or a portion of certain other non-debtor entities that are not Opco Entities. The Debtors, the Opco Entities, and the other non-debtor affiliates and subsidiaries form what is referred to as the "Trico Marine Group." A corporate organizational chart is attached hereto as Exhibit C.

### Section 2.02  Sources of Information

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT AND IS BASED, IN PART, UPON INFORMATION PREPARED BY PARTIES OTHER THAN THE DEBTORS. THEREFORE, ALTHOUGH THE DEBTORS HAVE MADE EVERY REASONABLE EFFORT TO BE ACCURATE IN ALL MATERIAL MATTERS, THE DEBTORS ARE UNABLE TO AND DO NOT WARRANT OR REPRESENT THAT ALL THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE.**

In arriving at your decision, you should not rely on any representation or inducement made to secure your acceptance or rejection that is in addition to or contrary to information contained in this Disclosure Statement, and any such additional or contrary representations or inducements should be reported to counsel for the Debtors, Vinson & Elkins L.L.P., Attn: John E. Mitchell, Trammel Crow Center, 2001 Ross Avenue, Suite 3700, Dallas, Texas 75201-2975.

**Section 2.03  Description of the Debtors' Businesses and Assets**

The Debtors are headquartered in Houston, Texas, and through debtor and nondebtor subsidiaries, provide subsea services, subsea trenching and protection services, and towing and supply services and vessels, primarily to oil and natural gas exploration and production companies that operate in major offshore oil and gas producing regions around the world, including the North Sea, West Africa, Mexico, Brazil, and the Asia Pacific Region.  TMS is the lead Debtor in the Chapter 11 Cases and is the ultimate parent of the other 43 entities in the Trico Marine Group.

The Debtors began as a towing and supply services company, but in 2007 and 2008, acquisitions expanded the services of the Trico Marine Group beyond towing and supply to include subsea services and subsea trenching and protection.  Debtors TMA, TMO, and TMI, along with nondebtor subsidiaries Trico Servicos Maritimos Ltda. ("Trico Brazil"), Coastal Inland Marine Services Ltd. ("Trico West Africa"), Trico Marine Services (Hong Kong) Ltd. ("Trico Hong Kong"), Eastern Marine Services Ltd. ("EMSL") and Naviera Mexicana de Servicios, S. de R.L. de C.V. ("Mexico"), provide towing and supply services.  This segment of the Trico Marine Group, along with certain related subsidiaries, is commonly referred to as "Holdco."  Because the Plan contemplates a liquidation of the Debtors, the towing and supply assets of Holdco have been and are currently being sold or marketed to be sold in the Chapter 11 Cases.

The Trico Marine Group provides subsea services and subsea trenching and protection services through certain of the Opco Entities, including DeepOcean AS ("DeepOcean") and CTC Marine Projects, Ltd. ("CTC Marine").  Trico Shipping AS ("Trico Shipping"), a subsidiary of Trico Supply, owns or owned the majority of the Trico Marine Group's vessels.

The Trico Marine Group also provides marine support services to the oil and gas industry through the use of a diversified fleet of vessels.  These services include the transportation of drilling materials, supplies and crews to drilling rigs and other offshore facilities, towing support for drilling rigs and equipment, and support for the construction, installation, repair, and maintenance of offshore facilities.

**Section 2.04  Debtors' Pre-Petition Indebtedness**

*(a)    U.S. Credit Facility.*

In January of 2008, TMS entered into a Credit Agreement (as amended, the U.S. Credit Facility) with Nordea Bank Finland PLC ("Nordea"), and Unicredit Bank AG (f/k/a Bayerische Hypo—Und Vereinsbank) ("Unicredit"), as lenders.  The U.S. Credit Facility Credit Agreement was amended and restated on June 11, 2010 as a $25 million term loan by and among TMS, as borrower; TMA, TMO, TMI, TMC and Trico, and certain non-debtor affiliates,[2] as guarantors; Obsidian Agency Services, Inc. ("Obsidian"), as collateral agent and administrative agent; and affiliates of Tennenbaum Capital Partners, LLC ("Tennenbaum Capital"), as lenders (replacing

---

[2] The non-debtor guarantors of the U.S. Credit Facility are Trico West Africa, Trico Hong Kong, Servicios de Apoyo Maritimo de Mexico, S. de R.L. de C.V., Trico Brazil, Trico International Holdings B.V., and Trico Marine International Holdings B.V.

Nordea and Unicredit). As amended, the U.S. Credit Facility is a $25 million term loan that matures on December 31, 2011. Interest on the U.S. Credit Facility accrues at an annual rate equal to LIBOR (subject to a 2.50% floor) plus 15.5%[3]. The U.S. Credit Facility is secured by mortgages (and related assignments of earnings and assignment of insurances) on certain vessels owned by TMA; pledges of all deposit accounts of TMS, TMA and TMO; 100% of the equity interests of TMA and TMO; 65% of the equity interests of TMC; and a pledge of a subordinated intercompany note from Trico Supply payable to TMO with an initial principal amount of $194 million (the "$194M Intercompany Note"). As of the Petition Date, approximately $25 million of principal was outstanding under the U.S. Credit Facility.

On June 11, 2010 TMS entered into (i) a Reimbursement Agreement ("Reimbursement Agreement") by and among TMS, TMA, TMO and Nordea and (ii) a L/C Cash Collateral Agreement (together with the Reimbursement Agreement, the "Letter of Credit Agreements") pursuant to which six letters of credit (as amended, the "Continuing Letters of Credit") with an aggregate stated amount of $3,490,546.24 originally issued pursuant to the U.S. Credit Facility were (x) kept outstanding after the termination of the letter of credit facility under the U.S. Credit Facility and (y) cash collateralized in an amount equal to 105% of the stated amount of such letters of credit. Nordea has no obligation to issue new letters of credit pursuant to the Letter of Credit Agreements. None of the Continuing Letters of Credit remain outstanding.

(b)     3% Senior Convertible Notes.

On February 7, 2007, TMS issued $150 million of 3% senior convertible debentures due 2027 (the "3% Notes") with Wells Fargo Bank, National Association as indenture trustee. The 3% Notes are unsecured and are not guaranteed by any affiliates of TMS. As of the Petition Date, $150 million of principal was outstanding under the 3% Notes.

(c)     8.125% Secured Notes

On May 14, 2009 TMS issued, in exchange for other notes then outstanding, approximately $202.8 million of 8.125% secured convertible debentures due 2013 (the "8.125% Notes") with U.S. Bank, National Association (as successor to Wells Fargo Bank, National Association) as indenture trustee. The 8.125% Notes are secured by a second lien on certain assets pledged to secure the U.S. Credit Facility, including certain vessels owned by TMA, the $194M Intercompany Note and 100% of the equity interests of TMA and TMO. TMA and TMO have issued non-recourse guaranties of the 8.125% Notes. As of the Petition Date, $202.8 million of principal was outstanding under the 8.125% Notes.

(d)     MARAD Notes.

In 1999, TMI issued $18.9 million of notes at 6.11% interest due in 2014 (the "MARAD Notes") to finance construction of two supply vessels, of which approximately $5 million remained outstanding as of the Petition Date. The notes were guaranteed by TMS and the U.S. Maritime Administration. The U.S. Maritime Administration guaranty is secured by first priority preferred mortgages on the vessels *Hondo River* (the "Hondo") and *Spirit River* (the "Spirit"). In February, 2011, the Debtors sold the *Hondo* and *Spirit* and transferred all outstanding principal

---

[3] The U.S. Credit Facility is also subject to a 2% default interest rate on all outstanding amounts.

and interest to the Indenture Trustee of the MARAD Notes. Accordingly, the Holders of the MARAD Notes will not receive any Distribution on account of any Claim arising under the MARAD Notes as any such Claims have already been satisfied.

### (e)    Guaranteed Debt of Opco Entities.

As set forth in greater detail below, Trico Shipping is the primary obligor on three separate financial debt obligations of the Opco Entities—a series of secured notes, a working capital credit facility, and a priority credit facility. The secured notes and the working capital credit facility are guaranteed by one or more of the Debtors.

### 1)    The High Yield Notes.

On October 30, 2009, Trico Shipping issued $400 million of 11.875% senior secured notes due 2014 (the "High Yield Notes"). TMS, Trico Holdco, TMC, and a substantial number of the non-debtor subsidiaries of TMS (all of which are Opco Entities) are guarantors of the High Yield Notes (collectively, the "High Yield Notes Guarantors").[4]

Trico Shipping and the High Yield Notes Guarantors pledged a first-priority lien in substantially all of their assets to secure the High Yield Notes. The collateral includes, *inter alia*: (i) 11 vessels and related assets, (ii) factoring agreements, (iii) a subordinated loan agreement dated May 15, 2008 from Trico Shipping payable to TMS in an initial principal amount of $395 million (the "$395 Million Intercompany Note"), (iv) a subordinated loan agreement dated November 8, 2007 from Trico Supply payable to TMC in an initial principal amount of $33 million (the "$33 Million Intercompany Note"), (v) TMS' equity interests in Trico Holdco, (vi) Trico Holdco's equity interests in TMC, and (vii) TMC's equity interests in Trico Supply.

All of the High Yield Notes Guarantors have also pledged their owned equity interests of certain affiliated subsidiaries to secure the High Yield Notes.[5] Additionally, nine of the non-debtor subsidiaries have pledged cash accounts.[6] The vessels and related assets, refund guarantees, factoring agreements, equity pledges, and cash account pledges (collectively, the "Trico Shipping Debt Collateral") constitute the bulk of the collateral pledged under the High Yield Notes. TMS's guarantee of the High Yield Notes is junior in right of payment to the U.S. Credit Facility.

---

[4] The High Yield Notes Guarantors are: TMS; TMC; Trico Holdco; Trico Supply; Trico Subsea Holding AS; Trico Subsea AS; DeepOcean Shipping III AS; Deep Ocean Shipping II AS; DeepOcean Shipping AS; DeepOcean; Trico Supply Limited; Albyn Marine Limited; CTC Marine Projects Limited; DeepOcean Brasil Servicos Ltda.; DeepOcean Maritime AS; DeepOcean Management AS; Deep Ocean de Mexico S. de R.L. de C.V.; CTC Marine Norway AS; CTC Marine Projects (Guernsey) Limited; DeepOcean Subsea Services Limited; DeepOcean BV; DeepOcean UK Ltd.; Servicios Profesionales de Apoyo Especializado, S. de R.L. de C.V.; and Servicios de Soporte Profesional Administrativo, S. de R.L. de C.V.

[5] The Guarantors pledging equity interests include: Trico Holdco; Trico Supply; Trico Shipping; Trico Subsea Holding AS; Trico Subsea AS; DeepOcean Shipping III AS; Deep Ocean Shipping II AS; DeepOcean Shipping AS; DeepOcean; Trico Supply Limited; Albyn Marine Limited; CTC Marine Projects Limited; DeepOcean Brasil Servicos Ltda.; DeepOcean Maritime AS; DeepOcean Management AS; Deep Ocean de Mexico S. de R.L. de C.V.; CTC Marine Norway AS; CTC Marine Projects (Guernsey) Limited; DeepOcean Subsea Services Limited; DeepOcean BV; DeepOcean UK Ltd.; Servicios Profesionales de Apoyo Especializado, S. de R.L. de C.V.; and Servicios de Soporte Profesional Administrativo, S. de R.L. de C.V.

[6] Guarantors pledging cash accounts include Trico Shipping, Trico Supply, DeepOcean Shipping III AS, DeepOcean Shipping II AS, Trico Subsea AS, Trico Subsea Holding AS, DeepOcean AS, DeepOcean Management AS, and DeepOcean Maritime AS.

On June 25, 2010, Trico Shipping and the High Yield Notes Guarantors entered into the first supplemental indenture to the High Yield Notes with Deutsche Bank National Trust Company as trustee (the "First Supplemental Indenture"). The First Supplemental Indenture, among other things, waived certain events of default and increased the amount of indebtedness that can be issued and secured by the Trico Shipping Debt Collateral of the High Yield Notes from $450 million to $465 million.

(f)     *Trico Shipping Working Capital Facility.*

In addition to the High Yield Notes, Trico Shipping is party to a working capital facility (the "Trico Shipping W/C Facility") originally with Nordea and Unicredit as lenders, and as more fully described herein, with the addition of Tennenbaum Capital as lender. Of the total commitment of approximately $15 million, plus a $10 million letter of credit subfacility, as of December 1, 2010 Trico Shipping has $6.1 million drawn on the revolving loan portion of the credit facility, and $5.36 million in issued letters of credit.

On June 29, 2010, Trico Shipping entered into the Third Amendment to Credit Agreement and Forbearance Agreement. This amendment provided for the addition of a term loan facility (the "Term Loan Facility") to be provided by affiliates of Tennenbaum Capital, including up to $50 million in Tranche A Term Loans and up to $15 million in Tranche B Term Loans (collectively, the "Term Loans").

At closing of the Term Loan Facility, Trico Shipping borrowed approximately $28 million under the Tranche A Term Loans. All further Term Loan commitments were later cancelled as set forth below.

The Trico Shipping W/C Facility, including the Term Loan Facility, is secured by the same Trico Shipping Debt Collateral and is *pari passu* in payment and lien priority with the High Yield Notes. Similar to the High Yield Notes, TMS's guarantee of the Trico Shipping W/C Facility and the Term Loan Facility is junior in right of payment to the U.S. Credit Facility.[7]

### Section 2.05  Events Leading to Chapter 11

The demand for subsea and marine support vessels and services is dependent upon the needs of offshore natural gas exploration and production companies. During 2009 and into 2010 there was a significant reduction in the level of operating and capital expenditures in the offshore oil and gas industries, as well as other industries that would require offshore services such as those provided by the Debtors. This reduction in demand was driven principally by the global economic slowdown that occurred during 2009. The Debtors provide services that relate to projects with a significant investment requirement as well as a significant lead time in developing and executing. As a result, the Debtors, and the companies to which the Debtors provide services, are susceptible to wide variations in supply and demand, commodity and currency fluctuations, changing regulatory regimes, political instability, and security concerns.

---

[7] To infuse the necessary liquidity into Opco that was originally contemplated to be provided by the Term Loan Facility, Trico Shipping entered into a $22,000,000 Secured Credit Facility (the "Priority Credit Agreement") with certain holders of the High Yield Notes and Tennenbaum Capital as lenders on September 21, 2010.[7] Each of Trico Shipping's subsidiaries provided upstream guarantees of the Priority Credit Agreement; however, none of the Debtors is a guarantor of the Priority Credit Agreement.

Additionally, as the prices of oil and natural gas decline or are depressed, drilling and construction activities in the regions in which the Debtors operate decline or remain stagnant. As the Debtors serve industries where there is a long lead time for investment, perceptions regarding global economic growth as well as perceptions regarding commodity prices impact investment decisions, and, thus, impact demand for the Debtors' services. In addition, the business of the Debtors is seasonal and depends in part on weather conditions.

As a result of (i) the decline in oil and gas prices, (ii) a decline in utilization and day rates in the towing and supply businesses driven by reduced exploration and production spending, (iii) and an increase in the supply of vessels, the Debtors were faced with insufficient liquidity to service the above-described pre-petition debts and obligations.

On or about June 17, 2010, the Debtors' grace period to make the interest payment on the 8.125% Notes expired. On June 29, 2010, the Debtors entered into a forbearance agreement with a majority of the holders of the 8.125% Notes (the "Secured Notes Forbearance Agreement"). The purpose of the Secured Notes Forbearance Agreement was to negotiate a consensual restructuring of the Debtors' assets and debts, not only with the holders of the 8.125% Notes, but also with the holders of the 3% Notes, and if necessary, with the holders of the Trico Shipping High Yield Notes, in light of TMS's guaranty and placement of certain intercompany notes in Trico Shipping's and Trico Supply's capital structures.

The Secured Notes Forbearance Agreement expired August 15, 2010. On August 16, 2010, a new forbearance agreement was executed with the majority holders of the 8.125% Notes, and, with no agreement being reached, this new forbearance agreement expired on August 24, 2010.

The grace period for the payment of interest due July 17, 2010 on the 3% Notes expired on August 15, 2010. Though discussions with the significant holders of 3% Notes was undertaken, no forbearance agreement was ever reached.

In the meantime, a reassessment of the business plan and downturn in the business being conducted by the Opco Entities impacted the availability of liquidity through the Trico Shipping W/C Facility. It soon became apparent that a strategy of reorganizing the Debtors without involving holders of significant debt at the non-debtor affiliate level was no longer feasible.

Between August 15, 2010 and the Petition Date, the Debtors and non-debtor affiliates engaged in an intense effort to reach a consensus with any of their significant creditors to inject sufficient liquidity and allow the Debtors to continue to operate outside of chapter 11 while a global, consensual restructuring of the Debtors and their non-debtor subsidiaries was negotiated. These discussions included each of the Debtors' and non-debtors' major constituencies: Tennenbaum Capital, the 3% Notes, 8.125% Notes, and High Yield Notes. The Debtors proposed the framework of a restructuring to all parties and, although parties initially indicated willingness to work within the framework, no consensual plan or feasible structure for short-term financing for the Debtors could ultimately be obtained, let alone a feasible, out-of-court restructuring.

Needing an immediate infusion of liquidity to operate, during the summer of 2010, the Debtors solicited bids for the provision of debtor-in-possession financing to finance the business and operations of the Debtors in the event of a chapter 11 filing. Therefore, contemporaneously with the June 11, 2010 amendment to the U.S. Credit Facility, TMS entered into an Existing Credit Commitment Purchase and Debtor-in-Possession Facility Commitment (the "Original DIP Facility Commitment"), among TMS and Tennenbaum DIP Opportunity Fund, LLC ("Tennenbaum"). The proceeds of the Original DIP Facility Commitment, if utilized, would be used in part to fully refinance the obligations under the existing U.S. Credit Facility and will accrue at an interest rate equal to the LIBOR Rate (as defined in the DIP Facility plus 9.5% per annum (the" Original DIP Facility"). The Original DIP Facility contemplated the funding of a $50 million debtor-in-possession facility, $25 million of which would have refinanced or "rolled up" the Debtors' obligations under the U.S. Credit Facility, and the $25 million balance in "new money" loans to the Debtors' estates.

However, after negotiating the terms of the amendments to the U.S. Credit Facility, and in the weeks leading up to the Petition Date, it became apparent that the assumptions regarding the financial status of the Debtors and the Debtors' non-debtor affiliates upon which the Original DIP Facility was structured were no longer valid. Accordingly, on August 24, 2010, and with little alternative financing options available to the Debtors, the Debtors amended the Original DIP Facility Commitment to instead provide for a $35 million debtor-in-possession credit facility, $25 million of which will refinance or "roll up" the Debtors' obligations under the U.S. Credit Facility, and the $10 million balance in "new money" loans to the Debtors' estates (the "DIP Facility" and "DIP Facility Commitment"). The interest rate under the DIP Facility increased to LIBOR plus 11.5%.

To access the financing available through the DIP Facility, among other things, and to maximize the value of the Debtors' assets for the benefit of their stakeholders, recapitalize their capital structure, and enable the Debtors to take strategic action to address short and long-term liquidity constraints, the Debtors commenced chapter 11 proceedings on the Petition Date. Additional discussion regarding the DIP Facility is provided in Section 2.08(c) hereof.

### Section 2.06  Debtors' Management

The Debtors' current management team is comprised of professionals with significant experience in many aspects of the marine services industry. The executive officers of the Debtors are as follows:

| Name | Title | Relevant Experience |
|------|-------|---------------------|
| Richard Bachmann | Chief Executive Officer / President / Chairman of the Board | Mr. Bachmann has served on the Board of Directors of TMS since 2005. Mr. Bachmann was asked to serve as Chairman, Chief Executive Officer, and President in May 2010. Mr. Bachmann founded Energy Partners, Limited, an independent exploration and production company focused on deep water of the |

| | | Gulf of Mexico and the continental shelf and served as its Chairman and Chief Executive Officer from 1998 to 2009. Prior to founding EPL, from 1995 to January 1997, he served as Director, President, and Chief Operating Officer of The Louisiana Land and Exploration Company, an independent oil and gas exploration company. |
|---|---|---|
| D. Michael Wallace | Interim Chief Operating Officer, TMS / Vice President / Chief Operating Officer / President, CTC Marine | Mr. Wallace is interim Chief Operating Officer for TMS. In addition, Mr. Wallace has served as Chief Operating Officer since August 2010. From 2007 to 2010, Mr. Wallace has served as the Chief Executive Officer of Eastern Marine Services Limited, the joint venture between TMS's subsidiary, Trico Marine Services (Hong Kong) Limited and China Oilfield Services Limited. From November 2002 until December 2006 he served as TMS's Vice President, Emerging Markets and Head of Global Marketing. From January 2000 to November 2002, Mr. Wallace was Vice President of Marine Division with ASCO US LLC, a wholesale petroleum broker. From December 1996 to December 1999, Mr. Wallace was General Manager for Tidewater Marine, Inc., an offshore supply vessel company, in Venezuela. |
| John Castellano | Chief Restructuring Officer | Mr. Castellano is a Managing Director of AlixPartners, LLP and associated with AP Services, LLC, which has been employed as crisis managers in these Cases. Mr. Castellano specializes in designing and implementing business turnarounds and in providing crisis interim management. He has extensive experience in strategic restructuring and hands-on implementation in the energy industry, consumer products and manufacturing industries. Mr. Castellano has been with AlixPartners since 1998, serving in interim management roles and |

| | | |
|---|---|---|
| | | in an advisory capacity to his clients. Mr. Castellano has had a tremendous amount of experience with large, complex restructurings and organizations, including Calpine Corporation and Mirant Corporation during the restructuring of those companies.<br><br>Prior to joining AlixPartners, Mr. Castellano was a manager of strategic advisory services for Ernst & Young. Prior to this, he was a manager of financial reporting and internal audit for the Sweetheart Cup Co. He started his professional career as a staff accountant with Ernst & Young. |
| Brett Cenkus | General Counsel and Secretary | Mr. Cenkus has served as General Counsel since 2009. In 2007, Mr. Cenkus joined TMS as its Senior Counsel from Andrews Kurth LLP. In 2001, Mr. Cenkus founded Paragon Residential, Inc., a mortgage bank, and served as its President until it was sold to Bridge Investments, LP in 2006. Prior to founding Paragon, Mr. Cenkus practiced law for Skadden Arps Slate Meagher & Flom LLP. |
| Stephen Morrell | VP Finance (Principal Financial Officer) | Mr. Morrell joined TMS in 2008 as Treasurer and Director of Financial Planning. Mr. Morrell previously spent over ten years with US Airways, where he served in various roles including Vice President – Finance and Treasurer and Vice President Financial Planning and Analysis. He also served as Group Treasurer for Rinker Group, an international building materials company. Mr. Morrell has experience developing and implementing comprehensive financing and restructuring plans. Mr. Morrell is a graduate of University of Rochester with a degree (with distinction) in Economics and an MBA from Duke University. Mr. Morrell spent seven years in the US Navy attaining the rank of Lieutenant. |

| Jeffrey Favret | Chief Accounting Officer | Mr. Favret joined TMS in April 2009 as Chief Accounting Officer. Mr. Favret has over 25 years of accounting experience, including 14 years in public accounting, concentrating in the energy, energy services, and construction industries. Prior to his current role at TMS, Mr. Favret was a partner in the accounting firm Postlethwaite & Netterville, serving in their Assurance and Advisory Services practice and before that spent over ten years with Ernst & Young, LLP in various roles in their audit practice. Mr. Favret has extensive experience in SEC, US GAAP, and IFRS technical accounting issues and work related to Sarbanes-Oxley Section 404 Compliance. Mr. Favret is a Certified Public Accountant and a member of the Louisiana and Texas State Societies of Certified Public Accountants. He is a graduate of the University of New Orleans. |

### Section 2.07  Overview of Chapter 11

Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a plan, which sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by a bankruptcy court binds a debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity the bankruptcy court may find to be bound by such plan. Chapter 11 requires that a plan treat similarly situated creditors and similarly situated equity interest holders equally, subject to the priority provisions of the Bankruptcy Code.

Prior to soliciting acceptances of a proposed plan, Bankruptcy Code § 1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125.

**Section 2.08  Events During the Bankruptcy Cases**

*(a)      Entry of "First Day" Orders*

On the Petition Date, the Debtors filed a number of motions with the Bankruptcy Court, primarily of an administrative nature.  The Bankruptcy Court thereafter entered orders that, among other things:

(1)    granted the Debtors' request for joint administration of the Chapter 11 Cases;

(2)    authorized the Debtors to file a consolidated list of creditors and approved the form and manner of notifying creditors of the commencement of the Chapter 11 Cases;

(3)    provided adequate assurance to utilities used by the Debtors;

(4)    authorized the Debtors to continue to use their existing cash management system;

(5)    authorized the Debtors to pay certain pre-petition wages of their employees and to continue to honor employee benefits and other employee programs in the ordinary course of business;

(6)    authorized the Debtors to pay pre-petition taxes and licensing and permit fees in the ordinary course of business;

(7)    authorized the Debtors to honor pre-petition obligations to certain critical vendors;

(8)    authorized the Debtors to continue certain insurance policies;

(9)    approved notification procedures and restrictions on certain transfers of interests in the Debtors' estates;

(10)  extended the time for the Debtors to file their Schedules and Statements with the Bankruptcy Court;

(11)  approved procedures for the Debtors to comply with Federal Rule of Bankruptcy Procedure 2015.3;

(12)  authorized the Debtors to retain and employ professionals utilized in the ordinary course of business;

(13)  provided the structure for the payment of fees and expenses of professionals employed by the Debtors and the Creditors' Committee; and

(14)  authorized the Debtors' employment and retention of Epiq Bankruptcy Solutions, LLC as Claims Agent.

*(b)     Retention of Debtors' Professionals*

During the Chapter 11 Cases, the Court granted the Debtors' applications or motions, as applicable, to employ and to retain the following professionals: (1) Vinson & Elkins L.L.P. as general bankruptcy and restructuring counsel; (2) Morris Nichols Arsht & Tunnel LLP as general bankruptcy and restructuring co-counsel; (3) Cahill Gordon & Reindel LLP as special litigation counsel and conflicts counsel; (4) Evercore Group L.L.C. as investment banker and financial advisors; (5) AP Services, LLP as crisis managers, and John Castellano as Chief Restructuring officer; (6) Postlethwaite & Netterville as accountants; (7) Ernst & Young LLP as tax advisors; (8) PricewaterhouseCoopers LLP as independent auditors; and (9) B&W Tech, Inc. as vessel broker.

*(c)     Debtor in Possession Financing and Use of Cash Collateral*

On the Petition Date, the Debtors sought the Bankruptcy Court's authority on an interim basis to: (i) enter into the DIP Facility; (ii) utilize cash collateral, grant liens and provide for super-priority administrative expense status; (iii) and grant adequate protection to certain pre-petition secured parties (the "DIP Financing Motion"). The DIP Financing Motion sought authority to obtain new money loans from the DIP Lenders in the principal amount of $10,000,000 and, upon entry of a final order, a loan to refinance the pre-petition first lien debt under the U.S. Credit Facility in the principal amount of $25,000,000 (the "Roll-Up").

On August 27, 2010, the Bankruptcy Court entered an order authorizing the DIP Facility on an interim basis (the "Interim DIP Order"). The Interim DIP Order was amended on September 7, 2010. The Debtors thereafter engaged in extensive negotiations with the DIP Lenders to reach a consensual resolution of objections related to the Roll-Up and other matters. The Interim DIP Order never became a Final Order, and, as a result, on November 8, 2010 Obsidian sent a termination notice to the Debtors pursuant to which the DIP Lenders terminated the DIP Facility.

On November 10, 2010, the Debtors filed their *Emergency Motion of the Debtors Pursuant to 11 U.S.C. Sections 105(A), 361, 363, 507(B), 1107, and 1108 and Federal Rules of Bankruptcy Procedure 4001, 9006(B) and 9014 for an Order (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection to Prepetition Lenders and (C) Scheduling a Final Hearing* to, among other things, authorize the use of cash collateral. The Court entered an interim order that same day approving the Debtors' limited use of cash collateral. On November 29, 2010, the Debtors and the DIP Lenders reached an agreement regarding access to cash collateral under the DIP Facility, which agreement was approved by the Court on November 30, 2010. In exchange for the DIP Lenders' consent to use cash collateral, the Debtors agreed to (i) comply with the budget filed with the Bankruptcy Court on November 29, 2010 [Dkt. No. 547], and (ii) use a portion of proceeds from the sale of certain vessels, as disclosed in the budget, to reduce the Debtors' obligations under the DIP Facility and the U.S. Credit Facility and ultimately to pay off the DIP Facility and U.S. Credit Facility by January 14, 2011.

Because the Debtors were unable to pay off the DIP Lenders' claims in full prior to January 14, 2011, on January 27, 2011, the DIP Lenders filed an emergency motion to, among other things, terminate the Debtors' use of cash collateral and schedule a global auction for the

Debtors' remaining unsold assets (the "Motion to Terminate Use of Cash Collateral"), alleging, among other things, that the Debtors failed to comply with the November 29, 2010 cash collateral agreement by reducing their obligations to the DIP Lenders to the agreed-upon level. The Debtors filed a response to the Motion to Terminate Use of Cash Collateral on February 3, 2011. In their response, the Debtors asserted that the DIP Lenders were adequately protected in respect of their prepetition claims, citing nearly $50 million in vessel sales occurring since the Petition Date, and accordingly, continued use of cash collateral was appropriate. The Bankruptcy Court scheduled a hearing on the Motion to Terminate Use of Cash Collateral and the Debtors' response for February 10, 2011.

Prior to the scheduled hearing, the Debtors and the DIP Lenders resolved the contested issues and negotiated an agreed order reflecting the parties' agreement regarding consensual use of cash collateral. This agreed order provides, among other things, that the Debtors may use cash collateral of the DIP Lenders in accordance with an agreed-upon budget through May 17, 2011 and that the Debtors will immediately pay down the entirety of the DIP Lenders' prepetition secured loan (except $100,000) using the proceeds of certain vessel sales and other cash on hand. The order sets forth a specific waterfall for distribution of the proceeds of sales of the Debtors' vessels and certain other assets that occur from the date of the order through April 30, 2011. In addition, the order provides that all parties waive their rights to object to any of the DIP Lenders' pre- and postpetition claims, including for attorneys' fees through the date of the order. In the event that all of the DIP Lenders' claims are not indefeasibly paid in full by April 30, 2011, the Debtors would schedule and hold a global auction for all of the Debtors' remaining assets on or prior to May 16, 2011 at which the DIP Lenders would have broad authority to credit bid any remaining Claims. In the event that all of the DIP Lenders' claims are not indefeasibly paid in full by May 17, 2011, the Debtors' Cases are converted to cases under chapter 7 or a chapter 11 trustee is appointed, the DIP Lenders would be granted automatic relief from the automatic stay contained in Bankruptcy Code § 362 with respect to all of the Debtors' assets and any existing injunctions preventing the DIP Lenders from exercising remedies. The order also granted the DIP Lenders first priority senior security interests for their outstanding DIP claims against all of the assets of the Debtors, including the proceeds of the Settlement described above. Finally, it provides for the implementation of global mutual releases for the Debtors and the DIP Lenders upon the satisfaction of certain conditions, including the indefeasible payment in full of all of the DIP Lenders' pre- and postpetition claims. The *Final Order (I) Authoring Debtors to Obtain Postpetition Secured Debtor in Possession Fiancning and Use Cash Collateral and (II) Providing Related Relief* was entered on February 18, 2011.

(d)    The Committee

On September 8, 2010, United States Trustee for the District of Delaware appointed the Creditors' Committee. The Creditors' Committee consists of the following creditors: (1) Astoundry Inc., (2) Joseph S. Compofelice, (3) Discovery Group, Inc., (4) Wells Fargo Bank N.A., and (5) Frank E. Williams, Jr.

The Bankruptcy Court has approved the employment of certain professionals for the Creditors' Committee, including (1) Kasowitz, Benson, Torres & Friedman LLP as counsel, (2) Pachulski Stang Ziehl & Jones LLP as co-counsel, (3) Lugenbuhl, Wheaton, Peck, Rankin & Hubbard as special counsel, and (4) Chanin Capital Partners as financial advisors.

*(e)    Executory Contracts and Leases*

On August 25, 2010, the Debtors filed their motion seeking to reject their nonresidential real property lease of certain industrial space in St. Rose, Louisiana.  The Debtors had vacated and were not currently using the premises, and the Debtors determined that the lease was not necessary to their continued operations during these Cases.  The Bankruptcy Court approved the rejection of the lease on September 22, 2010.

On December 21, 2010, the Debtors filed their motion to extend the time period provided by Bankruptcy Code § 365(d)(4)(A) to assume or reject unexpired leases of nonresidential real property for an additional 90 days, through an including March 23, 2011.  The Bankruptcy Court approved the requested extension on January 6, 2011.

On February 11, 2011, the Debtors filed a motion to reject the lease of their headquarters located in the Woodlands, Texas (the "Headquarters Lease").  Given the reduction in staff that has occurred prior to and throughout these Cases, the Debtors determined that it was not in their best interests to continue to operate under the Headquarters Lease.  The Bankruptcy Court entered an order approving the rejection of the Headquarters Lease on February 24, 2011.  On or around February 25, 2011, the Debtors relocated their operations to the site of their former headquarters, Phoenix Tower, located at 3200 Southwest Freeway, Suite 2950, Houston, Texas, which had previously been subject to a sublease.

*(f)    Sale of Assets*

*1)    GE/Comar Sale*

On October 29, 2010, the Debtors filed a motion (the "GE/Comar Motion") to (1) approve the assumption and assignment of that certain Master Bareboat Charter, dated September 30, 2002, to Comar Marine Corporation ("Comar"), (2) reject the three Master Management and Operating Agreements with Comar, and (3) sell certain spare vessel parts.  Under the Master Bareboat Charter, the Debtors charter three vessels owned by General Electric Capital Corporation.  Additionally, pursuant to the Master Bareboat Charter, the Debtors possessed an early buyout option to purchase the chartered vessels.

By the GE/Comar Motion, the Debtors sought to assume and assign the Master Bareboat Charter, upon which Comar would exercise the early buyout.  In consideration for the assumption and assignment, Trico received a $500,000 payment from Comar.

On November 23, 2010, the Bankruptcy Court entered an agreed order approving the transaction outlined in the GE/Comar Motion.

*2)    Trico Moon and Trico Mystic*

On September 17, 2010, the Debtors filed their motion (the "*Moon/Mystic* Sale Motion") to approve the sale of the *Trico Moon* (the "*Moon*") and *Trico Mystic* (the "*Mystic*") vessels to Tidewater, Inc. ("Tidewater") for a total purchase price of $26,000,000.  Subsequent to the filing of the *Moon/Mystic* Sale Motion, the Debtors filed a motion to approve certain sale procedures in

connection with the sale of the *Moon* and *Mystic*. On November 12, 2010, the Bankruptcy Court approved sale procedures for the sale of the *Moon* and *Mystic*.

The Debtors conducted on auction for the sale of the *Moon* and *Mystic* on November 24, 2010. At the auction, the Debtors selected Tidewater as the successful bidder. Tidewater's bid included a total purchase price of $30,500,000. On November 29, 2010, the Bankruptcy Court held a hearing to approve the sale to Tidewater. At the scheduled hearing, upon objections by Odyssea Vessels, Inc. ("Odyssea") and PACC Offshore Services Holdings Pte Lte ("PACC"), the Bankruptcy Court ordered that the auction be re-opened.

The Debtors re-opened the auction on November 30, 2010. At the auction, the Debtors selected PACC as the successful bidder for both the *Moon* and *Mystic*. Odyssea was the back-up bidder with respect to the *Moon*, and Tidewater was the back-up bidder with respect to the *Mystic*. The Bankruptcy Court approved the sale of the *Moon* and *Mystic* to PACC on December 1, 2010 for $31,280,0001 with a $780,000 break-up fee to Tidewater (the "*Moon/Mystic* Sale Order"). Pursuant to the *Moon/Mystic* Sale Order and that certain Heads of Agreement between PACC and Trico Marine Assets, Inc., the parties closed upon the sale of the *Moon* immediately.

The Debtors and PACC agreed on a December 17, 2010 closing date for the *Mystic* and, in anticipation of such closing, negotiated certain back-to-back agreements, which provided for continued performance under those certain contracts (the "Petrobras Contracts") with Petroleo Brasileiro S/A. Concurrently, the Debtors and PACC began the process to assign the Petrobras Contracts to PACC.

On December 17, 2010, the Debtors and PACC met at the Debtors' offices to close the sale of the *Mystic*. During the closing process, PACC's counsel informed the Debtors that PACC had been notified that the *Mystic* had an electric issue that needed repair. The Debtors began immediately working on repairing the *Mystic*, and in good faith agreed to absorb all costs of repair, including all costs associated with any down-time.

Repairs to the *Mystic* depended upon the efforts of Converteam, Inc. ("Converteam"), a vendor of the Debtors. Converteam began repairing the *Mystic* on December 18, 2010, but was initially unsuccessful. Subsequently, on December 23, 2010, Converteam told the Debtors that the repairs would not continue unless and until its pre-petition claim was paid, demanding in excess of $1 million. The Debtors attempted to contact Converteam over the Christmas holiday to complete repairs on the *Mystic*, but received no response from Converteam until December 27, 2010. The Debtors diligently worked with Converteam to settle the dispute over the pre-petition invoices, and upon resolution of the issues with Converteam, the repairs to the *Mystic* were completed, and the vessel was back on hire on January 2, 2011.

During this period, the Debtors and PACC discussed closing prior to the repairs being finalized. However, on December 30, 2010, PACC informed the Debtors that it intended to cancel the sale agreement for the *Mystic*, and on January 3, 2011, PACC sent notice to the Debtors of its intention to cancel the sale agreement for the *Mystic*. PACC also requested immediate release of the purchase price with respect to the *Mystic*, which was, at the time, held in escrow.

Upon receipt of this notice, the Debtors contacted PACC in an attempt to consensually resolve any issues that may have led to PACC's decision to seek cancellation. PACC, however, rebuffed these attempts by the Debtors. On January 6, 2011, the Debtors reiterated to PACC their readiness to close on the *Mystic* immediately and notified PACC that they had satisfied all performance conditions set forth in the sale agreement.

On January 10, 2011, the Debtors sent a letter notifying PACC that it intended to distribute the escrowed purchase price the following business day in accordance with the order approving the sale.

In response, on January 11, 2011, PACC filed a motion seeking, *inter alia*, an immediate telephonic hearing on the dispute over the cancellation and entry of an order (i) enforcing the order approving the sale and prohibiting the Debtors from withdrawing or distributing the escrowed purchase price pending further order of the Court and/or (ii) directing the Debtors and PACC to arbitration.

On January 13, 2011, the Court heard arguments regarding the motion. After the hearing, the Debtors and PACC negotiated a consensual closing of the sale of the *Mystic*, and on January 14, 2011, announced their agreement to the Court. Under the agreement, PACC would close on the *Mystic* immediately, with certain escrowed funds to be held for any possible future repairs necessary as a result of the electrical repair performed. On the same day, the sale of the *Mystic* closed.

### 3) *Trinity River, Suwanee River, Roe River, Oak River, and Elm River*

On November 2, 2010, the Debtors filed their motion to approve the sale of the *Trinity River*, *Suwanee River*, *Roe River*, *Oak River*, and *Elm River* vessels to GML (Offshore & Petroleum Limited) ("GML") for a total purchase price of $5,800,000 by private sale. On November 12, 2010, the Bankruptcy Court approved the sale of the above-listed vessels to GML. GML refused to close. Subsequently, the Debtors found a new purchaser for the *Roe River* and the *Oak River*. On February 24, 2011, the Bankruptcy Court approved the sale to Coastland Energy Logistics Limited.

### 4) *Carson River, East River, and Powder River*

On November 2, 2010, the Debtors filed their motion to approve the sale of the *Carson River*, *East River*, and *Powder River* vessels to Sea Lyon Marine, Inc. for a total purchase price of $1,500,000 by private sale. On November 12, 2010, the Bankruptcy Court approved the sale. In November, 2010, the sale closed.

### 5) *Truckee River*

On December 8, 2010, the Debtors filed their motion to approve the sale of the *Truckee River* vessel to Riverman Nigeria Limited for $950,000 by private sale. On December 14, 2010, the Bankruptcy Court approved the sale. In February, 2011, the sale closed.

### 6)     *Hondo River and Spirit River*

On November 15, 2010, the Debtors filed their motion to approve a set of standard procedures for the orderly sale of the certain operating assets. These operating assets included, but were not limited to, certain vessels and vessel related inventory. On December 13, 2010, the Bankruptcy Court approved the procedures (the "<u>Global Sale Procedures Order</u>").

On January 24, 2011, the Debtors received an offer from Odyssea to purchase the *Hondo River* and the *Spirit River*, *en bloc*, for a purchase price of $13,000,000. After consultation with the Creditors' Committee, Obsidian, and holders of the Debtors' 8.125% Notes (the "<u>8.125% Noteholders</u>" and together with the Committee and Obsidian, the "<u>Asset Sale Consultation Parties</u>"), the Debtors accepted the offer from Odyssea as the highest and best offer for the *Hondo River* and *Spirit River*, pursuant to the Global Sale Procedures Order. The sale closed on February 3, 2011.

Of the proceeds of the sale, $535,000 is currently being held in an escrow account pending resolution of the validity and priority of a make-whole premium alleged by the Indenture Trustee of the MARAD Notes.

### 7)     *James River, Pearl River, and Buffalo River*

On January 24, 2011, the Debtors held an auction for three vessels: the *James River* (the "<u>*James*</u>"), the *Pearl River* (the "<u>*Pearl*</u>"), and the *Buffalo River* (the "<u>*Buffalo*</u>").

At the conclusion of the bidding for the *James* and after consultation with the Asset Sale Consultation Parties, the Debtors selected Arfersi, S.A. de C.V. ("<u>Arfersi</u>") as the successful bidder, and its offer of $820,000 as the highest and best bid for the *James*. Additionally, Olmeca, S.A. de C.V. ("<u>Olmeca</u>") was selected as the back-up bidder.

At the conclusion of the bidding for the *Pearl* and after consultation with the Asset Sale Consultation Parties, the Debtors selected Naviera Mexicana Neptuno, S.A. de C.V ("<u>Neptuno</u>") as the successful bidder, and its offer of $695,000 as the highest and best bid for the *Pearl*. Additionally, Blanco Offshore Logistics, S.A. de C.V. ("<u>Blanco</u>") was selected as the back-up bidder.

At the conclusion of the bidding for the *Buffalo* and after consultation with the Asset Sale Consultation Parties, the Debtors selected Sea Lyon Marine, Inc. ("<u>Sea Lyon</u>") as the successful bidder, and its offer of $195,000 as the highest and best bid. Additionally, Blanco was selected as the back-up bidder.

On February 3, 2011, the sale of the *Pearl* to Neptuno closed.

On February 8, 2011, the sale of the *James* to Arfersi and the sale of the *Buffalo* to Sea Lyon closed.

### 8) Sale of Remaining Vessels

On February 23, 2011, the Bankruptcy Court entered an order providing for sale procedures for the sale of the *Elm River*, *Swuanee River*, *Trinity River*, and *Palma River*. Pursuant to the sale procedures, an auction is scheduled for March 21, 2011 for all vessels not currently sold, except the *Leigh River* and *Manatee River*.

The *Leigh River* and *Manatee River* will not be included in the March 21, 2011 auction because such vessels are pledged as collateral for an alleged tax claim by Mexican taxing authorities. Such tax claim is currently in litigation in Mexico.

### 9) De Minimis Asset Sale Procedures

On February 11, 2011, the Debtors filed a motion for an order approving sale procedures to be utilized in connection with the sale of certain de minimis assets (the "De Minimis Asset Sale Procedures"). After the Debtors agreed to modify certain terms of the procedures in response to informal comments from certain of the major parties in these Cases, on February 23, 2011, the Bankruptcy Court granted the Debtors' motion, allowing the Debtors to implement the De Minimis Asset Sale Procedures for the sales of their non-operating assets, including, but not limited to, equipment, vehicles, furniture, fixtures, and other similar assets (the "De Minimis Assets"). Generally, pursuant to the De Minimis Asset Sale Procedures, the Debtors may consummate sales of De Minimis Assets under $35,000, exclusive of sales to insiders and affiliates, with no notice. For proposed sales of De Minimis Assets between $35,000 and $100,000, and any sale to an insider or affiliate, the Debtors must provide ten business days' notice to certain parties in interest and, if no objection is received, the Debtors will be permitted to consummate such sales without further hearing or order of the Bankruptcy Court.

### (g) Exclusivity

According to Bankruptcy Code § 1121(b), the Debtors' exclusive right to file a plan or plans in their Cases was set to expire on December 23, 2010, and the exclusive right to solicit acceptances of a plan or plans was set to expire on February 21, 2011. On December 21, 2010, the Debtors filed their motion seeking to extend the exclusive periods to file a chapter 11 plan or plans (the "Exclusive Filing Period") and solicit acceptances thereof (the "Exclusive Solicitation Period").

On February 14, 2011, the Bankruptcy Court approved the Debtors' motion and extended the Exclusive Filing Period to February 28, 2011 and the Exclusive Solicitation Period to April 29, 2011.

### (h) The Debtors' Settlement with the Opco Entities

On or around November 4, 2010, the Debtors and certain of the Opco Entities agreed to pursue a restructuring and related compromise and settlement of claims pursuant to the terms and conditions of a term sheet (the "Term Sheet") with a steering committee (the "Steering Committee") of certain holders the High Yield Notes to effect a proposed global restructuring of the Opco Entities (the "Restructuring") and a settlement of the Debtors' claims and interests against one or more the Opco Entities (the "Holdco/Opco Settlement"). On or about November

19, 2010, TMS, the Opco Entities, and the Steering Committee entered into a Restructuring Support Agreement (the "RSA"), incorporating the Term Sheet and providing for a formal agreed-upon process to implement the Restructuring. On December 6, 2010, the Debtors filed a motion (the "Settlement Motion"), which sought Court approval of the proposed settlement with the Steering Committee on the terms set forth in the Term Sheet and the RSA (as subsequently revised).

Arrowgrass, the Creditors' Committee, and the US Trustee each filed an objection to the Settlement Motion [Dkt. Nos. 704, 690, 715]. Certain holders of the 8.125% Notes also filed a joinder to the Creditors' Committee's objection [Dkt. No. 692]. Prior to the scheduled contested hearings on the Trustee Motion, the Standing Motion, and the Settlement Motion, the Debtors, the Opco Entities, the Steering Committee, and the Creditors' Committee were able to resolve all issues in the aforementioned contested motions on the terms described below and as more fully set forth in revised versions of the Term Sheet and the RSA (the "Revised Term Sheet" and the "Revised RSA," respectively).

Generally, pursuant to the Revised Term Sheet and the Revised RSA, all of the outstanding, funded secured debt of Trico Supply, Trico Shipping, and the other Opco Entities (including the principal amounts outstanding under the High Yield Notes) described above, would be converted into 100% of new common stock of a reorganized and de-levered Trico Supply. The new common stock to be issued in exchange for the secured debt will be issued pursuant to an out-of-court exchange or, if the requisite levels of consents to the out-of-court exchange are not achieved, pursuant to a prepackaged chapter 11 plan filed in the Court by the Opco Entities in subsequently-filed bankruptcy cases (the "Prepackaged Plan"), provided the requisite acceptances for the Prepackaged Plan are obtained prior to filing.

The Revised Term Sheet and the Revised RSA also provided, as part of the Restructuring, for a compromise and settlement of (i) all claims and causes of action on account of the intercompany indebtedness (the "Intercompany Notes") among the Opco Entities, TMS, TMO, and Trico Cayman, (ii) fraudulent conveyance claims and claims and causes of action on account of the Intercompany Notes and any and all related claims and causes of action (the "Holdco/Opco Intercompany Claims"), including as set forth in the proposed Complaint attached as Exhibit A to the Standing Motion, (iii) all claims and causes of action based on transition and corporate services rendered by the Debtors to the Opco Entities or any other account payables owed by the Opco Entities to any of the Holdco Debtors (the "Transition Services Claims") and (iv) the Debtors' existing equity interests in the Opco Entities (the "Existing Equity"). Each of the above-listed claims and causes of action and the Existing Equity will be released, waived, and cancelled in exchange for 5% of the common equity of the Reorganized Trico Supply and five-year warrants to purchase 10% of the common equity of the Reorganized Trico Supply.

Furthermore, effective February 15, 2011, the Opco Entities will pay all salaries, fees, expenses, and any and all costs associated with, all of the Debtors' directors and Houston-based management and all other of the Debtors' Houston-based overhead expenses other than those directly related to the property and assets of the Debtors.

Finally, the Revised Term Sheet and the Revised RSA provided for the entry into the Transition Services Agreement by and between the Debtors and the Opco Entities to govern

corporate and management transition services to be provided by the Debtors to Opco in exchange for reimbursement of related costs incurred.

The Revised Term Sheet and the Revised RSA also provided value to the estates through the release of TMS's guarantee of the High Yield Notes debt. As set forth in the Settlement Motion, the Debtors believe that, absent the Holdco/Opco Settlement, depending on the value of the Opco Entities, the High Yield Notes would otherwise assert unsecured guarantee claims against the Debtors' estates relating to the senior debt in an amount up to $400 million, which would dilute the recovery available to unsecured creditors of these estates.

On February 17, 2011, the Bankruptcy Court entered an order approving the Settlement Motion (the "Holdco/Opco Settlement Order") [Dkt. No. 930], which is attached hereto as **Exhibit D**.

### (i) *Miscellaneous Resolved Motions*

#### 1) *The Arrowgrass Trustee Motion*

On October 26, 2010, Arrowgrass Master Fund Ltd. and Arrowgrass Distressed Opportunities Fund Limited (together, "Arrowgrass"), each a holder of 3% Notes, filed a *Motion for Order (i) Directing Debtor to Place Subsidiaries in Chapter 11 Cases or, Alternatively, (ii) Appointing a Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 1104(a)(1) and (a)(2)* (the "Trustee Motion") [Dkt. No. 359]. Arrowgrass filed a supplement to the Trustee Motion on December 6, 2010 [Dkt. No. 574]. Citing alleged conflicts of interest by the Debtors' management and professionals, Arrowgrass asserted in the Trustee Motion that the Court should order the Debtors to direct the non-debtor Opco Entities to file chapter 11 petitions, so that their estates may be jointly administered in the Court along with the Chapter 11 Cases. Alternatively, Arrowgrass requested that the Court appoint a chapter 11 trustee in the Chapter 11 Cases pursuant to Bankruptcy Code § 1104(a)(1), (2).

The Debtors filed an objection to the Trustee Motion on December 30, 2010 [Dkt. No. 694].

The Trustee Motion was resolved by the Holdco/Opco Settlement Order.

#### 2) *The Creditors' Committee's Standing Motion*

On November 24, 2010, the Creditors' Committee filed a *Motion For Entry of an Order Granting Leave, Standing and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates* (the "Standing Motion") [Dkt. No. 534], seeking standing to prosecute on behalf of the Debtors' estates certain alleged claims and causes of action relating to the issuance of the High Yield Notes the recovery of intercompany loans against the Debtors' non-debtor Opco subsidiaries.

On December 30, 2010, both the Debtors and the Indenture Trustee for the High Yield Notes filed objections to the Standing Motion [Dkt. Nos. 695, 689].

The Standing Motion was resolved by the Holdco/Opco Settlement Order.

# ARTICLE III

## SUMMARY OF PLAN

THIS SECTION PROVIDES A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN. ANY REFERENCE HEREIN IS QUALIFIED IN ITS ENTIRETY BY THE PLAN (AS WELL AS THE EXHIBITS ATTACHED THERETO AND DEFINITIONS THEREIN), WHICH IS ATTACHED HERETO AS **EXHIBIT A**.

### Section 3.01  Summary of Classes and Treatment of Claims and Interests

The classification of Claims and Interests, the estimated amount of Claims or Interests or the amount of claims filed in a Class are summarized in the table below. In accordance with Bankruptcy Code § 1123(a)(1), Superpriority Administrative Claims, Administrative Claims, Priority Tax Claims, and DIP Facility Claims have not been classified.

The estimated amount of Claims reflected in the table below are based upon the Debtors' preliminary review of Claims filed before the date of this Disclosure Statement and the Debtors' books and records, and may be substantially revised following the completion of a detailed analysis of the Claims filed.

| Description and Amount of Claims or Interests | Treatment |
|---|---|
| **Class 1:** U.S. Credit Facility Claims<br><br>Amount of Claim: $100,000 plus amounts owed under Bankruptcy Code § 506(b) | Unimpaired. Except to the extent that (i) Allowed Secured U.S. Credit Facility Claims have not previously been paid in full or (ii) a Holder of an Allowed Secured U.S. Credit Facility Claim agrees to less favorable treatment, Allowed Secured U.S. Credit Facility Claims shall be paid in full, in Cash, on the Effective Date, in full satisfaction, release, settlement and discharge of such Allowed U.S Credit Facility Claims. |
| **Class 2:** 8.125% Notes Secured Claims<br><br>Estimated Amount of Claims: [  ] | Impaired. Except to the extent that a Holder of an Allowed 8.125% Notes Secured Claim agrees to less favorable treatment or as otherwise provided in the Plan, and to the extent not previously paid, Allowed 8.125% Notes Secured Claims shall be paid from the proceeds of the sale of Collateral securing such Claims. Holders of Allowed 8.125% Notes Secured Claims shall retain their Liens and any other interests in and to any Collateral securing such Claims, provided however, that upon any sale of such Collateral, in |

| | whole or part, such sale shall be free and clear of any such Liens, Claims or other interests, with such Liens, Claims or other interests attaching to the proceeds of such sale in the same priority as existed prior to such sale. Any 8.125% Notes Deficiency Claim shall be treated as a Class 6 General Unsecured Claim and shall be entitled to vote in such Class to accept or reject the Plan. |
|---|---|
| **Class 3:** Other Secured Claims [8]<br><br>Estimated Amount of Claims: [  ] | Unimpaired. Except as otherwise provided in the Plan, and to the extent not previously paid, on, or as soon as reasonably practicable after, the latest of (i) the Distribution Date, (ii) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim or (iii) the date on which such Other Secured Claim becomes due and payable pursuant to any agreement between a Debtor and the Holder of an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive in full satisfaction, release, settlement, and discharge of and in exchange for such Allowed Other Secured Claim: (a) at the sole discretion of the applicable Debtor, (1) Cash equal to the unpaid portion of such Allowed Other Secured Claim including any interest on such Allowed Other Secured Claim required to be paid under Bankruptcy Code § 506(b) of the Bankruptcy Code, (2) Reinstatement of the legal, equitable and contractual rights of the Holder of such Allowed Other Secured Claim, subject to the provisions of the Plan, (3) the property serving as Collateral for its Claim, or (4) such other treatment that will otherwise render such Allowed Other Secured Claim unimpaired in accordance with Bankruptcy Code § 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default, or (b) such other treatment |

---

[8] The "Amount of Claims Filed" stated in Classes 3, 4, 5, and 6 represents the amount of Claims that have been filed against a Debtor in each of the Cases. Many of the Claims are duplicate Claims, are for improper amounts, and/or are improperly classified. The Debtors, the Liquidating Debtors or the Plan Administrator, as the case may be, intend to file objections to Claims that are not properly filed after an analysis of such Claims.

| | as the applicable Debtors and such Holder shall have agreed in writing. |
|---|---|
| **Class 4:** Other Priority Claims<br><br>Amount of Claims Filed: [   ] | Unimpaired.  Except to the extent that a Holder of an Allowed Other Priority Claims agrees to less favorable treatment or as provided otherwise in the Plan, and to the extent not previously paid, Holders of Allowed Other Priority Claims shall, in full satisfaction, discharge and release of such Claim, receive either (i) to the extent such Claim is due and owing on the Effective Date, payment in full, in Cash, on the Distribution Date, (ii) to the extent such Claim is not due and owing on the Effective Date, payment in full, in Cash, in accordance with the terms of any agreement between such Claimant and any applicable Debtor or Liquidating Debtor, or when such Claim otherwise becomes due and owing under (a) applicable non-bankruptcy law, or (b) in the ordinary course of business, or (iii) such other treatment as may be agreed to by such Holder and the Debtors or Liquidating Debtors. |
| **Class 5:** Convenience Claims<br><br>Amount of Claims Filed: [   ] | Impaired.   Holders of Allowed Convenience Claims shall receive in full satisfaction, discharge and release of such Claim its *pro rata* share of $250,000, in Cash, on the Distribution Date. |
| **Class 6:** General Unsecured Claims<br><br>Amount of Claims Filed: [   ] | Impaired. Holders of Allowed General Unsecured Claims shall, in full satisfaction, discharge and release of such Claim, receive its Pro Rata share of Available Assets. |
| **Class 7:** Intercompany Claims | Impaired.   All Intercompany Claims shall be cancelled or otherwise terminated and Holders of Intercompany Claims shall receive no Distribution under the Plan. |
| **Class 8:** Intercompany Interests | Impaired. Allowed Intercompany Interests will remain in full force and effect and shall be retained by the respective Holders of such |

| | Interests, provided, however, that Holders of Allowed Intercompany Interests shall receive no Distribution under the Plan. |
|---|---|
| **Class 9:** Old TMS Equity | Impaired. Old TMS Equity will be cancelled or otherwise terminated and Holders of Allowed Old TMS Equity will receive no Distribution under the Plan. |

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST, REGARDLESS OF WHETHER SUCH PARTIES VOTED TO ACCEPT THE PLAN. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

**THE PLAN PROVIDES CERTAIN (I) EXCULPATIONS, (II) RELEASES BY THE DEBTORS, AND (III) RELEASES BY CREDITORS WHO VOTE IN FAVOR OF THE PLAN AS MORE FULLY DESCRIBED IN §§ 12.06, 12.08, AND 12.09 OF THE PLAN, ATTACHED HERETO AS <u>EXHIBIT A</u>.**

## ARTICLE IV

### CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS OF THE PLAN

**TO ENSURE COMPLIANCE WITH U.S. TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"); (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (3) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM THEIR OWN INDEPENDENT TAX ADVISORS.**

The following is a summary of certain U.S. federal income tax consequences of the implementation of the Plan to Holders of 8.125% Notes Secured Claims, Convenience Claims, and General Unsecured Claims. This summary does not address the U.S. federal income tax

consequences to Holders not entitled to vote on the Plan, including Holders whose Claims are not impaired and Holders whose Claims are to be extinguished without any Distribution.

This summary is based on the Internal Revenue Code (the "IRC") and the U.S. Treasury Regulations, rulings, administrative pronouncements and judicial decisions thereunder as of the date hereof, all of which are subject to change or differing interpretations at any time with possible retroactive effect. We have not requested, and do not intend to request, a ruling from the U.S. Internal Revenue Service (the "IRS") or an opinion of counsel with respect to any of the U.S. federal income tax consequences described below. There can be no assurance that the IRS will not disagree with or challenge any of the conclusions set forth herein.

The U.S. federal income tax consequences of the Plan are complex, and this summary is general in nature. This summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of the Holder's particular circumstances or to certain types of Holders subject to special treatment under U.S. federal income tax laws (such as Holders who are related to the Debtors within the meaning of the IRC, insurance companies, tax-exempt organizations, regulated investment companies, real estate investment trusts, partnerships or other pass-through entities and holders of interests therein, and Holders of Claims who are themselves in bankruptcy). In addition, this discussion does not consider the effect of any U.S. federal tax laws other than U.S. federal income tax laws or of any foreign, state, local or other tax laws that may be applicable to particular Holders. Further, this summary assumes that Holders of Claims hold only Claims in a single Class. Holders of multiple Classes of Claims should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.

As used herein, a "U.S. Holder" means a Holder of a 8.125% Notes Secured Claim, Convenience Claim, or General Unsecured Claim that, for U.S. federal income tax purposes is (i) an individual citizen or resident of the United States, (ii) a corporation (or other entity treated as a corporation) created or organized in or under the laws of the United States, any State thereof or the District of Columbia, (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source or (iv) a trust (a) that is subject to the primary supervision of a court within the United States and under the control of one or more United States persons (as defined in Section 7701(a)(30) of the IRC) or (b) that has a valid election in effect under the U.S. Treasury Regulations to be treated as a United States person.

As used herein, a "Non-U.S. Holder" means a Holder of a 8.125% Notes Secured Claim, Convenience Claim, or General Unsecured Claim that is an individual, corporation, estate or trust that is not a U.S. Holder.

If an entity treated as a partnership for U.S. federal income tax purposes is a Holder of a Claim, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership that is a Holder of a Claim, you are urged to consult your own tax advisor about the U.S. federal income tax consequences to you of the consummation of the Plan.

**Section 4.01  U.S. Federal Income Tax Consequences to U.S. Holders of Claims**

A U.S. Holder of a surrendered 8.125% Notes Secured Claim, Convenience Claim, or General Unsecured Claim generally will recognize gain or loss upon the receipt of Distributions of Cash or property pursuant to the Plan with respect to such Claim in an amount equal to the difference between (1) the amount of Cash and the fair market value of any property received and (2) the U.S. Holder's adjusted tax basis in its Claim.  A U.S. Holder's adjusted tax basis in a Claim will generally be the amount paid for the property underlying such Claim and, in the case of a Claim treated as a debt instrument for U.S. federal income tax purposes, such cost will be increased by the amount of any market discount (as discussed below in "Market Discount") included in income, and decreased by any amortizable bond premium that has been amortized by the U.S. Holder.  If the Distributions may be received over more than one year, a U.S. Holder may be required to allocate its basis and calculate its income or loss (and any imputed interest) with respect to each Distribution under the installment sale rules.

The character of any gain or loss that is recognized upon the receipt of Distributions will depend upon a number of factors, including the status of the U.S. Holder and the nature of the Claim in its hands.  If the Claim constitutes a debt instrument for U.S. federal income tax purposes, such factors will include whether the Claim was purchased at a discount, whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to the Claim, and the U.S. Holder's holding period of the Claim.  Generally, a U.S. Holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the U.S. Holder has held its Claim (or the asset underlying the Claim) for more than one year) if the Claim is a capital asset in the U.S. Holder's hands.  However, such gain or loss may be ordinary if a Distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the U.S. Holder's trade or business for the performance of services or for the sale of goods or merchandise.  To the extent that a portion of the Distributions received represents accrued but unpaid interest that the U.S. Holder has not already included in income, the U.S. Holder should recognize ordinary interest income (*See* "Accrued but Unpaid Interest"). In addition, certain U.S. Holders of Claims may be subject to other special tax rules that affect the character, timing and amount of any income, gain, loss or deduction.  Capital losses may generally offset only capital gains, although individuals may, to a limited extent, offset ordinary income with capital losses (*See* "Limitation on Use of Capital Losses**").**

*(a)      Accrued but Unpaid Interest*

To the extent that any portion of a Distribution received by a U.S. Holder of a surrendered Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income.  Conversely, a U.S. Holder of a surrendered Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which a Distribution received by a U.S. Holder of a Claim constituting a debt instrument will be attributable to accrued interest on the Claim is unclear.  Certain Treasury

Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, Distributions in respect of a Claim bearing accrued but unpaid interest shall be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes) and then, to the extent the Distributions exceed the principal amount of the Claim, to any portion of such Claim attributable to accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for U.S. Holders.

### (b) Market Discount

Under the "market discount" provisions of the IRC, some or all of any gain recognized by a U.S. Holder with respect to a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" accrued on the Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if the U.S. Holder's adjusted tax basis in the debt instrument at the time of its acquisition is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of Claims treated as debt instruments that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### (c) Limitation on Use of Capital Losses

U.S. Holders of Claims who recognize capital losses as a result of Distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000.00 ($1,500.00 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

## Section 4.02 U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims

### (a) *Gains realized by Non-U.S. Holders*

Subject to the discussion of amounts attributable to accrued but unpaid interest, any gain realized by a Non-U.S. Holder of a 8.125% Notes Secured Claim, Convenience Claim, or General Unsecured Claim under the Plan generally will not be subject to U.S. federal income tax, unless:

- such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business within the United States, in which case the Non-U.S. Holder would be taxed on the gain in the manner described below under "Interest or Gain Effectively Connected with a U.S. Trade or Business," unless an applicable income tax treat provides otherwise; or

- the Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are satisfied, in which case the Non-U.S. Holder would be subject to a flat 30% rate of U.S. federal income tax on the gain, which may be offset by U.S. source capital losses.

Subject to the discussion of information reporting and backup withholding below, amounts, if any, received pursuant to the Plan that are attributable to accrued but unpaid interest on a Claim generally will not be subject to U.S. federal withholding tax, provided that:

- the Non-U.S. Holder certifies its foreign status by providing a properly executed IRS Form W-8BEN;

- the Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of the stock of the applicable Debtor entitled to vote,

- the Non-U.S. Holder is not (A) a controlled foreign corporation that is related to the applicable Debtor or (B) a bank receiving interest on a loan entered into in the ordinary course of business; and

- such interest is not effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States.

A Non-U.S. Holder that does not meet the requirements described above generally will be subject to U.S. federal withholding tax at a 30% rate on the portion of a Distribution attributable to accrued but unpaid interest, unless such Non-U.S. Holder provides a properly executed (1) IRS Form W-8BEN (or suitable substitute form) claiming an exemption from or reduction in withholding under an applicable income tax treaty or (2) IRS Form W-8ECI (or suitable substitute form) stating that such Distributions are not subject to withholding tax because the Distributions are effectively connected with a U.S. trade or business (and, if an applicable income tax treaty so requires, are attributable to such Non-U.S. Holder's permanent

establishment in the United States) as discussed below under "Gain or Accrued Interest Effectively Connected with a U.S. Trade or Business."

> *(b)* *Gain or Accrued Interest Effectively Connected with a U.S. Trade or Business*

Gain resulting from Distributions in respect of a surrendered Claim and the portion (if any) of such Distributions attributable to accrued but unpaid interest that are effectively connected with the conduct by a Non-U.S. Holder of a trade or business within the United States (and, if required by an applicable income tax treaty, are attributable to a permanent establishment maintained by the Non-U.S. Holder in the United States) will be subject to U.S. federal income tax on a net income basis at the rates applicable to U.S. persons generally (and, with respect to corporate Non-U.S. Holders, may also be subject to a 30% branch profits tax). Distributions attributable to accrued but unpaid interest that is effectively connected to a Non-U.S. Holder's U.S. trade or business (and, if required, is attributable to its U.S. permanent establishment) will not be subject to U.S. federal withholding tax if the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or IRS Form W-8BEN claiming exemption under an applicable income tax treaty).

### Section 4.03  Information Reporting and Backup Withholding

Distributions in respect of a Claim pursuant to the Plan, are generally subject to information reporting and backup withholding unless the Holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income, or (iii) in the case of a Non-U.S. Holder, provides an IRS Form W-8BEN certifying as to its foreign status. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against the Holder's U.S. federal income tax liability, if any, provided the required information is furnished to the IRS.

The foregoing discussion is intended only as a summary of certain income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Claim Holder's particular circumstances. **Accordingly, Holders of Claims are urged to consult their own tax advisors about the U.S. federal, state, local, and applicable foreign income and other tax consequences of the plan.**

# ARTICLE V

## BEST INTERESTS OF CREDITORS AND LIQUIDATION ANALYSIS

### Section 5.01  Best Interests Test

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each Holder of a Claim or interest in such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such person would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.  In chapter 7 liquidation cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior Class receiving any payments until all amounts due to senior Classes have been paid fully or any such payment is provided for:

- Secured creditors (to the extent of the value of their collateral);

- Administrative and other priority creditors;

- Unsecured creditors;

- Debt expressly subordinated by its terms or by order of the Bankruptcy Court; and

- Interest holders.

For the reasons set forth Section 5.02, below, the Debtors believe that the value of any distributions in a chapter 7 case would be less than the value of distributions under the Plan. Accordingly, the Debtors believe that the "best interests" test of Bankruptcy Code § 1129 is satisfied.

### Section 5.02  Liquidation Analysis

The Debtors have liquidated substantially all of their assets through asset sales during the Chapter 11 Cases and are in the process of liquidating any remaining assets.  The Debtors believe that liquidation under chapter 11 is more beneficial to the Holders of Claims and Interests than a liquidation under chapter 7 because the Plan incorporates the Holdco/Opco Settlement, allows the Debtors' remaining assets to be promptly administered, and grants the Plan Administrator the right to object to Claims and to pursue claims and causes of action of the Debtors and their estates that are not otherwise settled or released under the Plan.  Any proceeds from such claims or causes of action or from the liquidation of the remaining assets of the Debtors will be distributed in accordance with the Plan.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of: (a) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time; and (b) additional administrative expenses involved in the appointment of a trustee.

Specifically, the Debtors' costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other Professionals that such a trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors and the Committee during the Chapter 11 Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Allowed General Unsecured Claims.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared with the value of the property offered to such Classes of Claims and Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to the Holders of Claims and Interests in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the likely erosion in value of assets in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere that would prevail under a chapter 7 liquidation and (iii) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined that Confirmation of the Plan will provide each holder of an Allowed Claim or Interest with a recovery that is not less than such holder would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## ARTICLE VI

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed (or elected) to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests is set forth above in Section 5.02.

## ARTICLE VII

## RISK FACTORS

**HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED**

**TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

### Section 7.01  Risks Related to Projections and Estimates

This Disclosure Statement and the material incorporated by reference herein (the "Incorporated Materials") include "forward-looking statements" as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934.  All statements other than statements of historical facts included in this Disclosure Statement and the Incorporated Materials regarding the Debtors' financial position, and plans and objectives including but not limited to statements using words such as "anticipates," "expects," "estimates," "believes," and "likely" are forward-looking statements.  Management of the Debtors believes that its current views and expectations are based on reasonable assumptions; however, there are significant risks and uncertainties that could significantly affect expected results.  Important factors that could cause actual results to differ materially from those in the forward-looking statements ("Cautionary Statements") are disclosed throughout this Disclosure Statement and include, without limitation, the risk factors discussed herein, the success in the sales process, and written and oral forward-looking statements attributable to the Debtors, or Persons acting on their behalf, are expressly qualified in their entirety by the Cautionary Statements.  The Debtors do not intend to update or otherwise revise the forward-looking statements contained herein to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

### Section 7.02  Objections to Classifications

Bankruptcy Code § 1122 provides that a Plan may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests of such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### Section 7.03  Nonoccurrence of the "Effective Date" as pursuant to and as defined in the Opco Restructuring Term Sheet

Although the Bankruptcy Court approved the Holdco / Opco Settlement on February 10, 2011, the "Effective Date," as pursuant to and as defined in the Opco Restructuring Term Sheet, may not occur.  The Debtors believe all conditions to the "Effective Date," as defined in the

Opco Restructuring Term Sheet, under the Debtors' control will be satisfied. There can be, however, no assurance that each and every condition to the "Effective Date," as defined in the Opco Restructuring Term Sheet, will be satisfied.

### Section 7.04 Nonoccurrence of Effective Date of Plan

Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan may not become effective. The Plan sets forth conditions to the occurrence of the Effective Date of the Plan which may not be satisfied. The Debtors believe that they will satisfy all requirements for consummation under the Plan. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for consummation of the Plan have been satisfied.

## ARTICLE VIII

## PREFERENCES

Pursuant to Bankruptcy Code § 547, a debtor may recover certain preferential transfers of property, including Cash, made while insolvent during the ninety (90) days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts to the extent the transferee received more than it would have in respect of the pre-existing debt had the debtor been liquidated under chapter 7 of the Bankruptcy Code. In the case of "Insiders," the Bankruptcy Code provides for a one-year preference period. There are certain defenses to such recoveries. Transfers made in the ordinary course of the debtor's and the transferee's business or according to ordinary business terms are not recoverable. Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property. If a transfer is recovered by a debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery. Any such general unsecured claims will be considered Disputed Claims pursuant to the Plan, unless and until such general unsecured claim becomes an Allowed Claim either by Final Order or a determination by the Debtors or the Plan Administrator, on behalf of the Liquidating Debtors, as applicable.

Attached hereto as **Exhibit E** is a list of all payments of $5,850 or more made by the Debtors to creditors within the ninety (90) days prior to the Petition Date. Attached hereto as **Exhibit F** is a list of all payments made to insiders within the one (1) year period prior to the Petition Date. The Debtors have not made any analysis with regard to whether specific payments on **Exhibits E or F** are preferences, within the meaning of the Bankruptcy Code, nor whether any such payment would have a defense available to a preference action. However, any Person on the list is cautioned that the Debtors or the Plan Administration on behalf of the Liquidating Debtors, as applicable, reserves the right to review and, if the Debtors or if the Plan Administrator, on behalf of the Liquidating Debtors, as applicable, believes appropriate, assert that any and all payments contained on the attached **Exhibits E or F** are preference payments within the meaning of the Bankruptcy Code and therefore should be returned to the Estates, except for preferences that are specifically released in the Plan or by order of the Bankruptcy Court. In this regard, the Debtors and the Plan Administrator on behalf of the Liquidating Debtors specifically reserve all rights to pursue preference claims or any other Causes of Action.

The listing of potential preference payments on the attached **Exhibits E or F** is not exhaustive and if a potential preference payment is not identified on the attached **Exhibits E or F** it is because such payment is not known to the Debtors at this time. The listing of potential preference payments includes, but is not limited to, payments arising out of, or in connection with, the Debtors' business, assets, or operations, or otherwise affecting the Debtors, including but not limited to matters pertaining to contracts, leases, deposits, turnover of property of the Debtors or property of the Debtors' estates, sale of the Debtors' assets, cure payments, cross-claims or counter-claims in pending non-bankruptcy litigation. On behalf of the Debtors and their Estates, the Debtors preserve for the Liquidating Debtors, the rights to any insider preference payments that may be identified on or after the Effective Date.

Except as specifically provided in this Disclosure Statement, the Plan or in the Confirmation Order, nothing contained in this Disclosure Statement, the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights, claims, or Causes of Action (including but not limited to, any Avoidance Actions) that the Debtors or the Liquidating Debtors, as the case may be, may have or which the Debtors or the Plan Administrator, as the case may be, may choose to assert on behalf of the Estates or the Liquidating Debtors, as applicable, in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, any other Cause of Action not specifically released pursuant to the Plan.

## ARTICLE IX

## SOLICITATION AND VOTING PROCEDURES

### Section 9.01  Introduction

Detailed instructions for voting on the Plan are provided with the Ballot(s) accompanying this Disclosure Statement (the "Ballot"). For purposes of the Plan, only holders of record of Claims in the following Classes, as of the _____, 2011 voting record date established by the Debtors for purposes of this solicitation are entitled to vote:

- Class 2: 8.125% Notes Secured Claims

- Class 5: Convenience Claims

- Class 6: General Unsecured Claims

If your Claim or Interest is not in one of these Classes, you are not entitled to vote on the Plan, and you will not receive the Ballot with this Disclosure Statement. If your Claim is in one of these Classes, you should read your Ballot and follow the listed instructions carefully. Please use only the Ballot that accompanies this Disclosure Statement.

IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, YOU MAY CONTACT THE SOLICITATION AGENT BY MAIL AT THE ADDRESS BELOW OR BY PHONE BY CALLING 1-888-369-8929.

### Section 9.02  Voting

In order for your vote to be counted, your signed Ballot must be actually **received** by the Solicitation Agent at the following address before the Plan Voting Deadline of 4:00 p.m. (prevailing Eastern time) on _____, 2011:

**If by U.S. Mail:**

Trico Marine Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014

**If by Courier/Hand Delivery:**

Trico Marine Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, Third Floor
New York, NY 10017

**IF YOU ARE A CLASS 2 HOLDER OF THE 8.125% NOTES SECURED CLAIMS OR A CLASS 6 HOLDER OF THE 3% UNSECURED DEBENTURES CLAIMS AND HOLD YOUR NOTES THROUGH A BANK, BROKER OR OTHER NOMINEE, PLEASE FOLLOW THE INSTRUCTIONS PROVIDED REGARDING SUBMISSION OF YOUR BENEFICIAL BALLOT.**  UNLESS OTHERWISE DIRECTED YOU MUST RETURN YOUR BENEFICIAL HOLDER BALLOT TO YOUR NOMINEE ON OR BEFORE _____, 2011 IN ACCORDANCE WITH THE INSTRUCTIONS FROM YOUR NOMINEE, AND IN ANY EVENT, IN SUFFICIENT TIME TO PERMIT YOUR NOMINEE TO DELIVER A MASTER BALLOT INCLUDING YOUR VOTE TO THE SOLICITATION AGENT BY THE VOTING DEADLINE.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE SOLICITATION AGENT AT THE NUMBER SET FORTH ABOVE. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED EITHER AS A VOTE TO ACCEPT OR A VOTE TO REJECT THE PLAN.

UNLESS A BALLOT OR MASTER BALLOT IS ACTUALLY RECEIVED BY THE SOLICITATION AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST OF THE BANKRUPTCY COURT THAT ANY SUCH VOTE BE COUNTED.

UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT, BALLOTS THAT ARE SIGNED, DATED, AND TIMELY RECEIVED, BUT ON WHICH A VOTE TO

ACCEPT OR REJECT THE PLAN HAS NOT BEEN INDICATED, WILL NOT BE COUNTED FOR VOTING PURPOSES.

### Section 9.03  Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such person should indicate such capacity when signing, and may be required, upon request, to submit proper evidence satisfactory to the Debtors of authority to so act.

### Section 9.04  Change of Vote

Any party who has previously submitted to the Solicitation Agent prior to the Plan Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Solicitation Agent prior to the Plan Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan.

### Section 9.05  Waiver of Defects, Irregularities

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Solicitation Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors, in their sole discretion, may request that the Solicitation Agent attempt to contact voters to cure any defects in their Ballots.

The Debtors reserve the right to reject any and all Ballots submitted by any creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.  The Debtors further reserve their rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured on or before the Plan Voting Deadline or within such other time as the Debtors (or the Bankruptcy Court) may determine.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### Section 9.06  Reservation of Rights Regarding Solicitation

THE DEBTORS RESERVE THE RIGHT, AT THEIR SOLE DISCRETION, AND WITHOUT NOTICE EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE LAW, TO EXTEND THE SOLICITATION PERIOD OR TERMINATE THEIR SOLICITATION OF VOTES ON THE PLAN.

# ARTICLE X

## CONFIRMATION PROCEDURES

### Section 10.01  The Confirmation Hearing

Bankruptcy Code § 1128(a) requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Bankruptcy Code § 1128(b) provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for **_____, 2011, at __:__ _.m., prevailing Eastern Time**, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom #1, Wilmington, Delaware 19801.

Objections to Confirmation of the Plan must be filed and served on the Debtors and the other parties set forth in the order approving the Disclosure Statement, and certain other parties, by no later than _____, **2011**, in accordance with the order approving the Disclosure Statement.  THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT.

The notice of the Confirmation Hearing will contain, among other things, the deadline to object to Confirmation of the Plan, the Plan Voting Deadline, and the date and time of the Confirmation Hearing.

### Section 10.02  Statutory Requirements for Confirmation of the Plan

The Debtors believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of chapter 11; and (c) the Plan has been proposed in good faith.

### Section 10.03  Amendments, Modification, or Withdrawal of Plan

The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Exhibit or Schedule, including to amend or modify it to satisfy Bankruptcy Code § 1129(b), if necessary.

### Section 10.04  Identity of Persons to Contact for More Information

Any interested party desiring further information about the Plan should contact the Solicitation Agent at the phone number and/or addresses listed page iii of this Disclosure Statement.

# ARTICLE XI

## CONCLUSION AND RECOMMENDATION

The Debtors believe that the Plan is in the best interests of all Holders of Claims and Interests, and urge those Holders of Claims entitled to vote to accept the Plan to evidence such acceptance by returning their Ballots so they will be RECEIVED by the Solicitation Agent no later than _____, 2011.

*[Signature Pages Immediately Follow]*

Dated: February 25, 2011

TRICO MARINE SERVICES, INC.
on Behalf of Itself and the Other Debtors


By: ___/s/ John Castellano_____
    Name: John Castellano
    Title: Chief Restructuring Officer

February 25, 2011
Wilmington, Delaware

Respectfully submitted,

*/s/ Andrew R. Remming*
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
Tel:  302.658.9200
Fax:  302.658.3989

-and-

John E. Mitchell
Tonya M. Ramsey
Angela B. Degeyter
John Paul K. Napier
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Tel:  214.220.7700
Fax: 214.999.7787
jmitchell@velaw.com
tramsey@velaw.com
adegeyter@velaw.com
jnapier@velaw.com

*Attorneys for the Debtors and*
*Debtors-in-Possession*

4111081.1