# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRICO MARINE SERVICES, INC., et al., | ) | Case No. 10-12653 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Related to Docket Nos. 942, 984, |
| | ) | 1010, and 1013 |
| | ) | |

Andrew Remming
Robert J. Dehney
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
Wilmington, DE 19899

John E. Mitchell
Tonya M. Ramsey
Angela B. Degeyter
Vinson & Elkins LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX 75201

*Counsel for the Debtors and Debtors-in-Possession*

Kurt Gwynne
Timothy P. Reiley
Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801

*Counsel for Bank of New York Mellon Trust Company, N.A., as indenture trustee*

## OPINION[1]

Before the Court is a motion (the "Motion") [Docket No. 942] filed by Trico Marine Services, Inc. (the "Debtors") to determine the validity and priority of a certain make-whole premium (the "Make-Whole Premium") asserted by Bank of New York Mellon Trust Company, N.A. (the "Indenture Trustee"). Pursuant to an order of this Court approving the sale of certain

---

[1] Pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014, this Opinion constitutes the Court's findings of fact and conclusions of law.

assets, the Indenture Trustee seeks full and immediate payment of the Make-Whole Premium out of sale proceeds currently held in escrow. By the Motion, the Debtors contest the Indenture Trustee's entitlement to such payment. For the following reasons, the Court has concluded that the Indenture Trustee is not entitled to full and immediate payment on account of the Make-Whole Premium out of the sale proceeds. Accordingly, the Court will grant the Motion.[2]

## I. BACKGROUND

On August 25, 2011 (the "Petition Date"), Trico Marine Services, Inc. and various of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the District of Delaware.[3] Prior to and after the Petition Date, the Debtors have been engaged in the business of providing support services in the oil industry. Their primary line of work is providing logistical and technical support to operators of off-shore oil rigs.

### A.     The Indenture

In 1999, Debtor Trico Marine International, Inc. ("TMI") issued notes, payable in 2014, in the amount of $18,867,000 (the "Obligation") to finance the construction of two supply vessels, the Hondo River and the Spirit River (collectively, the "Vessels"). The Obligation is

---

[2] The Court notes that the Indenture Trustee has also objected to the Motion on the ground that it is procedurally defective because the Debtors should be required, pursuant to Federal Rule of Bankruptcy Procedure 7001(2), to bring an adversary proceeding for the purpose of determining the validity, priority, or extent of the Indenture Trustee's claim for the Make-Whole Premium. However, the Court finds that the Indenture Trustee's objection elevates form over substance. Given that all parties have had a full and fair opportunity to be heard on the merits of the dispute concerning the Make-Whole Premium and that the issue in dispute concerns the construction and interpretation of this Court's prior order, the Court overrules this objection.

[3] The Court has ordered the joint administration of these bankruptcy cases. The United States Trustee appointed the official Committee of Unsecured Creditors (the "Committee") in the Debtors' consolidated bankruptcy cases on September 8, 2010.

governed by the terms of a trust indenture, dated April 21, 1999 (the "Indenture") by and between TMI and Bank One Trust Company, N.A. ("Bank One"), the predecessor-in-interest to the Indenture Trustee.

Pursuant to the Indenture, the Obligation accrues interest at a rate of 6.11% per annum and is subject to semi-annual mandatory sinking fund redemption payments (the "Mandatory Redemption Payments") on April 21 and October 21 annually, until April 21, 2014, when the outstanding principal and accrued interest becomes due. Indenture ¶ 3.02(a). Each Mandatory Redemption Payment is scheduled in the amount of $629,000 of the principal plus accrued interest. The record reflects that the Debtors have made all Mandatory Redemption Payments as and when due.

**B.** **The Guarantee**

The Indenture is not secured by any of the Debtors' property. However, to induce the extension of this credit facility to the Debtors, the Obligation was guaranteed by the United States Secretary of Transportation, on behalf of the Maritime Administration ("MARAD"), under the terms of the U.S. Government Guaranteed Ship Financing Bond and the Guarantee of the United States of America, dated April 21, 1999 (the "Guarantee"). Pursuant to the Guarantee, MARAD guaranteed "payment of the unpaid interest on, and the unpaid balance of the principal of, such Obligation, including interest accruing between the date of the default under such Obligation, and the payment in full of this Obligation under this Guarantee." Guarantee at 8.

TMI issued to MARAD a promissory note secured by a first-priority lien on the Vessels dated April 21, 1999 (the "Security Agreement") "[a]s security for the due and timely payment of the Secretary's Note" in the event that the Guarantee is called and MARAD becomes entitled

to seek reimbursement from TMI. Security Agreement, Special Provisions ¶ F. Among other provisions, the Security Agreement prohibited the sale of the Vessels without MARAD's prior written consent. Security Agreement ¶ 2.02(b). The Indenture Trustee is not a party to the Security Agreement.

C.  **The Sale of the Vessels**

The record reflects that construction of the Vessels was completed and the Vessels joined the Debtors' fleet in 2000. The Debtors have continued to own and operate the Vessels through the Petition Date. However, following the Petition Date, the Debtors decided to liquidate certain assets of the Debtors' estates, including the Vessels. The Debtors accepted an offer from Odyssea Vessels, Inc. ("Odyssea") to purchase both of the Vessels for a total of $13,000,000. Accordingly, TMI and Odyssea entered into a memorandum of agreement, dated January 24, 2011 (the "Agreement"), for the sale of the Vessels to Odyssea (the "Sale").

In exchange for its consent to the Sale, MARAD required the Debtors to redeem the Obligation in full to ensure that the Indenture Trustee would not call upon the Guarantee. Accordingly, upon closing of the Sale, the Debtors caused the Indenture Trustee to receive $4,555,489 (the "Payoff"), which included the outstanding principal ($4,400,000) and accrued but unpaid interest ($60,489) under the Obligation, as well as an estimate of the Indenture Trustee's attorneys' fees and expenses to date ($95,000).

On February 2, 2011, following a full hearing (the "Sale Hearing"), the Court entered an order (the "Sale Order") [Docket No. 850] pursuant to which it, inter alia, approved both TMI's entry into the Agreement and the Sale.

### D. The Make-Whole Premium

Under the terms of the Indenture, the Obligation is also subject to an optional redemption premium (the "Make-Whole Premium") that matures only if and when TMI elects, at its option, to redeem the Obligations, "in whole or in part, at any time, at the redemption prices." Indenture ¶ 3.03. In advance of the Sale Hearing and in connection with the contemplated Payoff, the Indenture Trustee claimed that it was entitled to receive an additional sum of money on account of the Make-Whole Premium that would accrue upon TMI's election to redeem the Obligations using the proceeds of the Sale. Based upon the date of redemption, the Indenture Trustee asserts that the Make-Whole Premium is $511,849.01, and the record reflects that the Debtors have not contested this figure.

However, the Debtors disputed, or at least challenged, the validity and priority of the Indenture Trustee's claim to the Make-Whole Premium, but lacked sufficient opportunity to investigate its validity and priority in advance of the Sale Hearing. Nonetheless, to avoid delaying the Sale, the parties agreed in the Sale Order that the Debtors would reserve $535,000 from the proceeds of the Sale in a separate escrow (the "MARAD Escrow") pending resolution of the dispute as to the Make-Whole Premium. Sale Order ¶ 12.

The Sale Order provides that the Debtors and the Indenture Trustee would attempt to resolve the issue regarding the Make-Whole Premium. Id. But, to the extent that the parties would be unable to reach resolution, or to the extent that other interested parties would not consent to a resolution, the Sale Order provides that the issue would be brought before the Court for adjudication. Id. To date, the Indenture Trustee and the Debtors have been unable to resolve

their dispute concerning the Make-Whole Premium. In accordance with the Sale Order, the issue is now before the Court.[4]

## II. THE PARTIES' POSITIONS

### A. The Debtors' Position

By the Motion, the Debtors seek a determination that the Make-Whole Premium is not an allowable claim because it is unmatured interest subject to disallowance under 11 U.S.C. § 502(b)(2). Alternatively, the Debtors assert that the Make-Whole Premium is, at best, a general unsecured claim that is not covered by the Guarantee and is therefore not subject to MARAD's lien under the Security Agreement.

The Debtors contend that they elected to redeem in full the Obligation owed to the Indenture Trustee in order to obtain MARAD's consent to the Sale and to prevent the Guarantee from being called upon. Although the Obligation is itself unsecured, the Debtors' obligation to reimburse MARAD on account of the Guarantee is secured by the Vessels. Rather than risk the call on the Guarantee and the consequent fees and costs that the Debtors would owe to MARAD as a result of its collection efforts, the Debtors chose to pay the Indenture Trustee, directly from the Sale proceeds, all principal and interest due on account of the unsecured Obligation.

The Debtors do not dispute that the Indenture Trustee is entitled to the Make-Whole Premium to the extent that it is valid. However, the Debtors contend that the Indenture Trustee's claim for the Make-Whole Premium is neither a secured claim nor covered by the Guarantee.

---

[4] The Court notes that the Indenture Trustee and MARAD have both filed secured proofs of claim for the Make-Whole Premium, and that the Debtors intend to contest these claims at a later hearing. For the avoidance of doubt, the Court hereby clarifies that this Opinion does not resolve the ultimate allowance of any claims with respect to the Make-Whole Premium because argument on that issue has been reserved for another day.

6

The Debtors assert that applicable case law supports their contention that the Make-Whole Payment is not "principal or interest," and that it is therefore not covered by the Guarantee. For this reason, the Debtors argue that the Indenture Trustee's claim should not be treated as a secured claim and is not entitled to full payment out of the funds in the MARAD Escrow. Therefore, the Debtors contend that the Indenture Trustee's claim for the Make-Whole Premium is only an unsecured claim in the event and to the extent that it is allowed.

**B.**     **The Indenture Trustee's Position**

The Indenture Trustee makes two alterative arguments. First, it contends that by the terms of the Sale Order, it need only demonstrate that it has an "allowed" claim—not necessarily a secured claim or one that is covered by the Guarantee—in order to establish its entitlement to full payment on the Make-Whole Premium out of the MARAD Escrow. In the alternative, the Indenture Trustee contends that the Make-Whole Premium is in fact covered by the Guarantee, and thus the Indenture Trustee reserves its right to proceed directly against MARAD on the Guarantee for full payment of the Make-Whole Premium.

**C.**     **The Positions of MARAD and the Committee**

In light of the fact that the resolution of the dispute as to the Make-Whole Premium between the Debtors and the Indenture Trustee may affect it, MARAD has weighed in on this dispute. MARAD contends that the Guarantee does not cover the Make-Whole Premium. To the extent that the Indenture Trustee is seeking payment on an unsecured prepetition claim, the Committee objects to any payment out of the MARAD Escrow to the Indenture Trustee on account of the Make-Whole Premium.

This matter has been fully briefed and argued, and it is now ripe for decision.

## III. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(N).

## IV. DISCUSSION

This dispute concerning the Make-Whole Premium raises two questions. First, is the Make-Whole Premium included in the "principal and interest" obligation that is guaranteed by MARAD under the terms of the Guarantee? If so, then the Indenture Trustee may proceed against the Guarantee, and MARAD, to the extent that it pays pursuant to the Guarantee, will have a secured claim against the Debtors for such amount, in accordance with the Security Agreement. Second, if the Guarantee does not cover the Make-Whole Premium, do the terms of the Sale Order and the parties' commitments made in connection therewith nevertheless entitle the Indenture Trustee to full and immediate payment out of the reserved funds in the MARAD Escrow? If so, then the Indenture Trustee may seek full payment on the Make-Whole Premium. If not, then the Indenture Trustee may seek only its pro rata distribution under the Debtors' plan of reorganization on account of its general unsecured claim for the Make-Whole Premium, to the extent that such claim is allowed.[5]

### A.  The Extent of MARAD's Guarantee

As described above, the Debtors raised the funds for the construction of the Vessels on an unsecured basis. A critical element that allowed the Debtors to utilize this favorable funding arrangement was the Guarantee, which motivated parties to lend the necessary capital to the

---

[5] As noted above, this Opinion does not decide the extent to which the Indenture Trustee's claim for the Make-Whole Premium is allowed.

Debtors on an unsecured basis. In exchange for the Guarantee, the Debtors issued to MARAD the Security Agreement providing for a lien on the Vessels, which secured the Debtors' reimbursement obligation to MARAD in the event that the Guarantee was called upon.

By its terms, the Guarantee obligates the United States Secretary of Transportation, on behalf of MARAD, to pay to the Indenture Trustee, following default and demand on account of the Obligation, "the unpaid interest on, and the unpaid balance of the principal of, such Obligation, including interest accruing between the date of the default under such Obligation, and the payment in full of this Obligation under this Guarantee." Guarantee at 8.

The statutory authority that enables MARAD to issue the Guarantee is found in 46 U.S.C. § 53702(a). Such authority is expressly limited to the guarantee of the payment of principal and interest only:

> The Secretary or Administrator, on terms the Secretary or Administrator may prescribe, may prescribe, may guarantee or make a commitment to guarantee the payment of the <u>principal of and interest</u> on an obligation eligible to be guaranteed under this chapter. A guarantee or commitment to guarantee shall cover 100 percent of the <u>principal and interest</u>.

46 U.S.C. § 53702(a) (emphasis added).

Application of MARAD's limited statutory authority requires the Court to find that the Guarantee would extend to the Make-Whole Premium only to the extent that the Make-Whole Premium may be properly characterized as "interest" owed under the Obligation. To the extent that the Make-Whole Premium is not "interest," it is not covered by the Guarantee.

**1.  Whether the Make-Whole Premium is Interest**

Bankruptcy courts construing contractual make-whole or prepayment obligations have split on whether such obligations are characterized as unmatured interest or as liquidated

9

damages. Compare In re Ridgewood Apartments of DeKalb Cnty., Ltd., 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994) ("Absent actual prepayment by the Debtor, [the lender's] claim for a prepayment penalty could be no more than a contingent liability. Further, because the contingent claim is for interest which is not yet due at the time the bankruptcy was filed (because prepayment had not occurred), it would not be allowed to an undersecured creditor [under 11 U.S.C. § 502(b)(2)]."), with In re 360 Inns, Ltd., 76 B.R. 573, 576 (Bankr. N.D. Tex. 1987) ("[T]he prepayment penalty was not unmatured interest as contemplated in § 502(b)(2), inasmuch as the prepayment penalty was activated and matured once the plan of reorganization proposed to prepay [the lender's] debt.").

Research reveals that the substantial majority of courts considering this issue have concluded that make-whole or prepayment obligations are in the nature of liquidated damages rather than unmatured interest, whereas courts taking a contrary approach are distinctly in the minority. Noonan v. Fremont Fin. (In re Lappin Elec. Co.), 245 B.R. 326, 330 (Bankr. E.D. Wis. 2000) ("[T]his court is in agreement with a majority of courts that view a prepayment charge as liquidated damages, not as unmatured interest or an alternative means of paying under the contract.") (citations omitted); see also In re Outdoor Sports Headquarters, Inc., 161 B.R. 414, 424 (Bankr. S.D. Ohio 1993) ("Prepayment amounts, although often computed as being interest that would have been received through the life of a loan, do not constitute unmatured interest because they fully mature pursuant to the provisions of the contract.") (citations omitted); In re Skyler Ridge, 80 B.R. 500, 508 (Bankr. C.D. Cal. 1987) ("Liquidated damages, including prepayment premiums, fully mature at the time of breach, and do not represent unmatured interest.") (citation omitted).

This Court is persuaded by the soundness of the majority's interpretation of make-whole obligations, and therefore finds that the Indenture Trustee's claim on account of the Make-Whole Premium is akin to a claim for liquidated damages, not a claim for unmatured interest. As such, it is a claim for neither principal nor interest and is therefore outside the scope of the Guarantee. The Indenture Trustee's contention that the Guarantee extends to the "Obligation" in its entirety, including the Make-Whole Premium, is belied both by the express terms of the Guarantee and the narrowly circumscribed statutory authority under which MARAD may guarantee the Debtors' liability on account of the Obligation.

2. **Whether the Make-Whole Premium is Subject to Disallowance**

Because the Court has determined that the Make-Whole Premium is not a claim for unmatured interest, the Court therefore finds that under 11 U.S.C. § 502(b)(2), the Indenture Trustee's claim is therefore not subject to disallowance on that ground. Accordingly, the Indenture Trustee holds an allowable claim for the Make-Whole Premium.

B. **The Relevant Provisions of the Sale Order**

Having concluded that the Make-Whole Premium is neither covered by the Guarantee nor susceptible to disallowance under § 502(b)(2) as unmatured interest, the Court now turns to the provisions of the Sale Order. As noted above, contemporaneous with the Sale Hearing, the Indenture Trustee asserted its entitlement to immediate payment on account of the Make-Whole Premium, in addition to the outstanding principal of and interest on the Obligation, from the proceeds of the Sale. The record reflects that the Debtors and the Committee expressed reservations about the status and nature of the Make-Whole Premium, but in order to allow the Sale to proceed, the parties' negotiations resulted in protective language in the Sale Order that was agreed to by the parties and ultimately entered by the Court. Specifically, decretal

paragraph 12 of the Sale Order encapsulates the impasse as to the Make-Whole Premium and the parties' intentions to proceed with the Sale nonetheless, while reserving their right to resolve this dispute at a later date:

> In addition, from the Sale Proceeds deposited into the Escrow on the Closing Date, the Debtors will reserve a good-faith estimate of the make-whole premium asserted by BNY Mellon in connection with the payment of the MARAD Notes (estimated to be $535,000) (the "MARAD Escrow"), and the amount of such estimate shall be based upon what the Debtors and BNY Mellon agree, or as otherwise ordered by the Court if the parties are unable to agree on such amount. The Debtors and BNY Mellon will attempt to resolve the issue of whether the make-whole premium asserted by BNY Mellon is an allowable claim (the "Make-Whole Issue"), and, if the parties are able to agree on a resolution of the Make-Whole Issue, the Debtors are authorized and directed to pay from the Escrow the asserted make-whole premium or the portion thereof to which the parties agree; provided, however, (i) if the Debtors and BNY Mellon agree upon a resolution but the Committee, Obsidian, and the 8.125% Noteholders do not consent to such a resolution, or (ii) if the Debtors and BNY Mellon are unable to agree on a resolution of the Make-Whole Issue, the issue will be brought before the Court for resolution on a schedule mutually agreeable to the parties or as otherwise ordered by the Court. The Debtors shall pay the allowed amount (if any) of the make-whole premium (plus BNY Mellon's reasonable fees and expenses) from the MARAD Escrow.

Sale Order at ¶ 12.

Pursuant to paragraph 21, the Court has retained "exclusive jurisdiction to interpret and enforce the provisions of . . . this Order in all respects." Sale Order ¶ 21. It is also well established that the Court has the authority to construe the Sale Order under 28 U.S.C. § 157(b)(2)(N). See also Travelers Indem. Co. v. Bailey, 129 S.Ct. 2195, 2205 (2009) ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders."); Health Scis. v. Nat'l Union of Hosp. and Health Care Emp. (In re Allegheny Health Educ. and Research Found.), 383 F.3d 169, 175-76 (3d Cir. 2004) ("[T]he bankruptcy court correctly determined that

the suit was a core proceeding because it required the court to interpret and give effect to its previous sale orders."); In re Marcus Hook Dev. Park, Inc., 943 F.2d 261, 267 (3d Cir. 1991).

When construing an agreed or negotiated form of order, such as the Sale Order in this case, the Court approaches the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order. See City of Covington v. Covington Landing Ltd. P'ship, 71 F.3d 1221, 1227 ("An agreed order, like a consent decree, is in the nature of a contract, and the interpretation of its terms presents a question of contract interpretation."); Rifken v. CapitalSource Fin., LLC (In re Felt Mfg. Co., Inc.), 402 B.R. 502, 511 (Bankr. D.N.H. 2009) ("The terms of court orders, plans of reorganizations, and stipulations between parties are typically examined under principles of contract interpretation.") (citations omitted). At bottom, the goal is to determine the rights, duties, and reasonable expectations of the parties, as disclosed to and blessed by the Court. The Third Circuit Court of Appeals has held that "[t]he paramount goal of contract interpretation is to determine the intent of the parties." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 587 (3d Cir. 2009) (internal quotation marks omitted) (quoting Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc., 273 F.3d 332, 335 (3d Cir. 2001)). The Third Circuit has further established that "[t]he strongest manifestation of that intent is the wording of the agreement itself." Nova Chem., Inc. v. Sekisui Plastics Co., Ltd., 579 F.3d 319, 323 (3d Cir. 2009) (citing Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980)).

The Indenture Trustee insists that the last sentence in paragraph 12, which states that the Debtors shall pay "the allowed amount (if any) of the make-whole premium (plus BNY Mellon's reasonable fees and expenses) from the MARAD Escrow," should be interpreted to entitle the Indenture Trustee to full and immediate payment on account of the Make-Whole Premium, to the

extent that it is allowed, irrespective of its secured or unsecured status. However, the Court is not persuaded by the Indenture Trustee's construction for at least two reasons.

First, the Court is obliged to construe the Sale Order in its entirety and interpret its provisions in a consistent manner. In re Cendant Corp. Sec. Litig., 454 F.3d 235, 247 (3d Cir. 2006) ("A contract is to be considered as a whole, and, if possible, all its provisions should be given effect.") (internal quotation marks omitted) (quoting Capitol Bus Co. v. Blue Bird Coach Lines, Inc., 478 F.2d 556, 560 (3d Cir. 1973)). The need for construction of the Sale Order as a whole is further supported by paragraph 26, which states that "[t]he provisions of this Order are nonseverable and mutually dependent." Sale Order ¶ 26. The Court therefore cannot interpret paragraph 12 in isolation without considering the other provisions of the Sale Order. Specifically, the Court notes that paragraph 7 would be rendered ineffective if the Court permitted the Indenture Trustee's argument to prevail. In relevant part, paragraph 7 reads:

> Any and all valid and enforceable liens, claims, or encumbrances on, against or in the Vessels, including those asserted by the Debtors' lenders including, without limitation Obsidian and MARAD, shall be transferred, affixed, and attached to the proceeds of the Sale . . . <u>with the same validity, priority, force and effect such liens, claims, or encumbrances had on the Vessels immediately prior to the Sale</u>.

Id. ¶ 7 (emphasis added).

The Indenture Trustee's desired result—an attachment to the Sale proceeds for the purpose of satisfying the Make-Whole Premium, to the extent that it is deemed an allowed claim, but regardless of its secured status—would result in the creation of a new, senior lien in favor of the Indenture, and thus would be violative of the prohibition in paragraph 7 against such liens on the Sale proceeds.

14

Second, notwithstanding the agreed upon provisions in the Sale Order, the Court cannot enforce a provision that would violate the Bankruptcy Code. There is no dispute that any claim held by the Indenture Trustee with respect to the Obligation is an unsecured claim. The Sale Order cannot change the nature of the Indenture Trustee's claim and convert it into a secured claim. Therefore, to the extent that paragraph 12 of the Sale Order provides for such conversion, it need not be given effect. See In re Cendant, 454 F.3d at 247 ("A contract is to be considered as a whole, and, if possible, all its provisions should be given effect.") (emphasis added). Here, it is simply not possible for the Court to enforce paragraph 12 to the extent that it would convert the Indenture Trustee's unsecured claim into a secured claim.

Moreover, the Court cannot enforce paragraph 12 to the extent that it would cause a creditor to be paid on account of an unsecured claim, absent a separate evidentiary predicate and showing,[6] outside the Debtors' plan of reorganization and in contravention of the absolute priority rule under 11 U.S.C. § 1129(b)(2). As the holder of, at best, an unsecured claim for the Make-Whole Premium, the Indenture Trustee is entitled to receive only its pro rata distribution of the funds allocated for the benefit of all unsecured claims under the Debtors' plan. Therefore, full payment outside the Debtors' plan to the Indenture Trustee on account of its unsecured claim would threaten to violate the absolute priority rule.

Finally, the Court's ruling today is entirely consistent with the reasonable intentions and expectations of the parties in negotiating the Sale Order. The parties recognized an issue leading up to the Sale Hearing, and fashioned a remedy that would allow them to close a much-needed

---

[6] As noted above, the existence of the Guarantee provides adequate evidentiary and business justification for immediate payment of principal and interest to the Indenture Trustee on account of the Obligation.

15

sale while "keeping their powder dry" on the question of entitlement to the Make-Whole Premium. Able counsel for the Indenture Trustee negotiated for the MARAD Escrow to ensure that monies would be available for payment; equally experienced counsel for the Committee and the secured lenders reserved their rights to fight in the event that the matter was not resolved. The Indenture Trustee's pinched construction of what was reserved for future negotiation and/or litigation simply does not square with the economic interests each side was intending to protect in negotiating the Sale Order.

## V. CONCLUSION

For the foregoing reasons, the Court concludes that the Indenture Trustee's claim for the Make-Whole Premium is not covered by the Guarantee because it is not a claim for interest. Given that the Make-Whole Premium does not represent unmatured interest, the Indenture Trustee's claim is therefore not subject to disallowance under 11 U.S.C. § 502(b)(2). With respect to the Make-Whole Premium, the Indenture Trustee therefore holds an allowable but unsecured claim, and as such, is not entitled to full and immediate payment out of the MARAD Escrow on account of such claim outside the Debtors' plan of reorganization. An appropriate Order follows.

BY THE COURT:

Dated: Wilmington, Delaware
April 15, 2011

Brendan Linehan Shannon
United States Bankruptcy Judge