# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | § | Chapter 11 |
| In re: | § | |
| | § | Case No. 10-12653 |
| TRICO MARINE SERVICES, INC., et al., | § | |
| | § | |
| Debtors | § | (Jointly Administered) |
| | § | |

## SECOND AMENDED DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN OF LIQUIDATION DATED: MAY 25, 2011

## IMPORTANT DATES

- Date by which Ballots must be received: **July 8**, **2011**

- Deadline by which objections to Confirmation of the Plan must be filed and served: **July 8**, **2011**

- Hearing on Confirmation of the Plan: **11:00 a.m., prevailing Eastern Time, July 18, 2011**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

**VINSON & ELKINS L.L.P.**
John E. Mitchell
Tonya M. Ramsey
John P. Napier
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Phone: (214) 220-7700
Facsimile: (214) 220-7716

Steven M. Abramowitz
Alexandra S. Kelly
666 Fifth Avenue, 26th Floor
New York, New York 10103-0040
Phone: (212) 237-0000
Facsimile: (212) 237-0100

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney (No. 3578)
Eric D. Schwartz (No. 3134)
Andrew R. Remming (No. 5120)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Phone: (302) 658-9200
Facsimile: (302) 658-3989

**ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

Trico Marine Services, Inc. ("TMS") and certain of the other debtors in the above-captioned chapter 11 cases (collectively, the "Debtors") submit the following second amended disclosure statement (as amended, modified or supplemented from time to time, the "Disclosure Statement") pursuant to § 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") for purposes of soliciting votes to accept or reject the Debtors' first amended joint plan of liquidation (as amended, modified or supplemented from time to time, the "Plan"), a copy of which is attached to the Disclosure Statement as *Exhibit A*. Capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in Section 1.02 of the Plan. Any term used but not defined herein or in the Plan that is defined in the Bankruptcy Code or the Bankruptcy Rules, as the case may be, shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules. The Disclosure Statement describes certain aspects of the Plan, including the treatment of Holders of Claims and Interests.

* * * * * * *

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN DESCRIBED HEREIN IS JULY 8, 2011, UNLESS THE DEBTORS EXTEND THIS DATE PRIOR TO THE PLAN VOTING DEADLINE. TO BE COUNTED, THE SOLICITATION AGENT MUST RECEIVE YOUR BALLOT ON OR BEFORE THE PLAN VOTING DEADLINE.

## PLEASE READ THIS IMPORTANT INFORMATION

THE BANKRUPTCY CODE REQUIRES THAT THE PARTY PROPOSING A CHAPTER 11 PLAN PREPARE AND FILE A DOCUMENT WITH THE BANKRUPTCY COURT CALLED A "DISCLOSURE STATEMENT." THIS DOCUMENT IS THE DISCLOSURE STATEMENT FOR THE PLAN DESCRIBED HEREIN. THE DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE BANKRUPTCY COURT HAS REVIEWED THIS DISCLOSURE STATEMENT, AND HAS DETERMINED THAT IT CONTAINS ADEQUATE INFORMATION AND MAY BE SENT TO YOU TO SOLICIT YOUR VOTE TO ACCEPT THE PLAN.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT AND THE PLAN ATTACHED HERETO BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF. HOLDERS OF CLAIMS AND INTERESTS MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THE LIQUIDATING DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY

OTHER PURPOSE. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN. MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OR THE LIQUIDATING DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY OTHER INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF THE PLAN.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS OR FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN, OR SUCH OTHER DOCUMENTS, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

* * * * *

THE BANKRUPTCY COURT HAS SCHEDULED THE HEARING ON CONFIRMATION OF THE PLAN FOR JULY 18, 2011, AT 11:00 A.M. PREVAILING EASTERN TIME BEFORE THE HONORABLE BRENDAN L. SHANNON, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 6TH FLOOR, COURTROOM #1, WILMINGTON, DELAWARE 19801. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT OF THE CONFIRMATION HEARING.

TO ENSURE THAT YOUR BALLOT IS COUNTED, YOU MUST DELIVER THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN SO AS TO BE RECEIVED NO LATER THAN JULY 8, 2011.

OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE JULY 8, 2011. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**TABLE OF EXHIBITS**

| Exhibit | Name |
|---------|------|
| A | Debtors' First Amended Joint Plan of Liquidation |
| B | Order Approving Disclosure Statement and Approving Voting Procedures |
| C | Corporate Organizational Chart |
| D | Holdco / Opco Settlement Order |
| E | Schedule of Payments Made within 90 Days of Petition Date |
| F | Schedule of Payments Made to Insiders within One Year of Petition Date |
| G | Transition Services Agreement |

**THE FOLLOWING STATEMENTS ARE QUALIFIED IN THEIR ENTIRETY BY THE MORE DETAILED INFORMATION AND FINANCIAL STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN.**

The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on August 25, 2010.[1]  Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession in the Chapter 11 Cases.

On February 25, 2011, the Debtors filed the Plan and Disclosure Statement with the Bankruptcy Court.  A first amended version of the Plan and Disclosure Statement was thereafter filed on May 18, 2011.  A second amended version of the Plan and Disclosure Statement was filed on May 25, 2011.  On May 25, 2011, the Bankruptcy Court approved the adequacy of the Disclosure Statement pursuant to Bankruptcy Code § 1125, which allowed the Debtors to commence soliciting votes from Holders of Claims and Interests entitled to accept or reject the Plan.  The Order Approving Disclosure Statement and Voting Procedures (the "Disclosure Statement Order") is attached hereto as ***Exhibit B***.

This Disclosure Statement describes certain aspects of the Plan, the Debtors' operations, assets, and related matters, including the treatment of Claims against, and Interests in, the Debtors.  The Disclosure Statement also describes certain potential federal income tax consequences to Holders of Claims and Interests, voting procedures, and the Confirmation process.

The Debtors are furnishing this Disclosure Statement as the proponents of the Plan pursuant to Bankruptcy Code § 1125 and in connection with the solicitation of votes to accept or reject the Plan, as it may be amended or supplemented from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

The Debtors submit that the Plan maximizes the Debtors' value, is in the best interests of the Holders of Claims and Interests, and that any alternative to Confirmation would result in significant delays and additional costs to the Debtors and their Estates.  If the Plan were not to be confirmed, the Debtors believe that they could be forced to prepare a separate plan less beneficial to creditors, or liquidate under chapter 7 of the Bankruptcy Code, or that another party could propose a competing plan.

The Plan contemplates the consolidation of four of the Debtors for voting and distribution purposes but does not contemplate the merger or consolidation of the Debtors as legal entities.

---

[1]    For purposes of the Plan, the Debtors are:  (1) Trico Marine Assets, Inc. ("TMA"), (2) Trico Marine Operators, Inc. ("TMO"), (3) Trico Marine International, Inc. ("TMI"), and (4) TMS.  Trico Holdco, LLC ("Trico Holdco") and Trico Marine Cayman, LP ("TMC") also filed for chapter 11 protection concurrently with the Debtors.  However, as described in further detail in Section 2.04 hereof and Section 4.02 of the Plan, the Plan does not contemplate the liquidation of Trico Holdco or TMC under the Plan.

**Solicitation Package**

Article IX of the Disclosure Statement specifies the deadlines, procedures and instructions for voting to accept or reject the Plan and the applicable standards for tabulating Ballots. An appropriate return envelope will be included with each Ballot.

The Debtors have engaged, and the Bankruptcy Court has authorized the employment of, Epiq Bankruptcy Solutions, LLC as the Solicitation Agent to assist in the voting process. The Solicitation Agent will answer questions, provide additional copies of materials, and process and tabulate Ballots but cannot provide legal advice. The addresses of the Solicitation Agent are:

**If by U.S. Mail:**

Trico Marine Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014

**If by Courier/Hand Delivery:**

Trico Marine Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, Third Floor
New York, NY 10017

The solicitation package ("Solicitation Package") shall include, among other things, the Plan and this Disclosure Statement and, where appropriate, Ballots.

The Solicitation Package, except for Ballots, may also be obtained at no cost by accessing the website at http://dm.epiq11.com/TMG, by requesting a copy from the Solicitation Agent by writing to one of the addresses above, or by calling 1-888-369-8929.

**FOR YOUR VOTE TO BE COUNTED, THE SOLICITATION AGENT MUST RECEIVE YOUR BALLOT OR A MASTER BALLOT CONTAINING YOUR VOTE ON THE PLAN, IN ACCORDANCE WITH THE PROCEDURES AND REQUIREMENTS SET FORTH HEREIN, PRIOR TO 4:00 P.M., EASTERN TIME, ON JULY 8, 2011.**

**HOLDERS MUST CAST THEIR BALLOTS IN ACCORDANCE WITH THE SOLICITATION PROCEDURES SET FORTH IN ARTICLE IX OF THIS DISCLOSURE STATEMENT. EXCEPT AS MAY BE PERMITTED IN ACCORDANCE WITH THE SOLICITATION PROCEDURES SET FORTH HEREIN AND AS MAY BE APPROVED BY THE COURT, ANY BALLOT RECEIVED AFTER THE PLAN VOTING DEADLINE WILL NOT BE COUNTED.**

**The Confirmation Hearing**

Bankruptcy Code § 1128(a) requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing. Bankruptcy Code § 1128(b) provides that any party-in-interest may object to Confirmation. The Bankruptcy Court has scheduled the Confirmation Hearing to commence on July 18, 2011, at 11:00 a.m. prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for

the District of Delaware, located at 824 North Market Street, 6th Floor, Courtroom #1, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, on or before July 8, 2011, at 4:00 p.m., prevailing Eastern Time, in accordance with the Disclosure Statement Order, attached hereto as ***Exhibit B***.

**THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION THAT HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THE TERMS OF THE ORDER APPROVING THE DISCLOSURE STATEMENT.**

### Recommendation

The Board of Directors of TMS, on its behalf and the behalf of the other Debtors, has approved the Disclosure Statement, the Plan, and the transactions contemplated thereby and, along with management of the Debtors, recommend the Plan because it provides for greater distributions to the Holders of Claims than would result from any other alternative. Accordingly, the Debtors recommend that all Creditors entitled to vote on the Plan support Confirmation and vote to accept the Plan.

# TABLE OF CONTENTS

**ARTICLE I BACKGROUND** ................................................................................. 1
    Section 1.01   Debtors' Corporate Structure ......................................................... 1
    Section 1.02   Sources of Information .................................................................. 1
    Section 1.03   Description of the Debtors' Businesses and Assets ...................... 1
    Section 1.04   Debtors' Pre-Petition Indebtedness ............................................. 2
    Section 1.05   Events Leading to Chapter 11 ...................................................... 6
    Section 1.06   Debtors' Management .................................................................. 8
    Section 1.07   Overview of Chapter 11 ............................................................. 12
    Section 1.08   Events During the Chapter 11 Cases .......................................... 12

**ARTICLE II SUMMARY OF PLAN** ................................................................. 30
    Section 2.01   Summary of Classes and Treatment of Claims and Interests ....... 30

**ARTICLE III CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS OF THE PLAN** ....................................................................................................... 60
    Section 3.01   U.S. Federal Income Tax Consequences to U.S. Holders of Claims .......................................................................................... 62
    Section 3.02   U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims ....................................................................... 64
    Section 3.03   Information Reporting and Backup Withholding ....................... 65

**ARTICLE IV BEST INTERESTS OF CREDITORS AND LIQUIDATION ANALYSIS** ........................................................................................................... 66
    Section 4.01   Best Interests Test ..................................................................... 66
    Section 4.02   Liquidation Analysis ................................................................. 66

**ARTICLE V ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ....................................................................................................... 67

**ARTICLE VI RISK FACTORS** .......................................................................... 68
    Section 6.01   Risks Related to Projections and Estimates ............................... 68
    Section 6.02   Objections to Classifications ..................................................... 68
    Section 6.03   Nonoccurrence of Effective Date of Plan .................................. 69

**ARTICLE VII PREFERENCES** .......................................................................... 69

**ARTICLE VIII SOLICITATION AND VOTING PROCEDURES** ................... 70
    Section 8.01   Introduction ............................................................................... 70
    Section 8.02   Voting ....................................................................................... 71
    Section 8.03   Fiduciaries and Other Representatives ....................................... 72
    Section 8.04   Change of Vote .......................................................................... 72
    Section 8.05   Waiver of Defects, Irregularities ............................................... 72

Section 8.06    Reservation of Rights Regarding Solicitation ............................ 73

**ARTICLE IX CONFIRMATION PROCEDURES** ................................................................ **73**
Section 9.01    The Confirmation Hearing ............................................................. 73
Section 9.02    Statutory Requirements for Confirmation of the Plan................. 73
Section 9.03    Amendments, Modification, or Withdrawal of Plan ................... 74
Section 9.04    Identity of Persons to Contact for More Information.................. 74

**ARTICLE X CONCLUSION AND RECOMMENDATION** ................................................ **74**

**ALL HOLDERS OF CLAIMS OR INTERESTS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN CAREFULLY AND IN THEIR ENTIRETY. TO THE EXTENT OF ANY DISCREPANCIES BETWEEN THE PROVISIONS OF THE DISCLOSURE STATEMENT AND THE PROVISIONS OF THE PLAN, THE PROVISIONS OF THE PLAN SHALL CONTROL.**

## ARTICLE I

## BACKGROUND

### Section 1.01  Debtors' Corporate Structure

Debtor TMS is a publicly-traded corporation incorporated under the laws of Delaware. TMS owns 100% of the equity interests in TMA, TMO, and Trico Holdco, and 99% of the equity interests in TMC.  Trico Holdco owns 1% of the equity interests in TMC, and TMA owns 100% of the equity interests in Debtor TMI.  On the Petition Date, TMC owned 100% of the equity of non-Debtor Trico Supply AS ("Trico Supply"), which, together with its direct and indirect subsidiaries, are referred to as the "Opco Entities."  As discussed more fully herein, the Debtors no longer own the Opco Entities.  TMS, TMA, and TMO also own all or a portion of certain other non-Debtor entities that are not affiliated with the Opco Entities.  The Debtors, the Opco Entities (prior to being reorganized and recapitalized outside of chapter 11), and the other non-Debtor affiliates and subsidiaries formed what was commonly referred to as the "Trico Marine Group."  A corporate organizational chart (as of the Petition Date) is attached hereto as ***Exhibit C***.

### Section 1.02  Sources of Information

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT AND IS BASED, IN PART, UPON INFORMATION PREPARED BY PARTIES OTHER THAN THE DEBTORS.  THEREFORE, ALTHOUGH THE DEBTORS HAVE MADE EVERY REASONABLE EFFORT TO BE ACCURATE IN ALL MATERIAL MATTERS, THE DEBTORS ARE UNABLE TO AND DO NOT WARRANT OR REPRESENT THAT ALL THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE.**

In arriving at your decision, you should not rely on any representation or inducement made to secure your acceptance or rejection that is in addition to or contrary to information contained in this Disclosure Statement, and any such additional or contrary representations or inducements should be reported to counsel for the Debtors, Vinson & Elkins L.L.P., Attn:  John E. Mitchell, Trammel Crow Center, 2001 Ross Avenue, Suite 3700, Dallas, Texas 75201-2975.

### Section 1.03  Description of the Debtors' Businesses and Assets

The Debtors are headquartered in Houston, Texas, and prior to winding down their affairs, through Debtor and non-Debtor subsidiaries, provided subsea services, subsea trenching and protection services, and towing and supply services and vessels, primarily to oil and natural gas exploration and production companies that operate in major offshore oil and gas producing

regions around the world, including the North Sea, West Africa, Mexico, Brazil, and the Asia Pacific Region. TMS is the lead Debtor in the Chapter 11 Cases and as of the Petition Date, was the ultimate parent of the other 43 entities in the Trico Marine Group.

The Debtors began as a towing and supply services company, but in 2007 and 2008, acquisitions expanded the services of the Trico Marine Group beyond towing and supply to include subsea services and subsea trenching and protection. Debtors TMA, TMO, and TMI, along with non-Debtor subsidiaries Trico Servicos Maritimos Ltda. ("Trico Brazil"), Coastal Inland Marine Services Ltd. ("Trico West Africa"), Trico Marine Services (Hong Kong) Ltd. ("Trico Hong Kong"), Eastern Marine Services Ltd. ("EMSL") and Naviera Mexicana de Servicios, S. de R.L. de C.V. ("Mexico"), provide towing and supply services. This segment of the Trico Marine Group, along with certain related subsidiaries, is commonly referred to as "Holdco." Because the Plan contemplates a liquidation of the Debtors, the towing and supply assets of Holdco have largely been sold in the Chapter 11 Cases.

The Trico Marine Group also provided subsea services and subsea trenching and protection services through certain of the Opco Entities, including DeepOcean AS ("DeepOcean") and CTC Marine Projects, Ltd. ("CTC Marine"). Trico Shipping AS ("Trico Shipping"), a subsidiary of Trico Supply, owns or owned the majority of the Opco Entities' vessels.

The Trico Marine Group also provided marine support services to the oil and gas industry through the use of a diversified fleet of vessels. These services included the transportation of drilling materials, supplies and crews to drilling rigs and other offshore facilities, towing support for drilling rigs and equipment, and support for the construction, installation, repair, and maintenance of offshore facilities.

### Section 1.04  Debtors' Pre-Petition Indebtedness

      *(a)*      *U.S. Credit Facility.*

In January of 2008, TMS entered into a Credit Agreement (as amended, the "U.S. Credit Facility") with Nordea Bank Finland PLC ("Nordea"), and Unicredit Bank AG (f/k/a Bayerische Hypo—Und Vereinsbank) ("Unicredit"), as lenders. The U.S. Credit Facility Credit Agreement was amended and restated on June 11, 2010 as a $25 million term loan by and among TMS, as borrower; TMA, TMO, TMI, TMC and Trico Holdco, and certain non-Debtor affiliates,[2] as guarantors; Obsidian Agency Services, Inc. ("Obsidian"), as collateral agent and administrative agent; and affiliates of Tennenbaum Capital Partners, LLC ("Tennenbaum Capital"), as lenders (replacing Nordea and Unicredit). As amended, the U.S. Credit Facility was a $25 million term loan that was scheduled to mature on December 31, 2011. Interest on the U.S. Credit Facility

---

[2]    The non-Debtor guarantors of the U.S. Credit Facility are Trico West Africa, Trico Hong Kong, Servicios de Apoyo Maritimo de Mexico, S. de R.L. de C.V., Trico Brazil, Trico International Holdings B.V., and Trico Marine International Holdings B.V.

accrued at an annual rate equal to LIBOR (subject to a 2.50% floor) plus 15.5%[3]. The U.S. Credit Facility was secured by mortgages (and related assignments of earnings and assignment of insurances) on certain vessels owned by TMA; pledges of all deposit accounts of TMS, TMA and TMO; 100% of the equity interests of TMA and TMO; 65% of the equity interests of TMC; and a pledge of a subordinated intercompany note from Trico Supply payable to TMO with an initial principal amount of $194 million (the "$194M Intercompany Note"). As of the Petition Date, approximately $25 million of principal was outstanding under the U.S. Credit Facility. On April 18, 2011, all principal and interest due under the U.S. Credit Facility was paid in full.

On June 11, 2010 TMS entered into (i) a Reimbursement Agreement and among TMS, TMA, TMO and Nordea and (ii) a L/C Cash Collateral Agreement (together with the Reimbursement Agreement, the "Letter of Credit Agreements") pursuant to which six letters of credit (as amended, the "Continuing Letters of Credit") with an aggregate stated amount of $3,490,546.24 originally issued pursuant to the U.S. Credit Facility were (x) kept outstanding after the termination of the letter of credit facility under the U.S. Credit Facility and (y) cash collateralized in an amount equal to 105% of the stated amount of such letters of credit. Nordea has no obligation to issue new letters of credit pursuant to the Letter of Credit Agreements. None of the Continuing Letters of Credit remain outstanding.

### (b) *3% Senior Convertible Notes*.

On February 7, 2007, TMS issued $150 million of 3% senior convertible debentures due 2027 (the "3% Unsecured Debentures") with Wells Fargo Bank, National Association as indenture trustee. The 3% Unsecured Debentures are unsecured and are not guaranteed by any affiliates of TMS. As of the Petition Date, $150 million of principal was outstanding under the 3% Unsecured Debentures.

### (c) *8.125% Secured Notes*.

On May 14, 2009, TMS issued, in exchange for other notes then outstanding, approximately $202.8 million of 8.125% secured convertible debentures due 2013 (the "8.125% Notes") with U.S. Bank, National Association (as successor to Wells Fargo Bank, National Association) as indenture trustee. The 8.125% Notes are secured by a second lien on certain assets pledged to secure the U.S. Credit Facility, including certain vessels owned by TMA, the $194M Intercompany Note and 100% of the equity interests of TMA and TMO. TMA and TMO have issued non-recourse guaranties of the 8.125% Notes. As of the Petition Date, $202.8 million of principal was outstanding under the 8.125% Notes.

### (d) *MARAD Notes*.

In 1999, TMI issued $18.9 million of notes at 6.11% interest due in 2014 (the "MARAD Notes") to finance construction of two supply vessels, of which approximately $5 million remained outstanding as of the Petition Date. The MARAD Notes were guaranteed by TMS and

---

[3]     The U.S. Credit Facility is also subject to a 2% default interest rate on all outstanding amounts.

the U.S. Maritime Administration. The U.S. Maritime Administration guaranty was secured by first priority preferred mortgages on the vessels *Hondo River* and *Spirit River*. In February, 2011, the Debtors sold the *Hondo* and *Spirit* and transferred $4,555,489 which covered*, inter alia,* all outstanding principal and interest to the Indenture Trustee of the MARAD Notes. As described in Section 1.08(f)(6) herein, because the Holders of the MARAD Notes were not paid the Make-Whole Premium provided for in the MARAD Notes, the Debtors expect that the Holders of the MARAD Notes will have an allowed unsecured claim in the amount of $511,849.01 against TMI.

### (e) Guaranteed Debt of Opco Entities.

As set forth in greater detail below, prior to the Opco Restructuring, Trico Shipping was the primary obligor on three separate financial debt obligations of the Opco Entities—a series of secured notes, a working capital credit facility, and a priority credit facility. The secured notes and the working capital credit facility were guaranteed by one or more of the Debtors.

### 1) The High Yield Notes.

On October 30, 2009, Trico Shipping issued $400 million of 11.875% senior secured notes due 2014 (the "High Yield Notes"). TMS, Trico Holdco, TMC, and a substantial number of the non-Debtor subsidiaries of TMS (all of which are Opco Entities) were guarantors of the High Yield Notes (collectively, the "High Yield Notes Guarantors").[4]

Trico Shipping and the High Yield Notes Guarantors pledged a first-priority lien in substantially all of their assets to secure the High Yield Notes. The collateral included, *inter alia*: (i) 11 vessels and related assets, (ii) factoring agreements, (iii) a subordinated loan agreement dated May 15, 2008 from Trico Shipping payable to TMS in an initial principal amount of $395 million (the "$395 Million Intercompany Note"), (iv) a subordinated loan agreement dated November 8, 2007 from Trico Supply payable to TMC in an initial principal amount of $33 million (the "$33 Million Intercompany Note"), (v) TMS' equity interests in Trico Holdco, (vi) Trico Holdco's equity interests in TMC, and (vii) TMC's equity interests in Trico Supply.

All of the High Yield Notes Guarantors also pledged their owned equity interests of certain affiliated subsidiaries to secure the High Yield Notes.[5] Additionally, nine of the non-

---

[4] The High Yield Notes Guarantors are: TMS; TMC; Trico Holdco; Trico Supply; Trico Subsea Holding AS; Trico Subsea AS; DeepOcean Shipping III AS; Deep Ocean Shipping II AS; DeepOcean Shipping AS; DeepOcean; Trico Supply Limited; Albyn Marine Limited; CTC Marine Projects Limited; DeepOcean Brasil Servicos Ltda.; DeepOcean Maritime AS; DeepOcean Management AS; Deep Ocean de Mexico S. de R.L. de C.V.; CTC Marine Norway AS; CTC Marine Projects (Guernsey) Limited; DeepOcean Subsea Services Limited; DeepOcean BV; DeepOcean UK Ltd.; Servicios Profesionales de Apoyo Especializado, S. de R.L. de C.V.; and Servicios de Soporte Profesional Administrativo, S. de R.L. de C.V.

[5] The Guarantors pledging equity interests include: Trico Holdco; Trico Supply; Trico Shipping; Trico Subsea Holding AS; Trico Subsea AS; DeepOcean Shipping III AS; Deep Ocean Shipping II AS; DeepOcean Shipping AS; DeepOcean; Trico Supply Limited; Albyn Marine Limited; CTC Marine Projects Limited; DeepOcean Brasil Servicos Ltda.; DeepOcean Maritime AS; DeepOcean Management AS; Deep Ocean de Mexico S. de R.L. de C.V.; CTC Marine Norway AS; CTC

Debtor subsidiaries pledged cash accounts.[6] The vessels and related assets, refund guarantees, factoring agreements, equity pledges, and cash account pledges (collectively, the "Trico Shipping Debt Collateral") constituted the bulk of the collateral pledged under the High Yield Notes. TMS's guarantee of the High Yield Notes was junior in right of payment to the U.S. Credit Facility.

On June 25, 2010, Trico Shipping and the High Yield Notes Guarantors entered into the first supplemental indenture to the High Yield Notes with Deutsche Bank National Trust Company as trustee (the "First Supplemental Indenture"). The First Supplemental Indenture, among other things, waived certain events of default and increased the amount of indebtedness that can be issued and secured by the Trico Shipping Debt Collateral of the High Yield Notes from $450 million to $465 million.

(f)    *Trico Shipping Working Capital Facility.*

In addition to the High Yield Notes, Trico Shipping was party to a working capital facility (the "Trico Shipping W/C Facility") originally with Nordea and Unicredit as lenders, and as more fully described herein, with the addition of Tennenbaum Capital as lender. Of the total commitment of approximately $15 million, plus a $10 million letter of credit subfacility, as of December 1, 2010, Trico Shipping had $6.1 million drawn on the revolving loan portion of the credit facility, and $5.36 million in issued letters of credit.

On June 29, 2010, Trico Shipping entered into the Third Amendment to Credit Agreement and Forbearance Agreement. This amendment provided for the addition of a term loan facility (the "Term Loan Facility") to be provided by affiliates of Tennenbaum Capital, including up to $50 million in Tranche A Term Loans and up to $15 million in Tranche B Term Loans (collectively, the "Term Loans").

At closing of the Term Loan Facility, Trico Shipping borrowed approximately $28 million under the Tranche A Term Loans. All further Term Loan commitments were later cancelled as set forth below.

The Trico Shipping W/C Facility, including the Term Loan Facility, was secured by the same Trico Shipping Debt Collateral and was *pari passu* in payment and lien priority with the High Yield Notes. Similar to the High Yield Notes, TMS's guarantee of the Trico Shipping W/C Facility and the Term Loan Facility was junior in right of payment to the U.S. Credit Facility.[7]

---

Marine Projects (Guernsey) Limited; DeepOcean Subsea Services Limited; DeepOcean BV; DeepOcean UK Ltd.; Servicios Profesionales de Apoyo Especializado, S. de R.L. de C.V.; and Servicios de Soporte Profesional Administrativo, S. de R.L. de C.V.

[6]    Guarantors pledging cash accounts include Trico Shipping, Trico Supply, DeepOcean Shipping III AS, DeepOcean Shipping II AS, Trico Subsea AS, Trico Subsea Holding AS, DeepOcean AS, DeepOcean Management AS, and DeepOcean Maritime AS.

[7]    To infuse the necessary liquidity into Opco that was originally contemplated to be provided by the Term Loan Facility, Trico Shipping entered into a $22,000,000 Secured Credit Facility (the "Priority Credit Agreement") with certain holders of

*(g)    Release of Guarantee Claims.*

Pursuant to the Holdco / Opco Settlement, all claims against the Holdco Debtors held by the Holders of the High Yield Notes and by the lenders under the Trico Shipping W/C Facility were released as of the Effective Date of the Opco Restructuring and, therefore, no distributions will be made under the Plan to any Holder of the High Yield Notes, and no distributions will be made under the Plan to any lender under the Trico Shipping W/C Facility on account of their guarantee claims arising under or in connection with the Trico Shipping W/C Facility.

## Section 1.05  Events Leading to Chapter 11

The demand for subsea and marine support vessels and services is dependent upon the needs of offshore natural gas exploration and production companies.  During 2009 and into 2010 there was a significant reduction in the level of operating and capital expenditures in the offshore oil and gas industries, as well as other industries that would require offshore services such as those provided by the Debtors.  This reduction in demand was driven principally by the global economic slowdown that occurred during 2009.  The Debtors provided services that relate to projects with a significant investment requirement as well as a significant lead time in developing and executing.  As a result, the Debtors, and the companies to which the Debtors provided services, were susceptible to wide variations in supply and demand, commodity and currency fluctuations, changing regulatory regimes, political instability, and security concerns. Additionally, as the prices of oil and natural gas decline or are depressed, drilling and construction activities in the regions in which the Debtors operated decline or remain stagnant. As the Debtors served industries where there is a long lead time for investment, perceptions regarding global economic growth as well as perceptions regarding commodity prices impact investment decisions, and, thus, impacted demand for the Debtors' services.  In addition, the business of the Debtors was seasonal and depended in part on weather conditions.

As a result of (i) the decline in oil and gas prices, (ii) a decline in utilization and day rates in the towing and supply businesses driven by reduced exploration and production spending, (iii) and an increase in the supply of vessels, the Debtors were faced with insufficient liquidity to service the above-described pre-petition debts and obligations.

On or about June 17, 2010, the Debtors' grace period to make the interest payment on the 8.125% Notes expired.  On June 29, 2010, the Debtors entered into a forbearance agreement with a majority of the Holders of the 8.125% Notes (the "Secured Notes Forbearance Agreement"). The purpose of the Secured Notes Forbearance Agreement was to negotiate a consensual restructuring of the Debtors' assets and debts, not only with the Holders of the 8.125% Notes, but also with the Holders of the 3% Unsecured Debentures, and if necessary, with the Holders of the Trico Shipping High Yield Notes, in light of TMS's guaranty and placement of certain intercompany notes in Trico Shipping's and Trico Supply's capital structures.

---

the High Yield Notes and Tennenbaum Capital as lenders on September 21, 2010.[7]  Each of Trico Shipping's subsidiaries provided upstream guarantees of the Priority Credit Agreement; however, none of the Debtors is a guarantor of the Priority Credit Agreement.

The Secured Notes Forbearance Agreement expired August 15, 2010. On August 16, 2010, a new forbearance agreement was executed with the majority Holders of the 8.125% Notes, and, with no agreement being reached, this new forbearance agreement expired on August 24, 2010.

The grace period for the payment of interest due July 17, 2010 on the 3% Unsecured Debentures expired on August 15, 2010. Though discussions with the significant Holders of 3% Unsecured Debentures were undertaken, no forbearance agreement was ever reached.

In the meantime, a reassessment of the business plan and downturn in the business being conducted by the Opco Entities impacted the availability of liquidity through the Trico Shipping W/C Facility. It soon became apparent that a strategy of reorganizing the Debtors without involving Holders of significant debt at the non-Debtor affiliate level was no longer feasible.

Between August 15, 2010 and the Petition Date, the Debtors and non-Debtor affiliates engaged in an intense effort to reach a consensus with any of their significant creditors to inject sufficient liquidity and allow the Debtors to continue to operate outside of chapter 11 while a global, consensual restructuring of the Debtors and their non-Debtor subsidiaries was negotiated. These discussions included each of the Debtors' and non-Debtors' major constituencies: Tennenbaum Capital, the 3% Unsecured Debentures, 8.125% Notes, and High Yield Notes. The Debtors proposed the framework of a restructuring to all parties and, although parties initially indicated willingness to work within the framework, no consensual plan or feasible structure for short-term financing for the Debtors could ultimately be obtained, let alone a feasible, out-of-court restructuring.

Needing an immediate infusion of liquidity to operate, during the summer of 2010, the Debtors solicited bids for the provision of debtor-in-possession financing to finance the business and operations of the Debtors in the event of a chapter 11 filing. Therefore, contemporaneously with the June 11, 2010 amendment to the U.S. Credit Facility, TMS entered into an Existing Credit Commitment Purchase and Debtor-in-Possession Facility Commitment (the "Original DIP Facility Commitment"), among TMS and Tennenbaum DIP Opportunity Fund, LLC ("Tennenbaum"). The proceeds of the Original DIP Facility Commitment, if utilized, would be used in part to fully refinance the obligations under the existing U.S. Credit Facility and will accrue at an interest rate equal to the LIBOR Rate (as defined in the DIP Facility plus 9.5% per annum (the "Original DIP Facility"). The Original DIP Facility contemplated the funding of a $50 million debtor-in-possession facility, $25 million of which would have refinanced or "rolled up" the Debtors' obligations under the U.S. Credit Facility, and the $25 million balance in "new money" loans to the Debtors' estates.

However, after negotiating the terms of the amendments to the U.S. Credit Facility, and in the weeks leading up to the Petition Date, it became apparent that the assumptions regarding the financial status of the Debtors and the Debtors' non-Debtor affiliates upon which the Original DIP Facility was structured were no longer valid. Accordingly, on August 24, 2010, and with little alternative financing options available to the Debtors, the Debtors amended the Original DIP Facility Commitment to instead provide for a $35 million debtor-in-possession credit

facility, $25 million of which will refinance or "roll up" the Debtors' obligations under the U.S. Credit Facility, and the $10 million balance in "new money" loans to the Debtors' estates (the "DIP Facility" and "DIP Facility Commitment").    The interest rate under the DIP Facility increased to LIBOR plus 11.5%.

To access the financing available through the DIP Facility, among other things, and to maximize the value of the Debtors' assets for the benefit of their stakeholders, recapitalize their capital structure, and enable the Debtors to take strategic action to address short and long-term liquidity constraints, the Debtors commenced chapter 11 proceedings on the Petition Date. Additional discussion regarding the DIP Facility is provided in Section 1.08(c) hereof.

### Section 1.06  Debtors' Management

The Debtors' current management team is comprised of professionals with significant experience in many aspects of the marine services industry.    The executive officers of the Debtors are as follows:

| Name | Title | Relevant Experience |
|------|-------|---------------------|
| Richard Bachmann | Chief Executive Officer / President / Chairman of the Board | Mr. Bachmann has served on the Board of Directors of TMS since 2005. Mr. Bachmann was asked to serve as Chairman, Chief Executive Officer, and President in May 2010. Mr. Bachmann founded Energy Partners, Limited, an independent exploration and production company focused on deep water of the Gulf of Mexico and the continental shelf and served as its Chairman and Chief Executive Officer from 1998 to 2009. Prior to founding EPL, from 1995 to January 1997, he served as Director, President, and Chief Operating Officer of The Louisiana Land and Exploration Company, an independent oil and gas exploration company. |
| D. Michael Wallace | Interim Chief Operating Officer, TMS / Vice President / Chief Operating Officer / President, CTC Marine | Mr. Wallace is interim Chief Operating Officer for TMS. In addition, Mr. Wallace has served as Chief Operating Officer since August 2010. From 2007 to 2010, Mr. Wallace has served as the Chief Executive Officer of Eastern Marine Services Limited, the joint venture between TMS's subsidiary, Trico Marine Services (Hong Kong) Limited and China Oilfield Services Limited. From November 2002 until December 2006 he served as TMS's Vice President, Emerging Markets and Head of Global Marketing. From January 2000 to November 2002, Mr. Wallace was Vice President of Marine Division with ASCO US LLC, a wholesale petroleum broker. From December 1996 to December 1999, Mr. Wallace was General Manager for Tidewater Marine, Inc., an offshore supply vessel company, in Venezuela. |
| John Castellano | Chief Restructuring Officer | Mr. Castellano is a Managing Director of AlixPartners, LLP and associated with |

|  |  | AP Services, LLC, which has been employed as crisis managers in the Chapter 11 Cases. Mr. Castellano specializes in designing and implementing business turnarounds and in providing crisis interim management. He has extensive experience in strategic restructuring and hands-on implementation in the energy industry, consumer products and manufacturing industries. Mr. Castellano has been with AlixPartners since 1998, serving in interim management roles and in an advisory capacity to his clients. Mr. Castellano has had a tremendous amount of experience with large, complex restructurings and organizations, including Calpine Corporation and Mirant Corporation during the restructuring of those companies.

Prior to joining AlixPartners, Mr. Castellano was a manager of strategic advisory services for Ernst & Young. Prior to this, he was a manager of financial reporting and internal audit for the Sweetheart Cup Co. He started his professional career as a staff accountant with Ernst & Young. |

| | | |
|---|---|---|
| Brett Cenkus | General Counsel and Secretary | Mr. Cenkus has served as General Counsel since 2009. In 2007, Mr. Cenkus joined TMS as its Senior Counsel from Andrews Kurth LLP. In 2001, Mr. Cenkus founded Paragon Residential, Inc., a mortgage bank, and served as its President until it was sold to Bridge Investments, LP in 2006. Prior to founding Paragon, Mr. Cenkus practiced law for Skadden Arps Slate Meagher & Flom LLP. |
| Stephen Morrell | VP Finance (Principal Financial Officer) | Mr. Morrell joined TMS in 2008 as Treasurer and Director of Financial Planning. Mr. Morrell previously spent over ten years with US Airways, where he served in various roles including Vice President – Finance and Treasurer and Vice President Financial Planning and Analysis. He also served as Group Treasurer for Rinker Group, an international building materials company. Mr. Morrell has experience developing and implementing comprehensive financing and restructuring plans. Mr. Morrell is a graduate of University of Rochester with a degree (with distinction) in Economics and an MBA from Duke University. Mr. Morrell spent seven years in the US Navy attaining the rank of Lieutenant. |
| Jeffrey Favret | Chief Accounting Officer | Mr. Favret joined TMS in April 2009 as Chief Accounting Officer. Mr. Favret has over 25 years of accounting experience, including 14 years in public accounting, concentrating in the energy, energy services, and construction industries. Prior to his current role at TMS, Mr. Favret was a partner in the accounting firm Postlethwaite & Netterville, serving in their Assurance and Advisory Services practice and before that spent over ten years with Ernst & Young, LLP in various roles in their audit practice. Mr. Favret has |

| | | extensive experience in SEC, US GAAP, and IFRS technical accounting issues and work related to Sarbanes-Oxley Section 404 Compliance. Mr. Favret is a Certified Public Accountant and a member of the Louisiana and Texas State Societies of Certified Public Accountants. He is a graduate of the University of New Orleans. |
|---|---|---|

### Section 1.07  Overview of Chapter 11

Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a plan, which sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by a bankruptcy court binds a debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity the bankruptcy court may find to be bound by such plan. Chapter 11 requires that a plan treat similarly situated creditors and similarly situated equity interest holders equally, subject to the priority provisions of the Bankruptcy Code.

Prior to soliciting acceptances of a proposed plan, Bankruptcy Code § 1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125.

### Section 1.08  Events During the Chapter 11 Cases[8]

#### (a)     Entry of "First Day" Orders

On the Petition Date, the Debtors filed a number of motions with the Bankruptcy Court, primarily of an administrative nature. The Bankruptcy Court thereafter entered orders that, among other things:

(1)    granted the Debtors' request for joint administration of the Chapter 11 Cases;

---

[8]    The following is a summary of the major events that occurred during the Chapter 11 Cases. For a full listing of all of the documents and papers filed on the docket in the Chapter 11 Cases since the Petition Date (and links to copies thereof), please refer to the website of the Debtors' Solicitation Agent, Epiq Bankruptcy Solutions, Inc. at http://dm.epiq11.com/TMG/Project/default.aspx.

(2)     authorized the Debtors to file a consolidated list of creditors and approved the form and manner of notifying creditors of the commencement of the Chapter 11 Cases;

(3)     provided adequate assurance to utilities used by the Debtors;

(4)     authorized the Debtors to continue to use their existing cash management system;

(5)     authorized the Debtors to pay certain pre-petition wages of their employees and to continue to honor employee benefits and other employee programs in the ordinary course of business;

(6)     authorized the Debtors to pay pre-petition taxes and licensing and permit fees in the ordinary course of business;

(7)     authorized the Debtors to honor pre-petition obligations to certain critical vendors;

(8)     authorized the Debtors to continue certain insurance policies;

(9)     approved notification procedures and restrictions on certain transfers of interests in the Debtors' estates;

(10)    extended the time for the Debtors to file their Schedules and Statements with the Bankruptcy Court;

(11)    approved procedures for the Debtors to comply with Bankruptcy Rule 2015.3;

(12)    authorized the Debtors to retain and employ professionals utilized in the ordinary course of business;

(13)    provided the structure for the payment of fees and expenses of professionals employed by the Debtors and the Creditors' Committee; and

(14)    authorized the Debtors' employment and retention of Epiq Bankruptcy Solutions, LLC as Solicitation Agent.

*(b)     Retention of Debtors' Professionals*

During the Chapter 11 Cases, the Court granted the Debtors' applications or motions, as applicable, to employ and to retain the following professionals: (1) Vinson & Elkins L.L.P. as general bankruptcy and restructuring counsel; (2) Morris Nichols Arsht & Tunnel LLP as general bankruptcy and restructuring co-counsel; (3) Cahill Gordon & Reindel LLP as special litigation counsel and conflicts counsel; (4) Evercore Group L.L.C. as investment banker and financial advisors ("Evercore"); (5) AP Services, LLP as crisis managers, and John Castellano as Chief Restructuring officer; (6) Postlethwaite & Netterville as accountants; (7) Ernst & Young LLP as

tax advisors; (8) PricewaterhouseCoopers LLP as independent auditors; and (9) B&W Tech, Inc. as vessel broker.

*(c)*     *Debtor in Possession Financing and Use of Cash Collateral*

On the Petition Date, the Debtors sought the Bankruptcy Court's authority on an interim basis to: (i) enter into the DIP Facility; (ii) utilize cash collateral, grant liens and provide for super-priority administrative expense status; (iii) and grant adequate protection to certain pre-petition secured parties (the "DIP Financing Motion") [Dkt. No. 13]. The DIP Financing Motion sought authority to obtain new money loans from the DIP Lenders in the principal amount of $10,000,000 and, upon entry of a final order, a loan to refinance the pre-petition first lien debt under the U.S. Credit Facility in the principal amount of $25,000,000 (the "Roll-Up").

On August 27, 2010, the Bankruptcy Court entered an order authorizing the DIP Facility on an interim basis (the "Interim DIP Order") [Dkt. No. 58]. The Interim DIP Order was amended on September 7, 2010. The Debtors thereafter engaged in extensive negotiations with the DIP Lenders to reach a consensual resolution of objections related to the Roll-Up and other matters. The Interim DIP Order never became a Final Order, and, as a result, on November 8, 2010 Obsidian sent a termination notice to the Debtors pursuant to which the DIP Lenders terminated the DIP Facility.

On November 10, 2010, the Debtors filed their *Emergency Motion of the Debtors Pursuant to 11 U.S.C. Sections 105(A), 361, 363, 507(B), 1107, and 1108 and Federal Rules of Bankruptcy Procedure 4001, 9006(B) and 9014 for an Order (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection to Prepetition Lenders and (C) Scheduling a Final Hearing* [Dkt. No. 416] to, among other things, authorize the use of cash collateral. The Court entered an interim order that same day approving the Debtors' limited use of cash collateral. On November 29, 2010, the Debtors and the DIP Lenders reached an agreement regarding access to cash collateral under the DIP Facility, which agreement was approved by the Court on November 30, 2010. In exchange for the DIP Lenders' consent to use cash collateral, the Debtors agreed to (i) comply with the budget filed with the Bankruptcy Court on November 29, 2010 [Dkt. No. 547], and (ii) use a portion of proceeds from the sale of certain vessels, as disclosed in the budget, to reduce the Debtors' obligations under the DIP Facility and the U.S. Credit Facility and ultimately to pay off the DIP Facility and U.S. Credit Facility by January 14, 2011.

Because the Debtors were unable to pay off the DIP Lenders' claims in full prior to January 14, 2011, on January 27, 2011, the DIP Lenders filed an emergency motion to, among other things, terminate the Debtors' use of cash collateral and schedule a global auction for the Debtors' remaining unsold assets (the "Motion to Terminate Use of Cash Collateral") [Dkt. No. 813], alleging, among other things, that the Debtors failed to comply with the November 29, 2010 cash collateral agreement by reducing their obligations to the DIP Lenders to the agreed-upon level. The Debtors filed a response to the Motion to Terminate Use of Cash Collateral on February 3, 2011. In their response, the Debtors asserted that the DIP Lenders were adequately protected in respect of their prepetition claims, citing nearly $50 million in vessel sales occurring

since the Petition Date, and accordingly, continued use of cash collateral was appropriate. The Bankruptcy Court scheduled a hearing on the Motion to Terminate Use of Cash Collateral and the Debtors' response for February 10, 2011.

Prior to the scheduled hearing, the Debtors and the DIP Lenders resolved the contested issues and negotiated an agreed order reflecting the parties' agreement regarding consensual use of cash collateral. This agreed order provides, among other things, that the Debtors may use cash collateral of the DIP Lenders in accordance with an agreed-upon budget through May 17, 2011 and that the Debtors will immediately pay down the entirety of the DIP Lenders' prepetition secured loan (except $100,000) using the proceeds of certain vessel sales and other cash on hand. The order sets forth a specific waterfall for distribution of the proceeds of sales of the Debtors' vessels and certain other assets that occur from the date of the order through April 30, 2011. In addition, the order provides that all parties waive their rights to object to any of the DIP Lenders' pre- and postpetition claims, including for attorneys' fees through the date of the order. In the event that all of the DIP Lenders' claims are not indefeasibly paid in full by April 30, 2011, the Debtors would schedule and hold a global auction for all of the Debtors' remaining assets on or prior to May 16, 2011 at which the DIP Lenders would have broad authority to credit bid any remaining Claims. In the event that all of the DIP Lenders' claims are not indefeasibly paid in full by May 17, 2011, the Debtors' Cases are converted to cases under chapter 7 or a chapter 11 trustee is appointed, the DIP Lenders would be granted automatic relief from the automatic stay contained in Bankruptcy Code § 362 with respect to all of the Debtors' assets and any existing injunctions preventing the DIP Lenders from exercising remedies. The order also granted the DIP Lenders first priority senior security interests for their outstanding DIP claims against all of the assets of the Debtors, including the proceeds of the Settlement described above. Finally, it provides for the implementation of global mutual releases for the Debtors and the DIP Lenders upon the satisfaction of certain conditions, including the indefeasible payment in full of all of the DIP Lenders' pre- and postpetition claims. The *Final Order (I) Authoring Debtors to Obtain Postpetition Secured Debtor in Possession Financing and Use Cash Collateral and (II) Providing Related Relief* (the "Final Cash Collateral Order") [Dkt. No. 936] was entered on February 18, 2011.

In mid April 2011, the DIP Lenders' claims were indefeasibly paid in full. As a result, on April 21, 2011, U.S. Bank National Association, as trustee for the 8.125% Notes (the "8.125% Notes Indenture Trustee") filed an emergency motion [Dkt. No. 1156] seeking modification or termination of the Debtors' use of cash collateral (the "Trustee Emergency Cash Collateral Motion"). Additionally, On February 24, 2011, the 8.125% Notes Indenture Trustee filed a motion [Dkt. No. 965] seeking reconsideration of certain elements of the Final Cash Collateral Order. Subsequent to the filing of these two motions, the Debtors and the 8.125% Notes Indenture Trustee reached an agreement regarding the Debtors' use of cash collateral through and including May 23, 2011. By the *Supplemental Final Order (I) Authorizing Debtors to Obtain Postpetition Secured Debtor in Possession Financing and Use Cash Collateral and (II) Providing Related Relief* (the "Supplemental Final Order") [Dkt. No. 1237] entered on May 13, 2011, the Debtors' are authorized to use cash collateral through and including May 23, 2011 in accordance with the budget attached to the Supplemental Final Order. The Supplemental Final

Order also restricts the Debtors use of proceeds of EMSL, or any amounts constituting part of the Secured Claim Reserve (as set forth in the budget attached to the Supplemental Final Order).

On May 20, 2011, the Debtors filed their *Emergency Motion For Entry Of Interim And Final Orders Pursuant To 11 U.S.C. §§ 361 And 363 Authorizing Debtors To Use Cash Collateral And Granting Adequate Protection* [Docket No. 1266], seeking authority to use the cash collateral of the 8.125% Notes Indenture Trustee on an interim basis through June 17, 2011 and on a final basis through September 1, 2011. On May 23, 2011, the Court entered an order approving the Debtors' emergency motion (the "May 23 Interim Cash Collateral Order"). The May 23 Interim Cash Collateral Order mooted the Trustee Emergency Cash Collateral Motion. A final hearing on the relief sought in the Debtors' emergency motion is scheduled for June 10, 2011.

### (d)  The Creditors' Committee

On September 8, 2010, the United States Trustee for the District of Delaware appointed the Creditors' Committee. The Creditors' Committee consists of the following creditors: (1) Astoundry Inc., (2) Joseph S. Compofelice, (3) Discovery Group, Inc., (4) Wells Fargo Bank N.A., and (5) Frank E. Williams, Jr.

The Bankruptcy Court has approved the employment of certain professionals for the Creditors' Committee, including (1) Kasowitz, Benson, Torres & Friedman LLP as counsel, (2) Pachulski Stang Ziehl & Jones LLP as co-counsel, (3) Lugenbuhl, Wheaton, Peck, Rankin & Hubbard as special counsel, and (4) Chanin Capital Partners as financial advisors.

### (e)  Executory Contracts and Leases

On August 25, 2010, the Debtors filed their motion seeking to reject their nonresidential real property lease of certain industrial space in St. Rose, Louisiana. The Debtors had vacated and were not currently using the premises, and the Debtors determined that the lease was not necessary to their continued operations during the Chapter 11 Cases. The Bankruptcy Court approved the rejection of the lease on September 22, 2010.

On December 21, 2010, the Debtors filed their motion to extend the time period provided by Bankruptcy Code § 365(d)(4)(A) to assume or reject unexpired leases of nonresidential real property for an additional 90 days, through an including March 23, 2011. The Bankruptcy Court approved the requested extension on January 6, 2011.

On February 11, 2011, the Debtors filed a motion [Dkt. No. 909] to reject the lease of their headquarters located in the Woodlands, Texas (the "Headquarters Lease"). Given the reduction in staff that has occurred prior to and throughout the Chapter 11 Cases, the Debtors determined that it was not in their best interests to continue to operate under the Headquarters Lease. The Bankruptcy Court entered an order [Dkt. No. 962] approving the rejection of the Headquarters Lease on February 24, 2011. On or around February 25, 2011, the Debtors relocated their operations to the site of their former headquarters, Phoenix Tower, located at

3200 Southwest Freeway, Suite 2950, Houston, Texas, which had previously been subject to a sublease.

On March 23, 2011, the Debtors filed a motion [Dkt. No. 1058] to reject the lease at Phoenix Tower (the "Phoenix Tower Lease"). As set forth in the motion, due to the Debtors' liquidation, the Debtors and FSP Phoenix Tower Limited Partnership (the "Landlord") agreed to a stipulated rejection date of June 30, 2011. The Bankruptcy Court entered an order [Dkt. No. 1151] approving the rejection of the Phoenix Tower Lease as of June 30, 2011.

(f)     *Sale of Assets*

1)     *GE/Comar Sale*

On October 29, 2010, the Debtors filed a motion (the "GE/Comar Motion") [Dkt. No. 375] to (1) approve the assumption and assignment of that certain Master Bareboat Charter, dated September 30, 2002 between GE and Trico to Comar Marine Corporation ("Comar"), (2) reject the three Master Management and Operating Agreements with Comar, and (3) sell certain spare vessel parts. Under the Master Bareboat Charter, the Debtors chartered three vessels owned by General Electric Capital Corporation. Additionally, pursuant to the Master Bareboat Charter, the Debtors possessed an early buyout option to purchase the chartered vessels.

By the GE/Comar Motion, the Debtors sought to assume and assign the Master Bareboat Charter, upon which Comar would exercise the early buyout with regards to one of the vessels. In consideration for the assumption and assignment, Trico received a $500,000 payment from Comar.

On November 23, 2010, the Bankruptcy Court entered an agreed order [Dkt. No. 522] approving the transaction outlined in the GE/Comar Motion.

2)     *Trico Moon and Trico Mystic*

On September 17, 2010, the Debtors filed their motion (the "Moon/Mystic Sale Motion") [Dkt. No. 293] to approve the sale of the *Trico Moon* (the "Moon") and *Trico Mystic* (the "Mystic") vessels to Tidewater, Inc. ("Tidewater") for a total purchase price of $26,000,000. Subsequent to the filing of the *Moon/Mystic* Sale Motion, the Debtors filed a motion [Dkt. No. 460] to approve certain sale procedures in connection with the sale of the *Moon* and *Mystic*. On November 12, 2010, the Bankruptcy Court approved sale procedures for the sale of the *Moon* and *Mystic* [Dkt. No. 447].

The Debtors conducted on auction for the sale of the *Moon* and *Mystic* on November 24, 2010. At the auction, the Debtors selected Tidewater as the successful bidder. Tidewater's bid included a total purchase price of $30,500,000. On November 29, 2010, the Bankruptcy Court held a hearing to approve the sale to Tidewater. At the scheduled hearing, upon objections by Odyssea Vessels, Inc. ("Odyssea") and PACC Offshore Services Holdings Pte Lte ("PACC"), the Bankruptcy Court ordered that the auction be re-opened.

The Debtors re-opened the auction on November 30, 2010. At the auction, the Debtors selected PACC as the successful bidder for both the *Moon* and *Mystic*. Odyssea was the back-up bidder with respect to the *Moon*, and Tidewater was the back-up bidder with respect to the *Mystic*. The Bankruptcy Court approved the sale of the *Moon* and *Mystic* to PACC on December 1, 2010 for $31,280,001 with a $780,000 break-up fee to Tidewater (the "*Moon/Mystic* Sale Order"). Pursuant to the *Moon/Mystic* Sale Order and that certain Heads of Agreement between PACC and Trico Marine Assets, Inc., the parties closed upon the sale of the *Moon* immediately.

Additionally, under the *Moon/Mystic* Sale Order, $1,564,000 of the sale proceeds was escrowed to protect against any pre-close liens or encumbrances, $782,000 on account of the *Moon* (the "*Moon* Escrow"), and $782,000 on account of the *Mystic* (the "*Mystic* Escrow"). On April 20, 2011, the *Moon* Escrow was distributed to the Debtors. On May 18, 2011, the *Mystic* Escrow was distributed to the Debtors.

The Debtors and PACC agreed on a December 17, 2010 closing date for the *Mystic* and, in anticipation of such closing, negotiated certain back-to-back agreements, which provided for continued performance under those certain contracts (the "Petrobras Contracts") with Petroleo Brasileiro S/A. Concurrently, the Debtors and PACC began the process to assign the Petrobras Contracts to PACC.

On December 17, 2010, the Debtors and PACC met at the Debtors' offices to close the sale of the *Mystic*. During the closing process, PACC's counsel informed the Debtors that PACC had been notified that the *Mystic* had an electric issue that needed repair. The Debtors began immediately working on repairing the *Mystic*, and in good faith agreed to absorb all costs of repair, including all costs associated with any down-time.

Repairs to the *Mystic* depended upon the efforts of Converteam, Inc. ("Converteam"), a vendor of the Debtors. Converteam began repairing the *Mystic* on December 18, 2010, but was initially unsuccessful. Subsequently, on December 23, 2010, Converteam told the Debtors that the repairs would not continue unless and until its pre-petition claim was paid, demanding in excess of $1 million. The Debtors attempted to contact Converteam over the Christmas holiday to complete repairs on the *Mystic*, but received no response from Converteam until December 27, 2010. The Debtors diligently worked with Converteam to settle the dispute over the pre-petition invoices, and upon resolution of the issues with Converteam, the repairs to the *Mystic* were completed, and the vessel was back on hire on January 2, 2011.

During this period, the Debtors and PACC discussed closing prior to the repairs being finalized. However, on December 30, 2010, PACC informed the Debtors that it intended to cancel the sale agreement for the *Mystic*, and on January 3, 2011, PACC sent notice to the Debtors of its intention to cancel the sale agreement for the *Mystic*. PACC also requested immediate release of the purchase price with respect to the *Mystic*, which was, at the time, held in escrow.

Upon receipt of this notice, the Debtors contacted PACC in an attempt to consensually resolve any issues that may have led to PACC's decision to seek cancellation. PACC, however,

rebuffed these attempts by the Debtors. On January 6, 2011, the Debtors reiterated to PACC their readiness to close on the *Mystic* immediately and notified PACC that they had satisfied all performance conditions set forth in the sale agreement.

On January 10, 2011, the Debtors sent a letter notifying PACC that it intended to distribute the escrowed purchase price the following business day in accordance with the order approving the sale.

In response, on January 11, 2011, PACC filed a motion [Dkt. No. 741] seeking, *inter alia*, an immediate telephonic hearing on the dispute over the cancellation and entry of an order (i) enforcing the order approving the sale and prohibiting the Debtors from withdrawing or distributing the escrowed purchase price pending further order of the Court and/or (ii) directing the Debtors and PACC to arbitration.

On January 13, 2011, the Court heard arguments regarding the motion. After the hearing, the Debtors and PACC negotiated a consensual closing of the sale of the *Mystic*, and on January 14, 2011, announced their agreement to the Court. Under the agreement, PACC would close on the *Mystic* immediately, with the *Mystic* Escrow to be held for any possible future repairs necessary as a result of the electrical repair performed, in addition to certain pre-close liens or encumbrances. On the same day, the sale of the *Mystic* closed. On May 18, 2011, the *Mystic* Escrow was distributed to the Debtors.

3)      *Trinity River, Suwanee River, Roe River, Oak River, and Elm River*

On November 2, 2010, the Debtors filed their motion [Dkt. No. 387] to approve the sale of the *Trinity River*, *Suwanee River*, *Roe River*, *Oak River*, and *Elm River* vessels to GML (Offshore & Petroleum Limited) ("GML") for a total purchase price of $5,800,000 by private sale. On November 12, 2010, the Bankruptcy Court approved the sale of the above-listed vessels to GML [Dkt. No. 446]. GML refused to close. Subsequently, the Debtors found a new purchaser for the *Roe River* and the *Oak River*. On February 24, 2011, the Bankruptcy Court approved the sale to Coastland Energy Logistics Limited [Dkt. No. 961].

4)      *Carson River, East River, and Powder River*

On November 2, 2010, the Debtors filed their motion [Dkt. No. 389] to approve the sale of the *Carson River*, *East River*, and *Powder River* vessels to Sea Lyon Marine, Inc. for a total purchase price of $1,500,000 by private sale. On November 12, 2010, the Bankruptcy Court approved the sale [Dkt. No. 445]. In November, 2010, the sale closed.

5)      *Truckee River*

On December 8, 2010, the Debtors filed their motion [Dkt. No. 594] to approve the sale of the *Truckee River* vessel to Riverman Nigeria Limited for $950,000 by private sale. On December 14, 2010, the Bankruptcy Court approved the sale [Dkt. No. 633]. In February, 2011, the sale closed.

### 6) *Hondo River and Spirit River*

On November 15, 2010, the Debtors filed their motion [Dkt. No. 460] to approve a set of standard procedures for the orderly sale of the certain operating assets. These operating assets included, but were not limited to, certain vessels and vessel related inventory. On December 13, 2010, the Bankruptcy Court approved the procedures (the "Global Sale Procedures Order") [Dkt. No. 623].

On January 24, 2011, the Debtors received an offer from Odyssea to purchase the *Hondo River* (the "*Hondo*") and the *Spirit River* (the "*Spirit*"), *en bloc*, for a purchase price of $13,000,000, with $2,600,000 of the sale proceeds escrowed for certain pre-close liens or encumbrances (the "Hondo/Spirit Escrow"). After consultation with the Creditors' Committee, Obsidian, and Holders of the Debtors' 8.125% Notes (the "8.125% Noteholders" and together with the Committee and Obsidian, the "Asset Sale Consultation Parties"), the Debtors accepted the offer from Odyssea as the highest and best offer for the *Hondo* and *Spirit*, pursuant to the Global Sale Procedures Order. The sale closed on February 3, 2011. As of May 23, 2011, $2,570,000 of the *Hondo/Spirit* Escrow has been distributed to the Debtors.

As a result of the sale of the *Hondo* and *Spirit*, the Indenture Trustee of the MARAD Notes claimed it was owed a "Make-Whole Premium" (the "Make-Whole Premium"). The Debtors disputed the validity and/or priority of the claim for the Make-Whole Premium. However, so that the issue would not delay the closing of the Sale, the Debtors escrowed $535,000 from the proceeds of the Sale (the "MARAD Escrow") with Wilmington Trust Company pending resolution of the validity and priority of the Make-Whole Premium.

On February 18, 2011, the Debtors filed a motion asserting that the claim to the Make-Whole Premium was (i) not an allowed claim, or alternatively, (ii) to the extent the claim to the Make-Whole Premium was an allowed claim, such claim was an unsecured claim and because the MARAD Guarantee did not cover the Make-Whole Premium, the Indenture Trustee was not entitled to payment of the Make-Whole Premium from the MARAD Escrow.

After the Bankruptcy Court ruled that the Indenture Trustee's claim for the Make-Whole Premium (a) was not covered by the Guarantee and (b) was an allowable but unsecured claim and that the Indenture Trustee was not entitled to full and immediate payment of the Make-Whole Premium, the Indenture Trustee filed its notice of appeal the Bankruptcy Court's decision (the "Appeal").

The Debtors, in the exercise of their business judgment concluded that the cost, inconvenience, and burden associated with the Appeal would exceed any benefit to the Debtors estates in engaging in a lengthy appeals process. Furthermore, MARAD advised the Debtors that

it would object to the release of the MARAD Escrow unless and until the Appeal is resolved and MARAD is assured it will not be sued under the Guarantee by the Indenture Trustee. Thus, in an effort to resolve the disputes surrounding the Appeal, the Debtors engaged in arm's-length and good faith negotiations with the Indenture Trustee and entered into that certain *Settlement and Release Agreement*, dated as of May 2, 2011 (the "Settlement Agreement").

The Settlement Agreement, *inter alia*, provides for an allowed unsecured claim in the amount of $511,849.01 against TMI in the Chapter 11 Cases, on account of the Make-Whole Premium (the "Allowed Unsecured Claim") in exchange for a withdrawal of the Appeal and a release from the Estates.

In addition, upon approval of the Settlement Agreement, Wilmington Trust Company will be authorized and directed to immediately distribute the entirety of the MARAD Escrow to the Debtors.

Upon dismissal of the Appeal with prejudice, the Make-Whole Order will be final and the Indenture Trustee shall be estopped from bringing any claims or causes of action against MARAD for the Make-Whole Premium. The Indenture Trustee is to also take all necessary actions to cause the presentation to MARAD of a certificate stating that the Obligations have been "Retired and Paid," as such term is defined in Schedule A to the Indenture, in accordance with Section 6.04(a)(1) and Section 12.01 of the Indenture.

On May 2, 2011, the Debtors filed a motion seeking approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019 [Dkt. No. 1204]. No objections have been filed to the motion, and the Debtors expect the motion to be approved on or around May 23, 2011.

### 7) James River, Pearl River, and Buffalo River

On January 24, 2011, the Debtors held an auction for three vessels: the *James River* (the "James"), the *Pearl River* (the "Pearl"), and the *Buffalo River* (the "Buffalo").

At the conclusion of the bidding for the *James* and after consultation with the Asset Sale Consultation Parties, the Debtors selected Arfersi, S.A. de C.V. ("Arfersi") as the successful bidder, and its offer of $820,000 as the highest and best bid for the *James*. Additionally, Olmeca, S.A. de C.V. ("Olmeca") was selected as the back-up bidder.

At the conclusion of the bidding for the *Pearl* and after consultation with the Asset Sale Consultation Parties, the Debtors selected Naviera Mexicana Neptuno, S.A. de C.V ("Neptuno") as the successful bidder, and its offer of $695,000 as the highest and best bid for the *Pearl*. Additionally, Blanco Offshore Logistics, S.A. de C.V. ("Blanco") was selected as the back-up bidder.

At the conclusion of the bidding for the *Buffalo* and after consultation with the Asset Sale Consultation Parties, the Debtors selected Sea Lyon Marine, Inc. ("Sea Lyon") as the successful

bidder, and its offer of $195,000 as the highest and best bid. Additionally, Blanco was selected as the back-up bidder.

On February 3, 2011, the sale of the *Pearl* to Neptuno closed.

On February 8, 2011, the sale of the *James* to Arfersi and the sale of the *Buffalo* to Sea Lyon closed.

8)      *Roe River and Oak River*

In accordance with the Global Sale Procedures Order, on February 8, 2011, the Debtors accepted an offer from Coastland Energy Logistics Limited ("<u>Coastland Energy</u>") for the purchase of the *Roe River* and *Oak River* for $2,300,000 *en bloc*. The Bankruptcy Court approved the sale of the *Roe River* and *Oak River* to Coastland Energy [Dkt. No. 961] on February 24, 2011. On March 17, 2011, the sale of the *Roe River* and *Oak River* closed.

9)      *Elm River, Suwannee River, Trinity River, and Palma River*

On February 23, 2011, the Bankruptcy Court entered an order [Dkt. No. 953] providing for sale procedures for the sale of the *Elm River*, *Swuanee River*, *Trinity River*, and *Palma River*.

On March 3, 2011, the Bankruptcy Court approved the sale of the *Elm River* to Marine Energy & Investment Nig. Ltd. for $1,200,000 [Dkt. No. 998]. On March 17, 2011, the sale of the *Elm River* closed.

On March 29, 2011, the Bankruptcy Court approved the sale of the *Suwannee River* to Odekole International Services, Ltd. for $700,000 [Dkt. No. 1074]. On April 5, 2011, the sale of the *Suwannee River* closed.

On April 7, 2011, the Bankruptcy Court approved the sale of the *Trinity River* to Lanex Corporation for $611,000 [Dkt. No. 1104]. On April 12, 2011, the sale of the *Trinity River* closed.

On April 20, 2011, the Bankruptcy Court approved the sale of the *Palma River* to Odyssea for $2,900,000 [Dkt. No. 1144]. On April 21, 2011, the sale of the *Palma River* closed.

10)      *Sale of Remaining Vessels*

Two vessels, the *Leigh River* and *Manatee River*, have not been sold. These vessels cannot be sold because such vessels are pledged as collateral for an alleged tax claim by Mexican taxing authorities. Such tax claim is currently in litigation in Mexico. In this litigation, the Mexican tax authorities, in conjunction with their audit of the 2006 tax year which was completed in 2009, issued two assessments to Naviera Mexicana de Servicos, S. de R. I. de C.V. (Mexico) ("<u>NAMESE</u>"), the Debtors' non-Debtor Mexican joint venture. The first was in the amount of approximately 3 million pesos ($250,000) related to a partial year audit and a second

in the incremental amount of approximately 32 million pesos ($2,700,000) related to the total audit for 2006. These assessments relate to loans made by Trico Marine Operators to NAMESE which were considered by the tax authorities to be collections for services rendered and thus subject to income tax and value added tax (IVA). NAMESE appealed each of the these assessments by filing lawsuits in the judicial system. In order to pursue these appeals, NAMESE was required to post collateral in an amount at least equal to the two assessments. As an alternative to posting cash collateral, NAMESE pledged two offshore supply vessels (OSVs) the Manatee River and the Leigh River. Both lawsuits remain in the court process. Based on recent sale values of similar vessels in Mexico, the expected sale price of the two vessels is less than the total amount of the contested assessments.

Additionally, in conjunction with the recently completed 2007 audit, the Mexican tax authorities issued an assessment of approximately 33.4 million pesos ($2,850,000) related to funds transfers from the US that the tax authorities determined should be treated as revenue (and thus subject to income and IVA taxes) along with a 15% retention on revenue earned by certain NAMESE vessels that were judged not to be cabotage compliant. The deadline to pay or challenge this assessment is June 20, 2011.

### 11)    De Minimis Asset Sale Procedures

On February 11, 2011, the Debtors filed a motion [Dkt. No. 910] for an order approving sale procedures to be utilized in connection with the sale of certain de minimis assets (the "De Minimis Asset Sale Procedures"). After the Debtors agreed to modify certain terms of the procedures in response to informal comments from certain of the major parties in the Chapter 11 Cases, on February 23, 2011, the Bankruptcy Court granted the Debtors' motion [Dkt. No. 954], allowing the Debtors to implement the De Minimis Asset Sale Procedures for the sales of their non-operating assets, including, but not limited to, equipment, vehicles, furniture, fixtures, and other similar assets (the "De Minimis Assets"). Generally, pursuant to the De Minimis Asset Sale Procedures, the Debtors may consummate sales of De Minimis Assets under $35,000, exclusive of sales to insiders and affiliates, with no notice. For proposed sales of De Minimis Assets between $35,000 and $100,000, and any sale to an insider or affiliate, the Debtors must provide ten business days' notice to certain parties in interest and, if no objection is received, the Debtors will be permitted to consummate such sales without further hearing or order of the Bankruptcy Court.

### (g)    Exclusivity

According to Bankruptcy Code § 1121(b), the Debtors' exclusive right to file a plan or plans in the Chapter 11 Cases was set to expire on December 23, 2010, and the exclusive right to solicit acceptances of a plan or plans was set to expire on February 21, 2011. On December 21, 2010, the Debtors filed their motion [Dkt. No. 672] seeking to extend the exclusive periods to file a chapter 11 plan or plans (the "Exclusive Filing Period") and solicit acceptances thereof (the "Exclusive Solicitation Period").

On February 14, 2011, the Bankruptcy Court approved the Debtors' motion and extended the Exclusive Filing Period to February 28, 2011 and the Exclusive Solicitation Period to April 29, 2011 [Dkt. No. 912].

On April 29, 2011, the Debtors filed their motion [Dkt. No. 1196] seeking to further extend the Exclusive Solicitation Period to July 29, 2011.

(h)     *The Debtors' Settlement with the Opco Entities*

On or around November 4, 2010, the Debtors and certain of the Opco Entities agreed to pursue a restructuring and related compromise and settlement of claims pursuant to the terms and conditions of a term sheet (the "Term Sheet") with a steering committee (the "Steering Committee") of certain Holders the High Yield Notes to effect a proposed global restructuring of the Opco Entities (the "Opco Restructuring") and a settlement of the Debtors' claims and interests against one or more the Opco Entities (the "Holdco / Opco Settlement"). On or about November 19, 2010, TMS, the Opco Entities, and the Steering Committee entered into a Restructuring Support Agreement (the "RSA"), incorporating the Term Sheet and providing for a formal agreed-upon process to implement the Restructuring. On December 6, 2010, the Debtors filed a motion (the "Settlement Motion") [Dkt. No. 581], which sought Court approval of the proposed settlement with the Steering Committee on the terms set forth in the Term Sheet and the RSA (as subsequently revised).

Arrowgrass, the Creditors' Committee, and the US Trustee each filed an objection to the Settlement Motion [Dkt. Nos. 704, 690, 715]. Certain Holders of the 8.125% Notes also filed a joinder to the Creditors' Committee's objection [Dkt. No. 692]. Prior to the scheduled contested hearings on the Trustee Motion, the Standing Motion, and the Settlement Motion, the Debtors, the Opco Entities, the Steering Committee, and the Creditors' Committee were able to resolve all issues in the aforementioned contested motions on the terms described below and as more fully set forth in revised versions of the Term Sheet and the RSA (the "Opco Restructuring Term Sheet" and the "Opco RSA," respectively).

Generally, pursuant to the Opco Restructuring Term Sheet and the Opco RSA, all of the outstanding, funded secured debt of Trico Supply, Trico Shipping, and the other Opco Entities (including the principal amounts outstanding under the High Yield Notes and the Trico Shipping W/C Facility) described above, would be converted into 95% of new common stock of a reorganized and de-levered Trico Supply. The new common stock to be issued in exchange for the secured debt would be issued pursuant to an out-of-court exchange or, if the requisite levels of consents to the out-of-court exchange were not achieved, pursuant to a prepackaged chapter 11 plan filed in the Court by the Opco Entities in subsequently-filed bankruptcy cases (the "Prepackaged Plan"), provided the requisite acceptances for the Prepackaged Plan were obtained prior to filing.

The Opco Restructuring Term Sheet and the Opco RSA also provided, as part of the Opco Restructuring, for a compromise and settlement of (i) all claims and causes of action on account of the intercompany indebtedness (the "Intercompany Notes") among the Opco Entities,

TMS, TMO, and Trico Cayman, (ii) fraudulent conveyance claims and claims and causes of action on account of the Intercompany Notes and any and all related claims and causes of action (the "Holdco / Opco Intercompany Claims"), including as set forth in the proposed Complaint attached as Exhibit A to the Standing Motion, (iii) all claims and causes of action based on transition and corporate services rendered by the Debtors to the Opco Entities or any other account payables owed by the Opco Entities to any of the Holdco Debtors (the "Transition Services Claims") and (iv) the Debtors' existing equity interests in the Opco Entities (the "Existing Equity").  Each of the above-listed claims and causes of action and the Existing Equity will be released, waived, and cancelled in exchange for 5% of the common equity of the Reorganized Trico Supply and five-year warrants to purchase 10% of the common equity of the Reorganized Trico Supply.

Furthermore, effective February 15, 2011, the Opco Entities would pay all salaries, fees, expenses, and any and all costs associated with, all of the Debtors' directors and Houston-based management and all other of the Debtors' Houston-based overhead expenses other than those directly related to the property and assets of the Debtors.

Finally, the Opco Restructuring Term Sheet and the Opco RSA provided for the entry into the Transition Services Agreement by and between the Debtors and the Opco Entities to govern corporate and management transition services to be provided by the Debtors to Opco in exchange for reimbursement of related costs incurred.

The Opco Restructuring Term Sheet and the Opco RSA also provided value to the estates through the release of TMS's guarantee of the High Yield Notes debt and the Holdco Debtors' guarantee of the debt arising under the Trico Shipping W/C Facility.

On February 17, 2011, the Bankruptcy Court entered an order approving the Settlement Motion [Dkt. No. 930], and on April 26, 2011, the Bankruptcy Court entered a supplemental order further effectuating the Holdco / Opco Settlement which specifically provided for the transfer of intercompany claims and equity interests free and clear of liens, claims, and encumbrances to effectuate the Opco Restructuring  [Docket No. 1177] (together, the "Holdco / Opco Settlement Order") which is attached hereto as **Exhibit D**.

As contemplated by the Opco RSA and the Opco Restructuring Term Sheet, on March 1, 2011, an out-of-court exchange offer (the "Exchange Offer") was launched whereby the Holders of the High Yield Notes were solicited to exchange the indebtedness owed under the High Yield Notes for common stock of the reorganized Debtors.  Contemporaneous with the Exchange Offer, the lenders under the Trico Shipping W/C Facility were also solicited to exchange the indebtedness owed under the Trico Shipping W/C Facility for common stock of the reorganized Debtors.  Collectively, the Holders of the High Yield Notes and the lenders under the Trico Shipping W/C Facility would receive 95% of the new common stock of the reorganized Debtors (subject to dilution by common stock to be issued under a management incentive plan), to be distributed on a pro rata basis.

The conditions to the closing of the Exchange Offer were met, and, on May 13, 2011, the Opco Restructuring was consummated.

### (i)    Miscellaneous Resolved Motions

#### 1)    The Arrowgrass Trustee Motion

On October 26, 2010, Arrowgrass Master Fund Ltd. and Arrowgrass Distressed Opportunities Fund Limited (together, "Arrowgrass"), each a Holder of 3% Unsecured Debentures, filed a *Motion for Order (i) Directing Debtor to Place Subsidiaries in Chapter 11 Cases or, Alternatively, (ii) Appointing a Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 1104(a)(1) and (a)(2)* (the "Trustee Motion") [Dkt. No. 359]. Arrowgrass filed a supplement to the Trustee Motion on December 6, 2010 [Dkt. No. 574]. Citing alleged conflicts of interest by the Debtors' management and professionals, Arrowgrass asserted in the Trustee Motion that the Court should order the Debtors to direct the non-Debtor Opco Entities to file chapter 11 petitions, so that their estates may be jointly administered in the Court along with the Chapter 11 Cases. Alternatively, Arrowgrass requested that the Court appoint a chapter 11 trustee in the Chapter 11 Cases pursuant to Bankruptcy Code § 1104(a)(1), (2).

The Debtors filed an objection to the Trustee Motion on December 30, 2010 [Dkt. No. 694].

The Trustee Motion was resolved by the Holdco / Opco Settlement Order.

#### 2)    The Creditors' Committee's Standing Motion

On November 24, 2010, the Creditors' Committee filed a *Motion For Entry of an Order Granting Leave, Standing and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates* (the "Standing Motion") [Dkt. No. 534], seeking standing to prosecute on behalf of the Debtors' estates certain alleged claims and causes of action relating to the issuance of the High Yield Notes the recovery of intercompany loans against the Debtors' non-Debtor Opco subsidiaries.

On December 30, 2010, both the Debtors and the Indenture Trustee for the High Yield Notes filed objections to the Standing Motion [Dkt. Nos. 695, 689].

The Standing Motion was resolved by the Holdco / Opco Settlement Order.

### (j)    Litigation

#### 1)    Litigation Against the Debtors

The Debtors are defendants in a number of prepetition lawsuits. During the Chapter 11 Cases, certain plaintiffs filed motions to lift the automatic stay to proceed either against

insurance proceeds or for purposes of liquidating their prepetition litigation Claims against the Debtors. A description of such Claims is below.

On October 14, 2010, David Connelly filed his *Motion to Lift Automatic Stay* [Dkt. No. 294] wherein David Connelly sought to proceed with his personal injury lawsuit in Louisiana state court. David Connelly alleged that the Debtors would not be harmed because any damages would be paid from an applicable insurance policy, and that the cost of defense would be borne by such insurance policy. The Debtors filed an objection to this motion on November 22, 2010 [Dkt. No. 509], as the applicable insurance policy would only cover a portion of the damages, if any. On December 14, 2010 this motion was withdrawn without prejudice [Dkt. No. 629].

On October 18, 2010, Steven Jennings filed his *Amended Motion to Lift Automatic Stay* [Dkt. No. 304] wherein Steven Jennings sought to proceed with his personal injury lawsuit in Texas state court. Steven Jennings alleged that the Debtors would not be harmed because any damages would be paid from an applicable insurance policy, and that the cost of defense would be borne by such insurance policy. The Debtors filed an objection to this motion on November 22, 2010 [Dkt. No. 510], as no applicable insurance policy applied to the claims alleged by Steven Jennings. On December 14, 2010 this motion was withdrawn without prejudice [Dkt. No. 630].

On March 3, 2011, Chavez J. Pierre filed his *Motion of Creditor Chavez J. Pierre to Modify Automatic Stay under §11 U.S.C. § 362(D)(1)* [Dkt. No. 1001] wherein Chavez Pierre sought to, *inter alia*, proceed with his personal injury lawsuit in California state court and recover against available insurance proceeds to obtain full satisfaction or partial satisfaction. On April 19, 2011, the Bankruptcy Court approved the stipulation [Dkt. No. 1137] entered into by and among the Debtors and Chavez Pierre regarding his motion, and his related *Motion to Allow Late Filed Claim* [Dkt. No. 1000]. The Stipulation generally provided that the motions filed by Chavez Pierre would be deemed withdrawn, and the Debtors would use their reasonable commercial efforts to comply with the reasonable requests made by Chavez Pierre for assistance in his personal injury lawsuit.

On March 28, 2011, Matthew Stark filed his *Motion to Lift Automatic Stay* [Dkt. No. 1063] wherein Matthew Stark sought to proceed with his personal injury lawsuit in the United States District Court for the Eastern District of Louisiana. Matthew Stark alleged that the Debtors would not be harmed because any damages would be paid from an applicable insurance policy, and that the cost of defense would be borne by such insurance policy. Because of the self-insured retention under the applicable insurance policy, the Debtor concluded that Mr. Stark would not be able to access any insurance proceeds based on his Claim. Mr. Stark agreed to withdraw his motion for relief from the stay based on this representation by the Debtors.

On March 28, 2011, Steven Jennings filed his *Motion of Creditor Steven Jennings to Modify Automatic Stay under §11 U.S.C. § 362(D)(1)* [Dkt. No. 1069] wherein Steven Jennings sought to, *inter alia*, proceed with his personal injury lawsuit in Texas state court and recover against available insurance proceeds to obtain full satisfaction or partial satisfaction. The

Debtors filed an objection to this motion on April 11, 2011 [Dkt. No. 1069], as no applicable insurance policy applied to the claims alleged by Steven Jennings. Thereafter, on May 18, 2011, Steven Jennings filed a complaint titled *Steven Jennings v. Trico Marine Services, Inc. et al., (In re Trico Marine Services, Inc., et al.)*, 11-52003 (BLS) (Bankr. D. Del.). In the complaint, Mr. Jennings alleges that he was a seaman injured aboard the Big Blue River, that such vessel was owned and controlled by the Debtors at the time of his injuries, and that Mr. Jennings holds a secured claim against the Big Blue River pursuant to the Jones Act. Mr. Jennings filed a prepetition lawsuit against TMA for this personal injury claim in Texas state court. Mr. Jennings further alleges that the Debtors sold the Big Blue River prior to the Petition Date and, on account of such sale, Mr. Jennings alleges that he is entitled to a constructive trust or resulting trust in the proceeds of the sale. The Debtors dispute all of Mr. Jennings allegations, claims and arguments and reserve all of their rights.

### 2) Director and Officer Litigation

On March 17, 2011, Special Value Continuation Partners, L.P., Tennenbaum DIP Opportunity Fund, LLC and Tennenbaum Opportunities Partners V, LP (collectively, the "Tennenbaum Plaintiffs") filed a lawsuit (the "California Lawsuit") against Richard Bachmann, Kenneth Burke, Edward Hutcheson, Myels Scoggins, Per Staehr, Geoff A. Jones, D. Michael Wallace, Rishi Varma, Brett Cenkus, Stephen Morrell, Mads Bardsen, Bjorn Inge Staalesen, Gerald Gray and Does 1-99, in the Superior Court of the State of California in the County of Los Angeles. The California Lawsuit was thereafter removed to federal court by the Debtors.

On May 20, 2011, the Tennenbaum Plaintiffs filed a new lawsuit in Harris County, Texas, styled *Special Value Continuation Partners, L.P. Tennenbaum DIP Opportunity Fund, LLC and Tennenbaum Opportunities Partners V, LP v. Richard Bachmann, Geoff A. Jones, D. Michael Wallace, Rishi Varma, Brett Cenkus, Stephen Morrell and Gerald Gray*; Cause No. 2011-30714-189; In the 189th District Court, Harris County, Texas (the "Tennenbaum Lawsuit").

On May 23, 2011 the California Lawsuit was voluntarily dismissed without prejudice by the Tennenbaum Plaintiffs. In the event a judgment is obtained against Trico's officers and directors in the Tennenbaum Lawsuit and such judgment is paid out of the Debtors' directors' and officers' insurance policy, the available proceeds under the directors' and officers' insurance policy would be reduced. Such proceeds may also be reduced to the extent of any defense costs expended in the Tennenbaum Litigation.

### (k) Plan Process

On February 25, 2011, three days prior to the termination of the Debtors' Exclusive Filing Period, the Debtors filed the Plan and the Disclosure Statement. Due to numerous factors, including the ongoing disputes between the Debtors and the DIP Lenders regarding use of cash collateral and repayment of the DIP Lenders' Claims, the Plan and Disclosure Statement filed by the Debtors in February established a general framework for the liquidation and distribution of

the Debtors' remaining assets but did not reflect any agreements between the Debtors and the Debtors' creditor constituents regarding a consensual plan of liquidation and confirmation process providing for a distribution of the Debtors' assets.

Thus, since the filing of that Plan, and beginning in earnest in April 2011, shortly after the repayment in full of the DIP Lenders' Claims, the Debtors negotiated with every major creditor constituent, including representatives from the Creditors' Committee, the 8.125% Indenture Trustee, the 3% Unsecured Debentures Indenture Trustee and Arrowgrass, regarding the terms of a consensual plan of liquidation. Among other things, the parties had disputes and controversies regarding: (a) the extent and validity of the Allowed amount of the Secured Claim of the 8.125% Notes Indenture Trustee, (b) the extent and validity of the Liens, Claims and security interests, if any, of the 8.125% Notes Indenture Trustee and the Holders of the 8.125% Notes on the EMSL Proceeds, (c) the allocation of the proceeds of the Holdco / Opco Settlement among the chapter 5 claims and Holdco / Opco Intercompany Claims that were compromised and settled in connection therewith, and the resultant Liens, Claims and security interests of the 8.125% Notes Indenture Trustee and the Holders of the 8.125% Notes, if any, that would attach thereto based on such allocation, (d) the breadth and comprehensiveness of the release and exculpatory provisions contemplated by the Plan, (e) the appropriate classification of the various Claims and Interests under the Plan, (f) the appropriate Distribution of the remaining assets of the Liquidating Debtors to the various Holders of Claims and Interests, and (g) the timing and priority of such Distributions under the Plan.

At the outset of the discussions, the 8.125% Notes Indenture Trustee alleged that it held a Secured Claim in physical assets that had a value on the Petition Date of approximately $28 million dollars and Secured Claims on substantially all of the Opco Equity and Warrants and all of the EMSL Proceeds. In addition, the 8.125% Notes Indenture Trustee alleged that on account of prior orders of the Bankruptcy Court, including the DIP Order, it held adequate protection Liens and Claims and Superpriority Administrative Claims on all assets of these Estates, including all Cash, the Opco Equity and Warrants and the EMSL Proceeds. By contrast, the Creditors' Committee, Arrowgrass and the 3% Unsecured Debentures Indenture Trustee alleged that the 8.125% Notes Indenture Trustee had, at most, a $3.8 million Secured Claim as of the Petition Date, and no Liens, Secured Claims or Superpriority Administrative Expense Claims on the Opco Equity and Warrants or the EMSL Proceeds. In addition, the Creditors' Committee objected to the scope of the proposed release provisions under the initial Plan.

Extensive negotiations ensued thereafter over a period of more than a month in which the parties, in consultation with their respective legal and financial advisors, exchanged numerous offers and counteroffers regarding the structure and terms of a consensual plan. Towards the end of the week of May 9, 2011, the Debtors formulated a tentative structure for the plan that, in the Debtors' position, offered a fair compromise of the distribution of the remaining value in the estate based upon the various arguments and positions offered by the parties during these negotiations, including an agreement to allow the 8.125% Notes Secured Claim at $6.5 million, to separately classify the General Unsecured Claims, the Qualified Investor Claims and the 8.125% Notes Deficiency Claims, and, based on such classification, to provide for certain

proportional Distributions of assets substantially similarly to that contained in the attached Plan. The Debtors proposed this classification structure so as to afford the parties broader flexibility to allocate Distributions in a fair manner based on good faith negotiations, while providing a mechanism to minimize the risk of requiring registration or reporting obligations for the Opco Entities under the Securities Act on account of the distribution of the Opco Equity and Warrants under the Plan. Although none of the Creditors' Committee, the 8.125% Indenture Trustee, the 3% Unsecured Debentures Indenture Trustee or Arrowgrass found the Debtors' proposal wholly acceptable, the Debtors continued diligently to attempt to bring the parties together around what they considered a fair, mid-point proposal.

Notwithstanding the failure to reach a concrete agreement, the Debtors filed the First Amended Plan of Liquidation and related Disclosure Statement on May 18, 2011 in an effort to propel the parties towards a definitive settlement and with the intent of continuing negotiations to bridge the relatively small gap between the parties' positions. This process continued after the filing of the First Amended Plan of Liquidation and related Disclosure Statement, and resulted in several changes to the first amended Plan, including, among others, an increase in the Cash being distributed to the General Unsecured Claims Fund and an agreement to satisfy the claims of the 8.125% Notes Indenture Trustee and the 3% Unsecured Debentures for fees and expenses in full under the Plan.

The Plan, as filed, represents a full, final and complete good faith compromise and settlement of all disputes and controversies between every significant relevant party involved in this process, namely, the Debtors, the Creditors' Committee, the 8.125% Notes Indenture Trustee the 3% Unsecured Debentures Indenture Trustee, each in its capacity as trustee. The Plan, as proposed, has the unequivocal support of the Debtors and the Creditors' Committee. The 8.125% Indenture Trustee and the 3% Unsecured Debentures Indenture Trustee, each in its capacity as indenture trustee and in the exercise of its prudent judgment, will not object to the Plan absent contrary direction in accordance with their respective Indentures and will allow the Plan to be solicited to their respective Holders.

## ARTICLE II

## SUMMARY OF PLAN

THIS SECTION PROVIDES A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN. ANY REFERENCE HEREIN IS QUALIFIED IN ITS ENTIRETY BY THE PLAN (AS WELL AS THE EXHIBITS ATTACHED THERETO AND DEFINITIONS THEREIN), WHICH IS ATTACHED HERETO AS *EXHIBIT A*.

### Section 2.01 Summary of Classes and Treatment of Claims and Interests

The classification of Claims and Interests, the estimated amount (or amount filed, as applicable) of Claims or Interests in each Class and the estimated recovery for Holders of Claims and Interests in each Class are summarized in the table below. In accordance with Bankruptcy

Code § 1123(a)(1), Superpriority Administrative Claims, Administrative Claims, Priority Tax Claims, DIP Facility Claims and U.S. Credit Facility Claims have not been classified, and their treatment is set forth below.

## Superpriority Administrative Claims

Except as otherwise provided for in the Plan, and subject to the requirements of Section 12.01 of the Plan, each Holder of an Allowed Superpriority Administrative Claim shall, in full satisfaction of such Allowed Superpriority Administrative Claim: (a) to the extent such Claim is an Allowed Superpriority Administrative Claim on the Effective Date, be paid in full, in Cash, on the Distribution Date; (b) to the extent such Claim is not an Allowed Superpriority Administrative Claim on the Effective Date, be paid in full, in Cash, on the date such Claim becomes an Allowed Superpriority Administrative Claim or as soon as reasonably practicable thereafter; or (c) receive such other treatment as to which such Holder may agree with the Debtors, Liquidating Debtors or Plan Administrator, as applicable.

## Administrative Claims

Except as otherwise provided for in the Plan, and subject to the requirements of Section 12.01 of the Plan, each Holder of an Allowed Administrative Claim shall, in full satisfaction of such Allowed Administrative Claim: (a) to the extent such claim is due and owing on the Effective Date, be paid in full, in Cash, on the Distribution Date; (b) to the extent such claim is not due and owing on the Effective Date, be paid in full, in Cash, (i) in accordance with the terms of any agreement between the Debtors and such Holder, or when such claim becomes due and payable under applicable non-bankruptcy law or (ii) in the ordinary course of business; or (c) receive such other treatment as to which such Holder may agree with the Debtors, Liquidating Debtors or Plan Administrator, as applicable. Notwithstanding the foregoing, all Intercompany Administrative Claims shall be cancelled or otherwise terminated and Holders of Intercompany Administrative Claims shall receive no Distribution under the Plan.

## Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction thereof (a) such treatment as to which such Holder may agree with the applicable Debtor or Liquidating Debtor, as the case may be, or (b) at the sole option of the applicable Debtor or Liquidating Debtor, as the case may be, (i) payment in full of such Allowed Priority Tax Claim on the Distribution Date or (ii) treatment in accordance with the provisions of Bankruptcy Code § 1129(a)(9)(C) or (D), as applicable.

## DIP Facility Claims

All DIP Facility Claims have been paid and satisfied in full prior to the date of the Plan, and all such DIP Facility Claims against the Debtors were released by the Holders thereof. Thus, the Liquidating Debtors shall not make any Distributions on account of DIP Facility Claims under the Plan, and (a) all commitments under the DIP Facility that have not previously

terminated shall immediately terminate and (b) all Liens and security interests granted to secure such DIP Facility obligations shall be deemed terminated and of no further force and effect.

**U.S. Credit Facility Claims**

All U.S. Credit Facility Claims have been paid and satisfied in full prior to the date of the Plan, and all such U.S. Credit Facility Claims against the Debtors were released by the Holders thereof. Thus, the Liquidating Debtors shall not make any Distributions on account of U.S. Credit Facility Claims under the Plan, and (a) all commitments under the U.S. Credit Facility that have not previously terminated shall immediately terminate and (b) all Liens and security interests granted to secure such U.S. Credit Facility obligations shall be deemed terminated and of no further force and effect.

\*    \*    \*    \*    \*    \*

The estimated amount of Claims reflected in the table below are based upon the Debtors' preliminary review of Claims filed before the date of this Disclosure Statement and the Debtors' books and records, and may be substantially revised following the completion of a detailed analysis of the Claims filed. The estimated number of Claims reflected in the table below is based on the number of Claims in such Class for which proofs of Claim were filed. In addition, the projected recoveries set forth below are preliminary and are based on the information the Debtors and their professionals had as of the date hereof. Such recovery projections are subject to material change if and to the extent the Debtors receive additional information regarding Allowed Claims amounts, the value of and ability to liquidate their remaining assets and other factors, including projected Allowed Administrative Claims and wind-down costs.

| Description and Amount of Claims or Interests | Treatment |
| --- | --- |
| **Class 1:** 8.125% Notes Secured Claims<br><br>Estimated Amount of Claims: $6.5 million<br><br>Estimated Number of Claims: 1<br><br>Estimated Recovery: 100% | ***Impaired.*** Except to the extent that a Holder of an Allowed 8.125% Notes Secured Claim agrees to less favorable treatment or as otherwise provided in the Plan, and to the extent not previously paid, Allowed 8.125% Notes Secured Claims in the amount of $6.5 million shall be paid in full in Cash on the Effective Date or as soon thereafter as Cash sufficient to satisfy the 8.125% Notes Secured Claims is received by the Liquidating Debtors and is available for such use in accordance with the terms of the Plan. The Opco Equity and Warrants shall not be monetized to satisfy the 8.125% Notes Secured Claims unless such claim has not been satisfied in full |

| | within one year of the Effective Date, at which time the Plan Advisory Committee representative appointed by the 8.125% Notes Indenture Trustee may direct the Plan Administrator to monetize the Opco Equity and Warrants to satisfy the remaining amount of the 8.125% Notes Secured Claims at that time then owing in accordance with the procedures set forth in Section 4.11 of the Plan. |
|---|---|
| **Class 2:** Other Secured Claims[9]<br><br>Estimated Amount of Claims: $23,536<br><br>Estimated Number of Claims: 5<br><br>Estimated Recovery: 100% | ***Unimpaired***.  Except as otherwise provided in the Plan, and to the extent not previously paid, on, or as soon as reasonably practicable after, the latest of (a) the Distribution Date, (b) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim or (c) the date on which such Other Secured Claim becomes due and payable pursuant to any agreement between a Debtor and the Holder of an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive in full satisfaction of and in exchange for such Allowed Other Secured Claim: (i) at the sole discretion of the applicable Debtor, subject only to notice to and without objection from the Creditors' Committee and the 8.125% Notes Indenture Trustee prior to the Effective Date, and the Plan Advisory Committee after the Effective Date, (A) Cash equal to the unpaid portion of such Allowed Other Secured Claim including any interest on such Allowed Other Secured Claim required to be paid under Bankruptcy Code § 506(b), (B) Reinstatement of the legal, equitable and contractual rights of the Holder of such Allowed Other Secured Claim, subject to the provisions of the Plan, (C) the property serving as Collateral for its Claim, or (D) such other treatment that will otherwise render such Allowed Other Secured Claim Unimpaired in accordance with Bankruptcy Code § 1124, notwithstanding any contractual |

---

[9] The "Estimated Amount of Claims" stated in Classes 2, 3, 4, and 5 represents the Debtors' estimate of the ultimate amount of Claims that will be Allowed in each Class based on the Claims that have been filed and based on the Debtors' own books and records.

| | provision or applicable nonbankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default, or (ii) such other treatment as the Debtors, Liquidating Debtors or Plan Administrator, as applicable, and such Holder shall have agreed in writing. |
|---|---|
| **Class 3:** Other Priority Claims<br><br>Estimated Amount of Claims: $23,540<br><br>Estimated Number of Claims: 2<br><br>Estimated Recovery: 100% | ***Unimpaired.*** Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment or as provided otherwise in the Plan, and to the extent not previously paid, Holders of Allowed Other Priority Claims shall receive, in full satisfaction of such Claim, either (a) to the extent such Claim is due and owing on the Effective Date, payment in full, in Cash, on the Distribution Date, (b) to the extent such Claim is not due and owing on the Effective Date, payment in full, in Cash, in accordance with the terms of any agreement between such Claimant and any applicable Debtor or Liquidating Debtor, or when such Claim otherwise becomes due and owing under (i) applicable non-bankruptcy law, or (ii) in the ordinary course of business, or (c) such other treatment as may be agreed to by such Holder and the Debtors or Liquidating Debtors. |
| **Class 4:** General Unsecured Claims<br><br>Estimated Amount of Claims: $3,145,715<br><br>Estimated Number of Claims: 150<br><br>Estimated Recovery: 11.13% - 15.89% | ***Impaired.*** Holders of Allowed General Unsecured Claims shall receive in full satisfaction of such Claim its Pro Rata share of $350,000 in Cash on the Distribution Date, plus the first $150,000 in proceeds from the D&O Litigation, if applicable,. |
| **Class 5:** Qualified Investor Claims<br><br>Estimated Amount of Claims: $162,996,727<br><br>Estimated Number of Claims: 6 | ***Impaired.*** Each Holder of an Allowed Qualified Investor Claim shall receive, in full satisfaction of such Claim, its Pro Rata share of the Class 5 Distribution Assets. A full description of the Class 5 Distribution Assets is set forth in Section |

| | |
|---|---|
| Estimated Recovery: 5.52% | 2.02 hereof. |
| **Class 6:** 8.125% Notes Deficiency Claims<br><br>Estimated Amount of Claims: $209,314,547<br><br>Estimated Number of Claims: 1<br><br>Estimated Recovery: 10.27% | ***Impaired.*** Each Holder of an 8.125% Notes Deficiency Claim shall receive, in full satisfaction of such Claim, its Pro Rata share of the Class 6 Distribution Assets. A full description of the Class 6 Distribution Assets is set forth in Section 2.02 hereof. |
| **Class 7:** Intercompany Claims<br><br>Estimated Recovery: 0% | ***Impaired***. All Intercompany Claims shall be cancelled or otherwise terminated and Holders of Intercompany Claims shall receive no Distribution under the Plan. |
| **Class 8:** Intercompany Interests<br><br>Estimated Recovery: 0% | ***Unimpaired***. Allowed Intercompany Interests will remain in full force and effect and shall be retained by the respective Holders of such Interests, provided, however, that Holders of Allowed Intercompany Interests shall receive no Distribution under the Plan. |
| **Class 9:** Old TMS Equity<br><br>Estimated Recovery: 0% | ***Impaired/Unimpaired.*** In the event that the Kistefos Transaction is consummated, Class 9 is Unimpaired and Holders of Class 9 Old TMS Equity are presumed to have accepted the Plan. In the event that the Kistefos Transaction is not consummated, Class 9 is Impaired and Holders of Class 9 Old TMS Equity are deemed to have rejected the Plan. Thus, Holders of Class 9 Old TMS Equity will be not entitled to vote to accept or reject the Plan. |

**THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST, REGARDLESS OF WHETHER SUCH PARTIES VOTED TO ACCEPT THE PLAN. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER**

**HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.**

**Section 2.02  Description of Projected Recoveries and Assets Available for Distribution**

After the Effective Date, the Plan Administrator and Disbursing Agent shall be responsible for liquidating and distributing the assets of the Liquidating Debtors in accordance with the terms of the Plan.  The projected recoveries for Class 5 and Class 6 in the chart above reflect, among other things, the amount of assets the Debtors believe they will have available for distribution to Holders of Claims in Classes 5 and 6 after (a) satisfaction in full of all Allowed Administrative Claims, Priority Tax Claims, 8.125% Notes Secured Claims, Other Secured Claims, Other Priority Claims, and Superpriority Administrative Claims, (b) funding of the General Unsecured Claims Fund, and (c) payment of the costs and expenses of administration of the Liquidating Debtors on and after the Effective Date, including, without limitation, the costs of pursuing any Avoidance Actions, monetizing any remaining assets held by the Liquidating Debtors and winding up the Liquidating Debtors' business affairs pursuant to the Wind-down Budget, including funding the Wind-down Reserve (the "Priority Amounts").  The anticipated amount of such Claims and expenses is as follows:

- Secured, Priority and Administrative Claims:  $10.9 million (breakdown set forth below)

    o  Allowed Administrative Claims: $3,976,904.  The Debtors have been paying operational Administrative Claims in the ordinary course of their businesses during the Chapter 11 Cases.  To the Debtors' knowledge, all Administrative Claims that exist have been paid or will be paid in the ordinary course of business, except for Administrative Claims for Professional Fee Claims and Claims of the 8.125% Notes Indenture Trustee and the 3% Unsecured Debentures Indenture Trustee for fees, and costs under their respective indentures.  These remaining unpaid Administrative Claims shall be paid in accordance with the terms of the Plan, including Section 12.01(d) and (d) thereof, or in accordance with prior orders of the Bankruptcy Court.  There may also be some de minimis amounts that will be paid in connection with (a) Cure Payments for contracts being assumed in accordance with the terms of the Plan ($10,126) and (b) Allowed § 503(b)(9) Claims ($2,211).

    o  Priority Tax Claims:  $369,542

    o  8.125% Notes Secured Claims: $6.5 million

    o  Other Secured Claims:  $23,356

    o  Other Priority Claims:  $23,450

o Superpriority Administrative Claims: $0. The Debtors do not believe that any Superpriority Administrative Claims exist other than those granted to the 8.125% Notes Indenture Trustee for any diminution in value of its collateral during the Chapter 11 Cases granted under the May 23 Interim Cash Collateral Order and the other orders regarding use of cash collateral entered in the Chapter 11 Cases.

- General Unsecured Claims Fund - $350,000 (plus the first $150,000 in proceeds from the D&O Litigation, if any)

- Wind-down Budget - $1,000,000 (estimated)

The Debtors estimate that the following assets will be available for payment of the above amounts, as well as distribution to Holders of Allowed Claims:

- Cash on Hand. As of the date hereof, the Debtors have approximately $3.6 million in Cash on hand, of which $2.7 million is in the secured claim reserve contemplated by the Final Cash Collateral Order and the Supplemental Final Order.

- EMSL Proceeds. On November 16, 2010, the Debtors filed the *Application to Employ B&W Tech, Inc. ("B&W") as Vessel Broker for the Debtors* [Dkt. No. 476]. Under the application, B&W is to be employed as a non-exclusive vessel broker to assist in the sale of all vessels owned by EMSL. On December 10, 2010, the Bankruptcy Court approved the application [Dkt. No. 617]. As a result of such vessel sales, among other things, the Debtors expect to obtain approximately $12.2 million in distributions from Eastern Marine Services Limited (Hong Kong) to Trico Marine Services (Hong Kong) Limited on account of Trico Marine Services (Hong Kong) Limited's 49% interest in the EMSL joint venture, which amounts would thereafter be distributed to TMA for distribution to Holders of Allowed Claims. Of that $12.2 million, the Debtors believe approximately $7.5 million will be available after EMSL Proceeds are used for satisfaction of certain Allowed Administrative Claims. The Debtors expect to utilize $6.5 million of the $7.5 million EMSL Proceeds to satisfy the 8.125% Notes Secured Claims.

- Opco Equity and Warrants. In connection with the Holdco / Opco Settlement, the Debtors received 5% common equity of DeepOcean Group Holding AS before accounting for potential dilution from (i) shares issued in connection with the Management Incentive Plan (as defined in the Opco Restructuring Term Sheet) and (ii) issuance of the Equity Warrants (as defined in the Opco Restructuring Term Sheet); and (b) the Equity Warrants. The Debtors estimate the Opco Equity and Warrants are worth $22 to $37 million. As set forth in further detail in the *Declaration of Stephen Sieh in Support of Debtors Motion Pursuant to*

*Bankruptcy Code Sections 105 and 363 and Bankruptcy Rule 9019 for an Order Authorizing the Debtors to Compromise Certain Intercompany Claims and Equity Interests* [Docket No. 862], and the exhibit attached thereto, Evercore conducted a valuation analysis of the Opco Entities in connection with the Holdco / Opco Settlement. Evercore's estimate of the Total Enterprise Value ("TEV") of the Opco Entities was between $335 and $415 million as of December 31, 2010. Based on such TEV, Evercore assessed the total value of the Holdco / Opco Settlement consideration to be between $22 million to $37 million. The valuation analysis conducted by Evercore contemplated facts and conditions known and existing as of December 31, 2010. Events and conditions subsequent to that date, including but not limited to updated projections, as well as other factors, could have a substantial impact upon the value of the Opco Entities. In connection with that analysis, Evercore's estimate of TEV reflects the application of standard valuation techniques and does not purport to reflect or constitute liquidation values or estimates of the actual market value that may be realized through the sale of the Opco Equity and Warrants, which may be significantly different than the amounts set forth in the analysis. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated TEV range of the Opco Entities is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Actual market prices of the Opco Equity and Warrants will depend upon, among other things, the operating performance of the Opco Entities, prevailing interest rates, conditions in the financial markets, developments in the Opco Entities' industry and economic conditions generally, and other factors which generally influence the prices of securities.

- D&O Litigation. The Creditors' Committee has indicated that it intends to investigate potential claims against the Debtors' officers and directors for various acts and omissions that occurred prior to the Petition Date. The Debtors have analyzed these allegations and do not believe that any viable claims against their officers and directors exist. However, the Debtors do hold a directors and officers insurance policy that could provide up to $45 million in proceeds in the event the Creditors' Committee or their representatives after the Effective Date are successful in litigating and bringing to judgment such claims. As described in Section 1.08(j) hereof, in the event a judgment is obtained against Trico's officers and directors in the Tennenbaum Lawsuit and such judgment is paid out of the Debtors' directors' and officers' insurance policy, the available proceeds under the directors' and officers' insurance policy would be reduced. Such proceeds may also be reduced to the extent of any defense costs expended in the Tennenbaum Litigation. As set forth in Section 4.10 of the Plan, the Plan Administrator or Plan Advisory Committee, as applicable, must file a notice with the Bankruptcy Court detailing the identity of any attorneys engaged for the purpose of representing the Liquidating Debtors in connection with any Cause of

Action, including the D&O Litigation and the Avoidance Actions, and the terms of such engagement. To the extent the Debtors formulate any additional procedures for the prosecution of Causes of Action prior to Confirmation, the Debtors will include such procedures as part of the Plan Supplement.

- **Preference Litigation.** The Debtors and their professionals have conducted a preliminary analysis of potential preference claims, and based on that analysis, believe there is less than $1 million in potential recovery expected from preference litigation.

- **Kistefos Payment.** If the Kistefos Transaction is consummated, the Debtors will receive a transaction fee that will be available for distribution to Holders of Allowed Claims.

As described in further detail in the Plan, Class 5 Distribution Assets available for Distribution to Holders of Allowed Class 5 Claims consists of:

- 29.5% of the Opco Equity and Warrants and of the first $1 million in Cash available for distribution to Holders of Claims after reserving, funding, paying or satisfying in full the Priority Amounts; and

- Class 5 Pro Rata Proportion of the remaining assets which shall include all of the assets above other than the Opco Equity and Warrants and the first $1 million in Cash available for distribution to Holders of Claims after reserving, funding, paying or satisfying in full the Priority Amounts.

Class 6 Distribution Assets available for Distribution to Holders of Allowed Class 6 Claims shall consists of:

- 70.5% of the Opco Equity and Warrants and of the first $1 million in Cash available for distribution to Holders of Claims after reserving, funding, paying or satisfying in full the Priority Amounts; and

- Class 6 Pro Rata Proportion of all remaining assets.

For the avoidance of doubt, no Distributions shall be made on account of any Allowed Claims in Class 5 and Class 6 unless and until all Priority Amounts have been reserved, funded, paid or satisfied in full. Except as otherwise provided herein, the Plan Administrator may not utilize the Opco Equity and Warrants through monetization thereof for satisfaction of any Claims other than Class 5 and Class 6 Claims until all other assets of the Liquidating Debtors have been fully and completely depleted.

To the extent that Allowed Administrative Claims and Allowed 8.125% Notes Secured Claims that must be paid in full under the Plan must be satisfied through monetization of the Opco Equity and Warrants because proceeds from other assets of the Liquidating Debtors are

insufficient to fully satisfy such claims, Class 5 and Class 6 shall bear their respective Pro Rata proportion of the total shortfall required to satisfy such claims.

*     *     *     *     *

**THE PLAN PROVIDES CERTAIN (I) EXCULPATIONS, (II) RELEASES BY THE DEBTORS, AND (III) RELEASES BY CREDITORS WHO VOTE IN FAVOR OF THE PLAN AS MORE FULLY DESCRIBED BELOW AND IN §§ 12.06, 12.08, AND 12.09 OF THE PLAN.**

**CERTAIN MATERIAL PROVISIONS OF THE PLAN ARE SET FORTH BELOW. HOWEVER, NUMEROUS OTHER PROVISIONS OF THE PLAN ARE NOT CONTAINED IN THE DISCLOSURE STATEMENT AND A SPECIFIC REVIEW OF THE ENTIRETY OF THE PLAN IS STRONGLY RECOMMENDED.**

### Section 2.03  Consolidation for Voting and Distribution Purposes

The Plan contemplates and is predicated upon the consolidation of the Debtors' Estates, other than Trico Holdco and TMC, only for purposes of voting on the Plan and making Distributions to Holders of Claims under the Plan.  On the Effective Date, and other than with respect to Trico Holdco and TMC, (i) all assets and liabilities of the Debtors will, for voting and Distribution purposes only, be merged or treated as if they were merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (iii) all Intercompany Claims by, between, and among the Debtors will be eliminated and (iv) any obligation of the Debtors and all guaranties thereof by one or more of the other Debtors, will be deemed to be one obligation of all of the Debtors.  Except as set forth in this Article, such consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Debtors or Liquidating Debtors.  The consolidation called for herein shall not affect the obligation of each and every Debtor or Liquidating Debtor, as applicable, to pay quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 until the earlier of the time such Debtor's or Liquidating Debtor's Chapter 11 Case is closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

### Section 2.04  Dismissal of Certain of the Chapter 11 Cases

Immediately after the Effective Date, the Chapter 11 Cases of Trico Holdco and TMC shall be deemed dismissed for all purposes pursuant to Bankruptcy Code § 1112.

### Section 2.05  Continuation of Corporate Existence; Dissolution of Liquidating Debtors

#### (a)  Continued Existence

The Debtors shall continue to exist as the Liquidating Debtors after the Effective Date in accordance with the laws of their respective states or applicable jurisdiction of incorporation, formation, or organization and pursuant to their respective certificates of incorporation, by-laws,

articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws are amended under the Plan, or as deemed necessary or appropriate by the Liquidating Debtors to effect the Plan, for the limited purposes of liquidating all of the assets of the Estates and making Distributions in accordance with the Plan.

### (b)    Transition Services Agreement

Pursuant to the Holdco / Opco Settlement, TMS and/or certain of the Debtors and certain of the Opco Entities have entered into the Transition Services Agreement whereby certain Opco Entities will engage the Debtors and Liquidating Debtors to provide certain corporate and support services as outlined in the Transition Services Agreement which was filed as an exhibit to the Disclosure Statement.   For additional information regarding the Transition Services Agreement and the basis for the Debtors' entry into that agreement, please see *Debtors' Motion Pursuant to Bankruptcy Code Sections 105 and 363 and Bankruptcy Rule 9019 for an Order Authorizing the Debtors to Compromise Certain Intercompany Claims and Equity Interests* [Docket No. 581] and the entirety of the record before the Bankruptcy Court at the hearing on February 10, 2011 at which the Settlement Motion was heard.

### (c)    Dissolution of the Liquidating Debtors

Within the time determined by the Plan Administrator as necessary or appropriate under the circumstances, each Liquidating Debtor shall be dissolved without any further action by its former stockholders, officers, members, or directors.   The Plan Administrator may, in his or her discretion, file all necessary certificates of dissolution and take any other actions necessary or appropriate to effect such dissolution under applicable non-bankruptcy law.   All applicable regulatory or governmental agencies shall accept any certificates of dissolution or other papers filed by the Plan Administrator on behalf of each Liquidating Debtor and shall take all steps necessary to allow and effect the prompt dissolution as provided herein, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates, except as the Plan Administrator may determine in his or her sole discretion.   Upon entry of a final decree in each Chapter 11 Case, if not previously dissolved, the applicable Liquidating Debtor shall be deemed automatically dissolved and wound up without any further action or formality which might otherwise be required under applicable non-bankruptcy laws.

### (d)    Transactions Regarding Non-Debtor Subsidiaries

On the Effective Date, or as soon as reasonably practicable thereafter, the Plan Administrator may enter into transactions deemed necessary or appropriate to effect the sale, liquidation, dissolution, winding-up or other disposition of the Liquidating Debtors' non-Debtor subsidiaries other than the Opco Entities (or their assets), and may take any and all actions that may be necessary or appropriate to effect such transactions including (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable non-

bankruptcy law and any other terms to which the Plan Administrator, on behalf of the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable non-bankruptcy law; (4) filing of bankruptcy and insolvency proceedings in accordance with the provisions of applicable law; and (5) all other actions that the Plan Administrator, on behalf of the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. All such actions are hereby authorized without any further action by any former or current shareholders, members, officers, directors, owners or other Persons. The provisions of Section 4.03(d) of the Plan are in addition to and not a limitation of other Sections of the Plan.

## Section 2.06   Corporate and Other Action

### (a)   Amended Governance Documents

On the Effective Date, or as soon as reasonably practicable thereafter, each of the Liquidating Debtors  is hereby authorized to file applicable Amended Governance Documents in their applicable jurisdiction of formation or incorporation that such Liquidating Debtor deems necessary or appropriate to carry out the provisions of the Plan, including the Kistefos Transaction if such transaction shall be consummated. To the extent so required, the Amended Governance Documents (i) shall prohibit the issuance of nonvoting equity securities, and (ii) after the Effective Date, shall be subject to further amendment as provided in such Amended Governance Documents, or as otherwise permitted by applicable law.

### (b)   Other General Corporate Matters

Entry of the Confirmation Order shall establish conclusive corporate and other authority (and evidence of such corporate and other authority) required for each of the Debtors to undertake any and all acts and actions required to implement or contemplated by the Plan (including, without limitation, the execution and delivery of any documentation necessary to effect a sale of any assets), and such acts and actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without the need for board or shareholder or membership vote and without any requirement of further action by any members, stockholders, managers, officers, or boards of directors or managers of the Debtors.

## Section 2.07   Corporate Governance

### (a)   Managers and Officers

Certain employees of the Debtors may remain employed by the Liquidating Debtors, either pursuant to the terms of the Transition Services Agreement or otherwise at the discretion

of the Liquidating Debtors, on and after the Effective Date to assist the Liquidating Debtors with the wind down and administration of the Estates and businesses of the Liquidating Debtors. However, none of such employees shall constitute managers or officers with the authority attendant to such titles under the Debtors' governance documents or other applicable law on and after the Effective Date. For the avoidance of doubt, any employment agreements governing the employment of such parties with the Debtors shall be deemed rejected as of the Effective Date in accordance with Section 6.01 of the Plan. An initial list of the employees to remain with the Liquidating Debtors on and after the Effective Date will be filed as an exhibit in the Plan Supplement.

### (b) Boards

The members of any board of directors or board of managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing authority with respect to the Liquidating Debtors on or after the Effective Date and each such member will be deemed to have resigned on the Effective Date.

### (c) Plan Administrator as Sole Manager, Officer and Director

The Plan Administrator shall be, as applicable, the sole manager, officer and sole member of any board of directors and/or board of managers of each of the Liquidating Debtors from and following the Effective Date without the need for board or shareholder or membership vote and without any requirement of further action by any members, stockholders, managers, officers, or boards of directors or managers of the Debtors and shall have all rights of a manager, officer and director of the Liquidating Debtors under applicable non-bankruptcy law, including, without limitation, the right and authority to appoint other officers or board members as deemed necessary or appropriate to assist in carrying out the provisions of the Plan, and all rights conferred under the Confirmation Order and the Plan. The Plan Administrator is authorized to execute and/or deliver on behalf of the Debtors and the Liquidating Debtors, as the case may be, the agreements, document and instruments necessary or appropriate to effect the Plan or as otherwise contemplated by the Plan, the Plan Supplement, and any schedules, exhibits or other documents attached thereto or contemplated thereby, in the name and on behalf of the Debtors and the Liquidating Debtors. The Plan Administrator may employ one or more Persons to assist it with performing its duties under the Plan.

## Section 2.08 Restructuring Transactions

### (a) Issuance of New TMS Equity Interests

Unless the Debtors elect to consummate the Kistefos Transaction and it is thereafter consummated, on the Effective Date, Liquidating Debtor TMS shall issue one share of stock comprising 100% of the New TMS Equity Interest to the Plan Administrator who thereafter shall be the sole shareholder of Liquidating Debtor TMS with the authority to act on behalf of the Liquidating Debtors to the fullest extent provided under applicable non-bankruptcy law and the Plan. If the Kistefos Transaction is consummated, Liquidating Debtor TMS shall issue a

sufficient number of New TMS Equity Interests to the Plan Administrator to dilute the current equity interest of Kistefos in TMS to less than 10%. On the Effective Date, the issuance by Liquidating Debtor TMS of the New TMS Equity Interest(s) is hereby authorized without the need for any further corporate action under applicable law, regulation order or rule and without any further action by Holders of Claims or Interests. Such securities shall be distributed in accordance with the Plan. The New TMS Equity Interest(s) shall not be registered under applicable securities laws and neither the Debtors nor the Liquidating Debtors shall have any obligation to register the New TMS Equity Interest(s). The New TMS Equity Interest(s) issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable. In the event the Kistefos Transaction is consummated, the Liquidating Debtors shall be authorized to take, and shall take, any and all actions necessary such that TMS shall not have reporting or similar obligations under the Securities Act on and after the Effective Date.

### (b)    Securities Exemption

The Confirmation Order shall provide that, pursuant to Bankruptcy Code § 1145, the issuance of the New TMS Equity Interest(s) shall be exempt from the registration requirements of the Securities Act, as amended, and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of securities; provided, however, that if the issuance of the New TMS Equity Interest(s) do not qualify for an exemption under Bankruptcy Code § 1145, the New TMS Equity Interest(s) will be issued in reliance upon another available exemption from the registration requirements of the Securities Act. All securities issued pursuant to the Plan will be deemed issued as of the Effective Date regardless of the date actually distributed.

The Debtors are not seeking authority to issue the Opco Equity and Warrants pursuant to § 1145 of the Bankruptcy Code, and instead, shall issue such securities in reliance upon another available exemption from the registration requirements of the Securities Act. Moreover, the Debtors have endeavored to structure the Plan (through separate classification of the General Unsecured Claims and the Qualified Investor Claims) so as to mitigate the risk that the Opco Entities will have registration or reporting obligations under the Securities Act on and after the Effective Date.

### (c)    Kistefos Transaction

The Kistefos Transaction is a transaction whereby Kistefos AS (or its nominee to be determined), the Holder of approximately 18% of the Old TMS Equity, has agreed to pay a fee, the amount of which is to be determined (the "Kistefos Payment") to the Debtors in exchange for the Debtors' agreement to keep the Old TMS Equity outstanding under the Plan for a period of at least two years from the Effective Date. In addition, if necessary in order to reduce the number of record stockholders of the Liquidating Debtors so as to effect a deregistration of the Old TMS Equity under the Securities Act, the Liquidating Debtors may effect a reverse stock split so that each share of Old TMS Equity issued and outstanding prior to the split will be equal to some percentage of a share (with such percentage to be determined) following the split. Following the reverse stock split all fractional shares of Old TMS Equity will be cancelled. Other than retention of the Old TMS Equity, Holders of Old TMS Equity will not be entitled to any

Distributions under the Plan.  The Debtors may elect to consummate the Kistefos Transaction if the necessary approvals and other requirements for the transaction can be satisfied.

If the Debtors elect to proceed with the Kistefos Transaction, they will file a motion on or before June 10, 2011 that will detail the basic terms of the Kistefos Transaction and will seek authority to receive a work fee from Kistefos to fund the cost of investigating and analyzing any potential issues related to the negotiation and implementation of the Kistefos Transaction, or, alternatively, will file a notice with the Bankruptcy Court that they do not intend to pursue the Kistefos Transaction in connection with the Plan.  The motion should provide all parties with adequate information regarding the basic structure and terms of the Kistefos Transaction, in addition to what is contained herein. If any written agreement is reached regarding the Kistefos Transaction, a copy of such agreement will be filed as an exhibit to the Plan Supplement.

If the Debtors proceed with the Kistefos Transaction, they will seek approval of the transaction in connection with Confirmation of the Plan.  If any aspect of the Kistefos Transaction would render the Plan not confirmable under Bankruptcy Code § 1129(b)(2)(B)(ii) (taking into account any equitable or common law exceptions thereto) or otherwise, the Debtors reserve the right to and will seek Confirmation of the Plan without the inclusion of the Kistefos Transaction (thus resulting in Old TMS Equity being cancelled).

### Section 2.09  Plan Administrator

#### (a)  Appointment; Authority

Not less than ten days prior to the commencement of the Confirmation Hearing and subject to Bankruptcy Court approval in connection with the Confirmation, the Debtors shall designate a person acceptable to the Creditors' Committee, the 3% Unsecured Debentures Indenture Trustee and 8.125% Notes Indenture Trustee who initially will serve as the Plan Administrator; *provided*, *however*, that in the event the party designated to be the Plan Administrator is not acceptable to the Creditors' Committee, the 3% Unsecured Debentures Indenture Trustee or the 8.125% Notes Indenture Trustee, the Bankruptcy Court shall have the authority to approve the appointment of such person despite such non-acceptance.  Except as otherwise provided in the Plan, on the Effective Date, subject to the rights of the Plan Advisory Committee as set forth in Section 4.08 of the Plan, the Plan Administrator shall be vested with authority to exercise all rights of the Liquidating Debtors under applicable non-bankruptcy law and under the Plan.

#### (b)  Plan Administrator Agreement

Prior to or on the Effective Date, the Debtors shall execute the Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement.  Any nonmaterial modifications to the Plan Administrator Agreement made by the Debtors prior to the Effective Date are hereby ratified.  The Plan Administrative Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement necessary to implement the provisions of the Plan.

### (c) Qualifications

The Plan Administrator shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under the Plan.

### (d) Compensation

The Plan Administrator shall be compensated from the Wind-down Reserve pursuant to the terms of the Plan Administrator Agreement. Any professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Wind-down Reserve. The payment of the fees and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to approval of the Bankruptcy Court; *provided, however*, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

### (e) Liability and Indemnification

The Plan Administrator shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct. The Liquidating Debtors shall indemnify and hold harmless (i) the Plan Administrator (in its capacity as such and as officer, director, or manager, as applicable, of the Liquidating Debtors and/or of the Liquidating Debtors' non-Debtor affiliates), (ii) such individuals that may serve as officers and directors and employees of the Liquidating Debtors, if any, and (iii) the professionals retained by the Plan Administrator (collectively, the "Plan Administrator Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Plan Administrator Indemnified Party's willful misconduct or gross negligence, with respect to the Liquidating Debtors and/or of the Liquidating Debtors' non-Debtor Affiliates or the implementation or administration of the Plan or Plan Administrator Agreement. To the extent a Plan Administrator Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to such Plan Administrator Indemnified Party in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Plan Administrator Indemnified Party (and such Plan Administrator Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Plan Administrator Indemnified Party is not entitled to be indemnified therefore) out of the Wind-down Reserve or any insurance purchased using the Wind-down Reserve. The indemnification provisions of Section 4.07(e) of the Plan shall remain available to and be binding upon the Plan Administrator or the estate and shall survive any termination of the Plan Administrator Agreement.

### (f)    Resignation, Death or Removal

The Plan Administrator may be removed by the Bankruptcy Court upon application for good cause shown.  In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Plan Administrator, the Plan Advisory Committee shall designate another person to become Plan Administrator and thereupon the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.  To the extent the Plan Advisory Committee cannot agree on a successor Plan Administrator, any party in interest may request the Bankruptcy Court to appoint a successor Plan Administrator.

### (g)    Wind-down of the Debtors' Estates

Subject to the rights of the Plan Advisory Committee as set forth in Section 4.08 of the Plan, the Plan Administrator shall oversee the liquidation of the Liquidating Debtors and the winding up of their respective businesses and shall make Distributions to, and otherwise hold all property of the Liquidating Debtors for the benefit of, Holders of Allowed Claims consistent and in accordance with the Plan and the Confirmation Order.  Neither the Liquidating Debtors nor the Plan Administrator shall be required to post a bond in favor of the United States.

### (h)    Duties of the Plan Administrator

Except as otherwise provided in the Plan or the Plan Administrator Agreement, the Plan Administrator, subject to the rights of the Plan Advisory Committee as set forth in Section 4.08 of the Plan, shall have the power and authority to perform the following acts on behalf of the Liquidating Debtors, in addition to any powers granted by applicable non-bankruptcy law or conferred by any other provision of the Plan, the Plan Administrator Agreement or orders of the Bankruptcy Court: (i) take all steps and execute all instruments and documents necessary to make Distributions to Holders of Allowed Claims; (ii) object to Claims, Administrative Expenses or Interests as provided in the Plan and prosecute such objections; (iii) resolve, compromise and/or settle any objections to the amount, validity, priority, treatment, allowance or priority of Claims, including Administrative Claims, or Interests; (iv) comply with the Plan and the obligations hereunder; (v) if necessary, employ, retain or replace professionals to represent it with respect to its responsibilities; (vi) establish, replenish or release reserves as provided in the Plan, as applicable; (vii) take all actions necessary or appropriate to enforce the Debtors' or Liquidating Debtors' rights under any order authorizing a sale of assets, and any related document and to fulfill, comply with or otherwise satisfy the Debtors' or Liquidating Debtors' covenants, agreement and obligations under any such sale and any related document; (viii) make all determinations on behalf of the Debtors or Liquidating Debtors under any sale; (ix) prepare and file applicable tax returns for any of the Debtors or Liquidating Debtors; (x) liquidate or administer through sale, prosecution, compromise or release any of the assets; (xi) deposit funds of the Liquidating Debtors, draw checks and make disbursements consistent with the terms of the Plan; (xii) purchase or continue insurance protecting the Debtors, the Liquidating Debtors, the Plan Administrator, their respective representatives, agents, employees or independent contractors, and the property of the Liquidating Debtors; (xiii) seek entry of a final decree in any

of the Chapter 11 Cases at the appropriate time; (xiv) prosecute, resolve, compromise and/or settle any litigation, except the D&O Litigation; (xv) seek tax liability pursuant to Bankruptcy Code § 505; (xvi) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization (as such term is described in the Internal Revenue Code § 501(c)(3) (whose contributions are deductible under Internal Revenue Code § 170)) of the Plan Administrator's choice, any assets that are of no material benefit, including distributable Cash hereunder; (xvii) take all actions necessary or appropriate to pursue, defend, compromise, settle or otherwise resolve any and all Causes of Action, except Avoidance Actions and the D&O Litigation; and (xviii) take such other action as the Plan Administrator may determine to be, necessary, desirable or appropriate to carry out the purpose of the Plan. The Plan Administrator shall have no duties, obligations or authority with respect to the pursuit, defense, settlement or any other aspect of the Avoidance Actions and the D&O Litigation, which litigation shall be entirely managed and controlled by the Creditors' Committee representative on the Plan Advisory Committee as set forth in Section 4.08 of the Plan.

### (i) Investments

All Cash held by the Plan Administrator shall be invested (i) in accordance with Bankruptcy Code § 345 or as otherwise permitted by a Final Order; or (ii) as deemed appropriate by the Plan Administrator with approval of the Plan Advisory Committee.

## Section 2.10  Plan Advisory Committee

### (a) Appointment

On the Effective Date, a Plan Advisory Committee shall be appointed to oversee the implementation of the Plan by the Plan Administrator. The members of the Plan Advisory Committee shall undertake their duties as specified in the Plan. The Plan Advisory Committee shall initially be comprised of three representatives, one each appointed by (i) the 8.125% Notes Indenture Trustee; (ii) the Creditors' Committee; and (iii) the Liquidating Debtors, with the approval of the 8.125% Notes Indenture Trustee, the 3% Unsecured Debentures Indenture Trustee and the Creditors' Committee, *provided however*, that absent such approval, the Liquidating Debtors may seek approval from the Bankruptcy Court for such appointment with such approval binding on all Persons. Under no circumstances shall any representative on the Plan Advisory Committee, or the representative's agent, designee or person under control, be a person that the Liquidating Debtors' Estates potentially have a Cause of Action against or has been or may be named a defendant in any potential Cause of Action. In addition, a Plan Advisory Committee representative may not be an employee, creditor, agent, designee or person under the control of a party that voted against the Plan or otherwise acted to impede Confirmation.

### (b) Liability and Indemnification

The Plan Advisory Committee shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately

and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct. The Liquidating Debtors shall indemnify and hold harmless (i) the Plan Advisory Committee; and (ii) such individuals that may serve as a member of the Plan Advisory Committee (collectively, the "Plan Advisory Committee Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Plan Advisory Committee Indemnified Party's willful misconduct or gross negligence, with respect to the Liquidating Debtors or the implementation or administration of the Plan or Plan Administrator Agreement, as applicable. To the extent a Plan Advisory Committee Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to such Plan Advisory Committee Indemnified Party in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Plan Advisory Committee Indemnified Party (and such Plan Advisory Committee Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Plan Advisory Committee Indemnified Party is not entitled to be indemnified therefore) out of the Wind-down Reserve or any insurance purchased using the Wind-down Reserve. The indemnification provisions of Section 4.08(b) of the Plan shall remain available to and be binding upon any former member of the Plan Advisory Committee or the estate of any decedent of any member of the Plan Advisory Committee.

(c)  *Resignation, Death or Removal*

In the event of the resignation or removal, liquidation, dissolution, death or incapacity of a member of the Plan Advisory Committee, the remaining two members of the Plan Advisory Committee shall designate another person to become the third member of the Plan Advisory Committee.  To the extent the Plan Advisory Committee cannot agree on a successor committee member, the Plan Administrator may request the Bankruptcy Court to appoint a successor member.

(d)  *Rights and Duties of the Plan Advisory Committee*

The Plan Advisory Committee shall:

1)  have the right to review and object to settlements and proposed releases or abandonment of objections to Claims, Avoidance Actions or Causes of Action by the Plan Administrator or Liquidating Debtors, as applicable, in accordance with the Plan, provided, however, that such right to review and object shall apply only to Claims, Avoidance Actions or Causes of Action that were asserted in an amount in excess of $250,000.00.

2)  have the right to remove or replace the Plan Administrator, with or without cause, upon the unanimous written consent of all Plan Advisory Committee members; and

*3)* perform such additional functions and have such other rights, duties, powers and obligations as (i) may be agreed to by the Liquidating Debtors, (ii) are provided for in the Confirmation Order, or (iii) are provided for by further order of the Bankruptcy Court entered after the Effective Date.

In addition, the representative appointed by the Creditors' Committee on the Plan Advisory Committee shall have the exclusive power and authority to take all actions necessary or appropriate to prosecute, pursue, defend, compromise, settle or otherwise resolve any Avoidance Actions or the D&O Litigation; *provided, however*, that the Plan Advisory Committee representative appointed by the Creditors' Committee must obtain the consent of the Plan Advisory Committee representative appointed by the 8.125% Notes Indenture Trustee on any decision to commence or not commence or to compromise, settle or otherwise resolve an Avoidance Action or the D&O Litigation. To the extent reasonably practicable, the Creditors' Committee representative will inform the other Plan Advisory Committee representatives prior to commencing any Avoidance Actions or the D&O Litigation and will provide such other representatives periodic updates of the status of those proceedings..

*(e) Resolution of Disputes Between the Plan Advisory Committee and the Plan Administrator*

To the extent the Plan Administrator and the Plan Advisory Committee cannot resolve any dispute that may arise between them, either party may file appropriate pleadings with the Bankruptcy Court seeking resolution of the dispute by the Bankruptcy Court.

## Section 2.11  Plan Funding

The Debtors' and the Liquidating Debtors' obligations under the Plan will be funded from the following sources: (a) proceeds from the sale of assets; (b) revenues from the Transition Services Agreement; (c) recoveries from Causes of Action; (d) ordinary course revenues from the operation of the Debtors' or Liquidating Debtors' businesses during the wind-down process; (e) proceeds from the Holdco / Opco Settlement; (f) the EMSL Proceeds; and (g) existing Cash, if any, held on the Effective Date. For the avoidance of doubt, no Distributions shall be made on account of any Allowed Claims in Class 5 and Class 6 unless and until all Priority Amounts have been reserved, funded, paid or satisfied, as applicable. Except as otherwise provided herein, including without limitation Section 3.03(a) of the Plan, the Plan Administrator may not utilize the Opco Equity and Warrants through monetization thereof for satisfaction of any Claims other than Class 5 and Class 6 Claims until all other assets of the Liquidating Debtors have been depleted.

## Section 2.12  Wind-down Reserve

The Plan Administrator shall establish a Wind-down Reserve and shall pay, among other costs and expenses, wind-down costs and costs of holding and liquidating the Estates' assets, including, but not limited to, taxes, compensation of the Plan Administrator, and compensation of any professionals retained by the Plan Administrator from the Wind-down Reserve. The Plan

Administrator or Plan Advisory Committee, as applicable, must file a notice with the Bankruptcy Court detailing the identity of any attorneys engaged for the purpose of representing the Liquidating Debtors in connection with any Cause of Action, including the D&O Litigation and the Avoidance Actions, and the terms of such engagement. To the extent that the Plan Administrator determines that funds so reserved are insufficient, the proceeds of the continuing liquidation of assets, the EMSL Proceeds and any other assets held by the Liquidating Debtors, to the extent necessary for such purposes, will be allocated to the Wind-down Reserve. The Opco Equity and Warrants may only be monetized in accordance with terms of Section 4.11 of the Plan and utilized for the purposes contemplated by Section 4.10 of the Plan after notice to and an opportunity to object by the Plan Advisory Committee. After all costs associated with a Wind-down Reserve have been paid, and/or upon the reasonable determination by the Plan Administrator that the funds in the Wind-down Reserve exceed the amounts necessary to pay the expenses for which such fund is established, the remaining or excess funds shall constitute Residual Distribution Assets, and shall be distributed in accordance with the terms of the Plan.

### Section 2.13  Sale or Liquidation of Assets

Except as otherwise provided in the Plan, including Section 3.03(e) thereof, the Liquidating Debtors or Plan Administrator, as applicable, shall be authorized to, among other things, sell, assume, assign and/or transfer all or part of the assets pursuant to Bankruptcy Code §§ 105(a), 363, 365, 1123(b)(4), 1129 and 1146(a) under the terms and conditions of the Plan on and after the Effective Date. The authority granted in Section 4.11 of the Plan shall supersede any orders entered during the Chapter 11 Cases in respect of procedures for the sale of Estate assets. Sales pursuant to Section 4.11 of the Plan shall be free and clear of any and all Liens, Interests, Claims, charges and encumbrances, with such interests attaching to the proceeds of such sale and distributed as provided in the Plan. The Liquidating Debtors or Plan Administrator, as applicable, shall be, and are hereby, authorized to take any and all actions necessary or appropriate to consummate any sale. The actions necessary to effect the sale of all or part of the assets may include: (a) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of any applicable Final Order or the Plan and (b) all other actions that the Liquidating Debtors or Plan Administrator, as applicable, determine to be necessary or appropriate in connection with such transactions, including making such filings or recordings that may be required or appropriate under applicable state law. For any proposed sale, assumption, assignment or transfer of (i) the Opco Equity and Warrants or (ii) any other assets with a selling price of more than $500,000, the Liquidating Debtors or Plan Administrator, as applicable, must provide ten days' written notice to the Office of the United States Trustee and the Plan Advisory Committee prior to the consummation of the proposed transaction. If the Office of the United States Trustee or the Plan Advisory Committee lodges a written objection to a proposed sale, assumption, assignment or transfer of assets within ten days after service of written notice thereof, the Liquidating Debtors or Plan Administrator, as applicable, may not consummate the proposed transaction in accordance with this provision absent mutual agreement by the parties or further order of the Bankruptcy Court.

**Section 2.14  Credit Agreements and Existing Security Agreements**

**Except as otherwise provided in the Plan, on the Effective Date, all agreements, instruments, and other documents evidencing any Claim against or Interest in a Debtor and any rights of any Holder in respect thereof, including any security interests or Liens in assets of the Debtors, shall be deemed void and of no force or effect against the Debtors, the Liquidating Debtors and their assets.  The Holders of, or parties to, such instruments, security agreements and other documentation will have no rights arising from or relating to such instruments, security agreements and other documentation against the Debtors or Liquidating Debtors or their assets, except the rights provided for pursuant to the Plan, but shall reserve any and all rights arising therein against all other Persons, unless specifically released hereunder.**  To the extent deemed necessary or appropriate by the Plan Administrator, the Plan Administrator shall have the authority on behalf of and in the name of the Holders of Secured Claims to execute, deliver and file documents to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*.

**Section 2.15  Cancellation of Certain Existing Security Interests**

As a condition to receiving any Distribution under the Plan, if requested by the Debtors or Liquidating Debtors, as applicable, each holder of a promissory note, certificate, or other instrument evidencing a Claim or Interest shall surrender such promissory note, certificate, or other instrument to the Debtors or, if after the Effective Date, the Plan Administrator or its designee.  Any Holder of a Claim that fails to (a) surrender such instrument or (b) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to applicable Debtor or, if after the Effective Date, the Plan Administrator before the later to occur of (i) the second anniversary of the Effective Date and (ii) six months following the date such Holder's Claim or Interest is Allowed, shall be deemed to have forfeited all rights and claims with respect thereto, may not participate in any Distribution under the Plan on account thereof, and all amounts owing with respect to such Allowed Claim shall be retained by the applicable Debtor or Liquidating Debtor.

Notwithstanding anything to the contrary herein, any agreement that governs the rights of the 3% Unsecured Debentures Indenture Trustee or the Holders of the 3% Unsecured Debentures will continue in effect solely for purposes of (a) permitting the 3% Unsecured Debentures Indenture Trustee to maintain and enforce its 3% Unsecured Debentures Indenture Trustee Charging Lien against property distributed to the Plan Administrator or Disbursing Agent, as applicable, pursuant to Section 3.03(e) hereof on account of the 3% Unsecured Debentures pursuant to the Plan or any other property for fees, costs, and expenses under such 3% Unsecured Debentures Indenture or any other agreement, and (b) governing the rights and obligations of non-Debtor parties to such agreements, vis-à-vis each other. Upon completion of all such Distributions under the Plan and actions set forth pursuant to this Section 4.13, the 3% Unsecured Debentures and the 3% Unsecured Debentures Indenture shall be automatically cancelled and deemed terminated, extinguished and of no further force of effect without further act or action under any applicable agreement, law, regulation, order or rule; *provided however*,

that the 3% Unsecured Debentures Indenture Trustee shall have no further obligations under the 3% Unsecured Debentures Indenture or under the Plan after the Effective Date, and *provided further, however* that nothing herein shall alter, impair or affect its right to enforce the 3% Unsecured Debentures Indenture Trustee Charging Lien.

Notwithstanding anything to the contrary herein, any agreement that governs the rights of the 8.125% Notes Indenture Trustee or the Holders of the 8.125% Notes will continue in effect solely for purposes of (a) allowing the 8.125% Notes Indenture Trustee, pursuant and subject to the 8.125% Notes Indenture, to make distributions under the Plan to Holders of the 8.125% Notes, (b) permitting the 8.125% Notes Indenture Trustee to maintain and enforce its 8.125% Notes Indenture Trustee Charging Lien against property distributed on account of the 8.125% Notes pursuant to the Plan or any other property for fees, costs, and expenses under such 8.125% Notes Indenture or any other agreement, and (c) governing the rights and obligations of non-Debtor parties to such agreements, vis-à-vis each other. Upon completion of all such Distributions under the Plan and actions set forth pursuant to this Section 4.13, the 8.125% Notes and the 8.125% Notes Indenture shall be automatically cancelled and deemed terminated, extinguished, of no further force of effect, and the 8.125% Notes Indenture Trustee shall have no further obligations thereunder or under the Plan, without further act or action under any applicable agreement, law, regulation, order or rule. Nothing in the Plan shall alter, impair or affect the 8.125% Notes Indenture Trustee Charging Lien.

## Section 2.16  Vesting of Assets

Except as otherwise set forth herein, in the Plan Supplement or in the Confirmation Order, as of the Effective Date, all property of the Debtors being liquidated hereunder shall vest in the applicable Liquidating Debtor free and clear of all Claims, Liens, encumbrances and other Interests. From and after the Effective Date, the Liquidating Debtors may operate (or liquidate and wind up) their businesses and use, acquire and dispose of property and assets of any nature and settle and compromise claims or interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. The EMSL Proceeds and Opco Equity and Warrants shall be held by the Plan Administrator in trust for the beneficiaries of the Plan and may not be used for any purpose other than as provided in the Plan. Without limiting the generality of the foregoing and subject to the other provisions of the Plan, the Liquidating Debtors may, without application to or approval by the Bankruptcy Court, pay fees that they incur after the Effective Date for Professional fees and expenses.

## Section 2.17  Preservation of Rights of Action; Settlement

Except to the extent such rights, claims, Causes of Action, defenses, and counterclaims are otherwise dealt with in the Plan or are expressly and specifically released in connection with the Plan, the Confirmation Order or in any settlement agreement approved during the Chapter 11 Cases, or otherwise provided in the Confirmation Order or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code § 1123(b):  (a) any and all rights, claims, Causes of Action (including

Avoidance Actions), defenses, and counterclaims of or accruing to the Debtors or their Estates shall remain assets of and vest in the Liquidating Debtors, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, claims, Causes of Action, defenses and counterclaims have been listed or referred to in the Plan, the Bankruptcy Schedules, or any other document filed with the Bankruptcy Court, and (b) the Liquidating Debtors shall in no manner waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, claim, Cause of Action, defense, or counterclaim that constitutes property of the Estates: (i) whether or not such right, claim, Cause of Action, defense, or counterclaim has been listed or referred to in the Plan or the Bankruptcy Schedules, or any other document filed with the Bankruptcy Court, (ii) whether or not such right, claim, Cause of Action, defense, or counterclaim is currently known to the Debtors, and (iii) whether or not a defendant in any litigation relating to such right, claim, Cause of Action, defense or counterclaim filed a proof of Claim in the Chapter 11 Cases, filed a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against the Plan, or received or retained any consideration under the Plan. Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principal of law or equity, without limitation, any principals of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, claim, Cause of Action, defense, or counterclaim, or potential right, claim, Cause of Action, defense, or counterclaim, in the Plan, the Bankruptcy Schedules, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Liquidating Debtors' right to commence, prosecute, defend against, settle, and realize upon any rights, claims, Causes of Action, defenses, or counterclaims that the Debtors or the Liquidating Debtors have, or may have, as of the Effective Date. Subject to the express provisions of the Plan, including Sections 4.07 and 4.08 of the Plan, the Liquidating Debtors may commence, prosecute, defend against, settle, and realize upon any rights, claims, Causes of Action, defenses, and counterclaims in their sole discretion, in accordance with what is in the best interests, and for the benefit, of the Liquidating Debtors.

**Section 2.18  Holdco / Opco Settlement**

Prior to the filing of the Plan, the Debtors agreed to the Holdco / Opco Settlement, subject to Bankruptcy Court approval. The Holdco / Opco Settlement was approved by the Bankruptcy Court pursuant to the Holdco / Opco Settlement Order. The Holdco / Opco Settlement became effective on May 13, 2011 and is fully enforceable in accordance with its terms, and nothing in the Plan shall be deemed to alter, amend or otherwise modify the Holdco / Opco Settlement or Holdco / Opco Settlement Order, and to the extent of any conflict between the Holdco / Opco Settlement and Holdco / Opco Settlement Order, and the Plan, the Holdco / Opco Settlement and Holdco / Opco Settlement Order shall control. Any property received by the Debtors pursuant to the Holdco / Opco Settlement will be administered by the Plan Administrator as set forth in the Plan. All securities issued pursuant to the Plan will be deemed issued as of the Effective Date regardless of the date actually distributed.

**Section 2.19   Exclusivity Period**

The Debtors shall retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date.

**Section 2.20   Exemption from Transfer Taxes**

Pursuant to Bankruptcy Code § 1146(a), the issuance, transfer, or exchange of a security, or the making of delivery of an instrument of transfer, including without limitation any transfers effected by mergers provided under the Plan, from the Debtors to the Liquidating Debtors or any other Person or Entity pursuant to the Plan may not be taxed under any law imposing a stamp tax or similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Section 2.21   No Discharge of the Debtors**

Pursuant to Bankruptcy Code § 1141(d)(3), Confirmation will not discharge the Debtors under Bankruptcy Code § 1141 of any debts; *provided, however,* upon Confirmation, the occurrence of the Effective Date and the Distributions contemplated hereunder, Holders of Claims and Interests may not seek payment or recourse against the Debtors, the Liquidating Debtors or the Estates, as applicable, or otherwise be entitled to any Distribution except as expressly provided in the Plan.

**Section 2.22   Exculpation and Limitation of Liability**

Except as otherwise specifically provided in the Plan, none of (i) the Debtors and the Liquidating Debtors; (ii) the professionals, consultants and advisors of any of the Debtors that were retained, employed or otherwise working with the Debtors on or after the Petition Date; (iii) the Creditors' Committee and the Plan Advisory Committee and, solely in their respective capacities as members or representatives of the Creditors' Committee and the Plan Advisory Committee, as applicable, each member thereof; (iv) the Plan Administrator; (v) the 8.125% Notes Indenture Trustee solely in its capacity as such; (vi) the 3% Unsecured Debentures Indenture Trustee solely in its capacity as such; and (vii) each of such parties' respective agents, directors, officers, managers, members, employees, advisors, accountants, investment bankers, consultants, attorneys and other representatives of any of the foregoing solely in their respective capacities as such (collectively, the "Protected Parties"), shall have or incur, and each such party is hereby exculpated from, any liability (whether arising under contract, tort, or federal or state securities laws, whether known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise) to, or be subject to any right of action by, any Holder of a Claim or Interest or any other party in interest, or (with respect to such Claims or Interests) any of their respective agents, affiliates, or any of their successors or assigns, for any prepetition or postpetition act or omission taken or not taken (as the case may be) or any other transaction,

event, or occurrence in any way connected with, relating to, or arising out of, (i) the Debtors' Chapter 11 Cases and the commencement and administration thereof; (ii) the Disclosure Statement, the Plan, any documents related thereto, and all transactions contemplated thereby; (iii) the pursuit of Confirmation and the approval of the Disclosure Statement (including, without limitation, the formulation, negotiation, preparation, dissemination, implementation, or administration of any of the foregoing documents, or the solicitation of votes in connection therewith), or any orders of the Bankruptcy Court related thereto; (iv) the administration and Consummation of the Plan and the occurrence of the Effective Date; (v) the property to be distributed under, or sold in the manner contemplated by, the Plan or any other Final Order; (vi) any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any Plan Document; (vii) the Holdco / Opco Settlement and the Opco Restructuring; or (viii) any other act taken or omitted to be taken in connection with, or in contemplation of, any of the restructuring or other transactions contemplated by the Plan or any document related thereto, in each instance, except any act, omission, transaction, agreement, event or other occurrence determined by a Final Order to constitute fraud, willful misconduct, or gross negligence (the "Precluded Claims"), and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**Section 2.23   Permanent Injunction**

**The Plan provides and the Confirmation Order shall provide, among other things, that any Person (other than the Debtors, the Liquidating Debtors, the Creditors' Committee, the Estates or the Plan Administrator) who has held, holds, or may hold a Claim against or Interest in the Debtors, the Estates, or the Liquidating Debtors, or any Claim against or Interest in any Person (including any Debtor) for which the Debtors or the Liquidating Debtors are or may be directly liable or indirectly liable by way of contribution, indemnity (including an obligation to pay defense costs under the Plan or otherwise) or otherwise is, with respect to any such Claim or Interest, permanently enjoined from and after the Effective Date from taking any of the following actions (i) asserting, commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting any of the Debtors, the Estates, or the Liquidating Debtors on account of any Claim for which the Debtors or Liquidating Debtors are directly or indirectly liable by way of contribution, indemnity or otherwise, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against any of the Debtors, the Estates, or the Liquidating Debtors; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien of any kind against the Debtors, the Estates, or the Liquidating Debtors on account of any Claim for which any of the Debtors or Liquidating Debtors are or may be directly or indirectly liable by way of contribution, indemnity or otherwise; (iv) asserting any right of setoff or subrogation of any kind, directly or indirectly, against any obligation due to any of the Debtors, the Estates, or the Liquidating Debtors, on account of any Claims for which any of the Debtors**

or Liquidating Debtors are or may be directly or indirectly liable by way of contribution, indemnity or otherwise; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) prosecuting, commencing, continuing or otherwise asserting any right, Claim or cause of action released pursuant to the Plan or that is otherwise inconsistent with the provisions of the Plan. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages, from the willful violator(s). Notwithstanding the foregoing, Holders of Disputed Claims are not enjoined from and shall retain all rights to defend or prosecute such Disputed Claims in the Bankruptcy Court, including, without limitation, the right to assert affirmative defenses, setoff, or recoupment, if applicable.

**Section 2.24   Releases by the Debtors and their Estates**

Except as otherwise expressly provided in the Plan and subject to the terms of any prior Bankruptcy Court orders, in consideration of, among other things, the Distributions and the obligations of the Debtors contemplated hereby, and the other contracts, instruments, releases, agreements, waivers, and documents to be executed and delivered in connection with the Plan, and in consideration of the efforts of the following parties to facilitate the implementation of the transactions contemplated by the Plan, each of the Debtors and any Person or Entity seeking to exercise rights or claims on behalf of the Debtors and their Estates shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, waived, released and discharged the Protected Parties from all claims, obligations, suits, damages, demands, debts, rights, or Causes of Action the Debtors or the Liquidating Debtors may have against the Protected Parties of whatever kind or nature, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, in law or equity, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date, relating to or in connection with the Debtors, the Chapter 11 Cases, the Holdco / Opco Settlement and the Opco Restructuring, the conduct of the Debtors' business, or the Plan; *provided, however,* that the foregoing release (i) will have no effect on the liability of any Protected Parties arising from an act, omission, transaction, agreement, event or other occurrence determined by a Final Order to constitute fraud, willful misconduct, or gross negligence; and (ii) will not constitute a release or waiver of any defense available to the Debtors or the Liquidating Debtors in connection with any Disputed Claim (including Administrative Claims) asserted against the Debtors, their Estates, or the Liquidating Debtors by any Protected Party. The releases described herein shall be binding upon all Persons. Accordingly, all Persons shall hereby be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover any such claim that could be brought on behalf of or in the name of the Debtors, the Liquidating Debtors or their Estates including any derivative claims asserted or assertable on behalf of the Debtors, the Liquidating Debtors or their Estates. Notwithstanding anything herein to the contrary, in any proceeding brought by the Creditors' Committee or any other person or entity on behalf of the Debtors or Liquidating Debtors (an "<u>Estate Representative</u>")

against any individuals serving or having served as directors, officers, employees, agents or representatives of the Debtors during the pendency of the Chapter 11 Cases (the "<u>Present Management</u>"), the Estate Representative will not seek any recovery in excess of the dollar amount of the policy limits, as such limits have been actually reduced from time to time by defense costs or other claims made against such policies, of any available directors and officers liability insurance; nothing contained herein shall relieve the Present Management from any liability on a claim for any amount less than the policy limits of any available directors and officers liability insurance. However, should there be no directors and officers liability insurance (including without limitation any deductible or retention) available with respect to a claim, the Estate Representative will not seek recovery on that claim against the Present Management. If the Estate Representative obtains a judgment on a claim against any of the Debtors' former officers, directors, employees, agents or representatives and such former officer, director, employee, agent or representative obtains a Final Order against any of the Present Management by reason of contribution, indemnification or other claim related to such claim (a "<u>D&O Contribution Claim</u>"), the Estate Representative will reduce its judgment against such former officer, director, employee, agent or representative by the amount of such D&O Contribution Claim.

Section 2.25   Releases by Holders of Claims and Interests

Except as otherwise expressly provided in the Plan, in consideration of, among other things, the Distributions and the obligations of the Debtors contemplated hereby, and the other contracts, instruments, releases, agreements, waivers, and documents to be executed and delivered in connection with the Plan, and in consideration of the efforts of the following parties to facilitate the implementation of the transactions contemplated by the Plan, all Holders of Claims and Interests who vote in favor of the Plan, for themselves and on behalf of their respective successors and assigns, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Protected Parties from any and all claims, interests, obligations, rights, suits, damages, losses, costs and expenses, actions, causes of action, remedies, and liabilities of any kind or character whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, the Liquidating Debtors or their Estates, or any claims arising out of, or relating to, any alleged fiduciary or other duty, any alleged violation of any federal or state securities law or any other law relating to creditors' rights generally, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, suspected or unsuspected, matured or unmatured, fixed or contingent, existing or hereafter arising, in law, equity or otherwise, that such Entity ever had, now has or hereafter can, shall or may have, or otherwise would have been entitled to assert (whether individually or collectively or directly or derivatively), against any Protected Party arising from or relating to, directly or indirectly, in whole or in part, the Debtors, the Debtors' restructuring, the operation or administration of the Debtors' business and assets, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements among any two or more of any Debtor or

any **Affiliate thereof, any Liquidating Debtor or any Protected Party (and the acts or omissions of any other Protected Party in connection therewith), the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the Holdco / Opco Settlement and the Opco Restructuring, the negotiation, formulation, or preparation of the Plan, Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence, including the management and operation of the Debtors, taking place on or before the Effective Date. Notwithstanding the foregoing, nothing in Section 12.09 of the Plan shall release any Protected Party from liability for any act, omission, transaction, agreement, event or other occurrence determined by a Final Order to constitute fraud, willful misconduct, or gross negligence. Further notwithstanding the foregoing, nothing in Section 12.09 of the Plan shall be deemed to assert or imply any admission of liability on the part of any of the parties released hereby.**

### Section 2.26 Compromises and Settlements

Pursuant to Bankruptcy Code § 363 and Bankruptcy Rule 9019, in consideration for, among other things, the proposed classification of Claims and Interests under the Plan, the Distributions to the Holders of 8.125% Notes Secured Claims, Qualified Investor Claims, General Unsecured Claims and 8.125% Notes Deficiency Claims and other benefits provided hereunder, including the proportional Distributions of the remaining assets of the Liquidating Debtors as set forth in the Plan, the creation and funding of the General Unsecured Claims Fund, the satisfaction of the Administrative Claims of the 8.125% Notes Indenture Trustee and the 3% Unsecured Debentures Indenture Trustee for fees and expenses, and the releases and exculpatory provisions contemplated by the Plan, the Plan constitutes a settlement of the following disputes and controversies, among others: (a) the extent and validity of the Allowed amount of the Secured Claim of the 8.125% Notes Indenture Trustee, (b) the extent and validity of the Liens, Claims and security interests, if any, of the 8.125% Notes Indenture Trustee and the Holders of the 8.125% Notes on the EMSL Proceeds, (c) the allocation of the proceeds of the Holdco / Opco Settlement among the chapter 5 claims and Holdco / Opco Intercompany Claims that were compromised and settled in connection therewith, and the resultant Liens, Claims and security interests of the 8.125% Notes Indenture Trustee and the Holders of the 8.125% Notes, if any, that would attach thereto based on such allocation, (d) the breadth and comprehensiveness of the release and exculpatory provisions contemplated by the Plan, (e) the appropriate classification of the various Claims and Interests under the Plan, (f) the appropriate Distribution of the remaining assets of the Liquidating Debtors to the various Holders of Claims and Interests, and (g) the timing and priority of such Distributions under the Plan. The settlement embodied by the Plan is intended to effectuate the waiver and release of any and all asserted and/or Allowed Superpriority Administrative Claims and asserted and/or Allowed Secured Claims of the 8.125% Notes Indenture Trustee and the Holders of the 8.125% Notes on account of the 8.125% Notes in exchange for the treatment afforded to the Allowed Claims of the 8.125% Notes Indenture Trustee and the Holders of the 8.125% Notes on account of the 8.125% Notes as set forth in the Plan. This settlement is intended to and does constitute a full, final and complete good-faith compromise and settlement of all disputes and controversies between the relevant parties to this

matter including the Debtors, the Creditors' Committee, the 8.125% Notes Indenture Trustee on behalf of its Holders and the 3% Unsecured Debentures Indenture Trustee on behalf of its Holders.

In addition, the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest, and shall include a settlement of all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors.

The entry of the Confirmation Order shall constitute, pursuant to Bankruptcy Rule 9019, the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

Except as expressly provided in the Plan, it is not the intent of the Debtors that Confirmation shall in any manner alter or amend any settlement and compromise between the Debtors and any Person that has been previously approved by the Bankruptcy Court, including, without limitation, the Holdco / Opco Settlement. Except as expressly provided in the Plan, to the extent of any conflict between the terms of the Plan and the terms of any prior settlement, the terms of the prior settlement shall control and such prior settlement shall be enforceable according to its terms.

## ARTICLE III

### CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS OF THE PLAN

**TO ENSURE COMPLIANCE WITH U.S. TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED; (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (3) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM THEIR OWN INDEPENDENT TAX ADVISORS.**

The following is a summary of certain U.S. federal income tax consequences of the implementation of the Plan to Holders of 8.125% Notes Secured Claims, General Unsecured Claims, 8.125% Notes Deficiency Claims and Qualified Investor Claims. This summary does

not address the U.S. federal income tax consequences to Holders not entitled to vote on the Plan, including Holders whose Claims are not impaired and Holders whose Claims are to be extinguished without any Distribution.

This summary is based on the Internal Revenue Code (the "IRC") and the U.S. Treasury Regulations, rulings, administrative pronouncements and judicial decisions thereunder as of the date hereof, all of which are subject to change or differing interpretations at any time with possible retroactive effect.  We have not requested, and do not intend to request, a ruling from the U.S. Internal Revenue Service (the "IRS") or an opinion of counsel with respect to any of the U.S. federal income tax consequences described below. There can be no assurance that the IRS will not disagree with or challenge any of the conclusions set forth herein.

The U.S. federal income tax consequences of the Plan are complex, and this summary is general in nature.  This summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of the Holder's particular circumstances or to certain types of Holders subject to special treatment under U.S. federal income tax laws (such as Holders who are related to the Debtors within the meaning of the IRC, insurance companies, tax-exempt organizations, regulated investment companies, real estate investment trusts, partnerships or other pass-through entities and holders of interests therein, and Holders of Claims who are themselves in bankruptcy). In addition, this discussion does not consider the effect of any U.S. federal tax laws other than U.S. federal income tax laws or of any foreign, state, local or other tax laws that may be applicable to particular Holders.  Further, this summary assumes that Holders of Claims hold only Claims in a single Class.  Holders of multiple Classes of Claims should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.

As used herein, a "U.S. Holder" means a Holder of a 8.125% Notes Secured Claim, General Unsecured Claim, or Qualified Investor Claim that, for U.S. federal income tax purposes is (i) an individual citizen or resident of the United States, (ii) a corporation (or other entity treated as a corporation) created or organized in or under the laws of the United States, any State thereof or the District of Columbia, (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source or (iv) a trust (a) that is subject to the primary supervision of a court within the United States and under the control of one or more United States persons (as defined in Section 7701(a)(30) of the IRC) or (b) that has a valid election in effect under the U.S. Treasury Regulations to be treated as a United States person.

As used herein, a "Non-U.S. Holder" means a Holder of a 8.125% Notes Secured Claim, General Unsecured Claim, 8.125% Notes Deficiency Claim or Qualified Investor Claim that is an individual, corporation, estate or trust that is not a U.S. Holder.

If an entity treated as a partnership for U.S. federal income tax purposes is a Holder of a Claim, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership that is a Holder of a Claim, you are urged to consult your own tax advisor about the U.S. federal income tax consequences to you of the Consummation.

**Section 3.01  U.S. Federal Income Tax Consequences to U.S. Holders of Claims**

A U.S. Holder of 8.125% Notes Secured Claim, General Unsecured Claim, 8.125% Notes Deficiency Claim or Qualified Investor Claim generally will recognize gain or loss upon the receipt of Distributions of Cash or property pursuant to the Plan with respect to such Claim in an amount equal to the difference between (1) the amount of Cash and the fair market value of any property received and (2) the U.S. Holder's adjusted tax basis in its Claim.  A U.S. Holder's adjusted tax basis in a Claim will generally be the amount paid for the property underlying such Claim and, in the case of a Claim treated as a debt instrument for U.S. federal income tax purposes, such cost will be increased by the amount of any market discount (as discussed below in "Market Discount") included in income, and decreased by any amortizable bond premium that has been amortized by the U.S. Holder.  If the Distributions may be received over more than one year, a U.S. Holder may be required to allocate its basis and calculate its income or loss (and any imputed interest) with respect to each Distribution under the installment sale rules.

The character of any gain or loss that is recognized upon the receipt of Distributions will depend upon a number of factors, including the status of the U.S. Holder and the nature of the Claim in its hands.  If the Claim constitutes a debt instrument for U.S. federal income tax purposes, such factors will include whether the Claim was purchased at a discount, whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to the Claim, and the U.S. Holder's holding period of the Claim.  Generally, a U.S. Holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the U.S. Holder has held its Claim (or the asset underlying the Claim) for more than one year) if the Claim is a capital asset in the U.S. Holder's hands.  However, such gain or loss may be ordinary if a Distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the U.S. Holder's trade or business for the performance of services or for the sale of goods or merchandise.  To the extent that a portion of the Distributions received represents accrued but unpaid interest that the U.S. Holder has not already included in income, the U.S. Holder should recognize ordinary interest income (*See* "Accrued but Unpaid Interest").  In addition, certain U.S. Holders of Claims may be subject to other special tax rules that affect the character, timing and amount of any income, gain, loss or deduction.  Capital losses may generally offset only capital gains, although individuals may, to a limited extent, offset ordinary income with capital losses (*See* "Limitation on Use of Capital Losses").

*(a)  Accrued but Unpaid Interest*

To the extent that any portion of a Distribution received by a U.S. Holder of a surrendered Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income.  Conversely, a U.S. Holder of a surrendered Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which a Distribution received by a U.S. Holder of a Claim constituting a debt instrument will be attributable to accrued interest on the Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, Distributions in respect of a Claim bearing accrued but unpaid interest shall be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes) and then, to the extent the Distributions exceed the principal amount of the Claim, to any portion of such Claim attributable to accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for U.S. Holders.

### (b)    Market Discount

Under the "market discount" provisions of the IRC, some or all of any gain recognized by a U.S. Holder with respect to a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" accrued on the Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if the U.S. Holder's adjusted tax basis in the debt instrument at the time of its acquisition is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of Claims treated as debt instruments that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### (c)    Limitation on Use of Capital Losses

U.S. Holders of Claims who recognize capital losses as a result of Distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000.00 ($1,500.00 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**Section 3.02 U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims**

*(a)    Gains realized by Non-U.S. Holders*

Subject to the discussion of amounts attributable to accrued but unpaid interest, any gain realized by a Non-U.S. Holder of a 8.125% Notes Secured Claim, General Unsecured Claim, 8.125% Notes Deficiency Claim or Qualified Investor Claim under the Plan generally will not be subject to U.S. federal income tax, unless:

- such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business within the United States, in which case the Non-U.S. Holder would be taxed on the gain in the manner described below under "Interest or Gain Effectively Connected with a U.S. Trade or Business," unless an applicable income tax treat provides otherwise; or

- the Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are satisfied, in which case the Non-U.S. Holder would be subject to a flat 30% rate of U.S. federal income tax on the gain, which may be offset by U.S. source capital losses.

Subject to the discussion of information reporting and backup withholding below, amounts, if any, received pursuant to the Plan that are attributable to accrued but unpaid interest on a Claim generally will not be subject to U.S. federal withholding tax, provided that:

- the Non-U.S. Holder certifies its foreign status by providing a properly executed IRS Form W-8BEN;

- the Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of the stock of the applicable Debtor entitled to vote,

- the Non-U.S. Holder is not (A) a controlled foreign corporation that is related to the applicable Debtor or (B) a bank receiving interest on a loan entered into in the ordinary course of business; and

- such interest is not effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States.

A Non-U.S. Holder that does not meet the requirements described above generally will be subject to U.S. federal withholding tax at a 30% rate on the portion of a Distribution attributable to accrued but unpaid interest, unless such Non-U.S. Holder provides a properly executed (1) IRS Form W-8BEN (or suitable substitute form) claiming an exemption from or reduction in withholding under an applicable income tax treaty or (2) IRS Form W-8ECI (or suitable substitute form) stating that such Distributions are not subject to withholding tax

because the Distributions are effectively connected with a U.S. trade or business (and, if an applicable income tax treaty so requires, are attributable to such Non-U.S. Holder's permanent establishment in the United States) as discussed below under "Gain or Accrued Interest Effectively Connected with a U.S. Trade or Business."

> (b)     *Gain or Accrued Interest Effectively Connected with a U.S. Trade or Business*

Gain resulting from Distributions in respect of a surrendered Claim and the portion (if any) of such Distributions attributable to accrued but unpaid interest that are effectively connected with the conduct by a Non-U.S. Holder of a trade or business within the United States (and, if required by an applicable income tax treaty, are attributable to a permanent establishment maintained by the Non-U.S. Holder in the United States) will be subject to U.S. federal income tax on a net income basis at the rates applicable to U.S. persons generally (and, with respect to corporate Non-U.S. Holders, may also be subject to a 30% branch profits tax). Distributions attributable to accrued but unpaid interest that is effectively connected to a Non-U.S. Holder's U.S. trade or business (and, if required, is attributable to its U.S. permanent establishment) will not be subject to U.S. federal withholding tax if the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or IRS Form W-8BEN claiming exemption under an applicable income tax treaty).

**Section 3.03  Information Reporting and Backup Withholding**

Distributions in respect of a Claim pursuant to the Plan, are generally subject to information reporting and backup withholding unless the Holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income, or (iii) in the case of a Non-U.S. Holder, provides an IRS Form W-8BEN certifying as to its foreign status. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against the Holder's U.S. federal income tax liability, if any, provided the required information is furnished to the IRS.

The foregoing discussion is intended only as a summary of certain income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Claim Holder's particular circumstances. **Accordingly, Holders of Claims are urged to consult their own tax advisors about the U.S. federal, state, local, and applicable foreign income and other tax consequences of the plan.**

# ARTICLE IV

## BEST INTERESTS OF CREDITORS AND LIQUIDATION ANALYSIS

### Section 4.01  Best Interests Test

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each Holder of a Claim or interest in such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such person would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.  In chapter 7 liquidation cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior Class receiving any payments until all amounts due to senior Classes have been paid fully or any such payment is provided for:

- Secured creditors (to the extent of the value of their collateral);

- Administrative and other priority creditors;

- Unsecured creditors;

- Debt expressly subordinated by its terms or by order of the Bankruptcy Court; and

- Interest holders.

For the reasons set forth Section 4.02, below, the Debtors believe that the value of any distributions in a chapter 7 case would be less than the value of distributions under the Plan. Accordingly, the Debtors believe that the "best interests" test of Bankruptcy Code § 1129 is satisfied.

### Section 4.02  Liquidation Analysis

The Debtors have liquidated substantially all of their assets through asset sales during the Chapter 11 Cases and are in the process of liquidating any remaining assets.  The Debtors believe that liquidation under chapter 11 is more beneficial to the Holders of Claims and Interests than a liquidation under chapter 7 because the Plan incorporates the Holdco / Opco Settlement, allows the Debtors' remaining assets to be promptly administered, and grants the Plan Administrator the right to object to Claims and to pursue claims and causes of action of the Debtors and their estates that are not otherwise settled or released under the Plan.  Any proceeds from such claims or causes of action or from the liquidation of the remaining assets of the Debtors will be distributed in accordance with the Plan.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of: (a) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter

period of time; and (b) additional administrative expenses involved in the appointment of a chapter 7 trustee.

Specifically, the Debtors' costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other Professionals that such a trustee might engage. In addition, additional claims could arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of claims and other claims that might arise in a chapter 7 liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors and the Creditors' Committee during the Chapter 11 Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available for distribution to Holders of Allowed General Unsecured Claims.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared with the value of the property offered to such Classes of Claims and Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to the Holders of Claims and Interests in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee and (ii) the increases in Claims which could be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined that Confirmation of the Plan will provide each Holder of an Allowed Claim or Interest with a recovery that is not less than such Holder would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## ARTICLE V

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed (or elected) to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests is set forth above in Section 4.02.

## ARTICLE VI

## RISK FACTORS

**HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

### Section 6.01  Risks Related to Projections and Estimates

This Disclosure Statement and the material incorporated by reference herein include "forward-looking statements" as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934.  All statements other than statements of historical facts included in this Disclosure Statement and any materials incorporated by reference herein regarding the Debtors' financial position, and plans and objectives including but not limited to statements using words such as "anticipates," "expects," "estimates," "believes," and "likely" are forward-looking statements.  Management of the Debtors believes that its current views and expectations are based on reasonable assumptions; however, there are significant risks and uncertainties that could significantly affect expected results.  Important factors that could cause actual results to differ materially from those in the forward-looking statements are disclosed throughout this Disclosure Statement and include, without limitation, the risk factors discussed herein, the success in the sales process, and written and oral forward-looking statements attributable to the Debtors, or Persons acting on their behalf, are expressly qualified in their entirety by the statements made herein.  The Debtors do not intend to update or otherwise revise the forward-looking statements contained herein to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

### Section 6.02  Objections to Classifications

Bankruptcy Code § 1122 provides that a Plan may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests of such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### Section 6.03  Nonoccurrence of Effective Date of Plan

Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan may not become effective.  The Plan sets forth conditions to the occurrence of the Effective Date of the Plan which may not be satisfied.  The Debtors believe that they will satisfy all requirements for consummation under the Plan.  There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for consummation of the Plan have been satisfied.

## ARTICLE VII

## PREFERENCES

Pursuant to Bankruptcy Code § 547, a debtor may recover certain preferential transfers of property, including Cash, made while insolvent during the ninety (90) days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts to the extent the transferee received more than it would have in respect of the pre-existing debt had the debtor been liquidated under chapter 7 of the Bankruptcy Code.  In the case of "Insiders," the Bankruptcy Code provides for a one-year preference period.  There are certain defenses to such recoveries. Transfers made in the ordinary course of the debtor's and the transferee's business or according to ordinary business terms are not recoverable.  Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property.  If a transfer is recovered by a debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery.  Any such general unsecured claims will be considered Disputed Claims pursuant to the Plan, unless and until such general unsecured claim becomes an Allowed Claim either by Final Order or a determination by the Debtors or the Plan Administrator, on behalf of the Liquidating Debtors, as applicable.

Attached hereto as *Exhibit E* is a list of all payments of $5,850 or more made by the Debtors to creditors within the ninety (90) days prior to the Petition Date.  Attached hereto as *Exhibit F* is a list of all payments made to insiders within the one (1) year period prior to the Petition Date.  The Debtors have conducted a preliminary analysis as to whether the payments on *Exhibits E or F* but have not yet commenced any preference actions.  Any Person on the list is cautioned that the Debtors or the Plan Administrator, on behalf of the Liquidating Debtors, as applicable, reserves the right to review and, if the Debtors or if the Plan Administrator, on behalf of the Liquidating Debtors, as applicable, believes appropriate, assert that any and all payments contained on the attached *Exhibits E or F* are preference payments within the meaning of the Bankruptcy Code and therefore should be returned to the Estates, except for preferences that are specifically released in the Plan or by order of the Bankruptcy Court.  In this regard, the Debtors

and the Plan Administrator, on behalf of the Liquidating Debtors, specifically reserve all rights to pursue preference claims or any other Causes of Action.

The listing of potential preference payments on the attached ***Exhibits E or F*** is not exhaustive and if a potential preference payment is not identified on the attached ***Exhibits E or F*** it is because such payment is not known to the Debtors at this time. The listing of potential preference payments includes, but is not limited to, payments arising out of, or in connection with, the Debtors' business, assets, or operations, or otherwise affecting the Debtors, including but not limited to matters pertaining to contracts, leases, deposits, turnover of property of the Debtors or property of the Debtors' estates, sale of the Debtors' assets, cure payments, cross-claims or counter-claims in pending non-bankruptcy litigation. On behalf of the Debtors and their Estates, the Debtors preserve for the Liquidating Debtors the rights to any insider preference payments that may be identified on or after the Effective Date.

Except as specifically provided in this Disclosure Statement, the Plan or in the Confirmation Order, nothing contained in this Disclosure Statement, the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights, claims, or Causes of Action (including but not limited to any Avoidance Actions) that the Debtors or the Liquidating Debtors, as the case may be, may have or which the Debtors or the Plan Administrator, as the case may be, may choose to assert on behalf of the Estates or the Liquidating Debtors, as applicable, in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, any other Cause of Action not specifically released pursuant to the Plan.

# ARTICLE VIII

## SOLICITATION AND VOTING PROCEDURES

### Section 8.01 Introduction

Detailed instructions for voting on the Plan are provided with the Ballot(s) accompanying this Disclosure Statement (the "Ballot"). For purposes of the Plan, only Holders of record of Claims in the following Classes, as of the _____, 2011 voting record date established by the Debtors for purposes of this solicitation are entitled to vote:

- Class 1: 8.125% Notes Secured Claims

- Class 4: General Unsecured Claims

- Class 5: Qualified Investor Claims

- Class 6: 8.125% Notes Deficiency Claims

If your Claim or Interest is not in one of these Classes, you are not entitled to vote on the Plan, and you will not receive the Ballot with this Disclosure Statement. If your Claim is in one of these Classes, you should read your Ballot and follow the listed instructions carefully. Please use only the Ballot that accompanies this Disclosure Statement.

---

**IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, YOU MAY CONTACT THE SOLICITATION AGENT BY MAIL AT THE ADDRESS BELOW OR BY PHONE BY CALLING 1-888-369-8929.**

---

### Section 8.02  Voting

In order for your vote to be counted, your signed Ballot must be actually **received** by the Solicitation Agent at the following address before the Plan Voting Deadline of 4:00 p.m. (prevailing Eastern time) on July 8, 2011:

**If by U.S. Mail:**                                **If by Courier/Hand Delivery:**

Trico Marine Ballot Processing          Trico Marine Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC    c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014               757 Third Avenue, Third Floor
New York, NY 10150-5014                  New York, NY 10017


**IF YOU ARE A CLASS 1 HOLDER OF A 8.125% NOTES SECURED CLAIM, A CLASS 5 HOLDER OF A 3% UNSECURED DEBENTURES CLAIM OR A CLASS 6 HOLDER OF A 8.125% NOTES DEFICIENCY CLAIMS AND HOLD YOUR NOTES THROUGH A BANK, BROKER OR OTHER NOMINEE, PLEASE FOLLOW THE INSTRUCTIONS PROVIDED REGARDING SUBMISSION OF YOUR BENEFICIAL BALLOT.** UNLESS OTHERWISE DIRECTED YOU MUST RETURN YOUR BENEFICIAL HOLDER BALLOT TO YOUR NOMINEE ON OR BEFORE _____, 2011 IN ACCORDANCE WITH THE INSTRUCTIONS FROM YOUR NOMINEE, AND IN ANY EVENT, IN SUFFICIENT TIME TO PERMIT YOUR NOMINEE TO DELIVER A MASTER BALLOT INCLUDING YOUR VOTE TO THE SOLICITATION AGENT BY THE VOTING DEADLINE.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE SOLICITATION AGENT AT THE NUMBER SET FORTH ABOVE. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR

REJECTION OF THE PLAN WILL NOT BE COUNTED EITHER AS A VOTE TO ACCEPT OR A VOTE TO REJECT THE PLAN.

UNLESS A BALLOT OR MASTER BALLOT IS ACTUALLY RECEIVED BY THE SOLICITATION AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST OF THE BANKRUPTCY COURT THAT ANY SUCH VOTE BE COUNTED.

UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT, BALLOTS THAT ARE SIGNED, DATED, AND TIMELY RECEIVED, BUT ON WHICH A VOTE TO ACCEPT OR REJECT THE PLAN HAS NOT BEEN INDICATED, WILL NOT BE COUNTED FOR VOTING PURPOSES.

### Section 8.03  Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such person should indicate such capacity when signing, and may be required, upon request, to submit proper evidence satisfactory to the Debtors of authority to so act.

### Section 8.04  Change of Vote

Any party who has previously submitted to the Solicitation Agent prior to the Plan Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Solicitation Agent prior to the Plan Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan.

### Section 8.05  Waiver of Defects, Irregularities

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Solicitation Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors, in their sole discretion, may request that the Solicitation Agent attempt to contact voters to cure any defects in their Ballots.

The Debtors reserve the right to reject any and all Ballots submitted by any creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.  The Debtors further reserve their rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured on or before the Plan Voting Deadline or within such other time as the Debtors (or the Bankruptcy Court) may

determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### Section 8.06  Reservation of Rights Regarding Solicitation

THE DEBTORS RESERVE THE RIGHT, AT THEIR SOLE DISCRETION, AND WITHOUT NOTICE EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE LAW, TO EXTEND THE SOLICITATION PERIOD OR TERMINATE THEIR SOLICITATION OF VOTES ON THE PLAN.

## ARTICLE IX

## CONFIRMATION PROCEDURES

### Section 9.01  The Confirmation Hearing

Bankruptcy Code § 1128(a) requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Bankruptcy Code § 1128(b) provides that any party in interest may object to Confirmation.

The Bankruptcy Court has scheduled the Confirmation Hearing for **July 18 2011, at 11:00 a.m., prevailing Eastern Time**, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom #1, Wilmington, Delaware 19801.

Objections to Confirmation must be filed and served on the Debtors and the other parties set forth in the Disclosure Statement Order, and certain other parties, by no later than **July 8, 2011**, in accordance with the order approving the Disclosure Statement. THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.

The notice of the Confirmation Hearing will contain, among other things, the deadline to object to Confirmation, the Plan Voting Deadline, and the date and time of the Confirmation Hearing.

### Section 9.02  Statutory Requirements for Confirmation

The Debtors believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of chapter 11; and (c) the Plan has been proposed in good faith.

**Section 9.03    Amendments, Modification, or Withdrawal of Plan**

The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or part thereof, as well as the documents included as part of the Plan Supplement, including to amend or modify it to satisfy Bankruptcy Code § 1129(b), if necessary.

**Section 9.04    Identity of Persons to Contact for More Information**

Any interested party desiring further information about the Plan should contact the Solicitation Agent at the phone number and/or addresses listed page iii of this Disclosure Statement.

## ARTICLE X

## CONCLUSION AND RECOMMENDATION

The Debtors believe that the Plan is in the best interests of all Holders of Claims and Interests, and urge those Holders of Claims entitled to vote to accept the Plan to evidence such acceptance by returning their Ballots so they will be RECEIVED by the Solicitation Agent no later than **July 8**, **2011**.

*[Signature Pages Immediately Follow]*

Dated: May 25, 2011

TRICO MARINE SERVICES, INC.
on Behalf of Itself and the Other Debtors

By: ___/s/ *John Castellano*_____
     Name: John Castellano
     Title: Chief Restructuring Officer

May 25, 2011
Wilmington, Delaware

Respectfully submitted,

*/s/ Andrew R. Remming*
Robert J. Dehney (No. 3578)
Eric D. Schwartz (No. 3134)
Andrew R. Remming (No. 5120)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
Tel:  302.658.9200
Fax:  302.658.3989

-and-

John E. Mitchell
Tonya M. Ramsey
John P. Napier
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Tel:  214.220.7700
Fax: 214.999.7787
jmitchell@velaw.com
tramsey@velaw.com
adegeyter@velaw.com

Steven M. Abramowitz
Alexandra S. Kelly
666 Fifth Avenue, 26th Floor
New York, New York 10103-0040
Tel:  212.237.0000
Fax:  212.237.0100

*Attorneys for the Debtors and*
*Debtors-in-Possession*