# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRICO MARINE SERVICES, INC., *et al.*, | Case No. 10-12653 (BLS) |
| Debtors. | Jointly Administered |
| | Ref. Docket Nos. 1320, 1350, 1356, and 1360 |
| | Hearing Date: July 18, 2011 at 11:00 a.m. (ET) |

## OBJECTION OF TENNENBAUM DIP OPPORTUNITY FUND, LLC, TENNENBAUM OPPORTUNITIES PARTNERS V, LP, AND SPECIAL VALUE CONTINUATION PARTNERS, LP TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) DISALLOWING ANY GUARANTY CLAIMS OF THE TENNENBAUM LENDERS OR (II) IN THE ALTERNATIVE, ENFORCING THE OPCO SETTLEMENT ORDER AGAINST THE PARTIES TO THE OPCO SETTLEMENT

Tennenbaum DIP Opportunity Fund, LLC, Tennenbaum Opportunities Partners V, LP, and Special Value Continuation Partners, LP (collectively, "**Tennenbaum**") respectfully submit the following objection (the "**Objection**")[1] to the Debtors' Motion for Entry of an Order (I) Disallowing Any Guaranty Claims of the Tennenbaum Lenders or (II) In the Alternative, Enforcing the Opco Settlement Order Against the Parties to the Opco Settlement (the "**Motion**"). In support of their objection, Tennenbaum respectfully submits the following memorandum.

---

[1] All facts herein are supported by the Declaration of David A. Hollander, attached hereto as Exhibit A and the Declaration of Robert A. Klyman, attached hereto as Exhibit B.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II. RELEVANT BACKGROUND ...............................................................................4

    A.    Opco's Secured Indebtedness. ......................................................................4

           1.    The Working Capital Facility. .............................................................4

           2.    The High Yield Notes. ........................................................................5

    B.    The Debtors' Bankruptcy, The Official Committee Investigation, And The Standing Motion.........................................................................................6

    C.    The Proposed Settlement Of The Holdco Estates' Potential Avoidance Claims. .....................................................................................................7

    D.    The Hearing on the 9019 Settlement Motion.........................................11

    E.    The Negotiation of the 9019 Order. ........................................................14

    F.    The Negotiation of the Debt for Equity Exchange by Tennenbaum. ......16

III. ARGUMENT.........................................................................................................21

    A.    Tennenbaum Authorized Nordea, as Agent for the Working Capital Facility, to File Proofs of Claim on Tennenbaum's Behalf and Preserve Tennenbaum's Rights Under the Guarantees ...........................................21

    B.    Tennenbaum Did Not Waive Any of Its Rights Under the Guarantees.................24

    C.    The Debtors Cannot Deduct From the Guarantees Any of Tennenbaum's Recovery In the Opco Restructuring.........................................................30

           1.    The Debtors Waived Any Defense to Performance Under the Guarantees Other than Payment in Full and in Cash. ...............30

           2.    As a Matter of Bankruptcy Law, Tennenbaum Need Not Deduct From its Claim against the Debtors the Consideration Received Under the Opco Restructuring. ..........................................32

IV. CONCLUSION.......................................................................................................34

YCST01:11243566.1                                                        069543.1001

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Citibank v. Plapinger,*
  66 N.Y.2d 90 (1985)............................................................................31

*Citicorp Leasing Inc., v. United American Funding, Inc.,*
  2005 WL 1847300 (S.D.N.Y. 2005) ...................................................31

*First New York Bank for Business v. DeMarco,*
  130 Bankr. 650 (S.D.N.Y. 1991).........................................................32

*Gannett v. Tesler,*
  577 N.Y.S.2d 248 (1991) .....................................................................31

*In re Bradlees Stores, Inc.,*
  2001 U.S.Dist. LEXIS 14755 (Bankr. S.D.N.Y. 2001).....................28

*In re Ionosphere Clubs, Inc.,*
  101 B.R. 844 (Bankr. S.D.N.Y. 1989) ...............................................23

*In re Jamesway Corp.,*
  201 B.R. 73 (Bankr. S.D.N.Y. 1996) .................................................28

*In re National Energy & Gas Transmission, Inc.,*
  492 F.3d 297 (4th Cir. 2007)...............................................................33

*In re North Bay Gen. Hosp., Inc.,*
  404 B.R. 443 (Bankr. S.D.N.Y. 2009) ...............................................23

*Ivanhoe Building & Loan Ass'n v. Orr,*
  295 U.S. 243 (1935) ......................................................................32, 34

*Mission Towers v. Grace,*
  2007 U.S. Dist. LEXIS 89913 (D. Del. 2007).....................................21

*Nation Wide, Inc. v. Scullin,*
  256 F. Supp. 929 (D.N.J. 1966)..........................................................32

*Port Distrib. Corp. v. Pflaummer,*
  880 F. Supp. 204 (S.D.N.Y., aff'd 70 F.3d 8 (2d Cir. 1995)..............28

*Red Tulip, LLC v. Neiva,*
  44 A.D.3d 204 (1st Dep't 2007).........................................................32

YCST01:11243566.1
069543.1001

*Sterling Nat. Bank v. Biaggi,*
   47 A.D.3d 436 (1st Dep't 2008).........................................................................32

## STATUTES

11 U.S.C. § 365(f)...............................................................................................28

## OTHER AUTHORITIES

*Restatement (second) Agency* § 15 (1958)...........................................................21

YCST01:11243566.1
069543.1001

# I.

## INTRODUCTION

1.    Tennenbaum holds a valid claim against the Debtors arising under the Debtors' Guarantees[2] of approximately $27 million of unpaid debt owed by Trico Shipping AS, one of the foreign non-debtor operating subsidiaries of the Debtors ("**Opco**"), pursuant to that certain Amended Credit Agreement dated October 30, 2009, as amended, among Trico Shipping AS, the Debtors, and originally with Nordea Bank Finland PLC, New York Branch, as Administrative Agent and Unicredit Bank AG (f/k/a Bayerische Hypo-Und Vereinsbank) (the "**Working Capital Facility**").[3] The Debtors' Motion[4] improperly seeks to disallow this claim. Because the Debtors have neither the law nor the facts on their side, the Motion is littered with slanders and irrelevant obfuscations. But despite the Debtors' attempt to confuse the issues, the following facts are not even in dispute: Opco borrowed approximately $28 million from Tennenbaum under the Working Capital Facility; of the $28 million originally borrowed, approximately $27 million of principal and interest remains outstanding, all of which is due and payable; the Debtors executed Guarantees of all obligations owed by Opco under the Working Capital Facility, including those owed to Tennenbaum; the Guarantees are valid and enforceable under state law; the agent for the lenders under the Working Capital Facility timely filed a proof of claim with respect to the Guarantees; Tennenbaum is not a party to any contract under which

---

[2]    The Guarantees are comprised of, collectively, (i) the Trico Marine guaranty (the "**Trico Marine Guaranty**") (ii) the Cayman guaranty (the "**Cayman Guaranty**") and (iii) the Marine Holdco guaranty (the "**Marine Holdco Guaranty**"). The Trico Marine Guaranty was established pursuant to the *Subordinated Parent Guaranty*, attached to the Declaration of David A. Hollander as Exhibit 2. The Cayman Guaranty and the Marine Holdco Guaranty were established pursuant to Article 13 of the Working Capital Facility (defined herein).

[3]    Relevant excerpts of the Working Capital Facility are attached as Exhibit 1 to the Declaration of David A. Hollander.

[4]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

its rights under the Guarantees have been released; and the contracts executed by Tennenbaum under which it exchanged its Opco debt for equity expressly preserved Tennenbaum's rights under the Guarantees and provided that the Guarantees were not subject to the releases contained therein.

2.     What then, is the basis for the Motion to disallow Tennenbaum's claims?  It is this: the Debtors contend that Tennenbaum waived its rights under the Guarantees when Tennenbaum withdrew its objections to the settlement between the Debtors, Opco, and the Opco Steering Committee of High Yield Noteholders (the "**9019 Settlement**").  This argument relies entirely on one paragraph of the Order Approving the 9019 Settlement (the "**9019 Order**"), which states that the releases approved in the 9019 Settlement would become effective "in accordance with their terms" on the effective date of the Opco Restructure.  9019 Order at ¶ 8.

3.     The Debtors' argument is false and the Motion should be overruled.  At least four different provisions in the 9019 Order show that Tennenbaum preserved its claim under the Guarantees.  Moreover, the releases that were approved in the 9019 Settlement were contained in a contract, the Restructuring Support Agreement (as defined below), that Tennenbaum never became a party to and is not bound by in any way.  The only parties who waived their claims under guarantees issued by the Debtors were the High Yield Noteholders (as defined below), who did so by becoming parties to the Restructuring Support Agreement.  It is uncontroverted that Tennenbaum was never a party to the Restructuring Support Agreement. On the contrary, the only contracts that Tennenbaum executed in connection with the transactions contemplated by the Restructuring Support Agreement expressly stated that Tennenbaum was _not_ waiving its rights against the Debtors under the Guarantee or otherwise.  In fact, the _only_ provision of any

order or document implementing the 9019 Settlement or the Opco Restructuring that mentions any guaranty specifically provides that the holders of High Yield Notes, <u>but not Tennenbaum</u>, waived their respective guarantees against the Debtors.

4.     The Debtors also incorrectly argue that their liability under the Guarantees should be reduced by the value of the stock and other consideration received by Tennenbaum through the exchange of the debt owed under the Working Capital Facility into equity as part of the Opco Restructuring.  The Debtors contend that a conversion of debt into equity constitutes a "payment" of such debt and reduced the amount of the Guaranty Claims (as defined in the Motion) that Tennenbaum can assert a claim for in these cases.  The argument that receipt of stock in exchange for debt constitutes "payment" of the Guaranty Claims conflicts with the Guarantees and New York state law.  The argument that Tennenbaum's claim under the Guarantees can be reduced by the value of consideration it received from Opco is also wrong as a matter of federal law. The Guarantees provides that Debtors guaranteed the payment of the Guaranty Claims "in full, in cash."  Receipt of stock, regardless of its value, is not "payment" and certainly not "payment in full, in cash" as required by the express language of the Guarantees, and the Guarantees contain waivers by the Debtors of any rights to the contrary. Further, the Debtors' argument that the amount of Tennenbaum's claims against the Debtors must be reduced by the value of consideration it receives from a third party conflicts with Supreme Court case law that preserves Tennenbaum's rights to enforce the full amount of the Guarantees against the Debtors.

5.     In short, the Motion is frivolous.  It is replete with erroneous assertions and misleading omissions and represents another of the Debtors' repeated efforts to deprive Tennenbaum of the benefit of its bargain.  Tennenbaum respectfully requests the Court to deny

the Motion and hold that (a) Tennenbaum DIP Opportunity Fund, LLC holds an allowed unsecured claim arising out of the Guarantees in the amount of at least $13,495,171.05, (b) Tennenbaum Opportunities Partners V, LP, holds an allowed unsecured claim arising out of the Guarantees in the amount of at least $9,956,962.92 and (c) Special Value Continuation Partners, LP is entitled to an allowed unsecured claim arising out of the Guarantees in the amount of $3,538,208.13, plus in each case an award of fees and costs incurred by Tennenbaum in responding to the Motion.[5]

## II.

## RELEVANT BACKGROUND[6]

### A. Opco's Secured Indebtedness.

#### 1. The Working Capital Facility.

6.     Tennenbaum extended credit to the Debtor and certain of its subsidiaries at two different levels and pursuant to two separate facilities. First, Tennenbaum was a prepetition lender and DIP lender to the Debtors. The DIP loan, which the Debtors defaulted on almost immediately after its funding, has been repaid, and is not the subject of Tennenbaum's claim or this Objection.[7]

7.     Separate and apart from the DIP loan, Tennenbaum also extended credit to Opco pursuant to the Working Capital Facility. The Working Capital Facility was created on or about October 30, 2009. Tennenbaum was not a lender under the Working Capital Facility at that time.

---

[5]     The Plan classifies the Guarantees in Class 5. Concurrently herewith, Tennenbaum filed an objection to confirmation seeking, among other things, an order classifying Tennenbaum's claims in Class 6.

[6]     The following facts are drawn from the concurrently filed Declarations of David A. Hollander and Robert A. Klyman. Tennenbaum expects that additional facts will be adduced through ongoing expedited discovery.

[7]     It is not clear why the Motion discusses the terms of the DIP loan or the legal expenses incurred by Tennenbaum in defending itself from the Debtors' previous litigation tactics since the DIP loan is not the basis of Tennenbaum's proofs of claim.

After the Working Capital Facility had been amended and restated, Tennenbaum became a lender thereunder on June 11, 2010, when the original Working Capital Facility was amended and restated. The Working Capital Facility was amended again, and Opco borrowed approximately $28 million from Tennenbaum under the amended Working Capital Facility. As of May 24, 2011, approximately $26.9 million of principal and interest remained outstanding in principal amount under the loans extended by Tennenbaum to Opco under the Working Capital Facility. See Declaration of David A. Hollander at ¶ 3.

8.　　Indebtedness under the Working Capital Facility, including the indebtedness owed to Tennenbaum is guaranteed by certain indirect corporate parents of Trico Shipping, i.e., Trico Marine Services, Trico Holdco, LLC, and Trico Marine Cayman, LP (collectively, the "**Holdco Guarantors**"). Such indebtedness was also guaranteed by (i) the immediate corporate parent of Trico Shipping, i.e., Trico Supply; and (ii) the direct and indirect subsidiaries of Trico Supply and Trico Shipping (the "**Subsidiary Guarantors**") (together with Trico Supply, the "**Opco Guarantors**"). The guarantees by the Opco Guarantors were released in the Restructuring, but the guarantees of the Working Capital Facility by the Holdco Guarantors were not released. Declaration of David A. Hollander at ¶ 4.

### 2.　The High Yield Notes.

9.　　On or about October 30, 2009, the same date as the original Working Capital Facility, Opco issued $400.0 million aggregate principal amount of High Yield Notes (the "**High Yield Notes**") pursuant to that certain Senior Secured Notes Indenture (the "**Senior Secured Notes**"). The Trustee for the Senior Secured Notes is Deutsche Bank National Trust Company (the "**High Yield Noteholders**"). As of February 25, 2011, on information and belief, approximately $26.5 million of the principal amount of High Yield Notes had been redeemed at 100% of such amount, plus approximately $3.1 million in interest, leaving approximately

5

$373.5 million of principal outstanding under the High Yield Notes. The indebtedness under the High Yield Notes was guaranteed by the Holdco Guarantors and certain subsidiaries of Opco.

10.     Almost immediately after Tennenbaum extended credit to Opco under the Working Capital Facility, it became apparent that the representations and projections made by Opco to induce Tennenbaum to extend such credit were fraudulent. Soon thereafter, Opco defaulted under both the Working Capital Facility and the High Yield Notes. The obligations owed to Tennenbaum under the Working Capital Facility have been accelerated. Declaration of David A. Hollander at ¶ 5.

**B.      The Debtors' Bankruptcy, The Official Committee Investigation, And The Standing Motion.**

11.     On August 25, 2010, the Debtors (which include the Holdco Guarantors and certain affiliates, but not Opco) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.

12.     On November 24, 2010, the Official Committee filed its *Motion of the Official Committee of Unsecured Creditors For Entry of an Order Granting Leave, Standing and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates* [Holdco D.I. 534] ("**Standing Motion**"), wherein the Official Committee described certain potential avoidance actions belonging to the estates of the Debtors ("**Holdco Estates**") against the Senior Secured Notes Indenture Trustee, the Collateral Agent, Trico Shipping, and Trico Supply, all arising in connection with the incurrence of the $400 million in debt under the High Yield Notes and the collateralization of that debt.

13.     Specifically, the Standing Motion and the draft complaint attached thereto as Exhibit A ("**Complaint**") asserted that the Holdco Estates were entitled to the following relief: (i) avoidance of the guarantees given by the Holdco Guarantors in respect of the Senior Secured

6

Notes as constructive fraudulent transfers, (ii) avoidance of Trico Marine Services' subordination of its rights under certain intercompany notes receivable in favor of the Senior Secured Notes as constructive fraudulent transfers, (iii) avoidance of the debt incurred and collateral granted by Trico Shipping in respect of the High Yield Notes as constructive fraudulent transfers, (iv) avoidance of the debt incurred and the collateral granted by Trico Supply in respect of the High Yield Notes as constructive fraudulent transfers, and (v) collection of three intercompany notes receivable ("**Intercompany Notes**"). *See* Exhibit A to Standing Motion. The Complaint did not list Tennenbaum as a defendant or seek to challenge or avoid the Working Capital Facility or the Guarantees thereof.

**C.     The Proposed Settlement Of The Holdco Estates' Potential Avoidance Claims.**

14.     On December 6, 2010, the Debtors filed a motion in the Bankruptcy Court seeking authority to enter into a comprehensive restructuring of the indebtedness owing to Trico Shipping and Trico Supply, and settlement of certain of the Debtors' claims against and equity interests in those entities (as modified, the "**9019 Settlement**"). *See Motion Pursuant To Bankruptcy Code Sections 105 and 363 and Bankruptcy Rule 9019 For an Order Authorizing the Debtors to Compromise Certain Intercompany Claims and Equity Interests* [Holdco D.I. 581] ("**9019 Settlement Motion**").

15.     As reflected in the 9019 Settlement Motion, Trico Shipping, Trico Supply, the Debtors, and the members of a steering comprised of the holders of an aggregate 83% of the Senior Secured Notes (the "**Steering Committee**") reached agreement on a term sheet ("**Initial Termsheet**") and executed a restructuring support agreement ("**Restructuring Support**

YCST01:11243566.1                                    069543.1001

**Agreement**")[8] contemplating, among other things the release of the debt under the Working Capital Facility and the High Yield Notes (including the guarantee liability of the Debtors) in exchange for the issuance to the holders thereof of 100% of the equity in a reorganized entity through which the Opco entities would be held ("**Reorganized Opco**"), and the issuance to the Debtors of out-of-the-money warrants representing 5% of the equity in Reorganized Opco[9] (such actions collectively, the "**Opco Restructuring**").

16.     The Initial Term Sheet, however, did *not* purport to settle the fraudulent transfer claims articulated in the Standing Motion. *See* 9019 Settlement Motion ¶¶ 5 and 58. Moreover, at the time the Debtors filed the 9019 Settlement Motion, the Official Committee was not a party to the proposed settlement and objected to its approval.

17.     Prior to hearings on the Standing Motion and the 9019 Settlement Motion, the Debtors, the Steering Committee, and the Official Committee negotiated and ultimately reached agreement on a modified settlement and compromise to which the Official Committee would also agree.[10]   On February 3, 2011, the Debtors filed a revised term sheet ("**Revised Termsheet**") describing the modified deal.[11]

18.     The salient differences in the Revised Term Sheet were that it now proposed as part of the restructuring to release all fraudulent transfer claims and causes of action articulated

---

[8]     The Initial Termsheet and Restructuring Support Agreement were attached to the 9019 Settlement Motion.

[9]     The Initial Term Sheet and executed Restructuring Support Agreement were attached as Exhibits A and B, respectively, to the 9019 Settlement Motion.

[10]     *See Debtors' Memorandum in Further Support of Their Motions (I) Pursuant to Bankruptcy Code Sections 105 and 363 and Bankruptcy Rule 9019 for an Order Authorizing the Debtors to Compromise Certain Intercompany Claims and Equity Interests and (II) for Approval of Executive Compensation and Employee Incentive Plan for Non-Debtor OPCO Subsidiaries* [Holdco D.I. 860] ("**Settlement Motion Supplement**").

[11]     *See Notice of (I) Settlement of Committee's Objections To The Debtors' Motion Pursuant To Bankruptcy Code Sections 105 and 363 and Bankruptcy Rule 9019 For an Order Authorizing the Debtors to Compromise Certain Intercompany Claims and Equity Interest and (II) Revised Restructure Support Agreement Term Sheet* [Holdco D.I. 857] ("**Modified Settlement Notice**"). The Revised Term Sheet was attached thereto as Exhibit A and a blackline of the document was attached thereto as Exhibit B.

in the Standing Motion and draft Complaint, and to provide that (i) the Debtors receive 5% of the equity in Reorganized Opco plus warrants to purchase an additional 10% of the equity in Reorganized Opco under a restructuring transaction for the Opco Entities, (ii) the holders of the debt under the Working Capital Facility and the Senior Secured Notes receive only 95% of the equity in Reorganized Opco under that transaction, and (iii) the Opco entities would pay the Debtors the sum of $1 million, conditioned on the effectuation of that transaction. *See* Modified Settlement Notice, Exhibit B at 4; Settlement Motion Supplement at 10-12.

19.    As a condition to the settlement reflected in the Revised Term Sheet, the Official Committee was required to withdraw its Standing Motion and its objection to the 9019 Settlement Motion. *See* Modified Settlement Notice, Exhibit B at 8.

20.    Tennenbaum, as lender to the Debtors, filed an objection to the 9019 Settlement on January 12, 2011 with a supplemental objection filed on February 8, 2011.[12] The basis for these objections included that the 9019 Settlement would dispose of the Intercompany Notes, which constituted collateral for Tennenbaum's prepetition first lien loans and DIP loans to the Debtors. In exchange for such collateral, the Debtors initially negotiated to receive warrants issued by Opco that would constitute proceeds of both the Intercompany Notes. The Debtors later proposed a modified 9019 Settlement that provided for the Debtors (a) to release fraudulent conveyance claims against the High Yield Noteholders, and (b) to receive a direct grant of equity of Opco in addition to the allocation of warrants described above. The Debtors and the Official Committee made no secret of their intention to argue that the stock and warrants that the Debtors

---

[12]    *See Objection to Debtors' Motion Pursuant to Bankruptcy Code Sections 105 and 363 for an Order Authorizing the Debtors to Compromise Certain Intercompany Claims and Interests Objection to the 9019 Settlement, filed by Obsidian Agency Services, Inc., Special Value Continuation Partners, LP, Tennenbaum DIP Opportunity Fund, LLC, Tennenbaum Opportunities Partners V, LP,* [D.I. 753]; *see also Supplemental Objection to Debtors' Motion Pursuant to Bankruptcy Code Sections 105 and 363 and Bankruptcy Rule 9019 for an Order Authorizing the Debtors to Compromise Certain Intercompany Claims and Equity Interests,* [D.I. 890].

would receive under the 9019 Settlement were all attributable to the fraudulent conveyance claim and not the Intercompany Notes, and that Tennenbaum would not have a lien on the stock and warrants to be received by the Debtors. For example, counsel for the Official Committee told the Court that:

> From our perspective, the reason we were able to negotiate the improved deal is because we were in a position to settle the fraudulent conveyance claims. So from our perspective *the real value in the settlement is the fraudulent conveyance claims*, as opposed to the notes, which I think everybody in the room probably acknowledges, have no monetary value in themselves. And I believe the term sheet expresses the view that the real value here is in terms of fraudulent conveyance. *And I think all the parties of settlement do agree with that.*

9019 Settlement Hearing Transcript, dated February 10, 2011 (the "**2/10/11 Hearing Transcript**") [Holdco D.I. 917] at 121:20-122:4 (emphasis added). Similarly, counsel for Arrowgrass Master Fund reiterated that the resolution of the fraudulent transfer claims was the primary driver behind the proposed settlement. *See id.* at 128:5-23. Likewise, advisors to the Debtors argued that the intercompany notes had no independent value, contending that "the enterprise value of the Opco Subsidiaries will not exceed the aggregate senior secured debt presently in place" and that "it is unlikely that the Debtors would realize any value from the Intercompany Claims or Existing Equity absent Court approval of the Settlement." *Declaration of John R. Castellano in Support of [the Debtors' 9019 Motion]* [Holdco D.I. 861] ¶ 22. *See also Declaration of Stephen Sieh in Support of [the Debtors' 9019 motion]* [Holdco D.I. 862] ("**Sieh Declaration**") ¶ 19 ("[I]t is Evercore's belief that the Opco Subsidiaries cannot currently sustain their current debt levels, and . . . the Intercompany Notes owed to Holdco would receive no recovery on an absolute priority distribution basis.").

21.     Tennenbaum never objected to the substance of the 9019 Settlement or the Restructuring Support Agreement approved thereby. Tennenbaum's primary objections to the

9019 Settlement were limited to the issue of ensuring that the consideration that the Debtors would receive under the 9019 Settlement would continue to be collateral for Tennenbaum's loans to the Debtors. In Tennenbaum's capacity as lender to Opco under the Working Capital Facility, Tennenbaum had no objections to the 9019 Settlement or the Restructuring Support Agreement because Tennenbaum was not a party to the Restructuring Support Agreement and was not bound by its terms. The only circumstances in which the Restructuring Support Agreement could bind Tennenbaum as a lender to Opco was one in which Opco and the other parties to the Restructuring Support Agreement implemented its terms through a bankruptcy of Opco or if Tennenbaum voluntarily consented to become a party thereto. Neither of these events happened. Further, at the hearing to approve the 9019 Settlement held on February 10, 2011, as discussed in greater detail below, Tennenbaum, as lender to Opco, expressly reserved its rights to oppose any plan of reorganization for Opco that attempted to implement the 9019 Settlement. Declaration of David A. Hollander at ¶ 7.

**D.    The Hearing on the 9019 Settlement Motion.**

22.    The hearing on the 9019 Settlement Motion was held on February 10, 2011. The main purpose of the hearing was to resolve Tennenbaum's objections to the 9019 Motion and to the Debtors' continued use of cash collateral, which Tennenbaum sought to limit as a result of the Debtors' continued breach of previous cash collateral orders. As noted above, Tennenbaum objected to the 9019 Settlement in its capacity as a lender to the Debtors because the 9019 Settlement sought to convert Tennenbaum's collateral under Tennenbaum's prepetition first lien loan and DIP Loan – e.g., Intercompany Notes– into equity of Reorganized Opco that Tennenbaum might not have a lien on.

23.    The Motion argues that, by withdrawing its objection to the 9019 Settlement, Tennenbaum became subject to the releases in the Restructuring Support Agreement, and agreed

11

to release its Guarantees, in exchange for the "concessions" it received in respect of the use of cash collateral:

> The Tennenbaum Lenders, therefore, acquiesced to the 9019 Settlement and its release and waiver of any claims (including the Guaranty Claims) against the Debtors—no doubt in exchange for the major concessions they received for the withdrawal of their objection to the 9019 Motion and the cash collateral resolution.

Motion at 22. The hearing on the 9019 Settlement is devoid of any evidence in support of this argument. Tennenbaum withdrew its opposition to the 9019 Settlement only because the Debtors agreed that Tennenbaum's lien on the Intercompany Notes would attach to the 9019 Settlement consideration. *See* 2/10/11 Hearing Transcript at p 24:

> For the avoidance of doubt, the DIP obligations will be secured by the first priority liens and not subject to any prior liens in the proceeds of the 9019 settlement and the consideration for that settlement, any avoidance actions and the proceeds of avoidance actions.

The withdrawal by Tennenbaum of its objections to the 9019 Settlement did not make Tennenbaum a party to the Restructuring Support Agreement, which is the agreement that contains the releases of the Guarantees. No one contends that Tennenbaum was ever a party to the Restructuring Support Agreement, and the Debtor's argument that Tennenbaum nevertheless became bound by one provision of it (the releases) by withdrawing its objections to the 9019 Settlement is without merit. As confirmed by Debtors' counsel, the agreement with Tennenbaum that led to the withdrawal of Tennenbaum's objection to the 9019 Settlement only related to:

> continued use of cash collateral and treatment of DIP financing obligations until [the Debtors] are able to pay [Tennenbaum, as prepetition first lien lender and DIP Lender to the Debtors] in full. . . . And that is an agreement which is tied to the 9019 and they've given their agreement to the 9019 to go through in light of the fact that we've agreed on the use of cash collateral and treatment of the remaining DIP financing claims.

2/10/11 Hearing Transcript at 15, lines 5-12 (emphasis added).

YCST01:11243566.1 069543.1001

Debtors' counsel again reiterated that Tennenbaum's agreement with respect to the 9019 Settlement was (a) unrelated to the Guarantees and instead (b) tied only to Tennenbaum's rights in connection with cash collateral and DIP Financing:

> We have an agreement with Tennenbaum that we would like to – Mr. Klyman to read into the record. <u>And it's the terms of the continued use of cash collateral and treatment of the DIP financing</u>.

2/10/11 Hearing Transcript at 15, lines 18-21 (emphasis added).

24. The sole support given by the Debtors for their argument that Tennenbaum's withdrawal of objections to the 9019 Settlement constituted an agreement by Tennenbaum to waive its claims under the Guarantees is a quote from page 26 of the 2/10/11 Hearing Transcript where counsel to Tennenbaum withdrew the "secured lenders" objection to the 9019 Settlement. *See* Motion at Section 46, page 22. As demonstrated throughout the 2/10/11 Hearing Transcript, however, "secured lenders" refers exclusively to Tennenbaum in its capacity as Prepetition First Lien Lender and DIP Lender to the Debtors – not as holder of any Guarantees against the Debtors. Further, the full quote of the passage from the 2/10/11 Hearing Transcript shows that Tennenbaum was expressly reserving its rights to challenge any plan of reorganization that sought to implement the 9019 Settlement:

> The secured lenders will withdraw any objection to the 9019 settlement as creditors in the -- in these cases. ***But they reserve all of their rights with respect to claims and rights as creditors of Opco, including with respect to any plan that seeks to implement the 9019 settlements.*** 2/10/11 Hearing Transcript at page 26-27 [emphasis added].

25. The reservation of rights by Tennenbaum as creditor of Opco was clear and precise. If Opco filed for bankruptcy and sought to implement the 9019 Settlement—including the releases therein—over Tennenbaum's objection, Tennenbaum reserved the right to object to such plan. If Opco did not file for bankruptcy, Tennenbaum as Opco creditor had no objections

to the 9019 Settlement, and did not need to preserve rights against it, because the 9019 Settlement and the releases contained therein did not bind Tennenbaum.

**E.    The Negotiation of the 9019 Order.**

26.    The 9019 Order, among other things, approved the substitution of the Revised Termsheet for the Initial Termsheet attached to the Restructuring Support Agreement, and authorized the Debtors to enter into the Restructuring Support Agreement and consummate the transactions contemplated thereby.   The Restructuring Support Agreement itself is simply a contract.   The parties to the Restructuring Support Agreement were the Debtors, Opco and its subsidiaries, members of the Steering Committee and the Official Committee.   Tennenbaum was never a party to the Restructuring Support Agreement.   It should go without saying that the Restructuring Support Agreement only bound those who became parties to that contract.

27.    On February 12, 2011, counsel for the Debtors circulated to Tennenbaum a draft of the 9019 Order.   Multiple drafts were exchanged among the parties and a final version was agreed to on or about February 16, 2011.   The Court entered the 9019 Order on February 17, 2011.   *See* [D.I. 930]; *see also* Declaration of David A. Hollander at ¶ 8.

28.    The 9019 Order contains the following provision:

> 8.    Upon the Effective Date (as defined in the Revised Term Sheet) of the Settlement, the releases included therein shall be immediately effective and enforceable and deemed binding in accordance with their terms, notwithstanding any subsequent appointment of any trustee (including any chapter 7 trustee appointed in any of the Debtors' Cases) or other fiduciary under any section of any chapter of the Bankruptcy Code.   In addition, the terms of the Settlement shall continue notwithstanding any foreclosure or sale of the Intercompany Notes and Fraudulent Transfer Claims (as defined in the Revised Term Sheet) and the holders of those Intercompany Notes and Fraudulent Transfer Claims (to the extent the foregoing foreclosure or sale occurs) shall have the right to enforce the term and conditions of the Settlement and receive the proceeds of the Settlement.

9019 Order ¶ 8.

14

It is this provision—Section 8 of the 9019 Order—that forms the entire basis of the Debtors' argument that Tennenbaum waived its claims under the Guarantee upon the effectiveness of the Restructuring Support Agreement. Notably, Section 8 does not even refer to Tennenbaum as a party bound by it. It only says that the releases contained in the Revised Term Sheet would become effective "in accordance with their terms." But the terms of such releases were only binding on the parties to the Restructuring Support Agreement, which included the High Yield Noteholders, but not Tennenbaum. The effectiveness of the Restructuring Support Agreement would have released only the guaranty claims of the High Yield Noteholders, but not Tennenbaum's rights under the Guarantees.

29.     The fact that the releases in the Revised Term Sheet only released (and were only intended to release) the Guarantee claims of the High Yield Noteholders and not Tennenbaum is shown by Section 5 of the 9019 Order:

> 5.     For the avoidance of doubt, upon the occurrence of the Effective Date of the Settlement, the holders of the High Yield Notes forever release and waive any claim of any kind they may hold against the Debtors for any guaranties provided under any of the documents evidencing the issuance of the High Yield Notes.

Unlike Section 8 of the 9019 Order, which makes no reference to Tennenbaum or the Guarantees, Section 5 clearly and unambiguously refers solely to the High Yield Note holders as the only parties who were releasing their claims under Guarantees made by the Debtors upon the effective date of the Settlement.

30.     To avoid any possibility that any provision of the Restructuring Support Agreement, the Revised Termsheet, or the releases could be deemed to limit any rights that Tennenbaum held against the Debtors, Tennenbaum added the following provision to the 9019 Order, which preserves all rights that Tennenbaum holds directly against the Debtors and Opco:

11. Notwithstanding anything in this Order to the contrary, nothing contained herein shall:

(a) modify, limit or impact in any way the respective rights of (i) Obsidian Agency Services, Inc., Tennenbaum DIP Opportunity Fund, LLC, Tennenbaum Opportunities Partners V, LP, and Special Value Continuation Partners, LP, or any of their respective affiliates (collectively, "Obsidian") and (ii) Nordea Bank Finland PLC, New York Branch ("Nordea"), each as creditors of Opco Subsidiaries, against any party or entity, including without limitation the Opco Subsidiaries, their respective non-Debtor affiliates and each of their respective assets, officers, directors, agents, employees, representatives;

(b) modify, limit or impact in any way the rights of (i) Obsidian that Obsidian holds directly and not as a derivative claim released by the Debtors, (ii) the Second Lien Note Parties hold directly and not as a derivative claim released by the Debtors and (iii) Nordea that Nordea holds directly and not as a derivative claim released by the Debtors; or

(c) modify, limit or impact in any way any rights granted to Obsidian, Nordea, Nordea Bank Norge ASA, Cayman Islands Branch or the Second Lien Note Parties under any other order of this Court relating to financing or use of cash collateral; provided, however, that that the conversion of the Intercompany Notes and Fraudulent Conveyance Claims which constitute collateral pledged to Obsidian is hereby approved subject to the terms of (i) the Revised Term Sheet, (ii) the order of the Court relating to cash collateral as (x) "so ordered" on the record on February 10, 2011 and (y) reflected in a subsequent written order of this Court.

As discussed in Section III B below, clauses (a), (b) and (c) of this Section 11 each provides for an independent ground for preserving all rights that Tennenbaum has under the Guarantees.

**F.     The Negotiation of the Debt for Equity Exchange by Tennenbaum.**

31.     Shortly after the entry of the 9019 Order, based on information and belief, Opco commenced a solicitation of the holders of its High Yield Notes requesting them to consent to the Opco Restructuring or, if that could not be implemented out of court, to a pre-packaged plan of reorganization that would seek to implement the Opco Restructuring over the objection of non-consenting parties.   One condition to the effectiveness of the out of court Opco Restructuring was that Tennenbaum and the other lenders under the Working Capital Facility participated in the proposed exchange of debt for equity.   Opco solicited Tennenbaum's

16

participation in the exchange offer, and Tennenbaum declined to participate. One reason that Tennenbaum did not agree to participate in the exchange offer on the original terms was that such terms would have required Tennenbaum to waive rights against the Debtors (including the Guarantees) and its directors and officers, which Tennenbaum was not willing to do. The request that Tennenbaum participate in the exchange offer on the same terms as the High Yield Noteholders was unfair and unjustified because the basis for the payment of consideration to the Debtors, which diluted Tennenbaum's recovery, was the release of the fraudulent conveyance claims asserted by the Official Committee against the High Yield Noteholders, but not Tennenbaum. As noted above, the Debtors and the Official Committee asserted that substantially all of the value of the consideration to be received by the Debtors was attributable to the release of the fraudulent conveyance claims, but the release of those claims was only of value to the High Yield Noteholders, not Tennenbaum. Accordingly, Tennenbaum would have received less consideration than the High Yield Noteholders under the proposed terms of the Opco Restructuring.

32.     Tennenbaum, Opco and the Steering Committee then entered into extensive negotiations on the terms under which Tennenbaum would be willing to participate in the Opco Restructuring. At no time did any party assert to Tennenbaum that it was already bound by the Restructuring Support Agreement. Tennenbaum's eventual consent to the Opco Restructuring was memorialized in two documents negotiated, drafted and executed nearly two months after entry of the 9019 Order. These are the Lender/Opco Agreement, dated May 13, 2011 (the "**Lender/Opco Agreement**") and the Contribution Agreement (the "**Contribution Agreement**") which are appended to the Declaration of David A. Hollander as Exhibits 3 and 4, respectively. Each of those agreements specifically and expressly provided that Tennenbaum retained all of its

rights under the Guarantees.

33.     The Lender/Opco Agreement memorialized Tennenbaum's participation in the Opco Restructuring. This Agreement specifically carved out of its release section any of Tennenbaum's rights under the Guarantees. *See* Lender Opco Agreement at Section 19(A)(1): the releases under the Opco Restructuring "shall not include . . . any and all Rights and Claims held by [Tennenbaum] against any third party (whether directly, indirectly or beneficially), **including, without limitation, any Rights and Claims described in any proof of claim filed by or on behalf of [Tennenbaum]**" (emphasis added).[13]

34.     The Lender/Opco Agreement contains an integration clause, which provides the Lender/Opco Agreement constitutes the "entire agreement" among the parties thereto with respect to the subject matter of the Lender/Opco agreement and "supercedes all other prior negotiations, agreements and understandings" with respect to the subject matter of the Lender/Opco Agreement. See Lender/Opco Agreement at 16.

35.     The Contribution Agreement memorialized the agreement pursuant to which Tennenbaum contributed its Opco loans—but not the Guarantees—to DeepOcean. The contributed loans expressly excluded the Excluded Claims, which were defined as "all Rights and Claims held by [Tennenbaum] that are specified in Section 19(A), (B) and (C) of the Lender/Opco Agreement, **each of which shall remain property of [Tennenbaum]**." Contribution Agreement at 1 (recital defining "Contributions" and "Contributed Loans") and at 3 (definition of Excluded Claims) [emphasis added]. As noted above, the Guarantees fell within Section 19(A) of the Lender/Opco Agreement and therefore remained property of Tennenbaum. Accordingly, the Opco Restructuring did not impact Tennenbaum's rights under the Guarantees.

---

[13]     The Proofs of Claim preserved Tennenbaum's claims under the Guarantees. See discussion, infra, at ¶ 38.

36.     John Mitchell of Vinson & Elkins, wearing his dual hat as Debtors' and Opco's lawyer, negotiated the Lender/Opco Agreement and the Contribution Agreement and served as notice party for DeepOcean and Opco, *see* Contribution Agreement at Section 5.12.[14] The Debtors' Chief Restructuring Officer and General Counsel also reviewed and approved the Contribution Agreement before Opco executed that agreement.

37.     Thus, Tennenbaum's reservation of rights under the Guarantees and proofs of claim was well-known to the Debtors and their professionals and executives. If those reservations of rights were inconsistent with the 9019 Settlement and the 9019 Order, the Debtors and Opco had the absolute right to terminate their obligations under the 9019 Settlement. Pursuant to the Restructuring Support Agreement, the Debtors and Opco agreed, among other things, to "take no actions inconsistent with the Restructuring Support Agreement and the Restructuring Term Sheet." Restructuring Support Agreement at 2(f). The Debtors had the absolute right to terminate the Restructuring Support Agreement if Opco "breached any of [its] material obligations under the RSA." Restructuring Support Agreement at 6.1(a). If the exemption of the Guarantees from the Opco Restructuring and retention of the Guarantees by Tennenbaum was inconsistent with the 9019 Settlement, the Debtors could have terminated their obligations under the Restructuring Support Agreement. That the Debtors failed to do so speaks volumes about the merits of the Motion.

38.     In the Motion, the Debtors allege that Tennenbaum's notification on May 26, 2011 to the Debtors that Tennenbaum's claims under the Guarantees remained viable somehow

---

[14]     Curiously, although Mr. Mitchell is lead lawyer for the Debtors with respect to confirmation and all other matters, Mr. Mitchell does not appear on the caption or signature page for the Debtors' Motion, despite the fact that Vinson & Elkins has billed $4,324,632.00 representing the Debtors in these proceedings (excluding June and July). *See Tenth Monthly Application of Vinson & Elkins L.L.P., as Attorneys for Debtors and Debtors in Possession, for Allowance of Interim Compensation and for Interim Reimbursement of All Actual and Necessary Expenses Incurred for the Period May 1, 2011 Through May 31, 2011*, filed on June 24, 2011 [D.I. 1355].

constitutes an eleventh hour extortive grab by Tennenbaum. *See* Motion at 3. This allegation is belied by the facts, which show that Tennenbaum's Agent had filed proofs of claim for the Guarantees on February 24, 2011[15] (the "**Proofs of Claim**") and the Debtors were fully aware that Tennenbaum intended to preserve such claims. For example, on May 9, 2011, Vinson & Elkins, the Debtors' and Opco's joint lead counsel, sent a revised Lender/Opco Agreement to Tennenbaum, marked to show changes from a prior Tennenbaum draft. *See* email from Allan Reiss of Vincent & Elkins, appended to the Declaration of Robert A. Klyman as Exhibit 2 (the "**V&E Reiss Email**") and revised Lender/Opco Agreement, appended to the Declaration of Robert A. Klyman as Exhibit 3 ("**Lender/Opco Markup**"). In that markup of the Lender/Opco Agreement, <u>Vincent & Elkins inserted a provision that expressly carved out from any releases granted under the Opco Restructuring Tennenbaum's rights under the Proofs of Claim and Guarantees</u>. *See* Lender/Opco Markup at Section 19(a)(A)(1). Notably, that mark-up was also sent to John Castellano, the Chief Restructuring Officer of the Debtors and Brent Cenkus, the General Counsel of the Debtors. *See* V&E Reiss Email address list. On May 21, 2011—12 days *after* their joint counsel circulated the markup of the Lender/Opco Agreement—the Debtors filed their amended plan of liquidation and related disclosure statement [D.I. 1260 and 1259, respectively], in which they contended that Tennenbaum no longer held valid Guarantees. The picture that the Debtors wish to paint in their Disclosure Statement of an "eleventh hour" demand by Tennenbaum is simply false. Their plan and disclosure statement was filed nearly two weeks after their own counsel had negotiated terms that explicitly preserved Tennenbaum's rights under the Guarantees in the Lender/Opco Agreement, which was approved by their Chief

---

[15] *See Proofs of Claim and attachments* filed by NORDEA Bank Finland PLC, New York Branch against Trico Holdco, LLC, Trico Marine Services, Inc. and Trico Marine Cayman, LP, attached to the Declaration of Robert A. Klyman as Exhibit 1.

Restructuring Officer and General Counsel. The Debtors tactically chose to ignore that preservation of the Guarantees and as a result have intentionally drafted a plan and disclosure statement that fails to properly provide for claims that they knew Tennenbaum preserved and intended to pursue.

## III.

## ARGUMENT

**A. Tennenbaum Authorized Nordea, as Agent for the Working Capital Facility, to File Proofs of Claim on Tennenbaum's Behalf and Preserve Tennenbaum's Rights Under the Guarantees**

39.     The Debtors allege that Tennenbaum failed to preserve its rights under the Guarantees because Nordea, as administrative agent under the Working Capital Facility, filed the Proofs of Claim on Tennenbaum's behalf. Amazingly, the Debtors are contending that the party defined in the Working Capital Facility as Tennenbaum's "Administrative Agent" was not its "agent" for purposes of the proof of claim. This allegation is meritless. Federal Rule of Bankruptcy 3001(b) provides that "[a] proof of claim shall be executed by the creditor or the creditor's authorized agent." As noted by the court in *Mission Towers v. Grace*, 2007 U.S. Dist. LEXIS 89913 (D. Del. 2007), "An agency relationship exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent to so act" (quoting *Restatement* (*second*) *Agency* § 15 (1958)).

40.     Nordea's filing of the Proofs of Claim falls squarely within the foregoing authorities. First, Tennenbaum reviewed the Proofs of Claim and directed Nordea to file them on Tennenbaum's behalf. *See* Declaration of Robert Klyman at ¶ 3.

41.     Second, Nordea's authorization to file the Proofs of Claim on behalf of Tennenbaum also arises from plain terms of the Working Capital Facility. Pursuant to the terms of the Working Capital Facility, Tennenbaum expressly authorized Nordea, as administrative

21

agent, among other things:

> to take such action on [Tennenbaum's] behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto.

Working Capital Facility at 12.01(a). The powers and duties delegated to Nordea included, without limitation:

> To act as agent on Tennenbaum's "behalf with regard to (i) the security, powers, rights, titles, benefits and interests (both present and future) constituted by and conferred on [Tennenbaum] or for the benefit thereof under or pursuant to any Credit Document (including, without limitation, the benefit of all covenants, undertakings, representations, warranties and obligations given, made or undertaken to any Lender in any Credit Document)" *Id.* at 12.01(a)(i).

One of those key powers, rights and benefits conferred on Tennenbaum under the Working Capital Facility (and by express delegation to Nordea) was to exercise any "right or remedy" against the Debtors in the event the Debtors defaulted under the Guarantees. *Id.* at Section 13.08. The filing a proof of claim to preserve the rights under the Guarantees is clearly within the bounds of those "rights and remedies." Further, the Debtors agreed to pay Tennenbaum or Nordea (as Tennenbaum's agent) under the Guarantees. *See id.* at Section 13.01 (Debtors covenant and "unconditionally and irrevocably undertake to pay such indebtedness to the Administrative Agent and/or the other Guaranteed Creditors, or order, on demand") (emphasis added); and Trico Marine Guaranty at Section 2 (Trico Marine covenanted to pay "any and all of the Guaranteed Obligations to the Guaranteed Creditors" [defined as Nordea and Tennenbaum]). If Nordea as Administrative Agent could demand and receive payment under the Guarantees, Nordea cannot be held to lack the authorization to file Proofs of Claim to ensure that such payment would be made.

42. The Proofs of Claim expressly stated that Nordea was duly authorized under

Section 12.01 of the Working Capital Facility to file the Proofs of Claim. *See* Proofs of Claim at Section 1. In addition, in the event any party wanted to review Section 12.01, the Proofs of Claim referenced the Working Capital Facility and stated that the Working Capital Facility was in the possession of the Debtors and counsel for Nordea, and available upon request for review. *See* Proofs of Claim at 10.

43.    Therefore, the incontrovertible evidence demonstrates that Tennenbaum authorized Nordea to act on Tennenbaum's behalf to exercise rights and remedies against the Debtors under the Working Capital Facility, and expressly authorized Nordea (in advance of filing) to file the Proofs of Claim. Nordea's filing of the Proofs of Claim therefore cannot credibly be challenged as an unauthorized act.

44.    Moreover, the cases cited by the Debtors are inapposite to the instant facts:

- *In re North Bay Gen. Hosp., Inc.*, 404 B.R. 443 (Bankr. S.D.N.Y. 2009) (cited in the Motion at 18-19): the court found that purported agent could not file proof of claim on behalf of unsecured creditors because, among other things, the agent (a) relied on a plan of reorganization in a prior bankruptcy case to give him authority to file proofs of claim in a subsequent case, but the prior plan in fact provided no such authority and (b) the agent failed to provide any evidence that each unsecured creditor consented to him representing them in the second bankruptcy case. In contrast, the Working Capital Facility expressly authorizes Nordea to act as agent on behalf of Tennenbaum, exercise any of Tennenbaum's rights or remedies under the Guarantees and even to accept payment from the Debtors on account of the Guarantees. Tennenbaum as creditor, unlike the unsecured creditors in *North Bay Gen. Hosp.*, also expressly authorized Nordea to file the Proofs of Claim.

- *In re Ionosphere Clubs, Inc.*, 101 B.R. 844 (Bankr. S.D.N.Y. 1989) (cited in the Motion at 18): In *Ionosphere*, the movant, a consumer union, brought a motion as a proposed attorney-in-fact on behalf of in excess of 100,000 ticket holders. However, it was undisputed that the movant had received specific authorization from only six individuals out of the 100,000 individuals at issue. Because all ticketholders had not given their express authorization to the movant to act on their behalf, the court refused to allow the movant to act as the agent for the group of more than 100,000 individuals. Again, in contrast, Nordea was expressly authorized to act as Tennenbaum's agent, both in the Working Capital Facility itself and by separate direction in advance of filing the Proofs of Claim.

YCST01:11243566.1

069543.1001

Accordingly, the argument in the Motion that Nordea Bank (defined as the Agent under the Working Capital Facility) was not authorized to file proofs of claim on behalf of Tennenbaum should be rejected.

**B.    Tennenbaum Did Not Waive Any of Its Rights Under the Guarantees**

45.    Four different provisions of the 9019 Order show that Tennenbaum preserved its claim under the Guarantees. The first of these is Section 5 of the 9019 Order, which provides as follows:

> 5.    For the avoidance of doubt, upon the occurrence of the Effective Date of the Settlement, <u>the holders of the High Yield Notes</u> forever release and waive any claim of any kind they may hold against the Debtors for any guaranties provided under any of the documents evidencing the issuance of the High Yield Notes.

9019 Order at Section 5 (emphasis added). The Debtors fail to quote this provision in their Motion even though it is the only provision of the 9019 Order, the Termsheet or the Restructuring Support Agreement that directly refers to the Guarantees. No comparable provision stating that Tennenbaum released and waived the Guarantees exists in the 9019 Order, the Restructuring Support Agreement, the Termsheet or any other agreement. **The Debtors' failure to reference Section 5 of the 9019 Order in the Motion can only be described as stunning.** The Debtors drafted the 9019 Order and it presumably reflects their intention as to the effect of the Restructuring Support Agreement, the Termsheet and the 9019 Order. Section 5 does not refer to Tennenbaum because Tennenbaum was not a party to the Restructuring Support Agreement and was not subject to the releases contained therein. Accordingly, this Court should find that Tennenbaum did not release its claims under the Guarantees.

46.    Section 8 of the 9019 Order (referring to the releases) is subject to Section 11 of the 9019 Order. Three different clauses of Section 11 of the 9019 Order provide that Tennenbaum retained its claims under the Debtors' Guarantees notwithstanding Section 8. One

is Section 11(b), which the Debtors also failed to cite in their Motion. Section 11(b) of the 9019 Order provides that:

> Notwithstanding anything in this Order to the contrary . . . nothing contained herein shall: (b) modify, limit or impact in any way the rights of (i) Obsidian[16] that Obsidian holds directly and not as a derivative claim released by the Debtors. . . .

9019 Order at Section 11(b). This provision of the 9019 Order by its terms preserves Tennenbaum's direct rights against any party – including the Debtors. As admitted by the Debtors in the Motion, the Guarantees constitute claims that Tennenbaum holds directly against the Debtor. *See* Motion at Section 47, page 23. Therefore, the Guarantees must be deemed excluded from the 9019 Order and 9019 Settlement.

47. Section 11(a) of the 9019 Order also preserves Tennenbaum's Guarantee claims. This Section provides that:

> 11. Notwithstanding anything in this Order to the contrary, nothing contained herein shall:
>
> (a) modify, limit or impact in any way the respective rights of (i) Obsidian Agency Services, Inc., Tennenbaum DIP Opportunity Fund, LLC, Tennenbaum Opportunities Partners V, LP, and Special Value Continuation Partners, LP, or any of their respective affiliates (collectively, "Obsidian") and (ii) Nordea Bank Finland PLC, New York Branch ("Nordea"), each as creditors of Opco Subsidiaries, against any party or entity, including without limitation the Opco Subsidiaries, their respective non-Debtor affiliates and each of their respective assets, officers, directors, agents, employees, representatives

9019 Order at Section 11(a)

This Section preserves all claims of Tennenbaum against "any party or entity." The Motion contends that this Section is intended to be limited to preservation of claims against Opco and its non-debtor affiliates. The Debtors' interpretation conflicts with both the clear language to the

---

[16] Obsidian ("**Obsidian**") is defined in the 9019 Order to include Tennenbaum DIP Opportunity Fund, LLC, Tennenbaum Opportunity Partners V., LP, and Special Valuate Continuation Partners, or any of their respective affiliates. These entities were lenders under separate loans to both the Debtors and Opco and holders of the Guarantees with respect the loans to Opco.

YCST01:11243566.1 069543.1001

contrary ("any party or entity, including without limitation...") as well as the drafting history of the 9019 Order. An intermediate draft of the 9019 Order contained a version of this clause that was limited to preserving claims against the Opco Subsidiaries. This language was intentionally changed in the final version of the Order to make clear that there was no such limitation. Declaration of David A. Hollander at ¶¶ 8-9.

48. The third clause of Section 11 that preserves Tennenbaum's claims under the Guarantees is clause 11(c), which provides as follows:

> 11. Notwithstanding anything in this Order to the contrary, nothing contained herein shall:
> ....
> (c) modify, limit or impact in any way any rights granted to Obsidian, Nordea, Nordea Bank Norge ASA, Cayman Islands Branch or the Second Lien Note Parties under any other order of this Court relating to financing or use of cash collateral;"

9019 Order at Section 11(c)

On February 18, 2011, the day after the 9019 Order was entered, the Court also entered a *Final Order (I) Authorizing Debtors to Obtain Postpetition Secured Debtor in Possession Financing and Use Cash Collateral and (II) Providing Related Relief* order governing use of cash collateral (the "**Final Cash Collateral Order**"). The Final Cash Collateral Order preserved the rights of Tennenbaum as lender to Opco and as beneficiary of the Guarantees:

> Notwithstanding anything to the contrary in this Order, all of Obsidian's rights are reserved with respect to their respective claims and rights . . . arising under or in connection with that certain Amended and Restated Credit Agreement among Trico Supply AS, as borrower, and various guarantors and lenders, as originally dated as of October 30, 2009, and as subsequently amended from time to time, including by . . . that certain Third Amendment to Credit Agreement and Forbearance Agreement, dated as of June 29, 2010.

Final Cash Collateral Order [D.I. 936] at Section 22 (emphasis added).

The Amended and Restated Credit Agreement referred to in the Final Cash Collateral Order is the Working Capital Facility.

49.     The Debtors argue that the preservation of rights under the Final Cash Collateral Order does not extend to the rights under the Guarantees because it only preserves rights "arising under or in connection with" the Working Capital Facility which they allege does not include claims under the Guarantees.  Motion at 25.  However, the language quoted above in the Final Cash Collateral Order, which the Debtors assert does not extend to the Guarantees, is nearly identical to the language in the Revised Termsheet that the Debtors contend releases the Guarantees:

> Upon the effectiveness of the Restructuring, all claims and rights of the holders of the debt **arising under or in connection with** the Nordea Facility Direct Borrowings, Tennenbaum Facility [i.e., the Working Capital Facility], and the Senior Secured Notes (the "Secured Claims") shall be automatically waived and released…. [emphasis added]

Revised Termsheet at p. 3.

The release does not refer to the Guarantees.  It only releases claims arising "under or in connection with" the Working Capital Facility.  The Debtors can't have it both ways.  If the language in the Revised Termsheet, which releases claims "arising under or in connection with" the Working Capital Facility is broad enough to include claims under the Guarantees, then the identical language in the Final Cash Collateral Order is broad enough to preserve such claims, and under Section 11(c) of the 9019 Order, the Final Cash Collateral Order trumps the Revised Termsheet.

50.     Finally, the release contained in the Restructuring Support Agreement by its own terms provides that it does not apply to Tennenbaum's claims under the Guarantees.   Clause (ii) of the release in Section 11 of the Restructuring Support Agreement provides that "the

YCST01:11243566.1

069543.1001

foregoing releases shall not apply to any contractual obligations owed by any Released Party or any right or obligation arising under or that are part of the Restructuring or an agreement entered into pursuant to, in connection with or contemplated by the Restructuring." If and to the extent that Tennenbaum is deemed to have participated in the "Restructuring" it did so pursuant to two agreements that expressly provided that Tennenbaum's claims under the Guarantees were not released but shall instead "remain property" of Tennenbaum. This preservation constitutes a contractual right that would not be released by Tennenbaum upon the effectiveness of the Restructuring even if Tennenbaum were otherwise subject to the terms of the Restructuring Support Agreement, which it manifestly is not.

51.     The law regarding waiver is clear.[17] "Waiver is the <u>intentional</u> relinquishment of a known right." *See In re Jamesway Corp.*, 201 B.R. 73, 76-77 (Bankr. S.D.N.Y. 1996) (emphasis added). The alleged intent to waive a right or privilege must be proven by clear, unambiguous and unmistakable evidence. *Jamesway Corp.* at 76-77 (holding that "[w]aiver must be evidenced by a clear manifestation of intent and be unmistakable and unambiguous").

52.     The party asserting the defense that a waiver has occurred bears the burden of proof on the issue. *Id.*; *In re Bradlees Stores, Inc.*, 2001 U.S. Dist. LEXIS 14755, at *38-40 (Bankr. S.D.N.Y. 2001) (holding that the party alleging the waiver had to provide that upon entrance into a settlement agreement there was an explicit intention to waive the right to invoke section 365(f) of the Bankruptcy Code in a subsequent proceeding, but finding that no such explicit, unmistakable and/or unambiguous waiver existed); *see also Port Distrib. Corp. v. Pflaummer*, 880 F. Supp. 204, 211 (S.D.N.Y., aff'd 70 F.3d 8 (2d Cir. 1995) (emphasis added)

---

[17]     The Guarantees are governed by New York law. See Working Capital Facility at Section 14.08 and the Trico Marine Guaranty at Section 28.

(holding "that a waiver of the obligation to perfect the security interest must be express – the waiver must state specifically that it contemplates some release or reduction of the collateral or that the secured status of the debt is irrelevant to the guaranty. This rule is in accordance with the general principle that a waiver is the intentional relinquishment of a known right which must be evidenced by a clear manifestation of intent").

53.     The Debtors failed to meet their burden to demonstrate that Tennenbaum explicitly, unmistakably and unambiguously waived the Guarantees.[18] On the contrary, multiple provisions of the 9019 Order, the Final Cash Collateral Order, the Restructuring Support Agreement, the Lender/Opco Agreement and the Contribution Agreement all show that Tennenbaum reserved all of its direct rights against the Debtors under the Guarantees (and otherwise) by the terms of the 9019 Order. On the other hand, where the Debtors and Steering Committee determined a waiver of a guaranty should occur (e.g., the waiver of the Debtors' guarantee of the High Yield Notes in Section 5 of the 9019 Order), they knew how to make that that waiver express, unmistakable and unambiguous. Further, Tennenbaum was not a party to the 9019 Settlement and never agreed to be bound to the Term Sheet. The Debtors were fully aware of the terms of the Lender/Opco Agreement and Contribution Agreement but failed to exercise the right they had under the Restructuring Support Agreement to terminate the Agreement based on the alleged breach by Opco. It is difficult to imagine how much clearer Tennenbaum could have been that it was not releasing the Guarantees, and the Debtors knew it and nevertheless permitted Opco to consummate the Restructuring on terms that preserved the Guarantees.

---

[18]     Without citing any authority, the Debtors seek to flip the burden in the Motion by alleging that Tennenbaum should have made the failure to waive the Guarantees express. *See, e.g.,* Motion at 53. This improper burden-shifting should be disregarded by the Court in light of the applicable authorities set forth in the preceding paragraph.

**C. The Debtors Cannot Deduct From the Guarantees Any of Tennenbaum's Recovery In the Opco Restructuring**

      **1. The Debtors Waived Any Defense to Performance Under the Guarantees Other than Payment in Full and in Cash.**

54.     The Debtors erroneously assert that Tennenbaum's recoveries under the Guarantees should be reduced by the consideration Tennenbaum received under the Opco Restructuring. In so doing, the Debtors ignore the plan language of the Guarantees. The Guarantees expressly state that the Debtors must unconditionally and irrevocably guarantee the full payment of the Guaranteed Obligations. The Debtor Guarantee further provides that "[a]ny reference herein to the satisfaction or payment in full of the Guaranteed Obligations shall mean the payment in full in cash of all Guaranteed Obligations." Because Tennenbaum has not been paid in full in cash, the foregoing waiver precludes any claim by the Debtors that Tennenbaum's recoveries from Opco should reduce the amount of Guarantees.[19]

55.     The Trico Marine Guaranty provides that Trico Marine (a) unconditionally guaranteed payment of the Opco Loan to Tennenbaum and (b) waived any defenses other than payment in full and in cash:

> The Parent [Trico Marine] hereby and ***unconditionally and irrevocably*** guarantees, as primary obligor and not merely as surety, the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the Guaranteed Obligations to the Guaranteed Creditors. If any or all of the Guaranteed Obligations becomes due and payable hereunder, the Parent, ***unconditionally and irrevocably***, promises to pay such indebtedness to the Agent and/or the other Guaranteed Creditors, or order, on demand, together with any and all reasonable documented out-of-pocket expenses which may be incurred by the

---

[19]     In addition, the Debtors also expressly waived any right to reduce their respective liability under the Guarantees as a result of "any other guaranty or undertaking." *See* Trico Marine Guaranty at Section 11(b); Cayman Guaranty and the Marine Holdco Guaranty at Section 13.04 of the Working Capital Facility. Tennenbaum filed three Proofs of Claim and is entitled to a pro rata recovery on each one.

                                              

Agent and the other Guaranteed Creditors in collecting any of the Guaranteed Obligations.[20]

Section 2 (emphasis added).

-- and --

The Parent *waives any defense* based on or arising out of any defense of the Borrower, any other guarantor or any other party, *other than payment in full in cash* of the Guaranteed Obligations, based on or arising out of the disability of the Borrower, any other guarantor or any other party, or the validity, legality or unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower *other than payment in full in cash of the Guaranteed Obligations. The Guaranteed Creditors may... exercise any... right or remedy... against the Borrower, or any other party, or any security, without affecting or impairing in any way the liability of the Parent hereunder except to the extent the Guaranteed Obligations have been paid in cash.* The Parent waives any defense arising out of any such election by the Guaranteed Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Parent against the Borrower, or any other party or any security.

Section 15(c) (emphasis added).

Similar provisions exist under the Cayman Guaranty and the Marine Holdco Guaranty. *See, i.e.,* Section 13.08 of the Working Capital Facility.

56. New York courts have long recognized that an absolute and unconditional guaranty is broadly enforceable in accordance with its terms. *See, e.g., Citibank v. Plapinger*, 66 N.Y.2d 90, 92 (1985) (language, such as that contained in the Guarantees, "is sufficiently specific to constitute a valid waiver of the right to plead defenses"). It is well established that "a guarantor cannot assert defenses that he expressly waived." *Citicorp Leasing Inc., v. United American Funding, Inc.*, 2005 WL 1847300, *5 (S.D.N.Y. 2005). *See also, e.g., Gannett v. Tesler*, 577 N.Y.S.2d 248, 249 (1991) ("a defendant cannot rely on defenses that were waived by

---

[20] Tennenbaum intends to supplement the amount sought under the Proofs of Claim by the fees and costs Tennenbaum incurred in connection with collection under the Guarantees.

a guarantee"); *Sterling Nat. Bank v. Biaggi*, 47 A.D.3d 436 (1st Dep't 2008) (language, such as that contained in the Guarantee, "is sufficiently specific to constitute a valid waiver of the right to plead defenses"); *Red Tulip, LLC v. Neiva*, 44 A.D.3d 204 (1st Dep't 2007) ("Relying on *Citibank*, New York courts have consistently upheld broadly worded waiver language of this type to preclude the assertion of defenses to a guaranty"); *First New York Bank for Business v. DeMarco*, 130 Bankr. 650, 654 (S.D.N.Y. 1991) ("Absolute and unconditional guaranties such as those executed by defendants are consistently upheld by New York courts. Indeed, unconditional guaranties have been held to foreclose, as a matter of law, guarantors from asserting any defenses or counterclaims") (emphasis added). *See also, generally, Nation Wide, Inc. v. Scullin*, 256 F. Supp. 929, 932 (D.N.J. 1966)("However harsh a bargain it may seem in retrospect, the defendants' obligation was voluntarily assumed and made absolute by its terms.") The instant case falls squarely within the foregoing authorities. The Guarantees are absolute and unconditional, and expressly waive any defenses other than payment in full in cash of the obligations under the Opco Working Capital Facility. Tennenbaum has not received payment in full in cash of such obligations. As a result, the Debtors are not entitled to assert as a defense that Tennenbaum's claims under the Guarantees should be reduced by the value of the consideration received by Tennenbaum from Opco.

> **2. As a Matter of Bankruptcy Law, Tennenbaum Need Not Deduct From its Claim against the Debtors the Consideration Received Under the Opco Restructuring.**

57. Although the plain language of the Guarantees mandates the denial of the Debtors' attempt to reduce the Debtors' exposure under the Guarantees by virtue of consideration provided in the Opco Restructuring, that result is further buttressed by Supreme Court and other case law. In *Ivanhoe Building & Loan Ass'n v. Orr*, 295 U.S. 243 (1935), the Supreme Court held that a creditor need not deduct from its claim in bankruptcy an amount

32

received from a non-debtor third party in partial satisfaction of its claim. Thus, as a matter of Supreme Court law, the Debtors' obligations under the Guarantees shall not be reduced by the amount Tennenbaum received from Opco – the non-debtor third party – in partial satisfaction of Tennenbaum's claims.

58.    The Fourth Circuit in *In re National Energy & Gas Transmission, Inc.*, 492 F.3d 297 (4th Cir. 2007) ("**NEGT**"), applied *Ivanhoe* and reached a similar result. NEGT involved one debtor identified as ET Power that entered in an energy agreement with Liberty Electric Power ("**Liberty**"). Liberty acquired two guarantees to protect its interests in the energy agreement: one from NEGT, ET's corporate parent and also a debtor in a bankruptcy case, and another from GTN, a non-debtor subsidiary of NEGT. Each guarantee was capped at $140 million. Following NEGT's bankruptcy filing and rejection of the energy agreement, Liberty and NEGT entered into arbitration. Liberty was awarded $140 million plus $17 million in interest. *Id.*, 492 F.3d at 299-300. GTN paid $140 million in full and final satisfaction of its guaranty, which Liberty applied first to $17 million in interest and then to $123 million in principal owing. This application left a $17 million shortfall in principal. *See id.*

59.    Liberty filed proof of claim claims against each of ET Power and NEGT for the full $140 million owing under the energy agreement. The Debtors objected and argued, among other things, that Liberty should not be able to pursue a claim for the full amount owed, but only for the $17 million that was left unpaid. The Fourth Circuit disagreed and held, under *Ivanhoe*, that the payment on the guarantee did not reduce the total amount of debt owed by ET Power as guarantor to Liberty. *See id.*, 492 F.3d at 301.

60.    The Debtors' argument that Tennenbaum's claims must be reduced by the amount of consideration received by Tennenbaum in the Opco Restructuring cannot withstand

33

application of the foregoing authorities. It is well established under *Ivanhoe* and its progeny[21] that Tennenbaum need not reduce its claim under the Guarantees. That is the fair result: even with full allowance of the Guarantees, the distributions in these cases will leave Tennenbaum with a material shortfall in recovery under the Guarantees.

## IV.

## CONCLUSION

In light of the foregoing, Tennenbaum respectfully requests this Court to enter an order (a) denying the Motion in its entirety, (b) allowing the Guarantees in full and without reduction, (c) awarding Tennenbaum its fees and expenses (including, without limitation, attorneys' fees) incurred in connection with the Motion and (d) granting such other relief as may be just and appropriate under the circumstances.

(Remainder of page intentionally left blank.)

---

[21] *See also, e.g., In re Delta Airlines, Inc.*, 608 F.3d 139 (2d Cir. 2010) (allowing overlapping claims without credit or deduction where claimant had not otherwise been paid in full).

Dated: Wilmington, Delaware
July 7, 2011

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Donald J. Bowman, Jr.
Michael R. Nestor (No. 3526)
Donald J. Bowman, Jr. (No. 4383)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

LATHAM & WATKINS LLP
Robert A. Klyman (admitted *pro hac vice*)
355 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 891-7584
Facsimile: (213) 891-8763

ATTORNEYS FOR TENNENBAUM DIP
OPPORTUNITY FUND, LLC, TENNENBAUM
OPPORTUNITIES PARTNERS V, LP, AND SPECIAL
VALUE CONTINUATION PARTNERS, LP