# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| | § | Case No. 10-12653 |
| TRICO MARINE SERVICES, INC., et al., | § | |
| | § | |
| Debtors | § | (Jointly Administered) |
| | § | |

---

## DEBTORS' SECOND AMENDED JOINT PLAN OF LIQUIDATION
### DATED: MAY 25, 2011

---

**VINSON & ELKINS L.L.P.**
John E. Mitchell
Tonya M. Ramsey
John P. Napier
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas  75201-2975
Phone:  (214) 220-7700
Facsimile:  (214) 220-7716

Steven M. Abramowitz
Alexandra S. Kelly
666 Fifth Avenue, 26th Floor
New York, New York 10103-0040
Phone:  (212) 237-0000
Facsimile:  (212) 237-0100

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney (No. 3578)
Eric D. Schwartz (No. 3134)
Andrew R. Remming (No. 5120)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Phone:  (302) 658-9200
Facsimile:  (302) 658-3989

**ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION**



US 897757v.3

## TABLE OF CONTENTS

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME** .................................................................................1
    Section 1.01   Scope of Defined Terms; Rules of Construction and Interpretation..................................................................................1
    Section 1.02   Defined Terms ......................................................................2
    Section 1.03   Computation of Time............................................................17
    Section 1.04   Reference to Monetary Figures.............................................17
    Section 1.05   Reference to Debtors or Liquidating Debtors.......................17

**ARTICLE II UNCLASSIFIED CLAIMS** ...........................................................17
    Section 2.01   Superpriority Administrative Claims.....................................17
    Section 2.02   Administrative Claims..........................................................18
    Section 2.03   Priority Tax Claims..............................................................18
    Section 2.04   DIP Facility Claims..............................................................18
    Section 2.05   U.S. Credit Facility Claims..................................................18

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ...............................................................................................19
    Section 3.01   Introduction.........................................................................19
    Section 3.02   Voting; Presumptions...........................................................20
    Section 3.03   Classes and Treatment of Claims.........................................20
    Section 3.04   Unimpaired Classes of Claims.............................................24
    Section 3.05   Impaired Classes of Claims Entitled to Vote on the Plan.............24
    Section 3.06   Impaired Classes of Claims Receiving No Distribution Under the Plan...................................................................25
    Section 3.07   Special Provision Regarding Unimpaired Claims .................25
    Section 3.08   Cram Down ..........................................................................25

**ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN**....................25
    Section 4.01   Consolidation for Voting and Distribution Purposes.............25
    Section 4.02   Dismissal of Certain of the Chapter 11 Cases ......................26
    Section 4.03   Continuation of Corporate Existence; Dissolution of Liquidating Debtors ...........................................................26
    Section 4.04   Corporate and Other Action.................................................27
    Section 4.05   Corporate Governance .........................................................28
    Section 4.06   Restructuring Transactions ..................................................29
    Section 4.07   Plan Administrator...............................................................30
    Section 4.08   Plan Advisory Committee.....................................................33
    Section 4.09   Plan Funding .......................................................................35
    Section 4.10   Wind-down Reserve.............................................................35
    Section 4.11   Sale or Liquidation of Assets...............................................36
    Section 4.12   Credit Agreements and Existing Security Agreements .................36
    Section 4.13   Cancellation of Certain Existing Security Interests.......................37
    Section 4.14   Vesting of Assets .................................................................38

US 897757v.3

Section 4.15   Preservation of Rights of Action; Settlement ...............................38
Section 4.16   Holdco / Opco Settlement..................................................................39
Section 4.17   Employee and Retiree Benefits.........................................................39
Section 4.18   Workers' Compensation Programs .....................................................40
Section 4.19   Exclusivity Period..............................................................................40
Section 4.20   Exemption from Transfer Taxes ........................................................40

**ARTICLE V PROVISIONS GOVERNING DISTRIBUTIONS............................................40**
Section 5.01   Distributions for Claims and Interests Allowed as of
             Effective Date .....................................................................................40
Section 5.02   Interest on Claims ..............................................................................41
Section 5.03   Disbursing Agent ...............................................................................41
Section 5.04   Record Date for Distributions............................................................42
Section 5.05   Means of Cash Payment.....................................................................42
Section 5.06   Delivery of Distributions ...................................................................42
Section 5.07   Claims Paid or Payable by Third Parties ...........................................43
Section 5.08   Fractional Dollars; De Minimis Distributions ..................................44
Section 5.09   Withholding and Reporting Requirements .........................................44
Section 5.10   Expunging of Certain Claims.............................................................44

**ARTICLE VI EXECUTORY CONTRACTS, UNEXPIRED LEASES AND OTHER
AGREEMENTS .........................................................................................45**
Section 6.01   Assumption or Rejection of Executory Contracts and
             Unexpired Leases...............................................................................45
Section 6.02   Inclusiveness......................................................................................45
Section 6.03   Approval of Assumption or Rejection of Executory
             Contracts and Unexpired Leases.......................................................45
Section 6.04   Pass-Through .....................................................................................45
Section 6.05   Preexisting Obligations to the Debtors Under Executory
             Contracts and Unexpired Leases.......................................................46
Section 6.06   Intercompany Contracts, Assumed Contracts and Leases............46
Section 6.07   Contracts and Leases Entered Into After Petition Date .................46
Section 6.08   Reservation of Rights.........................................................................46
Section 6.09   Nonoccurrence of Effective Date.......................................................47
Section 6.10   Cure Provisions..................................................................................47
Section 6.11   Claims Based on Rejection of Executory Contracts and
             Unexpired Leases...............................................................................47
Section 6.12   Indemnification Rights and Insurance Coverage..........................48
Section 6.13   Insurance Policies and Agreements ...................................................48

**ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT,
AND UNLIQUIDATED CLAIMS .........................................................49**
Section 7.01   Objections to Claims..........................................................................49
Section 7.02   Estimation of Claims..........................................................................49
Section 7.03   No Distributions Pending Allowance .................................................50
Section 7.04   Distributions After Allowance............................................................50
Section 7.05   Claims Already Satisfied ...................................................................50

US 897757v.3

Section 7.06   Compliance with Tax Requirements/Allocations ...........................50

**ARTICLE VIII CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ....................................................................**51**
Section 8.01   Conditions Precedent to Confirmation..........................................51
Section 8.02   Conditions Precedent to Effective Date ........................................51
Section 8.03   Substantial Consummation ...........................................................52
Section 8.04   Waiver of Conditions.....................................................................52
Section 8.05   Revocation, Withdrawal, or Non-Consummation ........................53

**ARTICLE IX AMENDMENTS AND MODIFICATIONS** .....................................................**53**

**ARTICLE X RETENTION OF JURISDICTION**.................................................................**53**

**ARTICLE XI COMPROMISES AND SETTLEMENTS**......................................................**55**

**ARTICLE XII MISCELLANEOUS PROVISIONS** ...........................................................**57**
Section 12.01   Bar Dates for Certain Claims......................................................57
Section 12.02   Payment of Statutory Fees..........................................................58
Section 12.03   Severability of Plan Provisions....................................................59
Section 12.04   Successors and Assigns................................................................59
Section 12.05   No Discharge of the Debtors........................................................59
Section 12.06   Exculpation and Limitation of Liability ......................................59
Section 12.07   Permanent Injunction ..................................................................60
Section 12.08   Releases by the Debtors and their Estates....................................61
Section 12.09   Releases by Holders of Claims and Interests................................62
Section 12.10   Satisfaction of Claims..................................................................63
Section 12.11   Third Party Agreements; Subordination .......................................63
Section 12.12   Binding Effect..............................................................................64
Section 12.13   Plan Supplement ..........................................................................64
Section 12.14   Notices .........................................................................................64
Section 12.15   Term of Injunctions Or Stay ........................................................65
Section 12.16   Setoff and Recoupment................................................................65
Section 12.17   Hart-Scott-Rodino Compliance ...................................................66
Section 12.18   Dissolution of Committee ............................................................66
Section 12.19   No Admissions..............................................................................66
Section 12.20   Governing Law ............................................................................66

**ARTICLE XIII CONFIRMATION REQUEST** ...................................................................**67**

US 897757v.3

## INTRODUCTION

Trico Marine Services, Inc. ("TMS"), a Delaware corporation, and certain of its subsidiaries (the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (as hereinafter defined) on August 25, 2010.[1]  The Debtors hereby propose the following second amended joint plan of liquidation (the "Plan") for the resolution of outstanding claims against, and equity interests in, the Debtors.  The Debtors are the proponents of the Plan within the meaning of 11 U.S.C. § 1129. The Plan contemplates the consolidation of the Debtors for voting and distribution purposes but does not contemplate the merger or consolidation of the Debtors as legal entities.  Reference is made to the Disclosure Statement (as hereinafter defined) for a discussion of the Debtors' history, businesses, properties, and results of operations, as well as a summary and description of the Plan and certain related matters.  No materials other than the Disclosure Statement, the Plan and any exhibits and schedules attached thereto or referenced therein have been authorized by the Debtors for use in soliciting acceptances or rejections of the Plan.  Subject to the provisions of 11 U.S.C. § 1127 and Federal Rule of Bankruptcy Procedure 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to the Effective Date (as hereinafter defined).

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY.  TO THE EXTENT OF ANY DISCREPANCIES BETWEEN THE PROVISIONS OF THE DISCLOSURE STATEMENT AND THE PROVISIONS OF THIS PLAN, THE PROVISIONS OF THIS PLAN SHALL CONTROL.**

### ARTICLE I
### DEFINED TERMS, RULES OF INTERPRETATION,
### AND COMPUTATION OF TIME

**Section 1.01  Scope of Defined Terms; Rules of Construction and Interpretation**

For purposes of the Plan, except as expressly defined elsewhere in the Plan or Disclosure Statement or unless the context otherwise requires, all capitalized terms used but not defined herein shall have the meanings ascribed to them in Article I of the Plan.  Any term used but not defined herein that is defined in the Bankruptcy Code or the Bankruptcy Rules (each as hereinafter defined), as the case may be, shall have the meaning ascribed to such terms in the Bankruptcy Code or the Bankruptcy Rules.  Whenever the context requires, such terms shall include the plural as well as the singular.  The masculine gender shall include the feminine, and the feminine gender shall include the masculine.

For purposes of the Plan (i) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and

---

[1]  For purposes of the Plan, the Debtors are:  (1) Trico Marine Assets, Inc. ("TMA"), (2) Trico Marine Operators, Inc. ("TMO"), (3) Trico Marine International, Inc. ("TMI"), and (4) TMS.  Trico Holdco, LLC ("Trico Holdco") and Trico Marine Cayman, LP ("TMC") also filed for chapter 11 protection concurrently with the Debtors.  However, as described in further detail in Section 4.02 hereof, the Plan does not contemplate the liquidation of Trico Holdco or TMC under the Plan.

conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (ii) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented, (iii) unless otherwise specified, all references in the Plan to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules, and Exhibits of or to the Plan, (iv) the words "herein," "hereto" and "hereof" refer to the Plan in its entirety rather than to a particular portion of the Plan, (v) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (vi) the rules of construction set forth in Bankruptcy Code § 102 and in the Bankruptcy Rules shall apply.

**Section 1.02  Defined Terms**

(1)  "3% Unsecured Debentures" means the 3% senior convertible debentures due 2027 pursuant to the 3% Unsecured Debenture Indenture.

(2)  "3% Unsecured Debentures Claims" means the Allowed Unsecured Claims in the amount of $152,794,555.00 arising from or related to the 3% Unsecured Debentures.

(3)  "3% Unsecured Debentures Indenture Trustee Charging Lien" means the lien of the 3% Unsecured Debentures Indenture Trustee, arising under the 3% Unsecured Debentures Indenture upon, including without limitation, Distributions relating to or on account of 3% Unsecured Debentures Claims, securing the payment of, including without limitation, the fees and expenses of the 3% Unsecured Debentures Indenture Trustee, including fees and expenses of counsel and other professionals engaged by, on behalf of or for the benefit of the 3% Unsecured Debentures Indenture Trustee, whether incurred prepetition, postpetition or before or after the Effective Date.

(4)  "3% Unsecured Debentures Indenture" means that certain Indenture dated as of February 7, 2007, as the same may be amended, supplemented or otherwise modified from time to time by and between TMS and the 3% Unsecured Debentures Indenture Trustee.

(5)  "3% Unsecured Debentures Indenture Trustee" means Wells Fargo Bank, National Association in its capacity as trustee under the 3% Unsecured Debentures Indenture.

(6)  "8.125% Notes Indenture" means that certain Indenture dated as of May 14, 2009, as the same may be amended, supplemented or otherwise modified from time to time, by and between TMS and the 8.125% Notes Indenture Trustee.

(7)  "8.125% Notes Indenture Trustee Charging Lien" means the lien of the 8.125% Notes Indenture Trustee, arising under the 8.125% Notes Indenture, upon, including without limitation,  Distributions relating to or on account of 8.125% Notes Secured Claims and the 8.125% Notes Deficiency Claims, securing the payment of, including without limitation,  the fees and expenses of the 8.125% Notes Indenture Trustee, including fees and expenses of counsel and other professionals engaged by, on behalf of or for the benefit of the 8.125%

2

Notes Indenture Trustee, whether incurred prepetition, postpetition or before or after the Effective Date.

(8)  "8.125% Notes Indenture Trustee" means U.S. Bank National Association (as successor to Wells Fargo Bank, National Association) in its capacity as trustee under the 8.125% Notes Indenture.

(9)  "8.125% Notes" means the 8.125% secured convertible debentures due 2013 issued pursuant to the 8.125% Notes Indenture.

(10)  "8.125% Notes Deficiency Claims" means the Allowed Deficiency Claims of the Holders of the 8.125% Notes in the amount of $209,314,547.

(11)  "8.125% Notes Secured Claims" means the Allowed Secured Claims in the amount of $6.5 million arising from or related to the 8.125% Notes.

(12)  "Administrative Claim(s)" means a Claim for costs and expenses of administration pursuant to Bankruptcy Code §§ 503(b), 507(a)(2), 507(b), or 1114(e)(2) including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services, and payments for goods and other services) incurred from the Petition Date to the Effective Date; (b) all fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930; (c) all Substantial Contribution Claims; and (d) all fees, costs, and expenses due and owing to (i) the 3% Unsecured Debentures Indenture Trustee under the 3% Unsecured Debentures Indenture or any other applicable agreement and (ii) the 8.125% Notes Indenture Trustee under the 8.125% Notes Indenture or any other applicable agreement.

(13)  "Administrative Claims Bar Date" has the meaning set forth in Section 12.01(a) hereof.

(14)  "Affiliate" has the meaning set forth in Bankruptcy Code § 101(2).

(15)  "Allowed" means, with reference to any Claim or Interest or any portion thereof, a Claim or Interest: (a) as to which no objection to allowance or request for estimation has been interposed on or before the latter of (i) the Claims Objection Deadline or (ii) the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, (b) that is listed on the Bankruptcy Schedules as liquidated, non-contingent and undisputed, but only as to the amount listed on the Bankruptcy Schedules for such Claim, (c) as to which any objection to its allowance has been settled, waived through payment, withdrawn, or denied by a Final Order, (d) as to which liability of the Debtors and the amount thereof has been determined by a Final Order, (e) that is expressly deemed allowed in a liquidated amount in the Plan; *provided, however*, that with respect to an Administrative Claim, "Allowed Administrative Claim" means an Administrative Claim (x) as to which a timely request for payment has been made in accordance with Section 12.01 hereof (if such written request is required), (y) that is not subject to setoff, recoupment or other

3

equitable defense to payment, and (z) as to which the Debtors, the Liquidating Debtors or the Plan Administrator, as applicable, (1) have not interposed a timely objection or (2) have interposed a timely objection and such objection has been settled, waived through payment, withdrawn, or denied by a Final Order; *provided further, however*, that Claims or Interests allowed pursuant to a Final Order solely for the purpose of voting to accept or reject the Plan shall not be considered "Allowed" hereunder.

(16) "Amended Governance Documents" means any amended certificate of formation, bylaws and limited liability company agreement (or any other applicable formation and organizational documents) of the Liquidating Debtors put into effect as of the Effective Date.

(17) "Assumed Contract Schedule" means the schedule of executory contracts and unexpired leases to be assumed by the Debtors in accordance with the terms of the Plan that will be filed as part of the Plan Supplement.

(18) "Avoidance Actions" means any and all remaining actual or potential claims to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including Bankruptcy Code §§ 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) that are not otherwise released, settled or otherwise satisfied or dismissed pursuant to the Plan or other Final Order.

(19) "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date as heretofore or hereafter amended.

(20) "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court properly exercising jurisdiction over the Chapter 11 Cases.

(21) "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

(22) "Bankruptcy Schedules" means the schedules of assets and liabilities and statements of financial affairs filed by the Debtors pursuant to Bankruptcy Code § 521 and Bankruptcy Rule 1007(b), as such schedules or statements may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

(23) "Bar Date(s)" means February 24, 2011 at 4:00 p.m. (prevailing Eastern Time) with respect to Claims arising before the Petition Date, as such date may be extended by agreement in writing with the applicable Debtor or by Final Order.

(24) "Budget" shall mean the cash flow budget attached as an exhibit to the Plan Supplement.

(25) "Business Day" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York, New York.

(26) "Cash" means, at the option of the Debtors or Liquidating Debtors, as applicable, (a) the legal currency of the United States of America or equivalents thereof, including bank deposits and checks or (b) the legal currency, or equivalent thereof, including bank deposits and checks, of a particular country that the Debtors used to pay costs and expenses incurred in the operation of such Debtors' or Liquidating Debtors' business.

(27) "Causes of Action" means all remaining actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims whatsoever, in each case held by the Debtors or their Estates, whether known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date that are not otherwise released, settled, satisfied or dismissed pursuant to the Plan or other Final Order, including, without limitation, the D&O Litigation and the Avoidance Actions.

(28) "Chapter 11 Case(s)" means (a) when used in reference to a particular Debtor or group of Debtors, the chapter 11 case pending for that Debtor or particular group of Debtors, and (b) when used in reference to all of the Debtors, the above-captioned procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

(29) "Claim" means a claim, whether or not asserted or Allowed, as defined in Bankruptcy Code § 101(5).

(30) "Claimant" or "Creditor" means any Person who holds a Claim against a Debtor.

(31) "Claims Agent" or "Solicitation Agent" means Epiq Bankruptcy Solutions, LLC.

(32) "Claims Objection Deadline" means the first Business Day which is at least 180 days after the Effective Date, or such other date as may be established or extended by the Bankruptcy Court in accordance with Section 7.01 hereof.

(33) "Class" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to Bankruptcy Code § 1122(a).

(34) "Class 5 Distribution Assets" means, collectively, (a) 29.5% of the Unsecured Distribution Assets and (b) the Class 5 Pro Rata Proportion of the Residual Distribution Assets, less the Class 5 Pro Rata Proportion of the Secured and Administrative Claim Shortfall, if any.

(35) "Class 5 Pro Rata Proportion" means the sum of the equation where the numerator is the number equal to the aggregate amount of all Allowed Class 5 Claims and the denominator is the number equal to the sum of the aggregate amount of all Allowed Class 5 Claims plus the aggregate amount of all Allowed Class 6 Claims.

(36) "Class 6 Distribution Assets" means, collectively, (a) 70.5% of the Unsecured Distribution Assets and (b) the Class 6 Pro Rata Proportion of the Residual Distribution Assets, less the Class 6 Pro Rata Proportion of the Secured and Administrative Claim Shortfall, if any.

(37) "Class 6 Pro Rata Proportion" means the sum of the equation where the numerator is the number equal to the aggregate amount of all Allowed Class 6 Claims and the denominator is the number equal to the sum of the aggregate amount of all Allowed Class 5 Claims plus the aggregate amount of all Allowed Class 6 Claims.

(38) "Collateral" means any property or interest in property of the Debtors or their Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable nonbankruptcy law.

(39) "Confirmation" means entry by the Bankruptcy Court of the Confirmation Order on the docket of the Chapter 11 Cases.

(40) "Confirmation Date" means the date on which the Confirmation Order is entered on the docket in the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

(41) "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation pursuant to Bankruptcy Code § 1129, as such hearing may be continued from time to time.

(42) "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code § 1129.

(43) "Consummation" means the occurrence of the Effective Date.

(44) "Creditor" or "Claimant" means any Person who holds a Claim against a Debtor.

(45) "Creditors' Committee" means the official committee of unsecured creditors appointed on September 8, 2010 in the Chapter 11 Cases, as such committee may be constituted from time to time.

US 897757v.3

(46) "Cure Payment" means any monetary amounts that must be cured pursuant to Bankruptcy Code § 365(b) as a requirement for assumption and/or assignment of any executory contract or unexpired lease by any Debtor or Liquidating Debtor.

(47) "Debtors" means, for purposes of the Plan, (1) TMA, (2) TMO, (3) TMI, and (4) TMS.

(48) "Deficiency Claim" means the portion of an Allowed Claim secured by a Lien on property in which a Debtor or its Estate has an interest that is determined pursuant to Bankruptcy Code § 506(a) or through agreement, to exceed the value of the Claimant's Lien in such property. For the sake of clarity, if a Claimant has an otherwise valid Lien in property of a Debtor and such Lien is determined for any reason to have no value, then the entire amount of such Allowed Claim shall be a Deficiency Claim.

(49) "DIP Agent" means Obsidian Agency Services, Inc., in its capacity as administrative agent under the DIP Facility.

(50) "DIP Facility" means that certain Senior Secured, Superpriority Debtor-In-Possession Credit Agreement dated as of August 24, 2010, as the same may be amended, supplemented or otherwise modified from time to time, by and among TMS, the guarantors party thereto, the DIP Agent, the DIP Lenders, and the financial institutions or other Person from time to time parties thereto.

(51) "DIP Facility Claim" means any Claim of the DIP Agent or any DIP Lender against any of the Debtors arising under, in connection with or related to the DIP Facility or the DIP Order, including all principal, interest, fees, expenses and other amounts payable thereon.

(52) "DIP Lenders" means, collectively, the financial institutions and other Persons from time to time as a party to the DIP Facility as "Lenders" (as defined in the DIP Facility) thereunder, including any predecessors or successors and assigns.

(53) "DIP Order" means, collectively, (a) that certain *Amended Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) And 507(a), Fed. R. Bankr. P. 2002, 4001 and 9014 and Del. Bankr. L.R. 4001-2 (I) Authorizing Debtors (A) to Obtain Postpetition Secured DIP Financing (B) to Use Cash Collateral (II) Granting Liens and Providing for Superpriority Administrative Expense Status; (III) Granting Adequate Protection to Prepetition Secured Parties; (IV) Modifying Automatic Stay; and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b), and (c)* entered on September 7, 2010, as may be amended, supplemented, extended or otherwise modified either orally, or in writing, from time to time, including, the oral agreement entered on the record at the November 29, 2010 hearing, (b) that certain *Final Order (I) Authorizing Debtors to Obtain Post Petition Secured Debtor in Possession Financing and Use of Cash Collateral and (II) Providing Related Relief,* entered on February 18, 2011, and (c) that certain *Supplemental Final Order (I) Authorizing Debtors to Obtain Post Petition Secured Debtor in*

7

*Possession Financing and Use of Cash Collateral and (II) Providing Related Relief,* entered on May 13, 2011.

(54)  "Disbursing Agent" means, as applicable, (a) the Plan Administrator; or (b) such Entity selected by the Plan Administrator to make or facilitate Distributions under the Plan.

(55)  "Disclosure Statement" means the Disclosure Statement for the Debtors' Proposed Second Amended Joint Plan of Liquidation dated as of May 25, 2011, as the same may be amended, modified or supplemented from time to time, including all exhibits and schedules thereto, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

(56)  "Disputed" means, in reference to a Claim or Interest, any Claim or Interest not otherwise Allowed or paid pursuant to the Plan or an order of the Bankruptcy Court (a) which has been or hereafter is listed on the Bankruptcy Schedules as unliquidated, contingent, or disputed, and which has not been resolved by written agreement of the parties or a Final Order, (b) proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of Claim or Interest was not timely or properly filed, (c) that is disputed in accordance with the provisions of the Plan, or (d) as to which the Debtors, the Liquidating Debtors or the Plan Administrator, as applicable, have interposed a timely objection or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court, or is otherwise disputed by the Debtors, the Liquidating Debtors or the Plan Administrator, as applicable, in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order.

(57)  "Distribution" means the payment or distribution under the Plan of cash, assets, securities or instruments evidencing an obligation under the Plan or other property of any nature to any Holder of an Allowed Claim or Allowed Interest.

(58)  "Distribution Dates" means the Initial Distribution Date and any other date or dates upon which Distributions are made pursuant to the terms of the Plan to Holders of Allowed Claims; *provided, however,* that should such Allowed Claims be paid in the ordinary course of business, the Distribution Dates shall be the dates such Allowed Claim becomes payable under the terms of any contract or agreement or applicable non-bankruptcy law.

(59)  "Distribution Record Date" means the record date for purposes of making Distributions under the Plan, which shall be the Effective Date.

(60)  "D&O Contribution Claim" shall be given the meaning ascribed to such term in Section 12.08 hereof.

(61)  "D&O Litigation" means those Causes of Action, if any, brought against former officers and directors of the Debtors as contemplated in Section 4.08 hereof.

US 897757v.3

(62) "Effective Date" means the Business Day on which all conditions set forth in Section 8.02 of the Plan have been satisfied or waived as permitted hereunder and the Plan becomes effective.

(63) "EMSL" means Eastern Marine Services Limited (Hong Kong).

(64) "EMSL Proceeds" means all distributions, payments, dividends, loans, contributions, or other transfers of property made from EMSL to Trico Marine Services (Hong Kong) Limited on account of Trico Marine Services (Hong Kong) Limited's 49% interest in the EMSL joint venture and thereafter distributed to TMA.

(65) "Entity" has the meaning set forth in Bankruptcy Code § 101(15).

(66) "Equity Interests" means (a) an ownership interest in a corporation, whether or not transferable or denominated "stock" or similar security; (b) interest of a limited partner in a limited partnership; (c) interest of a general partner in a partnership; (d) interest of a joint venture partner in a joint venture; (e) interest of a member in a limited liability company; (f) any ownership interest in an entity not covered by (a) through (e) above; or (g) any warrant, option, or right, contractual or otherwise, to acquire or receive the interests in (a) through (f) above.

(67) "Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to Bankruptcy Code § 541.

(68) "Estate Representative" shall be given the meaning ascribed to such term in Section 12.08 hereof.

(69) "Excluded Administrative Claims" shall be given the meaning ascribed to such term in Section 12.01(a) hereof.

(70) "Face Amount" means (a) when used in reference to a Disputed Claim, the full stated amount claimed by the Holder of such Claim in any proof of Claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order or other applicable bankruptcy law, and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

(71) "Federal Judgment Rate" means the federal judgment rate in effect as of the Petition Date.

(72) "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; *provided, however*, that no order shall fail to be a final

order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure, Bankruptcy Rule 9024, any similar local bankruptcy rule or any similar state statute or rule may be filed with respect to such order.

(73) "General Unsecured Claim" means any prepetition Unsecured Claim against the Debtors in an amount equal to or less than five hundred thousand dollars ($500,000) that is not (a) a Priority Tax Claim, (b) an Other Priority Claim, (c) an Intercompany Claim, (d) an 8% Notes Deficiency Claim or (e) a 3% Unsecured Debentures Claim.

(74) "General Unsecured Claims Fund" means $350,000 in Cash plus the first $150,000 in proceeds from the D&O Litigation, if applicable.

(75) "Holdco / Opco Intercompany Claims" means those certain claims and Causes of Action formerly held by certain of the Debtors against certain of the Opco Entities that were released pursuant to the Holdco / Opco Settlement all as more particularly discussed in the Opco RSA, Opco Restructuring Term Sheet and Holdco / Opco Settlement Order and as described in further detail in the Disclosure Statement.

(76) "Holdco / Opco Settlement" means that certain settlement between, among others, the Debtors and the Opco Entities as more fully described in the Opco RSA, Opco Restructuring Term Sheet, and the Disclosure Statement, and as approved by the Bankruptcy Court pursuant to the Holdco / Opco Settlement Order.

(77) "Holdco / Opco Settlement Order" means that certain order approving the Holdco / Opco Settlement entered on February 17, 2011 [Docket No. 930] and that certain supplemental order further effectuating the Holdco / Opco Settlement entered on April 26, 2011 [Docket No. 1177].

(78) "Holdco / Opco Transition Services Claims" means intercompany claims held by the Debtors against the Opco Entities related to transition and corporate services rendered by the Debtors to the Opco Entities.

(79) "Holder" means the beneficial holder of any Claim or Interest.

(80) "Impaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Bankruptcy Code § 1124.

(81) "Indemnification Rights" means the indemnification rights to be provided by the Opco Entities pursuant to the Holdco / Opco Settlement.

(82) "Initial Cash Balance" means the first $1 million in Cash available for distribution to Holders of Unsecured Claims after reservation, funding, payment or satisfaction in full of all Priority Amounts, as applicable.

US 897757v.3

(83) "Initial Distribution Date" means the Effective Date or such other date chosen in the reasonable discretion of the Plan Administrator when the initial Distributions are to be made in accordance with Section 5.01 hereof.

(84) "Intercompany Administrative Claim" means any all Intercompany Claims against a Debtor by another Debtor arising after the Petition Date as a result of intercompany transactions.

(85) "Intercompany Claim" means any Claim held by a Debtor against another Debtor or any Claim held by a non-Debtor Affiliate against a Debtor.

(86) "Intercompany Interest" means any Equity Interest in a Debtor held by another Debtor.

(87) "Intercreditor Agreement" means that certain Intercreditor Agreement dated as of May 14, 2009, by and among TMS, TMA, TMO, Obsidian Agency Services, Inc. (as successor to Nordea Bank Finland plc, New York Branch), and the 8.125% Notes Indenture Trustee, as such agreement may have been amended, restated, supplemented or otherwise modified from time to time.

(88) "Interests" or "Interest" means, collectively, Equity Interests and Intercompany Interests.

(89) "Kistefos Transaction" shall be given the meaning ascribed to such term in Section 4.06(c) hereof.

(90) "Kistefos Payment" shall be given the meaning ascribed to such term in Section 4.06(c) hereof.

(91) "Lien" means a charge against or interest in property to secure payment of a debt or performance of an obligation.

(92) "Liquidating Debtors" means the Debtors on and after the Effective Date.

(93) "Maritime Liens" means a Lien or any similar interest in and to any vessel or ship owned or operated by any Debtor that arises under (a) Title 46 of the United States Code; or (b) similar applicable laws of foreign jurisdiction in which such ships or vessels are operated.

(94) "Maritime Lien Claims" means the Claims of Holders of valid Maritime Liens, as may be limited by other sections of the Plan.

(95) "New TMS Equity Interests" means the new Equity Interests in TMS to be issued pursuant to the Plan.

11

(96) "Old TMS Equity" means the Equity Interests in TMS existing on the Petition Date, including, if applicable, any preferred stock, warrants, options or rights, contractual or otherwise, to acquire or receive any such interests.

(97) "Opco Entities" means, certain of the Debtors' former operating subsidiaries to include Trico Supply AS, Trico Shipping AS, DeepOcean AS, DeepOcean Subsea Services, Hong Kong, Ltd., Trico Supply (UK) Limited, Albyn Marine Limited, Trico Subsea Cayman, Ltd., Trico Subsea AS, Trico Subsea Holding AS, DeepOcean Shipping AS, DeepOcean Shipping II AS, DeepOcean Shipping III AS, DeepOcean Brasil Servicos Ltda., DeepOcean Maritime AS, DeepOcean Subsea Services Limited (UK), DeepOcean B.V., DeepOcean UK Ltd., Deep Ocean Management AS, DeepOcean de Mexico, S. de R.L. de C.V., Servicios Profesionales de Apoyo Especializado, S. de R.L. de C.V., Servicios de Soporte Profesional Administrativo, S. de R.L. de C.V.,  Subseasantenet Haugesund AS, CTC Marine Projects Limited (UK), CTC Marine Norway AS, CTC Marine SBN BHD, and CTC Marine Projects (Guernsey) Limited.

(98) "Opco Equity and Warrants" means: (a) the 5% common equity of DeepOcean Group Holding AS before accounting for potential dilution from (i) shares issued in connection with the Management Incentive Plan (as defined in the Opco Restructuring Term Sheet) and (ii) issuance of the Equity Warrants (as defined in the Opco Restructuring Term Sheet); and (b) the Equity Warrants.

(99) "Opco Restructuring" means the financial restructuring of the Opco Entities as provided in, or contemplated by, *inter alia*, the Holdco / Opco Settlement Order, Opco RSA and the Opco Restructuring Term Sheet.

(100) "Opco Restructuring Term Sheet" means that certain Revised Term Sheet for Proposed Restructuring, filed with the Bankruptcy Court on February 17, 2011, and approved by the Bankruptcy Court on February 10, 2011, pursuant to the Holdco / Opco Settlement Order, by and between certain of the Opco Entities, certain of the Debtors, certain bondholders of Trico Shipping AS and the Creditors' Committee, a copy of which is attached to the Holdco / Opco Settlement Order.

(101) "Opco RSA" means the restructuring support agreement entered into between, among other parties, certain of the Debtors, certain of the Opco Entities and certain bondholders of Trico Shipping AS, as amended, modified or otherwise supplemented by agreement of the parties thereto or by Final Order.

(102) "Other Priority Claim" means a Claim entitled to priority under Bankruptcy Code §§ 507(a)(3), (4), (5), (6), (7) and/or (9).

(103) "Other Secured Claim" means any Secured Claim, including (a) Maritime Lien Claims; and (b) Claims secured by mechanics' and materialmen's or similar liens against property of any Debtor, but not including DIP Facility Claims, U.S. Credit Facility Claims, and the 8.125% Notes Secured Claims.

(104) "Person" has the meaning set forth in Bankruptcy Code § 101(41) and also includes an individual, partnership, limited liability company, trust, incorporated or unincorporated association, joint venture, joint stock company, government (or an agreed or political subdivision thereof) or other entity of any kind.

(105) "Petition Date" means August 25, 2010, the date on which the Debtors commenced the Chapter 11 Cases.

(106) "Plan" means this joint plan of liquidation, the Plan Supplement, and all exhibits and schedules annexed hereto or referenced herein, as may be amended, modified or supplemented from time to time. Any reference to the "Plan," in conjunction with a particular Liquidating Debtor or otherwise, shall be construed, if applicable, as a reference to the particular Plan of a particular Liquidating Debtor.

(107) "Plan Administrator" means the Person designated to administer the Plan pursuant to Section 4.07 hereof.

(108) "Plan Administrator Agreement" means the agreement between and among the Debtors and the Plan Administrator specifying, among other things, (a) the rights, duties and responsibilities of, and to be performed by, the Plan Administrator under the Plan; and (b) the compensation and other benefits to be paid or otherwise provided to the Plan Administrator, in substantially the form set forth in the Plan Supplement; *provided,* that after the Effective Date, any modifications made to the Plan Administrator Agreement shall be in form and substance acceptable to the Plan Advisory Committee.

(109) "Plan Administrator Indemnified Parties" shall have the meaning ascribed to such term in Section 4.07(e) hereof.

(110) "Plan Advisory Committee" means the committee appointed to oversee the implementation of the Plan by the Plan Administrator, as more specifically set forth in Section 4.08 hereof.

(111) "Plan Advisory Committee Indemnified Parties" shall have the meaning ascribed to such term in Section 4.08(b) hereof.

(112) "Plan Supplement" means the compilation of documents and forms of documents, schedules and exhibits to the Plan or Disclosure Statement, all of which are incorporated by reference into, and are an integral part of, the Plan to be filed with the Bankruptcy Court as provided for in Section 12.13 hereof, as it may be altered, amended, modified or supplemented from time to time.

(113) "Plan Voting Deadline" means the deadline established by the Bankruptcy Court for voting on the Plan.

US 897757v.3

(114) "Precluded Claims" shall have the meaning ascribed to such term in Section 12.06 hereof.

(115) "Present Management" shall be given the meaning ascribed to such term in Section 12.08 hereof.

(116) "Prime Rate" means the Prime Rate published on the Effective Date by *The Wall Street Journal* in the table titled "Bonds, Rates & Yields."

(117) "Priority Amounts" means the following: (a) amounts owed on account of Allowed Administrative Claims, Priority Tax Claims, 8.125% Notes Secured Claims, Other Secured Claims, Other Priority Claims, and Superpriority Administrative Claims, (b) amounts necessary to fund the General Unsecured Claims Fund, and (c) amounts necessary to fund the costs and expenses of administration of the Liquidating Debtors on and after the Effective Date, including, without limitation, the costs of pursuing any Causes of Action, monetizing any remaining assets held by the Liquidating Debtors and/or winding up the Liquidating Debtors' business affairs pursuant to the Wind-down Budget, including amounts necessary to fund the Wind-down Reserve.

(118) "Priority Tax Claim" means a Claim that is entitled to priority pursuant to Bankruptcy Code § 507(a)(8).

(119) "Pro Rata" means the proportion that the Face Amount of a Claim or Interest in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims) or all Interests (including Disputed Interests) in such Class, unless the Plan provides otherwise.

(120) "Professional" means any professional employed in the Chapter 11 Cases pursuant to Bankruptcy Code §§ 327, 328, 363 or 1103 and to be compensated for services rendered pursuant to Bankruptcy Code §§ 327, 328, 329, 330 or 331.

(121) "Professional Fee Claim" means a Claim of a Professional for compensation or reimbursement of expenses relating to services provided from the Petition Date through the Effective Date.

(122) "Protected Parties" shall have the meaning ascribed to such term in Section 12.06 hereof.

(123) "Qualified Investor Claim" means any (a) 3% Unsecured Debentures Claim or (b) prepetition Unsecured Claim against the Debtors in an amount greater than five hundred thousand dollars ($500,000).

(124) "Reinstatement" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder thereof so as to leave such Claim or Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such

Claim or Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Bankruptcy Code § 365(b)(2); (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim; *provided, however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement.

(125) "Remaining Cash Balance" means all Cash held by the Debtors or Liquidating Debtors in excess of $1 million after reservation, funding, payment or satisfaction in full of all Priority Amounts, as applicable.

(126) "Residual Distribution Assets" means the net assets held by the Debtors or Liquidating Debtors for distribution to Holders of Allowed Class 5 and Class 6 Claims, after reservation, funding, payment or satisfaction in full of all Priority Amounts, as applicable. The Residual Distribution Assets shall not include the Opco Equity and Warrants, but shall include the Remaining Cash Balance and the Kistefos Payment, if applicable.

(127) "Restructuring" means, collectively, the transactions and transfers described in Section 4.06 hereof.

(128) "Secured" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtors or their respective Estates have an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to Bankruptcy Code § 553, to the extent of the value of the creditor's interest in the Debtor's or Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code § 506(a), or (b) Allowed pursuant to the Plan as a Secured Claim.

(129) "Secured and Administrative Claim Shortfall" means any Allowed Administrative Claims and Allowed 8.125% Notes Secured Claims that must be paid in full under the Plan and are satisfied through monetization of the Opco Equity and Warrants in the event proceeds from other assets of the Liquidating Debtors are insufficient to fully satisfy such claims.

(130) "Setoff Claim" means a Claim of a Holder that has a valid right of setoff with respect to such Claim, which right is enforceable under Bankruptcy Code § 553 as determined by a Final Order or as agreed in writing by the Debtors, to the extent subject to such right of setoff.

15

(131) "Solicitation Agent" or "Claims Agent" means Epiq Bankruptcy Solutions, LLC.

(132) "Substantial Contribution Claim" means a claim for compensation or reimbursement of costs and expenses incurred in making a substantial contribution in the Chapter 11 Cases pursuant to Bankruptcy Code §§ 503(b)(3), (4), or (5).

(133) "Superpriority Administrative Claim" means the Claims, if any, arising pursuant to Bankruptcy Code § 364(c)(1) as provided in the DIP Order.

(134) "Transition Services Agreement" means that certain Transition Services Agreement dated as of May 13, 2011, by and among the Debtors and DeepOcean Group Holding AS.

(135) "Unimpaired" means a Claim or Interest that is not Impaired.

(136) "Unsecured Claim" means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or any Final Order, including any claim arising from rejection of an executory contract or unexpired lease under Bankruptcy Code § 365.

(137) "Unsecured Distribution Assets" means (a) the Initial Cash Balance and (b) the Opco Equity and Warrants less any portion of the Opco Equity and Warrants monetized (as described in Section 4.11 hereof) for reservation, funding, payment or satisfaction in full of Priority Amounts, as applicable.

(138) "U.S. Credit Facility" means the $25,000,000 term loan facility made available by the U.S. Credit Facility Lenders under the U.S. Credit Facility Credit Agreement and all documents executed in connection thereto.

(139) "U.S. Credit Facility Agent" means Obsidian Agency Services, Inc., in its capacity as administrative agent under the U.S. Credit Facility Credit Agreement.

(140) "U.S. Credit Facility Claims" means any and all Claims of the U.S. Credit Facility Agent or any U.S. Credit Facility Lender arising under the U.S. Credit Facility.

(141) "U.S. Credit Facility Credit Agreement" means that certain Second Amended and Restated Credit Agreement dated as of June 11, 2010, as the same may be amended, supplemented or otherwise modified from time to time, by and among TMS, the guarantors party thereto, the U.S. Credit Facility Agent and the U.S. Credit Facility Lenders.

(142) "U.S. Credit Facility Lenders" means Special Value Continuation Partners, LP, Tennenbaum Opportunities Partners V, LP and Tennenbaum DIP Opportunity Fund, LLC.

(143) "Wind-down Budget" means the budget attached as an exhibit to the Disclosure Statement (as may be modified from time to time) prepared by the Debtors (with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld) estimating the

16

funds necessary to implement and administer the Plan and wind down the Debtors' affairs as may be supplemented, amended or otherwise updated or modified from time to time by the Debtors, Liquidating Debtors and/or the Plan Administrator, as applicable, with the consent of the Creditors' Committee and/or Plan Advisory Committee, as applicable, which shall not be unreasonably withheld.

(144) "Wind-down Reserve" means the reserve established on the Effective Date by the Plan Administrator in accordance with the Wind-down Budget to implement and administer the Plan.

## Section 1.03   Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## Section 1.04   Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to legal currency of the United States of America, unless otherwise expressly provided.

## Section 1.05   Reference to Debtors or Liquidating Debtors

Unless specifically provided otherwise in the Plan, references to the Debtors or Liquidating Debtors shall mean the Debtors (or a Debtor) and/or Liquidating Debtors (or a Liquidating Debtor), as the context may require.

**ARTICLE II**
**UNCLASSIFIED CLAIMS**

**(Not Entitled To Vote On The Plan)**

In accordance with Bankruptcy Code § 1123(a)(l), Superpriority Administrative Claims, Administrative Claims, Priority Tax Claims, DIP Facility Claims and U.S. Credit Facility Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III hereof.  These unclassified Claims are treated as follows:

## Section 2.01   Superpriority Administrative Claims

Except as otherwise provided for in the Plan, and subject to the requirements of Section 12.01 hereof, each Holder of an Allowed Superpriority Administrative Claim shall, in full satisfaction of such Allowed Superpriority Administrative Claim: (a) to the extent such Claim is an Allowed Superpriority Administrative Claim on the Effective Date, be paid in full, in Cash, on the Distribution Date; (b) to the extent such Claim is not an Allowed Superpriority Administrative Claim on the Effective Date, be paid in full, in Cash, on the date such Claim becomes an Allowed Superpriority Administrative Claim or as soon as reasonably practicable

US 897757v.3

thereafter; or (c) receive such other treatment as to which such Holder may agree with the Debtors, Liquidating Debtors or Plan Administrator, as applicable.

## Section 2.02  Administrative Claims

Except as otherwise provided for in the Plan, and subject to the requirements of Section 12.01 of the Plan, each Holder of an Allowed Administrative Claim shall, in full satisfaction of such Allowed Administrative Claim: (a) to the extent such claim is due and owing on the Effective Date, be paid in full, in Cash, on the Distribution Date; (b) to the extent such claim is not due and owing on the Effective Date, be paid in full, in Cash, (i) in accordance with the terms of any agreement between the Debtors and such Holder, or when such claim becomes due and payable under applicable non-bankruptcy law or (ii) in the ordinary course of business; or (c) receive such other treatment as to which such Holder may agree with the Debtors, Liquidating Debtors or Plan Administrator, as applicable. Notwithstanding the foregoing, all Intercompany Administrative Claims shall be cancelled or otherwise terminated and Holders of Intercompany Administrative Claims shall receive no Distribution under the Plan.

## Section 2.03  Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction thereof (a) such treatment as to which such Holder may agree with the applicable Debtor or Liquidating Debtor, as the case may be, or (b) at the sole option of the applicable Debtor or Liquidating Debtor, as the case may be, (i) payment in full of such Allowed Priority Tax Claim on the Distribution Date or (ii) treatment in accordance with the provisions of Bankruptcy Code § 1129(a)(9)(C) or (D), as applicable.

## Section 2.04  DIP Facility Claims

All DIP Facility Claims have been paid and satisfied in full prior to the date of the Plan, and all such DIP Facility Claims against the Debtors were released by the Holders thereof.  Thus, the Liquidating Debtors shall not make any Distributions on account of DIP Facility Claims under the Plan, and (a) all commitments under the DIP Facility that have not previously terminated shall immediately terminate and (b) all Liens and security interests granted to secure such DIP Facility obligations shall be deemed terminated and of no further force and effect.

## Section 2.05  U.S. Credit Facility Claims

All U.S. Credit Facility Claims have been paid and satisfied in full prior to the date of the Plan, and all such U.S. Credit Facility Claims against the Debtors were released by the Holders thereof.  Thus, the Liquidating Debtors shall not make any Distributions on account of U.S. Credit Facility Claims under the Plan, and (a) all commitments under the U.S. Credit Facility that have not previously terminated shall immediately terminate and (b) all Liens and security interests granted to secure such U.S. Credit Facility obligations shall be deemed terminated and of no further force and effect.

# ARTICLE III
## CLASSIFICATION AND TREATMENT
## OF CLAIMS AND INTERESTS

### Section 3.01  Introduction

The categories of Claims and Interests set forth below classify Claims and Interests for all purposes, including for purposes of voting, Confirmation and Distribution pursuant to the Plan and Bankruptcy Code §§ 1122 and 1123(a)(l).  A Claim or Interest shall be deemed classified in a particular Class only to the extent that it qualifies within the description of such Class, and shall be deemed classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  Notwithstanding anything to the contrary in the Plan, a Claim or Interest shall be deemed classified in a Class only to the extent that such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

All Claims and Interests (except for Administrative Claims, Intercompany Administrative Claims, Superpriority Administrative Claims, DIP Facility Claims, U.S. Credit Facility Claims and Priority Tax Claims, which are not classified pursuant to Bankruptcy Code § 1123(a)(l)) are classified in Section 3.03 hereof.  The following table summarizes the Classes of Claims and Interests and specifies which Classes are Impaired and entitled to vote to accept or reject the Plan:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1 – 8.125% Notes Secured Claims | Impaired | Entitled to Vote |
| Class 2 – Other Secured Claims | Unimpaired | Not Entitled to Vote |
| Class 3 – Other Priority Claims | Unimpaired | Not Entitled to Vote |
| Class 4 – General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 – Qualified Investor Claims | Impaired | Entitled to Vote |
| Class 6 – 8.125% Notes Deficiency Claims | Impaired | Entitled to Vote |
| Class 7 – Intercompany Claims | Impaired | Not Entitled to Vote |
| Class 8 – Intercompany Interests | Unimpaired | Not Entitled to Vote |
| Class 9 – Old TMS Equity | If Kistefos Transaction is consummated, Unimpaired.  If Kistefos Transaction is not | Not Entitled to  Vote |

| Class | | Status | Voting Rights |
|---|---|---|---|
| | | consummated, Impaired. | |

### Section 3.02  Voting; Presumptions

     *(a)  Acceptance by Impaired Classes*

     Each Impaired Class of Claims that will (or may) receive or retain property or any interest in property under the Plan shall be entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the Holders (other than any Holder designated under Bankruptcy Code § 1126(e)) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders (other than any Holder designated under Bankruptcy Code § 1126(e)) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

     *(b)  Voting Presumptions*

     Claims and Interests in Unimpaired Classes are conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code § 1126(f) and, therefore, are not entitled to vote to accept or reject the Plan.  Claims and Interests in Classes that do not entitle the Holders thereof to receive or retain any property under the Plan are conclusively deemed to have rejected the Plan pursuant to Bankruptcy Code § 1126(g) and, therefore, are not entitled to vote to accept or reject the Plan.

### Section 3.03  Classes and Treatment of Claims

     *(a)*  Class 1: 8.125% Notes Secured Claims

     *1)*  Classification: Class 1 consists of 8.125% Notes Secured Claims.

     *2)*  Treatment: Except to the extent that a Holder of an Allowed 8.125% Notes Secured Claim agrees to less favorable treatment or as otherwise provided in the Plan, and to the extent not previously paid, Allowed 8.125% Notes Secured Claims shall be paid in full in Cash on the Effective Date or as soon thereafter as Cash sufficient to satisfy the 8.125% Notes Secured Claims is received by the Liquidating Debtors and is available for such use in accordance with the terms of this Plan.  The Opco Equity and Warrants shall not be monetized to satisfy the 8.125% Notes Secured Claims unless such claim has not been satisfied in full within one year of the Effective Date, at which time the Plan Advisory Committee representative appointed by the 8.125% Notes Indenture Trustee may direct the Plan Administrator to monetize the Opco Equity and Warrants to satisfy the remaining amount of the 8.125% Notes Secured Claims at that time then owing in accordance with the procedures set forth in Section 4.11 hereof.

In accordance with Section 5.03 hereof, all Distributions relating to or on account of the 8.125% Notes Secured Claims shall be made to the 8.125% Notes Indenture Trustee subject to the terms of the 8.125% Notes Indenture, including the 8.125% Notes Indenture Trustee Charging Lien.

        *3)*    <u>Impairment and Voting</u>: Class 1 is Impaired and Holders of Claims in Class 1 are entitled to vote to accept or reject the Plan.

        *(b)*   Class 2: Other Secured Claims

        *1)*    <u>Classification</u>:   Class 2 consists of Other Secured Claims, including without limitation, Maritime Lien Claims.

        *2)*    <u>Treatment</u>:  Except as otherwise provided in the Plan, and to the extent not previously paid, on, or as soon as reasonably practicable after, the latest of (a) the Distribution Date, (b) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim or (c) the date on which such Other Secured Claim becomes due and payable pursuant to any agreement between a Debtor and the Holder of an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive in full satisfaction of and in exchange for such Allowed Other Secured Claim: (i) at the sole discretion of the applicable Debtor, subject only to notice to and without objection from the Creditors' Committee, the 3% Unsecured Debentures Indenture Trustee and the 8.125% Notes Indenture Trustee prior to the Effective Date, and the Plan Advisory Committee after the Effective Date, (A) Cash equal to the unpaid portion of such Allowed Other Secured Claim including any interest on such Allowed Other Secured Claim required to be paid under Bankruptcy Code § 506(b), (B) Reinstatement of the legal, equitable and contractual rights of the Holder of such Allowed Other Secured Claim, subject to the provisions of the Plan, (C) the property serving as Collateral for its Claim, or (D) such other treatment that will otherwise render such Allowed Other Secured Claim Unimpaired in accordance with Bankruptcy Code § 1124, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default, or (ii) such other treatment as the Debtors, Liquidating Debtors or Plan Administrator, as applicable, and such Holder shall have agreed in writing.  The applicable Debtors' failure to object to any Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the rights of the Debtors, Liquidating Debtors or Plan Administrator, as applicable, to contest or otherwise defend against such Claim in any appropriate forum when and if such Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan or elsewhere shall preclude the applicable Debtors, Liquidating Debtors or Plan Administrator, as applicable, from challenging the validity or priority of any alleged encumbrance on any asset.  An Other Secured Claim will qualify as an Allowed Other Secured Claim only if the Liens securing such Claim have priority on the Petition Date over the Liens and security interests of the U.S. Credit Facility Claims, and/or the 8.125% Notes Secured Claims, or otherwise are validly perfected against assets of the Debtors to which the Holders of U.S. Credit Facility Claims and/or the

8.125% Notes Secured Claims do not have Liens and security interests. For purposes of the Plan, each Other Secured Claim will be deemed a separate subclass.

> *3)*     <u>Impairment and Voting</u>: Class 2 is Unimpaired. Holders of Class 2 Claims are presumed to have accepted the Plan, and accordingly, are not entitled to vote to accept or reject the Plan.

> > *(c)*     Class 3: Other Priority Claims

> > > *1)*     <u>Classification</u>: Class 3 consists of Other Priority Claims.

> > > *2)*     <u>Treatment</u>: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment or as provided otherwise in the Plan, and to the extent not previously paid, Holders of Allowed Other Priority Claims shall receive, in full satisfaction of such Claim, either (a) to the extent such Claim is due and owing on the Effective Date, payment in full, in Cash, on the Distribution Date, (b) to the extent such Claim is not due and owing on the Effective Date, payment in full, in Cash, in accordance with the terms of any agreement between such Claimant and any applicable Debtor or Liquidating Debtor, or when such Claim otherwise becomes due and owing under (i) applicable non-bankruptcy law, or (ii) in the ordinary course of business, or (c) such other treatment as may be agreed to by such Holder and the Debtors or Liquidating Debtors.

> > > *3)*     <u>Impairment and Voting</u>: Class 3 is Unimpaired. Holders of Class 3 Claims are presumed to have accepted the Plan, and accordingly, are not entitled to vote to accept or reject the Plan.

> > *(d)*     Class 4: General Unsecured Claims

> > > *1)*     <u>Classification</u>: Class 4 consists of all General Unsecured Claims against the Debtors.

> > > *2)*     <u>Treatment</u>: Each Holder of an Allowed General Unsecured Claims shall receive, in full satisfaction of such Claim, its Pro Rata share of the General Unsecured Claims Fund, in Cash, on the Distribution Date.

> > > *3)*     <u>Impairment and Voting</u>: Class 4 Claims are Impaired and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

> > *(e)*     Class 5: Qualified Investor Claims

> > > *1)*     <u>Classification</u>: Class 5 consists of all Qualified Investor Claims against the Debtors.

US 897757v.3

*2)*    <u>Treatment</u>:  Each Holder of an Allowed Qualified Investor Claim shall receive, in full satisfaction of such Claim, its Pro Rata share of the Class 5 Distribution Assets.

In accordance with Section 5.03 hereof, all Distributions relating to or on account of the 3% Unsecured Debentures shall be made by the Plan Administrator or Disbursing Agent, as applicable, subject to the 3% Unsecured Debentures Indenture Trustee Charging Lien, if any.  The Plan Administrator or Disbursing Agent, as applicable, shall make no further Distributions relating to or on account of the 3% Unsecured Debentures to any Person or Entity other than the 3% Unsecured Debentures Indenture Trustee without the prior written approval of the 3% Unsecured Debentures Indenture Trustee.  Upon request of the 3% Unsecured Debentures Indenture Trustee, the Plan Administrator or Disbursing Agent, as applicable, shall sell such portion of the Distributions or any other property it holds as may be necessary and remit proceeds thereof to the 3% Unsecured Debentures Indenture Trustee in amount sufficient to satisfy the 3% Unsecured Debentures Indenture Trustee Charging Lien.

*3)*    <u>Impairment and Voting</u>:  Class 5 Claims are Impaired and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

*(f)*    Class 6:  8.125% Notes Deficiency Claims

*1)*    <u>Classification</u>:  Class 6 consists of all 8.125% Notes Deficiency Claims against the Debtors.

*2)*    <u>Treatment</u>:  Each Holder of an 8.125% Notes Deficiency Claim shall receive, in full satisfaction of such Claim, its Pro Rata share of the Class 6 Distribution Assets.

In accordance with Section 5.03 hereof, all Distributions relating to or on account of the 8.125% Notes Deficiency Claims shall be made to the 8.125% Notes Indenture Trustee subject to the terms of the 8.125% Notes Indenture, including the 8.125% Notes Indenture Trustee Charging Lien.

*3)*    <u>Impairment and Voting</u>:  Class 6 Claims are Impaired and Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

*(g)*    Class 7:  Intercompany Claims

*1)*    <u>Classification</u>:  Class 7 consists of all Allowed Intercompany Claims.

*2)*    <u>Treatment</u>:  All Intercompany Claims shall be cancelled or otherwise terminated and Holders of Intercompany Claims shall receive no Distribution under the Plan.

> *3)*    <u>Impairment and Voting</u>:  Class 7 is Impaired.  Holders of Class 7 Claims are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

> *(h)*   Class 8:  Intercompany Interests

>> *1)*    <u>Classification</u>:  Class 8 consists of Intercompany Interests.

>> *2)*    <u>Treatment</u>:  Allowed Intercompany Interests will remain in full force and effect and shall be retained by the respective Holders of such Interests, provided, however, that Holders of Allowed Intercompany Interests shall receive no Distribution under the Plan.

>> *3)*    <u>Impairment and Voting</u>:  Class 8 is Unimpaired.  Holders of Class 8 Interests are presumed to have accepted the Plan, and accordingly, are not entitled to vote to accept or reject the Plan.

> *(i)*   Class 9:  Old TMS Equity

>> *1)*    <u>Classification</u>:  Class 9 consists of Old TMS Equity.

>> *2)*    <u>Treatment</u>:   If the Debtors elect to consummate the Kistefos Transaction and it is thereafter consummated, Old TMS Equity will not be cancelled, but shall remain in full force and effect and shall be retained by the respective Holders of such Interests, provided, however, that Holders of such Interests shall receive no Distribution under the Plan.  If the Debtors do not elect to consummate the Kistefos Transaction or cannot consummate the Kistefos Transaction for any reason, Old TMS Equity will be cancelled or otherwise terminated and Holders of Old TMS Equity will receive no Distribution under the Plan.

>> *3)*    <u>Impairment and Voting</u>:  In the event that the Kistefos Transaction is consummated, Class 9 is Unimpaired and Holders of Class 9 Old TMS Equity are presumed to have accepted the Plan.  In the event that the Kistefos Transaction is not consummated, Class 9 is Impaired and Holders of Class 9 Old TMS Equity are deemed to have rejected the Plan.   Thus, Holders of Class 9 Old TMS Equity will be not entitled to vote to accept or reject the Plan.

## Section 3.04   Unimpaired Classes of Claims

Classes 2, 3, 8 and 9 (if the Kistefos Transaction is consummated) are Unimpaired and such Classes are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

## Section 3.05   Impaired Classes of Claims Entitled to Vote on the Plan

Classes 1, 4, 5 and 6 are Impaired and are entitled to vote to accept or reject the Plan.

US 897757v.3

### Section 3.06    Impaired Classes of Claims Receiving No Distribution Under the Plan

Classes 7 and 9 (if the Kistefos Transaction is not consummated) are (i) Impaired, (ii) receiving no Distributions under the Plan, (iii) deemed to reject the Plan, and (iv) not entitled to vote to accept or reject the Plan.

### Section 3.07    Special Provision Regarding Unimpaired Claims

Except as otherwise provided in the Plan, nothing shall affect the Debtors' or Liquidating Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to Setoff Claims or recoupments against Unimpaired Claims.

### Section 3.08    Cram Down

If any Class of Claims or Interests entitled to vote on the Plan shall not vote to accept the Plan, the Debtors shall (i) seek confirmation of the Plan under Bankruptcy Code § 1129(b) or (ii) amend or modify the Plan in accordance with Article IX of the Plan.  With respect to any Class of Claims or Interests that is deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm or "cram down" the Plan pursuant to Bankruptcy Code § 1129(b).

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

### Section 4.01    Consolidation for Voting and Distribution Purposes

The Plan contemplates and is predicated upon the consolidation of the Debtors' Estates, other than Trico Holdco and TMC, only for purposes of voting on the Plan and making Distributions to Holders of Claims under the Plan.  On the Effective Date, and other than with respect to Trico Holdco and TMC, (i) all assets and liabilities of the Debtors will, for voting and Distribution purposes only, be merged or treated as if they were merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (iii) all Intercompany Claims by, between, and among the Debtors will be eliminated and (iv) any obligation of the Debtors and all guaranties thereof by one or more of the other Debtors, will be deemed to be one obligation of all of the Debtors.  Except as set forth in this Article, such consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Debtors or Liquidating Debtors.  The consolidation called for herein shall not affect the obligation of each and every Debtor or Liquidating Debtor, as applicable, to pay quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 until the earlier of the time such Debtor's or Liquidating Debtor's Chapter 11 Case is closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

US 897757v.3

**Section 4.02   Dismissal of Certain of the Chapter 11 Cases**

Immediately after the Effective Date, the Chapter 11 Cases of Trico Holdco and TMC shall be deemed dismissed for all purposes pursuant to Bankruptcy Code § 1112.

**Section 4.03   Continuation of Corporate Existence; Dissolution of Liquidating Debtors**

*(a)   Continued Existence*

The Debtors shall continue to exist as the Liquidating Debtors after the Effective Date in accordance with the laws of their respective states or applicable jurisdiction of incorporation, formation, or organization and pursuant to their respective certificates of incorporation, by-laws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws are amended under the Plan, or as deemed necessary or appropriate by the Liquidating Debtors to effect the Plan, for the limited purposes of liquidating all of the assets of the Estates and making Distributions in accordance with the Plan.

*(b)   Transition Services Agreement*

Pursuant to the Holdco / Opco Settlement, TMS and/or certain of the Debtors and certain of the Opco Entities have entered into the Transition Services Agreement whereby certain Opco Entities will engage the Debtors and Liquidating Debtors to provide certain corporate and support services as outlined in the Transition Services Agreement which was filed as an exhibit to the Disclosure Statement.

*(c)   Dissolution of the Liquidating Debtors*

Within the time determined by the Plan Administrator as necessary or appropriate under the circumstances, each Liquidating Debtor shall be dissolved without any further action by its former stockholders, officers, members, or directors.  The Plan Administrator may, in his or her discretion, file all necessary certificates of dissolution and take any other actions necessary or appropriate to effect such dissolution under applicable non-bankruptcy law.  All applicable regulatory or governmental agencies shall accept any certificates of dissolution or other papers filed by the Plan Administrator on behalf of each Liquidating Debtor and shall take all steps necessary to allow and effect the prompt dissolution as provided herein, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates, except as the Plan Administrator may determine in his or her sole discretion.  Upon entry of a final decree in each Chapter 11 Case, if not previously dissolved, the applicable Liquidating Debtor shall be deemed automatically dissolved and wound up without any further action or formality which might otherwise be required under applicable non-bankruptcy laws.

*(d)   Transactions Regarding Non-Debtor Subsidiaries*

US 897757v.3

On the Effective Date, or as soon as reasonably practicable thereafter, the Plan Administrator may enter into transactions deemed necessary or appropriate to effect the sale, liquidation, dissolution, winding-up or other disposition of the Liquidating Debtors' non-Debtor subsidiaries other than the Opco Entities (or their assets), and may take any and all actions that may be necessary or appropriate to effect such transactions including (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable non-bankruptcy law and any other terms to which the Plan Administrator, on behalf of the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable non-bankruptcy law; (4) filing of bankruptcy and insolvency proceedings in accordance with the provisions of applicable law; and (5) all other actions that the Plan Administrator, on behalf of the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. All such actions are hereby authorized without any further action by any former or current shareholders, members, officers, directors, owners or other Persons. The provisions of this Section are in addition to and not a limitation of other Sections of the Plan.

## Section 4.04  Corporate and Other Action

### (a)  Amended Governance Documents

On the Effective Date, or as soon as reasonably practicable thereafter, each of the Liquidating Debtors is hereby authorized to file applicable Amended Governance Documents in their applicable jurisdiction of formation or incorporation that such Liquidating Debtor deems necessary or appropriate to carry out the provisions of the Plan, including the Kistefos Transaction if such transaction shall be consummated. To the extent so required, the Amended Governance Documents (i) shall prohibit the issuance of nonvoting equity securities, and (ii) after the Effective Date, shall be subject to further amendment as provided in such Amended Governance Documents, or as otherwise permitted by applicable law.

### (b)  Other General Corporate Matters

Entry of the Confirmation Order shall establish conclusive corporate and other authority (and evidence of such corporate and other authority) required for each of the Debtors to undertake any and all acts and actions required to implement or contemplated by the Plan (including, without limitation, the execution and delivery of any documentation necessary to effect a sale of any assets), and such acts and actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without the need for board or shareholder or membership vote and without any requirement of further action

by any members, stockholders, managers, officers, or boards of directors or managers of the Debtors.

### Section 4.05   Corporate Governance

(a)   *Managers and Officers*

Certain employees of the Debtors may remain employed by the Liquidating Debtors, either pursuant to the terms of the Transition Services Agreement or otherwise at the discretion of the Liquidating Debtors, on and after the Effective Date to assist the Liquidating Debtors with the wind down and administration of the Estates and businesses of the Liquidating Debtors. However, none of such employees shall constitute managers or officers with the authority attendant to such titles under the Debtors' governance documents or other applicable law on and after the Effective Date.  For the avoidance of doubt, any employment agreements governing the employment of such parties with the Debtors shall be deemed rejected as of the Effective Date in accordance with Section 6.01 hereof.  An initial list of the employees to remain with the Liquidating Debtors on and after the Effective Date will be filed as an exhibit in the Plan Supplement.

(b)   *Boards*

The members of any board of directors or board of managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing authority with respect to the Liquidating Debtors on or after the Effective Date and each such member will be deemed to have resigned on the Effective Date.

(c)   *Plan Administrator as Sole Manager, Officer and Director*

The Plan Administrator shall be, as applicable, the sole manager, officer and sole member of any board of directors and/or board of managers of each of the Liquidating Debtors from and following the Effective Date without the need for board or shareholder or membership vote and without any requirement of further action by any members, stockholders, managers, officers, or boards of directors or managers of the Debtors and shall have all rights of a manager, officer and director of the Liquidating Debtors under applicable non-bankruptcy law, including, without limitation, the right and authority to appoint other officers or board members as deemed necessary or appropriate to assist in carrying out the provisions of the Plan, and all rights conferred under the Confirmation Order and the Plan.  The Plan Administrator is authorized to execute and/or deliver on behalf of the Debtors and the Liquidating Debtors, as the case may be, the agreements, document and instruments necessary or appropriate to effect the Plan or as otherwise contemplated by the Plan, the Plan Supplement, and any schedules, exhibits or other documents attached thereto or contemplated thereby, in the name and on behalf of the Debtors and the Liquidating Debtors.  The Plan Administrator may employ one or more Persons to assist it with performing its duties under the Plan.

US 897757v.3

**Section 4.06   Restructuring Transactions**

(a)   *Issuance of New TMS Equity Interests*

Unless the Debtors elect to consummate the Kistefos Transaction and it is thereafter consummated, on the Effective Date, Liquidating Debtor TMS shall issue one share of stock comprising 100% of the New TMS Equity Interest to the Plan Administrator who thereafter shall be the sole shareholder of Liquidating Debtor TMS with the authority to act on behalf of the Liquidating Debtors to the fullest extent provided under applicable non-bankruptcy law and the Plan.   If the Kistefos Transaction is consummated, Liquidating Debtor TMS shall issue a sufficient number of New TMS Equity Interests to the Plan Administrator to dilute the current equity interest of Kistefos in TMS to less than 10%.   On the Effective Date, the issuance by Liquidating Debtor TMS of the New TMS Equity Interest(s) is hereby authorized without the need for any further corporate action under applicable law, regulation order or rule and without any further action by Holders of Claims or Interests.   Such securities shall be distributed in accordance with the Plan.   The New TMS Equity Interest(s) shall not be registered under applicable securities laws and neither the Debtors nor the Liquidating Debtors shall have any obligation to register the New TMS Equity Interest(s).   The New TMS Equity Interest(s) issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable.   In the event the Kistefos Transaction is consummated, the Liquidating Debtors shall be authorized to take, and shall take, any and all actions necessary such that TMS shall not have reporting or similar obligations under the Securities Act on and after the Effective Date.

(b)   *Securities Exemption*

The Confirmation Order shall provide that, pursuant to Bankruptcy Code § 1145, the issuance of the New TMS Equity Interest(s) shall be exempt from the registration requirements of the Securities Act, as amended, and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of securities; *provided, however,* that if the issuance of the New TMS Equity Interest(s) do not qualify for an exemption under Bankruptcy Code § 1145, the New TMS Equity Interest(s) will be issued in reliance upon another available exemption from the registration requirements of the Securities Act.   All securities issued pursuant to the Plan will be deemed issued as of the Effective Date regardless of the date actually distributed.

(c)   *Kistefos Transaction*

The Kistefos Transaction is a transaction whereby Kistefos AS (or its nominee to be determined), the Holder of approximately 18% of the Old TMS Equity, has agreed to pay a fee, the amount of which is to be determined (the "Kistefos Payment") to the Debtors in exchange for the Debtors' agreement to keep the Old TMS Equity outstanding under the Plan for a period of at least two years from the Effective Date.   In addition, if necessary in order to reduce the number of record stockholders of the Liquidating Debtors so as to effect a deregistration of the Old TMS Equity under the Securities Act, the Liquidating Debtors may effect a reverse stock split so that each share of Old TMS Equity issued and outstanding prior to the split will be equal to some percentage of a share (with such percentage to be determined) following the split. Following the

29

reverse stock split all fractional shares of Old TMS Equity will be cancelled. Other than retention of the Old TMS Equity, Holders of Old TMS Equity will not be entitled to any Distributions under the Plan. The Debtors may elect to consummate the Kistefos Transaction if the necessary approvals and other requirements for the transaction can be satisfied.

If any written agreement is reached regarding the Kistefos Transaction, a copy of such agreement will be filed as an exhibit to the Plan Supplement.

### Section 4.07   Plan Administrator

#### (a)   Appointment; Authority

Not less than ten days prior to the commencement of the Confirmation Hearing and subject to Bankruptcy Court approval in connection with the Confirmation, the Debtors shall designate a person acceptable to the Creditors' Committee, the 3% Unsecured Debentures Indenture Trustee and 8.125% Notes Indenture Trustee who initially will serve as the Plan Administrator; *provided, however,* that in the event the party designated to be the Plan Administrator is not acceptable to the Creditors' Committee, the 3% Unsecured Debentures Indenture Trustee or the 8.125% Notes Indenture Trustee, the Bankruptcy Court shall have the authority to approve the appointment of such person despite such non-acceptance. Except as otherwise provided in the Plan, on the Effective Date, subject to the rights of the Plan Advisory Committee as set forth in Section 4.08 hereof, the Plan Administrator shall be vested with authority to exercise all rights of the Liquidating Debtors under applicable non-bankruptcy law and under the Plan.

#### (b)   Plan Administrator Agreement

Prior to or on the Effective Date, the Debtors shall execute the Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Plan Administrator Agreement made by the Debtors prior to the Effective Date are hereby ratified. The Plan Administrative Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement necessary to implement the provisions of the Plan.

#### (c)   Qualifications

The Plan Administrator shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under the Plan.

#### (d)   Compensation

The Plan Administrator shall be compensated from the Wind-down Reserve pursuant to the terms of the Plan Administrator Agreement. Any professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Wind-down Reserve. The payment of the fees and

US 897757v.3

expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to approval of the Bankruptcy Court; *provided, however*, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

(e)    *Liability and Indemnification*

The Plan Administrator shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct. The Liquidating Debtors shall indemnify and hold harmless (i) the Plan Administrator (in its capacity as such and as officer, director, or manager, as applicable, of the Liquidating Debtors and/or of the Liquidating Debtors' non-Debtor affiliates), (ii) such individuals that may serve as officers and directors and employees of the Liquidating Debtors, if any, and (iii) the professionals retained by the Plan Administrator (collectively, the "Plan Administrator Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Plan Administrator Indemnified Party's willful misconduct or gross negligence, with respect to the Liquidating Debtors and/or the Liquidating Debtors' non-Debtor Affiliates or the implementation or administration of the Plan or Plan Administrator Agreement. To the extent a Plan Administrator Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to such Plan Administrator Indemnified Party in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Plan Administrator Indemnified Party (and such Plan Administrator Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Plan Administrator Indemnified Party is not entitled to be indemnified therefore) out of the Wind-down Reserve or any insurance purchased using the Wind-down Reserve. The indemnification provisions of this Section shall remain available to and be binding upon the Plan Administrator or the estate and shall survive any termination of the Plan Administrator Agreement.

(f)    *Resignation, Death or Removal*

The Plan Administrator may be removed by the Bankruptcy Court upon application for good cause shown. In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Plan Administrator, the Plan Advisory Committee shall designate another person to become Plan Administrator and thereupon the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor. To the extent the Plan Advisory Committee cannot agree on a successor Plan Administrator, any party in interest may request the Bankruptcy Court to appoint a successor Plan Administrator.

(g)   *Wind-down of the Debtors' Estates*

Subject to the rights of the Plan Advisory Committee as set forth in Section 4.08 hereof, the Plan Administrator shall oversee the liquidation of the Liquidating Debtors and the winding up of their respective businesses and shall make Distributions to, and otherwise hold all property of the Liquidating Debtors for the benefit of, Holders of Allowed Claims consistent and in accordance with the Plan and the Confirmation Order.  Neither the Liquidating Debtors nor the Plan Administrator shall be required to post a bond in favor of the United States.

(h)   *Duties of the Plan Administrator*

Except as otherwise provided in the Plan or the Plan Administrator Agreement, the Plan Administrator, subject to the rights of the Plan Advisory Committee as set forth in Section 4.08 hereof, shall have the power and authority to perform the following acts on behalf of the Liquidating Debtors, in addition to any powers granted by applicable non-bankruptcy law or conferred by any other provision of the Plan, the Plan Administrator Agreement or orders of the Bankruptcy Court: (i) take all steps and execute all instruments and documents necessary to make Distributions to Holders of Allowed Claims; (ii) object to Claims, Administrative Expenses or Interests as provided in the Plan and prosecute such objections; (iii) resolve, compromise and/or settle any objections to the amount, validity, priority, treatment, allowance or priority of Claims, including Administrative Claims, or Interests; (iv) comply with the Plan and the obligations hereunder; (v) if necessary, employ, retain or replace professionals to represent it with respect to its responsibilities; (vi) establish, replenish or release reserves as provided in the Plan, as applicable; (vii) take all actions necessary or appropriate to enforce the Debtors' or Liquidating Debtors' rights under any order authorizing a sale of assets, and any related document and to fulfill, comply with or otherwise satisfy the Debtors' or Liquidating Debtors' covenants, agreement and obligations under any such sale and any related document; (viii) make all determinations on behalf of the Debtors or Liquidating Debtors under any sale; (ix) prepare and file applicable tax returns for any of the Debtors or Liquidating Debtors; (x) liquidate or administer through sale, prosecution, compromise or release any of the assets; (xi) deposit funds of the Liquidating Debtors, draw checks and make disbursements consistent with the terms of the Plan; (xii) purchase or continue insurance protecting the Debtors, the Liquidating Debtors, the Plan Administrator, their respective representatives, agents, employees or independent contractors, and the property of the Liquidating Debtors; (xiii) seek entry of a final decree in any of the Chapter 11 Cases at the appropriate time; (xiv) prosecute, resolve, compromise and/or settle any litigation, except the D&O Litigation; (xv) seek tax liability pursuant to Bankruptcy Code § 505; (xvi) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization (as such term is described in the Internal Revenue Code § 501(c)(3) (whose contributions are deductible under Internal Revenue Code § 170)) of the Plan Administrator's choice, any assets that are of no material benefit, including distributable Cash hereunder; (xvii) take all actions necessary or appropriate to pursue, defend, compromise, settle or otherwise resolve any and all Causes of Action, except Avoidance Actions and the D&O Litigation; and (xviii) take such other action as the Plan Administrator may determine to be, necessary, desirable or appropriate to carry out the purpose of the Plan.   The Plan Administrator